IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT G. WINGO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:08:CV-00368 |
| | ) | |
| THYSSENKRUPP MATERIALS NA, INC., | ) | Honorable Samuel Der-Yeghiayan |
| d/b/a COPPER and BRASS SALES, INC. | ) | Magistrate Judge Schenkier |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S LOCAL RULE 56.1(a)
STATEMENT OF UNDISPUTED MATERIAL FACTS**[1]

Defendant ThyssenKrupp Materials NA, Inc., d/b/a Copper and Brass Sales, Inc. ("Copper and Brass" or "the Company"), by and through its attorneys, Quarles and Brady, LLP and Honigman Miller Schwartz and Cohn LLP, hereby submits this Statement of Undisputed Material Facts in support of Defendant's Motion for Summary Judgment, pursuant to N.D. Ill. L.R. 56.1(a) and Fed. R. Civ. P. 56:

**Jurisdiction, Venue and the Parties**

1. This Court has subject matter jurisdiction over Plaintiff's Complaint (the "Complaint") arising under the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. § 621, *et seq.*, pursuant to 28 U.S.C. § 1331. (Compl. ¶ 2.) Copper and Brass concedes

---

[1] The following abbreviations are used throughout Defendant's Statement of Undisputed Facts: Plaintiff's Complaint ("Compl. ¶ __") (Ex. A); Randy Lunt Deposition ("Lunt Dep. at __") (Ex. B); Plaintiff Robert Wingo Deposition ("Wingo Dep. at __") (Ex. C); Pete LaRocco Deposition ("LaRocco Dep. at __") (Ex. D); Mario Alvarez Deposition ("Alvarez Dep. at __") (Ex. E); Mark DeMien Deposition ("M. DeMien Dep. at __") (Ex. F); Patrick Bishop Deposition ("Bishop Dep. at __") (Ex. G).

that this Court has personal jurisdiction over it in this matter. Venue in the Northern District of Illinois is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2). (Compl. ¶ 3.)

2.      Copper and Brass is a processor and distributor of non-ferrous metals with a Schaumburg, Illinois warehouse facility stocking approximately 2,000 different types of such products. (Lunt Dep. at 16.)

3.      Plaintiff is a former warehouse clerk[2] at Copper and Brass's Schaumburg facility who was terminated for falsifying company documents pursuant to the Company's work rules on December 3, 2007. (Compl. ¶¶ 8, 20.)

## Plaintiff's Employment and Job

4.      Copper and Brass employed Plaintiff from January 1984 until his employment terminated on December 3, 2007 -- when he was 54 years old -- and he worked on the Company's first shift from 6:00 a.m. until 2:30 p.m. ever since his first two weeks of employment. (Compl. ¶¶ 4, 8, 20; Wingo Dep. at 51.)

5.      Copper and Brass's three shift times are: (a) first shift 6:00 a.m. to 2:30 p.m.; (b) second shift 2:30 p.m. to 11:00 p.m.; and (c) third shift 11:00 p.m. to 7:00 a.m., so the most that employees on different shifts would overlap is approximately one hour between third and first shift. (LaRocco Dep. at 44.)

6.      All hourly Schaumburg warehouse employees are represented and members of Teamsters Local 714 ("the Union"), and their employment is governed by the terms of a collective bargaining agreement ("the CBA") and work rules. (Wingo Dep. at 18, 42; Exhibit H (Collective Bargaining Agreement).)

---

[2] Warehouse clerks are a specific category of employees who fall under the more general job classification of "warehousemen." (Lunt Dep. at 41-42; Wingo Dep. at 329.)

2

7.     Plaintiff's specific work assignment for the last two years of his employment at Copper and Brass was the rod, bar and wire ("RBW") work station, where his responsibilities included weighing, measuring and packing various metal products for shipment to customers according to written work orders and instructions, generating and attaching shipping labels for delivery of the product, verifying the accuracy of the materials he was to pack by reviewing work orders, and reading, understanding and following all work orders, entering shipment data into the Company's computerized work order/inventory system and maintaining daily production logs of work orders he completed. (Lunt Dep. at 43; Wingo Dep. at 49-50, 54-55; Exhibit I (Job Description).)

8.     Plaintiff performed similar order-processing duties in other work areas for an additional five to seven years before moving to the RBW work station. (Wingo Dep. at 51-52.)

9.     Other warehouse employees work as side load operators who bring materials and product for filling customer orders to warehouse clerks (or clerks may obtain the material themselves), but regardless of who actually brings material, warehouse clerks must perform their job accurately. (Lunt Dep. at 44-45; Alvarez Dep. at 73-74.)

**Other Relevant Copper and Brass Employees**

10.     Randy Lunt ("Lunt"), who was 54 years old at the time of Plaintiff's termination, has been Schaumburg's plant manager since approximately 2001. (Lunt Dep. at 11, 14-15.)

11.     Mark DeMien ("M. DeMien"), who was almost 46 years old at the time of Plaintiff's termination, has been a foreman at Schaumburg since 2003 and directly supervised Plaintiff from at least September 2004 until Plaintiff's termination. (M. DeMien Dep. at 7, 11.)

12.     Pete LaRocco ("LaRocco"), who was 48 years old at the time of Plaintiff's termination, is a lead machine operator at Schaumburg and serves as its union steward. (LaRocco Dep. at 8, 10.)

13. Patrick Bishop ("Bishop") is a warehouse clerk working in Schaumburg's receiving department who previously worked in the Company's RBW station and was 30 years old at the time of Plaintiff's termination. (Bishop Dep. at 10, 13-14.)

14. Tyler DeMien ("T. DeMien")[3] is a former side load operator on the third shift at Schaumburg, who was 22 years old at the time of Plaintiff's termination, and was himself terminated on June 24, 2008, for attendance issues. (M. DeMien Dep. at 18-19; Exhibit J ¶¶ 21, 31 (Lunt Aff.).)

15. Eluterio (Al) Herrera ("Herrera") is a warehouse clerk on the third shift at Schaumburg and was 43 years old at the time of Plaintiff's termination. (Lunt Dep. at 115; Wingo Dep. at 211; Ex J ¶ 22.)

16. Mario Alvarez ("Alvarez") is a former warehouse clerk who worked on the second shift at Schaumburg and was 47 years old at the time of Plaintiff's termination. (Alvarez Dep. at 8, 10-12.)

17. Isidro Garcia ("Garcia")[4] is a warehouse clerk who works on the second shift at Schaumburg and was 52 years old at the time of Plaintiff's termination. (Wingo Dep. at 215; Ex. J ¶ 23.)

18. Lizardo Hernandez ("Hernandez") works as a side load operator on the first shift at Schaumburg and was 35 years old at the time of Plaintiff's termination. (Wingo Dep. at 218; Ex. J ¶ 24.)

---

[3] Tyler DeMien is Mark DeMien's son. (M. DeMien Dep. at 16-17.)

[4] Paragraph 12 of Plaintiff's Complaint mentions an individual named "Zidrow," and Plaintiff testified at his deposition that Zidrow refers to someone with the initials IG, who may be Isidro Garcia. (Wingo Dep. at 215; M. DeMien Dep. at 52.) Copper and Brass also has a Schaumburg employee named Sergio Garcia, and Lunt apparently misspoke when he identified Isidro Garcia as Sergio when testifying about an order that Isidro Garcia completed for Plaintiff. (Lunt Dep. at 76-77.)

4

19. Ray Cather ("Cather") works as a warehouse clerk at Schaumburg and was 27 years old at the time of Plaintiff's termination. (Wingo Dep. at 222-23; Ex. J ¶ 25.)

20. At the time of Plaintiff's termination, there were a total of thirty-nine hourly employees at Schaumburg; seventeen of the employees were between the ages of 40 and 49 years, four of the employees (not including Plaintiff) were between the ages of 50 and 59 years, and two employees were over age 60 years; so a total of twenty-three employees (not including Plaintiff) were over age 40 years. Today, twenty-three of thirty-four employees are over age 40. (Ex. J ¶¶ 18-19.)

### Plaintiff's Data Entry Responsibilities

21. The duties of warehouse clerks, including Plaintiff, require reviewing work orders from Copper and Brass customers, entering corresponding data into the Company's computer system, verifying weight and piece-count of customer orders, confirming that the product matches what the customer ordered prior to it being packed for shipping, and then packing orders. (Lunt Dep. at 43; Wingo Dep. at 54-56, 154.)

22. It is important that warehouse clerks accurately enter the information in the Company's computer for purposes of inventory and billing. (Wingo Dep. at 57, 63; Ex. I.)

23. M. DeMien counseled Plaintiff on more than one occasion about the need to accurately and reliably enter data into Copper and Brass computers. (Wingo Dep. at 142-43.)

24. The economic downturn in the fall of 2007 led to an even greater concern about careful customer service and accurately processing customer orders. (Wingo Dep. at 64.)

### Plaintiff's Daily Production Log Responsibilities

25. Completing paperwork correctly was an "essential function" of Plaintiff's job as a warehouse clerk, and it was mostly new employees who received discipline for repetitive errors on work orders. (Wingo Dep. at 340; LaRocco Dep. at 27.)

5

26.     Certain job positions within the warehouseman classification require that they maintain and complete daily production logs, which provide details about the name of the employee performing the work, shift, date, work station and the work orders filled, including work order number, number of pieces, weight, any applicable comments and the time a work order was completed, Plaintiff completed such paperwork for ten to fifteen years as a part of his warehouse clerk duties, and he admits that it was important to complete them accurately. (Lunt Dep. at 57-58; Wingo Dep. at 64, 67, 182, 294; Ex. J ¶ 13; Exhibit K (Daily Production Log Policy).)

27.     Daily production logs are "self-explanatory," and plant postings detail how to complete the logs. Additionally, every one to two years, warehousemen receive a review of the information that must be noted on the daily production logs, and meetings have been conducted to train employees and provide refreshers on how to properly complete them, which includes instruction that employees are to write down completed work orders only. (Lunt Dep. at 87-88; LaRocco Dep. at 61; M. DeMien Dep. at 50-51; Bishop Dep. at 27-28.)

28.     If an employee is in the middle of a work order at the end of a shift, they must either stay and inform the next shift or write down notes on their daily production log. In either case an employee must note on their daily production log that they did not complete the order. (LaRocco Dep. at 44-46.)

### Copper and Brass Work Rules

29.     Copper and Brass work rules ("the Work Rules"), enacted pursuant to the CBA, establish a progressive discipline policy for certain categories of infractions and certain specified major offenses are subject to immediate termination. The work rules further specify that, while progressive discipline may be followed, the severity of the violation and the employee's past

work rule violations may influence management's action. (Lunt Dep. at 35-36, 38-39; Ex. H; Ex. J ¶ 3; Exhibit L at 2 (Copper and Brass Work Rules).)

30. Pursuant to the Work Rules, warehouse employees, including Plaintiff, are subject to discipline for repetitive errors (administrative or otherwise) in properly filling work orders, and subject to discharge for the fourth violation of that rule. (Wingo Dep. at 134; Ex. L at 1, 3.)

31. The Work Rules provide that employees may be terminated for their first offense of falsifying Copper and Brass documents or records. Misrepresenting the status of work orders on an employee's daily production log constitutes falsifying company documents or records. (Lunt Dep. at 38-39; Wingo Dep. at 134, 190; M. DeMien Dep. at 28; Bishop Dep. at 57; Ex. L at 8.)

32. Plaintiff admits that providing false or misleading information and misrepresenting the status of work on daily production logs subjects an employee to discipline. (Wingo Dep. at 190-91.)

### Plaintiff's Extensive Disciplinary Record

33. From 1995 through 2006, Plaintiff was disciplined on at least fifteen occasions; two of which involved suspension and nine of which were for work order errors (the remainder were for unacceptable performance, slowing down production, taking company property without permission,[5] and failure to wear safety glasses):

Date             Discipline (repetitive work order errors in **bold**)

5/11/95          Written warning, unacceptable performance
1/29/99          One-day suspension for lack of production
**5/28/99          Letter of counsel, failure to follow order procedures**
[chart continued on next page]

---

[5] On March 28, 2006, M. DeMien issued Plaintiff a written warning for failure to perform a task, which could have been deemed removal of company property without the proper written permission and subject to immediate termination. (Wingo Dep. at 136-37.) At the time of that occurrence Plaintiff was 52 years old.

7

| Date, cont. | Discipline, cont. (repetitive work order errors in **bold**) |
|---|---|
| **6/15/99** | **Oral warning, repetitive work order errors** |
| 7/16/99 | One-day suspension for failure to stop, wasting time |
| **1/10/01** | **Oral warning, incorrect labeling of work orders** |
| **2/12/01** | **Written warning, failure to follow order procedures** |
| 11/7/01 | Letter of counsel, failure to wear safety goggles |
| **10/1/02** | **Oral warning, repetitive work order errors** |
| **9/12/[no year]** | **Oral warning, repetitive work order errors** |
| **9/22/03** | **Written warning, repetitive work order errors** |
| **9/22/04** | **Written warning, incorrect labeling of work orders** |
| **5/11/05** | **Oral warning, repetitive work order errors** |
| 12/1/05 | Written warning, slowing down production |
| 3/28/06 | Written warning, failure to perform task – did not request permission |

(Wingo Dep. at 85, 88, 106, 108-12, 117-18, 127, 129, 131, 135, 137-39, 228-29; Exhibit M (Pl.'s Pre-2007 Disciplinary Records).)

34. Plaintiff knew he could file grievances under the CBA to challenge disciplinary actions by the Company and other conduct that violated the CBA's non-discrimination provision but never filed any grievances challenging any of his discipline before being terminated. (Wingo Dep. at 161, 228-29; Exhibit N (Pl.'s Termination Grievance).)

### Plaintiff's 2007 Discipline Record

35. On June 22, 2007, Lunt issued Plaintiff a verbal warning for repetitive work order errors, which Plaintiff never grieved under the CBA. (Wingo Dep. at 140; Exhibit O (Pl.'s Jun. 22, 2007 Discipline).)

36. In August, 2007, M. DeMien issued letters of counsel for wasting time and talking on the job to Plaintiff and Pat Bishop, who was 30 years old. After Plaintiff complained that he felt the counseling was unfair, Lunt investigated the situation and concluded that M. DeMien acted appropriately. Plaintiff never grieved this discipline under the CBA. (Lunt Dep. at 48-53; Wingo Dep. at 330; Bishop Dep. at 10.)

37. On October 4, 2007, Plaintiff was issued a written warning by M. DeMien for repetitive errors in properly filling work orders after improperly labeling shipments which caused

8

missed and late customer deliveries. Plaintiff never grieved the discipline under the CBA. Plaintiff does not claim that the discipline was issued because of his age and admits that he made the mistake which resulted in the discipline. (Wingo Dep. at 145-46; Exhibit P (Pl.'s Oct. 4, 2007 Discipline.)

38.    On October 10, 2007, Plaintiff was issued a one-day suspension by M. DeMien for repetitive work order errors and not properly filling work orders after he admittedly allowed the wrong product to be shipped to the customer, but never filed a grievance under the CBA contesting that discipline. Plaintiff admits his duties included reviewing work orders before he packs them and that he should have caught the mistake before allowing it to be shipped to the customer. (Lunt Dep. at 99; Wingo Dep. at 146-50, 154; Exhibit Q (Pl.'s Oct. 10, 2007 Discipline).)

39.    On November 8, 2007, Plaintiff was suspended for three days by Lunt for repetitive key punch errors, which he never grieved under the CBA. Plaintiff does not dispute making the error or claim that he was suspended because of his age. (Wingo Dep. at 155-59, 161, 178; Exhibit R (Pl.'s Nov. 8, 2007 Discipline).)

40.    On November 14, 2007, after returning to work from his suspension, Lunt and M. DeMien met with Plaintiff and discussed the importance of reading, understanding and following all work orders, the need to key punch all work orders correctly, offered him assistance, counseled him about his lack of production, and issued him a memo concerning their meeting, after which Plaintiff filed no grievance. (Wingo Dep. at 162-65, 167, 171-72; Exhibit S (Pl.'s Nov. 19, 2007 Discipline).)

41.    On November 30, 2007, Lunt appropriately counseled Plaintiff after he admittedly failed to follow the instruction on a work order which required Plaintiff to repack the order.

Plaintiff never grieved the counseling. Plaintiff admits that Lunt acted appropriately and Lunt was not discriminating against Plaintiff on the basis of his age when counseling and issuing the memo. (Wingo Dep. at 173-74, 176-77; Exhibit T (Pl.'s Nov. 30, 2007 Discipline).)

42.  Sometime in November or December 2007, Plaintiff rejected Lunt's offer to reassign him to the helper position. (Wingo Dep at 72-73; Ex. J ¶ 10.)

### Copper and Brass Discovers that Plaintiff Provided False Information on His Daily Production Log

43.  On a daily basis at the end of his shift, M. DeMien enters work production data onto a computer spreadsheet for which he relies on his shift's warehousemen's daily production logs and also conducts daily and/or weekly random checks of the accuracy of the data written on the logs. (M. DeMien Dep. at 33-35.)

44.  As part of his checking daily production logs for November 29, 2007, M. DeMien discovered that Plaintiff's November 28 and 29, 2007 logs improperly took credit for packing orders that were packed by other employees on other shifts. Warehouse clerks are only permitted to take credit for orders that they actually complete themselves and Plaintiff admits that he would not want to take credit for work he did not do. (Lunt Dep. at 62, 80, 90; Wingo Dep. at 192; M. DeMien Dep. at 44-45, 51-52.)

45.  After M. DeMien brought his findings to Lunt, they reviewed a random sample of Plaintiff's daily production logs for November 2007, and discovered that Plaintiff's logs for November 15, 19, 20, 28 and 29, 2007 listed work orders that he did not complete and failed to indicate that those orders were incomplete at the end of his shift. (Lunt Dep. at 79-80; Wingo Dep. at 184-87, 194, 238; Exhibit U (Selected November 2007 Daily Production Logs).)

46.  Lunt and M. DeMien confirmed that Plaintiff misrepresented the items on his November 28 and 29, 2007 daily production logs because the documents listed piece counts,

weight and completion times for work orders, but computer data indicated that other employees actually packed those orders. M. DeMien then placed the initials of the other employees who actually completed the work orders on copies of Plaintiff's daily production logs, those versions are referred to as the Annotated November 2007 Daily Production Logs and they are Exhibit V. (Lunt Dep. at 82-91; M. DeMien Dep. at 44-45; Exhibit V (Annotated November 2007 Daily Production Logs).)

47.   Plaintiff admits that he completed the daily production logs by listing a completion time and other information for work orders that he did not complete himself. (Lunt Dep. at 84-85; Wingo Dep. at 184-85.)

48.   Even though Plaintiff recorded some comments regarding certain orders, this does not excuse the fact that he represented he had completed those orders by listing a completion time on his daily production logs. (Lunt Dep. at 90.)

### Plaintiff's Termination

49.   While Plaintiff admits he did not know who made the decision to terminate him, Lunt made the decision on December 3, 2007, with input from M. DeMien. (Lunt Dep. at 36-38; Wingo Dep at 132; M. DeMien Dep. at 27-28; Exhibit W (Pl.'s Dec. 3, 2007 Termination Record).)

50.   Lunt terminated Plaintiff for falsifying Company records/documents for two days in a row -- specifically, taking credit for completing work orders on November 28 and 29, 2007 -- which is a "Category D" work rule violation warranting discharge for the first offense. (Lunt Dep. at 38; Wingo Dep. at 201; M. DeMien Dep. at 28; Ex. L at 2, 8.)

### Plaintiff's Age Discrimination Allegations and Claim

51.   According to Plaintiff, any age discrimination against him began on August, 30, 2007 at the earliest, or perhaps in September 2007. (Compl. ¶ 10; Wingo Dep. at 242.)

11

52. Any age discrimination based upon disciplinary action taken against Plaintiff is limited to: (a) his one-day suspension on October 10, 2007; and (b) his termination on December 3, 2007. (Wingo Dep. at 178, 206.)

53. The remaining disciplinary actions Plaintiff received between June 2007 and his termination were admittedly his fault and not age-related. (Wingo Dep. at 145-46, 161, 177.)

54. Plaintiff's one-day suspension on October 10, 2007 resulted from another work order mistake which he admitted making. Plaintiff testified that he "*could* have caught [the] mistake," should not have allowed the wrong product to be shipped to the customer, and it was his *responsibility* to catch the mistake. (Wingo Dep. at 178-79, 315-16; Ex. Q (emphasis added).)

55. Plaintiff has no evidence, but speculates that his termination was age-related because "[the younger workers are] still there and I'm gone." (Wingo Dep. at 244.)

56. Plaintiff admits that the following warehouse employees are still employed by Copper and Brass at Schaumburg: Frederick Stalzik (whom Plaintiff says is probably over age 50); Tony Falco (whom Plaintiff says is probably age 47); Arturo Flores (whom Plaintiff says is probably age 50); and Lance Amack. (Wingo Dep. at 245, 247-48.)

57. When Plaintiff was terminated, twenty-three of thirty-nine Schaumburg hourly employees were over age 40; four of whom were between the ages of 50 and 59 years, and two of whom were over age 60. (Ex. J ¶ 18.)

58. Copper and Brass continues to employ numerous warehouse employees at Schaumburg that are members of Plaintiff's protected class, such as Frederick Stelzik (age 64 at the time of Plaintiff's termination), Lance Amack (age 63), Denny Prosser (age 51), Flores (age 51) and Tony Falco (age 49). Of the thirty-four total employees at Schaumburg, twenty-three are

over age 40, six of whom are between the ages of 50 and 59 years, and two of whom are over age 60 years. (Wingo Dep. at 52-53, 245-48; Ex. J ¶¶ 19, 26-30.)

### **Plaintiff Never Complained About Age Discrimination**

59. Plaintiff knew that the CBA prohibited age discrimination and that he could have filed a grievance for such violations. Plaintiff never filed any such grievance. (Wingo Dep. at 23-24.)

60. Plaintiff did not mention age discrimination when he complained about being terminated to William Fruehauf, Copper and Brass's Vice President and Regional Manager, on December 4, 2007. (Wingo Dep. at 260.)

61. Plaintiff never complained that anyone harassed him because of his age, that his termination was a result of his age, or that anyone made comments about his age. (LaRocco Dep. at 74, 77-78; Bishop Dep. at 49.)

62. Plaintiff's union grievance challenging his termination did not mention age discrimination. (Ex. N.)

### **Plaintiff Lacks Evidence of Similarly-Situated, Younger Employees Being Treated More Favorably Than Him**

63. The younger employees that Plaintiff has identified as comparables are T. DeMien (age 22), Herrera (age 43), Alvarez (age 47), Garcia (age 52), Hernandez (age 35) and Cather (age 27). (Compl. ¶ 12; Wingo Dep. at 105-06; Alvarez Dep. at 8; Ex. J ¶¶ 21-25.)

64. Side load operators like T. DeMien and Hernandez and receiving clerks like Bishop had different job duties and responsibilities than warehouse clerks like Plaintiff, do not complete daily production logs or other paperwork, and Plaintiff admits that they do not have the same job as him. (Lunt Dep. at 57; Wingo Dep. at 210-11, 221-22.)

65. Plaintiff admits that he does not know whether his alleged comparators have as extensive of a disciplinary history as him; and does not know their disciplinary records. The only disciplinary record that Plaintiff has actual knowledge about is his own. (Wingo Dep. at 101, 200-01, 209-10, 212, 217, 219, 223-24.)

66. T. DeMien did not have a comparable disciplinary record to Plaintiff. (Wingo Dep. at 210.)

67. T. DeMien and Herrera worked on the third shift, and Alvarez and Garcia worked on the second shift, and all had different supervisors than Plaintiff. (Wingo Dep. at 211, 215; Alvarez Dep. at 12.)

68. No other hourly Schaumburg employee had as extensive a disciplinary record as Plaintiff, whether during the last six months of his employment or during the entire time Copper and Brass disciplined Plaintiff. In fact, Plaintiff's disciplinary record was far more extensive than any other Schaumburg employee. (Ex. J ¶¶ 16-17.)

69. Copper and Brass followed its progressive disciplinary policy in Plaintiff's situation, and gave Plaintiff more chances than other employees. (LaRocco Dep. at 26, 79, 83.)

70. Plaintiff does not know if Copper and Brass management was aware that Herrera included on his daily production logs work orders which Herrera allegedly did not complete. (Wingo Dep. at 224.)

71. Alvarez never told Lunt or M. DeMien that he thought it was acceptable to include on his daily production logs work orders which he did not complete. (Alvarez Dep. at 89.)

72.     Alvarez was terminated on January 28, 2008 for a verbal altercation with another employee pursuant to a last chance agreement between he and the Company. (Lunt Dep. at 119-20; Alvarez Dep. at 13.)

73.     Alvarez testified that he completed some of the work orders that Plaintiff indicated were done by him on his November 29, 2007 daily production log. (Alvarez Dep. at 61, 80-81.)

74.     Like Plaintiff, Alvarez, Garcia and Herrera received discipline for repetitive work order errors, and Plaintiff does not know whether any other employees were disciplined for repetitive errors. (Wingo Dep. at 98-99; LaRocco Dep. at 27-28; Exhibit X (Herrera and Alvarez Discipline).)

75.     Copper and Brass did not discipline Plaintiff for using his cell phone during work hours, and Herrera (one of the alleged comparators) also complained that T. DeMien was allowed to use a cell phone during work hours. (Wingo Dep. at 151-52.)

76.     No other warehouse employee had ever misrepresented their work in the manner that Plaintiff did on his November 28 and 29, 2007 daily production logs. (Ex. J ¶ 16.)

### **Plaintiff Is Replaced Pursuant to the CBA**

77.     T. DeMien did not replace Plaintiff, and Plaintiff does not know the identity of the employee, if any, who replaced him. (Lunt Dep. at 126; Wingo Dep. at 334; M. DeMien Dep at 66.)

78.     After Plaintiff's termination, Copper and Brass initially had RBW warehouse clerks on second and third shifts work overtime to cover the opening pursuant to the CBA (this included Arturo Flores ("Flores"), who was 50 years old at the time, and Herrera), but other employees could have been asked if Flores or Herrera declined the overtime. (Lunt Dep. at 125-26; Wingo Dep. at 247-48.)

79.     The Company filled the opening at the RBW station on a more permanent basis through a seniority-based bidding process under the CBA by drawing from a pool of available warehousemen who sought the position -- at first, Alvarez moved over from second shift and Mike Perrone has held the position since March or April, 2008.  No one has been hired to replace Plaintiff.  (Lunt Dep. at 126-27.)

                                                  Respectfully submitted,

DATED:  July 18, 2008         THYSSENKRUPP MATERIALS NA, INC.,
                                                 d/b/a Copper and Brass Sales, Inc.


                                          By:   /s Russell S. Linden
                                                One of its Attorneys


Russell S. Linden
Admitted *pro hac vice*
2290 First National Building
660 Woodward Avenue, Suite 2290
Detroit, Michigan 48226
(313) 465-7466

Jeffrey S. Piell, Esq.
Quarles & Brady LLP
500 West Madison Street, Suite 3700
Chicago, IL 60661
(312) 715-5000

## *CERTIFICATE OF SERVICE*

RUSSELL S. LINDEN states that on July 18, 2008, he caused a copy of **Defendant's Local Rule 56.1(a) Statement of Undisputed Material Facts,** along with this **Certificate of Service**, to be served via the electronic notification system of the United States District Court for the Northern District of Illinois Eastern Division to the e-mail address listed below:

Lisa Kane, Esq.
Lisa Kane & Associates, P.C.
lisakane@sbcglobal.net

                                           s/Russell S. Linden
                                           RUSSELL S. LINDEN

DETROIT.3202478.3