# EXHIBIT B

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


ROBERT G. WINGO,                    )

        Plaintiff,              )

    vs.                             ) No. 08 C 368

THYSSENKRUPP MATERIALS NA,      )

INC., d/b/a COPPER AND BRASS, )

        Defendant.              )


          Deposition of RANDY E. LUNT, called
for examination, taken pursuant to notice,
agreement and by the provisions of the Rules of
Civil Procedure for the United States District
Courts pertaining to the taking of depositions,
taken before PATRICIA A. ARMSTRONG, a Notary
Public within and for the County of DuPage, State
of Illinois, and a Certified Shorthand Reporter,
No. 084-1766, of said state, taken at 29 South
LaSalle Street, Chicago, Illinois, on the 29th day
of May, 2008 at 7:30 a.m.

1    by the foreman?

2        A.    I don't recall the exact date.  It

3    was in 2005.

4        Q.    Any other documents that you reviewed

5    to prepare for the deposition?

6        A.    I am sorry.

7        Q.    Are there any other documents that

8    you reviewed to prepare for the deposition, other

9    than what you already told me?

10        A.    I don't recall.  I may have looked at

11    a couple of my letters written to Mr. Wingo.

12        Q.    And what is your date of birth, sir?

13        A.    January 5, 1954.

14        Q.    What is your current age?

15        A.    Fifty-four.

16        Q.    Where do you reside?

17        A.    Glen Ellyn.

18        Q.    What is your current home address?

19        A.    One North 661 River Drive,

20    Glen Ellyn, Illinois.

21        Q.    And how long have you resided on

22    River Drive in Glen Ellyn, Illinois?

23        A.    Approximately three years.

24        Q.    Is your current residence a home or

1          Q.    In what position did you begin in

2    your employment with Copper and Brass Sales?

3          A.    Second shift supervisor.

4          Q.    And how long did you hold the second

5    shift supervisor position with Copper and Brass

6    Sales?

7          A.    Approximately one year.

8          Q.    And what is the next position that

9    you held with Copper and Brass Sales after about

10   one year as the second shift supervisor?

11         A.    First shift supervisor.

12         Q.    How long did you hold the first shift

13   supervisor position at Copper and Brass Sales?

14         A.    I am not positive.  I am going to

15   guess two years.

16         Q.    What was your next position at Copper

17   and Brass?

18         A.    General foreman.

19         Q.    How long were you general foreman at

20   Copper and Brass Sales?

21         A.    I don't remember exactly.  I am going

22   to estimate two years.

23         Q.    And after general foreman, what was

24   the next position that you held?

1          A.      Plant manager.

2          Q.      Do you recall what year you became

3    the plant manager at Copper and Brass Sales?

4          A.      I am sorry, I do not.

5          Q.      Are there any other positions that

6    you have held at Copper and Brass Sales?

7          A.      No.

8          Q.      Do you hold an ownership interest in

9    Copper and Brass Sales?

10         A.      No.

11         Q.      What do you currently earn as the

12   plant manager at Copper and Brass Sales?

13         MR. DISBROW:  I am going to object as to

14   relevant.

15              But you can answer the question.

16   BY THE WITNESS:

17         A.      Approximately $85,000.

18   BY MS. WEGNER:

19         Q.      And what are your duties and

20   responsibilities as the plant manager of Copper

21   and Brass Sales?

22         A.      I am responsible for shipping,

23   receiving, production, safety, disciplinary

24   action, training, quality, hiring and firing.

1          Q.    Now, do you currently supervise

2   anyone as the plant manager of Copper and Brass

3   Sales?

4          A.    I have four warehouse supervisors,

5   two full-time office personnel in and one-part

6   time office personnel.  There are also 37 hourly

7   employees.

8          Q.    Do the hourly employees at Copper and

9   Brass Sales report directly to you?

10         A.    Not directly to me, indirectly.

11         Q.    What is the business of Copper and

12  Brass Sales?

13         A.    They are a metal distributor.

14         Q.    What are the number of items of

15  product that are sold or distributed from the

16  Copper and Brass Sales location in Schaumburg?

17         A.    Can you please clarify that question?

18         Q.    Yes.  Do you have a catalog of items

19  that are sold or distributed from the Schaumburg

20  location?

21         A.    I do not.  I can only tell you that

22  we have approximately 2000 part numbers.

23         Q.    What were the gross sales of Copper

24  and Brass Sales from the Schaumburg location in

1    Q.    Are the work and safety rules for the

2  Schaumburg facility that we have marked as Exhibit

3  No. 5, those that were in effect when

4  Mr. Wingo was last employed there in December of

5  2007?

6    A.    Yes.

7    Q.    The work and safety rules that are

8  contained in Exhibit No. 5 are those that govern

9  the conduct of the employees that were subject to

10  the Collective Bargaining Agreement at the

11  Schaumberg location of Copper and Brass Sales?

12    A.    Could you repeat that?  I am not sure

13  I understood it.

14    MS. WEGNER:  Sure.  Would you read it back,

15  Pat.

16              (WHEREUPON, the record was

17              read by the reporter.)

18    MR. DISBROW:  I am sorry, that sounded more

19  like a statement than a question.

20              Jan, maybe it's better if you just

21  ask it again.

22  BY MS. WEGNER:

23    Q.    Are the work and safety rules that

24  are listed in Exhibit No. 5 those that govern the

 1   employees subject to the Collective Bargaining

 2   Agreement at the Copper and Brass Sales Schaumburg

 3   location?

 4        A.   Yes.

 5        Q.   Does the Copper and Brass Sales

 6   attendance policy fall under any of these

 7   categories of work and safety rules contained in

 8   Exhibit 5?

 9        A.   It's actually a separate document.  I

10   would love to see if it actually overlaps.

11        MR. DISBROW:  And I will just object to the

12   degree the document speaks for itself.

13   BY MS. WEGNER:

14        Q.   Were you involved in the decision to

15   terminate Mr. Wingo's employment?

16        A.   Yes, I was.

17        Q.   Who else was involved in the decision

18   to terminate Mr. Wingo's employment?

19        A.   His immediate supervisor also played

20   a part.  I don't recall if I contacted our HR

21   group prior to the decision.  I believe the

22   decision was more based on my --

23        MS. WEGNER:  Pat, can you read back that

24   response.

1                    (WHEREUPON, the record was

2                    read by the reporter.)

3    BY THE WITNESS:

4         A.    My review of the case, and it was my

5    decision.

6    BY MS. WEGNER:

7         Q.    And who is the immediate supervisor

8    of Mr. Wingo that you said played a part in the

9    decision to terminate him?

10        A.    Mark DeMien.

11        Q.    What was Mr. DeMien's part that he

12   played in the decision to terminate Mr. Wingo?

13        A.    He had been responsible for most of

14   the documentation in the last several years of

15   Mr. Wingo's failure to perform his tasks properly

16   as an employee.

17              He also came across Mr. Wingo's

18   production sheets showing that he had falsified

19   company documents.

20        Q.    Now, despite any performance

21   deficiencies on the part of Mr. Wingo, he was

22   employed by Copper and Brass Sales for about 24

23   years; isn't that right?

24        A.    That would be correct.

Page 38

1      Q.    When was the decision made to

2   terminate Mr. Wingo?

3      A.    I am not sure what day he was

4   terminated, but it was the day of his termination.

5      Q.    To your knowledge, what policy or

6   policies were violated by Mr. Wingo that resulted

7   in his termination?

8      A.    He was terminated for falsifying

9   company records, which is a Category D fork rule

10  violation.

11     Q.    Does Copper and Brass Sales have a

12  progressive discipline policy?

13     A.    Yes, they do.

14     Q.    Mr. Wingo did not receive progressive

15  discipline in connection with his violation that

16  resulted in his termination; correct?

17     MR. DISBROW:  Objection; foundation,

18  mischaracterizes earlier testimony.

19     MS. WEGNER:  Could I have an answer?

20     MR. DISBROW:  You can answer it if you

21  know.

22  BY THE WITNESS:

23     A.    Mr. Wingo had been given numerous

24  verbal written warnings, he had been given a

1    one-day suspension, a three-day suspension and

2    finally terminated for his -- because of errors,

3    plus the Category D, as shown on the work and

4    safety rules, is first offense termination.

5         MS. WEGNER:  Pat, would you mark that as

6    the next exhibit.

7              (WHEREUPON, a certain document

8              was marked Lunt Deposition

9              Exhibit No. 6, for identification,

10             as of May 29, 2008.)

11   BY MS. WEGNER:

12        Q.    Mr. Lunt, Exhibit No. 6 are documents

13   produced by the Defendant Copper and Brass Sales,

14   Bates stamped 00684 and 685.

15             Do you recognize this?

16        A.    It appears to be the job description

17   of the warehouse position -- warehouseman

18   position, I should say.

19        Q.    And the job description for warehouse

20   position that is marked as Exhibit 6 is dated

21   effective April 16, 2007; correct?

22        A.    Correct.

23        Q.    Since the version of the general

24   warehouse corporate job description that we have

1        Q.    Are all the warehousemen at the

2   Schaumburg Copper and Brass Sales location

3   expected to be able to function in any position in

4   the warehouse?

5        MR. DISBROW:  Objection.  It's an

6   incomplete hypothetical.

7             You can answer, if you know.

8   BY THE WITNESS:

9        A.    The goal was to eventually train

10  everyone at every location for every position.

11  BY MS. WEGNER:

12       Q.    And for the warehousemen at the

13  Schaumburg location of Copper and Brass Sales, how

14  many different positions are there?

15  BY THE WITNESS:

16       A.    They vary.  We have several work

17  stations that are dedicated to warehousemen.

18  There is overlap between operators and

19  warehousemen and overlap between helpers and the

20  warehousemen.  I believe there are four or five

21  different set positions there.

22  BY MS. WEGNER:

23       Q.    What are the titles of the four or

24  five different set positions at the warehouse?

Page 42

1          A.     They are all considered warehousemen.

2     There are different work stations.

3          Q.     What is the work that is performed at

4     the different work stations by the warehousemen at

5     the Schaumburg location?

6          A.     We have RBW nonprocessing, they fill

7     RBW nonprocessed orders.  We have the sheet

8     station, they fill nonprocessed sheet station

9     orders.

10               There is shipping and receiving, but

11    both of those can be done by helpers.  Packaging,

12    and also PVC, where a coating of PVC is applied to

13    raw material.

14         Q.     What does the initial RBW stand for?

15         A.     Rod, bar and wire.

16         Q.     And into what category do those

17    persons fall who are filling orders?

18         A.     It would be a warehouse position.

19         Q.     Well, does someone who is doing order

20    filling fall into the category of shipping and

21    receiving?

22         A.     Our shipping and receiving people can

23    fill orders and do on a regular basis.  That's not

24    their primary function.

1        Q.    What was Mr. Wingo's position at

2    Copper and Brass Sales just prior to his

3    termination?

4        A.    RBW nonprocessing.

5        Q.    In Mr. Wingo's position at the

6    Schaumburg location of Copper and Brass Sales in

7    RBW nonprocessing, what were his job duties?

8        A.    It was to pull material, inspect it,

9    verify the accuracy of the work order, read,

10   understand and follow all work order instructions,

11   package the material according to the

12   instructions, weigh it, stamp the weight.  And

13   then once done that, enter that information into

14   the system, generating a shipping label and attach

15   that shipping label to the material.

16       Q.    Prior to Mr. Wingo's termination from

17   Copper and Brass Sales, how long had he been in

18   the assignment in RBW nonprocessing?

19       A.    I really can't answer that.  He had

20   been there numerous times in the past and moved

21   throughout the warehouse, and probably there for

22   at least several months prior to his termination,

23   if not longer.

24       Q.    In Mr. Wingo's performance of his

1    duties in RBW nonprocessing, did his performance

2    depend on other employees on his shift to

3    accurately and efficiently perform their duties?

4         MR. DISBROW:  Objection; incomplete

5    hypothetical.

6              You can answer it.

7         THE WITNESS:  I am not sure what she is

8    asking on that.

9              Can you please repeat that?

10   BY MS. WEGNER:

11        Q.    In Mr. Wingo's last position in RBW

12   nonprocessing, did his successful performance of

13   his duties depend on other employees accurately

14   and efficiently completing their job duties?

15        MR. DISBROW:  Same objection.

16   BY THE WITNESS:

17        A.    Not really.  I mean, the side loader

18   driver would stage material, but it still was

19   Bob's responsibility to do his job properly.

20   BY MS. WEGNER:

21        Q.    What would the material be that a

22   side loader would stage for Mr. Wingo?

23        A.    It would be RBW or parts, parts dock.

24   It would be bundles of materials that Bob would

1    pull work orders from, whether they are full

2    bundles or partial bundles.

3         Q.    To your knowledge, would it be

4    necessary for Mr. Wingo to wait on occasion for

5    someone, such as the side loader, to pull material

6    for Mr. Wingo to have access to it?

7         A.    It's possible.  It would be rare,

8    though.

9              During those rare occasions, Bob was

10   capable of using his fork truck to pull his own

11   material down for himself.

12        Q.    In the RBW nonprocessing position,

13   was Mr. Wingo responsible for the PVC coat

14   process?

15        A.    No.

16        Q.    On the Schaumburg location of Copper

17   and Brass Sales, was the PVC coating contained on

18   rolls?

19        A.    Yes.

20        Q.    And this PVC coating is a material

21   that is applied to the metal so it's not

22   scratched; right?

23        A.    It has several purposes, but one of

24   them is to prevent scratches.

```
 1   DeMien swore at Mr. Wingo when Pat Bishop was

 2   assisting Mr. Wingo to lift a PVC roll?

 3        MR. DISBROW:  Objection as to foundation;

 4   assumes facts not in evidence.

 5             You can answer the question.

 6   BY THE WITNESS:

 7        A.    I am not aware of Mark DeMien

 8   swearing at Bob Wingo.

 9             I am aware of Bob Wingo and Pat

10   Bishop both receiving letters of counsel for

11   wasting time and talking at the PVC station.

12   BY MS. WEGNER:

13        Q.    Did Mr. Wingo have any discussion

14   with you regarding the incident that occurred for

15   which he got a letter of counsel for talking and

16   wasting time at the PVC station?

17        A.    Yes, he did.

18        Q.    Was anyone else present when

19   Mr. Wingo spoke to you regarding the incident that

20   occurred at the PVC roll station?

21        A.    I do not recall.

22        Q.    What did Mr. Wingo say to you about

23   this incident at the PVC station involving

24   Mr. DeMien?
```

1        A.    He denied that he was wasting time

2    and that he felt that he was unfairly written up.

3        Q.    And Mr. Bishop, did he talk to you

4    about it?

5        A.    Yes.  Mr. Bishop did talk to me about

6    it.

7        Q.    What did Mr. Bishop discuss with you

8    regarding the incident that occurred at the PVC

9    roll station?

10       A.    He felt that Bob had stopped him to

11   help him move a roll, but he felt that it was

12   unfair that if they are both treated the same, but

13   he felt that it was unnecessary for him to receive

14   the write-up.

15            I did investigate the claim and

16   talked to other individuals and found nobody in

17   the warehouse was willing to testify that they

18   heard any swearing or that Mark was out of line in

19   his write-up.

20       Q.    To your knowledge, did Mr. Bishop

21   obtain the permission of his immediate supervisor

22   to assist Mr. Wingo in handling this PVC roll for

23   which he received counseling?

24       MR. DISBROW:  Objection.  I think that

1   mischaracterizes earlier testimony.

2              You can answer, if you know.

3   BY THE WITNESS:

4        A.   He did receive permission to assist

5   Bob in moving a PVC roll, but not to talk.  That's

6   what the write-up was, wasting time to talk.

7   BY MS. WEGNER:

8        Q.   Who was the immediate supervisor that

9   gave Mr. Bishop permission to assist Mr. Wingo in

10  handling the PVC roll?

11       A.   Ray Dormill.

12       Q.   And who did you interview to

13  investigate Mr. Warton's claim that Mr. DeMien had

14  sworn at him?

15       A.   Ray Dormill and Sergio Garcia, along

16  with Mark DeMien.

17       Q.   When did you interview Sergio Garcia

18  regarding what occurred at the PVC roll?

19       A.   I don't remember the exact date.

20       Q.   Did you ever make any notes about

21  your interview of Mr. Garcia?

22       A.   More than likely, yes.

23       Q.   If you made notes regarding your

24  interview with Mr. Garcia, what did you do with

1    those notes?

2        A.    I don't recall.  They may be in

3    either Bob's or Pat Bishop's record, but I don't

4    recall what I did with them.

5        Q.    Did you ever ask Mr. Bishop whether

6    Mr. DeMien swore?

7        A.    Yes, I did.

8        Q.    What did Mr. Bishop say?

9        A.    I believe he did say yes, but I don't

10   recall that for a fact.

11       Q.    And why did you interview Sergio

12   Garcia to try and ascertain what occurred at the

13   PVC roll area between Mr. DeMien, Mr. Bishop and

14   Mr. Wingo?

15       A.    I believe Pat Bishop gave me that

16   name as a witness to what occurred, so I followed

17   up and talked to him.

18       Q.    Why did you interview Ray Dormill

19   regarding what occurred with respect to the PVC

20   roll incident?

21       A.    As a potential witness and also as

22   the person that they claimed gave Pat permission

23   to assist.

24       Q.    And did Mr. Dormill witness what

1    occurred with Mr. DeMien and Mr. Winger and

2    Mr. Bishop?

3         A.    He was in an office adjacent.  I did

4    not hear any swearing.  All he could testify is

5    the fact he gave Pat permission to assist Bob in

6    moving the roll of PVC.

7         Q.    Did you in this investigation of what

8    happened regarding the PVC roll interview Mr. Mark

9    DeMien?

10        A.    Yes.

11        Q.    And what did Mr. DeMien tell you when

12   you interviewed him regarding the PVC roll

13   incident?

14        A.    Basically that he had talked to both

15   Pat and Bob earlier in the day and warned them

16   about wasting time, because they were talking.

17   And it was only on the second time that he caught

18   them wasting time and talking that he talked to

19   both individuals and provided them with the letter

20   of counsel.

21        Q.    Did Mr. DeMien admit that he swore at

22   Mr. Wingo?

23        A.    He did not admit to anything.  He

24   denied swearing, let's put it that way.

1        Q.    Now, what were the words Mr. Wingo

2    told you Mark DeMien used when he swore at

3    Mr. DeMien?

4        A.    I honestly don't remember.

5        Q.    So did you reach a conclusion in your

6    investigation of Mr. Wingo's complaints about the

7    conduct of Mark DeMien?

8        A.    I talked to both Pat and Bob and told

9    them that I found no evidence to support their

10   claims.

11       Q.    Did Mr. DeMien receive any discipline

12   as a result of Mr. Wingo's complaints regarding

13   Mr. DeMien's conduct?

14       A.    No, I did not.

15       Q.    Did you ever prepare a written report

16   of this investigation regarding the PVC roll

17   incident?

18       A.    I don't recall putting together a

19   written report.  I don't believe there was ever a

20   written grievance filed in the incident.  I

21   believe everything was done verbally.

22       Q.    Now, is it a violation of any Copper

23   and Brass Sales policy for supervisory or

24   managerial employees to swear at subordinate

1    job positions within the warehouse classification

2    had Mr. Wingo held during his 24 years of service

3    with Copper and Brass Sales?

4          A.    To my knowledge, he has held every

5    one of them.

6          Q.    To your knowledge, did Mr. Winger

7    ever function as a machine operator at the

8    Schaumburg location?

9          A.    Not to my knowledge.

10         Q.    What are the types of machines the

11   machine operators operate at the Schaumburg

12   location?

13         A.    Currently, we have RBW saws, shears.

14         Q.    Now, are all warehouse employees

15   required to complete production logs on a daily

16   basis?

17         A.    Not all.

18         Q.    Which warehouse employees are

19   required to complete production logs on a daily

20   basis?

21         A.    We don't require our dock people or

22   side loader operators to do that.  Our people that

23   are filling or packaging orders should fill out

24   production sheets.  It is the same thing with our

1   machine operators that are filling orders.

2        Q.    Well, are there exceptions?  You say

3   should.

4              Machine operators and warehouse

5   persons, other than persons on the dock and the

6   side loaders, should fill out production logs

7   every day?

8        A.    The guys on the dock because they are

9   not filling orders, they are loading trucks or

10  unloading trucks, aren't going to be filling

11  orders, so they won't be.

12             Machine operators, as long as they

13  are cutting material or shearing material, yes,

14  should be required to fill out production sheets.

15       Q.    And are people that are filling,

16  packing on operating machines completing

17  production logs on a daily basis at the Schaumburg

18  location?

19       A.    Yes.

20       Q.    Is there a requirement that the

21  warehouse employees complete a certain number of

22  work orders per day?

23       A.    Every day and every position is

24  different, so we couldn't put a requirement.

1  required to be placed on the production logs by

2  warehouse employees?

3       A.    Employee name, I am going from memory

4  here, employee name, shift, date, work station,

5  work order number, number of pieces, number of

6  pounds and completion time.

7       Q.    Is there a procedure in place at the

8  Schaumburg facility of Copper and Brass Sales to

9  determine what procedure is to be followed if an

10  employee is unable to complete an order that's

11  being worked on when that employee's shift comes

12  to an end?

13       MR. DISBROW:  Can you read that back.  I

14  don't think I caught all that.

15                       (WHEREUPON, the record was

16                       read by the reporter.)

17       MR. DISBROW:  Thank you.

18  BY THE WITNESS:

19       A.    In a processed order, the operator

20  would only take credit for the material that he

21  has finished.

22            In a nonprocessed order, the

23  warehouse would only take credit for the orders

24  that he has completed.

1        MR. DISBROW:  Objection; form of the

2    question, it's vague, ambiguous.

3            You can answer it

4    BY THE WITNESS:

5        A.    Some minor things.  I mean, he has

6    taken credit for one work order three times rather

7    than put individual -- one single entry and put a

8    note down that it's three bundles or three boxes,

9    whatever type of package he used.  Not all of them

10   have time slotted.

11           And then there is a gap at the very

12   bottom.  And once again, there is a work order

13   number on the bottom that he didn't actually

14   package.

15   BY MS. WEGNER:

16       Q.    And how can you determine from

17   looking at Exhibit No. 9 that there is a work

18   order at the bottom that Mr. Wingo did not

19   package?

20       A.    Enter it into the computer system and

21   found that Sergio Garcia had actually packaged

22   that work order instead of Bob.

23       Q.    On the last line of Exhibit No. 9,

24   Line 20, there are initials IG next to the work

1    order number.

2                Do you know who placed those initials

3    there?

4        A.    I placed those initials there.

5        Q.    What is the reason that you placed

6    the initials IG on Line 20 of the work order we

7    have marked as Exhibit No. 9?

8        A.    That was the person who actually

9    packaged that work order.

10       Q.    And I am sorry, how did you determine

11   that IG, the initials that you placed on Line 20,

12   was the person that packaged the work order?

13       A.    I believe the initial assessment was

14   done looking at the computer, also look up the

15   yellow copy or the original copy of the work order

16   and see whose work was done on there and whose

17   initials.

18       Q.    Can you explain what the initials PT

19   mean in the comment or special assignment section

20   of the production log?

21       A.    Pool truck.

22       Q.    What does that mean?

23       A.    We have trucks that come from one

24   branch to another.  We have a central hub in

1  BY MS. WEGNER:

2         Q.    Thank you.

3               And do you know what the initials OT

4  means in the comment or special assignment section

5  of the work order we have marked as Exhibit 9?

6         A.    And that is our truck.  It means

7  that's delivered by one of our local trucks, it's

8  our truck, o-u-r, our truck.

9         Q.    On Line 19 of the daily production

10  log, it appears that there are the initials MSP

11  next to the pool truck terminology.

12              Do you know what that means?

13         A.    That is our Minnespolis branch.

14         Q.    What caused you to do an

15  investigation into the production log that we have

16  marked as Exhibit No. 9 to determine that Isidro

17  Garcia did the packaging for the last work order

18  on that document?

19         A.    After it was brought to my attention

20  that Bob had added work orders to other production

21  logs that he had not finished packaging, I took a

22  look at a random sample of November production

23  logs to see if there was a trend, and found two

24  other examples where Bob did the same thing.

1      Q.    I'm sorry.  Can you explain what you

2  mean when you say that he added work orders to

3  other production logs?

4      A.    He added, other than the 28th and the

5  29th, which were the two that initially caught my

6  supervisor's attention.

7           Once we did that, I looked at other

8  production sheets that Bob had turned in during

9  the month of November and found other instances

10  that he had written down and taken credit for

11  packaging orders that he did not complete himself,

12  that somebody else had packed.

13      MS. WEGNER:  This is going to be No. 10.

14           (WHEREUPON, a certain document

15           was marked Lunt Deposition

16           Exhibit No. 10, for identification,

17           as of May 29, 2008.)

18  BY MS. WEGNER:

19      Q.    Do you recognize Exhibit No. 10,

20  Mr. Lunt?

21      A.    Yes.

22      Q.    Can you identify Exhibit No. 10?

23      A.    Daily production log with the

24  initials RGW dated 11/20.

Page 82

1    Exhibit No. 10?

2           A.    I could not tell you that.

3           MS. WEGNER:  This is going to be No. 11.

4                 (WHEREUPON, a certain document

5                 was marked Lunt Deposition

6                 Exhibit No. 11, for identification,

7                 as of May 29, 2008.)

8    BY MS. WEGNER:

9           Q.    Do you recognize Exhibit No. 11?

10          A.    Yes.

11          Q.    Exhibit No. 11 is a document produced

12   by the Defendant, 00013.

13                Do you believe Exhibit No. 11 is a

14   production log completed by Mr. Wingo for

15   November 28, 2007?

16          A.    Yes.

17          Q.    Do you know whose initials appear in

18   the last two lines of the production log we have

19   marked as Exhibit 11?

20          A.    I am not sure what you mean by the

21   last two lines.

22          Q.    16 and 17, where there is initials

23   placed next to the work order?

24          A.    Are you referring to the initials

1    MEA?

2         Q.    Yes.

3         A.    Mark DeMien had placed those initials

4    and they are Mario Alvarez' initials because he is

5    the one that actually packaged, filled and

6    packaged these two orders.

7         Q.    Do you contend there is anything

8    improper about the way Mr. Wingo completed this

9    daily production log dated November 28, 2007?

10        A.    Yes.  He took credit for packaging

11   two orders, put weights, times, pieces down and he

12   did not fill the orders.

13        Q.    What are the orders you are referring

14   to that you think Mr. Winger improperly took

15   credit for on Exhibit No. 11?

16        A.    466844, 466883.

17        Q.    What leads you to believe that

18   Mr. Wingo took credit for work order 446883 on

19   Exhibit No. 11?

20        A.    The fact that he wrote down pieces,

21   pounds and a completion time.

22        Q.    Isn't it true that also on Exhibit

23   No. 11 on Line 17 next to work order 466883,

24   Mr. Wingo wrote "set up, stamped, boxed"?

1       MR. DISBROW:  Objection to the degree the

2  document speaks for itself, and on the grounds

3  that Mr. Lunt did not prepare this document and

4  may not know what Mr. Wingo was referring to.

5       But you can answer the question, if

6  you know.

7       THE WITNESS:  Could you repeat the

8  question.

9  BY MS. WEGNER:

10      Q.   Isn't it true that next to work order

11 No. 466883 in Exhibit No. 11 in the comments and

12 special assignment section, Mr. Wingo "wrote set

13 up, stamped, boxed"?

14      MR. DISBROW:  Same objections.

15 BY THE WITNESS:

16      A.   It appears he wrote that.  I am

17 making the assumption he wrote it and nobody else

18 did.

19 BY MS. WEGNER:

20      Q.   Did you ever conduct an investigation

21 to determine who wrote up set up, stamped, boxed

22 on Exhibit No. 11 on Line 17.

23      A.   During our discussion with Bob, he

24 admitted that he filled out this production sheet,

1    yes.

2          Q.    And it's your contention that

3    Mr. Alvarez actually completed the work order

4    process for work order 466883; right?

5          MR. DISBROW:  You answer it, but I just

6    want to put the objection asked and answered.

7    BY THE WITNESS:

8          A.    Yes.

9    BY MS. WEGNER:

10         Q.    What part of this process was it that

11   Mr. Alvarez conducted with work order 466883?

12         A.    He completed it and PK10'd it, put

13   the information in the computer and signed off on

14   the work order itself.

15         Q.    So there were, to your knowledge, two

16   steps in the process to completing work order

17   466883 that Mr. Alvarez completed?

18         MR. DISBROW:  Objection; mischaracterizes

19   his testimony.

20               You can answer, if you know.

21   BY THE WITNESS:

22         A.    Without looking at the yellow copy, I

23   couldn't tell you what else that Mr. Alvarez had

24   done to this work order.

1    BY MS. WEGNER:

2        Q.    And why is it that you contend

3    Mr. Wingo took credit for completing work order

4    466883?

5        A.    He wrote it down on his production

6    log.  He also put completion time.

7        Q.    So, it's your understanding that the

8    completion time Mr. Wingo put down was the time

9    that he completed with respect to work order

10    466883?

11        MR. DISBROW:  Just objection to the form of

12    the question.  I don't think I understand the

13    question, frankly.  Maybe that's me more than

14    anybody else.

15            But I think it's not clear, Jan, what

16    you mean.

17        MS. WEGNER:  I think Mr. Lunt is the one

18    that said he wrote down he completed it, and I am

19    asking what is the "it" he is referring to,

20    Mr. Lunt.

21    BY THE WITNESS:

22        A.    The fact that Bob would write down

23    the work order number, the number of pieces, the

24    number of pounds and the completion time tells me

1   he finished that order when he did that.

2   BY MS. WEGNER:

3        Q.    What is it about looking at Exhibit

4   No. 11 and Line 17 that tells you that Mr. Winger

5   put a completion time which states that he

6   completed the order?

7        MR. DISBROW:  I am just going to object

8   because it has been asked and answered a number of

9   times.

10  BY THE WITNESS:

11       A.    I believe I have answered this.

12       MS. WEGNER:  Okay.

13  BY MS. WEGNER:

14       Q.    What training has been provided to

15  the warehouse employees at the Schaumburg facility

16  of Copper and Brass Sales regarding the

17  information to be placed on production logs?

18       A.    I would guess that probably once

19  every year to two years, we go over this.  There

20  are several postings that have been posted in the

21  building and we have had meetings over periods of

22  time to train people and refresh their memories in

23  how to properly fill out a production sheet.

24       Q.    And the time that is expected to be

1   placed in the right-hand column on the production

2   log, is that supposed to be the time that the work

3   is completed?

4        A.    Correct.

5        MS. WEGNER:  Pat, would you mark that as

6   the next exhibit.

7                  (WHEREUPON, a certain document

8                  was marked Lunt Deposition

9                  Exhibit No. 12, for identification,

10                 as of May 29, 2008.)

11       MS. WEGNER:  What is the Bates stamp number

12  on 12, is that 14?

13       MR. DISBROW:  Yes, you got that right, Jan.

14  BY MS. WEGNER:

15       Q.    And Mr. Lunt, can you identify

16  Exhibit No. 12?

17       A.    Daily production log filled out by

18  RGW on November 29th.

19       Q.    Exhibit No. 12 is a document produced

20  by the Defendant, Bates stamped 00014.

21             And do you recognize Exhibit No. 12

22  as a production log completed by Mr. Wingo on

23  November 29, 2007?

24       A.    Yes.

1        Q.    At Line 20 and below Line 20, there

2   are initials placed next to the back order numbers

3   on Exhibit 12.

4             Do you know who placed those initials

5   there?

6        A.    Mark DeMien.

7        Q.    Do you know the reason Mr. DeMien

8   placed the initials next to the work orders in

9   Line 20 and the line blow that on Exhibit 12?

10       A.    Two work order numbers that somebody

11  else had actually done the work and completed that

12  should not have been on this production sheet.

13       Q.    Why is it that you contend that the

14  last two work orders listed on Exhibit No. 12

15  should not have been on Mr. Wingo's production

16  sheet or production log?

17       A.    Excuse me for a second.

18       MR. DISBROW:  Do you want to go off the

19  record?

20       MS. WEGNER:  Sure.

21            (WHEREUPON, a recess was had.)

22       MS. WEGNER:  Back on the record.

23       THE REPORTER:  There is a question pending.

24       MS. WEGNER:  Would you read it back,

1    please, Pat.

2                        (WHEREUPON, the record was

3                        read by the reporter.)

4    BY THE WITNESS:

5         A.    Because he did not complete them.

6    BY MS. WEGNER:

7         Q.    Is it your contention that Mr. Wingo

8    should not be writing work orders on production

9    logs where he does perform work on them?

10        A.    If he does not complete them, he

11   shouldn't take credit for them.

12        Q.    But were you not also requiring that

13   Mr. Wingo on his production log keep track of

14   everything he did during the day, including

15   clean-up and assisting other employees?

16        MR. DISBROW:  Just objection to the degree

17   it mischaracterizes earlier testimony.

18             You can answer the question.

19   BY THE WITNESS:

20        A.    He could put notes in the special

21   assignment, but at the same time, you can't take

22   credit for putting down a work order number, the

23   pounds packed, the pieces packed and the time

24   completed on it if he did not complete the order.

Page 91

1    BY MS. WEGNER:

2         Q.    Well, Mr. Wingo on Exhibit No. 12 did

3    not put down a time completed for the last entry,

4    work order 467012; isn't that correct?

5         A.    Well, in that work station, he would

6    only work on one work order at a time.  You have

7    to finish one before you start the next one.  You

8    can only fill one order at a time.

9              So it would be inconceivable for him

10   to be working on two work orders at the same time

11   and, therefore, he couldn't put down both work

12   order 467112 and 467012 and not finish either one

13   of those.

14        Q.    I'm sorry, you contend that Mr. Wingo

15   could only work on one work order at a time.

16             Haven't you cited him on prior

17   occasions for switching packing lists between

18   different orders that he had worked on?

19        MR. DISBROW:  Objection as to foundation;

20   assumes facts not in evidence.

21             Answer the question, if you can.

22   BY THE WITNESS:

23        A.    Two different situations.  He PK'd --

24   he could pack both orders, PK10 both orders, then

Page 99

1        A.    A one-day suspension.

2        Q.    And what was the reason Mr. Winger

3    received a one-day suspension on October 10, 2007,

4    as evidenced by Exhibit 16?

5        MR. DISBROW:  I am going to object to the

6    degree the document speaks for itself, but you can

7    answer.

8    BY THE WITNESS:

9        A.    Repetitive work order errors.

10   BY MS. WEGNER:

11       Q.    Repetitive work order errors.  Okay.

12             To your knowledge, was the order

13   contained in the work order identified in Exhibit

14   No. 16 one that was processed material?

15       A.    I'm sorry, I am not sure what you are

16   asking here.

17       Q.    Well, it says it was a processed work

18   order, it was cut material, so it should not have

19   gone to RBW MP?

20       A.    But Bob packed anyway, even though it

21   was not processed.  He failed to read and follow

22   work order instructions.

23       Q.    Isn't it true that someone else

24   didn't read and follow work order instructions in

1        MR. DISBROW:  I am just going to object to

2   the form of the question.  This document goes back

3   to 2003.

4              You haven't indicated a time frame,

5   it's vague and ambiguous in its current form.

6              You can answer if you can.

7   BY THE WITNESS:

8        A.    Again, it varies, the work order

9   error, the frequency of the work order error.

10  Everyone would handle it a little bit differently

11  as far as whether to do a verbal, a sitdown,

12  letter of counsel, sometimes just a blurb in his

13  training file to go over and make sure that the

14  employee understood what he did wrong and how to

15  correct that situation.

16  BY MS. WEGNER:

17       Q.    Has Mr. Herrera ever received any

18  suspension for repetitive work order errors?

19       A.    No, not that I am aware of.

20       Q.    Is Mr. Herrera still employed at

21  Copper and Brass Sales?

22       A.    Yes, he is.

23       MS. WEGNER:  Pat, would you mark that

24  Exhibit No. 20.

1          Q.    Page Bates stamped 696 seems to be a

2     different kind of employee report form in that

3     it's typed rather than on a printed form.

4                Did you prepare that document?

5          A.    No, I did not.

6          Q.    Are your initials contained on the

7     right-hand margin of Exhibit No. 20 Bates stamp

8     Page 696?

9          A.    My initials are, yes.

10         Q.    Your initials and your last name?

11         A.    Yes.

12         Q.    You have very nice handwriting?

13         A.    Thank you.

14         MR. DISBROW:  It's better than mine.

15    BY MS. WEGNER:

16         Q.    Mr. Alvarez, is he still employed at

17    Copper and Brass Sales?

18         A.    No, he isn't.

19         Q.    When did Mr. Alvarez' employment

20    cease with Copper and Brass Sales?

21         A.    I believe in January of 2008.

22         Q.    And what is the reason that

23    Mr. Alvarez' employment with Copper and Brass

24    Sales ended in January of 2008?

1        A.    Violation of an agreement with the

2    Company as far as last chance and basically an

3    altercation with -- a verbal altercation with

4    another employee.

5        Q.    And when was the last chance

6    agreement that Mr. Alvarez was provided with which

7    he violated and was terminated?

8              Is it contained in one of these?

9        A.    It's contained in your Exhibit 20.

10       Q.    Okay.

11       MR. DISBROW:  Did we just look at it?

12       THE WITNESS:  Yes.  It's dated

13    September 14, 2007 but signed on September 24,

14    2007.

15    BY MS. WEGNER:

16       Q.    Oh, it's this Page 693?

17       A.    Correct.

18       Q.    So the fact that Exhibit No. 20,

19    Page Bates stamped 693, states that this letter

20    serves as your final warning, you believe

21    constitutes a last chance agreement?

22       MR. DISBROW:  Objection to relevance.  The

23    document speaks for itself.

24              You can answer the question.

Page 125

1    arbitration.  But in place of arbitration, prior

2    to the arbitration, Jim Rodriguez, Bob Wingo and

3    Pete LaRocco met in my office to try to resolve

4    this issue.

5              We were unable to come to an

6    agreement and Bob's termination became final.

7         Q.    Do you recall when the meeting took

8    place with Mr. Rodriguez, Mr. Winger and

9    Mr. LaRocco regarding the third step?

10        A.    Do I remember what date that was, no,

11   I don't.

12        Q.    Who assumed any of Mr. Wingo's duties

13   after his termination?

14        A.    Immediately after his termination,

15   that vacancy was covered with overtime.

16        Q.    Who on overtime performed any of

17   Mr. Wingo's duties immediately following his

18   termination?

19        MR. DISBROW:  Objection.

20              To the degree that you know.  There

21   is a number of employees.

22        MS. WEGNER:  Please don't be helping him.

23        MR. DISBROW:  I stated my objection.  I

24   think it's an unfair question.  You can answer it,

1   if you can.

2   BY THE WITNESS:

3        A.    Overtime was covered through

4   contract.  The contract states that arc work gets

5   asked first.  In this case, that would be Al

6   Herrera on third shift and Art Pachaco Flores on

7   second shift.  And I am sure other individuals, if

8   they turned it down, would be asked.

9   BY MS. WEGNER:

10       Q.    Did Tyler DeMien perform any of

11  Mr. Wingo's duties immediately after he was

12  terminated?

13       A.    I don't recall.  I don't believe so.

14  He is a side loader driver and would not be the

15  first person asked.

16       Q.    And has there been a permanent

17  replacement for Mr. Wingo?

18       A.    We, through the bidding process, had

19  people switch shifts to replace the people on

20  first shift that are initially Al -- Mario Alvarez

21  was one of the people brought from second shift to

22  first shift.

23       Q.    And after Mr. Alvarez, who then took

24  the position that Mr. Winger had held?

1          MR. DISBROW:  I am just going to object to

2     the form of the question.  I think it

3     mischaracterizes his testimony.

4               But you can answer it.

5     BY MS. WEGNER:

6          A.    There are no direct replacements

7     because the warehousemen are a pool of labor that

8     we pick from.

9               What we did was increased the numbers

10    of first shift people through the bidding process,

11    and switching people around from work station to

12    work station.

13              That position is currently being

14    filled my Mike Perrone.

15         Q.    I'm sorry, by who?

16         A.    Mike Perrone.

17         Q.    And how long has Mr. Perrone been

18    filling the position that Mr. Wingo had held?

19         MR. DISBROW:  Same objection.

20              You can answer the question, but same

21    objection, and I think it mischaracterizes the

22    testimony you just gave.

23    BY THE WITNESS:

24         A.    A month to two months maybe.