# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


ROBERT G. WINGO,                          )

        Plaintiff,               )

        vs.                      ) 1:08:CV-00368

THYSSENKRUPP MATERIALS NA, INC., )

d/b/a COPPER and BRASS SALES,      )

INC.,                                )

        Defendant.               )


     The deposition of ROBERT G. WINGO, called

for examination, taken pursuant to the Federal Rules

of Civil Procedure of the United States District

Courts pertaining to the taking of depositions,

taken before ELIA E. CARRIÓN, CSR No. 084.004641, a

Notary Public within and for the County of Cook,

State of Illinois, and a Certified Shorthand

Reporter of said state, taken at Suite 3700,

500 West Madison Street, Chicago, Illinois, on the

19th day of May, A.D. 2008, at 9:53 a.m.

Page 18

1 with Pete LaRocco while you were employed at Copper

2 and Brass?

3       A.    Good.  I knew Pete for 25 years.

4       Q.    And during the time you worked at Copper

5 and Brass, you were represented by the Teamsters?

6       A.    Yes, sir.

7       Q.    Okay.  Did you ever have any issue with

8 the Teamsters representing you during your

9 employment?

10      A.    No.  Never had hardly a grievance.  In

11 25 years I hardly ever had any problems.  I was

12 always good and never had any problems.

13      Q.    Let's talk about your statement that you

14 hardly had any grievances.

15            First of all, you were familiar with the

16 labor contract between the company and the

17 Teamsters?

18      A.    Sure.

19      Q.    And you filed a grievance at the time you

20 were terminated, correct?

21      A.    Yes.

22      Q.    That's not the first and only grievance

23 you ever filed, correct?

24      A.    Correct.  I had filed one about two years

1      Q.      The phone conversation you just

2 described, when did that take place?

3      A.      That was roughly right before Christmas,

4 somewhere right in there, like maybe somewhere

5 between the 17th and 20 something.

6      Q.      So again, we're talking Christmastime

7 last year, 2007?

8      A.      Correct.

9      Q.      Did you ever receive anything in writing

10 from the Teamsters letting you know what they were

11 going to do with your grievance?

12     A.      No.

13     Q.      So you were familiar with the labor

14 contract between the company and the Teamsters,

15 correct?

16     A.      Yes.

17     Q.      And you were obviously familiar enough

18 that, with respect to your termination, you filed a

19 grievance challenging your termination, right?

20     A.      Sure, yes.

21     Q.      Were you aware that the contract, the

22 labor contract between the company and the Teamsters

23 had a no discrimination provision?

24     A.      Yes.

Page 24

1    Q.    And were you aware that no discrimination

2 provision, among other things, prohibited

3 discrimination on the basis of age?

4    A.    Yes.

5    Q.    You never filed a grievance claiming the

6 company violated that provision of the contract,

7 correct?

8    A.    I don't have a copy of the grievance in

9 front of me to list all the, the issues.

10    Q.    When you say you "don't have a copy of

11 the grievance," Mr. Wingo, what grievance are you

12 referring to?

13    A.    The one that challenged my termination.

14    Q.    So without seeing that document,

15 Mr. Wingo, are you suggesting you can't answer the

16 question whether or not you ever filed a grievance

17 claiming the company did anything against you

18 because of your age?

19    A.    I think that was included in the wording.

20 I don't know if it was specifically on that, but it

21 was definitely in the wording.

22    Q.    Let me ask you this, Mr. Wingo:  What, if

23 anything, did you review to prepare for your

24 deposition today?

1      Q.    And when did you start working for Copper

2 and Brass?

3      A.    January 5, 1984.

4      Q.    And who was your supervisor at that time?

5      A.    Jim Baber was the plant manager.

6      Q.    And was that a union facility at the

7 time?

8      A.    Yes.

9      Q.    And that would be a -- the union was

10 Teamsters Local 714?

11     A.    Correct.

12     Q.    Who was the business agent at that time,

13 if you can recall?

14     A.    Oh, I don't remember.  It was a long time

15 ago.

16           They hadn't -- they had a couple of

17 different people at times, maybe three people over

18 the years.  Bob Riley was the second one.  I don't

19 remember if he was there when I first started.  He

20 was one of the later ones, I think.  I don't

21 remember the very first guy.

22     Q.    What was your first job at Copper and

23 Brass?

24     A.    It was order clerk.

Page 49

1    Q.    All right.  Duties and

2 responsibilities-wise, how is the order clerk

3 position different than the warehouse clerk

4 position?

5    A.    They were the same, basically.

6    Q.    What about from the packer position?

7    A.    Each station had certain jobs and duties

8 to process orders, and that's what I'm trying to

9 say.

10    Q.    So for example, there was something

11 referred to as the RWB station?

12    A.    RBW station, yes, sir.  That's rod, bar,

13 and wire.

14    Q.    Did you ever work at that station?

15    A.    That's where I started, and that's where

16 I was when I was terminated.

17    Q.    And when you worked at the rod, bar, and

18 wire -- we'll refer to it as the RBW station, if you

19 don't mind -- what position did you hold?

20         Was it the warehouse clerk position?

21    A.    Yes.

22    Q.    And what were your duties and

23 responsibilities at the RBW station?

24    A.    To pack the orders.  To measure it and

Page 50

1 pack it and weigh it.

2    Q.    And these were orders that were being

3 sent to Copper and Brass' various customers?

4    A.    Yes, sir.

5    Q.    Would also some of the orders be sent to

6 the other Copper and Brass distribution centers?

7    A.    Sure.  Transfers.

8    Q.    So you indicated that the RBW station,

9 your responsibilities consisted of packing,

10 weighing, and measuring the product?

11    A.    Yes.

12    Q.    Anything else?

13    A.    That's basically it.

14    Q.    And you said, Mr. Wingo, at the time that

15 you were terminated in December of 2007, you were

16 working at the RBW station?

17    A.    Yes.

18    Q.    How long, at the time you were

19 terminated, had you been working at that station?

20    A.    At that station, maybe two years.

21         I was packing previous in a different

22 area.

23    Q.    And for the last two years up to the time

24 you were terminated, did you have the same

Page 51

1 supervisor?

2    A.    Yes.

3    Q.    And that would have been Mr. DeMien?

4    A.    Correct.

5    Q.    And what shift were you working on at

6 that time?

7    A.    Always the first shift.

8    Q.    And what were the hours of the first

9 shift?

10    A.    6:00 to 2:30.

11    Q.    So throughout your employment at Copper

12 and Brass, you worked the first shift?

13    A.    Yes, sir.

14          I had two weeks on second shift when I

15 first started.

16    Q.    But after that it was all the first

17 shift?

18    A.    Correct.

19    Q.    Okay.  All right.

20          Now, you said prior to working at the RBW

21 station, you were packing in a different area.

22    A.    Yes.

23    Q.    Where would that have been, sir?

24    A.    That was -- actually, it was a multiple

1 area.  I packed for the saws and for the shears.

2    Q.    And was that area called something in

3 particular?

4    A.    What did they call it?  I guess it was

5 just another packing station.

6    Q.    And how long were you in that other

7 packing station?

8    A.    That one, I was there for maybe

9 five years, five to seven years, roughly.

10    Q.    And why were you moved from that packing

11 area to the RBW area?

12    A.    Well, one of the guys that was -- well,

13 let's see.  At that time -- that one may have been

14 just for a change.  One guy wanted to get out of

15 there, and I offered to switch with him and we

16 changed.

17    Q.    Do you remember who that was?

18    A.    Lance Amack.

19    Q.    And at the time you left, at the time you

20 were terminated in December of 2007, was Mr. Amack

21 still working at Copper and Brass?

22    A.    Yes.

23    Q.    And do you know if he's still employed at

24 Copper and Brass?

Page 53

1    A.    I think so, yes.

2    Q.    Was Mr. Amack working there when you were

3 hired in, back in 1984?

4    A.    No.

5    Q.    He was hired after you came in?

6    A.    Yes, sir.

7    Q.    How long after you were hired do you

8 recall Mr. Amack being hired at Copper and Brass?

9    A.    I think he was there for the last

10 10 years, so around roughly my 15th year, 14th, 15th

11 year, they hired Lance.

12    Q.    When you left, was Mr. Amack also a

13 warehouse clerk?

14    A.    Yes.

15    Q.    Do you know if Mr. Amack is older or

16 young than you?

17    A.    Lance is older.

18    Q.    Do you know how old Mr. Amack is?

19    A.    I think he's 64 or something like that.

20    Q.    All right.  So let's talk for a moment a

21 little bit further about this, when you worked in

22 the shear and saw area.

23        What were your duties in that area?

24    A.    Basically the same.  You were order

Page 54

1 clerks, so you would pack orders.

2      Q.    And so --

3      A.    Processed orders.

4      Q.    So when you talk in terms of process

5 orders, that means you'd be packing, weighing, and

6 measuring?

7      A.    Correct.

8      Q.    Okay.  And with regard to those duties,

9 there's a clerical function?

10     A.    Yes.

11     Q.    And what would the clerical --

12     A.    PK10.

13     Q.    Okay.  And that's the data entry function

14 you described before?

15     A.    Yes.

16     Q.    Was there any paperwork that you had to

17 keep while working in that position?

18     A.    Production sheets.

19     Q.    Those would be the daily production logs?

20     A.    Yes.

21     Q.    And that's something all warehouse clerks

22 had responsibilities to maintain during their

23 shifts?

24     A.    Yes.  And operators, too, so operators.

Page 55

1    Q.    With regard to the PK10 function, you

2 indicated that data would go into the company's

3 computer system, correct?

4    A.    Yes.

5    Q.    And so the data, if I understand what

6 you've testified to about that, Mr. Wingo, is you'd

7 be, what, entering the work order number?

8    A.    Correct.

9    Q.    The weight of the product?

10    A.    Correct.

11    Q.    Possibly a number of pieces --

12    A.    Yes.

13    Q.    -- of the product?

14          Anything else?

15    A.    That's it, basically, the billing

16 process, whether it was pieces or weight; and you

17 would put, where you put it, maybe location, or you

18 would put -- sign your name, your initials.

19    Q.    When you talk in terms of pieces or

20 weight, we're talking, first of all, about the metal

21 product that Copper and Brass was selling to its

22 various customers, correct?

23    A.    Correct.

24    Q.    And sometimes customers would want you to

1 process the order based on piece number, correct?

2     A.    Yes.

3     Q.    Okay.  Sometimes they'd want you to do it

4 based on weight?

5     A.    Yes.

6     Q.    And how would you know that?

7     A.    It would usually be in the billing blank.

8 There would be a blank space in the work order for

9 billing, and that's usually where that would say how

10 is it billed.  And that's usually your

11 discriminating factor, as far as how you, what is it

12 billed by.

13     Q.    So when you talk about the billing order,

14 we're talking about, it's also the work order that

15 the company would give you?

16     A.    Could you rephrase that, please?

17     Q.    Well, let me ask you this:  You just said

18 there was a source that had various information that

19 you would know the customers' needs and demands,

20 correct?

21     A.    Yes.

22     Q.    Was that found on a work order?

23     A.    Yes.  It would be under billing.

24     Q.    And you would have that at your work

1 station?

2     A.    It would be the work order.  That's the

3 actual work order, how it was billed.

4     Q.    And were you supposed to review that,

5 before you would package the materials and have it

6 shipped off?

7     A.    No, you just basically look at it when

8 you PK10, and when you're doing your PK10, your data

9 entry.  That's where it would come out more than

10 anything.

11    Q.    All right.  So you'd take the work order,

12 and you'd look at the information on the work order,

13 and you'd enter that on the PK10?

14    A.    Correct.

15    Q.    And you would agree, it would be

16 important for you to accurately enter that

17 information, because the company would rely on that

18 data, correct?

19    A.    Yes, sir.

20    Q.    And the company would rely on that data

21 for, among other things, to track its inventory,

22 correct?

23    A.    Exactly.

24    Q.    All right.  So you indicated, Mr. Wingo,

1    Q.    With regard to the PK10 process, the

2 information that you would input into the computer,

3 did the company also rely upon that information to

4 service and bill their customers?

5    A.    Yes.

6    Q.    At the time in the fall of 2007, prior to

7 your termination, how many orders a day were you

8 processing, approximately?

9    A.    It varied, according to the work flow.  I

10 mean it's hard to put numbers.

11          I know that with the economy going bad,

12 the numbers went down.  I mean in previous times I'd

13 done over a hundred orders.

14    Q.    Let's focus on the fall of 2007.

15          What would be the range of the least

16 amount of orders and the most amount of orders you

17 might have done?

18    A.    One day at Thanksgiving one guy had eight

19 orders.  I had 12 that day.  It was right before

20 Thanksgiving, so it was a very slow time.  A lot of

21 companies had shut down, so that was the low

22 watermark for me probably was like 8 or 10 or 12.

23          And the high watermark was 25 to 35, you

24 know, it depends.  It was just always different.

Page 64

1    Q.    Now, you indicated that the economy was

2 going down in the fall of 2007?

3    A.    Yes.  I noticed a downturn in orders.

4    Q.    So you noticed that at Copper and Brass

5 there was a decline in orders?

6    A.    Exactly.

7    Q.    Was there any greater concern at Copper

8 and Brass at that point about the need to more

9 carefully service the customers and make sure their

10 quality and orders were being properly processed?

11    A.    Yes, and that always was an issue for

12 accuracy.

13    Q.    So coming back to your daily production

14 log, what information would you put on that?

15    A.    You would put the work order number and

16 the, what was -- the pieces and weight, I believe it

17 was.  I don't have one in front of me, but I believe

18 it was basically the pieces and the weight --

19    Q.    Okay.

20    A.    -- that you shipped out, and then any

21 notes that went along with it, you know.

22    Q.    What type of notes would you put on it?

23    A.    Well, sometimes the orders were bent

24 metal, or sometimes you weren't able to totally

Page 67

1 note.  You know, sometimes you would write it on

2 your, on your paper, you know, your production

3 sheet.  You didn't always have time, then you tried

4 to relay it to the guys who would walk by.

5 Sometimes the guys would come in early, so you could

6 verbally tell them.  You know, it wasn't always the

7 same process.  It was sometimes a combination.

8     Q.    And you would agree, like the data

9 entered for PK10'ing, the information you put on

10 your daily production logs, it was important for it

11 to be accurate?

12    A.    As much as possible, sure.

13    Q.    It was important to be accurate, again,

14 because the next shift might have to do something,

15 right?

16    A.    Yes.

17    Q.    And also the daily production log I'm

18 assuming was also used to track inventory?

19    A.    Yes.

20          That's -- okay.

21    Q.    The RWB station, is that considered to be

22 a non-processing work station?

23    A.    Yes.

24    Q.    And the shear and saw area that you

1 grievance and somewhere between termination.

2     Q.     All right.  So again, just so the record

3 is clear, we're talking in terms of the harassment

4 grievance.  That's the grievance where you

5 complained about Mr. DeMien swearing at you?

6     A.     Yes, sir.

7     Q.     So let's see if we can be a little bit

8 more surgically precise.

9          When was it that Mr. Lunt might have

10 offered you the helper position?

11     A.     Probably in October sometime.

12     Q.     And was this something he offered you --

13     A.     October, November.

14     Q.     So when was it that you recall Mr. Lunt

15 offering you the helper position?

16     A.     It was probably either end of October,

17 November or early December, somewhere in there;

18 right around the last month or so.

19     Q.     And is this something he offered you in

20 person?

21     A.     Yes.

22     Q.     Was anybody else present?

23     A.     I think Mark was there.

24     Q.     Mr. DeMien?

Page 73

1    A.    Mr. DeMien.

2    Q.    And where did the meeting take place?

3    A.    In Randy's office.

4    Q.    And what do you recall Mr. Lunt telling

5 you?

6    A.    That, that, you know, that they would

7 make me a general warehouse helper --

8    Q.    And what did you respond?

9    A.    -- if I made mistakes.

10         Yeah, um, I responded, saying that I

11 couldn't take it, because it was a cut in pay.  It

12 was a loss of pay, and I couldn't afford to do it.

13   Q.    How much of a loss in pay?

14   A.    Like three bucks an hour.

15   Q.    And had you already been disciplined on a

16 number of occasions in the fall of last year, when

17 he had this conversation with you?

18   A.    Pertaining to discipline how?

19   Q.    Let me ask you this:  You saw the

20 complaint that was filed by your attorney in this

21 case?

22   A.    Do you mean -- I'm not sure what you

23 mean.

24   Q.    The papers starting this lawsuit, did you

Page 85

1 and then it appears apparently you X'd out the box

2 "I disagree with this statement," correct?

3     A.    Yes, sir.

4     Q.    And this document indicates that you were

5 being suspended one day for lack of production on

6 January 29, 1999, correct?

7     A.    That's what it says, but Randy gave me a

8 vacation day for this day.

9     Q.    Well, regardless, this document says

10 you're being suspended for a day, doesn't it?

11     A.    Yes.

12     Q.    And it indicates -- where were you

13 working, first of all, on January --

14     A.    That's a good question.

15           And it looks like it was kind of a

16 floater-type position.  It was a time in '99 when

17 the economy was real bad, and there wasn't many

18 orders, and they had a big layoff around this time.

19 So there was, there was not many orders and stuff,

20 it was a slow time for the company.  They closed

21 down second and third shift.

22     Q.    And you would agree, this document

23 indicates that you have a long history of wasting

24 time, being away from your work station --

1    A.    No.

2    Q.    You don't recall being suspended in

3 July of 1999 by Copper and Brass?

4    A.    No.

5    Q.    Are you suggesting this document was

6 fabricated by Copper and Brass?

7    A.    There's no one that signed it.

8    Q.    Again, I'm going to ask you to answer my

9 question.  It merely calls for a yes or no.

10    A.    What's the question?

11    Q.    The question was, are you suggesting that

12 this document was fabricated by Copper and Brass?

13    A.    It's not a yes or no answer.  It's I

14 don't know, because there's no one that signed it.

15 Anyone could have wrote it.  I didn't sign it, it's

16 a -- you know.

17    Q.    Well, it's not quite accurate, when you

18 say no one signed the document.

19          Isn't Pete LaRocco's signature on the

20 bottom of the page?

21    A.    Yes, LaRocco is there, but no supervisor;

22 and myself, I did not sign it.

23    Q.    And again, I'm going to -- Mr. Wingo, I'm

24 going interrupt again.  I'm going to again ask you

Page 98

1 talking.

2    Q.    Do you know whether or not he had any

3 notes taken at that meeting or prepared for that

4 meeting or after that meeting?

5    A.    I, I didn't see him reading or anything,

6 no.  I think he was just talking.

7    Q.    Again, coming back to my question, do you

8 know if Randy Lunt prepared any notes before or

9 after that meeting, pertaining to that meeting?

10    A.    He could have prepared them afterwards.

11 I didn't see him reading anything at the time.

12    Q.    So you don't whether or not Randy Lunt

13 had notes that he prepared before or after that

14 meeting, do you?

15    A.    No, because he was just standing up there

16 talking.

17    Q.    What are repetitive errors?

18    A.    Errors that you make again.  Almost every

19 error in the place is repetitive, to some extent,

20 because --

21    Q.    Were you ever disciplined for repetitive

22 errors?

23    A.    Yes.

24    Q.    Were any other employees ever disciplined

Page 99

1 for repetitive errors?

2     A.    I don't know.

3     Q.    There were work rules at Copper and

4 Brass?

5     A.    Yes.

6     Q.    Did you ever receive any copies of the

7 work rules?

8     A.    Yes.

9     Q.    And the work rules, there were different

10 categories of work rules?

11     A.    Yes.

12     Q.    There's a categories A, B, C, and D,

13 correct?

14     A.    Correct, yes.

15     Q.    And D was considered to be the most

16 serious work rule to be violated?

17     A.    Possibly.  I think so.

18     Q.    If you violated work rule D, could that

19 subject you to immediate termination?

20     A.    Is that the one?  I don't have total

21 recall on the rules, but it could be.

22     Q.    When was the last time you saw the work

23 rules at Copper and Brass?

24     A.    You know, I was never in trouble, so I

Page 101

1    Q.    Would you agree that you were disciplined

2 more than ten times while you were employed at

3 Copper and Brass?

4    A.    No.  I doubt it.

5    Q.    Okay.  How does your disciplinary record

6 compare to other employees at Copper and Brass?

7    A.    Well, I lasted 24 years, so in comparison

8 to other employees, it was excellent.

9    Q.    Well, let's ask about you now, sir, about

10 other people's disciplinary records.

11          While you were employed at Copper and

12 Brass, did you have access to any other employees'

13 personnel files?

14    A.    No.

15    Q.    Have you ever reviewed any other

16 employee's personnel file?

17    A.    No.

18    Q.    Okay.  So how do you know that your

19 disciplinary record, in comparison to other

20 employees, was better than theirs?

21    A.    Because while I worked there, there was

22 nearly 300 people that were fired or let go in some

23 capacity, both sales and warehouse.  I lasted

24 24 years, so I would consider my tenure excellent,

Page 105

1 time --

2    A.    Give me another 30 seconds.

3    Q.    I really don't have any very specific

4 question.  It should take about 30 seconds.

5    A.    Okay, but this is kind of important stuff

6 here, though.

7          Okay.

8    Q.    So you've had a chance to kind of quickly

9 review Exhibit 7, which is the complaint filed on

10 your behalf?

11   A.    Yes, sir.

12   Q.    Have you seen that document before?

13   A.    Yes.

14   Q.    Okay.  And is there anything in there

15 that is not accurate?

16   A.    No.  I think it's pretty good, except for

17 there was a couple of names that were omitted from

18 number 12.

19   Q.    Okay.  What names were omitted from

20 number 12?

21   A.    Lizardo, Hernandez, and Ray Cather.

22         Lizardo, you want me to spell that?

23 It's just how it sounds, actually.

24   Q.    L-I-Z-A-R-D-O?

Page 106

1    A.    Correct, Hernandez.

2    Q.    And Ray Cather?

3    A.    Cather with a C.

4    Q.    So other than those two additions, the

5 complaint otherwise is accurate?

6    A.    I believe so.

7    Q.    Okay.  All right.  So let me ask you

8 this:  Do you know, do you recall working with a

9 gentleman named Scott Orsic?

10    A.    Yes.

11    Q.    Who was Scott Orsic?

12    A.    Scott Orsic was plant manager maybe

13 10 years ago, before Randy Lunt.

14    Q.    And did Mr. Orsic ever discipline you?

15    A.    Possibly.

16    Q.    Do you remember what he might have

17 possibly disciplined you for?

18    A.    I'm not sure.

19    Q.    Let's --

20    A.    I was there for 24 years.  It's hard to

21 have total recall.

22    MR. LINDEN:  Let's mark this Exhibit Number 8,

23 please.

24        (WHEREUPON, a certain document was

1        marked Wingo Deposition Exhibit No. 9,

2        for identification, as of this date.)

3            (WHEREUPON, the document was

4            tendered to the witness.)

5 BY MR. LINDEN:

6    Q.    All right.  Exhibit 9 is discipline you

7 were given in May of 1999, correct?

8    A.    What was the -- oh, letter of counsel?

9 Okay.

10    Q.    Do you recall receiving Exhibit Number 9?

11    A.    Is this -- yes, yes.

12    Q.    All right.  So you were given that back

13 in May of 1999, correct?

14    A.    Yes.

15    Q.    And it was given to you by Mr. Lunt?

16    A.    Correct.

17    Q.    What position did you hold at the time

18 you received this?

19    A.    I don't totally remember.  It could've

20 been -- '99, it could have -- oh, man, could have

21 been just packing sheet.  And I'm not sure where it

22 is.  Actually, he didn't say.

23    Q.    Okay.  Mr. Lunt notes in this counseling

24 that you need to improve your following of the

1 corporate packing and PK10 procedures, correct?

2    A.    Yes.

3    Q.    And he also wrote that you've been

4 trained and retrained, correct?

5    A.    Yes.

6    Q.    And your response on this document was

7 "200 orders a week, I'm not perfect," correct?

8          That's your writing?

9    A.    Yes.

10   Q.    Okay.  Did you file a grievance

11 challenging this?

12   A.    Basically, a verbal grievance with Randy,

13 where we discussed the whole thing.  I told him I

14 was doing 200 orders a week, that I wasn't going to

15 get them all correct every time.

16   Q.    Did you file a written grievance, under

17 the labor contract, challenging this discipline?

18   A.    No.

19   MR. LINDEN:  Let's mark that 10, please.

20        (WHEREUPON, a certain document was

21    marked Wingo Deposition Exhibit No. 10,

22    for identification, as of this date.)

23        (WHEREUPON, the document was

24        Tendered to the witness.)

Page 110

1 BY MR. LINDEN:

2    Q.    All right.  Mr. Wingo, you've been handed

3 what has been marked Exhibit 10, which is an

4 employee report form, dated June 15th, 1999,

5 addressed to you.

6          Do you recall receiving this?

7    A.    Yes.

8    Q.    Okay.  And that's your signature above

9 the employee signature?

10    A.    Yes.

11    Q.    And you also indicated you disagreed with

12 the statement, and you gave your explanation,

13 correct?

14    A.    Yes.

15    Q.    Did you ever file a written grievance,

16 under the labor contract, challenging this

17 discipline?

18    A.    No.  I just let Randy know that this

19 scale wasn't always working properly, and we tried

20 to --

21    Q.    All right, but coming back to my

22 question, so the record's clear, you never filed a

23 written grievance under the labor contract

24 challenging this discipline?

Page 111

1    A.    No.

2    Q.    And this was given to you by Randy Lunt,
3 correct?

4    A.    Yes.

5    Q.    And this was a verbal warning for
6 repetitive errors, correct?

7    A.    Yes, which only means the second
8 mistake --

9    Q.    I'm going to ask you to kindly confine
10 yourself to my question, sir.

11    A.    Okay.

12    MR. LINDEN:  Let's mark this Exhibit 11.

13         (WHEREUPON, a certain document was

14     marked Wingo Deposition Exhibit No. 11,

15     for identification, as of this date.)

16         (WHEREUPON, the document was

17         tendered to the witness.)

18 BY MR. LINDEN:

19    Q.    So you've been handed what has been
20 marked Exhibit 11, which is an employee report form
21 dated January 10, 2001.

22         Do you recall receiving this?

23    A.    Yes.

24    Q.    Was James Dunne ever your supervisor?

Page 112

1     A.    Yes.

2     Q.    Where were you working at the time in

3 January of 2001?

4     A.    As an order clerk.

5     Q.    And according to this document, this got

6 changed from a written warning to an oral warning,

7 correct?

8     A.    Yes.

9           Oh, wait, it was, it was oral.

10    Q.    Well, sir, you see at the bottom of the

11 page, where it says "Changed to verbal"?

12    A.    Nobody signed it, nobody dated it.  I

13 don't know who could have wrote that.

14    Q.    Let me ask you this, sir, since you seem

15 to be speculating about the document.

16          You see, first of all, above your

17 signature it says, "Written Warning," with an X in

18 it?

19    A.    Yes.

20    Q.    And then it's circled and written

21 "deleted"?

22    A.    Yes.

23    Q.    And then above it, there's an X in the

24 "Oral Warning" box, correct?

1 BY MR. LINDEN:

2    Q.    Did you ever file a written grievance,

3 under the labor contract, challenging this memo

4 issued to you?

5    A.    Just what I wrote on the work order.

6    Q.    All right, but again, try to answer my

7 question.  My question was --

8    A.    No.

9    Q.    Let me ask the question, Mr. Wingo.

10         Did you ever file a written grievance,

11 under the labor contract, challenging your being --

12 your receiving Exhibit 13?

13    A.    Not an official grievance.

14    Q.    Let's come back again to my question.

15    A.    No.

16    Q.    Did you ever file -- let me ask the

17 question, Mr. Wingo.  And in a minute my patience is

18 about to run out on this, and we're just going to

19 terminate the deposition.

20         My question is very simple, and again, if

21 you don't understand my question, let me know.  My

22 question is, did you ever file a written grievance

23 under the labor contract, challenging your receipt

24 of Exhibit 13?

1    A.    No.

2    MR. LINDEN:  Let's mark this Exhibit 14,

3 please.

4         (WHEREUPON, a certain document was

5     marked Wingo Deposition Exhibit No. 14,

6     for identification, as of this date.)

7         (WHEREUPON, the document was

8         tendered to the witness.)

9 BY MR. LINDEN:

10    Q.    You've been handed by the court reporter,

11 Mr. Wingo, what has been marked Exhibit 14, which is

12 a November 7, 2001 letter of counsel addressed to

13 you.

14         Have you seen this document before?

15    A.    Yes.

16    Q.    Is that your signature?

17    A.    Yes.

18    MR. LINDEN:  Let's mark this Exhibit 15.

19         (WHEREUPON, a certain document was

20     marked Wingo Deposition Exhibit No. 15,

21     for identification, as of this date.)

22         (WHEREUPON, the document was

23         tendered to the witness.)

24 BY MR. LINDEN:

Page 127

1 discipline that it was your first error in five

2 years, sorry, will watch closer.

3     A.    I was being sarcastic.

4     Q.    You were being sarcastic in your

5 response?

6     A.    Yes.

7     Q.    Did you ever file a written grievance,

8 under the labor contract, challenging this written

9 warning that you were given?

10    A.    No.

11    Q.    This was, this was given to you by

12 Mr. Lunt?

13    A.    Yes.

14    Q.    Okay.  Where were you working at the time

15 that you were given this?

16    A.    It's hard to say.  I mean I was -- I had

17 many various jobs.  I'm thinking this was probably

18 still at the shear sheet and RBW packing station.

19 This was a packing station, probably.

20          I was packing 40 orders a day, so

21 sometimes I made mistakes.

22    Q.    Mr. Wingo, I'm going to ask you to please

23 wait until I pose a question.  Thanks.

24    MR. LINDEN:  Let's mark this Exhibit 21,

Page 129

1 received this?

2    A.    I said already that I was at, probably at

3 one of the packing stations.

4    Q.    And you weren't issued a suspension at

5 this time, correct, it was actually a, issued a

6 written warning?

7    A.    Yes, sir.

8    Q.    Did you file a written grievance

9 challenging this written warning?

10    A.    No, I didn't.

11    Q.    You wrote an explanation, yet you refused

12 to sign it, correct?

13    A.    Yes.

14    Q.    And this was issued to you by Mr. DeMien,

15 correct?

16    A.    Yes.

17    Q.    So Mark DeMien was supervising you at

18 least as far back as September of 2004?

19    A.    Yes, sir.

20    Q.    But you didn't have any problems with

21 Mark DeMien until August of 2007, correct?

22    A.    Correct.

23    MR. LINDEN:  Let's please mark this Exhibit 22.

24         (WHEREUPON, a certain document was

1    A.    That I did 175 work orders a week, and

2 sorry if I will make -- if I made some mistakes.

3    Q.    Did you file a written grievance, under

4 the labor contract, challenging getting this

5 written -- not written, oral warning?

6    A.    No.

7    Q.    And in May of 2005, do you recall where

8 you would have been working at the time?

9    A.    That could have either still been the

10 previous packing area that we talked about or the

11 RBW area.  I wasn't real sure on which one that was.

12            (WHEREUPON, the deposition

13            was recessed until 1:10 p.m.,

14            this date.)

15    MR. LINDEN:  Let's go back on the record,

16 please.

17 BY MR. LINDEN:

18    Q.    Now, as I understand your claim in this

19 case, Mr. Wingo, you're claiming that the company

20 discriminated against you on the basis of your age,

21 correct?

22    A.    Yes, yes, sir.

23    Q.    And you're claiming, among other things,

24 they terminated you because of your age, correct?

Page 132

1    A.    Yes.

2    Q.    And you're also claiming that in the fall

3 of 2007 they disciplined you because of your age?

4    A.    Yes.

5    Q.    Okay.  Who is it at the company you're

6 claiming decided to terminate you because of your

7 age?

8    A.    I'm not sure exactly who the main ones

9 were or if it was three people.  You know, my

10 bosses, that's all I know.  Randy Lunt.

11    Q.    You said "three people."

12          Who could the three people possibly have

13 been?

14    A.    Mark DeMien, the day shift foreman;

15 Randy Lunt, the plant supervisor; and I don't know

16 who else, actually.

17    Q.    All right.

18          Do you know who actually made the

19 decision to terminate you?

20    A.    No.

21    Q.    Do you know how old Randy Lunt is?

22    A.    Yeah, he's my age.

23    Q.    So he's what, roughly 54 years old?

24    A.    Yes.

Page 134

1    A.    Yes.

2    Q.    And there's a work rule pertaining to

3 falsifying company documents?

4    A.    Correct.

5    Q.    Okay.  That's a work rule subject to

6 immediate termination, correct?

7    A.    Yes.

8    Q.    Okay.  Excessive errors, that's a

9 different work rule, right?

10    A.    Yes.

11    Q.    Okay.  And there's progressive discipline

12 that would be subject to that?

13    A.    Yes.

14    Q.    And you'd only get discharged after being

15 disciplined for the fourth time for that, correct?

16    A.    Okay, sure.  Yes.

17    Q.    Okay.

18    MR. LINDEN:  Let's mark this Exhibit 23, if we

19 could, please.

20        (WHEREUPON, a certain document was

21         marked Wingo Deposition Exhibit No. 23,

22         for identification, as of this date.)

23            (WHEREUPON, the document was

24              tendered to the witness.)

1 BY MR. LINDEN:

2    Q.    Mr. Wingo, you have been handed what has

3 been marked Exhibit 23, which is an employee report

4 form dated 12/1/05, to you, from Mark DeMien.

5          Excuse me for a minute.

6    MR. LINDEN:  We're going to have to go off the

7 record.

8          (Telephone interruption.)

9 BY MR. LINDEN:

10   Q.    All right.  Sorry about the interruption.

11         So you now have in front of you, in your

12 hand, Exhibit 23.

13         Have you seen this document before?

14   A.    Yes.

15   Q.    And that's your handwriting under, "I

16 disagree with statement"?

17   A.    Yes.

18   Q.    Did you ever file a written grievance

19 relative to this discipline?

20   A.    No.

21   Q.    And Mark DeMien gave you this discipline?

22   A.    Yes.

23   Q.    And were you working at the RBW area at

24 the time --

1     A.     No, this was at the PVC machine.

2     Q.     Okay.  Where is the PVC machine relative

3 to the RBW area?

4     A.     Opposite side of the building.  One's in

5 the front by the receiving doors, and one's in the

6 back of the building, on the opposite side.

7     Q.     Is theft a dischargeable offense at

8 Copper and Brass?

9     A.     I think so.

10    Q.     And is theft an offense that you could be

11 terminated for the first occurrence?

12    A.     Yes.

13    Q.     Were you ever accused of any theft?

14    A.     No.

15    Q.     Did anybody ever accuse you of taking

16 company property without permission?

17    A.     No, just -- the only things were like

18 wood, but Randy okayed all that.  He always said I

19 could take the firewood.

20    MR. LINDEN:  Let's mark this as Exhibit 24,

21 please.

22        (WHEREUPON, a certain document was

23        marked Wingo Deposition Exhibit No. 24,

24        for identification, as of this date.)

Page 137

1          (WHEREUPON, the document was

2          tendered to the witness.)

3 BY MR. LINDEN:

4      Q.    You've been handed by the court reporter

5 what has been marked Exhibit 24, which is, for

6 purposes of identification, is an employee report

7 formed dated March 28, 2006, addressed to you from

8 Mark DeMien.

9          Have you ever seen this document before?

10     A.    Yes.

11     Q.    And that's your signature above "Employee

12 Signature"?

13     A.    Yes.

14     Q.    Do you recall receiving this?

15     A.    Yes.

16     Q.    And this was prompted by Mark DeMien

17 apparently being concerned about you taking

18 six pieces of cut masonite.

19     A.    Yeah.  They were in the garbage.  They

20 were thrown out, and I was taking them home.

21     Q.    Did you ever file a grievance about

22 receiving this?

23     A.    This?  No.  He just said bring it back,

24 so I did.

1      Q.    But regardless, Mr. DeMien is the person

2 who disciplined you for this, correct?

3      A.    Yes.

4      Q.    And it was a written warning?

5      A.    Yes.

6      Q.    Okay.  Now, at various points Jim Dunne

7 was your supervisor?

8      A.    Yes.

9      Q.    How old is Jim Dunne?

10     A.    Maybe 35, something like that, when he

11 was there.  I'm not sure exactly.

12     Q.    Was he still working there when you left?

13     A.    No.  Jim got fired.

14     Q.    Do you know what he got fired for?

15     A.    I'm not exactly sure.

16     Q.    Now, I believe earlier today you

17 indicated during the course of your career there

18 were some 300 or so people you worked with?

19     A.    Roughly, yes.

20     Q.    And I'm assuming, of those 300 people,

21 some of them got terminated?

22     A.    Oh, yes.

23     Q.    Any of those people who got terminated

24 younger than you?

Page 139

1      A.      Probably.

2      Q.      Let me show you what I'm going to have

3 the court reporter mark as Exhibit 25.

4              (WHEREUPON, a certain document was

5          marked Wingo Deposition Exhibit No. 25,

6          for identification, as of this date.)

7              (WHEREUPON, the document was

8              tendered to the witness.)

9 BY MR. LINDEN:

10     Q.      You've been handed what has been marked

11 Exhibit 25.  It's -- for purposes of identification,

12 it's an employee report form dated September 12th,

13 addressed to you.

14             Is that your signature on this?

15     A.      Yes.

16     Q.      And this was an oral warning given to you

17 by Mr. Dunne?

18     A.      Yes.

19     Q.      Did you ever file a written grievance,

20 under the labor contract, challenging this

21 discipline?

22     A.      No.

23     MR. LINDEN:  Let's please mark this Exhibit 26.

24             (WHEREUPON, a certain document was

Page 140

1        marked Wingo Deposition Exhibit No. 26,

2         for identification, as of this date.)

3             (WHEREUPON, the document was

4             tendered to the witness.)

5  BY MR. LINDEN:

6        Q.    You've been handed what has been marked

7  Exhibit 26, Mr. Wingo, which, for purposes of

8  identification, is an employee report form, dated

9  June 22, 2007 addressed to you, issued by

10 Randy Lunt.

11            Have you seen this document before?

12       A.    Yes.

13       Q.    Okay.  Is that your signature above

14 "Employee Signature"?

15       A.    Yes.

16       Q.    So you received a copy of this?

17       A.    Yeah.

18       Q.    Did you ever file a written grievance

19 challenging this verbal warning you were given?

20       A.    No.

21       Q.    This was a verbal warning given to you by

22 Randy Lunt for repetitive work orders?

23       A.    Yes.

24       Q.    And your response was you disagreed with

Page 142

1 out"?

2         Was this discipline ever removed from

3 your record?

4    A.    Evidently not, no.

5    Q.    And you never filed a written grievance

6 challenging it?

7    A.    No.

8    Q.    Okay.  When you PK10 an order, and the

9 order from the customer requires it to be by piece

10 as opposed to weight, are you supposed to data entry

11 the number of pieces on that order?

12   A.    Correct.

13   Q.    Okay.  And if the work order specifies

14 the customer wants you to do it by piece and not by

15 weight, when you fill the order, are you supposed to

16 fill it by piece or by weight?

17   A.    If it's billed by piece, you fill it by

18 piece.

19   Q.    And the order will indicate as such?

20   A.    The work order, yes.  It should have it

21 on there that that's billed by the piece, so you

22 want to key punch by the piece.

23   Q.    Okay.  Did you ever have any discussions

24 with Mark DeMien about the importance of accurately

Page 143

1 and reliably doing the PK10 process?

2      A.     Sure.

3      Q.     On more than one occasion?

4      A.     Yes.

5      MR. LINDEN:  Let's mark this, please, as

6 Exhibit 27.

7             (WHEREUPON, a certain document was

8        marked Wingo Deposition Exhibit No. 27,

9        for identification, as of this date.)

10            (WHEREUPON, the document was

11               tendered to the witness.)

12 BY MR. LINDEN:

13     Q.     You've been handed, Mr. Wingo, what has

14 been marked Exhibit 27, which, for purposes of

15 identification, is an employee report form dated

16 October 4, 2007, addressed to you from Mr. DeMien.

17            Is that your signature on this?

18     A.     Yes.

19     Q.     Did you receive a copy of it?

20     A.     Yes.

21     Q.     This was a written warning issued you by

22 Mr. DeMien in October of 2007, correct?

23     A.     Yes, I was working with another employee,

24 and the labels got switched.

1 wait until I ask you questions, Mr. Wingo.

2      A.    Sure.

3      Q.    All right.  Now, this discipline

4 references the fact that you had previously received

5 the oral warning on June 22, 2007, correct?

6      A.    Yes.

7      Q.    And that was Exhibit 26, which we just

8 got done talking about?

9      A.    Yes.

10      Q.    Okay.  And like that, you never filed a

11 written grievance challenging this written warning

12 issued to you, correct?

13      A.    Correct.

14      Q.    And under the labor contract, if you

15 wanted to you could have filed a grievance

16 challenging the issuance of this discipline,

17 correct?

18      A.    Correct.

19      Q.    And you had your union steward present

20 when you got this discipline?

21      A.    Yes.  He signed it.

22      Q.    Now, are you claiming Mark DeMien gave

23 you this discipline on October 5, 2007, because he

24 was discriminating against you because of your age?

1      A.     Not all the errors were because of age.

2 I mean this error was a mistake, and people make

3 mistakes.  So I mean I made a mistake, it was in

4 there.

5      Q.     So you don't contest the fact that you

6 made a mistake which resulted in your discipline,

7 correct?

8      A.     Correct.

9      Q.     Okay.  But are you claiming that

10 Mr. DeMien gave you this discipline because of your

11 age?

12      A.     This discipline?

13      Q.     Correct.

14      A.     No.  I can't prove that.

15      MR. LINDEN:  Let's mark this Exhibit 28.

16          (WHEREUPON, a certain document was

17       marked Wingo Deposition Exhibit No. 28,

18       for identification, as of this date.)

19              (WHEREUPON, the document was

20              tendered to the witness.)

21 BY MR. LINDEN:

22      Q.     All right.  Mr. Wingo, you've been handed

23 by the court reporter what has been marked

24 Exhibit 28.  For purposes of identification, it's an

1 employee report form, dated October 10, 2007,

2 addressed to you from Mr. DeMien.

3          You received a copy of this?

4     A.   Yes.

5     Q.   And that's your signature above the

6 employee signature?

7     A.   Yes, sir.

8     Q.   And when Mr. DeMien gave this to you, did

9 he give it to you in person?

10    A.   I don't remember.  Probably.

11    Q.   And was Mr. LaRocco, your union steward,

12 present?

13    A.   Yes.

14    Q.   Do you remember where the three of you

15 might have met?

16    A.   Could have been in one of the offices.

17    Q.   But you don't recall for certain?

18    A.   Probably the office, his office, Mark's

19 office.

20    Q.   Okay.  And at the time you were issued a

21 one-day suspension?

22    A.   Yes.

23    Q.   Did you file a grievance, under the labor

24 contract, challenging your one-day suspension?

Page 148

1    A.    No.

2    Q.    And you could have, if you had wanted to,

3 correct?

4    A.    Yes.  I guess.  I wasn't totally aware

5 that you could file a grievance on every written

6 reprimand.

7    Q.    Well, let me ask you this, Mr. Wingo --

8    A.    I mean I just never did it.

9    Q.    Did you ask Mr. LaRocco to file a

10 grievance for you?

11    A.    No.  He didn't offer, I didn't ask.

12    Q.    Okay.  And you had received a copy of the

13 labor contract?

14    A.    Yes.

15    Q.    And you had filed grievances before,

16 under the contract, correct?

17    A.    Occasionally.  Only a couple.

18    Q.    When you say "a couple," how do you

19 define a couple?

20    A.    I was there 24 years, I probably filed

21 two or three.

22    Q.    Okay.  When's the last time you filed a

23 grievance, relative to your termination?

24    A.    The two years before that we had

Page 149

1 discussed earlier.

2    Q.    Concerning Mr. Catama?

3    A.    Yes, sir.

4    Q.    So that would have been in 2005?

5    A.    Yes.  And at the moment that's the only

6 other one I can recall in 24 years.

7    Q.    Fair enough.  Now, under "Employee

8 Statement" on Exhibit 28, that's your writing?

9    A.    Yes.

10    Q.    And so you were giving an explanation as

11 to what had happened, correct?

12    A.    Yes.  It shouldn't have came to my area.

13 It was a cut order that should have went to a whole

14 other area.  The operator made a mistake.

15    Q.    Who was the operator at the time?

16    A.    This, I believe this one was Tyler

17 DeMien, a younger, a younger operator.

18    Q.    Regardless of the fact, you did write on

19 this document, did you not, you should have caught

20 the mistake?

21    A.    We both should have caught the mistake.

22    Q.    I'm not asking if you both should have

23 caught the mistake.

24        You wrote on this document, did you not,

Page 150

1 you should have caught the mistake?

2      A.    Yes.

3      Q.    Now, do you know if Mr. DeMien received

4 any sort of counseling, verbal or otherwise, as a

5 result of this incident?

6      A.    As far as I know, no, because he didn't

7 sign the order, so they didn't know who did it.

8      Q.    Well, did you tell anybody who did it?

9      A.    I think I told his dad, and that's why

10 his dad would get mad at me, because I would tell

11 him that his son is pulling the wrong stuff.

12      Q.    So father and son are working together.

13 Mark DeMien is the supervisor of his son, Tyler

14 DeMien?

15      A.    Yes.

16      Q.    Did he ever show any favoritism to his

17 son, as a result?

18      A.    Well, he let him break company rules by

19 talking on his cell phone.  We weren't supposed to

20 have cell phones on the floor.  We weren't supposed

21 to talk on our cell phones while we're on the clock,

22 only at break time.  And he would continuously let

23 him talk, sitting in the Jeep in the building.  He

24 would let him leave the building on -- not on break

Page 151

1 and go out back and talk on the cell phone.

2    Q.    Did any of your fellow employees ever

3 complain to you that they thought Mark DeMien was

4 showing favoritism toward his son?

5    A.    Sure, lots of people.

6    Q.    Who do you recall making those

7 complaints?

8    A.    Other workers that worked in the area.

9    Q.    Such as?

10    A.    Al Herrera.

11    Q.    Who else?

12    A.    The guys I work with mainly, Ray Cather.

13 But he used to do it, too, so he didn't complain too

14 much, because he did it.  But I'd say, where's

15 Tyler?  He'd say, he's outside talking to his

16 girlfriend on his cell phone.

17         But Ray got away with it, too, and Ray

18 was a younger guy, and they were friends; so, you

19 know, they were allowed to do these things.

20    Q.    All right, but who else besides Al

21 Herrera and Ray Cather complained that Mark DeMien

22 was showing favoritism towards his son --

23    A.    Probably Lance Amack, too, he would know.

24    Q.    Anybody else?

1    A.    A lot of people knew it.  I don't know,

2 specifically, if they would be involved in the --

3 you know, I mean it was just a general given on this

4 type of a deal.

5    Q.    With regard to discipline for cell phone,

6 you would agree, all the discipline I've shown you

7 so far that you've received, none of it was for

8 talking on the cell phone, correct?

9    A.    Correct.

10    Q.    Were you ever formally disciplined for

11 talking on your cell phone?

12    A.    No.  I never brought it in the building,

13 because it was against company rules.

14    Q.    What are Tally materials?

15    A.    That's a stainless steel brand, kind of

16 like Kellogg cereal, it's a brand of stainless steel

17 company.  It's a mill.

18    Q.    And I may be mispronouncing this, and

19 I'll spell this for the court reporter in a moment.

20 Outokumpu?

21    A.    Not too bad, but it's Outokumpu.

22    Q.    Okay.  O-U-T-O-K-U-M-P-U.

23         Is that another stainless steel --

24    A.    Actually, they do, I think they do,

1 correct thing.

2    Q.    So as I understand your duties as a

3 warehouse clerk, working at the RBW station, when

4 you package materials -- which is part of your

5 responsibilities, correct?

6    A.    Sure.

7    Q.    -- you would review the work order before

8 you package them?

9    A.    Yes.

10    Q.    And on the work order would be

11 instructions from the customer, what you should be

12 packing?

13    A.    Yes.

14    Q.    And so some of the instructions would

15 include piece, as opposed to weight?

16    A.    Sure.

17    Q.    It might also specify a particular

18 manufacturer for product like stainless steel?

19    A.    Yes.

20    Q.    And for example, it might specify it

21 wants Tally material only?

22    A.    Sure.

23    Q.    And so when you're packaging, you're

24 supposed to be looking at the work order and then

1 packaging consistent with what the work order says?

2    A.    Yes.

3    Q.    Okay.

4    MR. LINDEN:  Let's mark this 29, please.

5        (WHEREUPON, a certain document was

6     marked Wingo Deposition Exhibit No. 29,

7     for identification, as of this date.)

8            (WHEREUPON, the document was

9             tendered to the witness.)

10 BY MR. LINDEN:

11    Q.    All right.  You've been handed what has

12 been marked Exhibit 29, Mr. Wingo, which, for

13 purposes of identification, is an employee report

14 form, this one dated November 8, 2007, addressed to

15 you from Randy Lunt.

16           Have you seen this document before?

17    A.    Yes.

18    Q.    That's your signature above "Employee

19 Signature"?

20    A.    Yes.

21    Q.    Did you receive a copy of this?

22    A.    Yes.

23    Q.    And you were being suspended for

24 three days at the time?

Page 156

1    A.    Yes.

2    Q.    Did you file any grievance, under the

3 labor contract, challenging your three-day

4 suspension?

5    A.    No.

6    Q.    Did you meet with Mr. Lunt, when he gave

7 you the three-day suspension?

8    A.    Yes, I did.

9    Q.    Who else was present?

10    A.    I believe Mark DeMien.

11    Q.    Anybody else?

12    A.    I'm not sure if Pete was there or if I

13 had another employee.

14    Q.    But you do recall you had some employee

15 representative present with you?

16    A.    I believe so.  At the bottom there's a

17 signature.  I can't quite read it, but yes, I think

18 so.

19    Q.    Where did the meeting take place, if you

20 can recall?

21    A.    Randy Lunt's office.

22    Q.    What did Mr. Lunt say during the meeting?

23    A.    He said, there was a key punch error.

24          I says, yes, I caught the first one, and

1 I went up and I tod Mark.  I says, Mark, I

2 accidentally hit enter on this, and it was wrong.

3 So I said, we need to fix it.

4          So he says, we can't fix it now, it's

5 already gone through.  We'll have to reprint the

6 order, reorder it and redo it all.

7          So we did, and I redid it all, and I took

8 my time and made sure that I got everything correct

9 the second time.  I redid it real slow and made

10 sure.  I had to enter seven things on the second

11 page and make sure everything was done, you know

12 perfect.

13          So I mean this is what I do every day,

14 and so I did it and it was right.  I felt that it

15 was totally right.  I was exactly positive it was

16 right.  And then the following Monday I came in, and

17 he said it was wrong.  So.

18     Q.    Who said it was wrong?

19     A.    Mark DeMien.

20     Q.    When you say "the following Monday," was

21 it the day --

22     A.    I believe, actually, I'm not sure of the

23 dates exactly, but I think the order that I messed

24 up, or they said I messed up, was Friday.  This

1 order that you're looking at for this suspension was

2 Friday, but I think the action came on the following

3 Monday.

4      Q.    Okay.

5      A.    I believe that's how it all happened.

6      Q.    And that's the day you met with Mr. Lunt,

7 Mr. DeMien and some union representative?

8      A.    Yes, I believe so.

9      Q.    And you were informed that you were being

10 suspended for three days for repetitive key punching

11 errors?

12     A.    Yes.

13     Q.    And the errors noted on this document,

14 you key punched in the wrong work order numbers?

15     A.    No, I believe it was actually -- when you

16 have a certain, when you have over three bundles or

17 boxes, see, like the order, I think, was for like

18 eight or 10 boxes, and so on the first page you can

19 only put three, so you have to go to the second

20 page, too.  And that's where I messed up on the

21 first one, I accidentally put enter after the first

22 three.

23           On the second one, when I reprinted the

24 order, brought it back, I did the original three.

1 Then, when I went to the second page, I made sure I

2 added the extra four or five or whatever it was, to

3 complete the order and have all eight or how many,

4 seven or eight or how many bundles or boxes it was.

5 So I was positive at that point that I had it all

6 correct.

7    Q.    You don't dispute the fact that you

8 initially made an error with key punching, correct?

9    A.    I mean it was -- yes, I caught it myself,

10 I caught the first error myself.

11    Q.    You don't dispute the fact there was an

12 error made, correct?

13    A.    No.

14    Q.    What --

15    A.    I don't dispute the fact, yes, I guess I

16 don't dispute the fact.

17    Q.    What is a certificate from a supplier?

18    A.    I'm not sure what you mean.

19    Q.    Are there certifications from the

20 various --

21    A.    The certs, okay, yes, certifications.

22    Q.    What would that be, Mr. Wingo?

23    A.    That's actually saying that it's this

24 mill, this lot number; it's identification from the

Page 161

1    Q.    And the customer gets that?

2    A.    Customer gets that.

3    Q.    So it's important that you make sure they

4 get all the paperwork that's required, the customer,

5 correct?

6    A.    Correct.

7    Q.    That's your responsibility as a warehouse

8 clerk?

9    A.    Yes.

10    Q.    Okay.  Now, are you claiming, when you

11 were given this three-day suspension, that you were

12 being singled out because of your age?

13    A.    Maybe not on this particular one.

14    Q.    Did you file a written grievance, under

15 the labor contract, contesting this three-day

16 suspension?

17    A.    No.

18    Q.    You could have, correct?

19    A.    Yes.

20    Q.    Why didn't you?

21    A.    I didn't, because before in the past,

22 when I had filed -- I didn't file that many

23 grievances over the years, and when I did, Randy

24 took it lightly; he didn't always respond, so I felt

1 it was useless.  So I just didn't get into the

2 grievance procedure a lot.

3     Q.    So your testimony is, over your 24 years

4 of employment, you only filed two or three

5 grievances?

6     A.    Not too many, not too many.  I don't know

7 the exact number, but not too many.

8     Q.    Did anybody ever tell you you could not

9 file a grievance under the labor contract?

10     A.    I don't think so.

11     Q.    Did Randy Lunt ever tell you you could

12 not file a grievance under the labor contract?

13     A.    I don't think so.

14     Q.    Now, after you were suspended for three

15 days, when you returned to work, was there any

16 meeting with Randy Lunt, Pete LaRocco, yourself and

17 Mark DeMien?

18     A.    I don't recall.

19          I think I may have met with Randy, but I

20 don't remember the others being there.

21     Q.    When you met with Randy, that was the day

22 you returned from your suspension in November of

23 2007?

24     A.    Possibly, I think so.

Page 163

1      Q.    Where did that meeting take place?

2      A.    I can't remember if he came out to the

3 work station or if we were in the office, I don't

4 really remember.  'Cause there was numerous meetings

5 at times, and he would come out sometimes and just

6 talk, and other times we would sit down.

7      Q.    Do you recall, when you returned from

8 your suspension, talking to Randy about how

9 important it was for you to read, understand and

10 follow all work order instructions?

11     A.    Yes.

12     Q.    Was anybody else present, Mr. Wingo,

13 during the discussion?

14     A.    I don't recall, I don't recall.

15     Q.    Do you recall also discussing with

16 Mr. Lunt at the time the need to key punch, PK10 all

17 work orders correctly?

18     A.    Sure, yes.

19     Q.    Do you recall Mr. Lunt indicating to you

20 that he was prepared to have Lance Amack as a tutor

21 on these things?

22     A.    He offered that, but Lance didn't work in

23 the area, and he didn't really know the system.  So

24 that was not really a useful tool for someone to

1 show you something that they don't really know how

2 to do themself.

3      Q.    And did you indicate that opinion to

4 Mr. Lunt, when he offered you that?

5      A.    Yeah, and I told him, and he offered

6 still to help me, and there was really no one else

7 around that could, so.

8      Q.    Was there also a discussion at that time

9 when you met with Mr. Lunt upon your return from

10 suspension how it was important for you to place

11 your initials in the "filled by" box and the "packed

12 by" box on the work order?

13      A.    Yes, I was filling -- I was signing it

14 three times, and he wanted -- I, actually I always

15 used to sign once; then we started signing twice for

16 "packed by" and "audit."

17            The third time was supposed to be the

18 side loader operator guy, the "filled by" was

19 supposed to be the side loader operator guy; but

20 they changed policy, and they wanted me to sign it

21 three times, and they didn't want the side loader

22 operator guy to sign it anywhere.  And it didn't

23 make much sense, because he was part of the team, it

24 was a team effort here.  He was bringing me metal,

Page 165

1 and a lot of times it was wrong.  So the way I felt

2 about it is if he could have brought me the right

3 metal, then I wouldn't have to deal with all this.

4 Or if he would have been accountable, I wouldn't

5 have had to deal with all the mistakes.  But the way

6 it was, he wasn't accountable; so he could just

7 bring anything, and it was up to me to catch all the

8 errors.

9      Q.    Again, I appreciate your embellishment

10 there.

11            But do you recall having a discussion

12 with Mr. Lunt, at the time you returned from your

13 suspension, where he told you what he expected you

14 to do about filling in the paperwork?

15     A.    Randy wanted me to sign it three times,

16 which I did do.

17     Q.    Do you recall having an additional

18 meeting after that meeting, where you attended and

19 Mr. LaRocco attended with Mr. Lunt; and Mr. Lunt was

20 still not satisfied with you filling out the

21 paperwork?

22     A.    A couple of them I forgot to do.  It was

23 kind of a new policy to sign it three times, and so

24 I forgot it on a couple of them.

1 way that it was done in the past?

2    A.    That was part of the deal I just
3 explained was the guy that filled it was supposed to
4 sign it.  And then all of a sudden he wanted me to
5 sign the "filled by"; and that guy would not appear
6 anywhere, when, in fact, he was the guy that filled
7 it.

8    Q.    Did Mr. Lunt ever indicate to you at that
9 time that your refusal to follow direct instructions
10 from either your supervisor and/or his -- the plant
11 manager, being Randy Lunt, would constitute
12 insubordination and grounds for termination?

13    A.    Yeah, and that's when I had to sign it
14 three times, no matter what I felt about, you know,
15 the issue.

16    Q.    Was there any discussion at that time
17 also about Mr. Lunt's concern about your lack of
18 production?

19    A.    Yes.  That was around the Thanksgiving
20 time, I believe, that we talked about, that I told
21 you that there was --

22    Q.    It's a simple yes or no, Mr. Wingo.

23    A.    Okay, could you ask again, please.

24    MR. LINDEN:  Can you please read back my

1        for identification, as of this date.)

2              (WHEREUPON, the document was

3                tendered to the witness.)

4 BY MR. LINDEN:

5      Q.    You've been handed, Mr. Wingo, what has

6 been marked Exhibit 30, which, for purposes of

7 identification, is a memo addressed to you from

8 Randy Lunt, dated November 19, 2007, subject,

9 repetitive warehouse errors.

10              Have you ever seen this document before?

11      A.    Yes.

12      Q.    Do you recall Mr. Lunt providing you with

13 a copy around the date of this memo?

14      A.    Yes.

15      Q.    Did you ever file a grievance about

16 receiving this document?

17      A.    No.

18      Q.    Do you recall ever having a meeting with

19 Mr. Lunt in which you went in asking him a question

20 about a work order, which you believed should be

21 done by weight and not by piece number?

22      A.    Sometimes -- yeah, sometimes there was

23 mistakes with the pieces, and the weight got messed

24 up.

1    Q.    And do you remember Mr. Lunt telling you,

2 on one such occasion in November 2007, that if the

3 order indicated count by pieces and not by weight,

4 you should fill it by pieces and not by weight?

5    A.    Yes.

6    Q.    And did you disregard Mr. Lunt's

7 instructions --

8    A.    No, I fixed, actually, I fixed the order.

9    Q.    You fixed the order?

10    A.    Yes.  I added -- I did it by weight, I

11 believe.  It may have been when it was done by

12 weight, so I had to change the pieces.  I had to go

13 back in and count 80 pieces.

14    Q.    And this is after you had a discussion

15 with Mr. Lunt?

16    A.    It could have been.

17    Q.    Well, let's see if I can refresh your

18 memory on that.

19    MR. LINDEN:  Let's mark this Exhibit 31,

20 please.

21        (WHEREUPON, a certain document was

22        marked Wingo Deposition Exhibit No. 31,

23        for identification, as of this date.)

24            (WHEREUPON, the document was

1                    tendered to the witness.)

2 BY MR. LINDEN:

3     Q.    You've been handed what has been marked
4 Exhibit 31, which, for purposes of identification,
5 is a memo addressed to you from Randy Lunt, dated
6 November 30, 2007, regarding repetitive warehouse
7 errors.

8           Have you ever seen this document before?

9     A.    Yes.

10    Q.    Were you provided with a copy of it?

11    A.    Maybe.

12    Q.    Did you ever file a grievance, under the
13 labor contract, concerning the receipt of this
14 document?

15    A.    No.

16    Q.    And so in this memo Mr. Lunt points out
17 the fact that apparently you had filled out an order
18 originally not with the correct piece numbers,
19 correct?

20    A.    Yes.   There was a discrepancy on the
21 footage, because the metal was shorter than they
22 thought it was going to be.

23    Q.    But regardless, the particular work order
24 specified a certain piece number --

Page 174

1    A.    Correct.

2    Q.    Let me finish.

3          -- being 75, correct?

4    A.    Yes.

5    Q.    And instead, you filled it with

6 82 pieces, correct?

7    A.    To give them the correct footage.

8    Q.    But regardless, it was contrary to the

9 number of pieces, correct?

10    A.    Yes, so we had to fix it.

11    Q.    And you only fixed it after Mr. DeMien

12 brought it to your attention, correct?

13    A.    Correct.

14          Could I add one thing?

15    Q.    No.

16    A.    Okay, fine.

17    Q.    Now, are you claiming Mr. Lunt gave you

18 this memo, because he was discriminating against you

19 because of your age?

20    A.    It's a possibility.

21    Q.    Well, let's focus a little bit more on

22 your speculation that it was a possibility.

23    A.    This was my fault.

24    Q.    Okay, go ahead.

1 received this memo, as well as Exhibit 30, you had

2 already been disciplined on three prior occasions in

3 the fall of 2007, for excessive work order errors,

4 correct?

5    A.    For different reasons, yes.

6    Q.    And so you were at the step that the next

7 violation, the company could terminate you, under

8 that work rule, correct?

9    A.    Yes.

10   Q.    So coming back to this particular

11 document, Exhibit 31, as I understand your

12 testimony, you concede that Mr. Lunt's giving you

13 this, he acted appropriately, because you had made

14 the error, correct?

15   A.    Yes.  He let me know that I made a

16 mistake, so we tried to fix it.

17   Q.    And then before, when I asked you whether

18 or not you're claiming that Mr. Lunt issued this to

19 you, because he was discriminating against your age,

20 your response was, well, maybe, possibly.

21         Correct?

22   A.    I made a mistake.  The pieces were off, I

23 didn't have the right piece count.  He probably

24 wasn't discriminating on my age on that particular

Page 177

1 one.  But on other ones that somebody else was

2 wrong, he didn't care who the other people was, and

3 that's where --

4      Q.    With regard to Exhibit 31, just so the

5 record's clear, you're not claiming that was given

6 to you because of your age?

7      A.    That particular one, maybe not.

8      Q.    Let's go back to Exhibit 30, the other

9 memo that Mr. Lunt gave you.

10           Are you claiming Mr. Lunt was

11 discriminating against you, based on your age, when

12 he issued you Exhibit 30?

13     A.    No.

14     Q.    Okay.  And as I understand it, your prior

15 testimony was also, when you were suspended for

16 three days in November of 2007, you're not claiming

17 that was because of your age, either, correct?

18     A.    I don't recall the suspension on that

19 one.  There was one for the key punch, but the one

20 where they brought me the wrong metal to the wrong

21 department, that was someone else's mistake, too,

22 and there I was discriminated by age on that one.

23     Q.    Well, we'll come back to that in a

24 moment.

1          You were suspended for three days for

2 excessive key punch errors, correct?

3     A.    Actually, I think it was one there, yes.

4     Q.    You're not claiming that was given to you

5 because of your age, correct?

6     A.    The key punch was basically my mistake,

7 but I thought I had it right.

8     Q.    All right, but when you say it was your

9 mistake, you're not claiming the company issued you

10 three days suspension for that, because they were

11 discriminating against you because of your age,

12 correct?

13     A.    No.

14     Q.    Okay.  But the one discipline you're

15 claiming that was issued to you because of your age

16 was the one-day suspension?

17     A.    I believe that's the case.  It was the

18 one where they brought the wrong size or the

19 wrong -- that was the one with Tally that we

20 discussed, where they brought the wrong mill, and it

21 shouldn't even have came to my department.  It was

22 an error that I did not catch, and it should not

23 have been at my department.  That was the younger

24 side loader operator brought that order.

1    Q.    Let's come to explore that a little bit

2 further.

3          In that document you admit that you made

4 the mistake.  You should have caught the error

5 yourself when you packed the materials, correct?

6    A.    Yes, on that one, yeah.  He made the

7 mistake of bringing me the wrong thing, and I did

8 not catch it.

9    Q.    And you could have caught --

10   A.    But I did catch three or four that --

11   Q.    You could have caught it -- one at a

12 time, please.  You could have caught it, had you

13 reviewed the work order, correct?

14   A.    Yes, and I did catch three or four a week

15 and sometimes three or four a day.

16   Q.    I'm not asking whether or not you caught

17 three or four a week.  We're talking right now about

18 this specific --

19   A.    This one, I did not catch this one, no.

20   Q.    And the younger side load operator we're

21 talking about, just so the record is clear, again,

22 we're talking about Tyler DeMien?

23   A.    I believe so, on this one, yes.

24   Q.    Well, you believe so or --

1          So you'd put comments in there that might

2 be of a special nature, correct?

3     A.    Correct.

4     Q.    All right.  And then the last column

5 would be "Stop Time."

6          That would be when you would be done

7 processing the order?

8     A.    Yes.

9     Q.    All right.  So let's talk for a moment

10 about some of the notations.

11         First of all, is your writing on this?

12    A.    Yes.

13    Q.    So the initials above "Please print name,

14 RGW," those are your initials, correct?

15    A.    Yes.

16    Q.    And this is a daily production log that

17 you completed, correct?

18    A.    Yes.

19    Q.    All right.  So let's focus for a moment,

20 then, on the notations in "Comments, Special

21 Assignment."

22         I think all of these, with the exception

23 of one of them, have "PT" in there.

24         That would stand for what, pull truck?

1           Looks like somebody wrote next to 10

2 something G, and then next to 11, APF?

3     A.    Yes.

4     Q.    Is that your writing?

5     A.    No.

6     Q.    Do you know whose writing that would be?

7     A.    I think it's the second shift guy.  I

8 think these are orders that I started to do.  Like I

9 told you, we had to put the certification ID on the

10 back of each order, okay.  These were probably

11 orders that come out late in the day, and I didn't

12 have time to finish them, so I just started them.

13 And by starting them, I put the certification or the

14 identification of the mill on the work orders, and

15 then it was time to go.  So I wasn't able to

16 complete the orders, or I started them and wasn't

17 able to finish them.

18    Q.    Separate and apart from your speculation,

19 do you actually know whose writing that is on those

20 initials next to items 10 and 11?

21    A.    I think it's initial of somebody on the

22 second shift.

23    Q.    Do you know who actually wrote that down?

24    A.    I'm not sure exactly who wrote that down.

Page 185

1     Q.     Now, where on this document does it

2 indicate that any of these particular orders were

3 not complete?

4     A.     I don't know if I -- it looks like I

5 didn't specify on this one.  I don't know what

6 happened, but I -- sometimes you didn't always have

7 time to specify if you were able to complete them or

8 not.

9     Q.     So there's nothing on this particular

10 document to indicate any of these orders were

11 incomplete, correct?

12    A.     Correct.

13    Q.     Okay.

14    A.     That's why the production, because there

15 was no orders.  There's no orders, you can't fill

16 anything.  You can't pack them, if they're not

17 there.

18    Q.     By the way, is completing the daily

19 production logs considered to be part of your

20 responsibilities in properly processing work orders?

21    A.     Yes.

22    MR. LINDEN:  Let's mark this Exhibit 33,

23 please.

24         (WHEREUPON, a certain document was

1        marked Wingo Deposition Exhibit No. 33,

2        for identification, as of this date.)

3            (WHEREUPON, the document was

4            tendered to the witness.)

5 BY MR. LINDEN:

6      Q.    All right.  The court reporter has handed

7 you what has been marked Exhibit 33, Mr. Wingo, and

8 for purposes of identification, at the top it's

9 entitled "Daily Production Log," with a date, 11/15.

10           Is this another one of your daily

11 production logs?

12     A.    Yes.

13     Q.    Okay.  Is there anybody else's

14 handwriting on this document, besides your own?

15     A.    Yes, down at the bottom.

16     Q.    Where on the bottom?

17     A.    20.  I started the order and almost

18 completed it.  But as you note in the bottom of the

19 order, of the production sheet, it says "Helped the

20 battery guy take two batteries, put them on skids

21 and load them on his truck."

22           So instead of completing number 20 on the

23 work order, instead of doing that, I ended up --

24 Mark asked me, the foreman asked me if I would help

1 the battery guy fix the batteries, because they had

2 some bad batteries that had to go back to be

3 repaired.  So Mark asked me, Bob, would you load

4 these up for the guys?  I said sure.

5          So I wasn't able to complete the work

6 order that I was working on.

7     Q.    Well, my question was --

8     A.    So that's why -- yes.

9     Q.    -- where on this document is there

10 someone else's handwriting?

11     A.    Number 20.  That was probably the

12 initials of the guy that completed the order.

13     Q.    So your testimony is the numbers in work

14 order, the piece numbers, the pounds and the

15 reference OT in the item 20, is somebody else's

16 writing other than yours?

17     A.    No, no, that's my writing.  But I'm

18 saying that I started the order, I almost completed

19 the order.  But before I was able to finish it, Mark

20 asked me to do another job.  He asked me to load the

21 batteries on the guy's truck.

22     Q.    Where on this document does it indicate

23 that you didn't complete the work order, item 20?

24     A.    I didn't always note it on there.

1 misrepresent anything in your daily production logs,

2 correct?

3      A.     No, but sometimes you don't --

4      Q.     It's a yes or no, Mr. Wingo.

5      A.     Yes, yes.

6      Q.     And you would agree that if you

7 misrepresented things in the daily production log,

8 that you'd be subject to discipline?

9      A.     Yes.

10     Q.     And you are aware that the company would

11 possibly discipline you for falsifying company

12 documents by misrepresenting things in your daily

13 production log?

14     A.     Well, the boss gave me a job, another job

15 to do while I was --

16     Q.     Again, my question is a yes or no.

17     A.     Could you rephrase it, please.   I

18 didn't --

19     MR. LINDEN:  Read back my question, please.

20          (WHEREUPON, the record was read

21          by the reporter.)

22 BY THE WITNESS:

23     A.     Yes.

24 BY MR. LINDEN:

1    Q.    And you are aware that the work rules

2 provided that you could be discharged for falsifying

3 company documents --

4    A.    Yes.

5    Q.    -- and reports?

6          We sort of spoke over one another is that

7 clear on the record?  I don't know if it was clear.

8          (WHEREUPON, the record was read

9          by the reporter.)

10    Q.    So we're going to have to do the question

11 over again, so the record's clear.

12    A.    Go ahead, you want to ask it?

13    MR. LINDEN:  You want to just read back my

14 question?

15          (WHEREUPON, the record was read

16          by the reporter.)

17 BY THE WITNESS:

18    A.    Yes.

19 BY MR. LINDEN:

20    Q.    Now, did you ever receive any sort of

21 training on preparing and compiling your daily

22 production log?

23    A.    Basically, it's pretty simple.  You just

24 fill in the work order and the pieces in the columns

1 and anything else that goes with it.  Comments, we

2 always added the comments --

3    Q.    Again, I'm going to have to interrupt,

4 because you didn't answer my question.

5    A.    Yes, I guess it's yes.  I mean yes, we

6 were instructed to fill it out.

7    Q.    Who instructed you?

8    A.    Probably one of the foremen, or Randy.  I

9 don't recall exactly who.

10    Q.    You would agree, you would not want to

11 take credit for doing work that you didn't do,

12 correct?

13    A.    Yes.

14    Q.    Okay.  And so it's your testimony, as I

15 understand it, that when you prepared your daily

16 production logs, you would indicate when you did not

17 complete your work?

18    A.    I tried to indicate, when I could, but

19 there was times --

20    Q.    Again, I'm going to ask you to answer my

21 question.  Hold on.  Just relax.

22    A.    Go ahead, ask.  I'll wait.

23    MR. LINDEN:  Would you please read back the

24 question.

1     A.     Yes, yes.

2     Q.     And where on this document do you

3 indicate that you had not completed any of these

4 items?

5     A.     Well, by the time, you can tell that the

6 last one probably was incomplete, because it started

7 at 2:20.  So I was basically just partialing that

8 one and just starting the order.  Maybe I put it on

9 the scale, but wasn't able to PK10 it in time.

10    Q.     All right, I appreciate your maybes

11 there.

12           Where, specifically, on this document

13 does it indicate that item 17 was incomplete?

14    A.     By the IG, probably.

15    Q.     Well, probably means you're guessing.

16           Where on this document does it indicate

17 item 17 is incomplete?

18    A.     I did not, I did not write it out on that

19 one.  Maybe it was close to the bell, and I didn't

20 have time.

21    Q.     All right.  So again, as we continue to

22 fence here, you would agree with me, item 17 does

23 not indicate that it's incomplete, does it?

24    A.     It is --

1    A.    Probably 40.

2    Q.    And you knew most of those 40 employees?

3    A.    Some not as well, because they worked
4 different shifts.

5    Q.    And with regard -- we've established you
6 obviously have been disciplined, correct?

7    A.    Yes.

8    Q.    You indicated Mr. Alvarez had been
9 disciplined?

10    A.    Possibly.  I didn't know everything.

11    Q.    Okay.  And who else besides yourself were
12 you actually aware had been disciplined?

13    A.    I don't know.  I -- just myself, as far
14 as I know.

15    Q.    So it would be safe to say you don't know
16 anybody else's disciplinary record, as of the time
17 you were terminated?

18    A.    There could have been others that I was
19 unaware of.  I didn't always ask people their
20 disciplinary problems.  Usually people were
21 embarrassed by their mistakes, and they didn't go
22 telling everybody.

23    Q.    So following your testimony, your
24 testimony suggests that you didn't know the

1 disciplinary records of any of your fellow

2 employees.

3      A.     I mean you knew that things were going on

4 with certain guys, but I didn't know everybody's

5 history and everybody's thing.

6      Q.     Again, coming back to my question, what

7 employee did you actually know what their

8 disciplinary record was?

9      A.     Myself.

10     Q.     Okay.

11     A.     That was my main concern was myself.

12     Q.     All right.  So you got terminated by

13 Mr. Lunt, correct?

14     A.     Yes.

15     Q.     And he terminated you for falsifying

16 company documents?

17     A.     Yes, for this one in specific that you

18 just handed me, Exhibit 35.

19     Q.     Well, it wasn't just that one, it was --

20 there were two days involved, correct?

21     A.     Two days in a row with similar problems.

22     MR. LINDEN:  Let's mark this, please,

23 Exhibit 36.

24           (WHEREUPON, a certain document was

Page 206

1    Q.    Did Randy Lunt tell you you were being

2 terminated concerning your documentation in your

3 employee production logs for the dates of -- let me

4 finish.

5    A.    Sorry.

6    Q.    Did Randy Lunt tell you he was

7 terminating you for falsifying company reports,

8 based upon your employee production -- daily

9 production logs of November 28th and November 29,

10 2007?

11    A.    Yes.

12    Q.    Did he show you those logs?

13    A.    Yes.

14    Q.    Now, are you claiming that he made the

15 decision to terminate you, because he wanted to get

16 rid of you because of your age?

17    A.    Yes, I think so.

18    Q.    Okay.  What is your support for your

19 belief or your thinking so, that Mr. Lunt was

20 terminating you because of your age?

21    A.    Well, because in my mind's eye, they were

22 not errors, I mean they were not falsifying.  All I

23 was just, basically was doing was stating what

24 happened with the orders.

1 please.

2          (WHEREUPON, the record was read

3          by the reporter.)

4 BY THE WITNESS:

5    A.    Well, he said I falsified the record, but

6 it wasn't, in my view, a falsification of the

7 record.

8 BY MR. LINDEN:

9    Q.    You disagreed with his opinion, correct?

10   A.    I disagreed with his opinion.

11   Q.    And that's your sole basis for your

12 belief that Mr. Lunt was getting rid of you because

13 of your age?

14   A.    Well, because other employees, younger

15 employees were allowed to do similar stuff.  They

16 weren't always completing the work order, and they

17 weren't being held accountable for that.

18   Q.    Beyond that, any other evidence to

19 support your belief that Mr. Lunt was terminating

20 you because of your age?

21   A.    By not holding the younger employees

22 accountable for their errors, that was one instance.

23          Allowing the younger employees to talk on

24 their cell phones, that was another instance.

1    Q.    You were never disciplined for talking on

2 your cell phone, were you?

3    A.    No.

4    Q.    All right.  Let's talk about these

5 so-called younger employees.

6          These are these younger employees that

7 you referenced in paragraph 12 of your complaint?

8    A.    Yes.

9    Q.    Okay.  Let's -- first of all, Tyler

10 DeMien, we've already established, through a variety

11 of exhibits I've asked you about, that by the fall

12 of 2007 you had been disciplined on a number of

13 occasions; would you agree?

14    A.    Yes.

15    Q.    Okay.  We've also established that by the

16 time you were terminated in December of 2007, you

17 had been progressively disciplined in the fall of

18 2007 for excessive work order errors, correct?

19    A.    Yes.

20    Q.    Did Tyler DeMien have an identical

21 disciplinary record to that?

22    A.    He had issues and problems with errors,

23 but he was never wrote up for it.

24    Q.    But my question is, did he have

1 discipline on his record like you did?

2    A.    No, they did not, they did not --

3    Q.    It's a yes or no.

4    A.    No, he didn't, because they didn't, they

5 didn't write him up.

6    Q.    It's a yes or no.

7    A.    No.

8    Q.    Okay.  And let's talk for a moment about

9 your problem with your daily production log reports.

10          Did you ever review Tyler DeMien's daily

11 production log reports?

12    A.    As far as I know, he didn't keep one.

13 Side loader operators didn't have to keep one.

14    Q.    So he didn't have that responsibility?

15    A.    No.

16    Q.    So he obviously couldn't be similar to

17 you, with respect to maintaining daily production

18 log reports, because he didn't have to keep them, as

19 you said?

20    A.    He was similar in the fact that we both

21 did orders, and we both --

22    Q.    Again, I'm going to have to interrupt,

23 because you're not answering the question.

24    MR. LINDEN:  Can you please read back my

Page 211

1 question.

2            (WHEREUPON, the record was read

3            by the reporter.)

4 BY THE WITNESS:

5      A.    Right, he didn't do the same job.

6 BY MR. LINDEN:

7      Q.    Okay.  Now, let's talk about Al Herrera.

8            Al Herrera, was he a warehouse clerk?

9      A.    Yes.

10     Q.    He worked what, the second shift?

11     A.    Third shift.

12     Q.    Third.  So you didn't even work on the

13 same shift as Al?

14     A.    We overlap shifts.  I come in at 4:00 in

15 the morning; Al worked till 7:00.

16     Q.    How old was Al Herrera?

17     A.    Al was 35 or so, somewhere in there.

18     Q.    And as of the time of your being

19 terminated, how long had Mr. Herrera worked for the

20 company?

21     A.    He was another guy that came from

22 Munster, so I'm not sure of the total history there.

23 He was at Schaumberg for two, three years, I

24 believe.

1    Q.    He worked some period of time for Copper

2 and Brass at the Munster facility?

3    A.    Correct, maybe five years total.  I'm not

4 sure of the exact numbers.

5    Q.    Do you ever review Mr. Herrera's

6 personnel file?

7    A.    No.

8    Q.    Do you know what kind of discipline he

9 has in his file?

10    A.    No.

11    Q.    Do you know if he's ever been disciplined

12 for anything?

13    A.    I think he mentioned it, but I'm not sure

14 of everything.

15    Q.    What did he mention to you?

16    A.    He may have mentioned -- he missed time.

17 He had to take a month off, because he had health

18 issues.  So I'm not sure if that was discipline or

19 if that was other issues.  I'm not sure on that.

20    Q.    Do you know if he was ever disciplined

21 for excessive work order errors?

22    A.    He made an error with me that we were, we

23 both got written up for, the very first one, if you

24 remember back.  I forget what exhibit it was.  We

Page 215

1 shift?

2    A.    Correct.

3    Q.    And during the time you worked with him,
4 did you ever work together on the same shift?

5    A.    Maybe once or twice, but not too often.

6    Q.    And you indicated a moment ago you don't
7 know anything about his disciplinary record, other
8 than whatever rumors you might have heard?

9    A.    I didn't pry into his private life.

10    Q.    All right.  Now, your complaint
11 references an employee by the name of Zidro, Z-I --

12    A.    Zidro, that's the IG guy.  Zidro, maybe
13 it's Garcia, I'm not sure.

14    Q.    What shift did he work?

15    A.    Second shift.

16    Q.    And how long did he work at Copper and
17 Brass for?

18    A.    Probably a year.  He wasn't there that
19 long.

20    Q.    He got terminated?

21    A.    I think he's still there.  I'm not sure.

22    Q.    Wait a minute, I'm confused now.

23          You said he was there for about a year,
24 he wasn't there that long.

Page 217

1           You didn't work with him on the same
2 shift, did you?
3      A.    I didn't work with him, but one of the
4 guys on days told me that he messed up some stuff.
5 I mean it was talk.  We would sometimes talk, and he
6 said that he messed up some stuff.
7      Q.    I'm now trying to find out about your own
8 personal knowledge.
9           Do you know for a fact, based on your own
10 personal knowledge, that Mr. Garcia made the same
11 type of mistakes you are claimed to have made on
12 your daily production log reports?
13      A.    No.  Those were not public information.
14      Q.    What was not public information?
15      A.    The mistakes guys made.
16      Q.    Okay.  So that would be true for all of
17 the employees you worked with?
18      A.    Pretty much so.  We didn't -- we talked,
19 and people knew some of the stuff, but you didn't
20 always know.  You didn't see the documentation.
21      Q.    And you wouldn't necessarily know what
22 the supervisors may have known about any of your
23 mistakes as well, correct?
24      A.    Only that they had told us we had too

Page 218

1 many plant-wide, there was way too many mistakes

2 plant-wide, that everybody was making them, and we

3 had to tighten them up.

4    Q.    When was that?

5    A.    I think you showed us the paper.  It was

6 back in June, possibly, or July, somewhere around

7 there.

8    Q.    In 2007?

9    A.    I believe so, yeah.

10          I mean we would have these type of

11 speeches once a year, you know, where we'd have a

12 meeting, and they'd say, you know, guys, we need to

13 cut the errors.  It was just overall effort.

14    Q.    Another employee who you claim was

15 treated more favorably than you is Lizardo

16 Hernandez?

17    A.    Yes.

18    Q.    What shift did Mr. Hernandez work?

19    A.    He worked on the first shift with me.

20    Q.    And he was a warehouse clerk?

21    A.    Actually, he was the guy that brought

22 wrong orders.  He was a side loader operator that

23 brought me wrong metal, but he was never

24 disciplined.

Page 219

1    Q.    He was the one who brought you the wrong

2 metal?  I thought that was Mr. DeMien.

3    A.    Both of them.  They were both side loader

4 operators.  They were both the guys who pulled the

5 orders for me.  So they went and got the metal and

6 the orders for me, but both of them made mistakes.

7 They were human, they made mistakes, but they were

8 never disciplined for it.

9    Q.    With respect to Mr. Hernandez, did you

10 ever see his disciplinary record?

11   A.    No.  I don't know everything.

12   Q.    And Mr. Hernandez worked at the company

13 for how long?

14   A.    Roughly five years.  I don't know for

15 sure.

16   Q.    Was he still employed there when you

17 left?

18   A.    Yes.

19   Q.    Okay.  And he was still a side load

20 operator?

21   A.    Yes.

22   Q.    And as a result of being a side load

23 operator, he did not have to prepare daily

24 production log reports like you?

1        When was it that Mr. Hernandez allegedly

2 brought you the wrong metal?

3    A.    This was quite often.  I was catching

4 three to five orders a week, so Lizardo was maybe

5 one or two a week.

6    Q.    But as I understand your testimony,

7 Mr. Wingo, at least you seem to be suggesting, under

8 sworn oath here today, that Mr. Hernandez brought

9 you wrong metal, which resulted in you being

10 disciplined, correct?

11    A.    He may have brought some of it over the

12 course of time.  I caught a lot of the stuff he

13 brought.

14    Q.    I'm not ask for speculation.  My question

15 is specific, very precise.

16        Are you claiming that Mr. Hernandez

17 brought you wrong metal, which subsequently resulted

18 in your being disciplined?

19    A.    I don't know, I don't think he signed the

20 work orders that I specifically got disciplined for.

21    Q.    Okay.  And so you would agree that

22 Mr. Hernandez, by virtue of his side load operator

23 position, was not similarly situated to you, because

24 he had different duties and responsibilities than a

1 warehouse clerk?

2    A.    Yes.

3    Q.    And that would be true for anybody whose

4 position was side load operator, correct?

5    A.    Yes.

6    Q.    Did he have a different supervisor than

7 you?

8    A.    Same.

9    Q.    Mr. DeMien?

10    A.    Correct.

11    Q.    And at other times it would have been

12 who?

13    A.    That was mainly it, first shift.  On

14 occasion, if Mark wasn't there, it would be Randy or

15 second shift foreman or one of the other foremans.

16 Ray Dormo was another foreman that occasionally

17 stepped in.

18    Q.    All right.  The last person you

19 identified as a possible comparable younger employee

20 treated more favorably than you would be Ray Cather?

21    A.    Ray Cather.

22    Q.    Was he a warehouse clerk?

23    A.    Yes.

24    Q.    And he was one of the persons who came

Page 223

1 over from Munster?

2    A.    Correct.

3    Q.    And how was he more favorably treated

4 than you?

5    A.    He was allowed to talk on his cell phone,

6 when the foreman would walk right by.  He slept in

7 his Jeep, and the foreman caught him two or three

8 times and didn't say anything, just kept walking.

9 He would ignore it.

10    Q.    Anything else?

11    A.    He was on the cell phone, he -- oh, he'd

12 sit in the job and just rock.  Rather than work, he

13 would just sit there and do nothing, maybe just rock

14 back and forth.  He had a nervous disorder where

15 he'd just rock and stuff.

16    Q.    So those are how he was more favorably

17 treated than you?

18    A.    Yeah, he was allowed to do these things.

19 If I was to do any of that, I would be disciplined.

20    Q.    But again, you were never disciplined for

21 talking on your cell phone?

22    A.    No.

23    Q.    And did you ever review Mr. Cather's

24 personnel file?

Page 224

1    A.    No.  Those were private.

2    Q.    So you don't know, for example, whether

3 or not he was disciplined for the things you just

4 described?

5    A.    I don't know for sure.  I know a lot of

6 times it was ignored.

7    Q.    Can you identify any younger warehouse

8 clerk who, on their daily production log reports,

9 misrepresented to the company that they had

10 completed all the work they had performed that day?

11    A.    Probably Al was the main one, because he

12 was the one I worked with.  Like I say, he would

13 take credit for three or four orders that we weren't

14 able to complete.  I mean, it would be usually at

15 least one or two a day.

16    Q.    Anybody else, besides Mr. Herrera?

17    A.    He was the main one that I worked with,

18 that I know.

19    Q.    Do you know if anybody in management in

20 Copper and Brass knew that?

21    A.    I don't know.  No, I don't know.

22    Q.    So other than what you've testified to

23 today, Mr. Wingo, what other proof do you have that

24 you were discriminated against on the basis of your

Page 228

1 of it and say, you can't do it this way anymore.

2      Q.    And you would agree, by the time you were

3 terminated, that the company had disciplined you on

4 a number of occasions about your paperwork, correct?

5      A.    I don't think so.  I mean, I wasn't

6 perfect, I made some mistakes; but overall my

7 paperwork was pretty much in order.

8      Q.    You are now going to disagree with the

9 record, all these exhibits here that establish that

10 you received discipline on multiple occasions for

11 excess work order errors?

12      A.    Sure.  I was there for 24 years, and --

13      Q.    I'm not asking you how many years you

14 were there for, Mr. Wingo.

15           Let's read back my question, please, and

16 I'd like to get an answer to my question.

17      A.    Sure.

18      Q.    I'm going to ask you, Mr. Wingo, to

19 kindly refrain from talking while I'm asking my

20 question.

21      A.    I thought you were done.  I'm sorry.

22      Q.    It's a simple courtesy, and I'll do the

23 same to you, okay.

24           You would agree today you've been

1 cross-examined about quite a few number of times

2 that you were disciplined for excessive work order

3 errors?

4    A.    Yes.

5    Q.    And you would agree, with respect to all

6 that discipline, you never filed a single grievance,

7 under the labor contract, contesting the validity of

8 any of that discipline?

9    A.    I never did grievance it.

10    Q.    And you would agree that in the fall of

11 2007, prior to your being terminated, you were

12 disciplined on several occasions for excessive work

13 order errors?

14    A.    Yes.

15    Q.    And you would agree also, after being

16 suspended for three days, for excessive work order

17 errors, when you returned to work, Mr. Lunt sat down

18 with you and talked to you and counseled you about

19 the importance of being accurate in your, in your

20 documentation?

21    A.    Yes.

22    Q.    And you would agree that you were

23 counseled on two occasions after you returned from

24 your suspension, but prior to your being terminated

Page 238

1    Q.    Okay.  And where on this do you indicate

2 any of these work orders are incomplete?

3    A.    Right on the right-hand column, in the

4 comments.

5    Q.    Which ones, sir?

6    A.    Okay, the first one, actually, the one,

7 the -- okay, the one with MEA by it, number 20, I

8 wrote that I boxed it.  And you can see by the time,

9 2:25, it was time to go.  So in other words, I just

10 prepared the order, I did a partial on it, I boxed

11 it up, I stamped the weight, I did everything but

12 complete the order, because it was time to go, it

13 was 2:25.  And that was common all the time, this

14 kind of stuff.

15    Q.    Other than the fact that you reference

16 the time 2:25, you would agree there's nothing in

17 your comments that says the order is incomplete?

18    A.    I did not write incomplete.  I did

19 everything but write incomplete.

20    Q.    Okay.

21    A.    And the one, the second one, number 21

22 was the wrong size was pulled, and I was just

23 documenting that the wrong size was pulled.  So I

24 told Arty, the second shift guy, I let him know that

Page 242

1 snickering.

2          When was it, Mr. Wingo?

3    A.    They were making errors all along.

4    Q.    What year did the age discrimination

5 allegedly start?

6    A.    Basically, right around the August, after

7 the, after the oral harassment from the foreman.

8    Q.    August of 2007?

9    A.    Correct.

10    Q.    Okay.  And when you say the harassment by

11 the, by the supervisor, 'cause I don't want the

12 record to be unfairly --

13    A.    By Mark DeMien.  By Mark DeMien.  I'll be

14 more specific.

15    Q.    And when we talk about Mark DeMien, we're

16 talking about your testimony earlier in your

17 deposition, where you were upset with the fact that

18 he swore at you?

19    A.    Yes, sir.

20    Q.    Okay.  That's what you mean by

21 harassment?

22    A.    Well, it was ongoing screaming and

23 yelling and swearing, a combination of all that.

24 That wasn't a professional way to handle a dispute

Page 244

1     A.     Yes, to Randy Lunt.

2     Q.     Okay.  And you also didn't like the fact

3 that you thought Mark DeMien was favoring his son?

4     A.     Well, he never was disciplined for the

5 wrong orders, so.

6     Q.     Again --

7     A.     Yes.

8     Q.     Thank you.

9            And so again, so I'm sure I could -- that

10 I want to be certain that I understand your claim in

11 this lawsuit, you're claiming what, both Mark DeMien

12 and Randy Lunt decided to terminate you because of

13 your age?

14    A.     They ignored others' errors, and yes,

15 they decided to terminate me for the errors that

16 other people were making, too, and they weren't

17 being disciplined.

18    Q.     So they terminated you as a sacrifice to

19 the younger people?

20    A.     Seems that way.

21    Q.     Okay.  And when you say it "seems that

22 way," you're speculating, right?

23    A.     Well, they're still there and I'm gone,

24 so.

Page 245

1    Q.    There are other people employed there who
2 are older than you, correct?

3    A.    Yes.

4    Q.    Lance Amack being one?

5    A.    Yes.  He's ready to retire.

6    Q.    Do you know a Mr., I believe, Polito?

7    A.    Do you have a first name?  I don't
8 recognize the last name.

9    Q.    Hold on.

10    A.    Maybe he was a newer guy.  I don't know
11 the names.

12          Probably second shift.

13    Q.    Do you know a Fredrick Stalzik
14 (phonetic)?

15    A.    Freddie, yes.  Yes, I do know Freddie.

16    Q.    Is he older or younger than you?

17    A.    I don't know his age.  I never asked him
18 his age.  I don't know.

19          He's an older gentleman.

20    Q.    Was he still employed --

21    A.    He's probably over 50.

22    Q.    Is he still employed there?

23    A.    I believe so.  I don't know.

24    Q.    Do you know an employee by the name of

Page 246

1 Enrico Polito?

2      A.    It sounds familiar, but I don't remember.

3 I don't know his last name.  That's why I don't

4 know.

5            I thought there was a Rico there, yes.

6      Q.    The Rico you knew, was he older or

7 younger than you?

8      A.    I don't know.  I'm not placing the guy

9 with the name.  It's been a while.

10     Q.    Do you know a Denny Prosser (phonetic)?

11     A.    Denny Prosser, yes.

12     Q.    He was employed at Copper and Brass when

13 you left?

14     A.    Yes.

15     Q.    Was he about the same age as you?

16     A.    I'm not sure his age.  I think he was

17 younger.

18     Q.    Well, was he much younger than you?

19     MS. WEGNER:  I'll object, calls for

20 speculation.  Already asked and answered.

21 BY THE WITNESS:

22     A.    Was he what, younger than me?

23 BY MR. LINDEN:

24     Q.    Much younger than you.

Page 247

1      MS. WEGNER:   Same objections.

2 BY THE WITNESS:

3      A.    I don't know.

4

5 BY MR. LINDEN:

6      Q.    Do you know a -- you mentioned, I think,

7 Zidro Garcia?

8      A.    Zidro.   That was the IG on the forms,

9 yes.   Zidro, yes.

10      Q.    And he worked on the second shift?

11      A.    Yes.

12      Q.    Do you know if he was roughly your age?

13      A.    I think he was younger.

14      Q.    Do you know how much younger?

15      A.    I don't know.

16      Q.    Do you know a Tony Falco?

17      A.    Yes.

18      Q.    Do you know how old he is?

19      A.    He's 40, 40 something.   I'm not sure

20 exactly what.

21      Q.    You don't know exactly how old he is?

22      A.    He's probably 47 or something like that.

23 I'm not sure.

24      Q.    Do you know an Arturo Flores?

Page 248

1    A.    Arty's probably 50.

2    Q.    Was he a warehouse clerk?

3    A.    Yes.

4    Q.    And was he still employed at Copper and

5 Brass when you left?

6    A.    I think so.

7    Q.    Okay.  So Mr. Wingo, you seem to be

8 suggesting in part, you don't dispute the fact that

9 you made errors?

10    A.    Yes.

11    Q.    And you don't dispute the fact that the

12 errors you made resulted in your discipline, but you

13 believe younger employees were making the same

14 mistakes, and they should have also been disciplined

15 like you were?

16    A.    Correct, they were making similar errors

17 on the work orders, maybe not exactly the same

18 problems; but they were bringing me the wrong

19 material, alloys, things I could not succeed with,

20 and they were not being disciplined.

21    Q.    All right.  So beyond them bringing you

22 the wrong materials and -- who were those younger

23 people that were bringing you the wrong materials?

24    A.    The side loader operators.

Page 260

1    A.    Yes, sir.

2    Q.    And this document indicates that you were

3 complaining to Mr. Fruehauf about how Mark DeMien

4 spoke to you when he swore at you?

5    A.    Yes.

6    Q.    Okay.

7    A.    How I was being harassed, yes.

8    Q.    And you would agree, there's nothing in

9 here to indicate that you were complaining to Bill

10 Fruehauf about age discrimination?

11    A.    Yes.

12    Q.    And the very last page of this exhibit,

13 this is your handwriting?

14    A.    Which page?

15    Q.    The very last page of the exhibit.

16    A.    Let me check.

17    Q.    000146 at the top.  It refers to Pat

18 Bishop, and there's a phone number.

19    A.    Yes.

20    Q.    This is all your handwriting?

21    A.    Yes, sir.

22    Q.    And what, you prepared this after having

23 a phone conversation with Pat Bishop?

24    A.    Yes.

Page 294

1 meeting with Randy Lunt, Gino, my union rep and Pete

2 LaRocco, my union steward, and I ran into Pat

3 Bishop.  And I said, Pat, didn't you tell them that

4 you heard the whole conversation?  Or what did you

5 say?  Didn't you hear it or what?

6            He says, yeah, of course I heard it.  I

7 was there, and I told you to hire a lawyer, that you

8 shouldn't let him talk to you that way.  But he said

9 Fruehauf never asked us, he never asked if we

10 witnessed it.  So in other words, he lied and said

11 that he did witness it, but he never did ask them if

12 they saw it.

13      Q.     During your employment with Copper and

14 Brass Sales, when did you begin completing the

15 production logs?

16      A.     That's hard to say.  Probably at least

17 ten or 15 years ago.

18      Q.     Okay.

19      A.     Quite a while back.

20      Q.     And did you do anything different in the

21 way that you completed the production logs from the

22 time you began until your termination?

23      A.     Not so much.  It basically stayed the

24 same.

Page 315

1    A.    Mark DeMien.

2    Q.    What proof do you have that Mark DeMien,

3 in 2005, denied you an overtime opportunity, because

4 you filed a grievance about -- I'm talking, sir.

5 I'm beginning to suspect you do that intentionally.

6    A.    I'm just trying to answer your question.

7    Q.    How could you be answering my question,

8 if I'm not even done with my question?

9    A.    I thought you were done.  I'm sorry, I

10 thought you were done.

11    MR. LINDEN:  Why don't you read back my

12 question, please.

13         (WHEREUPON, the record was read

14         by the reporter.)

15 BY THE WITNESS:

16    A.    I don't have any proof.

17    Q.    Thank you.

18         Let's talk about Exhibit 28, which is the

19 October 10, 2007 discipline.  I put Exhibit 28

20 before you, Mr. Wingo.

21         Your testimony now, in response to

22 questions from your counsel, you tried to blame what

23 happened there on the person who gave you the

24 product, correct?

Page 316

1    A.    Right, they pulled the wrong material.

2    Q.    You still processed, even though it was

3 brought to the wrong area, correct?

4    A.    I did not catch it.

5    Q.    Okay.  And that would have been your

6 responsibility, correct?

7    A.    Correct.

8    Q.    Okay.  Now, let's talk about Exhibit 37,

9 so I'm sure I understand your testimony.  This is

10 your daily production log for November 29, 2007.

11         As I understand your testimony, in

12 response to a question by your counsel, the times

13 you have in the column "Stop Time" are the actual

14 start times for when you start working on these

15 projects.

16   A.    I'm not sure on all of them that they

17 were start or stop times.  I just tried to document

18 some time there.

19   Q.    Well, how would the person relying on

20 this document know whether or not it was a start

21 time or a stop time -- I'm not done -- if you're

22 sitting here today, looking at your own document,

23 can't tell us whether or not the time is a stop time

24 or start time?

Page 329

1    Q.    Lance Amack ever take anything?

2    A.    I don't know.

3    Q.    Now, you indicated that the side loader

4 operators and the shipping and receiving are

5 actually warehouse clerks?

6    A.    Warehousemen.

7    Q.    Well, there's a job classification

8 warehouse clerk, isn't there?

9    A.    Probably.

10    Q.    What do you mean, "Probably"?

11    A.    Well, our classification was overall

12 warehousemen, and then you break it down to order

13 clerks or side loader operator; but we made the same

14 money.

15    Q.    And you had different duties and

16 responsibilities than the side load operator,

17 correct?

18    A.    Yes.

19    Q.    And you had different duties and

20 responsibilities than the shipping and receiving

21 clerks?

22    A.    Yes.

23    Q.    Now, when you complained to Bill Fruehauf

24 about Mark DeMien swearing at you in August of 2007,

Page 330

1 you had already been terminated, correct?

2    A.    Yes.

3    Q.    Now, this conference call you

4 described -- when was the last time you spoke to

5 Sergio Garcia?

6    A.    I haven't talked to Sergio since I was

7 terminated.

8    Q.    When was the last time you spoke to Pat

9 Bishop?

10    A.    I ran into Pat on the last day of my

11 grievance procedure, on the very last one.

12    Q.    Was Pat Bishop ever disciplined by

13 Mark DeMien?

14    MS. WEGNER:  Object, calls for speculation.

15 BY THE WITNESS:

16    A.    I don't know.

17 BY MR. LINDEN:

18    Q.    Well, let's see if I can help you out.

19    A.    Probably, yes.  Yes, he was wrote up that

20 same day, right, of the verbal harassment; yes, he

21 was.

22    Q.    So the very same day that you got

23 verbally --

24    A.    Wait, that was stricken from the case.

Page 334

1    A.    I can't remember exactly when.  It was

2 around, right after the termination, somewhere in

3 December.

4    Q.    But you don't know whether or not

5 Mr. DeMien was simply temporarily filling you until

6 such time as they permanently replaced you, if they

7 were going to --

8    A.    Yes.

9    Q.    And would there possibly have been a job

10 posting?

11    A.    There should have been, yes.

12    Q.    And so you don't know, sitting here

13 today, who, if anyone, would have permanently

14 replaced you?

15    A.    Correct.

16    Q.    All right.  Now, let's talk about this

17 conference call that took place on December 4th,

18 involving Mr. Fruehauf.

19          Your wife was also involved in that call?

20    A.    Yes, she was in the background, and she

21 understood, you know, a little of what was going on.

22    Q.    Did you let Mr. Fruehauf know that your

23 wife was on the telephone?

24    A.    No.  She was not on the phone, she was in

Page 340

1 your packing right the whole job do the order right

2 basically is what he was saying.  Not just

3 paperwork.  Paperwork's only part of the order.  You

4 know, you got to do the physical part of the order,

5 too.

6      Q.    And you agree, it's very important, it

7 was an essential function of your job to do your

8 paperwork right?

9      A.    Sure, yes.

10     Q.    And you would agree, if you didn't do

11 your paperwork right, that the company could

12 discharge you for it?

13     A.    Sure.

14     MR. LINDEN:  I have nothing further.

15     Thank you for your time, Mr. Wingo.

16     THE WITNESS:  Sure.

17                    EXAMINATION

18 BY MS. WEGNER:

19     Q.    To your knowledge, Mr. Wingo, was

20 Mr. LaRocco --

21     A.    LaRocco.

22     Q.    Was Mr. LaRocco very friendly with

23 members of management at Copper and Brass?

24     A.    Yes, he was.