# EXHIBIT D

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

ROBERT G. WINGO,                  )

     Plaintiff,              )

  vs.                             ) No. 08 C 368

THYSSENKRUPP MATERIALS NA,        )

INC., d/b/a COPPER AND BRASS,     )

     Defendant.              )


      Deposition of PETE LAROCCO, called for examination, taken pursuant to notice, agreement and by the provisions of the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before PATRICIA A. ARMSTRONG, a Notary Public within and for the County of DuPage, State of Illinois, and a Certified Shorthand Reporter, No. 084-1766, of said state, taken at 29 South LaSalle Street, Chicago, Illinois, on the 29th day of May, 2008 at 2:00 p.m.

```
 1      Q.    So your deposition today is pursuant
 2 to subpoena; correct?
 3      A.    Right.
 4      Q.    What is your current home address?
 5      A.    218 Wakefield Lane, Schaumburg,
 6 Illinois.  60193 is the Zip Code.
 7      Q.    And how long have you lived on
 8 Wakefield Lane in Schaumburg?
 9      A.    About 15 years now.
10      Q.    Is your current residence on
11 Wakefield Lane a home?
12      A.    Yes.
13      Q.    Do you have any present intention of
14 relocating?
15      A.    No.
16      Q.    What is your date of birth?
17      A.    9/11/59.
18      Q.    What is your current age?
19      A.    I am going to be 49.
20      Q.    You will be 49 in?
21      A.    Right, September.
22      Q.    So currently you are 48?
23      A.    Yeah, 48.  I'm sorry.
24      Q.    What is the highest level of
```

1 crime involving dishonesty?

2      A.     No.

3      Q.     Are you currently employed with
4 Copper and Brass Sales?

5      A.     Yes, I am.

6      Q.     When did you begin your employment
7 with --

8      A.     Twenty-nine years ago, 4/24/79, I
9 think it was.

10      Q.     And what is your position with Copper
11 and Brass Sales?

12      A.     I am a machine operator lead man and
13 the steward for our Local.

14      Q.     You are a machine operator?

15      A.     Yes.

16      Q.     And you are a lead man for what?

17      A.     For the bay, for the machine bay.
18 And I am the steward for the members.

19      Q.     Your position as a steward in
20 connection with your membership in Teamsters Local
21 714; is that correct?

22      A.     Yes.

23      Q.     How long have you been a member of
24 Teamsters?

1  BY MS. WEGNER:

2       Q.    And in your position at Copper and
3  Brass Sales as a machine operator, what is the
4  information that you write on the order?

5       A.    The size that I am cutting, the
6  tolerance that I am cutting, the weight of the
7  order, the weight of the material, and my initials
8  are done that I filled that order, and that they
9  are getting the correct material.

10      Q.    Is there a progressive discipline
11 policy at Copper and Brass Sales for the Union
12 employees?

13      A.    Yes, there is.  And I think it is
14 very lenient.  I mean, you really have to make the
15 same mistakes over and over.  Unless, you know,
16 like a one-month span, if you make six mistakes,
17 you are going to get disciplined.

18            And, as I said, then, if you don't
19 understand what you are doing, you could always
20 ask for training.

21            And I must say that Copper and Brass
22 Sales is very good on retraining you.  If you need
23 any retraining, they will take the time to give
24 you retraining during your working hours.

1  Q.  What is the basis for your statement
2  that if someone makes six mistakes, they will get
3  disciplines?
4  A.  Well, I am saying they are -- I mean,
5  you need to really make a lot of mistakes in one
6  month's span.  I threw a figure out there, I'm
7  sorry if that -- I am just saying that you really
8  need to make that same mistake over.
9  Q.  Is repetitive work order mistakes
10 something for which Mr. Wingo received discipline,
11 to your knowledge?
12 A.  Yes.
13 Q.  Who else at Copper and Brass Sales
14 have received discipline --
15 A.  Numerous people.
16 Q.  (Continuing.)  -- discipline for
17 repetitive work order mistakes?
18 A.  Numerous people.
19 Q.  Who?
20 A.  Mario Alvarez, Bob Wingo.  Their
21 names are on the second shift, there are Isidro, I
22 can't pronounce his last name.  There has been a
23 few of them.  A lot of them are mostly new men,
24 too.

1    Q.    Are you referring to Isidro Garcia?

2    A.    Yes, Isidro Garcia, and there has
3 been a few others.

4    Q.    In your work with Copper and Brass
5 Sales as a machine operator, do you fill out daily
6 production logs?

7    A.    Yes.

8    Q.    And what is the information that you
9 are required to complete on the daily production
10 logs?

11   A.    Your work order that you are filling,
12 how many pieces that you have filled, the weight,
13 your time start and your time finish.

14   Q.    Have you ever been informed of the
15 expectation of Copper and Brass Sales as to the
16 number of work orders you would be expected on
17 average to complete for the day?

18   A.    Yes.

19   Q.    What is the number of work orders you
20 are typically expected to complete for the day?

21   A.    Well, in the machine operator -- as a
22 machine operator in our bay, probably about 10 to
23 15 according to how much weight you are cutting
24 and how many pieces.

1    Q.    Do you know what hours Tyler DeMien
2 works on his third shift?
3    A.    I think it's 6:00 to 2:30, 2:30 to
4 11:00, 11:00 to 7:00.  11:00 to 7:00.  Three
5 shifts.
6    Q.    Okay.  And on your shift, you are
7 allowed to stop five minutes early for washing up?
8    A.    We are allowed to stop for five
9 minutes, yes, before wash-up.  The bell goes off,
10 but you still have to remain in the building and
11 you do have to wait those five minutes to leave,
12 that's it.
13    Q.    Is there a policy or procedure that
14 you follow when working on work orders that you
15 can't complete before the bell goes off and your
16 workday stops?
17    A.    You are supposed to communicate with
18 the next shift on -- that you are not able to
19 complete the order so that he is able to complete
20 the order.
21    Q.    And how do you communicate where you
22 left off on an order?
23    A.    You either write notes or you stay
24 and you tell the next shift.

1   Q.   And what procedure is typically used
2 to write the notes for the next shift to let them
3 know where you leave off on a work order?
4   A.   There is not really a procedure, it's
5 just you either write, you know, that, here, you
6 need to do this or that, or give it to the foreman
7 and let the foreman tell the individual.
8   Q.   I am going to show you a document we
9 have marked at an earlier deposition as Exhibit
10 No. 7.
11        Have you ever seen Exhibit 7 before?
12   A.   Yes.
13   Q.   Can you identify Exhibit No. 7?
14   A.   Yes.
15   Q.   What is Exhibit No. 7?
16   A.   About daily production log.
17   Q.   What is your understanding of the
18 instruction in the daily production log relating
19 to the completion of the daily production log, if
20 any, at or near the end of your workday?
21       MR. DISBROW:  I am just going to put an
22 objection on the record to the degree the document
23 speaks for itself.
24       You can answer.

```
 1 BY THE WITNESS:
 2      A.   If you do not finish the order, you
 3 are to state that you did not finish the order,
 4 and according to start and finish time.  So, if
 5 you don't finish, you are supposed to write in
 6 comments that you did not complete the order.
 7 BY MS. WEGNER:
 8      Q.   I am going to show you what was
 9 marked as Exhibit No. 18 at an earlier deposition,
10 which is a two-page document regarding discipline
11 for Tyler DeMienn.
12           Do you recognize this document?
13      A.   Yes.
14      MR. DISBROW:  I am just going to state for
15 the record, as indicated in an earlier deposition,
16 this is actually two separate documents about two
17 separate incidents.
18 BY MS. WEGNER:
19      Q.   Did you participate in any Union
20 proceedings regarding the suspension that Tyler
21 DeMien received on May 10, 2005 for leaving work
22 without permission, punching out without notifying
23 his supervisor?
24      A.   You know, I don't --
```

 1  BY THE WITNESS:

 2        A.    The way I see it is 12:55, the next
 3  order was completed at 1:22, the next order was
 4  completed at 2:00, the next order was completed at
 5  2:20.  That's how he did his start times, start
 6  and finish times.  That's what I am looking at.
 7  BY MS. WEGNER:

 8        Q.    Are you certain that that's how
 9  Mr. Wingo --
10        A.    I am not certain, but that's the way
11  that I see that he is writing it down as.
12              See, my sheets are different, my
13  sheets are finish and start, finish and start.
14  His sheets are just his stop times here.
15              You know, he started an order at
16  6:45, the next one was done at 7:15.  That's the
17  way I am looking at this.
18        Q.    I am going to show you an Exhibit
19  No. 14 from a previous deposition.
20              Do you recognize that?
21        A.    Yes, I do.
22        Q.    What is Exhibit No. 14?
23        A.    It's a production sheet.
24        Q.    Is Exhibit No. 14 one of the

1  that his discipline -- he didn't agree with his
2  discipline?
3        MS. WEGNER:  I will object; calls for
4  speculation, assumes facts not in evidence,
5  mischaracterizes the witness' prior testimony,
6  calls for speculation, form and foundation.
7        MR. DISBROW:  You can answer the question.
8  BY THE WITNESS:
9        A.    No.
10 BY MR. DISBROW:
11       Q.    To your knowledge, did Mr. Wingo ever
12 allege that Mr. DeMien or anyone else was
13 harassing him because of his age?
14       A.    Never.
15       Q.    Would you agree with me that there is
16 a fair amount of shop talk that goes on?
17       A.    Yes.
18       Q.    It's not uncommon for people to use
19 colorful language in the shop; is that fair --
20       A.    Yes --
21       Q.    Let me finish the question.
22             Is that a fair statement?
23       A.    Yes.
24       Q.    I want you to go ahead and take a

1  feel I was unfairly terminated."
2         Do you know whose writing that is?
3    A.  That's Bob's.
4    Q.  And were you with him when he filled
5  this grievance form out?
6    A.  No, I wasn't. He filled it out and
7  then brought it in, and then I signed it, so it
8  would go to Gino for the next step.
9    Q.  When Mr. Wingo filled this grievance
10 form out and returned it to you, did he ever
11 indicate to you that he believed he was being
12 terminated because of his age?
13   A.  Absolutely not.
14   Q.  That allegation was never made to
15 you?
16   A.  Never, never.
17   Q.  You were also involved, at least to
18 some degree, in the second step and other meetings
19 that Copper and Brass Sales had with regard to
20 Mr. Wingo's termination; is that correct?
21   A.  Yes.
22   Q.  Now, do you have any personal
23 knowledge of Mr. Wingo ever indicating in those
24 meetings that he felt he had been terminated

1 because of his age?

2      A.     Absolutely not.

3      Q.     Did he ever indicate that anyone had
4 made any comments with regard to his age?

5      A.     No.

6      Q.     Now, I think you indicated that you
7 had been a Union steward for about 21 years; is
8 that correct, at Copper and Brass?

9      A.     Yes.

10     Q.     And in that time, you have been
11 involved in a number of grievance proceedings, I
12 would assume?

13     A.     Yes.

14     Q.     And you have been involved in
15 representing Union employees when they have had
16 disciplinary action taken against them?

17     A.     Yes.

18     Q.     So you have some familiarity with the
19 amount of disciplinary action that goes on within
20 the plant?

21     A.     Yes.

22     Q.     How would you characterize the amount
23 of disciplinary action taken against Mr. -- strike
24 that.

1          How would you characterize the amount
2 of issues that Mr. Wingo had through the course of
3 his employment at Copper and Brass Sales as
4 compared to other employees?
5          MS. WEGNER: I object; calls for
6 speculation, form and foundation, relevance.
7          MR. DISBROW: You can answer the question.
8 BY THE WITNESS:
9          A.    I think he has had more chances than
10 others.
11 BY MR. DISBROW:
12         Q.    So it is fair to say that management
13 gave him numerous chances to correct his
14 performance issues?
15         A.    Absolutely, yes.
16         MS. WEGNER: Same objection.
17 BY MR. DISBROW:
18         Q.    And is it fair to say he had a number
19 of performance issues over his time at the
20 company?
21         A.    Yes.
22         MS. WEGNER: Same objection.
23 BY MR. DISBROW:
24         Q.    And I'm sorry, your answer to my

1 asking the company.

2          Really, I am being serious, why would
3 you ask me that question?

4     Q.   Because I am wondering why if
5 Mr. Wingo's discipline was so bad, he wasn't
6 terminated much earlier?

7     A.   He was terminated a few times -- not
8 terminated, suspended a few times before.

9     Q.   How many times are you aware of
10 Mr. Wingo being suspended?

11    A.   Oh, I would say he has been suspended
12 four or five times, if you look in the records.

13    Q.   Do you believe that Copper and Brass
14 Sales followed its discipline policy, its
15 progressive discipline policy when it terminated
16 Mr. Wingo?

17    A.   Yes, I do.

18    MS. WEGNER:  I don't have anything else.

19    MR. DISBROW:  Nothing.

20    MS. WEGNER:  Mr. LaRocco, you have the
21 right to review the transcript of this deposition
22 should you wish to do so.

23         That would allow you to receive
24 notice that it has been transcribed.  It's