# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

ROBERT G. WINGO,                    )
          PLAINTIFF,        )
     VS.                    ) No. CV 0 0368
THYSSENKRUPP MATERIALS NA, INC. )
D/B/A COOPER AND BRASS       )
SALES, INC.                 )
          DEFENDANTS,       )


   This is the discovery deposition of Mark DEMIEN, taken in the above-entitled cause before GWENDOLYN BEDFORD, a Notary Public and Certified Shorthand Reporter within and for the County of Cook, State of Illinois, taken at the offices of VICTORIA COURT REPORTING SERVICES, INC., 29 South LaSalle Street, Suite 200, Chicago, Illinois, held on the 12th day of June, 2008 at the hour of 10 o'clock a.m. pursuant to notice.

```
1      Q     And what is your present cell phone number?
2      A     (847)736-7727.
3      Q     What is your date of birth?
4      A     December 22, 1961.
5      Q     And what is your present age?
6      A     Forty-six.
7      Q     What is your Social Security number?
8            MR. DISBROW:  You can go ahead and give it to
9  her.  I'll object as to relevance, but you can go ahead
10 and give it to her.
11           THE WITNESS:
12           MR. DISBROW:  We'll ask pursuant to the
13 statute that that number be kept private and
14 confidential.
15           MR. DISBROW:  Mark, didn't understand exactly
16 what you meant by "party to a lawsuit".  He wanted to
17 clarify that there was a divorce proceeding.  You can
18 clarify that for her.
19           THE WITNESS:  With my ex-wife.
20           MS. WEGNER:  So you have been divorced.
21 Other than divorce proceedings, have you sued anyone or
22 any entity or has anyone or any entity sued you?
23           THE WITNESS:  No.
24
```

 1  branch.

 2     Q     Why did your employment end with the Daily
 3  Herald?

 4     A     I decided to seek employment elsewhere.

 5     Q     Have you ever been terminated from a position
 6  of employment?

 7     A     No.

 8     Q     When you began working with Cooper and Brass
 9  Sales in October of 1996 as a Receiving Supervisor,
10  what was your rate of pay?

11     A     I believe the salary was $27,000 per year.

12     Q     And how long were you Receiving Supervisor
13  with Copper and Brass Sales?

14     A     Up until 20, up until 2003.

15     Q     How many people did you supervise typically
16  as the Receiving Supervisor for Copper and Brass Sales?

17     A     Three, two to three.

18     Q     What is the next position that you assumed
19  after Receiving Supervisor of Copper and Brass Sales?

20     A     Current position, Plant Supervisor.

21     Q     Was the change from Receiving Supervisor to
22  Plant Supervisor a promotion?

23     A     Yes.

24     Q     And who promoted you to Plant Supervisor?

1 attended early in your employment at Copper & Brass
2 Sales?
3    A    The training was most of the day that I
4 remember.
5    Q    What was the content of the supervisor
6 seminar that you attended early in your employment at
7 Cooper and Brass Sales?
8         MR. DISBROW:  Object to the extent that you
9 recall.
10        THE WITNESS:  Dealing with subordinate
11 employees.
12 BY MS. WEGNER:
13   Q    Do the second shift employees at Cooper and
14 Brass Sales report to a particular person?
15   A    Yes.
16   Q    Who do the second shift employees report to?
17   A    Chris Ignacio.
18   Q    And what, to your knowledge, is Chris
19 Ignacio's title?
20   A    Second Shift Plant Supervisor.
21   Q    How long has Mr. Ignacio been the Second
22 Shift Plant Supervisor at Cooper and Brass Sales?
23   A    Roughly two years.
24   Q    Your son, Tyler, worked at Cooper and Brass

1 Sales, correct?

2    A    Yes.

3    Q    And when did Taylor begin working at Cooper
4 and Brass Sales?

5    A    Approximately three and a half year ago, I
6 believe.

7    Q    And in what position did your son, Tyler,
8 begin working at Copper and Brass Sales?

9    A    Union Helper.

10    Q    When Tyler began working at Cooper and Brass
11 Sales three and a half years ago, what shift did he
12 work on as Union Helper?

13    A    I believe he was on first shift.

14    Q    Did Tyler at some point in time stop being
15 Union Helper at Cooper and Brass Sales?

16    A    Yes.

17    Q    When was Tyler no longer a Union Helper at
18 Cooper and Brass Sales?

19    A    When he became a Warehouseman and I'm not
20 sure exactly when that was.

21    Q    Do you know how long Tyler was a Union
22 Helper?

23    A    Probably a year.  I can't recall the exact
24 time frame.

Case 1:08-cv-00368   Document 26-7   Filed 07/18/2008   Page 7 of 19

Page 18

```
 1     Q    When Tyler became a Warehouseman, what shift
 2 did he work on?
 3     A    Second shift.
 4     Q    And how long did Tyler work on the second
 5 shift as a Warehouseman once he assumed the
 6 Warehouseman position?
 7          MR. DISBROW:  Objection.  Foundation.
 8 Assumes facts not in evidence.
 9               You can answer, if you can.
10          THE WITNESS:  I'm not exactly sure, maybe six
11 months.
12 BY MS. WEGNER:
13     Q    What shift is Tyler currently working at
14 Cooper and Brass Sales?
15     A    Third shift.
16     Q    And for how long has Tyler worked on the
17 third shift at Copper and Brass Sales?
18     A    At least a year.  I'm not exactly sure of the
19 exact time frame.
20     Q    What are the third shift hours at Cooper and
21 Brass Sales?
22     A    11 p.m. to 7:30 a.m.
23     Q    And what are the first shift hours at Cooper
24 and Brass Sales?
```

```
 1     A     Typically 6:30 a.m. to 2:30 p.m.
 2     Q     How long have the first and third shift hours
 3 been in effect as you have described them to me at
 4 Cooper and Brass Sales?
 5     A     As long as I can remember.
 6     Q     Then there is an overlap from the employees
 7 from the third shift and the employees from the first
 8 shift, right?
 9     A     Yes.
10     Q     What duties does your son, Tyler, currently
11 perform at Copper and Brass Sales as the Warehouseman?
12           MR. DISBROW:  Object as to form and
13 foundation.  Answer to the degree that you know.
14           THE WITNESS:  He drives a side loader.
15 BY MS. WEGNER:
16     Q     How long has Tyler been in the position as a
17 Warehouseman primarily driving a side loader on the
18 third shift?
19     A     Every since he started working third shift.
20 It was primarily a side loader driver.
21     Q     What is it that a side loader driver does at
22 Cooper and Brass Sales?
23     A     He pulls material for customer work orders
24 and puts material away, stock for different
```

1 answer.

2          THE WITNESS:  Yes.

3 BY MS. WEGNER:

4     Q    What is Exhibit Number 5 from Mr. Lunt's
5 deposition?

6     A    Chicago Branch Work and Safety Rules.

7     Q    Are you familiar with Mr. Wingo?

8     A    Yes.

9     Q    And when did you first become acquainted with
10 Mr. Wingo?

11    A    I met him on my first day of employment.

12    Q    And Mr. Wingo was already employed at Copper
13 and Brass Sales when you began, correct?

14    A    Yes.

15    Q    Did you have any involvement in the decision
16 to terminate Mr. Wingo's employment with Copper and
17 Brass Sales?

18         MR. DISBROW:  I'm going to object to the form
19 and foundation.  Vague as to what "involvement" means,
20 but you can certainly answer to the degree that you
21 know.

22         THE WITNESS:  Yes.

23 BY MS. WEGNER:

24    Q    And what was your involvement in the

1 termination of Mr. Wingo at Copper and Brass Sales?

2    A    Listening to Mr. Lunt determine that

3 Mr. Wingo would be terminated.

4    Q    Do you know the basis of Mr. Lunt's

5 determination that Mr. Wingo would be terminated?

6    A    Yes.

7    Q    What is your understanding of the basis on

8 which Mr. Lunt determined that Mr. Wingo would be

9 terminated?

10    A    Falsification of company documents.

11    Q    Based on your employment at Cooper and Brass

12 Sales, do you have an understanding of the

13 falsification of company documents at Copper and Brass

14 Sales?

15    A    Yes.

16    Q    And what is your definition of the

17 falsification of company documents at Copper and Brass

18 Sales?

19    A    Writing untrue figures on a company document.

20    Q    And what company documents do you understand

21 Mr. Wingo allegedly falsified that resulted in his

22 termination?

23    A    Production reports.

24    Q    During your employment at Copper and Brass

1  Pages 105 and 106 are packing slips.

2          MR. DISBROW:  Is that a question, Counsel, or
3  a statement?

4  BY MS. WEGNER:

5      Q    Did you accumulate these documents following
6  Page 105 and 106 for any reason?

7          MR. DISBROW:  Object to form and foundation.
8  I don't know where those documents came from.  They
9  appear to have Plaintiff's Counsel's numbers on them.
10 I don't know where these particular copies came from.

11              You can answer to the degree that you
12 know.

13         THE WITNESS:  I don't know what "accumulate"
14 means.

15 BY MS. WEGNER:

16     Q    When did it first become important to you to
17 write these notes on these Daily Production Logs at
18 Pages 105 and 106 of Exhibit --

19         MR. DISBROW:  Objection as to form.  I don't
20 know what that means.

21              You can answer if you know.

22         THE WITNESS:  They were random checks.

23 BY MS. WEGNER:

24     Q    And how often do you conduct random checks of

1 Daily Production Logs as the Plant Supervisor at Copper
2 and Brass Sales?
3    A    I can't give you a concrete figure.
4 Sometimes weekly, sometimes daily, while I'm entering
5 them onto a computer spreadsheet.
6    Q    What is the purpose for which you enter the
7 Daily Production Logs onto a computer spreadsheet?
8    A    It is required by my job.
9    Q    In looking at Exhibit Number 1, Pages 105 and
10 106, are those the documents that you referred to
11 earlier as production reports?
12        MR. DISBROW: Objection as to form. Are you
13 asking if they are examples of production logs?
14        MS. WEGNER: I'm asking whether this document
15 that is entitled "Production Log" is the production
16 report that he was referring to earlier when he said
17 that the employees were required to fill them out?
18        MR. DISBROW: I understand that, Counsel. I
19 think language is important. You said are these the
20 production logs, not examples of. I think that the
21 form is vague.
22        You can answer if you know.
23        THE WITNESS: These appear to be copies of
24 the production logs that order fillers fill out when

1 they complete work orders.

2 BY MS. WEGNER:

3    Q    And when we were talking earlier, you were
4 talking about production reports and training that you
5 are aware employees received on how to complete
6 production reports. And my question is, was that what
7 you were referring to?

8    A    Yes, this right here. (Indicating)

9    Q    The production log?

10   A    The production log, they do fill those out.

11   Q    Do you, as the Plant Supervisor at Copper and
12 Brass Sales enter production logs prepared by all
13 employees at the plant at which you were the
14 supervisor?

15   A    To where?

16   Q    You say you enter them into a computer spread
17 sheet?

18   A    Yes.

19        MR. DISBROW: It is 11:33, whenever it is
20 convenient for you, I'm ready for a break.

21        MS. WEGNER: Fine, I can do that.

22              (BRIEF RECESS)

23              (WHEREUPON Exibit 2 was marked
24                for identification)

1 the initials on the left-hand side next to Number 16

2 and 17, what did you think?

3          MR. DISBROW:  Same objections.  I don't

4 know -- I don't even understand the question.  I think

5 it mischaracterizes his earlier testimony.

6          THE WITNESS:  I don't understand the

7 question.

8          MR. DISBROW:  I'm not trying to make a

9 talking objection, but hear me out for a minute.  Jan,

10 Mark -- I believe his testimony is that he made those

11 notations, if you are talking about the initials?  Are

12 you talking about the initials?

13          MS. WEGNER:  If that is true, then I

14 apologize.  I'm mistaken.  I thought he put the circle

15 there.

16          THE WITNESS:  I made the notations.

17 BY MS. WEGNER:

18      Q    You made the initial --

19      A    MEA, MEA.

20      Q    Why did you write "MEA" on Line 16 and 17 of

21 Exhibit Number 2?

22      A    As I was doing my random check of this

23 production log, by checking the computer as to who

24 actually filled the work order, what time the work

1 order was keypunched and completed, I discovered it was

2 filled by MEA, who is Mario Alvarez.

3    Q    And why did the fact that when you were

4 checking on the computer you found that these orders

5 were filled by Mario Alvarez call anything into

6 question?

7    A    Because Bob is writing them down as he is

8 claiming that he completed those orders.

9    Q    With respect to these two work orders for the

10 Daily Production Log on November 28, 2007 on Lines 16

11 and 17, were they entered into the computer on more

12 than one occasion?

13         MR. DISBROW:  Objection as to foundation.

14 You can answer, if you know.

15         THE WITNESS:  They can only get entered at

16 one time and a computer will document at what time the

17 work order is actually keypunched.

18 BY MS. WEGNER:

19    Q    So when you checked the work orders with

20 respect to the Daily Production Log on November 28,

21 2007, the last two items, who had actually keypunched

22 those work orders into the computer?

23    A    That would be Mario Alvarez.

24    Q    And do you know whether or not on

1 not clear.

2 BY MS. WEGNER:

3    Q    Who has covered in the training at Copper and
4 Brass Sales what employees are supposed to do when they
5 are supposed to work on a work order that is not
6 completed at the end of their shift?

7    A    Various supervisors.

8    Q    Where are the supervisors that you believe
9 have conducted training at Copper and Brass Sales what
10 employees are supposed to do if they are working on a
11 work order that they do not complete by the end of
12 their shift?

13    A    To my knowledge all supervisors.

14    Q    Have you been present at every training
15 session conducted by supervisors at Copper and Brass
16 Sales regarding what employees should do when they are
17 working on a work order that they are unable to
18 complete at the end of their shift?

19    MR. DISBROW: Objection as to form and
20 foundation.

21    THE WITNESS: I can't recall, no.

22 BY MS. WEGNER:

23    Q    And what are the instructions that the
24 employees are given at Copper and Brass Sales in their

1 training regarding what they should do if they are
2 working on a work order that they are unable to
3 complete at the end of their shift?
4     A    Employees are to write down completed work
5 orders on the production log that they complete.
6     Q    Did you ever check any of Mr. Alvarez's
7 production logs to see whether or not he also made
8 notes on the production logs about problems that he
9 encountered with work orders?
10    A    I can't recall specific times.
11         MS. WEGNER:  Let's make this Number 3.
12              (WHEREUPON Exhibit 3 was marked
13                  for identification)
14 BY MS. WEGNER:
15    Q    Exhibit Number 3, Mr. DeMien is a Daily
16 Production Log for November 29, 2007 on which you also
17 made notes as you told us earlier, correct?
18         MR. DISBROW:  Objection.  Assumes facts not
19 in evidence.  Form of the question.
20              You can answer the question.
21         THE WITNESS:  I wrote down the circle and
22 wrote down "MEA", and wrote down "IG" and the arrow
23 pointing to these two works orders were "filled by
24 second shift" and my initials and the date.  That is

1  what I wrote on this original copy.

2  BY MS. WEGNER:

3    Q    And who do the initials "IG" refer to.

4    A    I believe Isidro Garcia.

5    Q    Did you check any of Isidro Garcia's Daily

6  Production Logs to see if he made notes in the Comments

7  Section when he encountered a problem with the work

8  order?

9    A    Not that I can recall.

10    Q    Do you recall having an argument with

11  Mr. Wingo at the end of August or the very beginning of

12  September 2007, with Pat Bishop present, where you

13  swore and yelled at Mr. Wingo?

14    A    No.

15    Q    Were you ever made aware that Mr. Wingo

16  complained about the way you treated him at Copper and

17  Brass Sales?

18    A    Yes.

19    Q    And when were you made aware that Mr. Wingo

20  complained about your treatment of him at Copper and

21  Brass Sales?

22    A    On -- I can't remember specifics, but on many

23  different occasions over the years.

24    Q    What complaints were you made aware of that

1            You can answer it again, Mark.

2            THE WITNESS:  I can't recall the specific

3 person.

4 BY MS. WEGNER:

5     Q     Are there any records at your plant that

6 would reflect who began working at the RBW non-process

7 station that Mr. Wingo had worked at after his

8 termination?

9     A     I'm sure there is.

10    Q     What would those records be that we could

11 look at to determine who began working at the RBW

12 non-processed station immediately after Mr. Wingo was

13 terminated?

14    A     Production logs dated that day.  Work order

15 activity, who filled the work orders dated that day.

16 Attendance records that will show all the warehousemen

17 that were present on that day.

18    Q     Did your son, Tyler, move into the RBW

19 non-processed station that Mr. Wingo has worked at

20 after he was terminated?

21           MR. DISBROW:  Objection as to form.  Vague.

22           THE WITNESS:  No.

23 BY MS. WEGNER:

24    Q     Did you attend a meeting where Mr. Wingo was