# EXHIBIT H

Grievance Procedure p. 8



# AGREEMENT

### BETWEEN

## THYSSENKRUPP MATERIALS NA, INC.

## COPPER AND BRASS SALES
## CHICAGO BRANCH

### AND

## INTERNATIONAL BROTHERHOOD OF TEAMSTERS
## UNION LOCAL NO. 714

### APRIL 16, 2006 THROUGH APRIL 15, 2009

006003



C&B-Wingo00742

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| Agreement |  | 1 |
| Recognition | Article I | 1 |
| Union Shop - Checkoff | Article II | 1 |
| Management | Article III | 2 |
| Hours of Work | Article IV | 2-3 |
| Overtime | Article V | 3-4 |
| Report in Pay | Article VI | 4 |
| Holidays | Article VII | 4-5 |
| Vacations | Article VIII | 5-6 |
| Leave of Absence | Article IX | 6 |
| Seniority | Article X | 7 |
| Grievance Procedure | Article XI | 8 |
| No Strike and Lockout | Article XII | 9 |
| Wash Up Time | Article XIII | 9 |
| Payday | Article XIV | 10 |
| Rest Periods | Article XV | 10 |
| Lunch Periods | Article XVI | 10 |
| Bereavement Pay | Article XVII | 10 |
| Jury Duty | Article XVIII | 10 |
| Injury on the Job | Article XIX | 10 |
| Conditions for Employees | Article XX | 11 |
| Safety | Article XXI | 11 |
| Job Posting | Article XXII | 12 |
| Supervision Performing Hourly Work | Article XXIII | 12-13 |
| Union Access | Article XXIV | 13 |

000004

| | | |
|---|---|---|
| Discrimination | Article XXV | 13 |
| No Rate Reductions | Article XXVI | 13 |
| Verbal Agreements | Article XXVII | 13 |
| Wage Rates | Article XXVIII | 14-15 |
| Health & Welfare | Article XXIX | 15 |
| Pension | Article XXX | 16-17 |
| Drug and Alcohol Policy | Article XXXI | 18 |
| Complete Agreement | Article XXXII | 18 |
| Entire Agreement Clause | Article XXXIII | 18 |
| Separability and Savings Clause | Article XXXIV | 18 |
| Effective Period | Article XXXV | 18 |
| Appendix A - Drug and Alcohol Policy & Procedures | | 19-22 |
| Signature Page | | 23 |
| Letter of Understanding Regarding Company's Reward System | | 24 |
| Letter of Understanding Regarding Severance Formula | | 25 |
| Letter of Understanding – New Facilities | | 26 |
| Letter of Understanding – Attendance Policy | | 27 |
| Letter of Understanding – Pension Plan | | 28 |

C00005

C&B-Wingo00744

## AGREEMENT

THIS AGREEMENT has been made and entered into this **16th day of April 2006** by and between Copper and Brass Sales, hereinafter called the Company, and the MACHINERY, SCRAP IRON, METAL & STEEL CHAUFFEURS, WAREHOUSEMEN, HANDLERS, HELPERS, ALLOY FABRICATORS, THEATRICAL, EXPOSITION, CONVENTION AND TRADE SHOW EMPLOYEES UNION, Local No. 714, I.B. of T., C., W. and H. of A., for and on behalf of itself and all the employees covered by this Agreement, whether now employed or hereinafter employed, hereinafter collectively called the "Union".

### ARTICLE I
### RECOGNITION

1.1     The Company hereby recognizes the Union as the sole and exclusive bargaining agent for all of its production and maintenance, shipping and receiving employees located at 415 State Parkway, Schaumburg, Illinois, excluding all office and plant clerical employees, professional employees, technical employees, employees of other employers, supervisors and guards as defined in the National Labor Relations Act. "Employees" as used in this Agreement shall mean the employees for whom the Union is recognized as the bargaining representatives.

### ARTICLE II
### UNION SHOP - CHECKOFF

2.1     It shall be a condition of employment that all employees of the Company covered by this Agreement who are members of the Union in good standing on the execution date of this Agreement shall remain members in good standing and those who are not members on the execution date of this Agreement, shall, on the 31st day following the execution date of this Agreement, become and remain members in good standing in the Union. It shall also be a condition of employment that all members covered by this Agreement and hired on or after its execution date shall, on the 31st day following the beginning of such employment become and remain members in good standing in the Union. The Union shall notify the Company in writing whenever a member has lost good standing in the Union due to the failure of the employee to tender the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining Union membership.

2.2     The Company will deduct the monthly dues and initiation fees uniformly levied by the Union upon its members from the wages of each employee covered by this Agreement from whom the Company has received a voluntarily executed written authorization which meets the requirements of Section 302(c) of the National Labor Relations Act, as amended, authorizing such deductions.

2.3     The Union shall indemnify and save the Company harmless against any and all claims, demands, suits, or other forms of liability which may arise out of or by reason of any action taken or not taken in making deductions and remitting the same to the Union pursuant to the first paragraph of this Section.

C&B-Wingo00745

## ARTICLE III
## MANAGEMENT

3.1   It is agreed that the Union and the employees will cooperate with the Company within the obligation of the efficient and flexible operation of the Company's business. The Union recognizes that certain rights, powers, and responsibilities belong solely to and are exclusively vested in the Company except as they may be subject to a specific obligation of this Agreement. Among these rights, powers, and responsibilities, but not wholly inclusive, are all matters concerning or related to the management of the business and administration thereof, and the direction of the working forces, including (but not limited to) the right to suspend, discipline, or discharge for cause, to layoff for lack of work or for any other legitimate reason, to hire, classify, transfer, assign work, promote, demote, or recall, to make and enforce reasonable rules and regulations, to determine the products, processes, and extent of the business or production, the types and quantities of machinery, equipment and materials to be used, the nature, extend duration, character and method of operation including (but not limited to) the right to contract out or subcontract, the amount, utilization and kind of personnel and quality to workmanship and work required. Employees who are suspended, disciplined, or discharged for cause will have recourse to the Grievance Procedure. "Subcontracting", as used herein, is defined as:

a.   Precision slitting, sawing, machining, that the Company has as a past practice sent out to be done more efficiently or economically consistent with an intention insofar as practical, to maintain a stable work force; or

b.   Maintenance work other than the minor maintenance work historically performed by employees in the bargaining unit or janitorial services.

To insure maximum mobility, flexibility and efficiency of operations, all of which are vested exclusively in; the Company except as expressly abridged by a specific provision of this Agreement.

## ARTICLE IV
## HOURS OF WORK

4.1   All regular employees available and able to work the required work schedule shall be guaranteed forty (40) hours of work each week, provided:

1.   They have not received notice of layoff by the Company on or before the Friday preceding the day on which the workweek begins;

2.   They are scheduled to and report for work at their regular starting time on the first day of the scheduled work week, and on each day of the work week thereafter and work their scheduled hours on such days; and

3.   Neither a condition construed as an "Act of God" nor conditions beyond the Company's control make work unavailable.

The Company will be allowed to work the last ten (10) percent, but no less than one, of the active employees on the seniority list on the basis of a single day's work with no weekly guarantee, provided no extra men are called for work during that work week other than those required to replace absent employees.

C&B-Wingo00746

4.2   The workweek shall consist of five (5) days of eight (8) hours each, Monday a.m. through Friday p.m., except for a third shift commencing Sunday p.m. and ending Friday a.m. The work on Saturdays, Sundays, or holidays shall commence as per established hours by the Company.

4.3   The day shift shall be defined as any shift starting between the hours of 4:00 a.m. and 8:00 a.m. In accordance with 4.2, the second shift shall be defined as any shift starting between the hours of 10:00 a.m. and 4:00 p.m. The third shift will be defined as any shift starting on Sunday between the hours of 4:00 p.m. and 12:00 midnight. Wherever practical and consistent with the needs of the Company, the Company will provide thirty (30) days written notice for any change in shift times.

4.4   For hours worked on second shift, there shall be paid a premium rate of forty ($.40) per hour. For hours worked on the third shift, there shall be paid a premium rate of fifty ($.50) per hour.

**ARTICLE V**
**OVERTIME**

5.1   Overtime shall be paid at the rate of time and one half the regular hourly rate for all work performed in excess of eight (8) hours worked in any one day and for work performed on Saturdays. Double time shall be paid for all work performed on Sundays excluding all regularly scheduled shifts starting Sunday p.m. Overtime and/or premium pay shall not be paid twice for the same hours worked. Employees will be asked to work daily overtime by 11:00 a.m. first shift and 7:00 p.m. second shift if possible or by 12:30 p.m. first shift and 8:30 p.m. second shift at the latest except in emergency situations. If a third shift is added the times for overtime scheduling will be mutually agreed upon. Weekend overtime will be scheduled 48 hours in advance. It must be recognized, however; that the Company must serve their customers' need and therefore, overtime may be scheduled as required. The proper rate for the work involved or the employee's classification rate, whichever is higher, will be paid for all overtime worked.

5.2   When employees are needed to work daily overtime the following procedure will apply:

    A.   Employees presently at work, when management determines that daily overtime is required, will first be asked to volunteer for such work in the following order:

        1.   The most senior incumbent on that work station;

        2.   The most senior employee, regardless of classification, with the ability to perform the work;

    B.   If the overtime requirements cannot be filled on a volunteer basis, as set forth in Section 5.2 (A) above, the least senior employee with the ability to perform the work, regardless of classification, will be assigned to work the overtime.

5.3   When management determines that employees are needed to work overtime on weekends or holidays specified as such in Section 7.1 of this Agreement, the procedures set forth in Section 5.2 above shall be followed with one exception; i.e., the procedures will be applied to all employees, regardless of their regularly scheduled shifts and, therefore, not limited to employees "presently at work."

C&B-Wingo00747

5.4  In the event that a third shift is put into effect, overtime for the third shift shall be paid at the rate of time and one half the regular hourly rate, to include the shift premium, for all hours worked in excess of 40 hours worked in any one week and for work performed in excess of 8 hours worked in any one day. Double time, to include shift premium, will be paid for all hours worked on Saturdays, however; time and one half will be paid for overtime hours worked on Saturday when worked on a shift other than midnight and where work performed would actually be the sixth working day of the week.

5.5  When Overtime is required by the Company, employees who work in excess of eight hours in any 24 hour period, or in excess of 40 hours in any regular weekly work period will be paid time and one half for the hours worked in excess of eight on a daily basis or in excess of 40 on a weekly basis, whichever is greater but not both. In other words, overtime shall not be paid on overtime. There shall be no duplication of any premium wage payments. In the event several types of premium payments are applicable to work performed within a work week, the premium payment which will result in the highest total compensation shall be used. When two or more types of overtime or premium compensation are applicable to the same hours of work, only the higher rates of compensation shall be paid. In no case shall overtime or premium compensation be duplicated or pyramided.

## ARTICLE VI
## REPORT IN PAY

6.1  Employees reporting for work, at the beginning of the work day, as scheduled or notified, shall be assigned 4 hours work, and, if sent home because of lack of work, they shall be entitled to receive four (4) hours pay at their regular hourly rate of pay less any hours worked. No employee shall be paid if lack of work is beyond the Company's control; provided, however, that to be entitled to any pay under this Section there must have been an opportunity for the Company to notify the employees not to report to work which the Company failed to do.

## ARTICLE VII
## HOLIDAYS

7.1  All full-time non-probationary employees shall be paid eight (8) times his base straight-time hourly rate for the following holidays.

1. New Year's Day
2. Good Friday
3. Memorial Day
4. Independence Day
5. Labor Day
6. Thanksgiving Day
7. Day after Thanksgiving
8. Christmas Day
One (1) Employee floating holiday
Two (2) Company Floating Holidays

An employee must get management approval for their floating Holiday at least 24 hours in advance. Management will not unreasonably withhold permission in accordance with past practices related to vacation scheduling.

000009

4

C&B-Wingo00748

The Company will schedule two (2) floating holidays. The floating holidays will either be the day before or the day after Christmas, the day before or the day after New Year's Day, the day before or after Independence Day. The floating holidays will be scheduled by the Company in such a manner as to permit the possibility of four (4) day weekends.

Whenever such holidays fall within the regular workweek, Monday through Friday, such days shall be considered as time worked and overtime shall be computed accordingly.

7.2    It is agreed and understood that in order for an employee to qualify for holiday pay, he must have worked the last scheduled workday preceding and the next scheduled workday following the holiday. The provisions of this paragraph in respect to qualifying for holiday pay will be modified in cases of illness or other legitimate reasons at the option of the Company. There shall be no pyramiding of overtime.

7.3    If the holiday occurs during an employee's paid vacation, they will be paid for the unworked holiday, in addition to their vacation pay.

7.4    Any of the holidays which fall on Saturday or Sunday shall be observed on the Friday before or the following Monday.

7.5    An employee shall be paid one and one half (1-1/2) times his base straight-time hourly rate for all hours worked on any of the holidays listed in this article in addition to their regular holiday pay, as noted in Article 7.1. An employee must be a seniority employee to be eligible for Holiday pay.

## ARTICLE VIII
## VACATIONS

8.1    All employees who have been continuously in the employ of the company for a period indicated shall, on January 1st of each year become eligible to receive a vacation for the period stated below, with pay, at their regular straight time hourly rate. All non-probationary employees with less than one year of service as of January 1st of any year will receive a prorated vacation as indicated in the vacation schedule.

8.2    The vacation schedule will be:

| CONTINUOUS EMPLOYMENT | VACATION ELIGIBILITY |
|---|---|
| Less than one (1) year | 1 day per month of employment not to exceed 10 days |
| 1 year but less than 3 years | 10 days |
| 3 years but less than 5 years | 13 days |
| 5 years but less than 10 years | 15 days |
| 10 years but less than 15 years | 18 days |
| 15 years and above | 20 days |

8.3    Vacations must be taken during the calendar year following the anniversary date of the employee and such vacations shall not be accumulated from year to year.

C&B-Wingo00749

8.4   If an employee is discharged by the Company and not reinstated through the grievance and/or arbitration procedure, such employee shall be eligible for vacation pay accrued during the current calendar year. Such employee will be eligible for vacation pay accrued and earned during the prior year in accordance with the prorated schedule below. Employees who are laid off, or who voluntarily terminate themselves, shall as of their calendar date become eligible for prorated vacation pay as follows:

| STRAIGHT TIME HOURS WORKED DURING CALENDAR YEAR | VACATION PAY ELIGIBILITY |
|---|---|
| Less than 1000 hours | 0 |
| 1001 to 1120 hours | 7/12ths |
| 1121 to 1240 hours | 8/12ths |
| 1241 to 1360 hours | 9/12ths |
| 1361 to 1480 hours | 10/12ths |
| 1481 to 1600 hours | 11/12ths |
| 1601 hours and over | 12/12ths |

8.5   The vacation period shall be from January 1st to December 31st. However, if the Company chooses to close its business for vacation, annual vacations shall be taken by eligible employees at that time. If the Company chooses not to close its business for vacations, vacations will be granted so far as practical, by seniority provided that normally only one employee shall be on vacation at any one time; however, in order to ensure orderly and unhindered operations the final right to allotment of vacations is exclusively reserved to and vested solely in the Company, and the Company may request an employee to defer taking a vacation which would interfere with the efficient operation of the business, deferment not to exceed thirty (30) days. If the employee and the Company agree, the employee may elect to work during his vacation and receive his vacation pay but waive his time off. **This vacation pay will be paid on the same check as their regular weeks pay.** The Company will require that each employee give thirty (30) days notice of his choice of vacation time.

## ARTICLE IX
## LEAVE OF ABSENCE

9.1   The Company will consider applications made in writing to the General Manager for leave of absence without pay for a period not in excess of thirty (30) days. Such leaves, upon written application, may be extended beyond such period for good and sufficient reasons upon the approval by the Company. Generally, approval for such leave would be restricted to personal illness or military service. An approved copy of the leave application signed by the Company will be given to the employee before the leave is effective.

C&B-Wingo00750

## ARTICLE X
## SENIORITY

10.1    Seniority means the length of continuous service of an employee covered by this Agreement from the date of last hire by the Company

10.2    Continuous service of an employee shall be broken, seniority rights, if any, lost, and the employment relationship terminated by.

    a.    Quit,

    b.    Discharge,

    c.    Not working for a period of time equal to his length of service or one (1) year, whichever comes first.

    d.    Absence without proper notification for three (3) consecutive days,

    e.    Failure to indicate within 48 hours of intention to report for work within three (3) calendar days after notice by the Company to return to work following a layoff (mail addressed and sent to the employee's last address known to the Company shall constitute sufficient notice by the Company).

10.3    In layoffs plant-wide seniority shall govern, provided that in the Company's judgment the skill, efficiency, knowledge and ability to perform the work is equal among the employees involved.  In the event the Company recalls employees after a layoff the employees will be recalled in the reverse order of that in which they were laid off, provided the Company determines that the employee is able to do the work to the Company's satisfaction.

10.4    An employee may be eligible for recall for a period not to exceed his length of service or one (1) year whichever comes first.

10.5    It is specifically understood, however; that laid off employees upon being recalled must be qualified physically.  The Company agrees to notify each employee who has been laid off by certified mail when he is to return to work.  If the employee fails to return within three (3) days after such notice is delivered said employee forfeits his seniority.

10.6    It is specifically understood that all laid off employees upon being recalled will be returned to their previous classification at the prevailing rate of pay if work is available in that classification.  In the event work is unavailable in the laid off employees classification an opportunity will be provided through the job posting procedure for the laid off employee to qualify for an opening out of his classification.

10.7    It is agreed that a new employee shall be considered in training and on probation for a period of the first 180 days of continuous employment, during which time the Company shall have the sole and absolute right to discipline, discharge, or retain the employee in its own discretion.  After said 180 days the employee shall be placed on the regular seniority list and his or her seniority shall date from the employee's date of hire.

C&B-Wingo00751

## ARTICLE XI
## GRIEVANCE PROCEDURE

11.1    Any and all disputes and differences whatsoever between the Union or any of its members and the Company, concerning the meaning of application of a specific provision of this Agreement shall be no interruption of the business. It is agreed that the time limitations set forth herein are of the essence and that no action or matter not in compliance therewith shall be considered the subject of a grievance unless said time limitations are extended by agreement of both parties to this Agreement.

11.2    The grievance procedure shall be as follows:

Step 1. The aggrieved employee must first present the grievance to his proper supervisor. The steward may be present with the employee or employee may present the grievance alone. The time limit for filing of grievance shall be five (5) working days after the occurrence complained of. The aggrieved employee's supervisor shall give an answer to the grievance within two (2) working days, except for grievances where the Company or the Union needs more time to fully investigate and/or gather information concerning the grievance.

11.3    Step 2. If the matter is not settled in Step 1., the grievance will be reduced to writing and may, within five (5) working days, be referred to the General Manager or his authorized representative who shall answer the grievance within five (5) working days.

Failure of the Company to answer a grievance within the time limits herein shall permit the Union to refer the case to the succeeding step of the procedure, except that the time limits may be extended by mutual agreement of the parties.

Notwithstanding that a grievance shall be pending, employees shall promptly and efficiently carry out instructions and orders of any supervisor incident to the proper and efficient conduct of the business of the Company. The compliance with an order or instruction shall not waive the employee's right to have the same handled as a grievance. Refusal to comply with an order or instruction shall be cause for suspension or discharge at the option of the Company

11.4    Step 3 If the matter is not settled in Step 2., the Union may submit the dispute to arbitration by serving a written request to arbitrate, setting forth the facts and specific issues, upon the Company by certified mail, return receipt requested, within 10 days after the answer is given at Step 2. hereof. The parties shall then select an arbitrator. If the parties fail to agree on the election of an arbitrator, such arbitrator shall be selected in accordance with the rules of the Federal Mediation and Conciliation Service then in effect.

C00013

8

C&B-Wingo00752

An arbitral matter must involve the meaning and application of a specific provision of this Agreement. Management rights and prerogatives not specifically and expressly abridged by this Agreement are not subject to arbitration. The provisions of the Agreement shall be the sole source of any rights, which either party may assert in arbitration. The arbitrator shall have no power to amend, add to, subtract from, or change the terms of this Agreement, and shall be authorized only to interpret the existing provisions of the Agreement and apply them to the specific facts of the grievance or dispute. The decision of the arbitrator shall be based wholly on the evidence and arguments presented to him by the parties in the presence of each other and ex parte arbitration hearings and awards are void. The decision of the arbitrator within the limits herein prescribed shall be final and binding on all parties to the dispute, including the employee or employees involved. The Union will discourage any attempt of its members and will not encourage or cooperate with any of its members, in any appeal to any court, Labor Board or administrative body from a decision of the arbitrator. The fee of the arbitrator shall be borne equally by the Company and the Union.

### ARTICLE XII
### NO STRIKE AND LOCK-OUT

12.1   During the term of this Agreement, the Union and the employees it represents waive any right to engage in any concerted activity other than the grievance procedure and, neither the Union, nor any of its members, officers, stewards, agents or representatives, nor any employee shall instigate, authorize, call, support, sanction, encourage, maintain, or in any way take part in any strike, walkout, work stoppage, work slowdown, work curtailment, cessation or interruption of work or production, or picketing of the Company's premises (or the premises or facilities of any of the Company's customers or supplier because of any dispute between the Company and the Union or any of the Company's employees.)

12.2   The Union agrees that it will use its best efforts to prevent any acts forbidden in this Article and that in the event any such acts take place by any employee or group of employees, the Union further agrees it will use its best efforts to cause an immediate cessation thereof. If the Union immediately takes steps in good faith to end any unauthorized stoppages, strikes, intentional slowdown or suspension of work, the Company agrees that it will not bring litigation against the Union to establish responsibility for such wildcat or unauthorized strikes.

12.3   The Company in its sole discretion may terminate the employment of or otherwise discipline any employees who engage in any act forbidden in the Article.

12.4   The Company will not lock out employees during the term of the Agreement.

### ARTICLE XIII
### WASH-UP TIME

13.1   All employees covered by this Agreement shall receive a five (5) minute wash-up period at the end of the workday and at lunch period.

C&B-Wingo00753

## ARTICLE XIV
## PAY DAY

14.1   All employees covered by this Agreement shall be paid weekly on Friday p.m. for all work performed during the preceding payroll period ending Sunday p.m.

## ARTICLE XV
## REST PERIODS

15.1   Two (2) rest periods of fifteen (15) minutes shall be scheduled on each regular shift of eight (8) hours or more, with work to resume at the expiration of fifteen (15) minutes.

15.2   There will be a fifteen- (15) minute rest period for employees scheduled to work over ten (10) consecutive hours.

## ARTICLE XVI
## LUNCH PERIODS

16.1   Employees shall be allowed thirty (30) minutes lunch period without pay, however, the Company reserves the right to schedule staggered lunch periods.

## ARTICLE XVII
## BEREAVEMENT PAY

17.1   In the event of the death of an immediate family member consisting of, Mother, Father, Sister, Brother, Spouse, Mother-in-law, Father-in-law, Natural Grandparent or child, including step-children, of an employee of the Company, the employee shall be paid for the time lost through the day after the internment, not in excess of three (3) days at his regular rate of pay for 8 hours. Any additional non-paid time off needed for additional travel must be requested and approved by Management.

17.2   To be entitled to pay for a day of absence, it must have been a regularly scheduled workday for the employee.

17.3   If the employee takes this funeral leave, the Company requires some proof of death such as a copy of the Death Certificate or some other proof of death.

## ARTICLE XVIII
## JURY DUTY

18.1   Employees called for Jury Duty will be paid their regular hourly rates, adjusted downward to take into account fees and allowances received from public authorities for Jury Duty.

## ARTICLE XIX
## INJURY ON THE JOB

19.1   If an employee is injured in the employ of the Company and, further such injury requires the employee to see a doctor or receive emergency treatment at a hospital or clinic, such employee will be paid for the rest of his shift he was working, at the time of the injury, if the attending physician recommends the employee not return to work.

C&B-Wingo00754

## ARTICLE XX
## CONDITIONS FOR EMPLOYEES

20.1   The Company shall supply sufficient locks so that each employee shall have his own individual locker.

20.2   The Company shall maintain a sanitary and adequate washroom and supply sufficient warm water, soap and towels for all employees.

20.3   The Company shall furnish all gloves, gauges, rules, tools and safety glasses to the employees directed to use same. The Company agrees to purchase a pair of safety shoes for each employee, after one year of service and yearly thereafter. The company will select a store that employees will be able to receive up to $100 credit per year for employee's buying safety shoes that meet the company's safety requirements.    It is understood and agreed that safety shoes will be worn only on Company business. The Company reserves the right to purchase the safety shoes from whomever it chooses. The Company may promulgate rules and regulations to control the care and preventative loss or destruction of such tools and equipment.

20.4   Work consisting of emergency work such as fire protection will be done on a voluntary basis. Clearing walks and emergency exits of snow may be assigned to the least senior employee or to any employee in the helper classification. If the snow removal cannot be performed as noted, it may be subcontracted to an outside service. Thermal coveralls will be provided for work performed outside during cold weather.

20.5   Management/Labor meetings will be scheduled as needed to discuss and resolve problems of both the Union and the Company.

## ARTICLE XXI
## SAFETY

21.1   The Company and the union hereby recognize that the safety of all employees is a valuable asset that contributes to the most efficient operation of the facility. The Company, union and employees shall work cooperatively in promoting and supporting a safety program designed to minimize the loss of time and suffering due to accidents in workplace. To that end, a safety committee, consisting of two (2) union employees and two (2) management representatives shall meet on a minimum of a quarterly basis for the purpose of reviewing plant safety. Any employee who believes that a condition has developed that presents an unreasonable risk to his safety should promptly notify his immediate supervisor or any member of the Safety Committee. Safety disputes that remain unresolved after the Safety Committee has had an adequate opportunity to consider them may be submitted through the grievance procedure.

C&B-Wingo00755

## ARTICLE XXII
## JOB POSTING

22.1    The Company agrees to post all job openings on the bulletin board for three (3) working days. Advancement and changes in rate of pay will be based upon the employee's ability to perform the task, his work history and seniority. A warehouseman will be given preferential treatment over a helper for Machine Operator Bids, except when the warehouseman has a historical attendance problem. Employees promoted or transferred to different jobs as a result of job posting will be given a reasonable trial period with training to demonstrate their qualifications and ability to perform the work. Reasonable trial period with training is to be defined as up to (30) working days. During this trial period the employee shall receive his former rate until qualified for the new job. If he is deemed unqualified, he shall be returned to his former job, at the rate for that job. No lateral or downward bidding will be accepted for one (1) year after the employee has qualified in his classification. If any job posting goes unfilled after the three- (3) day period, the Company reserves the right to hire directly for that job posted.

22.2    Employees promoted or transferred to a higher rated job on a temporary or permanent assignment who have been previously qualified and able to operate the equipment unassisted shall be paid the highest rate for that job. It shall be the exclusive right of the Company to determine the qualification of an employee.

22.3    For the purpose of cross training, employees assigned to a machine or assisting a machine operator will be paid the rate of his present classification.

22.4    No employee will be asked to perform a job without adequate training.

## ARTICLE XXIII
## SUPERVISION PERFORMING HOURLY WORK

23.1    It is agreed that no bargaining work will be performed by Supervisors except,

    A.    When twenty-five (25) percent or more Union employees are absent, supervisory personnel will be allowed to work whatever time is necessary to insure the orderly operation of the plant, provided no hours of overtime are affected.

    B.    Supervisory personnel will be allowed to perform bargaining unit work in conjunction with training an employee only.

C00017

12

C&B-Wingo00756

23.2    Leadman shall be defined as, any hourly paid employee and member of the bargaining unit who will be designated solely by the Company to supervise other hourly employees in the performance of their duties. The leadman will be responsible for carrying out the production schedules and all work assignments for the shift or hours under his direction. The leadman will not have the responsibility or authority to initiate any disciplinary action for any employee under his supervision. If disciplinary action is required to assure the completion of his shift or hours of assignment, he shall contact a member of management for instructions. All of the above is in addition to his regularly assigned duties. The position of leadman will carry a fifty ($.50) cents per hour premium.



### ARTICLE XXIV
### UNION ACCESS

24.1    Upon reasonable advance notice to the Company, the Union's representative may speak to employees in the plant concerning grievances or Union business, provided that there is not in the Company's judgment an undue interruption of business. The Union representative must enter the plant via the regular front door and announce his presence to the receptionist and await permission to enter.

24.2    The Company will provide space for a Union bulletin board for the purpose of posting Union notices only, material to be posted shall be approved by the Company, in advance.

### ARTICLE XXV
### DISCRIMINATION

25.1    The Company and the Union agree that for all purposes of this Agreement there shall be no discrimination because of race, creed, color, sex, age, or national origin.

### ARTICLE XXVI
### NO RATE REDUCTIONS

26.1    It is mutually agreed and understood that no employee covered by this Agreement shall suffer any individual rate per hour reduction as a result of signing this Agreement. This means no individual rate per hour now in effect would be reduced, except in the case of a transfer to a lower rated classification or discontinuance of a job classification.

### ARTICLE XXVII
### VERBAL AGREEMENTS

27.1    No employee shall be compelled to enter into any verbal or written agreement in conflict with the terms and conditions of this Agreement.

C00018

C&B-Wingo00757

## ARTICLE XXVIII
### WAGE RATES

| 28.0 | | | Helper | Warehouse | Mach Operator |
|---|---|---|---|---|---|
| | Hourly Increase Effective 4-16-06 | | $0.40 | $0.45 | $0.50 |
| | Hourly Increase Effective 4-16-07 | | $0.40 | $0.45 | $0.50 |
| | Hourly Increase Effective 4-16-08 | | $0.40 | $0.45 | $0.50 |

| Machine Operator | Start | 90 Days | 180 Days | 1 year | 2 year |
|---|---|---|---|---|---|
| Effective 4/16/06 | $17.09 | $17.49 | $17.94 | | |
| Effective 4/16/07 | $17.59 | $17.99 | $18.44 | | |
| Effective 4/16/08 | $17.99 | $18.49 | $18.94 | | |

| Warehouse | Start | 90 Days | 180 Days | 1 year | 2 year |
|---|---|---|---|---|---|
| Effective 4/16/06 | $15.19 | | $15.69 | $16.19 | $17.19 |
| Effective 4/16/07 | $15.64 | | $16.14 | $16.64 | $17.64 |
| Effective 4/16/08 | $16.09 | | $16.59 | $17.09 | $18.09 |

| Helper | Start | 90 Days | 180 Days | 1 year | 2 year |
|---|---|---|---|---|---|
| Effective 4/16/06 | $13.65 | $13.90 | $14.15 | $14.65 | |
| Effective 4/16/07 | $14.05 | $14.30 | $14.55 | $15.05 | |
| Effective 4/16/08 | $14.45 | $14.70 | $14.95 | $15.45 | |

000019

14

C&B-Wingo00758

28.1   Warehousemen hired during the first twenty-four (24) months of seniority are accepted into the machine operator classification will be paid the full rate of the classification in accordance to the wage schedule.

28.2   Helper will be defined as a person who can assist a warehouseman or machine operator in the filling of an order. Additional independent responsibilities will include skid building/demolition, interior and exterior cleaning, trash removal or other functions not related to the processing or packaging of a customer order.

## ARTICLE XXIX
## HEALTH AND WELFARE

29.1   During his/her employment, a seniority employee shall be entitled to participate in the Copper and Brass Sales Health insurance program, including prescription drug, major medical, dental insurance, and vision plan coverage during his/her term of employment, on the same basis as provided active non-unit Copper and Brass employees (carrier, eligibility, premium participation, deductible, co-pays). Premiums will be paid by payroll deduction. An employee leaving Copper and Brass employment for any reason will be entitled solely to COBRA rights as provided by the law. The total amount of yearly medical opt-out plan will be the same amount as the salaried medical opt-out plan. The annual cash allowance payable in equal weekly installments will be allowed an employee who chooses not to participate in the above plans subject to the employee providing proof of health insurance coverage elsewhere.

The company will continue to allow employees to make payroll deductions towards the union's vision plan.

29.2   All eligible full-time seniority employees will be provided non-occupational weekly indemnity sickness and accident insurance of 66.5% of base weekly wage for a maximum of 52 weeks at no cost to the employee. The sickness and accident insurance benefit will commence on the 8th day of continuous disability. If hospitalized or the disability is due to an accident, the benefit will begin on the first day of disability. Sickness and accident claims shall be submitted for processing to a third party administrator who will be selected by the Company. No S&A payment will be processed until approved by the designated third party.

29.3   Effective April 16th, 2000 the life insurance coverage will be $26,000.00.
       Effective April 16th, 2001, the life insurance coverage will be $27,000.00.
       Effective April 16th, 2002, the life insurance coverage will be $28,000.00.

29.4   Company will hold annual meetings prior to or during the open enrollment period for the purpose of educating employees on significant changes in the Health and Welfare plans including coverage, co-pays, employee contributions, and out-of-pocket maximums.

29.5   The Company will provide for tuition reimbursement, up to $1,000.00 in a calendar year to seniority employees on the active employment rolls who satisfactorily complete (Grade A or B) after-hours job-related training approved by the Company at accredited universities, colleges, business schools, high schools and trade or vocational schools. An Application for Tuition Reimbursement will need to be completed and approved prior to the beginning of the class. Related training to mean: courses that will enrich an employee's advancement opportunities within the Company this is to include English as a Second Language Courses.

C&B-Wingo00759

## ARTICLE XXX
## PENSION

30.1    The pension plan now in effect will continue in effect exactly as presently administered and with the following benefits for the duration of the Agreement.


### HOURLY RATED EMPLOYEES RETIREMENT PLAN
### (CLEVELAND, GRAND RAPIDS, AND CHICAGO)
### MAIN SPECIFICATIONS OF PLAN

1.    Effective Date:    July 1, 1963; January 1, 1976 for Chicago, Illinois Plan), as amended through September 21, 1983 for Cleveland, as of July 1, 1983 for Grand Rapids.


### MINIMUM REQUIREMENTS

| 2. | Benefit Types | Age | (Service) Years | Benefit Formula |
|---|---|---|---|---|
| (a) | Normal Retirement | 65 | - | **Effective April 16, 2000** $25.00 per month for each year of Credited Service |
| | | | - | **Effective April 16, 2005** $26.00 per month for each year of Credited Service |

This subparagraph may be reopened at the option of either party if national health care legislation is enacted during the term of the Agreement, provided however, the agreement will not be changed without mutual agreement.

| (b) | Early Retirement: (i) At Employee's option | 60 or 55 "Rule of 85" | 5 | **Effective January 1, 1989** Normal formula reduced 5/9 of 1% each complete month under age 65, commencing immediately, or normal formula commencing at age 65. Optional level benefit of additional $96.00 reduced 5/9 of 1% for each complete month under age 62 payable to age 62 and reduced by $96.00 thereafter. |
| | (ii) At Company option or under mutually satis-factory conditions | 55 | 5 | **Effective Jan. 1, 1989** Double normal formula payable to age 65 or when eligible for any unreduced Social Security Benefit, if earlier with normal formula payable thereafter. |

000021

16

C&B-Wingo00760

| | | | | |
|---|---|---|---|---|
| (c) | Total and Permanent Disability Retirement | None | 5 | **Effective Jan. 1, 1989** Double normal formula payable to age 65 or when eligible for any unreduced Social Security Benefit, if earlier, with normal formula payable thereafter. |
| (d) | Deferred Vested (Applicable Terminations Eligibility Early Retirement) | | 5 | **Effective Jan. 1, 1989** Normal formula commencing at age 65 or to normal formula reduced 5/9 of 1% for Prior to each complete month under age 65 for for for commencing at or after 60. |
| (e) | Optional Benefit to Surviving Spouse | - | | Reduced monthly benefit may be elected at time of application for benefit, or at age 65 in the case of a Disability Retiree, providing for 55% continuation of re-reduced benefit is equal to 90% plus or minus .5% for each year spouse's age exceeds or is less than (respectively) the employee's age. |
| | | | | An employee eligible to retire early and who dies is assumed to have retired as of the date of his death and elected the 50% Optional Benefit to surviving Spouse. |

30.2    The benefit level will be frozen.

30.3    Any employee hired after April 16th 2000 will not be eligible for the pension plan.

30.4    Effective April 16th 2000, the Company will establish a 401K plan for all seniority employees.  The plan's implementation will be September 5th, 2000.  The Company will match 50% of the employee's first 6% of contribution.  The employee will be allowed to make the maximum contribution as allowed by the IRS. In order to be eligible for the company match an employee must contribute a minimum of 1%.  Enrollment into the plan will be January 1 and July 1 of each year beginning in 2001.  Upon completion of the 401K summary plan description, copies will be distributed to the employees.

000022

17

C&B-Wingo00761

## ARTICLE XXXI
## DRUG AND ALCOHOL POLICY

31.1   The Company and Union have negotiated and agreed upon terms of a 'Drug and Alcohol Policy and Procedures' which is attached hereto as Appendix A and made a part of this Agreement.

## ARTICLE XXXII
## COMPLETE AGREEMENT

32.1   This contract represents complete collective bargaining and full agreement by the parties in respect to rates of pay, wages, hours of employment or other conditions of employment which shall prevail during the term hereof, and any matters or subjects not herein covered have been satisfactorily adjusted, compromised or waived by the parties for the life of this Agreement.

## ARTICLE XXXIII
## ENTIRE AGREEMENT CLAUSE

33.1   It is the intent of the parties that the provisions of this agreement will supersede all prior agreements, understandings, and past practices, oral or written, express or implied, between such parties and shall govern their entire relationship and shall be the sole source of and all rights or claims which may be asserted in arbitration hereunder or otherwise.

## ARTICLE XXXIV
## SEPARABILITY AND SAVINGS CLAUSE

34.1   If any article of section of this Agreement or any appendix hereto shall be held invalid by operation of law or by any tribunal of competent jurisdiction, or if compliance with or enforcement of an article or section shall be restrained by such tribunal pending a final determination as to its validity, the remainder of this Agreement and of any appendix thereto, or the application of such article or section to persons or circumstances other than those as to which it has been held invalid or as to which compliance with or enforcement of has been retrained, shall not be affected thereby.

## ARTICLE XXXV
## EFFECTIVE PERIOD

35.1   This agreement shall be effective as of April 16, 2006, except as otherwise indicated, and shall continue in force to and including April 15, 2009 and it shall automatically renew itself for additional periods of one year each thereafter unless sixty (60) days prior to April 16, 2009, or April 16th in any subsequent year during which this Agreement, or any extension thereof, shall be in force, either party shall give written notice to the other of its intention to amend or terminate this Agreement.

C&B-Wingo00762

# APPENDIX A

## DRUG AND ALCOHOL POLICY AND PROCEDURES

1.   PURPOSE

The Company and Union share a vital interest in maintaining a safe and efficient work environment for all employees. Impairment from any illegal drug or alcohol threatens the safety and health of the user and the user's fellow employees. Therefore, the use, possession, sale, purchase or distribution of any illegal drug or alcohol in the workplace, as well as any impairment therefrom, is simply unacceptable and cannot be condoned. With these objectives, the parties have agreed to the following policy and procedures.

II.   DEFINITIONS

A.   "Impairment" is established when an employee has tested positive for the presence of any illegal drug, or for a specified level of alcohol, in accordance with the terms of this Policy.

B.   "Illegal Drug" means any dangerous, addictive or behavior influencing drug or substance, including but not limited to such substances as marijuana, cocaine, heroin, morphine, PCP, LSD, amphetamines and barbiturates.

III.   THE RULE

Employees are expected to report for work and remain at work in a condition that enables them to perform their duties without impairment from any illegal drug or alcohol. The possession, use, sale, purchase or distribution of any illegal drug or alcohol by any employee while on Company premises, or in the conduct of Company business, is strictly prohibited and will result in the termination of employment. As a limited exception the Company may, in its discretion authorize the reasonable use of alcohol at certain Company functions, provided that prior written notice of such authorization is given.

In addition, impairment as defined in Paragraph II(B) of this Policy is also strictly prohibited and will result in the termination of .employment, except as provided in Paragraph VIII.

000024

19

C&B-Wingo00763

IV.   <u>WHEN TESTING FOR IMPAIRMENT MAY BE REQUIRED</u>

A.   The Company may require an employee to be tested:

    (a)   after a work related accident;

    (b)   if the Company reasonably suspects that the employee has engaged in prohibited conduct under Paragraph III of this policy;

    (c)   when the employee applies for a commercial driver's license or in conjunction with D.O.T. or other regularly scheduled physical examination.

Reasonable suspicion shall be based upon observations by management concerning such things as the appearance, behavior, speech, performance, or odor of the employee. Employees to be tested will be advised by management, in the presence of a reasonably available Union Steward, of the reasons for requiring the test. An employee's refusal to consent to testing, or to cooperate fully in the testing procedures, shall result in termination.

V.   <u>PROCEDURES FOR MEDICAL TESTING</u>

A.   A supervisor who determines that an employee should be tested for impairment in accordance with this Policy should have another supervisor or Company representative, to the extent that one is reasonable available, observe the circumstances upon which the decision to test is based.

B.   An employee who is required to be tested for impairment shall be suspended, without pay, pending the completion of the testing procedures. If the test results are negative, the employee shall be reinstated with back pay for the period of suspension.

C.   All tests for impairment shall be limited to urine and Breathalyzer tests. The collection of all samples and the performance of all tests shall occur at a National Institute of Drug Abuse ("NIDA") or Department of Health and Human Services ("DHHS") certified facility. Procedures of the DHHS for maintaining integrity and chain of custody of the samples will be followed. Privacy of the employee will be respected.

D.   The employee shall disclose, on a form furnished by the Company, the use of any prescription or non-prescription drugs or medication before any test is given. The Company may require the employee to provide evidence that a prescription drug or medication has been lawfully prescribed. If an employee is taking any such drugs or medication in the manner and dosage as directed or prescribed, and has disclosed such use as required by this Policy, he will not be disciplined for the use of that drug or medication. Drugs or medication prescribed for another person, not the employee, shall be considered illegally used and will subject the employee to termination.

E.   The Company and the tested employee should be notified simultaneously of the results of the testing procedure. Written notification should immediately thereafter be delivered to the Company and the tested employee. The results of the test shall otherwise remain strictly confidential with release of information to be authorized on a "need to know" basis.

000025

20

F.   If the initial test is reported to be positive, the employee may, within 24 hours of being so notified, request that a confirmatory test be conducted by the gas chromatography/mass spectrometry ("GC/MS") method.   An employee who requests such a confirmatory test shall at that time execute a specific check off authorization to ensure payment for the confirmatory test; provided, however, that if the confirmatory test is negative, the Company shall reimburse the employee for the cost of the confirmatory test.

VI.   STANDARDS FOR INTERPRETING THE TESTS FOR IMPAIRMENT

A.   Testing for impairment from alcohol should be conducted using a breath test. Impairment shall be established by a Breathalyzer result of 0.04 or higher, which shall be considered a positive test result.

B.   An initial or confirmatory test for impairment from illegal drugs that reaches or exceeds the following levels shall be considered a positive test, thereby establishing impairment:

| Controlled Substance | Initial Test | Confirmatory Test |
|---|---|---|
| Marijuana metabolites | 50 ng/ml | 15 ng/ml |
| Cocaine metabolites | 300 ng/ml | 150 ng/ml |
| Opiates metabolites: | 300 ng/ml | |
| Morphine | | 300 ng/ml |
| Codeine | | 300 ng/ml |
| Phencyclidine (PCP) | 25 ng/ml | 25 ng/ml |
| Amphetamines: | 300 ng/ml | |
| Amphetamine | | 300 mg/ml |
| Methamphetamine | | 300 mg/ml |

C.   The initial test shall be performed using the Enzyme Multiplied Immunoassay Technique (EMIT").   The confirmatory test, if requested by the employee, shall utilize the GC/MS method.

D.   If the employee's initial test is positive and no confirmatory test is requested, impairment is established and the employee will be terminated. If a confirmatory test is requested, impairment is established only where both the initial and confirmatory tests are positive, at which point the employee shall be terminated.

C&B-Wingo00765

## VII.    SEARCH AND INSPECTION

When the Company has reasonable cause to believe that an employee has engaged in conduct prohibited by this Policy, the employee may be required, upon the Company's request, to submit to a search of any Company vehicle or any vehicle that the employee has brought on Company premises or is under the employee's control; to submit to a search of the employee's pocket, package, purse, brief case, toolbox, lunch box or other container brought onto Company premises; and to submit to a search of the employee's desk, file, locker or other stationary container provided by the Company. The employee will be requested to sign a consent form authorizing the search. An employees who refuses to sign the consent form and/or fails to cooperate in the search will be terminated, provided that reasonable suspicion has been established.

## VIII.    THE EMPLOYEE ASSISTANCE PROGRAM

The Company maintains an Employee Assistance Program ("EAP") for employees with problems relating in any way to the use or abuse of illegal drugs or alcohol. Employees who believe they may have such a problem, or who believe that there exists a potential for such a problem to develop, are strongly encouraged to utilize to the fullest extent the diagnostic, counseling, treatment and rehabilitation services that are available under the EAP. However, it is the responsibility of each employee to seek assistance from the EAP prior to being tested for impairment. Once an employee has been tested, or has otherwise been disciplined for engaging in any conduct prohibited by this Policy, the employee shall not be permitted to participate in the EAP.

Neither the employee's decision to seek such prior assistance from the EAP, nor his participation in the EAP, may be the basis for any disciplinary action and may not be used as evidence in any disciplinary proceeding; provided, however, that an employee who fails to complete the program or who refuses to cooperate while in the program is subject to discipline, including termination. Moreover, an employee in the EAP remains subject to termination if he engages in any conduct prohibited by this Policy where facts proving any such violation are obtained outside of the EAP. An employee who participates in the EAP will be subject to random testing for impairment for a period of twelve (12) months.

000027

22

C&B-Wingo00766

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals on this, 2006.

FOR THE UNION:

FOR THE COMPANY:

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, LOCAL UNION NO. 714

COPPER AND BRASS SALES

BY: _____
G. Rodriguez – Business Agent

William Fruehauf
W. Fruehauf, Vice President

BY: _____
P. LaRocco – Union Representative

R. Lunt, Plant Manager

BY: _____
M. Bahena – Union Representative

Lawrence Switaj
L. Switaj, Director of Administrative Services

000928

23

C&B-Wingo00767

## LETTER OF UNDERSTANDING REGARDING COMPANY'S REWARD SYSTEM

This is a non-negotiated benefit for the purpose of rewarding employees as deemed by the Company. The prize(s) or awards will be at the sole discretion of the Company and is not subject to bargaining or to the grievance procedure. The Company can dissolve the Reward System at any time for the good cause, bad cause, or no cause. Although the Company will attempt to notify the union before they are implemented, ThyssenKrupp Materials NA, Inc. controls and retains the right to amend, change, and/or terminate the Reward System offered by the Company.

The Union and Company agree that the Company's Reward System (Safety Bingo, Company Raffle...etc.) is and will not be considered as Gambling and participants will not be subject to disciplinary action.

BY: _____
G. Rodriguez – Business Agent

_____
W. Fruehauf – Vice President

BY: _____
R. LaRocco – Union Representative

_____
R. Lunt – Plant Manager

_____
M. Bahena – Union Representative

_____
L. Switaj – Director of Administrative Services

000029

24

C&B-Wingo00768

## LETTER OF UNDERSTANDING REGARD SEVERANCE FORMULA.

If the company moves more than 50 miles from its current location and asks the employee to work then the employee can continue his employment or accept the severance package.

The company will use the same severance formula that it used when removing the plate saws. One (1) week of pay at the regular classification rate per year of service with the minimum of two (2) weeks of pay.

BY: _____    _____
G. Rodriguez – Business Agent          W. Fruehauf – Vice President

BY: _____    _____
P. LaRocco – Union Representative       R. Lunt – Plant Manager

_____        _____
M. Banena – Union Representative        L. Switaj – Director of Administrative Services

C&B-Wingo00769

## LETTER OF AGREEMENT – NEW FACILITIES

During the negotiations, the parties discussed the business and growth plan for the Company's Central Region, a major component of which is the intent to establish and operate new facilities.  Consistent with the provisions of Article I and Article III of the Agreement, it is understood and agreed that the sole and exclusive rights of the Company to manage its business include the rights to expand, maintain or curtail operations at its facilities; to determine the location or relocations of operations; to determine what work shall be performed at its facilities; and to establish the initial wages, hours, and other terms and conditions of employment at its new facilities.  The terms and conditions set forth in the agreement were negotiated to accommodate and promote the interests of the Company, Union and employees at the Schaumburg, Illinois facility.  Therefore, application of the Agreement is limited to that facility on any other facility in the State of Illinois performing substantially the same work within a 50-mile radius of the Schaumburg facility.

BY: _____
G. Rodriguez – Business Agent

_____
W. Fruehauf – Vice President

BY: _____
P. LaRocco – Union Representative

_____
R. Lunt – Plant Manager

_____
M. Bahena – Union Representative

_____
L. Switaj – Director of Administrative Services

000031

26

C&B-Wingo00770

## Letter of Understanding regarding Attendance Policy

While the attendance policy is a non-negotiable Management Right, the company agrees to sit down and discuss this policy in the next 90 days with the Union Stewards.

BY: _____

 G. Rodriguez - Business Agent

_____

L. Switaj  –  Director  of  Administrative Services

_____

P. Larocco – Union Representative

_____

R. Lunt, Plant Manager

_____

M. Bahena – Union Representative

_____

D. Evert, Human Resource Manager

C00932

C&B-Wingo00771

## Letter of Understanding Regarding Current Defined Benefit Pension Plan

During these labor agreement negotiations, the Union proposed that the current Copper and Brass Sales, Chicago, IL, Hourly Union pension plan be liquidated and the funds due the participating employees be rolled-over into their 401-K account.

Based on the Union's request, the Company will through its legal counsel determine the legal and financial implication of such action and notify the Union of the results.

If, the proposed action is within the legal rights of the parties, the Company and Union will meet to discuss moving forward with the liquidation of the plan.

BY _____          _____
G. Rodriguez - Business Agent         L. Switaj  —  Director  of  Administrative
Services

_____          _____
P. Larocco - Union Representative     R. Lunt, Plant Manager

_____          _____
M. Sahena - Union Representative     D. Evert, Human Resource Manager

28

C00003