# EXHIBIT A

## Page 1

```
 1      IN THE UNITED STATES DISTRICT COURT
 2     FOR THE NORTHERN DISTRICT OF ILLINOIS
 3             EASTERN DIVISION
 4
 5  ROBERT G. WINGO,           )
 6        Plaintiff,     )
 7        vs.            ) 1:08:CV-00368
 8  THYSSENKRUPP MATERIALS NA, INC., )
 9  d/b/a COPPER and BRASS SALES,   )
10  INC.,                   )
11        Defendant.       )
12
13       The deposition of ROBERT G. WINGO, called
14  for examination, taken pursuant to the Federal Rules
15  of Civil Procedure of the United States District
16  Courts pertaining to the taking of depositions,
17  taken before ELIA E. CARRIÓN, CSR No. 084.004641, a
18  Notary Public within and for the County of Cook,
19  State of Illinois, and a Certified Shorthand
20  Reporter of said state, taken at Suite 3700,
21  500 West Madison Street, Chicago, Illinois, on the
22  19th day of May, A.D. 2008, at 9:53 a.m.
23
24
```

## Page 2

```
 1  APPEARANCES:
 2
 3     LISA KANE & ASSOCIATES, P.C.,
 4     (120 South LaSalle Street, Suite 1420,
 5     Chicago, Illinois 60603,
 6     Tel: 312-606-0383,
 7     Fax: 312-606-0765), by: ——
 8     MS. JANICE A. WEGNER,
 9        appeared on behalf of the Plaintiff;
10
11     HONIGMAN MILLER SCHWARTZ and COHN LLP,
12     (2290 First National Building,
13     660 Woodward Avenue,
14     Detroit, Michigan 48226-3506,
15     Tel: 313-465-7466,
16     Fax: 313-465-7467,
17     RLinden@honigman.com), by:
18     MR. RUSSELL S. LINDEN,
19        appeared on behalf of the Defendant.
20
21
22
23  REPORTED BY:  ELIA E. CARRIÓN, CSR
24      CERTIFICATE NO. 084.004641.
```

## Page 3

```
 1       (WHEREUPON, the witness was duly
 2        sworn.)
 3       ROBERT G. WINGO,
 4  called as a witness, having been duly sworn by a
 5  Notary Public, was examined and testified as
 6  follows:
 7             EXAMINATION
 8  BY MR. LINDEN:
 9    Q.   Good morning, Mr. Wingo.  My name is
10  Russell Linden.  I represent your former employer,
11  Copper and Brass, in this lawsuit that you filed
12  against it.
13       I don't know if you've ever had your
14  deposition taken before, but the way this process
15  works, I'm going to be asking you a series of
16  questions.  If you don't understand my question for
17  any reason, I'm going to ask you to please let me
18  know, because otherwise I'm going to have to assume
19  you understood my question.
20       The court reporter, for example, cannot
21  take down nods of the head.  So for example, if I
22  ask a question that calls for a yes or no, kindly
23  please answer yes or no.
24    A.   Yes, sir.
```

## Page 4

```
 1    MR. LINDEN:  Let the record reflect that this
 2  is the deposition of Robert Wingo, to be used for
 3  all purposes permissible under the federal rules of
 4  civil procedure.
 5  BY MR. LINDEN:
 6    Q.   Mr. Wingo, will you state your name for
 7  the record, please.
 8    A.   Robert G. Wingo.
 9    Q.   And can you tell us where you currently
10  live, please?
11    A.   2606 Flicker Lane, Rolling Meadows,
12  Illinois.
13    Q.   And, sir, how long have you lived at that
14  address for?
15    A.   25 years.
16    Q.   And who do you live at that address with?
17    A.   My wife and four children.
18    Q.   And what is your wife's name?
19    A.   Joanne.
20    Q.   And is that your first and only marriage?
21    A.   Yes, sir.
22    Q.   And your four children, what are their
23  names and ages, please?
24    A.   Jana, 22; Justin, 18; Janelle, 16; and
```

ROBERT G. WINGO, MAY 19, 2008

| Page 5 | Page 7 |
|---|---|

**Page 5**

1 Jake, 14.
2   Q.   And do all four children live with you?
3   A.   Yes.
4        Actually, Jana is going -- they're
5 both -- I have two in college. So Justin's home for
6 the summer, and Jana lives in Chicago.
7   Q.   Okay.
8   A.   But she comes home and stays
9 occasionally.
10   Q.   All right. Has she completed college?
11   A.   No. She's going to grad school at
12 Loyola.
13   Q.   Sir, are you currently employed?
14   A.   Yes, sir.
15   Q.   And where are you employed?
16   A.   BorgWarner.
17   Q.   And what is your job at BorgWarner?
18   A.   Shipping and receiving supervisor.
19   Q.   And what BorgWarner facility do you work
20 at?
21   A.   I'm at the North Greenbriar in Addison,
22 1350 North Greenbriar.
23   Q.   And how long have you been employed there
24 for?

**Page 6**

1   A.   It's been about a month.
2   Q.   And who is your supervisor there?
3   A.   George Payette, P-A-Y-E-T-T-E.
4   Q.   And is that an hourly position or a
5 salary position?
6   A.   It's hourly.
7   Q.   And what is your hourly rate?
8   A.   14.50.
9   Q.   And what other benefits, if any, do you
10 get at BorgWarner?
11   A.   In 90 days I'll get health insurance and
12 whatever else -- other plans kick in, like the 401K.
13        I'm not sure of the whole total package
14 yet. I'm kind of new there, so I'm still kind of
15 figuring it all out.
16   Q.   Did they give you any materials regarding
17 the possible benefits you'd be eligible for?
18   A.   Yes, health benefits and some of the
19 other 401K benefits.
20   Q.   Now, Mr. Wingo, you said you'd be
21 eligible in 90 days.
22        I'm assuming that means you're serving a
23 90-day probationary period?
24   A.   Correct.

**Page 7**

1   Q.   And you said you were a shipping and
2 receiving supervisor, so I'm assuming that's not a
3 union position?
4   A.   Not a union.
5   Q.   And before your work at BorgWarner, did
6 you have a job?
7   A.   Yes. I worked for one month at Murphy
8 Machine in Elk Grove Village. And then I was laid
9 off, because the work got -- business was slow.
10   Q.   Who was your supervisor there?
11   A.   What's his name? Steve -- I don't
12 remember his last name. It's Steve.
13   Q.   What was your job there?
14   A.   Shipping and receiving supervisor.
15   Q.   And what was your rate of pay?
16   A.   16 an hour.
17   Q.   And did you receive any other benefits?
18   A.   Same thing, the health insurance would
19 kick in in 90 days. I was there about a month, so
20 it didn't happen.
21        I think they had a 401K and some benefit
22 programs, too.
23   Q.   Was anybody else laid off at the time you
24 were laid off?

**Page 8**

1   A.   I think that two, two other employees.
2   Q.   And you said Murphy Machine is located in
3 Elk Grove?
4   A.   Elk Grove Village, correct.
5   Q.   Other than BorgWarner and Murphy Machine,
6 have you worked anywhere else besides those places,
7 since your employment ended at Copper and Brass?
8   A.   No.
9   Q.   After your employment ended at Copper and
10 Brass, besides Murphy Machine and BorgWarner, where
11 else did you apply for employment?
12   A.   It's hard to list them all, because it
13 was over a hundred. I was going door to door with
14 résumés and, and faxing as in the news -- in the
15 Daily Herald, in the newspaper.
16   Q.   Do you recall the names of any of the
17 places you applied to?
18   A.   We have a current list we can produce, if
19 you need it. Offhand, it was just most of the
20 bigger companies in the western suburbs.
21   Q.   You prepared a list of where you applied?
22   A.   Yes.
23   Q.   And you didn't bring that with you today?
24   A.   I don't -- I'm not sure if we have it

2 (Pages 5 to 8)

ROBERT G. WINGO, MAY 19, 2008

Page 9

1 here or not.
2    Q.    When did you prepare that list?
3    A.    It was about a month ago.
4    Q.    What did you rely upon to prepare the
5 list?
6    A.    We had kept lists, and I kept a lot of
7 business cards from most of the companies that I
8 went to.
9    Q.    Did you have any job interviews anywhere?
10    A.    There was a few interviews over the phone
11 type of deals, but the economy was real bad, so
12 there wasn't a lot of openings at -- like 90
13 something percent of the places were not hiring at
14 all. And so it was kind of a hit or miss, shot in
15 the dark with the door to door. And then the one
16 with the résumé -- the ads in the Daily Herald, that
17 was interviews on some of those. I'm trying to
18 think.
19         Yeah, I did go for other interviews.
20    Q.    Where did you go for interviews?
21    A.    I went to Feltco.
22    Q.    And where is Feltco located?
23    A.    That's in Des Plaines, on Oakton.
24    Q.    And what position did you interview for

Page 10

1 there?
2    A.    That was shipping and receiving
3 supervisor, too.
4    Q.    And do you recall what month you would
5 have gone for an interview there?
6    A.    That would be in April.
7    Q.    Of this year?
8    A.    Yes.
9    Q.    Did they make you an offer of employment?
10    A.    I was down to the final meeting with the
11 CEO, I was supposed to meet with the president and
12 the CEO, the main guy; and then I got offered a job
13 from Murphy Machine, and so I just took that job.
14         I didn't go for the final interview with
15 Feltco, because I thought that Murphy Machine was a
16 better offer.
17    Q.    What rate of pay would the Feltco job
18 have been?
19    A.    I don't even know. They didn't make an
20 offer. We didn't get to that final stage.
21    Q.    So you were supposed to have an interview
22 with the president and CEO at Feltco?
23    A.    Yes. I passed the preliminary interviews
24 and was down to the final interview.

Page 11

1    Q.    And what was the name of that individual?
2    A.    The final CEO, I'm not sure, I'm not
3 sure. I never did meet him.
4    Q.    Where else, if anywhere, did you have
5 interviews?
6    A.    Like I said, there was some over the
7 phone, but they weren't -- some weren't hiring; or
8 some were ruled out right away, because they weren't
9 what I was looking for.
10    Q.    The companies that you had phone
11 interviews for, what companies were those?
12    A.    Let me think of some of those. Let's
13 see. What was the name of that?
14         Berlin was one, and actually I went in a
15 phone interview and a regular interview, too, at
16 Berlin Industries, I believe it's called, on
17 Algonquin in Arlington Heights. Let me think.
18         There was another one. I can't remember
19 the name offhand. It was another big company in
20 Arlington Heights. I just can't remember the name.
21    Q.    So Berlin Industries, which you
22 mentioned, you actually had an interview there?
23    A.    Yes.
24    Q.    When were you interviewed there?

Page 12

1    A.    It would have been in March, it would
2 have been late February or March, somewhere in
3 there. I'm not exact on the dates right now.
4    Q.    We're talking February, March of this
5 year, right?
6    A.    Correct, yes.
7    Q.    And what position did you interview for
8 at Berlin Industries?
9    A.    That was also shipping and receiving
10 supervisor.
11    Q.    And what pay did that position offer?
12    A.    That -- we never got to that point.
13    Q.    Were you ever offered employment there?
14    A.    Not really.
15    Q.    When you say "Not really," what do you
16 mean?
17    A.    Well, I'd come down to the final
18 interview, and I talked to Tammy, one of the main
19 bosses; and she had to talk to her bosses, and then
20 they never did get back to me. I ended up taking
21 the Murphy job before I got a final answer from
22 them.
23    Q.    When you worked at Murphy Machine, were
24 you ever disciplined for anything?

3 (Pages 9 to 12)

ROBERT G. WINGO, MAY 19, 2008

**Page 13**

1    A.    No.

2    Q.    You weren't asked to leave Murphy
3    Machine?

4    A.    No.

5    Q.    All right.  So where else did you have
6    interviews, if any, besides Feltco and Berlin
7    Industries?

8    A.    Let me think.

9          There was, there was a few.  I can't
10   remember all the names.  I could produce them, if
11   you really need them.  I have business cards where I
12   went to some of the places, but I just can't recall
13   the names.

14         There was maybe five more interviews that
15   I went for.

16   Q.    Did you apply for unemployment benefits,
17   after you were terminated by Copper and Brass?

18   A.    Yes.

19   Q.    And did you receive unemployment
20   compensation benefits?

21   A.    Yes, sir.

22   Q.    For how long?

23   A.    What was it?  Actually was, maybe three
24   months, three months and then I was hired at Murphy.

**Page 14**

1    And then I worked a month there, and then I was laid
2    off; and then I received two more weeks of
3    unemployment benefits, and then I was hired at
4    BorgWarner.

5    Q.    Where did you go to high school,
6    Mr. Wingo?

7    A.    Bradley-Bourbonnais, Bourbonnais.

8    Q.    And where is that located?

9    A.    That's in Bradley, Illinois, down by
10   Kankakee; where the Bears train, down in
11   Bourbonnais.

12   Q.    And did you graduate from high school?

13   A.    Yes, sir.

14   Q.    What year?

15   A.    '71.

16   Q.    And after graduating from high school,
17   did you attend any college?

18   A.    Yes.

19   Q.    Where --

20   A.    Kankakee Community College --

21   Q.    And did you --

22   A.    -- for a year, and then I went to
23   Southern Illinois University --

24   Q.    Okay.

**Page 15**

1    A.    -- where I graduated in 1977.

2    Q.    And what was your degree in?

3    A.    Radio/TV communications.

4    Q.    And was that a bachelor of arts degree?

5    A.    I think it was bachelor of science, isn't
6    it?  I think a BS, bachelor of science.

7    Q.    Have you ever been involved in any other
8    lawsuits?

9    A.    No.

10   Q.    Have you ever filed a Workers'
11   Compensation claim?

12   A.    No.

13   Q.    Have you ever applied for Social Security
14   benefits?

15   A.    No.

16   Q.    Since your employment ended at Copper and
17   Brass, have you been unable to work for any reason?

18   A.    No.

19   Q.    Have you ever been convicted of any
20   crimes?

21   A.    No.

22   Q.    What's your Social Security number?

23   A.    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.

24   Q.    And what's your date of birth?

**Page 16**

1    A.    5/25/53.

2    Q.    Is your wife employed?

3    A.    She's a part-time teacher.

4    Q.    In what school district?

5    A.    15.

6    Q.    With regard to your job search, you
7    prepared a résumé?

8    A.    Yes.

9    Q.    And did you bring a copy --

10   A.    You know, I should have brought that
11   today.  I meant to bring that, and I forgot last
12   night to include it.  I don't have one.

13         I could fax you one, if you need one.

14   Q.    And have you provided job references for
15   your employment search?

16   A.    Yes, sir.

17   Q.    Who do you use as job references?

18   A.    Copper and Brass.  I was there for
19   24 years, so that's still my main reference.

20   Q.    Have you used anybody in particular there
21   as a job reference?

22   A.    Randy -- you mean as far as individual?

23   Q.    Yes.

24   A.    Yes, Randy Lunt.

ROBERT G. WINGO, MAY 19, 2008

Page 17

1    Q.   Anybody else?
2    A.   Bill Orpid (phonetic) and Keith Sealman
3  (phonetic).
4    Q.   Randy Lunt, he was the plant manager at
5  the time you were terminated?
6    A.   Yes.
7    Q.   Do you know who made the decision to
8  terminate you from Copper and Brass?
9    A.   Randy had me sign the final termination
10  papers, so as far as I know, it was Randy.
11    Q.   When you say "sign the termination
12  papers," this was at a meeting you attended?
13    A.   Yes, sir.
14    Q.   And attending the meeting was also Gino
15  Rodriguez?
16    A.   Correct -- no, actually, that day Gino
17  was not there. Gino was not there until the
18  grievance procedure. It was the next meeting.
19    Q.   You had your union representative present
20  at that meeting?
21    A.   Yes.
22    Q.   That would have been Pete LaRocco?
23    A.   Correct.
24    Q.   How would you describe your relationship

Page 18

1  with Pete LaRocco while you were employed at Copper
2  and Brass?
3    A.   Good. I knew Pete for 25 years.
4    Q.   And during the time you worked at Copper
5  and Brass, you were represented by the Teamsters?
6    A.   Yes, sir.
7    Q.   Okay. Did you ever have any issue with
8  the Teamsters representing you during your
9  employment?
10    A.   No. Never had hardly a grievance. In
11  25 years I hardly ever had any problems. I was
12  always good and never had any problems.
13    Q.   Let's talk about your statement that you
14  hardly had any grievances.
15    First of all, you were familiar with the
16  labor contract between the company and the
17  Teamsters?
18    A.   Sure.
19    Q.   And you filed a grievance at the time you
20  were terminated, correct?
21    A.   Yes.
22    Q.   That's not the first and only grievance
23  you ever filed, correct?
24    A.   Correct. I had filed one about two years

Page 19

1  previous, but I didn't have much of a response to
2  it. As a matter of fact, I never did get a response
3  to that grievance.
4    Q.   Not only then did you file a grievance.
5    Didn't you file some other grievances in
6  the years in the past?
7    A.   Not really. I don't even recall any
8  other ones.
9    I mean I had no problems. I'd just come
10  to work every day, did my job, and I never had any
11  problems. I got along with everyone. That's how I
12  lasted 24 years.
13    Q.   Let me suggest something to you,
14  Mr. Wingo. I'd like you to just answer my
15  questions, because here's what's going to happen,
16  unless you respond to my question. If you have any
17  problem understanding my question, let me know.
18  I'll be happy to rephrase it.
19    A.   Sure.
20    Q.   But if you go off the reservation, so to
21  speak, and you start answering beyond my question --
22    A.   Okay.
23    Q.   -- we'll be here a lot longer, 'cause
24  I'll have to repeat my question. So let's try to

Page 20

1  focus in on my question, if you could, sir.
2    So you had no problems with the union's
3  representation of you, correct?
4    A.   Yes.
5    Q.   And they filed a grievance challenging
6  your termination?
7    A.   Yes.
8    Q.   What ever happened to that grievance?
9    A.   We met with Randy, and it was denied.
10    Q.   And when you say you "met with Randy,"
11  we're talking about Mr. Lunt?
12    A.   Mr. Lunt, Pete was there, Pete LaRocco
13  was there; and Gino Rodriguez, the union rep, was
14  there.
15    Q.   Where did that meeting take place?
16    A.   In Randy Lunt's office.
17    Q.   Okay. Now, that's part of the step of
18  the grievance procedure under the contract?
19    A.   Yes.
20    Q.   And so after the company denied your
21  termination grievance at that meeting, did you ask
22  the union to pursue your grievance any further?
23    A.   Gino mentioned that he was going to take
24  it to the higher council of the union reps and meet

5 (Pages 17 to 20)

ROBERT G. WINGO, MAY 19, 2008

Page 21

1  with the union people, and if they deemed it was
2  necessary or if it was, if there was a deal there,
3  he would, he would let me know. And they never did
4  contact me, so I assume there was none.
5      Q.   So timingwise, let me ask you this: When
6  were you terminated?
7      A.   December 3rd.
8      Q.   And we're talking again 2007, correct?
9      A.   Correct.
10     Q.   And the meeting you described that you
11 attended with Randy Lunt, Gino Rodriguez, Pete
12 LaRocco, and yourself, when did that meeting take
13 place?
14     A.   The -- which meeting, the grievance
15 meeting?
16     Q.   The grievance meeting.
17     A.   That was roughly a week later. I don't
18 have the exact date in front of me.
19     Q.   So sometime in early December of last
20 year?
21     A.   Correct.
22     Q.   So after Mr. Rodriguez told you that he
23 was going to take your grievance to the next level
24 of the Teamsters, did Mr. Rodriguez let you know

Page 22

1  what happened to your grievance?
2      A.   He never called back.
3      Q.   Did you ever follow up?
4      A.   No.
5      Q.   Why not?
6      A.   Well, he told me if something was there,
7  that he would call me.
8      Q.   Okay. And he never called you?
9      A.   He never called.
10     Q.   When's the last time you had any
11 communication with Mr. Rodriguez?
12     A.   That day in the Lunt office, the
13 grievance meeting day.
14     Q.   So back in December of last year?
15     A.   Mm-hmm.
16     Q.   Is that correct?
17     A.   Yes, in December.
18         And then I did call him and say, Gino,
19 are you going to pursue this anymore?
20         And he says, yes, we will meet with the
21 union reps, like I just told you, and that they
22 would let me know.
23         And that was the last phone communication
24 I had. The other was the meeting with Lunt.

Page 23

1      Q.   The phone conversation you just
2  described, when did that take place?
3      A.   That was roughly right before Christmas,
4  somewhere right in there, like maybe somewhere
5  between the 17th and 20 something.
6      Q.   So again, we're talking Christmastime
7  last year, 2007?
8      A.   Correct.
9      Q.   Did you ever receive anything in writing
10 from the Teamsters letting you know what they were
11 going to do with your grievance?
12     A.   No.
13     Q.   So you were familiar with the labor
14 contract between the company and the Teamsters,
15 correct?
16     A.   Yes.
17     Q.   And you were obviously familiar enough
18 that, with respect to your termination, you filed a
19 grievance challenging your termination, right?
20     A.   Sure, yes.
21     Q.   Were you aware that the contract, the
22 labor contract between the company and the Teamsters
23 had a no discrimination provision?
24     A.   Yes.

Page 24

1      Q.   And were you aware that no discrimination
2  provision, among other things, prohibited
3  discrimination on the basis of age?
4      A.   Yes.
5      Q.   You never filed a grievance claiming the
6  company violated that provision of the contract,
7  correct?
8      A.   I don't have a copy of the grievance in
9  front of me to list all the, the issues.
10     Q.   When you say you "don't have a copy of
11 the grievance," Mr. Wingo, what grievance are you
12 referring to?
13     A.   The one that challenged my termination.
14     Q.   So without seeing that document,
15 Mr. Wingo, are you suggesting you can't answer the
16 question whether or not you ever filed a grievance
17 claiming the company did anything against you
18 because of your age?
19     A.   I think that was included in the wording.
20 I don't know if it was specifically on that, but it
21 was definitely in the wording.
22     Q.   Let me ask you this, Mr. Wingo: What, if
23 anything, did you review to prepare for your
24 deposition today?

6 (Pages 21 to 24)

Page 25

1    A.    Just some of the notes in the past and
2  some, just talked with my wife about some of the
3  issues.
4    Q.    Okay.  The issues you discussed with your
5  wife, first of all, when did you have those
6  discussions?
7    A.    Well, she kind of knew the whole story,
8  you know, starting to -- when it started going
9  downhill at Copper and Brass, when we first --
10    Q.    When did it start to go downhill at
11  Copper and Brass?
12    A.    Basically it started going downhill after
13  I had a harassment grievance.
14    Q.    A harassment grievance against who?
15    A.    Mark DeMien, the foreman.
16    Q.    When did you file a harassment grievance
17  against Mark DeMien?
18    A.    It was more of a verbal meeting grievance
19  type deal, where we went in, I went in with Pete
20  LaRocco, the union rep, the union steward, rather,
21  and we went in and sat down with Randy, and we tried
22  to work it out like that.
23    Q.    When was that?
24    A.    That was in September -- August 30, 2007.

Page 26

1    Q.    And again, who are the attendees at this
2  meeting?
3    A.    Me, Pete LaRocco, and Randy Lunt.
4    Q.    And you said this was a verbal grievance,
5  not a written grievance?
6    A.    Correct.
7    Q.    Who did you make that verbal grievance
8  to?
9    A.    To Randy.
10    Q.    What do you recall telling Randy?
11    A.    That the foreman basically had sworn at
12  me and -- sworn at me and yelled at me in front of
13  other employees.
14    Q.    The foreman, you're talking about Mark
15  DeMien?
16    A.    Correct.
17    Q.    When you say he swore at you, what words
18  did he use?
19    A.    He said, what the F are you doing?
20        And I told him I was waiting on a side
21  loader operator to bring me more metal.
22        And he said, get to F'ing work.
23        And I said, I was.  I was trying to get a
24  helper to help me lift the 60 wide rolls of PVC onto

Page 27

1  the machine, so I could run the order when the metal
2  came.
3    Q.    Who witnessed this?
4    A.    It was witnessed by Pat Bishop and Sergio
5  Garcia.
6    Q.    And Pat Bishop, was he a warehouse clerk?
7    A.    Yes.
8    Q.    And Sergio Garcia, was he also a
9  warehouse clerk?
10    A.    Yes.  They were both, actually they were
11  both -- worked on the receiving dock as warehouse
12  clerks, whatever you want to call them; receivers.
13    Q.    And had you ever heard Mark DeMien ever
14  swear at anybody before?
15    A.    No.
16    Q.    Had you ever heard Mark DeMien ever use
17  language like that before at all, period?
18    A.    No.
19    Q.    How long had you been working with
20  Mark DeMien as of that time in August 2007?
21    A.    How long was it?  Probably three to
22  five years.  I'm not sure of exact dates.
23    Q.    How much --
24    A.    He was a foreman in another part of the

Page 28

1  plant, before he became overall foreman.  So we
2  worked together probably as long as he was there.  I
3  was there longer, but as long as he was there, we
4  worked together.  But not really together; he was in
5  one part of the building, and I was in another part.
6    Q.    So the three to five years you indicated,
7  that was three to five years that he had been the
8  overall foreman?
9    A.    I think so.
10    Q.    And as of the time you were terminated in
11  December of 2007, approximately how long had Mark
12  DeMien worked at Copper and Brass?
13    A.    I'm not sure of the actual numbers.  I'm
14  guessing between five and seven years, roughly.
15    Q.    Now, there's also a Tyler DeMien who was
16  also working there at the time, correct?
17    A.    Yes, sir.
18    Q.    What relationship, if any, is there
19  between Mark and Tyler DeMien?
20    A.    Tyler is Mark's son.
21    Q.    Do you know approximately how old Mark
22  DeMien is?
23    A.    Mark is approximately in his 40s.
24    Q.    So let's --

7 (Pages 25 to 28)

ROBERT G. WINGO, MAY 19, 2008

Page 29

1    A.    Probably lower 40s.
2    Q.    Let's talk for a moment about this verbal
3    grievance.
4         So after you complained to Randy Lunt
5    about Mark DeMien swearing, what, if anything, did
6    Randy Lunt say?
7    A.    Randy didn't take it serious. He didn't,
8    he didn't seem to think much of it or something. I
9    don't know.
10        He never reprimanded Mark for swearing at
11   me. He never reprimanded his foreman for screaming
12   and yelling in front of other employees.
13   Q.    Did Mark DeMien ever yell and scream at
14   any other employees besides you?
15   A.    I don't know.
16   Q.    Well, you never saw Mark DeMien yell or
17   scream at anybody during the time you worked with
18   him?
19   A.    I don't really know. I can only speak
20   for myself. I didn't really notice that much, I
21   just did my own job.
22   Q.    You rendered an opinion that you thought
23   Randy Lunt did not take your complaint about DeMien
24   swearing at you.

Page 30

1         How did you come to that conclusion?
2    A.    Well, he never did anything about it. He
3    never called Mark in there to talk to him. He never
4    brought him in there, when we were in there, to
5    maybe say, what happened, you know, let's straighten
6    this out.
7    Q.    Let's talk further about your knowledge
8    in that regard.
9         Were you always present with Randy Lunt
10   throughout the time he was working there as plant
11   manager?
12   A.    What do you mean by that now?
13   Q.    Were you always physically present with
14   Randy Lunt?
15   A.    Yes. Yeah.
16   Q.    On a day to day, you were trailing him?
17   A.    No, no, no. He was the plant manager.
18   He had his own office, and I had my own work
19   station.
20   Q.    So you would agree with me, you wouldn't
21   know what Randy Lunt was doing on a moment-to-moment
22   basis, during the day?
23   A.    Right, I don't know if he reprimanded
24   Mark separately or anything. I don't know.

Page 31

1    Q.    You don't know what discussions, if any,
2    Randy Lunt might have had with Mark DeMien, after
3    you raised this concern about him swearing at you?
4    A.    Yes, sir.
5    Q.    Okay. So other than your complaining to
6    Randy Lunt about Mark DeMien swearing at you, did
7    you ever complain to Randy Lunt again about
8    Mark DeMien?
9    A.    No.
10   Q.    Did you ever complain to anybody else at
11   Copper and Brass about Mark DeMien?
12   A.    Not 'til I was terminated.
13   Q.    Who did you complain to about Mark DeMien
14   at the time of your termination?
15   A.    Right after I was terminated I went to
16   see the president of the company, who I knew pretty
17   well, and I felt I could talk to him and try to save
18   my job. I was basically trying to save my job.
19        So I went to the president,
20   Bill Fruehauf, and I says, Bill, can I talk to you
21   for a few minutes about the termination and issues?
22        He said, sure, Bob, come to my office.
23   Q.    Now, let's talk for a moment about
24   Mr. Fruehauf. You label him as the president of the

Page 32

1    company.
2         Are you sure he was the president of the
3    company?
4    A.    He was the main guy.
5    Q.    When you say "the main guy," would he
6    have been the main guy responsible for this
7    particular region in which the facility is located?
8    A.    Correct, he was.
9    Q.    And when was it, Mr. Wingo, that you had
10   this meeting with Mr. Fruehauf?
11   A.    That would -- I believe was December 4th,
12   the next day.
13   Q.    And where did you meet with Mr. Fruehauf?
14   A.    In his office.
15   Q.    And where is his office located?
16   A.    In the front of the warehouse.
17   Q.    Out in Schaumburg?
18   A.    Yes, sir.
19   Q.    Was anybody else present during this
20   meeting?
21   A.    No, just me and Bill.
22   Q.    Okay. And how long did you meet with
23   Mr. Fruehauf for?
24   A.    Roughly 15, 20 minutes.

8 (Pages 29 to 32)

ROBERT G. WINGO, MAY 19, 2008

Page 33

1    Q.   What did you tell Mr. Fruehauf during
2  that meeting?
3    A.   I just told him about the harassment
4  issue with Mark and that I thought the whole
5  thing started there.  I thought that Mark was, you
6  know, I thought that, you know, everything went bad
7  from there.
8        And I says, I was innocent, and he was
9  swearing at me.  And I was really just waiting on
10  metal from the side loader operator.  And I thought
11  it was unfair that he was swearing at me and --
12  multiple swears.
13    Q.   So it sounds like, Mr. Wingo, you were
14  telling Mr. Fruehauf that you concluded that
15  Mr. DeMien was out to get you, after you complained
16  about him swearing at you?
17    A.   I don't know if you could say it like
18  that.  I know that things went downhill after that
19  engagement with the harassment.
20    Q.   When you say "went downhill," that was
21  downhill with Mr. DeMien?
22    A.   Yes, sir.
23    Q.   Okay.  How was your relationship with
24  Randy Lunt up until the time you were terminated?

Page 34

1    A.   Pretty good most of the time.  Pretty
2  good.
3    Q.   And now, curiously, you've used this term
4  "harassment," and I just want to be sure you and I
5  are on the same page, with regard to this usage of
6  that term.
7        You testified that you complained at the
8  end of August about Mr. DeMien swearing at you,
9  right?
10    A.   Yes.
11    Q.   Okay.  How is it that you're claiming
12  that Mr. DeMien was harassing you?
13    A.   Well, it's more of a verbal harassment
14  when they swear at you, and just his tone of voice
15  and his yelling at me.
16    Q.   Did he ever swear at you again, after the
17  meeting that you complained about it?
18    A.   After that initial one, I don't recall.
19        I don't think so.
20    Q.   All right.  Now, let's back up for a
21  moment, Mr. Wingo.  I asked you before a question
22  about whether or not you had ever filed a grievance
23  alleging the company violated the no discrimination
24  provision, specifically in reference to age

Page 35

1  discrimination.
2        Do you recall that?
3    A.   Wait, say that again.
4    MR. LINDEN:  Could you kindly read back my
5  question, please?
6        (WHEREUPON, the record was read
7        by the reporter.)
8  BY THE WITNESS:
9    A.   No, I never filed a previous grievance on
10  age.
11  BY MR. LINDEN:
12    Q.   But you suggested in your testimony that
13  your termination grievance might have alleged age
14  discrimination?
15    A.   Yes, sir.
16    Q.   Did you review any documents before, to
17  prepare for today's deposition?
18    A.   Some of the forms that we had.
19    Q.   What, specifically, did you review?
20    A.   The one about where we applied for jobs
21  and just different, different things.
22    Q.   Well, when you say "different things,"
23  I'm going to ask you to be a little bit more
24  specific.

Page 36

1        Besides looking at documents pertaining
2  to your job search, what other documents, if any,
3  did you review to prepare for your deposition today?
4    A.   Just some of the, the papers that we had
5  about -- that you sent us about, you know, the
6  questionnaires and stuff.
7    Q.   Okay.  So you're aware, among other
8  things, that the company produced documents in
9  response to your discovery request in this case?
10    A.   Yes.  I, I don't know if I've read them
11  all, but probably.
12    Q.   You reviewed some of them?
13    A.   Yes.
14    Q.   And so you know, among other things,
15  documents were produced that were part of your
16  personnel file from the time you were employed at
17  Copper and Brass, correct?
18    A.   I haven't seen all those.
19    Q.   But have you seen some of them?
20    A.   You have files?
21        I don't have all the files.  I haven't
22  seen all the files.
23    Q.   Well, Mr. Wingo, let me -- again, I don't
24  know if you've ever had your deposition taken

9 (Pages 33 to 36)

ROBERT G. WINGO, MAY 19, 2008

Page 37

1  before.
2      Have you ever had your deposition taken?
3      A.  No, this is the first.
4      Q.  So unfortunately, the way this process
5  works today, I'm going to be the one asking you the
6  questions.
7      A.  Okay.
8      Q.  I'm not going to be answering any
9  questions today.
10     A.  Okay.
11     Q.  So let's get a little bit more specific.
12     What documents in particular do you
13  recall looking at to prepare for your deposition
14  today?
15     A.  I don't remember specifics on all the
16  documents.
17     Q.  Did you look at --
18     A.  I mean --
19     Q.  Go ahead.  Sorry to interrupt you there.
20     A.  I can't recall all that.  I mean we
21  discussed a lot of things, and I -- you know.
22     Q.  And I don't want to know anything that
23  you talked about with your attorneys.  So let's see
24  if I can help you about documents you may have

Page 38

1  looked at.
2      Did you look at the documents relating to
3  your termination for employment?
4      A.  Yes.
5      Q.  During the time you were employed at
6  Copper and Brass, did you ever keep any sort of
7  journal, diary, or calendar?
8      A.  I would keep verbal -- you know, I'd talk
9  with my wife a lot about it and stuff like that.
10     Q.  But my question now isn't about talking
11  to your wife.
12     Did you keep anything in writing about
13  events that took place that you are claiming to be
14  evidence of your claims in this case?
15     A.  Some of that stuff I think I did.  I'm
16  not sure of all of it.
17     Q.  And you still have those documents?
18     THE WITNESS:  Do we have anything?
19     MS. WEGNER:  Unfortunately, I can't help you
20  here.
21     But I think we did give you copies of those.
22  BY MR. LINDEN:
23     Q.  Have you provided those documents?
24     A.  I thought we did, yes.  I thought we

Page 39

1  provided you with all that.
2      Q.  Have you provided those documents to your
3  attorneys to be produced in this case?
4      A.  Yes.
5      MR. LINDEN:  Let's mark this Exhibit 1, please.
6      (WHEREUPON, a certain document was
7      marked Wingo Deposition Exhibit No. 1,
8      for identification, as of this date.)
9      (WHEREUPON, the document was
10      tendered to the witness.)
11  BY MR. LINDEN:
12     Q.  All right.  You've been handed what has
13  been marked Wingo Exhibit 1, for purposes of
14  identification, which is a grievance dated
15  December 4, 2007.  After you've had a chance to
16  review that, Mr. Wingo, let me know; and I'll have a
17  question or two to ask you about the document.
18     You've had a chance to review it?  Just
19  let me know when you're done reviewing it.
20     A.  Yes, I'm done.
21     Q.  So this is the grievance that was filed
22  on your behalf, challenging your termination?
23     A.  Yes.
24     Q.  And that would be your signature next to

Page 40

1  where it says, "Signature of employee"?
2      A.  Yes.
3      Q.  And this is the grievance you indicated
4  that the, apparently the Teamsters, as far as you
5  know, have not pursued any further?
6      A.  Correct.
7      Q.  And the writing on this, from your
8  signature above, is that all your writing?
9      A.  Yes.
10     Q.  Do you consider Gino Rodriguez to be a
11  trustworthy individual?
12     A.  Yes.
13     Q.  Do you consider Pete LaRocco to be a
14  trustworthy individual?
15     A.  Yes.
16     Q.  Now, you started working for Copper and
17  Brass in 1984, correct?
18     A.  Yes.
19     Q.  And I believe you indicated you graduated
20  from Southern Illinois in 1977, correct?
21     A.  Yes, sir.
22     Q.  All right.  So what was your first job
23  after graduating from college, your first full-time
24  job?

10 (Pages 37 to 40)

Page 41

1    A.    Basically, it was Copper and Brass.
2    Q.    So between 1977 and 1984 you had no
3  full-time employment?
4    A.    Correct.
5    Q.    Do you recall filling out an employment
6  application, when you applied for work at Copper and
7  Brass?
8    A.    Yes, sir.
9    Q.    Okay.  How did you find out about
10  employment at Copper and Brass?
11    A.    It was a door-to-door.
12    Q.    And where was Copper and Brass located at
13  that time?
14    A.    415 State Parkway, in Schaumburg.
15    Q.    Same address they're currently at?
16    A.    Yes, sir.
17    Q.    And did you have an interview?
18    A.    Yes.
19    Q.    And who did you interview with?
20    A.    Jim Baber.
21    Q.    He was the plant manager at the time?
22    A.    Yes.
23    Q.    And what position did you interview for?
24    A.    General warehouse.

Page 42

1    Q.    And when did you start working for Copper
2  and Brass?
3    A.    January 5, 1984.
4    Q.    And who was your supervisor at that time?
5    A.    Jim Baber was the plant manager.
6    Q.    And was that a union facility at the
7  time?
8    A.    Yes.
9    Q.    And that would be a -- union was
10  Teamsters Local 714?
11    A.    Correct.
12    Q.    Who was the business agent at that time,
13  if you can recall?
14    A.    Oh, I don't remember.  It was a long time
15  ago.
16         They hadn't -- they had a couple of
17  different people at times, maybe three people over
18  the years.  Bob Riley was the second one.  I don't
19  remember if he was there when I first started.  He
20  was one of the later ones, I think.  I don't
21  remember the very first guy.
22    Q.    What was your first job at Copper and
23  Brass?
24    A.    It was order clerk.

Page 43

1    Q.    And what were the duties of an order
2  clerk?
3    A.    Pack orders.
4    Q.    What was the nature of Copper and Brass'
5  business?
6    A.    It was a metal company.
7    Q.    When you say "a metal company," they're
8  actually a distributor of metal products?
9    A.    Correct.
10    Q.    So what position did you hold after being
11  order clerk?
12    A.    From order clerk, I was a side loader
13  operator.
14    Q.    How long were you an order clerk for?
15    A.    Was it maybe a year?  Six months or a
16  year?  I can't recall exactly.
17    Q.    And how long were you a side load
18  operator for?
19    A.    For over 10 years.
20    Q.    What were the duties of the side load
21  operator?
22    A.    Those were -- the duties were to fill the
23  orders, to go and get the orders and bring them to a
24  conveyor belt for the packers and the saw operators

Page 44

1  to cut or to process.
2    Q.    And you said you were a side load
3  operator for approximately 10 years?
4    A.    Yes.
5    Q.    So you were a side load operator, if my
6  math is correct, until sometime in the 1994, 1995 --
7    A.    You know what, I was one 'til the very
8  end.  I mean I was still one when -- I could still
9  operate one, but I just didn't do it full time.
10         I had held different positions.
11    Q.    When you say you "had held different
12  positions," there are different job titles under the
13  labor contract with the union, correct?
14    A.    Yes.
15    Q.    One position would be warehouse clerk?
16    A.    Yes.
17    Q.    Did you ever hold the position of
18  warehouse clerk?
19    A.    Yes.
20    Q.    When did you hold that position, sir?
21    A.    That was what I started at.  That's what
22  basically everybody is, an order clerk.
23    Q.    What position did you hold at the time of
24  your termination in December of last year?

11 (Pages 41 to 44)

ROBERT G. WINGO, MAY 19, 2008

---

Page 45

1    A.    I held like four, five positions, but I
2  ended up as an order clerk again.  So I was a
3  machine operator, side loader operator -- the
4  progression was order clerk, side loader operator,
5  machine operator, and then I was shipping and
6  receiving dock, I did that job, too.  And then I
7  worked at two other of the stations, too.
8    Q.    With regard to the warehouse clerk, what
9  are the duties of the warehouse clerk?
10    A.    Fill and pack orders, or -- you know,
11  basically pack orders.
12    Q.    And is there paperwork or clerical work
13  that the warehouse clerk has to do?
14    A.    Yes.  You do all the paperwork, and you
15  do data processing and entry.
16    Q.    And when you say, "data processing,"
17  we're talking about entering data into the computer
18  system?
19    A.    About the work order, sure.
20    Q.    Is there something known as PK10?
21    A.    Yes, sir.
22    Q.    What is PK10?
23    A.    PK10 is where you process the actual
24  order and give the details of the order, weights

---

Page 46

1  and --
2    Q.    And so that's information you would input
3  into the company's computer?
4    A.    Correct, so they -- for the billing
5  process.
6    Q.    Okay.
7    MR. LINDEN:  Excuse me, let's go off the record
8  for a moment.
9    (WHEREUPON, discussion was had
10    off the record.)
11  BY MR. LINDEN:
12    Q.    Now, Mr. Wingo, before we took a break,
13  we were talking about the various positions you've
14  held at the time you were employed at Copper and
15  Brass, and you indicated that there were several
16  positions.  You indicated among the positions
17  included machine operator, correct?
18    A.    Yes, sir.
19    Q.    When did you hold the position of machine
20  operator?
21    A.    That would have been the late eighties, I
22  believe.
23    Q.    Do you recall approximately how long you
24  held it for?

---

Page 47

1    A.    I'm thinking like a year or two.  I was
2  doing it while another guy was off on an injury.
3    Q.    Do you remember who that was?
4    A.    Ralph Coliano (phonetic).
5    Q.    And so when he returned, he assumed the
6  position, and you went back to your position?
7    A.    Correct.
8    Q.    What position did you go back to?
9    A.    Side loader operator.
10    Q.    You also said you held a shipping and
11  receiving position as well.
12    A.    Yes.
13    Q.    When did you hold that position?
14    A.    That would have been in the nineties.
15    Q.    Do you recall, specifically, what years
16  in the nineties that might have been?
17    A.    I'm not real sure of the dates.  It's
18  been a while.  I'm thinking '92 to '95, somewhere
19  like that.  I'm not totally sure, maybe '90 to '95.
20  I'm not sure.
21    Q.    You indicated, I believe, that that
22  position is considered to be higher up than the
23  warehouse clerk position?
24    A.    It's paid the same.  It was basically a

---

Page 48

1  lateral move, pay-wise, but it was -- if you want to
2  consider it a step up; some people did.
3    Q.    Okay.  Why did you stop holding the
4  position of shipping and receiving?
5    A.    I got tired of that, and I wanted to go
6  back to production.  I just wanted to try something
7  different.
8    Q.    And what position did you go back to?
9    A.    I went back to warehouse and order clerk.
10  Packer.
11    Q.    Just so I'm sure I understand the
12  nomenclature here, warehouse clerk, is that the same
13  position as order clerk and packer?
14    A.    Yes, sir.
15    Q.    So if I used the term "warehouse clerk,"
16  would it cover all those positions?
17    A.    I believe so.
18    Q.    And they were all paid the same rate?
19    A.    Correct.
20    Q.    And they all had the same duties and
21  responsibilities?
22    A.    Kind of.  They had different, different
23  duties and responsibilities, but similar.  They
24  basically process orders and, and pack orders.

---

12 (Pages 45 to 48)

ROBERT G. WINGO, MAY 19, 2008

Page 49

1    Q.   All right. Duties and
2  responsibilities-wise, how is the order clerk
3  position different than the warehouse clerk
4  position?
5    A.   They were the same, basically.
6    Q.   What about from the packer position?
7    A.   Each station had certain jobs and duties
8  to process orders, and that's what I'm trying to
9  say.
10    Q.   So for example, there was something
11  referred to as the RWB station?
12    A.   RBW station, yes, sir. That's rod, bar,
13  and wire.
14    Q.   Did you ever work at that station?
15    A.   That's where I started, and that's where
16  I was when I was terminated.
17    Q.   And when you worked at the rod, bar, and
18  wire -- we'll refer to it as the RBW station, if you
19  don't mind -- what position did you hold?
20        Was it the warehouse clerk position?
21    A.   Yes.
22    Q.   And what were your duties and
23  responsibilities at the RBW station?
24    A.   To pack the orders. To measure it and

Page 50

1  pack it and weigh it.
2    Q.   And these were orders that were being
3  sent to Copper and Brass' various customers?
4    A.   Yes, sir.
5    Q.   Would also some of the orders be sent to
6  the other Copper and Brass distribution centers?
7    A.   Sure. Transfers.
8    Q.   So you indicated that the RBW station,
9  your responsibilities consisted of packing,
10  weighing, and measuring the product?
11    A.   Yes.
12    Q.   Anything else?
13    A.   That's basically it.
14    Q.   And you said, Mr. Wingo, at the time that
15  you were terminated in December of 2007, you were
16  working at the RBW station?
17    A.   Yes.
18    Q.   How long, at the time you were
19  terminated, had you been working at that station?
20    A.   At that station, maybe two years.
21        I was packing previous in a different
22  area.
23    Q.   And for the last two years up to the time
24  you were terminated, did you have the same

Page 51

1  supervisor?
2    A.   Yes.
3    Q.   And that would have been Mr. DeMien?
4    A.   Correct.
5    Q.   And what shift were you working on at
6  that time?
7    A.   Always the first shift.
8    Q.   And what were the hours of the first
9  shift?
10    A.   6:00 to 2:30.
11    Q.   So throughout your employment at Copper
12  and Brass, you worked the first shift?
13    A.   Yes, sir.
14        I had two weeks on second shift when I
15  first started.
16    Q.   But after that it was all the first
17  shift?
18    A.   Correct.
19    Q.   Okay. All right.
20        Now, you said prior to working at the RBW
21  station, you were packing in a different area.
22    A.   Yes.
23    Q.   Where would that have been, sir?
24    A.   That was -- actually, it was a multiple

Page 52

1  area. I packed for the saws and for the shears.
2    Q.   And was that area called something in
3  particular?
4    A.   What did they call it? I guess it was
5  just another packing station.
6    Q.   And how long were you in that other
7  packing station?
8    A.   That one, I was there for maybe
9  five years, five to seven years, roughly.
10    Q.   And why were you moved from that packing
11  area to the RBW area?
12    A.   Well, one of the guys that was -- well,
13  let's see. At that time -- that one may have been
14  just for a change. One guy wanted to get out of
15  there, and I offered to switch with him and we
16  changed.
17    Q.   Do you remember who that was?
18    A.   Lance Amack.
19    Q.   And at the time you left, at the time you
20  were terminated in December of 2007, was Mr. Amack
21  still working at Copper and Brass?
22    A.   Yes.
23    Q.   And do you know if he's still employed at
24  Copper and Brass?

13 (Pages 49 to 52)

ROBERT G. WINGO, MAY 19, 2008

Page 53

1    A.    I think so, yes.
2    Q.    Was Mr. Amack working there when you were
3  hired in, back in 1984?
4    A.    No.
5    Q.    He was hired after you came in?
6    A.    Yes, sir.
7    Q.    How long after you were hired do you
8  recall Mr. Amack being hired at Copper and Brass?
9    A.    I think he was there for the last
10 10 years, so around roughly my 15th year, 14th, 15th
11 year, they hired Lance.
12    Q.    When you left, was Mr. Amack also a
13 warehouse clerk?
14    A.    Yes.
15    Q.    Do you know if Mr. Amack is older or
16 young than you?
17    A.    Lance is older.
18    Q.    Do you know how old Mr. Amack is?
19    A.    I think he's 64 or something like that.
20    Q.    All right.  So let's talk for a moment a
21 little bit further about this, when you worked in
22 the shear and saw area.
23        What were your duties in that area?
24    A.    Basically the same.  You were order

Page 54

1  clerks, so you would pack orders.
2    Q.    And so --
3    A.    Processed orders.
4    Q.    So when you talk in terms of process
5  orders, that means you'd be packing, weighing, and
6  measuring?
7    A.    Correct.
8    Q.    Okay.  And with regard to those duties,
9  there's a clerical function?
10    A.    Yes.
11    Q.    And what would the clerical --
12    A.    PK10.
13    Q.    Okay.  And that's the data entry function
14 you described before?
15    A.    Yes.
16    Q.    Was there any paperwork that you had to
17 keep while working in that position?
18    A.    Production sheets.
19    Q.    Those would be the daily production logs?
20    A.    Yes.
21    Q.    And that's something all warehouse clerks
22 had responsibilities to maintain during their
23 shifts?
24    A.    Yes.  And operators, too, so operators.

Page 55

1    Q.    With regard to the PK10 function, you
2  indicated that data would go into the company's
3  computer system, correct?
4    A.    Yes.
5    Q.    And so the data, if I understand what
6  you've testified to about that, Mr. Wingo, is you'd
7  be, what, entering the work order number?
8    A.    Correct.
9    Q.    The weight of the product?
10    A.    Correct.
11    Q.    Possibly a number of pieces --
12    A.    Yes.
13    Q.    -- of the product?
14        Anything else?
15    A.    That's it, basically, the billing
16 process, whether it was pieces or weight; and you
17 would put, where you put it, maybe location, or you
18 would put -- sign your name, your initials.
19    Q.    When you talk in terms of pieces or
20 weight, we're talking, first of all, about the metal
21 product that Copper and Brass was selling to its
22 various customers, correct?
23    A.    Correct.
24    Q.    And sometimes customers would want you to

Page 56

1  process the order based on piece number, correct?
2    A.    Yes.
3    Q.    Okay.  Sometimes they'd want you to do it
4  based on weight?
5    A.    Yes.
6    Q.    And how would you know that?
7    A.    It would usually be in the billing blank.
8  There would be a blank space in the work order for
9  billing, and that's usually where that would say how
10 is it billed.  And that's usually your
11 discriminating factor, as far as how you, what is it
12 billed by.
13    Q.    So when you talk about the billing order,
14 we're talking about, it's also the work order that
15 the company would give you?
16    A.    Could you rephrase that, please?
17    Q.    Well, let me ask you this:  You just said
18 there was a source that had various information that
19 you would know the customers' needs and demands,
20 correct?
21    A.    Yes.
22    Q.    Was that found on a work order?
23    A.    Yes.  It would be under billing.
24    Q.    And you would have that at your work

14 (Pages 53 to 56)

Page 57

1 station?
2    A.   It would be the work order.  That's the
3 actual work order, how it was billed.
4    Q.   And were you supposed to review that,
5 before you would package the materials and have it
6 shipped off?
7    A.   No, you just basically look at it when
8 you PK10, and when you're doing your PK10, your data
9 entry.  That's where it would come out more than
10 anything.
11    Q.   All right.  So you'd take the work order,
12 and you'd look at the information on the work order,
13 and you'd enter that on the PK10?
14    A.   Correct.
15    Q.   And you would agree, it would be
16 important for you to accurately enter that
17 information, because the company would rely on that
18 data, correct?
19    A.   Yes, sir.
20    Q.   And the company would rely on that data
21 for, among other things, to track its inventory,
22 correct?
23    A.   Exactly.
24    Q.   All right.  So you indicated, Mr. Wingo,

Page 58

1 that you -- for the last two years of your
2 employment at Copper and Brass, you were at RWB
3 station, right?
4    A.   Yes.
5    Q.   And I believe you also indicated you had
6 worked at that station before also, when you were at
7 Copper and Brass?
8    A.   Yes.
9    Q.   When would that have been, sir?
10    A.   I worked there my first year.  Like I
11 told you earlier, I worked there the first year, and
12 then I stayed in that area as a side loader operator
13 for 10 years, roughly.
14    Q.   Okay.
15    A.   And so I organized the area.  That was my
16 job is to set up the operators, packers and saw
17 people; and so I kind of organized the area.  I was
18 kind of like the lead man, but never titled lead
19 man.  I kind of ran the area, but I had no title.
20    Q.   The PK10 function we've been talking
21 about, as of the time of your termination in
22 December of 2007, how long had you been performing
23 the PK10 function?
24    A.   Since they got the computers.

Page 59

1    Q.   And when would that have been, sir?
2    A.   I'm thinking around '95, somewhere in
3 there.
4    Q.   When the company got the computers for
5 the PK10 function, did you and other people receive
6 training on it?
7    A.   Yes.
8    Q.   Now, you indicated a while ago,
9 Mr. Wingo, that according to you, everything went
10 downhill after you complained about Mr. DeMien
11 swearing at you, at the end of August of 2007,
12 correct?
13    A.   Yes.
14    Q.   Prior to that, did you have any problems
15 with Mr. DeMien?
16    A.   No.
17    Q.   Did you have any complaints against
18 Copper and Brass prior to that?
19    A.   You mean DeMien or in general?
20    Q.   Just in general.
21    A.   I believe I, I did file another
22 grievance, about two years previous to that, about
23 another foreman, but I never got a response on it.
24    Q.   Who would that have been?

Page 60

1    A.   That was Steve Catama, and I filed that
2 with Randy Lunt.
3    Q.   And that grievance was filed, what, in
4 2005?
5    A.   Yes.
6    Q.   What was the nature of that grievance?
7    A.   Basically, that he was harassing me while
8 I was trying to do the work orders, and I was trying
9 to PK10 an order.  And he'd come up screaming, and I
10 says, could you please give me a minute?  I'm trying
11 to finish the order.
12    Q.   So you filed a grievance, under the labor
13 contract, against Mr. Catama, after he screamed at
14 you?
15    A.   Yes.
16    Q.   And the union never took that grievance
17 to arbitration?
18    A.   No.  It was -- as far as I know, the ball
19 was dropped by Randy Lunt.  I never got a response
20 from Randy, and so I never pursued it.  I just kind
21 of dropped it, because they fired Mr. Catama shortly
22 after that, so it was kind of just dropped.
23    Q.   When you say "shortly after that," how
24 soon after that?

ROBERT G. WINGO, MAY 19, 2008

Page 61

1    A.    I'm not sure of the exact. I'm thinking
2  a couple of months, maybe.
3    Q.    So based on his getting fired, that is
4  Mr. Catama, you figured there was no reason to
5  pursue it any further?
6    A.    Correct, because he was gone.
7    Q.    When he screamed at you, what did he say?
8    A.    Basically, hurry up, the truck's waiting.
9       I says, I am, but I have to make sure I
10 get this information correct. I can't rush it.
11   Q.    And was anybody else present at the time?
12   A.    I don't recall.
13      I don't think so, though. I mean I don't
14 think I had a witness.
15   Q.    Other than your grievance against
16 Mr. Catama that you brought, as well as your
17 complaint about Mark DeMien in August of 2007, did
18 you make any other complaints about any other
19 supervisory personnel at Copper and Brass?
20   A.    None that I can recall.
21      I mean I basically got along with
22 everyone very well.
23   Q.    Including Randy Lunt?
24   A.    Yes, sir.

Page 62

1    Q.    You consider Randy Lunt to be an honest
2  guy?
3    A.    Yes.
4    Q.    And so other than the Steve Catama
5  incident, prior to August of 2007, did you have any
6  complaints about Copper and Brass?
7    A.    No.
8    Q.    Let's, for a moment, talk about the daily
9  production logs.
10      That was part of your clerical function
11 as a warehouse clerk, correct?
12   A.    Yes, sir.
13   Q.    And so you would fill those out during
14 the course of your shift?
15   A.    Yes.
16   Q.    Okay. And when you were done with them,
17 what would be done with those daily production logs
18 at the end of the shift?
19   A.    We would turn them in to the foreman's
20 office.
21   Q.    So for example, back in the fall of 2007,
22 when you returned it to the foreman's office, would
23 that have been Mr. DeMien?
24   A.    Yes.

Page 63

1    Q.    With regard to the PK10 process, the
2  information that you would input into the computer,
3  did the company also rely upon that information to
4  service and bill their customers?
5    A.    Yes.
6    Q.    At the time in the fall of 2007, prior to
7  your termination, how many orders a day were you
8  processing, approximately?
9    A.    It varied, according to the work flow. I
10 mean it's hard to put numbers.
11      I know that with the economy going bad,
12 the numbers went down. I mean in previous times I'd
13 done over a hundred orders.
14   Q.    Let's focus on the fall of 2007.
15      What would be the range of the least
16 amount of orders and the most amount of orders you
17 might have done?
18   A.    One day at Thanksgiving one guy had eight
19 orders. I had 12 that day. It was right before
20 Thanksgiving, so it was a very slow time. A lot of
21 companies had shut down, so that was the low
22 watermark for me probably was like 8 or 10 or 12.
23      And the high watermark was 25 to 35, you
24 know, it depends. It was just always different.

Page 64

1    Q.    Now, you indicated that the economy was
2  going down in the fall of 2007?
3    A.    Yes. I noticed a downturn in orders.
4    Q.    So you noticed that at Copper and Brass
5  there was a decline in orders?
6    A.    Exactly.
7    Q.    Was there any greater concern at Copper
8  and Brass at that point about the need to more
9  carefully service the customers and make sure their
10 quality and orders were being properly processed?
11   A.    Yes, and that always was an issue for
12 accuracy.
13   Q.    So coming back to your daily production
14 log, what information would you put on that?
15   A.    You would put the work order number and
16 the, what was -- the pieces and weight, I believe it
17 was. I don't have one in front of me, but I believe
18 it was basically the pieces and the weight --
19   Q.    Okay.
20   A.    -- that you shipped out, and then any
21 notes that went along with it, you know.
22   Q.    What type of notes would you put on it?
23   A.    Well, sometimes the orders were bent
24 metal, or sometimes you weren't able to totally

16 (Pages 61 to 64)

Page 65

1 complete an order, because it was tied up with QC,
2 meaning that it was bent or something was wrong with
3 the metal.
4       If it was bent, we were supposed to bring
5 it to the attention of the foreman, and he would
6 maybe make a decision on whether to ship it or not
7 or to DMR it.
8    Q.   DMR would mean what?
9    A.   That it's bad quality and that we really
10 shouldn't ship it. We want to put it in a
11 segregated area where they would either ship it back
12 to the mill, with the mill defects, or they would
13 just scrap it out.
14    Q.   So there was a form that you would use
15 for this daily production log, correct?
16    A.   Yes.
17    Q.   And there would be various columns for
18 the information you put on it?
19    A.   Correct.
20    Q.   And one of the columns would allow you to
21 put notes regarding the order you were processing?
22    A.   Sure. The disposition, whereas it
23 didn't, it wasn't, it wasn't shippable, it wasn't
24 good material; it was, you know, wrong alloy or if

Page 66

1 there was anything that went along, that you weren't
2 able to complete the order or process it, you would
3 write notes in there, maybe, for that effect.
4    Q.   So for example, if you were not able to
5 completely process the order, you would note that on
6 the daily production log?
7    A.   Most of the time, yes, yes. I try to
8 always note that, if I couldn't finish the order, I
9 would try to, try to usually write it down. You
10 couldn't always do it, but if it was defective, yes,
11 I would try to put that down.
12    Q.   And it was important to indicate that you
13 could not complete the processing of the order,
14 because when you were done at your shift, the next
15 shift would be taking over?
16    A.   Right, they would complete the order.
17    Q.   So they would need to know what had to be
18 done, presumably?
19    A.   Right. Sometimes we would just write
20 them a note, a separate note on the metal and say,
21 here, just PK10 it or whatever the process may be;
22 or here, the foreman's got the answer for this one.
23 You're waiting on the disposition from the foreman.
24       You try to either, either write them a

Page 67

1 note. You know, sometimes you would write it on
2 your, on your paper, you know, your production
3 sheet. You didn't always have time, then you tried
4 to relay it to the guys who would walk by.
5 Sometimes the guys would come in early, so you could
6 verbally tell them. You know, it wasn't always the
7 same process. It was sometimes a combination.
8    Q.   And you would agree, like the data
9 entered for PK10'ing, the information you put on
10 your daily production logs, it was important for it
11 to be accurate?
12    A.   As much as possible, sure.
13    Q.   It was important to be accurate, again,
14 because the next shift might have to do something,
15 right?
16    A.   Yes.
17    Q.   And also the daily production log I'm
18 assuming was also used to track inventory?
19    A.   Yes.
20       That's -- okay.
21    Q.   The RWB station, is that considered to be
22 a non-processing work station?
23    A.   Yes.
24    Q.   And the shear and saw area that you

Page 68

1 worked at before the RWB, is that considered to be a
2 processing station?
3    A.   Correct.
4    Q.   Okay. Now, you indicated, Mr. Wingo,
5 that at some point you worked shipping and
6 receiving, correct?
7    A.   Yes.
8    Q.   Who would have been your supervisor when
9 you worked shipping and receiving?
10    A.   Paul Muelefelt. I think it's
11 M-U-E-L-E-F-E-L-T. I think that's it. There may be
12 a D in there, too, I'm not sure.
13    Q.   Do you recall approximately when it was
14 that you would have worked in the shipping and
15 receiving area?
16    A.   That was roughly around '95 to 2000,
17 somewhere in there.
18    Q.   And did you ever receive any discipline,
19 while you were working in the shipping and receiving
20 area?
21    A.   No.
22    Q.   Were you ever counseled about slow
23 production in the shipping and receiving area?
24    A.   No, 'cause I basically wasn't in

17 (Pages 65 to 68)

Page 69

1  production anymore.  I was unloading trucks.
2      Q.    What's PVC?
3      A.    PVC is a process of putting plastic,
4  glued plastic, on metal, sheet metal.
5      Q.    And is there a work station that does
6  that at Copper and Brass?
7      A.    Yes.
8      Q.    Did you ever work at that work station?
9      A.    Yes.  That's where I was at when I was
10 verbally harassed.
11     Q.    By Mr. Catama?
12     A.    No, by Mr. DeMien.
13     Q.    All right.  And we're talking about the
14 end of August of 2007 --
15     A.    Correct.
16     Q.    -- when he swore at you?
17     A.    Yes, sir.
18     Q.    Okay.  Did Mr. DeMien ever complain to
19 you about your production at the PVC?
20     A.    Not that I recall.
21        Most -- I mean, the process over there
22 was you had to wait your turn for the metal.  The
23 operator that set you up -- in other words, you
24 couldn't do anything until the operator set you up.

Page 70

1  So the process was you would have to wait for the
2  operator to bring you more metal or to take away the
3  old metal.
4        It was a process.  You'd finish an order,
5  they would have to come and get it, they would have
6  to take their skid of finished metal away.  There
7  was two skids involved, they had to take them both
8  away.  Then they'd have to bring you a new metal and
9  a new blank skid, empty skid, that you would have to
10 fill with the new process order.
11       So it was a four-stage event, whenever
12 you'd finish an order over there.
13     Q.    I appreciate that, but let's come back to
14 my question.
15       Did Mr. DeMien ever complain to you or
16 counsel you about your production at the PVC?
17     A.    I don't recall.
18     MS. WEGNER:  Object, asked and answered.
19 BY MR. LINDEN:
20     Q.    Did anybody else besides -- did anyone
21 other than Mr. DeMien ever counsel you or discipline
22 you for your performance at the PVC?
23     A.    I don't recall, no.
24     Q.    Now, when you worked at the shear and saw

Page 71

1  station, did that include catching the product?
2      A.    Yes, sir.
3      Q.    When would that have been, sir?
4      A.    The shear station was an ongoing job that
5  I did for maybe the last 10 years, because it was
6  different needs.  Sometimes, sometimes it would be
7  slow on certain areas, so they would put you over
8  there, they needed a helper there.  So it was kind
9  of a need deal, where the company would kind of
10 bounce you around, as needed, you know.  If certain
11 areas were slow, they would move you to a different
12 area.
13     Q.    And while you were catching at the shear
14 station, did anybody in supervision counsel you
15 about reading the newspaper?
16     A.    No.
17     Q.    Did Randy Lunt ever offer to reassign you
18 as a helper?
19     A.    Yes.
20     Q.    When would that have been, sir?
21     A.    That was somewhere between August and
22 December --
23     Q.    Of 2000 --
24     A.    -- of 2007, after the harassment

Page 72

1  grievance and somewhere between termination.
2      Q.    All right.  So again, just so the record
3  is clear, we're talking in terms of the harassment
4  grievance.  That's the grievance where you
5  complained about Mr. DeMien swearing at you?
6      A.    Yes, sir.
7      Q.    So let's see if we can be a little bit
8  more surgically precise.
9        When was it that Mr. Lunt might have
10 offered you the helper position?
11     A.    Probably in October sometime.
12     Q.    And was this something he offered you --
13     A.    October, November.
14     Q.    So when was it that you recall Mr. Lunt
15 offering you the helper position?
16     A.    It was probably either end of October,
17 November or early December, somewhere in there;
18 right around the last month or so.
19     Q.    And is this something he offered you in
20 person?
21     A.    Yes.
22     Q.    Was anybody else present?
23     A.    I think Mark was there.
24     Q.    Mr. DeMien?

18 (Pages 69 to 72)

ROBERT G. WINGO, MAY 19, 2008

Page 73

1    A.    Mr. DeMien.
2    Q.    And where did the meeting take place?
3    A.    In Randy's office.
4    Q.    And what do you recall Mr. Lunt telling
5  you?
6    A.    That, that, you know, that they would
7  make me a general warehouse helper --
8    Q.    And what did you respond?
9    A.    -- if I made mistakes.
10         Yeah, um, I responded, saying that I
11  couldn't take it, because it was a cut in pay. It
12  was a loss of pay, and I couldn't afford to do it.
13    Q.    How much of a loss in pay?
14    A.    Like three bucks an hour.
15    Q.    And had you already been disciplined on a
16  number of occasions in the fall of last year, when
17  he had this conversation with you?
18    A.    Pertaining to discipline how?
19    Q.    Let me ask you this: You saw the
20  complaint that was filed by your attorney in this
21  case?
22    A.    Do you mean -- I'm not sure what you
23  mean.
24    Q.    The papers starting this lawsuit, did you

Page 74

1  ever see those papers?
2    A.    Probably.
3    Q.    And was everything in there accurate?
4    A.    I don't recall totally.
5    Q.    Okay. Let me ask you this: Were you
6  suspended on, on more than one occasion in the fall
7  of 2007?
8    A.    Yes.
9    Q.    You were suspended once for one day?
10    A.    Once for one day, for a cut and a half
11  order.
12         It shouldn't have been at my station, it
13  was --
14    Q.    Mr. Wingo, I'm going to have to interrupt
15  you. I'm going to ask you, again, kindly confine
16  yourself to my question. So we'll come back to my
17  question.
18         Were you suspended for one day in the
19  fall of 2007?
20    A.    Yes.
21    Q.    And were you subsequently suspended for
22  three days in the fall of 2007?
23    A.    Yes.
24    Q.    And the conversation you had with

Page 75

1  Mr. Lunt about the helper position, when did that
2  occur, relative to those two suspensions?
3    A.    Right afterwards.
4    Q.    Right after the three-day suspension?
5    A.    Yes.
6    Q.    And you were suspended in what, early
7  November of 2007 for three days?
8    A.    Yes.
9    Q.    Relative to the one-day suspension, did
10  you ever file a grievance?
11    A.    The one I told you about earlier with
12  Catama.
13    Q.    No, I'm not talking about -- you were
14  suspended for one day in the fall of 2007, right?
15    A.    Okay.
16    Q.    Did you ever file a grievance challenging
17  that one-day suspension?
18    A.    No.
19    Q.    Okay. And then you were suspended for
20  three days in November of 2007, correct?
21    A.    Yes.
22    Q.    Did you ever file a grievance challenging
23  that?
24    A.    No, I didn't file a grievance, but we

Page 76

1  verbally discussed it.
2    Q.    But regardless, you never filed a
3  grievance under the labor contract challenging that
4  three-day suspension?
5    A.    No, right, correct.
6    Q.    And before you were suspended for one day
7  in the fall of 2007, did you also receive a written
8  warning?
9    A.    Yes.
10    Q.    And did you file a grievance challenging
11  the written warning?
12    A.    No.
13    Q.    Did Mr. Lunt explain to you why he was
14  offering you the helper position?
15    A.    Yes. He said -- I offered to take a
16  lateral move job and maybe do something different,
17  and that was my suggestion to get me out of the bad
18  area for a while, because there was a lot of bad
19  orders coming my way. And I wanted to try to do
20  something different, laterally, because I couldn't
21  afford a pay cut.
22    Q.    What position did you suggest?
23    A.    Either restocking or possibly shipping
24  and receiving.

19 (Pages 73 to 76)

ROBERT G. WINGO, MAY 19, 2008

Page 77

1    Q.   And the shipping and receiving, were
2  there any vacancies in shipping and receiving?
3    A.   Yes, there was.  They had three guys over
4  there at one time and they were down to two.  And
5  actually I helped out over there on different
6  occasions, you know, here and there.  So yeah, there
7  was at one time three guys over there, and they were
8  operating at the time with two.
9    Q.   Who were the three guys that had been
10  over there?
11    A.   It was Pat Bishop, Sergio Garcia; and
12  they had different guys at different times, the
13  third guy was kind of different guys.
14    Q.   When you say, "different guys at
15  different times," I'm assuming what you possibly
16  might mean by that is the company would put somebody
17  over there on an as-needed basis?
18    A.   No, no, those were -- actually, at one
19  time they were permanent positions, they had three
20  guys there full time.
21       But the guys, some of them got out of
22  there, wanted to do something different.  For
23  various reasons different guys were shuffled around,
24  personality clashes, whatever.  Some guys were moved

Page 78

1  out of the area, and some guys were moved into the
2  area to try to work things out, you know.
3    Q.   When you say "personality clashes," who
4  was having personality clashes?
5    A.   Various employees.
6    Q.   Who in particular?
7    A.   Lance Amack had a problem with the
8  foremans and the workers over there.
9    Q.   Who was the foreman?
10    A.   At the time, it was Ray Dormo (phonetic).
11    Q.   All right.  So you indicated you had a
12  discussion with Mr. Lunt in the fall of 2007.  You
13  suggested that you make a lateral move, possibly to
14  shipping and receiving.
15       How long had this third position been
16  vacant for, at the time of this discussion?
17    A.   Off and on, you know, I mean off and on,
18  occasionally they would have a guy go over there and
19  help.  Mike Perone (phonetic) used to go over there
20  and help in that area, and then they kind of moved
21  him to another area to help alleviate the pressure
22  with the side loader operators in that one area that
23  I told you about, that they had four guys, that one
24  side loader guy was pulling for the four different

Page 79

1  stations; and so they moved Mike Perone from the
2  third bay, which is shipping and receiving.  He was
3  doing restocking over there, and they moved him into
4  the other area to help alleviate the abundance of
5  orders and pile-up.
6    Q.   So again, coming back to my question, as
7  of the time you had this conversation with
8  Randy Lunt in November of 2007, how long had that
9  third position been vacant in shipping and
10  receiving?
11    A.   It was filled on occasion with different
12  people, but I would say off and on it was like a
13  month or so that maybe it was available, maybe
14  two months where it was actually, where the guy was
15  actually assigned to do something different.  And
16  I'm not sure if he occasionally floated back there
17  to help out on a need basis.
18    Q.   All right.  So it sounds like, from what
19  you just described, the third position was being
20  filled on an as-needed basis?
21    A.   Pretty much so.  They could have probably
22  used a full-time guy, but they kind of just juggled
23  it around as needed.
24    Q.   Under the labor contract, was there a job

Page 80

1  posting provision?
2    A.   Yes.
3    Q.   And was -- and what, the company would
4  post positions for which there were vacancies?
5    A.   Yes.
6    Q.   And so when you suggested to Mr. Lunt
7  about a lateral move, as you characterized it, what,
8  if anything, was Randy Lunt's response?
9    A.   He said he'd think about it.
10    Q.   Now, you said at the time you were having
11  a lot of bad orders in the RWB area, correct?
12    A.   Yes.
13    Q.   Who else besides yourself worked in the
14  RWB area?
15    A.   Different people.  Again, you mean all
16  the shifts or do you mean day shift?
17    Q.   Just let's focus on day shift.
18    A.   Okay.  Day shift, at the last -- in the
19  fall period, we're talking about the fall period,
20  Ray Cather was a younger employee in the RBW area.
21    Q.   Anybody else?
22    A.   That was it for days, me and Ray.
23    Q.   All right.  Ray Cather, as of December of
24  2007, had been working at Copper and Brass for how

20 (Pages 77 to 80)

ROBERT G. WINGO,  MAY 19, 2008

Page 81

1 long?
2    A.   Ray had been there -- well, see, he was
3 in the Munster, Indiana plant for I think some
4 years, I'm not sure exactly how many, and then he
5 transferred to Schaumburg.  When the company moved,
6 they closed Munster, so he came to Schaumburg to
7 work for us.
8    Q.   So Mr. Cather had worked for Copper and
9 Brass at its Munster facility, which closed down?
10    A.   Correct.
11    Q.   That facility closed down what, in about
12 2001?
13    A.   Roughly.
14    Q.   Okay.  So he had been working there at
15 Schaumburg for roughly about six years, at the time
16 of your termination?
17    A.   I don't know if it was that long.  I'm
18 not sure.  I didn't -- I'm not sure of the dates and
19 times exactly there.  Roughly, yes.
20    Q.   And as of December 2007, how long had Ray
21 Cather been working with you in the RWB area?
22    A.   See, I had been doing different jobs.  I
23 had been doing catching and different stuff like
24 that, you know, and working in the PVC station, like

Page 82

1 we discussed earlier.  So I was kind of like a
2 bouncer/floater, I did different various jobs,
3 because I knew how to work a lot of different jobs.
4 So when guys would go on vacation, I would go on
5 vacation, to fill, you know, different -- I mean,
6 those guys would go on vacation, so I would fill
7 their spots for the days, because I knew how to do
8 like seven jobs, so I could help out there.  If they
9 went on vacation, I would be that guy for the week
10 or the day or whatever it would be, a lot of times.
11 I was one of the guys that was able to do that.  So
12 the company, you know, bounced you around as needed,
13 and different people -- and there was, you know, a
14 couple of other guys that were able to do different
15 jobs, too.
16    Q.   Now, are you aware, in the papers filed
17 by your attorney starting this lawsuit, you alleged,
18 among other things, that on five occasions you were
19 employee of the month?
20    A.   Yes, sir.
21    Q.   When was the last time you were employee
22 of the month, relative to your December 2007
23 termination?
24    A.   They did them in the eighties.  I don't

Page 83

1 remember all the dates on it, but they quit doing it
2 in the late eighties.  It was discontinued.
3    Q.   So last time you would have been employee
4 of the month was sometime prior to the termination
5 of the employee of the month concept in the late
6 eighties?
7    A.   Correct.
8    Q.   And who selected the employee of the
9 month?
10    A.   The plant manager.
11    Q.   It wasn't --
12    A.   And the foreman, plant manager and
13 foreman.
14    Q.   What about the rest of your employees?
15    A.   No.
16    Q.   Okay.
17    A.   It was a company decision.
18    Q.   Now, before being suspended for one day
19 and three days in the fall of 2007, had you ever
20 been suspended before?
21    A.   No, sir.
22    MR. LINDEN:  Let's mark this Exhibit 2.
23       (WHEREUPON, a certain document was
24       marked Wingo Deposition Exhibit No. 2,

Page 84

1       for identification, as of this date.)
2       (WHEREUPON, the document was
3       tendered to the witness.)
4 BY MR. LINDEN:
5    Q.   The court reporter has given you,
6 Mr. Wingo, what's marked Exhibit Number 2.  After
7 you've had a chance to review it, let me know, I'll
8 have a question or two for you regarding that.
9    A.   What was the question, sir?
10    Q.   No, I just want you to let me know when
11 you've had a chance to review Exhibit 2, and then
12 I'll have some questions for you.
13    A.   Whenever you're ready.
14    Q.   Yes.  You've had a chance to review
15 Exhibit 2?
16    A.   Yes -- hang on.
17       Yes, I have.
18    Q.   All right.  Your signature appears on
19 this?
20    A.   Yes, sir.
21    Q.   All right.  It appears in two places,
22 does it not?
23    A.   Yes.
24    Q.   It appears above "Employee Signature,"

21 (Pages 81 to 84)

**Page 85**

1 and then it appears apparently you X'd out the box
2 "I disagree with this statement," correct?
3    A.   Yes, sir.
4    Q.   And this document indicates that you were
5 being suspended one day for lack of production on
6 January 29, 1999, correct?
7    A.   That's what it says, but Randy gave me a
8 vacation day for this day.
9    Q.   Well, regardless, this document says
10 you're being suspended for a day, doesn't it?
11    A.   Yes.
12    Q.   And it indicates -- where were you
13 working, first of all, on January --
14    A.   That's a good question.
15       And it looks like it was kind of a
16 floater-type position. It was a time in '99 when
17 the economy was real bad, and there wasn't many
18 orders, and they had a big layoff around this time.
19 So there was, there was not many orders and stuff,
20 it was a slow time for the company.  They closed
21 down second and third shift.
22    Q.   And you would agree, this document
23 indicates that you have a long history of wasting
24 time, being away from your work station --

**Page 86**

1    A.   No, that's what I said.  I disagree with
2 that statement.
3    Q.   You would agree, Mr. Wingo, the document
4 says, unambiguously, that you have a long history of
5 wasting time, being away from your work station,
6 lack of production?
7    MS. WEGNER:  I'll object.  The document speaks
8 for itself.
9 BY MR. LINDEN:
10    Q.   Do you want to answer my question,
11 Mr. Wingo?
12    A.   Oh, I disagree with it.
13    Q.   Oh, it doesn't say that?
14    A.   I disagree with that, with that
15 statement.
16    Q.   But that's what the statement says that I
17 just read, doesn't it, Mr. Wingo?
18    A.   Yes, that's what it says, sure.
19    Q.   You were a member of Teamsters Local 714
20 at the time?
21    A.   Yes.
22    Q.   And your steward at the time would have
23 been Mr. LaRocco?
24    A.   Correct.

**Page 87**

1    Q.   Did you ever file a grievance challenging
2 the suspension?
3    A.   No.
4    Q.   Okay.
5    MR. LINDEN:  Let's mark this Exhibit 3.
6       (WHEREUPON, a certain document was
7       marked Wingo Deposition Exhibit No. 3,
8       for identification, as of this date.)
9       (WHEREUPON, the document was
10       tendered to the witness.)
11 BY MR. LINDEN:
12    Q.   All right, Mr. Wingo, same procedure.
13 The court reporter has handed you what has been
14 marked as Exhibit 3.  Take whatever time you need to
15 read it, let me know when you're done, and I'll have
16 a question or two regarding it.
17    A.   It doesn't have a supervisor's signature.
18    Q.   Mr. Wingo, just let me know when you're
19 done reading it.  I'm going to have some questions
20 for you about it.
21    A.   Okay.
22    Q.   You've had a chance to review it?
23    A.   Yes, sir.
24    Q.   Have you seen this document before?

**Page 88**

1    A.   No.
2    Q.   You don't recall being suspended in
3 July of 1999 by Copper and Brass?
4    A.   No.
5    Q.   Are you suggesting this document was
6 fabricated by Copper and Brass?
7    A.   There's no one that signed it.
8    Q.   Again, I'm going to ask you to answer my
9 question.  It merely calls for a yes or no.
10    A.   What's the question?
11    Q.   The question was, are you suggesting that
12 this document was fabricated by Copper and Brass?
13    A.   It's not a yes or no answer.  It's I
14 don't know, because there's no one that signed it.
15 Anyone could have wrote it.  I didn't sign it, it's
16 a -- you know.
17    Q.   Well, it's not quite accurate, when you
18 say no one signed the document.
19       Isn't Pete LaRocco's signature on the
20 bottom of the page?
21    A.   Yes, LaRocco is there, but no supervisor;
22 and myself, I did not sign it.
23    Q.   And again, I'm going to -- Mr. Wingo, I'm
24 going interrupt again.  I'm going to again ask you

Page 89

1  to please confine yourself to my question.  If you
2  have a problem doing so, let me know.
3       Pete LaRocco, in July of 1999, he was
4  your union steward?
5    A.   Correct.
6    Q.   Pete LaRocco ever have it out for you,
7  during the time you worked with him?
8    A.   I don't know.
9    Q.   How old is Pete LaRocco?
10   A.   40 something.
11   Q.   How many years did you work with Pete
12 LaRocco?
13   A.   My whole time.  Pete was the only
14 employee that was there longer than me.
15   Q.   So he started before 1984?
16   A.   Correct.  He started in 1979.
17   Q.   And he was still working there at the
18 time of your termination?
19   A.   Yes.
20   Q.   During the time you worked at Copper and
21 Brass, you received training?
22   A.   Initially, yes.
23   Q.   Well, you received training on the PK10
24 process, correct?

Page 90

1    A.   Yes.
2    Q.   And you indicated that the PK10 process
3  started 8 or 10 years prior to your termination,
4  correct?
5    A.   Yes.
6    Q.   Okay.
7       MR. LINDEN:  Let's mark this Exhibit 4, please.
8       (WHEREUPON, a certain document was
9       marked Wingo Deposition Exhibit No. 4,
10      for identification, as of this date.)
11      (WHEREUPON, the document was
12      tendered to the witness.)
13 BY MR. LINDEN:
14   Q.   Okay.  Same procedure, Mr. Wingo.  Let me
15 know once you've had a chance to review what's been
16 handed to you by the court reporter that's marked as
17 Exhibit 4.
18      You've had a chance to review Exhibit 4?
19   A.   Yes.
20   Q.   And that's an employee training log and
21 summary with your initials on it, correct?
22   A.   Yes, sir.
23   Q.   And the document in your possession
24 consists of four pages?

Page 91

1    A.   Yes.
2    Q.   What I'd like you to do, Mr. Wingo, is
3  turn to the very last page.
4    A.   Could I say one thing?
5    Q.   No.  If you're going to have additional
6  things to say, your attorney can ask you the
7  questions.
8       Why don't you turn to the last page.  And
9  it indicates, among other things, that apparently
10 you had work order instruction back in
11 September of 2000.
12      Do you see that?
13   A.   Reading work orders?
14   Q.   This would be on page 4, third one down.
15      Are you familiar with W --
16   A.   That's in '99, though.  '99, you mean?
17   Q.   '99.
18   A.   Or '98, it looks like.
19   Q.   '98.
20   A.   '98, got it.
21   Q.   Those are initials indicating you
22 received that training?
23   A.   Yes.
24   Q.   Then below that there's another work

Page 92

1  order instruction, also in '98, in April of '98.
2       That's also your initials?
3    A.   Yes, North Shore (phonetic) packing
4  instruction, yes.
5    Q.   All right.  Then further down you see
6  PK10 procedures.
7       Apparently you had training for that in
8  May of 1999?
9    A.   Verbal training in '99, yes.
10   Q.   And then apparently in February of 2000
11 you verbally reviewed reading work orders, correct?
12   A.   Yes.
13   Q.   And then towards the bottom, the last
14 one, work order instructions, verbal instructions,
15 meaning you apparently attended that, correct?
16   A.   Yes.  It was a group meeting.
17   Q.   Now, you received other training while
18 you were at Copper and Brass as well, correct?
19   A.   Yes.
20   Q.   Do you remember receiving any training or
21 attending any meetings in 2007 about work orders?
22   A.   I don't recall.
23      They're not on this sheet.
24   Q.   I'm not asking if they're on that sheet,

23 (Pages 89 to 92)

ROBERT G. WINGO, MAY 19, 2008

Page 93

1  Mr. Wingo. I'm asking you, independent of the
2  document, do you recall ever attending meetings
3  regarding work order training?
4      A.  We had some videos, I mean we had movies
5  and videos and stuff, but I don't recall if they
6  were on the work, you know, if they touched on it or
7  not. I don't recall.
8      MR. LINDEN: Let's mark this Exhibit Number 5.
9          (WHEREUPON, a certain document was
10         marked Wingo Deposition Exhibit No. 5,
11         for identification, as of this date.)
12         (WHEREUPON, the document was
13         tendered to the witness.)
14 BY MR. LINDEN:
15     Q.  Mr. Wingo, you've been handed what has
16 been marked Exhibit Number 5, which is a one-page
17 document. After you've had a chance to look at
18 that, let me know. I'll have some questions for you
19 regarding that.
20     A.  Okay, I'm ready.
21     Q.  Does that refresh your memory that you
22 attended work order training in January of 2007?
23     A.  January, yes, sir.
24     Q.  And in fact, that's your signature on

Page 94

1  this document, correct?
2      A.  Yes.
3      Q.  What do you remember about that training?
4      A.  Basically, we went over probably the PK10
5  process.
6      Q.  Anything else?
7      A.  How the work orders were set up and
8  billed and some of the technicalities of the job.
9      Q.  Okay. So the company was meeting with
10 all the first shift employees concerning work orders
11 in January of 2007, correct?
12     A.  Correct.
13     Q.  And who from the company conducted that
14 meeting, if you remember?
15     A.  Either Mark or Randy.
16     Q.  Okay. And we're talking about Randy Lunt
17 or Mark DeMien?
18     A.  Yes.
19     Q.  And did they stress how important it was
20 for you to properly prepare and process work orders?
21     A.  Yes.
22     Q.  Including PK10 data entry?
23     A.  Yes.
24     Q.  Do you remember attending any meetings in

Page 95

1  the fall of 2007, where one of the topics were
2  concerns about too many errors in paperwork?
3      A.  Yes. We were always made aware that we'd
4  try to cut the errors.
5      Q.  Again, focusing now on the fall of 2007,
6  do you remember attending any plant meetings where
7  that was discussed?
8      A.  We could have had one in there.
9      Q.  And was there any discussion at that
10 meeting about the possible disciplinary consequences
11 of having too many errors?
12     A.  Probably.
13     Q.  Do you remember if this was a meeting
14 conducted by Randy Lunt?
15     A.  I think so. I kind of recall.
16         We had various safety meetings, so I
17 don't recall the meeting, but I think so.
18     MR. LINDEN: Let's mark this Exhibit 6, please.
19         (WHEREUPON, a certain document was
20         marked Wingo Deposition Exhibit No. 6,
21         for identification, as of this date.)
22         (WHEREUPON, the document was
23         tendered to the witness.)
24 BY MR. LINDEN:

Page 96

1      Q.  All right, Mr. Wingo. You have been
2  handed what has been marked Exhibit 6, which
3  consists of a total of four pages. After you review
4  it, let me know, and I'll have a question or two
5  regarding that.
6      A.  I think we signed --
7      Q.  Hold on, hold on. Let me know when
8  you're done, and then I'm going to have some
9  questions for you, Mr. Wingo.
10     A.  Yes.
11     Q.  All right. Does this refresh your memory
12 as to your attending a meeting in November of 2007
13 where among other things discussed were repetitive
14 errors and the disciplinary consequences of those?
15     A.  The first page was not included, but I
16 believe we may have touched on these subjects.
17     Q.  Let's go to the second page.
18         Those are your initials next to your name
19 on the second page?
20     A.  Yes.
21     Q.  And so do you recall on that particular
22 day, November 6, 2007, attending some plant-wide
23 meeting?
24     A.  Yes.

24 (Pages 93 to 96)

Page 97

1    Q.   What do you remember about that
2  plant-wide meeting?
3    A.   Safety, we mainly discussed the safety
4  and the lien (phonetic). I think those were the two
5  main things that we discussed.
6    Q.   But there were other things discussed?
7    A.   There's always other things discussed.
8    Q.   Did you take any meet -- notes during
9  that meeting?
10   A.   No one did.
11   Q.   I'm asking, did you take any notes?
12   A.   No.
13   Q.   How do you know nobody took any notes
14 during that meeting?
15   A.   'Cause I saw.
16   Q.   Well, how many people attended that
17 meeting?
18   A.   What is it -- everybody on the one page,
19 so at least ten.
20   Q.   Where did that meeting take place?
21   A.   The break room.
22   Q.   Do you know if Randy Lunt had any notes
23 from that meeting?
24   A.   No, I don't think he did, because he was

Page 98

1  talking.
2    Q.   Do you know whether or not he had any
3  notes taken at that meeting or prepared for that
4  meeting or after that meeting?
5    A.   I, I didn't see him reading or anything,
6  no. I think he was just talking.
7    Q.   Again, coming back to my question, do you
8  know if Randy Lunt prepared any notes before or
9  after that meeting, pertaining to that meeting?
10   A.   He could have prepared them afterwards.
11 I didn't see him reading anything at the time.
12   Q.   So you don't whether or not Randy Lunt
13 had notes that he prepared before or after that
14 meeting, do you?
15   A.   No, because he was just standing up there
16 talking.
17   Q.   What are repetitive errors?
18   A.   Errors that you make again. Almost every
19 error in the place is repetitive, to some extent,
20 because --
21   Q.   Were you ever disciplined for repetitive
22 errors?
23   A.   Yes.
24   Q.   Were any other employees ever disciplined

Page 99

1  for repetitive errors?
2    A.   I don't know.
3    Q.   There were work rules at Copper and
4  Brass?
5    A.   Yes.
6    Q.   Did you ever receive any copies of the
7  work rules?
8    A.   Yes.
9    Q.   And the work rules, there were different
10 categories of work rules?
11   A.   Yes.
12   Q.   There's a categories A, B, C, and D,
13 correct?
14   A.   Correct, yes.
15   Q.   And D was considered to be the most
16 serious work rule to be violated?
17   A.   Possibly. I think so.
18   Q.   If you violated work rule D, could that
19 subject you to immediate termination?
20   A.   Is that the one? I don't have total
21 recall on the rules, but it could be.
22   Q.   When was the last time you saw the work
23 rules at Copper and Brass?
24   A.   You know, I was never in trouble, so I

Page 100

1  really didn't read them a lot. I just did the right
2  thing out there.
3    Q.   Let's come back to my question again.
4        When was the last time you saw the work
5  rules at Copper and Brass?
6    A.   We didn't always get a copy of the
7  contract. You know, if you asked for it, you got
8  one. They didn't always give them to us after the
9  contract signing, so I didn't always have one. So I
10 didn't read them for a while.
11   Q.   All right. Again, let's come back to my
12 question for the third time.
13        When was the last time you saw the work
14 rules at Copper and Brass?
15   A.   Around the time of my -- in the fall of
16 2007.
17   Q.   Okay. Now, I'm kind of curious as to
18 your statement that you were never in trouble at
19 Copper and Brass.
20   A.   Yes. I lasted 24 years there.
21   Q.   Okay. During that 24-year period, would
22 you agree that you were disciplined on more than one
23 occasion?
24   A.   Over 24 years, probably.

Page 101

1  Q.   Would you agree that you were disciplined
2  more than ten times while you were employed at
3  Copper and Brass?
4  A.   No.  I doubt it.
5  Q.   Okay.  How does your disciplinary record
6  compare to other employees at Copper and Brass?
7  A.   Well, I lasted 24 years, so in comparison
8  to other employees, it was excellent.
9  Q.   Well, let's ask about you now, sir, about
10 other people's disciplinary records.
11      While you were employed at Copper and
12 Brass, did you have access to any other employees'
13 personnel files?
14 A.   No.
15 Q.   Have you ever reviewed any other
16 employee's personnel file?
17 A.   No.
18 Q.   Okay.  So how do you know that your
19 disciplinary record, in comparison to other
20 employees, was better than theirs?
21 A.   Because while I worked there, there was
22 nearly 300 people that were fired or let go in some
23 capacity, both sales and warehouse.  I lasted
24 24 years, so I would consider my tenure excellent,

Page 102

1  in comparison to the two or 300 that were let go.
2  Q.   Let's explore your speculation a little
3  bit further.
4       I believe you indicated that Pete LaRocco
5  was employed at Copper and Brass longer than you?
6  A.   30 years, yes, roughly.
7  Q.   How does your disciplinary record at
8  Copper and Brass compare with Pete LaRocco's?
9  A.   Meaning what area?
10 Q.   Discipline.  Do you know what I mean by
11 discipline, sir?
12 A.   Well, Pete was probably suspended and had
13 more issues than me, over the long haul.  Pete was
14 always in trouble with his point system,
15 absenteeism, whereas I had nearly perfect attendance
16 in 24 years, Pete had ongoing problems with
17 attendance.
18 Q.   Let's separate further.  Separate and
19 apart from attendance -- we'll come back to your
20 professed knowledge about Mr. LaRocco's attendance
21 record in a moment.
22      Separate and apart from attendance, do
23 you know if Pete LaRocco was ever disciplined as
24 frequently as you for non attendance-related

Page 103

1  offenses?
2  A.   I would imagine much more.  I don't know
3  the exact details.  I know he did serve some
4  suspensions for absenteeism and different things.
5  Q.   Again, we're not talking about
6  absenteeism, sir.
7  A.   I thought that's what you said.  Sorry.
8  Q.   Why don't you kind of listen to my
9  question, as opposed to wanting to hear the question
10 you want to answer.
11      So my question was, focusing on
12 Mr. LaRocca now, separate and apart from attendance,
13 do you know if he was ever disciplined for any
14 nonattendance-related discipline?
15 A.   Probably, but I don't recall the exact
16 time or place.
17 Q.   Let's talk about probably, because that
18 sounds like speculation.
19      Do you know for a fact whether Pete
20 LaRocco was ever disciplined for something
21 unrelated -- let me finish my question, sir.
22      Do you know if Pete LaRocco was ever
23 disciplined for a nonattendance-related offense?
24 A.   I don't know.

Page 104

1  Q.   Okay.
2  MR. LINDEN:  Let's take a break for a moment.
3      (WHEREUPON, a recess was had.)
4  MR. LINDEN:  All right, let's mark this
5  Exhibit 7, please.
6      (WHEREUPON, a certain document was
7      marked Wingo Deposition Exhibit No. 7,
8      for identification, as of this date.)
9      (WHEREUPON, the document was
10     tendered to the witness.)
11 BY MR. LINDEN:
12 Q.   All right, Mr. Wingo.  The court reporter
13 has handed you what's been marked Exhibit 7, which,
14 for purposes of identification, is the complaint
15 that was filed on your behalf.
16      Why don't you take a moment or two just
17 to review it.  For right now, I'm probably just
18 going to have a couple of questions concerning it.
19      And to save us a little time, Mr. Wingo,
20 all you need to do for right now is kind of quickly
21 familiarize yourself.  I'm not going to have any
22 very specific questions about it, so --
23 A.   Okay.
24 Q.   Again, Mr. Wingo, just in the interest of

26 (Pages 101 to 104)

ROBERT G. WINGO, MAY 19, 2008

Page 105

1  time --
2      A.   Give me another 30 seconds.
3      Q.   I really don't have any very specific
4  question.  It should take about 30 seconds.
5      A.   Okay, but this is kind of important stuff
6  here, though.
7          Okay.
8      Q.   So you've had a chance to kind of quickly
9  review Exhibit 7, which is the complaint filed on
10  your behalf?
11      A.   Yes, sir.
12      Q.   Have you seen that document before?
13      A.   Yes.
14      Q.   Okay.  And is there anything in there
15  that is not accurate?
16      A.   No.  I think it's pretty good, except for
17  there was a couple of names that were omitted from
18  number 12.
19      Q.   Okay.  What names were omitted from
20  number 12?
21      A.   Lizardo, Hernandez, and Ray Cather.
22          Lizardo, you want me to spell that?
23  It's just how it sounds, actually.
24      Q.   L-I-Z-A-R-D-O?

Page 106

1      A.   Correct, Hernandez.
2      Q.   And Ray Cather?
3      A.   Cather with a C.
4      Q.   So other than those two additions, the
5  complaint otherwise is accurate?
6      A.   I believe so.
7      Q.   Okay.  All right.  So let me ask you
8  this: Do you know, do you recall working with a
9  gentleman named Scott Orsic?
10      A.   Yes.
11      Q.   Who was Scott Orsic?
12      A.   Scott Orsic was plant manager maybe
13  10 years ago, before Randy Lunt.
14      Q.   And did Mr. Orsic ever discipline you?
15      A.   Possibly.
16      Q.   Do you remember what he might have
17  possibly disciplined you for?
18      A.   I'm not sure.
19      Q.   Let's --
20      A.   I was there for 24 years.  It's hard to
21  have total recall.
22      MR. LINDEN:  Let's mark this Exhibit Number 8,
23  please.
24          (WHEREUPON, a certain document was

Page 107

1          marked Wingo Deposition Exhibit No. 8,
2          for identification, as of this date.)
3          (WHEREUPON, the document was
4          tendered to the witness.)
5  BY MR. LINDEN:
6      Q.   You've been handed what has been marked
7  Exhibit Number 8.
8          Have you ever seen that document before?
9      A.   Yeah.
10      Q.   And in fact --
11      A.   I don't agree with it, but yes.
12      Q.   That's your handwriting at the bottom of
13  the page, is it not?
14      A.   Yes, sir.
15      Q.   With your initials, R.W.?
16      A.   Yes.
17      Q.   And this was discipline given to you by
18  Mr. Orsic, correct?
19      A.   Yes.
20      Q.   And what position did you hold at the
21  time?
22      A.   I believe I was shipping and receiving.
23      MR. LINDEN:  Let's mark this Exhibit 9.
24          (WHEREUPON, a certain document was

Page 108

1          marked Wingo Deposition Exhibit No. 9,
2          for identification, as of this date.)
3          (WHEREUPON, the document was
4          tendered to the witness.)
5  BY MR. LINDEN:
6      Q.   All right.  Exhibit 9 is discipline you
7  were given in May of 1999, correct?
8      A.   What was the -- oh, letter of counsel?
9  Okay.
10      Q.   Do you recall receiving Exhibit Number 9?
11      A.   Is this -- yes, yes.
12      Q.   All right.  So you were given that back
13  in May of 1999, correct?
14      A.   Yes.
15      Q.   And it was given to you by Mr. Lunt?
16      A.   Correct.
17      Q.   What position did you hold at the time
18  you received this?
19      A.   I don't totally remember.  It could've
20  been -- '99, it could have -- oh, man, could have
21  been just packing sheet.  And I'm not sure where it
22  is.  Actually, he didn't say.
23      Q.   Okay.  Mr. Lunt notes in this counseling
24  that you need to improve your following of the

27 (Pages 105 to 108)

Page 109

1 corporate packing and PK10 procedures, correct?
2    A.    Yes.
3    Q.    And he also wrote that you've been
4 trained and retrained, correct?
5    A.    Yes.
6    Q.    And your response on this document was
7 "200 orders a week, I'm not perfect," correct?
8         That's your writing?
9    A.    Yes.
10    Q.    Okay. Did you file a grievance
11 challenging this?
12    A.    Basically, a verbal grievance with Randy,
13 where we discussed the whole thing. I told him I
14 was doing 200 orders a week, that I wasn't going to
15 get them all correct every time.
16    Q.    Did you file a written grievance, under
17 the labor contract, challenging this discipline?
18    A.    No.
19    MR. LINDEN: Let's mark that 10, please.
20         (WHEREUPON, a certain document was
21         marked Wingo Deposition Exhibit No. 10,
22         for identification, as of this date.)
23         (WHEREUPON, the document was
24         Tendered to the witness.)

Page 110

1 BY MR. LINDEN:
2    Q.    All right. Mr. Wingo, you've been handed
3 what has been marked Exhibit 10, which is an
4 employee report form, dated June 15th, 1999,
5 addressed to you.
6         Do you recall receiving this?
7    A.    Yes.
8    Q.    Okay. And that's your signature above
9 the employee signature?
10    A.    Yes.
11    Q.    And you also indicated you disagreed with
12 the statement, and you gave your explanation,
13 correct?
14    A.    Yes.
15    Q.    Did you ever file a written grievance,
16 under the labor contract, challenging this
17 discipline?
18    A.    No. I just let Randy know that this
19 scale wasn't always working properly, and we tried
20 to --
21    Q.    All right, but coming back to my
22 question, so the record's clear, you never filed a
23 written grievance under the labor contract
24 challenging this discipline?

Page 111

1    A.    No.
2    Q.    And this was given to you by Randy Lunt,
3 correct?
4    A.    Yes.
5    Q.    And this was a verbal warning for
6 repetitive errors, correct?
7    A.    Yes, which only means the second
8 mistake --
9    Q.    I'm going to ask you to kindly confine
10 yourself to my question, sir.
11    A.    Okay.
12    MR. LINDEN: Let's mark this Exhibit 11.
13         (WHEREUPON, a certain document was
14         marked Wingo Deposition Exhibit No. 11,
15         for identification, as of this date.)
16         (WHEREUPON, the document was
17         tendered to the witness.)
18 BY MR. LINDEN:
19    Q.    So you've been handed what has been
20 marked Exhibit 11, which is an employee report form
21 dated January 10, 2001.
22         Do you recall receiving this?
23    A.    Yes.
24    Q.    Was James Dunne ever your supervisor?

Page 112

1    A.    Yes.
2    Q.    Where were you working at the time in
3 January of 2001?
4    A.    As an order clerk.
5    Q.    And according to this document, this got
6 changed from a written warning to an oral warning,
7 correct?
8    A.    Yes.
9         Oh, wait, it was, it was oral.
10    Q.    Well, sir, you see at the bottom of the
11 page, where it says "Changed to verbal"?
12    A.    Nobody signed it, nobody dated it. I
13 don't know who could have wrote that.
14    Q.    Let me ask you this, sir, since you seem
15 to be speculating about the document.
16         You see, first of all, above your
17 signature it says, "Written Warning," with an X in
18 it?
19    A.    Yes.
20    Q.    And then it's circled and written
21 "deleted"?
22    A.    Yes.
23    Q.    And then above it, there's an X in the
24 "Oral Warning" box, correct?

ROBERT G. WINGO, MAY 19, 2008

Page 113

1    A.   Correct.
2    Q.   Okay.
3    A.   Somebody could have added that later,
4  though. It's kind of vague.
5    Q.   Do you know that for a fact, sir?
6    A.   I don't know, no, but it wasn't there the
7  first time I signed it.
8    Q.   But regardless, you don't know when it
9  was done and who did it?
10   A.   I don't know, right.
11   Q.   Okay.
12   MR. LINDEN:  Let's mark this 12, please.
13     (WHEREUPON, a certain document was
14     marked Wingo Deposition Exhibit No. 12,
15     for identification, as of this date.)
16     (WHEREUPON, the document was
17     tendered to the witness.)
18 BY MR. LINDEN:
19   Q.   You've been handed what has been marked
20 as Exhibit 12, which is a memo to you from
21 Jim Dunne, dated February 12, 2001.
22   A.   Okay.
23   Q.   Have you ever seen that document before?
24   A.   One of the work orders I didn't even

Page 114

1  sign.
2    Q.   That's not my question, sir. I'm asking
3  you for the last time, and then I'm going to
4  terminate the deposition, because of your continuing
5  unwillingness to be responsive to my questions.
6     My question, very simply, to you,
7  Mr. Wingo, is:  With respect to Exhibit 12, which is
8  a February 12, 2001 memo addressed to you from
9  Jim Dunne, have you ever seen that before?
10   A.   I didn't sign this. I don't recall.
11   Q.   You don't recall ever receiving it?
12   A.   No.
13     Usually we sign them when we receive
14 them.
15   Q.   So is it possible that you received it?
16   MS. WEGNER:  I object, calls for speculation.
17 Asked and answered.
18 BY MR. LINDEN:
19   Q.   Do you want to answer my question,
20 Mr. Wingo?
21   A.   I thought she did. I'm sorry.
22   Q.   No, I'm not examining her today, I'm
23 examining you.
24   A.   Okay.

Page 115

1     Could you rephrase it, please.
2    MR. LINDEN:  You want to read back my question.
3     (WHEREUPON, the record was read
4     by the reporter.)
5    MS. WEGNER:  Same objections.
6  BY THE WITNESS:
7    A.   I don't get it.
8     Do I have to answer?
9  BY MR. LINDEN:
10   Q.   Yes, you do.
11   A.   I didn't sign it. I don't know.
12   Q.   Okay. Let's see if I can help you out.
13   MR. LINDEN:  Let's mark this Exhibit 13.
14     (WHEREUPON, a certain document was
15     marked Wingo Deposition Exhibit No. 13,
16     for identification, as of this date.)
17     (WHEREUPON, the document was
18     tendered to the witness.)
19 BY MR. LINDEN:
20   Q.   All right. What's been put in front of
21 you, Mr. Wingo, has been marked Exhibit 13 by the
22 court reporter -- and I'd appreciate if you'd take a
23 look at it -- which is another copy of Exhibit 12,
24 the February 12, 2001 memo addressed to you. This

Page 116

1  one has some writing on it.
2     Is that your handwriting on this
3  document?
4    A.   This one I saw.
5    Q.   You're talking about Exhibit 13?
6    A.   Correct.
7    Q.   Is that your handwriting on that
8  document?
9    A.   Yes, sir.
10   Q.   Is there anybody else's handwriting on
11 that document?
12   A.   No.
13   Q.   So you would agree with me, since there's
14 handwriting on Exhibit 13, your handwriting,
15 obviously, you received a copy of Exhibit 13?
16   A.   Okay.
17   Q.   I'm not asking okay. Let's come back to
18 my question.
19   MR. LINDEN:  And would you please read back my
20 question.
21     (WHEREUPON, the record was read
22     by the reporter.)
23 BY THE WITNESS:
24   A.   Yes.

29 (Pages 113 to 116)

ROBERT G. WINGO, MAY 19, 2008

Page 117

1 BY MR. LINDEN:
2    Q.   Did you ever file a written grievance,
3 under the labor contract, challenging this memo
4 issued to you?
5    A.   Just what I wrote on the work order.
6    Q.   All right, but again, try to answer my
7 question.  My question was --
8    A.   No.
9    Q.   Let me ask the question, Mr. Wingo.
10      Did you ever file a written grievance,
11 under the labor contract, challenging your being --
12 your receiving Exhibit 13?
13   A.   Not an official grievance.
14   Q.   Let's come back again to my question.
15   A.   No.
16   Q.   Did you ever file -- let me ask the
17 question, Mr. Wingo.  And in a minute my patience is
18 about to run out on this, and we're just going to
19 terminate the deposition.
20      My question is very simple, and again, if
21 you don't understand my question, let me know.  My
22 question is, did you ever file a written grievance
23 under the labor contract, challenging your receipt
24 of Exhibit 13?

Page 118

1    A.   No.
2    MR. LINDEN:  Let's mark this Exhibit 14,
3 please.
4       (WHEREUPON, a certain document was
5       marked Wingo Deposition Exhibit No. 14,
6       for identification, as of this date.)
7       (WHEREUPON, the document was
8       tendered to the witness.)
9 BY MR. LINDEN:
10   Q.   You've been handed by the court reporter,
11 Mr. Wingo, what has been marked Exhibit 14, which is
12 a November 7, 2001 letter of counsel addressed to
13 you.
14      Have you seen this document before?
15   A.   Yes.
16   Q.   Is that your signature?
17   A.   Yes.
18   MR. LINDEN:  Let's mark this Exhibit 15.
19      (WHEREUPON, a certain document was
20      marked Wingo Deposition Exhibit No. 15,
21      for identification, as of this date.)
22      (WHEREUPON, the document was
23      tendered to the witness.)
24 BY MR. LINDEN:

Page 119

1    Q.   You've been handed what has been marked
2 Exhibit 15, Mr. Wingo, which is an employee report
3 form, dated October 1, 2002, addressed to you.
4       Have you seen this before?
5    A.   Yes.
6    Q.   That's your signature at the bottom?
7    A.   Yes.
8    Q.   And this was discipline issued to you by
9 Mr. Dunne in October of 2002, correct?
10   A.   Yes.
11   Q.   And it's for repetitive errors in filling
12 out production sheets, correct?
13   A.   Yes.
14   Q.   Where were you working at the time you
15 received this?
16   A.   '02, I was probably packing sheet and
17 sheared items and RBW cut items.
18   MR. LINDEN:  Let's mark this Exhibit 16,
19 please.
20      (WHEREUPON, a certain document was
21      marked Wingo Deposition Exhibit No. 16,
22      for identification, as of this date.)
23      (WHEREUPON, the document was
24      tendered to the witness.)

Page 120

1 BY MR. LINDEN:
2    Q.   You've been handed what has been marked
3 Exhibit 16 by the court reporter.
4       Have you seen this document, Mr. Wingo?
5    A.   Yes.
6    Q.   Is that your signature on this document,
7 sir?
8    A.   Yes.
9    Q.   Okay.  Switching gears for a second here,
10 talking about the collective bargaining agreement
11 with your union and the work rules, I believe you
12 indicated that on at least one occasion you received
13 copies of those documents?
14   A.   Yes.
15   MR. LINDEN:  Let's mark this Exhibit 17,
16 please.
17      (WHEREUPON, a certain document was
18      marked Wingo Deposition Exhibit No. 17,
19      for identification, as of this date.)
20      (WHEREUPON, the document was
21      Tendered to the witness.)
22 BY MR. LINDEN:
23   Q.   You've been handed by the court reporter
24 what she has marked as Exhibit 17, which is a

30 (Pages 117 to 120)

ROBERT G. WINGO, MAY 19, 2008

Page 121

1 receipt that you signed.
2          Is that your signature on this
3 document --
4      A.   Yes, sir.
5      Q.   -- Mr. Wingo?
6          And this acknowledges that you received a
7 copy of the 2003 through 2006 labor contract --
8      A.   Yes.
9      Q.   -- as well as a copy of the work rules,
10 correct?
11     A.   Yes.
12     Q.   Okay. Were you ever involved in
13 negotiations of the labor contract?
14     A.   Just on the team to prepare it.
15     Q.   When would that have been, sir?
16     A.   In the past. I don't recall which years.
17     Q.   Would -- go ahead.
18     A.   In the earlier days we all, you know -- I
19 wasn't on the actual negotiating team, no.
20     MR. LINDEN: Let's mark this Exhibit 18,
21 please.
22          (WHEREUPON, a certain document was
23          marked Wingo Deposition Exhibit No. 18,
24          for identification, as of this date.)

Page 122

1          (WHEREUPON, the document was
2          tendered to the witness.)
3
4 BY MR. LINDEN:
5      Q.   You've been handed by the court reporter
6 what has been marked as Exhibit 18, which is a memo
7 dated April 24, 2003 to all employees, from
8 Jim Dunne.
9          Have you seen this document before, sir?
10     A.   Yes.
11     Q.   That's your signature on this document?
12     A.   Yes.
13     Q.   Were you familiar about the concept, it's
14 about adding value, at Copper and Brass?
15     A.   Could you explain what you mean?
16     Q.   Have you ever heard the term, "it's about
17 value," during the time you were employed at Copper
18 and Brass?
19     A.   Probably.
20     Q.   Okay. And in what context did you hear
21 that term?
22     A.   To try to get the accuracy of the orders
23 as much as possible.
24     Q.   And did you receive any training about

Page 123

1 that?
2      A.   We, we reviewed the work orders to try to
3 make sure everybody was on the same page. They had
4 changed some policies, so we had to, you know, be
5 brought up to speed with some of the changes.
6      Q.   Do you recall ever seeing a video about
7 "It's About Adding Value"?
8      A.   Don't totally recall that one. I could
9 have been absent that day, I'm not sure. I don't
10 really remember that one, specifically.
11     MR. LINDEN: Let's mark this Exhibit 19,
12 please.
13          (WHEREUPON, a certain document was
14          marked Wingo Deposition Exhibit No. 19,
15          for identification, as of this date.)
16          (WHEREUPON, the document was
17          tendered to the witness.)
18 BY MR. LINDEN:
19     Q.   You've been handed by the court reporter
20 what's been marked as Exhibit 19, which is a sign-in
21 sheet for an August 27, 2003 viewing of the video
22 "It's About Adding Value."
23          Does this refresh your memory that you
24 attended such a video?

Page 124

1      A.   Yes, I was there.
2      Q.   In fact, number 6 is your signature on
3 the sign-in sheet, correct?
4      A.   Yes, sir.
5      Q.   Okay.
6      A.   I just didn't recall the name of the
7 movie.
8      MR. LINDEN: Let's mark this Exhibit 20,
9 please.
10          (WHEREUPON, a certain document was
11          marked Wingo Deposition Exhibit No. 20,
12          for identification, as of this date.)
13          (WHEREUPON, the document was
14          tendered to the witness.)
15 BY MR. LINDEN:
16     Q.   All right. You have been handed,
17 Mr. Wingo, what has been marked Exhibit 20, which is
18 a September 22, 2003 employee report form addressed
19 to you.
20          Do you recall receiving this?
21     A.   Can you give me a minute to review?
22     Q.   Sure. Take whatever time you need.
23     A.   Yes.
24     Q.   All right. That's your signature at the

31 (Pages 121 to 124)

ROBERT G. WINGO, MAY 19, 2008

Page 125

1  bottom?
2    A.  Yes, sir.
3    Q.  And this was issued to you by Mr. Lunt?
4    A.  Yes.
5    Q.  And this was for repetitive work orders,
6  correct?
7    A.  Yes.
8    Q.  And your response was, "First error in
9  five years, sorry.  Will watch closer," correct?
10    A.  Yes.
11    Q.  Now, I gather from some of the documents
12  we've already reviewed that, by and large, when you
13  got this discipline, you were more or less unwilling
14  to accept responsibility; is that correct?
15    A.  Not really.  I realize I'm not perfect, I
16  make mistakes.
17    Q.  And so your response to this particular
18  one was, you hadn't had an error in five years?
19    MS. WEGNER:  Object.  The document speaks for
20  itself, and asked and answered.
21  BY MR. LINDEN:
22    Q.  You have to answer the question.
23    A.  Oh, I thought she did.
24    Q.  I know you're listening to her.

Page 126

1    MR. LINDEN:  Want to read back the question,
2  please.
3    (WHEREUPON, the record was read
4    by the reporter.)
5    MS. WEGNER:  Same objections.
6  BY THE WITNESS:
7    A.  I'm not perfect, I make some mistakes, I
8  admit it.  I mean this was obviously one that
9  happened, and I don't know the circumstances.
10    The one that you handed me a while ago, I
11  didn't even sign it.  It wasn't even my work order,
12  and it was stapled together with mine.  I didn't
13  even do that order.
14  BY MR. LINDEN:
15    Q.  Well, again, Mr. Wingo, let's see if we
16  can stay focused.
17    A.  I'm trying to say yes or no, but
18  sometimes they don't apply to me.  It's someone
19  else's work, and I don't want to take credit
20  or blame for someone else's work.
21    Q.  Let's stay focused or talk -- we're now
22  talking about this particular exhibit.
23    A.  Okay.
24    Q.  You've acknowledged you wrote on the

Page 127

1  discipline that it was your first error in five
2  years, sorry, will watch closer.
3    A.  I was being sarcastic.
4    Q.  You were being sarcastic in your
5  response?
6    A.  Yes.
7    Q.  Did you ever file a written grievance,
8  under the labor contract, challenging this written
9  warning that you were given?
10    A.  No.
11    Q.  This was, this was given to you by
12  Mr. Lunt?
13    A.  Yes.
14    Q.  Okay.  Where were you working at the time
15  that you were given this?
16    A.  It's hard to say.  I mean I was -- I had
17  many various jobs.  I'm thinking this was probably
18  still at the shear sheet and RBW packing station.
19  This was a packing station, probably.
20    I was packing 40 orders a day, so
21  sometimes I made mistakes.
22    Q.  Mr. Wingo, I'm going to ask you to please
23  wait until I pose a question.  Thanks.
24    MR. LINDEN:  Let's mark this Exhibit 21,

Page 128

1  please.
2    (WHEREUPON, a certain document was
3    marked Wingo Deposition Exhibit No. 21,
4    for identification, as of this date.)
5    (WHEREUPON, the document was
6    Tendered to the witness.)
7  BY MR. LINDEN:
8    Q.  All right.  Mr. Wingo, you've been handed
9  what's marked as Exhibit 21, which is an employee
10  report form, dated September 22, 2004, addressed to
11  you, which is a written warning.
12    Does your handwriting appear anywhere on
13  this document?
14    A.  Yes.
15    Q.  Where would we find it, sir?
16    A.  In the employee's response.
17    Q.  And what was your response?
18    A.  I disagreed with the punishment of
19  three days, because I do 100 to 150 orders a week,
20  and there was 99 percent accuracy.  And I felt it
21  was a little rough, considering that I did so many
22  orders, a high volume of orders, that they would
23  take issue with the one or two that I got wrong.
24    Q.  Where were you working at the time you

32 (Pages 125 to 128)

Page 129

1  received this?
2      A.   I said already that I was at, probably at
3  one of the packing stations.
4      Q.   And you weren't issued a suspension at
5  this time, correct, it was actually a, issued a
6  written warning?
7      A.   Yes, sir.
8      Q.   Did you file a written grievance
9  challenging this written warning?
10     A.   No, I didn't.
11     Q.   You wrote an explanation, yet you refused
12  to sign it, correct?
13     A.   Yes.
14     Q.   And this was issued to you by Mr. DeMien,
15  correct?
16     A.   Yes.
17     Q.   So Mark DeMien was supervising you at
18  least as far back as September of 2004?
19     A.   Yes, sir.
20     Q.   But you didn't have any problems with
21  Mark DeMien until August of 2007, correct?
22     A.   Correct.
23     MR. LINDEN:   Let's please mark this Exhibit 22.
24     (WHEREUPON, a certain document was

Page 130

1      marked Wingo Deposition Exhibit No. 22,
2      for identification, as of this date.)
3      (WHEREUPON, the document was
4      tendered to the witness.)
5  BY MR. LINDEN:
6      Q.   Okay.  Sir, you have been handed what has
7  been marked Exhibit 22, which is an employee report
8  form dated May 11, 2005, addressed to you.  It's an
9  oral warning.
10     Have you seen this document before, sir?
11     A.   Yes.
12     Q.   And does any of your writing appear on
13  this document?
14     A.   Yes, sir.
15     Q.   Where would it be?
16     A.   In the middle.
17     Q.   Under "Employee Statement"?
18     A.   Yes, sir.
19     Q.   Okay.  And this was a verbal warning
20  given to you by Randy Lunt for excessive repetitive
21  work order errors, correct?
22     A.   Yes.
23     Q.   And your explanation was what, sir, in
24  response to getting this?

Page 131

1      A.   That I did 175 work orders a week, and
2  sorry if I will make -- if I made some mistakes.
3      Q.   Did you file a written grievance, under
4  the labor contract, challenging getting this
5  written -- not written, oral warning?
6      A.   No.
7      Q.   And in May of 2005, do you recall where
8  you would have been working at the time?
9      A.   That could have either still been the
10  previous packing area that we talked about or the
11  RBW area.  I wasn't real sure on which one that was.
12     (WHEREUPON, the deposition
13     was recessed until 1:10 p.m.,
14     this date.)
15     MR. LINDEN:   Let's go back on the record,
16  please.
17  BY MR. LINDEN:
18     Q.   Now, as I understand your claim in this
19  case, Mr. Wingo, you're claiming that the company
20  discriminated against you on the basis of your age,
21  correct?
22     A.   Yes, yes, sir.
23     Q.   And you're claiming, among other things,
24  they terminated you because of your age, correct?

Page 132

1      A.   Yes.
2      Q.   And you're also claiming that in the fall
3  of 2007 they disciplined you because of your age?
4      A.   Yes.
5      Q.   Okay.  Who is it at the company you're
6  claiming decided to terminate you because of your
7  age?
8      A.   I'm not sure exactly who the main ones
9  were or if it was three people.  You know, my
10  bosses, that's all I know.  Randy Lunt.
11     Q.   You said "three people."
12     Who could the three people possibly have
13  been?
14     A.   Mark DeMien, the day shift foreman;
15  Randy Lunt, the plant supervisor; and I don't know
16  who else, actually.
17     Q.   All right.
18     Do you know who actually made the
19  decision to terminate you?
20     A.   No.
21     Q.   Do you know how old Randy Lunt is?
22     A.   Yeah, he's my age.
23     Q.   So he's what, roughly 54 years old?
24     A.   Yes.

ROBERT G. WINGO, MAY 19, 2008

## Page 133

1   Q.   And Mark DeMien, I think you indicated
2 before, is in his 40s?
3   A.   Correct.
4   Q.   And as of the time you were terminated in
5 December 2007, how long had Randy Lunt been the
6 plant manager at Schaumburg for?
7   A.   Approximately 10 years.
8       I trained him when he came in.
9   Q.   And other than what you have alleged in
10 your complaint, what other evidence do you have to
11 support your claim that you were terminated because
12 of your age?
13   A.   Well, other, younger employees were
14 allowed to break company rules, talk on cell phones,
15 talk whenever they wanted, sit at their station and
16 not do any work; things along that line.
17   Q.   But you weren't terminated because you
18 were talking on your cell phone, were you?
19   A.   No, but they have made excessive errors,
20 and that's what I was basically, you know, put on
21 the ropes for. I mean that's what I had my
22 three-day suspension for.
23   Q.   Well, let me ask you this: You're
24 familiar with the work rules?

## Page 134

1   A.   Yes.
2   Q.   And there's a work rule pertaining to
3 falsifying company documents?
4   A.   Correct.
5   Q.   Okay. That's a work rule subject to
6 immediate termination, correct?
7   A.   Yes.
8   Q.   Okay. Excessive errors, that's a
9 different work rule, right?
10   A.   Yes.
11   Q.   Okay. And there's progressive discipline
12 that would be subject to that?
13   A.   Yes.
14   Q.   And you'd only get discharged after being
15 disciplined for the fourth time for that, correct?
16   A.   Okay, sure. Yes.
17   Q.   Okay.
18   MR. LINDEN: Let's mark this Exhibit 23, if we
19 could, please.
20       (WHEREUPON, a certain document was
21       marked Wingo Deposition Exhibit No. 23,
22       for identification, as of this date.)
23       (WHEREUPON, the document was
24       tendered to the witness.)

## Page 135

1 BY MR. LINDEN:
2   Q.   Mr. Wingo, you have been handed what has
3 been marked Exhibit 23, which is an employee report
4 form dated 12/1/05, to you, from Mark DeMien.
5       Excuse me for a minute.
6   MR. LINDEN: We're going to have to go off the
7 record.
8       (Telephone interruption.)
9 BY MR. LINDEN:
10   Q.   All right. Sorry about the interruption.
11       So you now have in front of you, in your
12 hand, Exhibit 23.
13       Have you seen this document before?
14   A.   Yes.
15   Q.   And that's your handwriting under, "I
16 disagree with statement"?
17   A.   Yes.
18   Q.   Did you ever file a written grievance
19 relative to this discipline?
20   A.   No.
21   Q.   And Mark DeMien gave you this discipline?
22   A.   Yes.
23   Q.   And were you working at the RBW area at
24 the time --

## Page 136

1   A.   No, this was at the PVC machine.
2   Q.   Okay. Where is the PVC machine relative
3 to the RBW area?
4   A.   Opposite side of the building. One's in
5 the front by the receiving doors, and one's in the
6 back of the building, on the opposite side.
7   Q.   Is theft a dischargeable offense at
8 Copper and Brass?
9   A.   I think so.
10   Q.   And is theft an offense that you could be
11 terminated for the first occurrence?
12   A.   Yes.
13   Q.   Were you ever accused of any theft?
14   A.   No.
15   Q.   Did anybody ever accuse you of taking
16 company property without permission?
17   A.   No, just -- the only things were like
18 wood, but Randy okayed all that. He always said I
19 could take the firewood.
20   MR. LINDEN: Let's mark this as Exhibit 24,
21 please.
22       (WHEREUPON, a certain document was
23       marked Wingo Deposition Exhibit No. 24,
24       for identification, as of this date.)

34 (Pages 133 to 136)

ROBERT G. WINGO, MAY 19, 2008

Page 137

1    (WHEREUPON, the document was
2        tendered to the witness.)
3 BY MR. LINDEN:
4    Q.   You've been handed by the court reporter
5 what has been marked Exhibit 24, which is, for
6 purposes of identification, is an employee report
7 formed dated March 28, 2006, addressed to you from
8 Mark DeMien.
9        Have you ever seen this document before?
10    A.   Yes.
11    Q.   And that's your signature above "Employee
12 Signature"?
13    A.   Yes.
14    Q.   Do you recall receiving this?
15    A.   Yes.
16    Q.   And this was prompted by Mark DeMien
17 apparently being concerned about you taking
18 six pieces of cut masonite.
19    A.   Yeah.  They were in the garbage.  They
20 were thrown out, and I was taking them home.
21    Q.   Did you ever file a grievance about
22 receiving this?
23    A.   This?  No.  He just said bring it back,
24 so I did.

Page 138

1    Q.   But regardless, Mr. DeMien is the person
2 who disciplined you for this, correct?
3    A.   Yes.
4    Q.   And it was a written warning?
5    A.   Yes.
6    Q.   Okay.  Now, at various points Jim Dunne
7 was your supervisor?
8    A.   Yes.
9    Q.   How old is Jim Dunne?
10    A.   Maybe 35, something like that, when he
11 was there.  I'm not sure exactly.
12    Q.   Was he still working there when you left?
13    A.   No.  Jim got fired.
14    Q.   Do you know what he got fired for?
15    A.   I'm not exactly sure.
16    Q.   Now, I believe earlier today you
17 indicated during the course of your career there
18 were some 300 or so people you worked with?
19    A.   Roughly, yes.
20    Q.   And I'm assuming, of those 300 people,
21 some of them got terminated?
22    A.   Oh, yes.
23    Q.   Any of those people who got terminated
24 younger than you?

Page 139

1    A.   Probably.
2    Q.   Let me show you what I'm going to have
3 the court reporter mark as Exhibit 25.
4        (WHEREUPON, a certain document was
5        marked Wingo Deposition Exhibit No. 25,
6        for identification, as of this date.)
7        (WHEREUPON, the document was
8        tendered to the witness.)
9 BY MR. LINDEN:
10    Q.   You've been handed what has been marked
11 Exhibit 25.  It's -- for purposes of identification,
12 it's an employee report form dated September 12th,
13 addressed to you.
14        Is that your signature on this?
15    A.   Yes.
16    Q.   And this was an oral warning given to you
17 by Mr. Dunne?
18    A.   Yes.
19    Q.   Did you ever file a written grievance,
20 under the labor contract, challenging this
21 discipline?
22    A.   No.
23    MR. LINDEN:  Let's please mark this Exhibit 26.
24        (WHEREUPON, a certain document was

Page 140

1        marked Wingo Deposition Exhibit No. 26,
2        for identification, as of this date.)
3        (WHEREUPON, the document was
4        tendered to the witness.)
5 BY MR. LINDEN:
6    Q.   You've been handed what has been marked
7 Exhibit 26, Mr. Wingo, which, for purposes of
8 identification, is an employee report form, dated
9 June 22, 2007 addressed to you, issued by
10 Randy Lunt.
11        Have you seen this document before?
12    A.   Yes.
13    Q.   Okay.  Is that your signature above
14 "Employee Signature"?
15    A.   Yes.
16    Q.   So you received a copy of this?
17    A.   Yeah.
18    Q.   Did you ever file a written grievance
19 challenging this verbal warning you were given?
20    A.   No.
21    Q.   This was a verbal warning given to you by
22 Randy Lunt for repetitive work orders?
23    A.   Yes.
24    Q.   And your response was you disagreed with

35 (Pages 137 to 140)

ROBERT G. WINGO, MAY 19, 2008

Page 141

1  the statement, correct?
2    A.   Yes.
3    Q.   And you wrote, "New system, getting used
4  to system."
5         What did you mean by that?
6    A.   I think they changed the policy of the
7  key punching on this one, and that's all I can tell
8  is that it maybe was something along that line, that
9  I was just getting used to the new system of -- and
10 key punching a certain way.
11   Q.   When did they make this change to the key
12 punching?
13   A.   I'm not sure.  It was evidently recently.
14   Q.   Well, what was the nature of the change?
15   A.   I don't recall.
16   Q.   Well --
17   A.   It says, when PK'ing the order, you have
18 to key punch the piece count on this particular one,
19 so that's what it was.
20   Q.   Did you discuss it with Mr. Lunt, the
21 fact --
22   A.   Yes, probably we straightened it out,
23 yes.
24   Q.   What do you mean, you "straightened it

Page 142

1  out"?
2         Was this discipline ever removed from
3  your record?
4    A.   Evidently not, no.
5    Q.   And you never filed a written grievance
6  challenging it?
7    A.   No.
8    Q.   Okay.  When you PK10 an order, and the
9  order from the customer requires it to be by piece
10 as opposed to weight, are you supposed to data entry
11 the number of pieces on that order?
12   A.   Correct.
13   Q.   Okay.  And if the work order specifies
14 the customer wants you to do it by piece and not by
15 weight, when you fill the order, are you supposed to
16 fill it by piece or by weight?
17   A.   If it's billed by piece, you fill it by
18 piece.
19   Q.   And the order will indicate as such?
20   A.   The work order, yes.  It should have it
21 on there that that's billed by the piece, so you
22 want to key punch by the piece.
23   Q.   Okay.  Did you ever have any discussions
24 with Mark DeMien about the importance of accurately

Page 143

1  and reliably doing the PK10 process?
2    A.   Sure.
3    Q.   On more than one occasion?
4    A.   Yes.
5    MR. LINDEN:  Let's mark this, please, as
6  Exhibit 27.
7         (WHEREUPON, a certain document was
8         marked Wingo Deposition Exhibit No. 27,
9         for identification, as of this date.)
10        (WHEREUPON, the document was
11        tendered to the witness.)
12 BY MR. LINDEN:
13   Q.   You've been handed, Mr. Wingo, what has
14 been marked Exhibit 27, which, for purposes of
15 identification, is an employee report form dated
16 October 4, 2007, addressed to you from Mr. DeMien.
17        Is that your signature on this?
18   A.   Yes.
19   Q.   Did you receive a copy of it?
20   A.   Yes.
21   Q.   This was a written warning issued you by
22 Mr. DeMien in October of 2007, correct?
23   A.   Yes, I was working with another employee,
24 and the labels got switched.

Page 144

1    Q.   Okay, that's not what I asked for, but I
2  appreciate your embellishment.
3         Did you ever file a written grievance
4  challenging this discipline?
5    A.   No, I did not.
6    Q.   And it indicates that work orders 457976
7  and 459783, apparently labels were switched
8  inadvertently causing misdeliveries, correct?
9    A.   Yes.
10   Q.   Now, when you worked at the RBW station,
11 as you did, as a, as a warehouse clerk in the fall
12 of 2007, do your duties and responsibilities include
13 checking the labels?
14   A.   Yes, you try to maintain correct labels
15 for the correct orders, but occasionally they get
16 switched.
17   Q.   And one of the possible consequences of
18 the labels getting switched is a customer may not
19 get the right product, correct?
20   A.   Correct.  It's a common error by the
21 employees.
22        And like I say, I was working with
23 another employee --
24   Q.   I'm going to have to tell you to kindly

36 (Pages 141 to 144)

ROBERT G. WINGO, MAY 19, 2008

## Page 145

1  wait until I ask you questions, Mr. Wingo.
2     A.   Sure.
3     Q.   All right.  Now, this discipline
4  references the fact that you had previously received
5  the oral warning on June 22, 2007, correct?
6     A.   Yes.
7     Q.   And that was Exhibit 26, which we just
8  got done talking about?
9     A.   Yes.
10    Q.   Okay.  And like that, you never filed a
11  written grievance challenging this written warning
12  issued to you, correct?
13    A.   Correct.
14    Q.   And under the labor contract, if you
15  wanted to you could have filed a grievance
16  challenging the issuance of this discipline,
17  correct?
18    A.   Correct.
19    Q.   And you had your union steward present
20  when you got this discipline?
21    A.   Yes.  He signed it.
22    Q.   Now, are you claiming Mark DeMien gave
23  you this discipline on October 5, 2007, because he
24  was discriminating against you because of your age?

## Page 146

1     A.   Not all the errors were because of age.
2  I mean this error was a mistake, and people make
3  mistakes.  So I mean I made a mistake, it was in
4  there.
5     Q.   So you don't contest the fact that you
6  made a mistake which resulted in your discipline,
7  correct?
8     A.   Correct.
9     Q.   Okay.  But are you claiming that
10  Mr. DeMien gave you this discipline because of your
11  age?
12    A.   This discipline?
13    Q.   Correct.
14    A.   No.  I can't prove that.
15    MR. LINDEN:  Let's mark this Exhibit 28.
16       (WHEREUPON, a certain document was
17       marked Wingo Deposition Exhibit No. 28,
18       for identification, as of this date.)
19       (WHEREUPON, the document was
20       tendered to the witness.)
21  BY MR. LINDEN:
22    Q.   All right.  Mr. Wingo, you've been handed
23  by the court reporter what has been marked
24  Exhibit 28.  For purposes of identification, it's an

## Page 147

1  employee report form, dated October 10, 2007,
2  addressed to you from Mr. DeMien.
3        You received a copy of this?
4     A.   Yes.
5     Q.   And that's your signature above the
6  employee signature?
7     A.   Yes, sir.
8     Q.   And when Mr. DeMien gave this to you, did
9  he give it to you in person?
10    A.   I don't remember.  Probably.
11    Q.   And was Mr. LaRocco, your union steward,
12  present?
13    A.   Yes.
14    Q.   Do you remember where the three of you
15  might have met?
16    A.   Could have been in one of the offices.
17    Q.   But you don't recall for certain?
18    A.   Probably the office, his office, Mark's
19  office.
20    Q.   Okay.  And at the time you were issued a
21  one-day suspension?
22    A.   Yes.
23    Q.   Did you file a grievance, under the labor
24  contract, challenging your one-day suspension?

## Page 148

1     A.   No.
2     Q.   And you could have, if you had wanted to,
3  correct?
4     A.   Yes.  I guess.  I wasn't totally aware
5  that you could file a grievance on every written
6  reprimand.
7     Q.   Well, let me ask you this, Mr. Wingo --
8     A.   I mean I just never did it.
9     Q.   Did you ask Mr. LaRocco to file a
10  grievance for you?
11    A.   No.  He didn't offer, I didn't ask.
12    Q.   Okay.  And you had received a copy of the
13  labor contract?
14    A.   Yes.
15    Q.   And you had filed grievances before,
16  under the contract, correct?
17    A.   Occasionally.  Only a couple.
18    Q.   When you say "a couple," how do you
19  define a couple?
20    A.   I was there 24 years, I probably filed
21  two or three.
22    Q.   Okay.  When's the last time you filed a
23  grievance, relative to your termination?
24    A.   The two years before that we had

37 (Pages 145 to 148)

Page 149

1  discussed earlier.
2      Q.   Concerning Mr. Catama?
3      A.   Yes, sir.
4      Q.   So that would have been in 2005?
5      A.   Yes.  And at the moment that's the only
6  other one I can recall in 24 years.
7      Q.   Fair enough.  Now, under "Employee
8  Statement" on Exhibit 28, that's your writing?
9      A.   Yes.
10     Q.   And so you were giving an explanation as
11 to what had happened, correct?
12     A.   Yes.  It shouldn't have came to my area.
13 It was a cut order that should have went to a whole
14 other area.  The operator made a mistake.
15     Q.   Who was the operator at the time?
16     A.   This, I believe this one was Tyler
17 DeMien, a younger, a younger operator.
18     Q.   Regardless of the fact, you did write on
19 this document, did you not, you should have caught
20 the mistake?
21     A.   We both should have caught the mistake.
22     Q.   I'm not asking if you both should have
23 caught the mistake.
24         You wrote on this document, did you not,

Page 150

1  you should have caught the mistake?
2      A.   Yes.
3      Q.   Now, do you know if Mr. DeMien received
4  any sort of counseling, verbal or otherwise, as a
5  result of this incident?
6      A.   As far as I know, no, because he didn't
7  sign the order, so they didn't know who did it.
8      Q.   Well, did you tell anybody who did it?
9      A.   I think I told his dad, and that's why
10 his dad would get mad at me, because I would tell
11 him that his son is pulling the wrong stuff.
12     Q.   So father and son are working together.
13 Mark DeMien is the supervisor of his son, Tyler
14 DeMien?
15     A.   Yes.
16     Q.   Did he ever show any favoritism to his
17 son, as a result?
18     A.   Well, he let him break company rules by
19 talking on his cell phone.  We weren't supposed to
20 have cell phones on the floor.  We weren't supposed
21 to talk on our cell phones while we're on the clock,
22 only at break time.  And he would continuously let
23 him talk, sitting in the Jeep in the building.  He
24 would let him leave the building on -- not on break

Page 151

1  and go out back and talk on the cell phone.
2      Q.   Did any of your fellow employees ever
3  complain to you that they thought Mark DeMien was
4  showing favoritism toward his son?
5      A.   Sure, lots of people.
6      Q.   Who do you recall making those
7  complaints?
8      A.   Other workers that worked in the area.
9      Q.   Such as?
10     A.   Al Herrera.
11     Q.   Who else?
12     A.   The guys I work with mainly, Ray Cather.
13 But he used to do it, too, so he didn't complain too
14 much, because he did it.  But I'd say, where's
15 Tyler?  He'd say, he's outside talking to his
16 girlfriend on his cell phone.
17         But Ray got away with it, too, and Ray
18 was a younger guy, and they were friends; so, you
19 know, they were allowed to do these things.
20     Q.   All right, but who else besides Al
21 Herrera and Ray Cather complained that Mark DeMien
22 was showing favoritism towards his son --
23     A.   Probably Lance Amack, too, he would know.
24     Q.   Anybody else?

Page 152

1      A.   A lot of people knew it.  I don't know,
2  specifically, if they would be involved in the --
3  you know, I mean it was just a general given on this
4  type of a deal.
5      Q.   With regard to discipline for cell phone,
6  you would agree, all the discipline I've shown you
7  so far that you've received, none of it was for
8  talking on the cell phone, correct?
9      A.   Correct.
10     Q.   Were you ever formally disciplined for
11 talking on your cell phone?
12     A.   No.  I never brought it in the building,
13 because it was against company rules.
14     Q.   What are Tally materials?
15     A.   That's a stainless steel brand, kind of
16 like Kellogg cereal, it's a brand of stainless steel
17 company.  It's a mill.
18     Q.   And I may be mispronouncing this, and
19 I'll spell this for the court reporter in a moment.
20 Outokumpu?
21     A.   Not too bad, but it's Outokumpu.
22     Q.   Okay.  O-U-T-O-K-U-M-P-U.
23         Is that another stainless steel --
24     A.   Actually, they do, I think they do,

38 (Pages 149 to 152)

ROBERT G. WINGO, MAY 19, 2008

Page 153

1 they're global and that, but I think they do a lot
2 of copper and stainless. I believe that's their
3 main lines.
4    Q.   So if you get a work order that indicates
5 that you're supposed to cut product to a certain
6 size and that it indicates Tally materials only, and
7 you're working as the warehouse clerk at the RBW
8 station with that work order, do your
9 responsibilities include making sure, when you
10 package the materials, that it's the Tally material
11 only that's being packaged?
12    A.   Sure, you should, yes.
13    Q.   And what would you do to make sure you
14 did that, Mr. Wingo?
15    A.   You have to verify heat (phonetic) and
16 lot numbers. Occasionally they get switched. Some
17 of the tags are bad on the metal itself. When they
18 bring you the bundles, sometimes the tags are not
19 always correct.
20       So it's easy to mess up. It's a lot
21 easier than you think to have an error, to make a
22 mistake, because things are not always according to
23 plan. Sometimes things are askew and awry, and you
24 have to kind of sift through it sometimes to get the

Page 154

1 correct thing.
2    Q.   So as I understand your duties as a
3 warehouse clerk, working at the RBW station, when
4 you package materials -- which is part of your
5 responsibilities, correct?
6    A.   Sure.
7    Q.   -- you would review the work order before
8 you package them?
9    A.   Yes.
10    Q.   And on the work order would be
11 instructions from the customer, what you should be
12 packing?
13    A.   Yes.
14    Q.   And so some of the instructions would
15 include piece, as opposed to weight?
16    A.   Sure.
17    Q.   It might also specify a particular
18 manufacturer for product like stainless steel?
19    A.   Yes.
20    Q.   And for example, it might specify it
21 wants Tally material only?
22    A.   Sure.
23    Q.   And so when you're packaging, you're
24 supposed to be looking at the work order and then

Page 155

1 packaging consistent with what the work order says?
2    A.   Yes.
3    Q.   Okay.
4    MR. LINDEN:  Let's mark this 29, please.
5       (WHEREUPON, a certain document was
6       marked Wingo Deposition Exhibit No. 29,
7       for identification, as of this date.)
8       (WHEREUPON, the document was
9       tendered to the witness.)
10 BY MR. LINDEN:
11    Q.   All right.  You've been handed what has
12 been marked Exhibit 29, Mr. Wingo, which, for
13 purposes of identification, is an employee report
14 form, this one dated November 8, 2007, addressed to
15 you from Randy Lunt.
16       Have you seen this document before?
17    A.   Yes.
18    Q.   That's your signature above "Employee
19 Signature"?
20    A.   Yes.
21    Q.   Did you receive a copy of this?
22    A.   Yes.
23    Q.   And you were being suspended for
24 three days at the time?

Page 156

1    A.   Yes.
2    Q.   Did you file any grievance, under the
3 labor contract, challenging your three-day
4 suspension?
5    A.   No.
6    Q.   Did you meet with Mr. Lunt, when he gave
7 you the three-day suspension?
8    A.   Yes, I did.
9    Q.   Who else was present?
10    A.   I believe Mark DeMien.
11    Q.   Anybody else?
12    A.   I'm not sure if Pete was there or if I
13 had another employee.
14    Q.   But you do recall you had some employee
15 representative present with you?
16    A.   I believe so.  At the bottom there's a
17 signature.  I can't quite read it, but yes, I think
18 so.
19    Q.   Where did the meeting take place, if you
20 can recall?
21    A.   Randy Lunt's office.
22    Q.   What did Mr. Lunt say during the meeting?
23    A.   He said, there was a key punch error.
24       I says, yes, I caught the first one, and

39 (Pages 153 to 156)

ROBERT G. WINGO, MAY 19, 2008

Page 157

1 I went up and I tod Mark. I says, Mark, I
2 accidentally hit enter on this, and it was wrong.
3 So I said, we need to fix it.
4       So he says, we can't fix it now, it's
5 already gone through. We'll have to reprint the
6 order, reorder it and redo it all.
7       So we did, and I redid it all, and I took
8 my time and made sure that I got everything correct
9 the second time. I redid it real slow and real
10 sure. I had to enter seven things on the second
11 page and make sure everything was done, you know
12 perfect.
13       So I mean this is what I do every day,
14 and so I did it and it was right. I felt that it
15 was totally right. I was exactly positive it was
16 right. And then the following Monday I came in, and
17 he said it was wrong. So.
18     Q.   Who said it was wrong?
19     A.   Mark DeMien.
20     Q.   When you say "the following Monday," was
21 it the day --
22     A.   I believe, actually, I'm not sure of the
23 dates exactly, but I think the order that I messed
24 up, or they said I messed up, was Friday. This

Page 158

1 order that you're looking at for this suspension was
2 Friday, but I think the action came on the following
3 Monday.
4     Q.   Okay.
5     A.   I believe that's how it all happened.
6     Q.   And that's the day you met with Mr. Lunt,
7 Mr. DeMien and some union representative?
8     A.   Yes, I believe so.
9     Q.   And you were informed that you were being
10 suspended for three days for repetitive key punching
11 errors?
12     A.   Yes.
13     Q.   And the errors noted on this document,
14 you key punched in the wrong work order numbers?
15     A.   No, I believe it was actually -- when you
16 have a certain, when you have over three bundles or
17 boxes, see, like the order, I think, was for like
18 eight or 10 boxes, and so on the first page you can
19 only put three, so you have to go to the second
20 page, too. And that's where I messed up on the
21 first one, I accidentally put enter after the first
22 three.
23       On the second one, when I reprinted the
24 order, brought it back, I did the original three.

Page 159

1 Then, when I went to the second page, I made sure I
2 added the extra four or five or whatever it was, to
3 complete the order and have all eight or how many,
4 seven or eight or how many bundles or boxes it was.
5 So I was positive at that point that I had it all
6 correct.
7     Q.   You don't dispute the fact that you
8 initially made an error with key punching, correct?
9     A.   I mean it was -- yes, I caught it myself,
10 I caught the first error myself.
11     Q.   You don't dispute the fact there was an
12 error made, correct?
13     A.   No.
14     Q.   What --
15     A.   I don't dispute the fact, yes, I guess I
16 don't dispute the fact.
17     Q.   What is a certificate from a supplier?
18     A.   I'm not sure what you mean.
19     Q.   Are there certifications from the
20 various --
21     A.   The certs, okay, yes, certifications.
22     Q.   What would that be, Mr. Wingo?
23     A.   That's actually saying that it's this
24 mill, this lot number; it's identification from the

Page 160

1 specific mill and lot.
2     Q.   And isn't it also important, with respect
3 to some of the certifications, that it will also
4 represent, among other things, that it perhaps has
5 not been contaminated by, for example, mercury?
6     A.   Yes.
7     Q.   And why is that important?
8     A.   For many reasons that they need to have
9 the correct metal. They can't have mercury for
10 obvious reasons.
11     Q.   This would be Copper and Brass customers?
12     A.   Yes.
13     Q.   And is it important, when you do your
14 duty as a warehouse clerk, that you make sure that
15 those certs are packed?
16     A.   We don't pack the certs with the metal.
17 The certs go later with the paperwork.
18     Q.   Is that part of your responsibility,
19 though?
20     A.   Yes. I try -- that's our responsibility
21 is to identify it and to put it on the work order.
22 That's what we do. We take the mill, and there's a
23 like a ticket, you peel it off and you put it on the
24 back. That identifies it with that.

40 (Pages 157 to 160)

Page 161

1    Q.   And the customer gets that?
2    A.   Customer gets that.
3    Q.   So it's important that you make sure they
4  get all the paperwork that's required, the customer,
5  correct?
6    A.   Correct.
7    Q.   That's your responsibility as a warehouse
8  clerk?
9    A.   Yes.
10   Q.   Okay.  Now, are you claiming, when you
11 were given this three-day suspension, that you were
12 being singled out because of your age?
13   A.   Maybe not on this particular one.
14   Q.   Did you file a written grievance, under
15 the labor contract, contesting this three-day
16 suspension?
17   A.   No.
18   Q.   You could have, correct?
19   A.   Yes.
20   Q.   Why didn't you?
21   A.   I didn't, because before in the past,
22 when I had filed -- I didn't file that many
23 grievances over the years, and when I did, Randy
24 took it lightly; he didn't always respond, so I felt

Page 162

1  it was useless.  So I just didn't get into the
2  grievance procedure a lot.
3    Q.   So your testimony is, over your 24 years
4  of employment, you only filed two or three
5  grievances?
6    A.   Not too many, not too many.  I don't know
7  the exact number, but not too many.
8    Q.   Did anybody ever tell you you could not
9  file a grievance under the labor contract?
10   A.   I don't think so.
11   Q.   Did Randy Lunt ever tell you you could
12 not file a grievance under the labor contract?
13   A.   I don't think so.
14   Q.   Now, after you were suspended for three
15 days, when you returned to work, was there any
16 meeting with Randy Lunt, Pete LaRocco, yourself and
17 Mark DeMien?
18   A.   I don't recall.
19        I think I may have met with Randy, but I
20 don't remember the others being there.
21   Q.   When you met with Randy, that was the day
22 you returned from your suspension in November of
23 2007?
24   A.   Possibly, I think so.

Page 163

1    Q.   Where did that meeting take place?
2    A.   I can't remember if he came out to the
3  work station or if we were in the office, I don't
4  really remember.  'Cause there was numerous meetings
5  at times, and he would come out sometimes and just
6  talk, and other times we would sit down.
7    Q.   Do you recall, when you returned from
8  your suspension, talking to Randy about how
9  important it was for you to read, understand and
10 follow all work order instructions?
11   A.   Yes.
12   Q.   Was anybody else present, Mr. Wingo,
13 during the discussion?
14   A.   I don't recall, I don't recall.
15   Q.   Do you recall also discussing with
16 Mr. Lunt at the time the need to key punch, PK10 all
17 work orders correctly?
18   A.   Sure, yes.
19   Q.   Do you recall Mr. Lunt indicating to you
20 that he was prepared to have Lance Amack as a tutor
21 on these things?
22   A.   He offered that, but Lance didn't work in
23 the area, and he didn't really know the system.  So
24 that was not really a useful tool for someone to

Page 164

1  show you something that they don't really know how
2  to do themself.
3    Q.   And did you indicate that opinion to
4  Mr. Lunt, when he offered you that?
5    A.   Yeah, and I told him, and he offered
6  still to help me, and there was really no one else
7  around that could, so.
8    Q.   Was there also a discussion at that time
9  when you met with Mr. Lunt upon your return from
10 suspension how it was important for you to place
11 your initials in the "filled by" box and the "packed
12 by" box on the work order?
13   A.   Yes, I was filling -- I was signing it
14 three times, and he wanted -- I, actually I always
15 used to sign once; then we started signing twice for
16 "packed by" and "audit."
17        The third time was supposed to be the
18 side loader operator guy, the "filled by" was
19 supposed to be the side loader operator guy; but
20 they changed policy, and they wanted me to sign it
21 three times, and they didn't want the side loader
22 operator guy to sign it anywhere.  And it didn't
23 make much sense, because he was part of the team, it
24 was a team effort here.  He was bringing me metal,

41 (Pages 161 to 164)

ROBERT G. WINGO, MAY 19, 2008

Page 165

1  and a lot of times it was wrong. So the way I felt
2  about it is if he could have brought me the right
3  metal, then I wouldn't have to deal with all this.
4  Or if he would have been accountable, I wouldn't
5  have had to deal with all the mistakes. But the way
6  it was, he wasn't accountable; so he could just
7  bring anything, and it was up to me to catch all the
8  errors.
9      Q.   Again, I appreciate your embellishment
10 there.
11         But do you recall having a discussion
12 with Mr. Lunt, at the time you returned from your
13 suspension, where he told you what he expected you
14 to do about filling in the paperwork?
15     A.   Randy wanted me to sign it three times,
16 which I did do.
17     Q.   Do you recall having an additional
18 meeting after that meeting, where you attended and
19 Mr. LaRocco attended with Mr. Lunt; and Mr. Lunt was
20 still not satisfied with you filling out the
21 paperwork?
22     A.   A couple of them I forgot to do. It was
23 kind of a new policy to sign it three times, and so
24 I forgot it on a couple of them.

Page 166

1      Q.   And did you ever indicate to Mr. Lunt
2  during that meeting that you disagreed with his
3  instruction?
4      A.   I don't recall.
5          I still tried to get him to have one of
6  the other employees sign in the "filled by," because
7  I wasn't used to signing the "filled by." I always
8  thought the "filled by" was the operator that pulled
9  it and filled it, and so that was kind of different
10 for me. And I said, Randy, I'm not used to this
11 system. Can you have these guys sign the filled by?
12 And they did sign it occasionally.
13     Q.   I'm not asking about what other people
14 did. I'm now specifically focusing on the meeting
15 with Mr. Lunt, Mr. LaRocco in November 2007, after
16 your return from suspension.
17         Did you ever indicate to Mr. Lunt that
18 you disagreed with his instructions about how he
19 wanted you to fill in the boxes?
20     A.   All I remember is that I agreed to sign
21 it three times, even though I didn't quite
22 understand why I should sign it three times.
23     Q.   You never indicated to Mr. Lunt that you
24 disagreed with his instructions, and it wasn't the

Page 167

1  way that it was done in the past?
2      A.   That was part of the deal I just
3  explained was the guy that filled it was supposed to
4  sign it. And then all of a sudden he wanted me to
5  sign the "filled by"; and that guy would not appear
6  anywhere, when, in fact, he was the guy that filled
7  it.
8      Q.   Did Mr. Lunt ever indicate to you at that
9  time that your refusal to follow direct instructions
10 from either your supervisor and/or his -- the plant
11 manager, being Randy Lunt, would constitute
12 insubordination and grounds for termination?
13     A.   Yeah, and that's when I had to sign it
14 three times, no matter what I felt about, you know,
15 the issue.
16     Q.   Was there any discussion at that time
17 also about Mr. Lunt's concern about your lack of
18 production?
19     A.   Yes. That was around the Thanksgiving
20 time, I believe, that we talked about, that I told
21 you that there was --
22     Q.   It's a simple yes or no, Mr. Wingo.
23     A.   Okay, could you ask again, please.
24     MR. LINDEN: Can you please read back my

Page 168

1  question.
2          (WHEREUPON, the record was read
3          by the reporter.)
4  BY THE WITNESS
5      A.   Yes, but we didn't have many orders.
6  BY MR. LINDEN:
7      Q.   Again, it's a yes or no, Mr. Wingo.
8          Isn't it true that Mr. Lunt indicated to
9  you that your consistently filling 15 to 20 work
10 orders in an eight-hour day was less than
11 50 percent, in comparison to the other employees?
12     A.   I don't get what you're saying. I'm not
13 sure what you're saying on that.
14     Q.   Well, did you ever receive any memo from
15 Mr. Lunt about the meeting that we've just got
16 talking about?
17     A.   Well, the deal was my --
18     Q.   I don't care what the deal was.
19     A.   I didn't have the orders. If they
20 weren't there, I couldn't fill them.
21     Q.   The question -- you're going to have to
22 kindly allow me to talk, and then you can talk,
23 Mr. Wingo.
24         My question called for a yes or no. And

42 (Pages 165 to 168)

Page 173

1          tendered to the witness.)
2   BY MR. LINDEN:
3      Q.   You've been handed what has been marked
4   Exhibit 31, which, for purposes of identification,
5   is a memo addressed to you from Randy Lunt, dated
6   November 30, 2007, regarding repetitive warehouse
7   errors.
8          Have you ever seen this document before?
9      A.   Yes.
10     Q.   Were you provided with a copy of it?
11     A.   Maybe.
12     Q.   Did you ever file a grievance, under the
13  labor contract, concerning the receipt of this
14  document?
15     A.   No.
16     Q.   And so in this memo Mr. Lunt points out
17  the fact that apparently you had filled out an order
18  originally not with the correct piece numbers,
19  correct?
20     A.   Yes. There was a discrepancy on the
21  footage, because the metal was shorter than they
22  thought it was going to be.
23     Q.   But regardless, the particular work order
24  specified a certain piece number --

Page 174

1      A.   Correct.
2      Q.   Let me finish.
3          -- being 75, correct?
4      A.   Yes.
5      Q.   And instead, you filled it with
6   82 pieces, correct?
7      A.   To give them the correct footage.
8      Q.   But regardless, it was contrary to the
9   number of pieces, correct?
10     A.   Yes, so we had to fix it.
11     Q.   And you only fixed it after Mr. DeMien
12  brought it to your attention, correct?
13     A.   Correct.
14         Could I add one thing?
15     Q.   No.
16     A.   Okay, fine.
17     Q.   Now, are you claiming Mr. Lunt gave you
18  this memo, because he was discriminating against you
19  because of your age?
20     A.   It's a possibility.
21     Q.   Well, let's focus a little bit more on
22  your speculation that it was a possibility.
23     A.   This was my fault.
24     Q.   Okay, go ahead.

Page 175

1      A.   This order was my fault, but a lot of
2   times the orders weren't solely my fault.  Other
3   people were involved, and they weren't held
4   accountable.
5      Q.   When you say this order was your fault,
6   then you don't take exception with the fact that
7   Mr. Lunt, giving you this memo, acted appropriately?
8      A.   No, they acted appropriately, because
9   they wanted the pieces -- I tried to make sure that
10  the customer got enough footage, and that's where I
11  messed up.  I should have just given them the
12  pieces, forget about the footage and just ship the
13  pieces.  But they wouldn't have got enough footage.
14         So I was just trying to do the right
15  thing by giving them a little extra, to make sure
16  they got enough footage that they needed for their
17  order, because the metal wasn't as long as what they
18  thought they were ordering.  They thought they were
19  ordering what was 132 feet or more feet, and it was
20  actually shorter, some of the pieces were shorter.
21  So they were going to come up shorter on their
22  footage, so I just tried to give them extra pieces
23  to make up --
24     Q.   You would agree, at the time that you

Page 176

1   received this memo, as well as Exhibit 30, you had
2   already been disciplined on three prior occasions in
3   the fall of 2007, for excessive work order errors,
4   correct?
5      A.   For different reasons, yes.
6      Q.   And so you were at the step that the next
7   violation, the company could terminate you, under
8   that work rule, correct?
9      A.   Yes.
10     Q.   So coming back to this particular
11  document, Exhibit 31, as I understand your
12  testimony, you concede that Mr. Lunt's giving you
13  this, he acted appropriately, because you had made
14  the error, correct?
15     A.   Yes.  He let me know that I made a
16  mistake, so we tried to fix it.
17     Q.   And then before, when I asked you whether
18  or not you're claiming that Mr. Lunt issued this to
19  you, because he was discriminating against your age,
20  your response was, well, maybe, possibly.
21         Correct?
22     A.   I made a mistake.  The pieces were off, I
23  didn't have the right piece count.  He probably
24  wasn't discriminating on my age on that particular

Page 177

1 one. But on other ones that somebody else was
2 wrong, he didn't care who the other people was, and
3 that's where --
4    Q.   With regard to Exhibit 31, just so the
5 record's clear, you're not claiming that was given
6 to you because of your age?
7    A.   That particular one, maybe not.
8    Q.   Let's go back to Exhibit 30, the other
9 memo that Mr. Lunt gave you.
10       Are you claiming Mr. Lunt was
11 discriminating against you, based on your age, when
12 he issued you Exhibit 30?
13    A.   No.
14    Q.   Okay. And as I understand it, your prior
15 testimony was also, when you were suspended for
16 three days in November of 2007, you're not claiming
17 that was because of your age, either, correct?
18    A.   I don't recall the suspension on that
19 one. There was one for the key punch, but the one
20 where they brought me the wrong metal to the wrong
21 department, that was someone else's mistake, too,
22 and there I was discriminated by age on that one.
23    Q.   Well, we'll come back to that in a
24 moment.

Page 178

1       You were suspended for three days for
2 excessive key punch errors, correct?
3    A.   Actually, I think it was one there, yes.
4    Q.   You're not claiming that was given to you
5 because of your age, correct?
6    A.   The key punch was basically my mistake,
7 but I thought I had it right.
8    Q.   All right, but when you say it was your
9 mistake, you're not claiming the company issued you
10 three days suspension for that, because they were
11 discriminating against you because of your age,
12 correct?
13    A.   No.
14    Q.   Okay. But the one discipline you're
15 claiming that was issued to you because of your age
16 was the one-day suspension?
17    A.   I believe that's the case. It was the
18 one where they brought the wrong size or the
19 wrong -- that was the one with Tally that we
20 discussed, where they brought the wrong mill, and it
21 shouldn't even have came to my department. It was
22 an error that I did not catch, and it should not
23 have been at my department. That was the younger
24 side loader operator brought that order.

Page 179

1    Q.   Let's come to explore that a little bit
2 further.
3       In that document you admit that you made
4 the mistake. You should have caught the error
5 yourself when you packed the materials, correct?
6    A.   Yes, on that one, yeah. He made the
7 mistake of bringing me the wrong thing, and I did
8 not catch it.
9    Q.   And you could have caught --
10    A.   But I did catch three or four that --
11    Q.   You could have caught it -- one at a
12 time, please. You could have caught it, had you
13 reviewed the work order, correct?
14    A.   Yes, and I did catch three or four a week
15 and sometimes three or four a day.
16    Q.   I'm not asking whether or not you caught
17 three or four a week. We're talking right now about
18 this specific --
19    A.   This one, I did not catch this one, no.
20    Q.   And the younger side load operator we're
21 talking about, just so the record is clear, again,
22 we're talking about Tyler DeMien?
23    A.   I believe so, on this one, yes.
24    Q.   Well, you believe so or --

Page 180

1    A.   I'm pretty sure it was, yes.
2    Q.   Well, you say you're "pretty sure."
3       Do you know that for a fact?
4    A.   Yes.
5    Q.   Okay.
6 MR. LINDEN: Let's take a break for a moment.
7       (WHEREUPON, a recess was had.)
8 BY MR. LINDEN:
9    Q.   Let's mark this Exhibit 32, please.
10       (WHEREUPON, a certain document was
11       marked Wingo Deposition Exhibit No. 32,
12       for identification, as of this date.)
13       (WHEREUPON, the document was
14       tendered to the witness.)
15 BY MR. LINDEN:
16    Q.   All right. Mr. Wingo, you've been handed
17 what has been marked as Exhibit 32, which, for
18 purposes of identification, is entitled at the top
19 "Daily Production Log."
20       Do you recognize this document?
21    A.   Yes.
22    Q.   And could you tell us what it is?
23    A.   It looks like a production sheet.
24    Q.   Okay, so we briefly talked about this

45 (Pages 177 to 180)

ROBERT G. WINGO, MAY 19, 2008

Page 181

1   earlier.
2         Is this the daily production log that you
3   would be completing during your shift?
4      A.   Yes.
5      Q.   And so there are a number of columns,
6   let's talk about those for a moment.  So the first
7   column on the left is "Items."
8         That would just keep track of the number
9   of items you would be processing during the course
10  of the day?
11     A.   Yes.
12     Q.   And then the column "Work Order," you'd
13  be putting in the work order off the work order form
14  that you would be processing, correct?
15     A.   Yes.
16     Q.   And then there's a column for "Pieces."
17        That would be what, the number of pieces
18  you would be handling during the course of the day?
19     A.   Yes.
20     Q.   And "Pounds" would be the amount of
21  weight?
22     A.   Yes.
23     Q.   Then there's a column entitled "Comments,
24  Special Assignment."

Page 182

1         So you'd put comments in there that might
2   be of a special nature, correct?
3      A.   Correct.
4      Q.   All right.  And then the last column
5   would be "Stop Time."
6         That would be when you would be done
7   processing the order?
8      A.   Yes.
9      Q.   All right.  So let's talk for a moment
10  about some of the notations.
11        First of all, is your writing on this?
12     A.   Yes.
13     Q.   So the initials above "Please print name,
14  RGW," those are your initials, correct?
15     A.   Yes.
16     Q.   And this is a daily production log that
17  you completed, correct?
18     A.   Yes.
19     Q.   All right.  So let's focus for a moment,
20  then, on the notations in "Comments, Special
21  Assignment."
22        I think all of these, with the exception
23  of one of them, have "PT" in there.
24        That would stand for what, pull truck?

Page 183

1      A.   Pull truck, yes.
2      Q.   So the pull truck would be a Copper and
3   Brass truck that would come to the Schaumburg
4   facility to get orders to be delivered to either
5   other Copper and Brass locations or customers?
6      A.   Toledo, mainly, yes.  Nighttime shift or
7   later, after Toledo is done, then you start the
8   nighttime shift of different set of orders.
9      Q.   And so you would be filling out this form
10  throughout your eight-hour shift, correct?
11     A.   Yes.
12     Q.   And it would be important for you to put
13  accurate and reliable information in this form,
14  correct?
15     A.   Sure, we try to, but you're doing
16  different jobs, though.  Sometimes it's not a
17  hundred percent accurate, but we try to.
18     Q.   Obviously, if you didn't compete a job,
19  as you indicated before, you would indicate as such
20  in your daily production log, correct?
21     A.   Yes.
22     Q.   All right.  Now, on this particular
23  document next to the "Items" box, next to numbers
24  10, 11, see there's some initials there?

Page 184

1         Looks like somebody wrote next to 10
2   something G, and then next to 11, APF?
3      A.   Yes.
4      Q.   Is that your writing?
5      A.   No.
6      Q.   Do you know whose writing that would be?
7      A.   I think it's the second shift guy.  I
8   think these are orders that I started to do.  Like I
9   told you, we had to put the certification ID on the
10  back of each order, okay.  These were probably
11  orders that come out late in the day, and I didn't
12  have time to finish them, so I just started them.
13  And by starting them, I put the certification or the
14  identification of the mill on the work orders, and
15  then it was time to go.  So I wasn't able to
16  complete the orders, or I started them and wasn't
17  able to finish them.
18     Q.   Separate and apart from your speculation,
19  do you actually know whose writing that is on those
20  initials next to items 10 and 11?
21     A.   I think it's initial of somebody on the
22  second shift.
23     Q.   Do you know who actually wrote that down?
24     A.   I'm not sure exactly who wrote that down.

46 (Pages 181 to 184)

Page 185

1  Q.  Now, where on this document does it
2  indicate that any of these particular orders were
3  not complete?
4     A.  I don't know if I -- it looks like I
5  didn't specify on this one.  I don't know what
6  happened, but I -- sometimes you didn't always have
7  time to specify if you were able to complete them or
8  not.
9     Q.  So there's nothing on this particular
10 document to indicate any of these orders were
11 incomplete, correct?
12    A.  Correct.
13    Q.  Okay.
14    A.  That's why the production, because there
15 was no orders.  There's no orders, you can't fill
16 anything.  You can't pack them, if they're not
17 there.
18    Q.  By the way, is completing the daily
19 production logs considered to be part of your
20 responsibilities in properly processing work orders?
21    A.  Yes.
22    MR. LINDEN:  Let's mark this Exhibit 33,
23 please.
24    (WHEREUPON, a certain document was

Page 186

1     marked Wingo Deposition Exhibit No. 33,
2     for identification, as of this date.)
3     (WHEREUPON, the document was
4     tendered to the witness.)
5  BY MR. LINDEN:
6     Q.  All right.  The court reporter has handed
7  you what has been marked Exhibit 33, Mr. Wingo, and
8  for purposes of identification, at the top it's
9  entitled "Daily Production Log," with a date, 11/15.
10    Is this another one of your daily
11 production logs?
12    A.  Yes.
13    Q.  Okay.  Is there anybody else's
14 handwriting on this document, besides your own?
15    A.  Yes, down at the bottom.
16    Q.  Where on the bottom?
17    A.  20.  I started the order and almost
18 completed it.  But as you note in the bottom of the
19 order, of the production sheet, it says "Helped the
20 battery guy take two batteries, put them on skids
21 and load them on his truck."
22    So instead of completing number 20 on the
23 work order, instead of doing that, I ended up --
24 Mark asked me, the foreman asked me if I would help

Page 187

1  the battery guy fix the batteries, because they had
2  some bad batteries that had to go back to be
3  repaired.  So Mark asked me, Bob, would you load
4  these up for the guys?  I said sure.
5     So I wasn't able to complete the work
6  order that I was working on.
7     Q.  Well, my question was --
8     A.  So that's why -- yes.
9     Q.  -- where on this document is there
10 someone else's handwriting?
11    A.  Number 20.  That was probably the
12 initials of the guy that completed the order.
13    Q.  So your testimony is the numbers in work
14 order, the piece numbers, the pounds and the
15 reference OT in the item 20, is somebody else's
16 writing other than yours?
17    A.  No, no, that's my writing.  But I'm
18 saying that I started the order, I almost completed
19 the order.  But before I was able to finish it, Mark
20 asked me to do another job.  He asked me to load the
21 batteries on the guy's truck.
22    Q.  Where on this document does it indicate
23 that you didn't complete the work order, item 20?
24    A.  I didn't always note it on there.

Page 188

1     Q.  So you would agree there's nothing on
2  here to indicate you did not complete it?
3     A.  Correct.  And that was common procedure.
4  We didn't always --
5     Q.  I'm not asking if anything's common
6  procedure.  It's a yes or no.
7     A.  Yes, I didn't complete it.
8     Q.  Okay.  Now, in item 20 there's also
9  initials that look like IG.
10    Do you see that?
11    A.  Yeah, that's the second shift guy.
12    Q.  You're going to have to wait to hear my
13 questions, or we're going to be here very long.
14    IG, is that your writing?
15    A.  Didn't we already answer that?
16    Q.  Is that your writing?
17    A.  No.
18    Q.  Okay.  Do you know whose writing that is?
19    A.  That's the second shift guy.
20    Q.  And how do you know that's the writing of
21 the second shift guy?
22    A.  I believe that's his initials, Zidro.
23    Q.  Did you see somebody write IG on this
24 document?

47 (Pages 185 to 188)

ROBERT G. WINGO, MAY 19, 2008

Page 189

1    A.    No.
2    Q.    When you complete the daily production
3  logs, you know that Copper and Brass is relying on
4  them being accurate, correct?
5    A.    To an extent, yes.
6    Q.    When you say "to an extent," what do you
7  mean by to an extent?
8    A.    Well, to an extent, you try to be as
9  accurate as you can, but you can't be --
10   Q.    I'm asking about your -- why don't you
11 listen to my question.  Again, if you don't
12 understand my question, kindly let me know, because
13 it seems like there's a communication problem here.
14       MR. LINDEN:  Can you read back my question,
15 please.
16       (WHEREUPON, the record was read
17           by the reporter.)
18 BY MR. LINDEN:
19   Q.    So again, you're aware that the company's
20 going to be relying on these daily production logs
21 in conducting their business?
22   A.    Yes.  We try to make them accurate as
23 possible.
24   Q.    And you obviously don't want to

Page 190

1  misrepresent anything in your daily production logs,
2  correct?
3    A.    No, but sometimes you don't --
4    Q.    It's a yes or no, Mr. Wingo.
5    A.    Yes, yes.
6    Q.    And you would agree that if you
7  misrepresented things in the daily production log,
8  that you'd be subject to discipline?
9    A.    Yes.
10   Q.    And you are aware that the company would
11 possibly discipline you for falsifying company
12 documents by misrepresenting things in your daily
13 production log?
14   A.    Well, the boss gave me a job, another job
15 to do while I was --
16   Q.    Again, my question is a yes or no.
17   A.    Could you rephrase it, please.  I
18 didn't --
19       MR. LINDEN:  Read back my question, please.
20       (WHEREUPON, the record was read
21           by the reporter.)
22 BY THE WITNESS:
23   A.    Yes.
24 BY MR. LINDEN:

Page 191

1    Q.    And you are aware that the work rules
2  provided that you could be discharged for falsifying
3  company documents --
4    A.    Yes.
5    Q.    -- and reports?
6       We sort of spoke over one another is that
7  clear on the record?  I don't know if it was clear.
8       (WHEREUPON, the record was read
9           by the reporter.)
10   Q.    So we're going to have to do the question
11 over again, so the record's clear.
12   A.    Go ahead, you want to ask it?
13       MR. LINDEN:  You want to just read back my
14 question?
15       (WHEREUPON, the record was read
16           by the reporter.)
17 BY THE WITNESS:
18   A.    Yes.
19 BY MR. LINDEN:
20   Q.    Now, did you ever receive any sort of
21 training on preparing and compiling your daily
22 production log?
23   A.    Basically, it's pretty simple.  You just
24 fill in the work order and the pieces in the columns

Page 192

1  and anything else that goes with it.  Comments, we
2  always added the comments --
3    Q.    Again, I'm going to have to interrupt,
4  because you didn't answer my question.
5    A.    Yes, I guess it's yes.  I mean yes, we
6  were instructed to fill it out.
7    Q.    Who instructed you?
8    A.    Probably one of the foremen, or Randy.  I
9  don't recall exactly who.
10   Q.    You would agree, you would not want to
11 take credit for doing work that you didn't do,
12 correct?
13   A.    Yes.
14   Q.    Okay.  And so it's your testimony, as I
15 understand it, that when you prepared your daily
16 production logs, you would indicate when you did not
17 complete your work?
18   A.    I tried to indicate, when I could, but
19 there was times --
20   Q.    Again, I'm going to ask you to answer my
21 question.  Hold on.  Just relax.
22   A.    Go ahead, ask.  I'll wait.
23       MR. LINDEN:  Would you please read back the
24 question.

48 (Pages 189 to 192)

Page 193

1     (WHEREUPON, the record was read
2       by the reporter.)
3  BY THE WITNESS:
4     A.   Yes, most of the time I did.  Sometimes
5  there was partials, I couldn't --
6  BY MR. LINDEN:
7     Q.   I'm going to ask you to confine yourself
8  to my question.  It was a yes or no.
9     MR. LINDEN:  Let's mark this Exhibit 33 -- 34.
10      (WHEREUPON, a certain document was
11      marked Wingo Deposition Exhibit No. 34,
12      for identification, as of this date.)
13      (WHEREUPON, the document was
14      tendered to the witness.)
15  BY MR. LINDEN:
16    Q.   You've been handed what has been marked
17  Exhibit 34, Mr. Wingo, which, for purposes of
18  identification, is another daily production log,
19  this one with a date, 11/20.
20      Is this another production log that you
21  completed?
22    A.   Yes, sir.
23    Q.   And those are your initials at the
24  bottom, RGW?

Page 194

1     A.   Yes, yes.
2     Q.   And where on this document do you
3  indicate that you had not completed any of these
4  items?
5     A.   Well, by the time, you can tell that the
6  last one probably was incomplete, because it started
7  at 2:20.  So I was basically just partialing that
8  one and just starting the order.  Maybe I put it on
9  the scale, but wasn't able to PK10 it in time.
10    Q.   All right, I appreciate your maybes
11  there.
12      Where, specifically, on this document
13  does it indicate that item 17 was incomplete?
14    A.   By the IG, probably.
15    Q.   Well, probably means you're guessing.
16      Where on this document does it indicate
17  item 17 is incomplete?
18    A.   I did not, I did not write it out on that
19  one.  Maybe it was close to the bell, and I didn't
20  have time.
21    Q.   All right.  So again, as we continue to
22  fence here, you would agree with me, item 17 does
23  not indicate that it's incomplete, does it?
24    A.   It is --

Page 195

1     MS. WEGNER:  I object.  That misrepresents his
2  testimony.
3     MR. LINDEN:  You want to read back my question,
4  please.
5     (WHEREUPON, the record was read
6       by the reporter.)
7
8  BY THE WITNESS:
9     A.   I didn't even get that.  Could you
10  rephrase it another way?  I didn't understand.
11  BY MR. LINDEN:
12    Q.   Where in your comments -- those are your
13  comments that you wrote on this document, correct?
14    A.   Yes.
15    Q.   Where on item 17, in your "Comments,
16  Special Assignment" does it indicate that item 17 is
17  incomplete?
18    A.   I didn't write it on there, and a lot of
19  times we didn't.  Most of the times we didn't.
20    Q.   Again, the question is, Mr. Wingo -- we
21  can stay here however long you want today, because
22  I'm prepared to stay here.
23    A.   I'm sorry.  It's not there, I agree it's
24  not there.  I'm not questioning that.

Page 196

1     But what I'm saying, a lot of --
2     Q.   The question simply called for a yes or
3  no.
4     So you would agree with me, there's
5  nothing in item 17 written by you, indicating that
6  that was incomplete?
7     A.   Yes.
8     Q.   And by the way, with respect to
9  Exhibit 34, is everything your handwriting on this,
10  except with respect to the initials IG found in
11  item 17.
12    A.   On number 34?
13    Q.   Yeah.
14    A.   Yes.
15    Q.   Okay.  What time would your shift
16  normally end?
17    A.   2:25.
18    MR. LINDEN:  Let's mark this Exhibit 35.
19      (WHEREUPON, a certain document was
20      marked Wingo Deposition Exhibit No. 35,
21      for identification, as of this date.)
22      (WHEREUPON, the document was
23      tendered to the witness.)
24  BY MR. LINDEN:

49 (Pages 193 to 196)

ROBERT G. WINGO,  MAY 19, 2008

Page 197

1    Q.   All right.  You've been handed what has
2  been marked as Exhibit 35, which, for purposes of
3  identification, is another production log.  This one
4  is dated November 28th.
5         Is this another production log that you
6  compiled, Mr. Wingo?
7    A.   Yes.
8    Q.   Okay.  And is there anyone else's
9  handwriting on this document besides yours?
10   A.   Yes -- no.
11        I initialed a "rejected" by the foreman,
12  though, on the last item.  The quality of the metal
13  was bad.  Actually, number 16, the quality of the
14  metal was bad, and I noted that on the production
15  log.  Which happens a lot, and it's not always
16  noted.
17        Here I made specific to note it, because
18  they were getting picky with all my production
19  sheets, so I felt it necessary to specify on that.
20  But I didn't -- wasn't able to always do these type
21  of things, and there was a lot of partials that you
22  weren't able to complete.
23   Q.   Does it -- is there anything in here that
24  you indicate that any of these orders were not

Page 198

1  complete?
2    A.   Yes.  The one that says it was
3  quarantined, the metal was taken out.  That's why it
4  wasn't completed.
5    Q.   That would be item 15?
6    A.   Actually, that was, if you see the circle
7  above the quarantine, that means it goes down below
8  with the other one.  See where it says "Quality of
9  metal"?
10   Q.   Beyond that notation, is there anything
11  else on here to indicate any of these other orders
12  are incomplete?
13   A.   Yes.  The one at the very bottom, the
14  number 17, it says it was set up, it was stamped, it
15  was boxed, but it was not PK10'ed.  So it was like
16  one of those partial orders, it was a common
17  practice to partially do the order.  You couldn't
18  always complete it, and I note it right there.
19   Q.   Who is Mario Alvarez?
20   A.   He was a second shift guy that came in
21  and did the same job we did.  He would come in, and
22  any orders that I had outstanding, he would finish
23  them up.
24   Q.   Was he working there at the time you were

Page 199

1  employed?
2    A.   Yes.
3    Q.   How old was Mr. Alvarez?
4    A.   He was 45, I believe.
5    Q.   And how long had he been working at the
6  company?
7    A.   Six years.
8    Q.   Do you know if he had any disciplinary
9  problems?
10   A.   I'm not sure of everything.
11   Q.   So you don't know whether or not he had
12  any disciplinary problems?
13   A.   He may have had some issues.  I mean most
14  of the people there had issues at one time or
15  another.
16   Q.   And so there were a number of people
17  besides yourself who got disciplined over the years
18  at Copper and Brass?
19   A.   Well, it's a big company with a lot of
20  employees.
21   Q.   Well, let's talk about that.
22        As of the time you were terminated in
23  December of 2007, how many unionized employees
24  worked at Schaumburg?

Page 200

1    A.   Probably 40.
2    Q.   And you knew most of those 40 employees?
3    A.   Some not as well, because they worked
4  different shifts.
5    Q.   And with regard -- we've established you
6  obviously have been disciplined, correct?
7    A.   Yes.
8    Q.   You indicated Mr. Alvarez had been
9  disciplined?
10   A.   Possibly.  I didn't know everything.
11   Q.   Okay.  And who else besides yourself were
12  you actually aware had been disciplined?
13   A.   I don't know.  I -- just myself, as far
14  as I know.
15   Q.   So it would be safe to say you don't know
16  anybody else's disciplinary record, as of the time
17  you were terminated?
18   A.   There could have been others that I was
19  unaware of.  I didn't always ask people their
20  disciplinary problems.  Usually people were
21  embarrassed by their mistakes, and they didn't go
22  telling everybody.
23   Q.   So following your testimony, your
24  testimony suggests that you didn't know the

50 (Pages 197 to 200)

ROBERT G. WINGO, MAY 19, 2008

Page 201

1  disciplinary records of any of your fellow
2  employees.
3      A.   I mean you knew that things were going on
4  with certain guys, but I didn't know everybody's
5  history and everybody's thing.
6      Q.   Again, coming back to my question, what
7  employee did you actually know what their
8  disciplinary record was?
9      A.   Myself.
10     Q.   Okay.
11     A.   That was my main concern was myself.
12     Q.   All right.  So you got terminated by
13  Mr. Lunt, correct?
14     A.   Yes.
15     Q.   And he terminated you for falsifying
16  company documents?
17     A.   Yes, for this one in specific that you
18  just handed me, Exhibit 35.
19     Q.   Well, it wasn't just that one, it was --
20  there were two days involved, correct?
21     A.   Two days in a row with similar problems.
22     MR. LINDEN:  Let's mark this, please,
23  Exhibit 36.
24         (WHEREUPON, a certain document was

Page 202

1      marked Wingo Deposition Exhibit No. 36,
2      for identification, as of this date.)
3          (WHEREUPON, the document was
4          tendered to the witness.)
5  BY MR. LINDEN:
6      Q.   You've been handed what is marked
7  Exhibit 36, Mr. Wingo, which, for purposes of
8  identification, is entitled "Employee Report Form,"
9  addressed to you, December 3, 2007.
10         After you've looked at it, let me know
11  and I'll have some questions for you.
12     A.   Yes.
13     Q.   You've seen that document before?
14     A.   Yes, sir.
15     Q.   Okay.  And this is what the company gave
16  you, when they terminated you?
17     A.   Yes, sir.
18     Q.   And was there a meeting involving your
19  termination?
20     A.   Yes.
21     Q.   Who attended that meeting?
22     A.   Randy and Pete LaRocco.
23     Q.   Okay.  Anybody else?
24     A.   I think that was it.

Page 203

1          I think Mark DeMien was there, but he
2  left.  He was only there for a few minutes.
3      Q.   Where did that meeting take place?
4      A.   Randy Lunt's office.
5      Q.   How long did the meeting last for?
6      A.   I can't remember exactly sure.  Probably
7  15 minutes or so.
8      Q.   What do you recall Mr. Lunt telling you
9  during that meeting?
10     A.   Well, he was saying that I falsified the
11  documents, and I was trying to explain to him that I
12  was just trying to document what I, what -- where my
13  timing went, because he was worried about my
14  production time.
15         And I was saying, Randy, every order is
16  not simple and complete.  You don't just bang them
17  all out.  This one was quarantined, I couldn't
18  finish it, you know, for one reason or another.  The
19  other one I had almost completed totally, but I
20  wasn't able to finish that one, because the bell
21  rang, it was late in the day.  I was able to box it
22  up, measure it, box it, weigh it, get it ready; all
23  it had to do was be PK10'ed.  But I wasn't able to
24  complete it, because the time ran out.

Page 204

1          And the one I had said earlier, the one
2  that was quarantined, that thing was kind of
3  staggering the other one.  I mean I started that one
4  first and I almost had it done, and then Mark
5  quarantined it and says, don't ship it --
6      Q.   All right.  What --
7      A.   -- so at that point I had to stop work
8  and put it back.
9      Q.   What did Randy Lunt say during the
10  meeting?
11     A.   Randy asked me, well, what happened to
12  the work orders?
13         And I said, well, one of them, I set it
14  up and I wasn't able to complete it.  So I had to
15  leave it for Mario.  And I said, just PK10 it,
16  that's all you had to do was finish it off and PK10
17  it, the computer work.  'Cause I didn't want to rush
18  it, because I knew I had trouble with the errors
19  and --
20     Q.   Again, my question is, what did
21  Randy Lunt say?
22     A.   I'm trying to tell you.  There was
23  problems with the errors, so I was --
24     Q.   I'm not asking what you --

51 (Pages 201 to 204)

ROBERT G. WINGO, MAY 19, 2008

Page 205

1   A.   Randy said, be careful with the orders,
2   make sure you get them right, take your time.
3        And I said that's what I was doing.
4   Q.   Did Randy Lunt tell you you were being
5   terminated?
6   A.   He said I was being terminated for
7   falsifying the documents, and I said I didn't agree.
8   Q.   And did Randy Lunt explain to you what he
9   meant by falsifying company documents?
10  A.   He said I was taking credit for the work,
11  but I wasn't. I was just --
12  Q.   Again, I'm asking you what Randy Lunt
13  said.
14       What reason did Randy Lunt give for your
15  termination?
16  A.   It's right on the thing.
17  Q.   What do you mean "on the thing"?
18  A.   He said right here, termination for
19  falsifying company documents.
20  Q.   Did Randy Lunt explain to you what he
21  meant by that?
22  A.   He did. And then I tried to explain to
23  him that it wasn't -- I wasn't taking credit for it,
24  I was just documenting my time for what I did.

Page 206

1   Q.   Did Randy Lunt tell you you were being
2   terminated concerning your documentation in your
3   employee production logs for the dates of -- let me
4   finish.
5   A.   Sorry.
6   Q.   Did Randy Lunt tell you he was
7   terminating you for falsifying company reports,
8   based upon your employee production -- daily
9   production logs of November 28th and November 29,
10  2007?
11  A.   Yes.
12  Q.   Did he show you those logs?
13  A.   Yes.
14  Q.   Now, are you claiming that he made the
15  decision to terminate you, because he wanted to get
16  rid of you because of your age?
17  A.   Yes, I think so.
18  Q.   Okay. What is your support for your
19  belief or your thinking so, that Mr. Lunt was
20  terminating you because of your age?
21  A.   Well, because in my mind's eye, they were
22  not errors, I mean they were not falsifying. All I
23  was just, basically was doing was stating what
24  happened with the orders.

Page 207

1        I didn't try to take credit for them, I
2   was just -- even in the margin I wrote down that the
3   metal was bad, it was quarantined; it was no good, I
4   couldn't ship it. Mark DeMien, the foreman,
5   denied -- he told me to quarantine it, don't ship
6   it.
7        The other one I wasn't able to complete
8   it, and I wrote it right on the order, stamped --
9   here this is right here. I wrote on there, set it
10  up, stamped it, boxed it, weighed it, got it ready
11  and it was ready to go, but I wasn't able to PK10
12  it. So I wasn't able to complete it.
13       So it wasn't falsifying, it was just not
14  being -- it was just partialing the order, not being
15  able to complete it.
16  Q.   So you disagree with Mr. Lunt's
17  characterizing it as falsifying?
18  A.   I guess.
19  Q.   And that's your sole basis for your
20  belief that Mr. Lunt was terminating you because of
21  your age?
22  A.   Could you say that again, please? I
23  didn't --
24  MR. LINDEN: Can you read back my question,

Page 208

1   please.
2        (WHEREUPON, the record was read
3        by the reporter.)
4   BY THE WITNESS:
5   A.   Well, he said I falsified the record, but
6   it wasn't, in my view, a falsification of the
7   record.
8   BY MR. LINDEN:
9   Q.   You disagreed with his opinion, correct?
10  A.   I disagreed with his opinion.
11  Q.   And that's your sole basis for your
12  belief that Mr. Lunt was getting rid of you because
13  of your age?
14  A.   Well, because other employees, younger
15  employees were allowed to do similar stuff. They
16  weren't always completing the work order, and they
17  weren't being held accountable for that.
18  Q.   Beyond that, any other evidence to
19  support your belief that Mr. Lunt was terminating
20  you because of your age?
21  A.   By not holding the younger employees
22  accountable for their errors, that was one instance.
23       Allowing the younger employees to talk on
24  their cell phones, that was another instance.

52 (Pages 205 to 208)

Page 209

1    Q.    You were never disciplined for talking on
2 your cell phone, were you?
3    A.    No.
4    Q.    All right.  Let's talk about these
5 so-called younger employees.
6        These are these younger employees that
7 you referenced in paragraph 12 of your complaint?
8    A.    Yes.
9    Q.    Okay.  Let's -- first of all, Tyler
10 DeMien, we've already established, through a variety
11 of exhibits I've asked you about, that by the fall
12 of 2007 you had been disciplined on a number of
13 occasions; would you agree?
14    A.    Yes.
15    Q.    Okay.  We've also established that by the
16 time you were terminated in December of 2007, you
17 had been progressively disciplined in the fall of
18 2007 for excessive work order errors, correct?
19    A.    Yes.
20    Q.    Did Tyler DeMien have an identical
21 disciplinary record to that?
22    A.    He had issues and problems with errors,
23 but he was never wrote up for it.
24    Q.    But my question is, did he have

Page 210

1 discipline on his record like you did?
2    A.    No, they did not, they did not --
3    Q.    It's a yes or no.
4    A.    No, he didn't, because they didn't, they
5 didn't write him up.
6    Q.    It's a yes or no.
7    A.    No.
8    Q.    Okay.  And let's talk for a moment about
9 your problem with your daily production log reports.
10        Did you ever review Tyler DeMien's daily
11 production log reports?
12    A.    As far as I know, he didn't keep one.
13 Side loader operators didn't have to keep one.
14    Q.    So he didn't have that responsibility?
15    A.    No.
16    Q.    So he obviously couldn't be similar to
17 you, with respect to maintaining daily production
18 log reports, because he didn't have to keep them, as
19 you said?
20    A.    He was similar in the fact that we both
21 did orders, and we both --
22    Q.    Again, I'm going to have to interrupt,
23 because you're not answering the question.
24    MR. LINDEN:  Can you please read back my

Page 211

1 question.
2        (WHEREUPON, the record was read
3        by the reporter.)
4 BY THE WITNESS:
5    A.    Right, he didn't do the same job.
6 BY MR. LINDEN:
7    Q.    Okay.  Now, let's talk about Al Herrera.
8        Al Herrera, was he a warehouse clerk?
9    A.    Yes.
10    Q.    He worked what, the second shift?
11    A.    Third shift.
12    Q.    Third.  So you didn't even work on the
13 same shift as Al?
14    A.    We overlap shifts.  I come in at 4:00 in
15 the morning; Al worked till 7:00.
16    Q.    How old was Al Herrera?
17    A.    Al was 35 or so, somewhere in there.
18    Q.    And as of the time of your being
19 terminated, how long had Mr. Herrera worked for the
20 company?
21    A.    He was another guy that came from
22 Munster, so I'm not sure of the total history there.
23 He was at Schaumberg for two, three years, I
24 believe.

Page 212

1    Q.    He worked some period of time for Copper
2 and Brass at the Munster facility?
3    A.    Correct, maybe five years total.  I'm not
4 sure of the exact numbers.
5    Q.    Do you ever review Mr. Herrera's
6 personnel file?
7    A.    No.
8    Q.    Do you know what kind of discipline he
9 has in his file?
10    A.    No.
11    Q.    Do you know if he's ever been disciplined
12 for anything?
13    A.    I think he mentioned it, but I'm not sure
14 of everything.
15    Q.    What did he mention to you?
16    A.    He may have mentioned -- he missed time.
17 He had to take a month off, because he had health
18 issues.  So I'm not sure if that was discipline or
19 if that was other issues.  I'm not sure on that.
20    Q.    Do you know if he was ever disciplined
21 for excessive work order errors?
22    A.    He made an error with me that we were, we
23 both got written up for, the very first one, if you
24 remember back.  I forget what exhibit it was.  We

53 (Pages 209 to 212)

ROBERT G. WINGO, MAY 19, 2008

Page 213

1  both were wrote up.
2      We did an order combined together, and Al
3  put it -- Al took the sticker that you put the name
4  of the customer, he put it on the wrong order. So
5  he switched tags on two orders, and so we both got
6  wrote up, because we were working together on it.
7      Q.  So you both got disciplined for that?
8      A.  We both were on that same work order,
9  yes.
10     Q.  Who disciplined him, if you know?
11     A.  Randy.
12     Q.  Randy Lunt?
13     A.  Yes.
14     Q.  Okay.  And Mr. Herrera, he had
15  responsibility to prepare daily production log
16  reports?
17     A.  Yes.
18     Q.  Did you ever review his daily production
19  log reports?
20     A.  He kept his side by side with mine,
21  usually.
22     Q.  Did you ever review them?
23     A.  You mean look at them and --
24     Q.  Yeah.

Page 214

1      A.  They were right next to mine.
2      Q.  Did you ever take any notes about them?
3      A.  No.
4      Q.  Okay.  Do you know if he ever indicated
5  on his daily production log reports that his work
6  was complete, when, in fact, it was incomplete?
7      A.  Yes.  A lot of times when Al would leave,
8  he would write down whatever orders I was working
9  on.  So most of the time I completed those orders.
10  He would maybe help me start them, and then I would
11  complete them.
12     Q.  And he would let you know they were
13  incomplete?
14     A.  Yes.  I don't know if he wrote it on his
15  worksheet or production sheet.  Most of the time he
16  probably didn't, because that's just the way we did
17  it.  We didn't always write it down.  So Al probably
18  didn't write it most of the time.
19      But there was many, many times when I
20  would complete orders that Al took credit for and he
21  put on his sheet, but I would be the one who
22  completed them.
23     Q.  Let's talk about Mario Alvarez.
24      He was a warehouse clerk on the second

Page 215

1  shift?
2      A.  Correct.
3      Q.  And during the time you worked with him,
4  did you ever work together on the same shift?
5      A.  Maybe once or twice, but not too often.
6      Q.  And you indicated a moment ago you don't
7  know anything about his disciplinary record, other
8  than whatever rumors you might have heard?
9      A.  I didn't pry into his private life.
10     Q.  All right.  Now, your complaint
11  references an employee by the name of Zidro, Z-I --
12     A.  Zidro, that's the IG guy.  Zidro, maybe
13  it's Garcia, I'm not sure.
14     Q.  What shift did he work?
15     A.  Second shift.
16     Q.  And how long did he work at Copper and
17  Brass for?
18     A.  Probably a year.  He wasn't there that
19  long.
20     Q.  He got terminated?
21     A.  I think he's still there.  I'm not sure.
22     Q.  Wait a minute, I'm confused now.
23      You said he was there for about a year,
24  he wasn't there that long.

Page 216

1      A.  He wasn't there very long.  He was only
2  there a year during my time.  I've been out of there
3  six months or so.
4      Q.  So he was still working there when you
5  left?
6      A.  Yes.
7      Q.  How old is he?
8      A.  Zidro is 45 or somewhere in there.  I'm
9  not exactly sure of his age.  I never asked him.
10     Q.  And what offense did he allegedly commit
11  that he wasn't disciplined for?
12     A.  Maybe making errors.  I don't know for
13  sure.
14      I mean everybody, everybody made mistakes
15  there.  Nobody went a hundred percent all year, the
16  rest of their life, with no mistakes.  We all made
17  mistakes.
18     Q.  I appreciate your soundness.
19      Do you know for a fact, did you work with
20  this gentleman, and do you know for a fact he made
21  mistakes?
22     A.  Yes.  The other employees said yes.
23     Q.  I'm not asking about the other employees.
24  I'm talking about your personal knowledge.

54 (Pages 213 to 216)

ROBERT G. WINGO, MAY 19, 2008

Page 217

1      You didn't work with him on the same
2  shift, did you?
3      A.   I didn't work with him, but one of the
4  guys on days told me that he messed up some stuff.
5  I mean it was talk.  We would sometimes talk, and he
6  said that he messed up some stuff.
7      Q.   I'm now trying to find out about your own
8  personal knowledge.
9      Do you know for a fact, based on your own
10 personal knowledge, that Mr. Garcia made the same
11 type of mistakes you are claimed to have made on
12 your daily production log reports?
13     A.   No.  Those were not public information.
14     Q.   What was not public information?
15     A.   The mistakes guys made.
16     Q.   Okay.  So that would be true for all of
17 the employees you worked with?
18     A.   Pretty much so.  We didn't -- we talked,
19 and people knew some of the stuff, but you didn't
20 always know.  You didn't see the documentation.
21     Q.   And you wouldn't necessarily know what
22 the supervisors may have known about any of your
23 mistakes as well, correct?
24     A.   Only that they had told us we had too

Page 218

1  many plant-wide, there was way too many mistakes
2  plant-wide, that everybody was making them, and we
3  had to tighten them up.
4      Q.   When was that?
5      A.   I think you showed us the paper.  It was
6  back in June, possibly, or July, somewhere around
7  there.
8      Q.   In 2007?
9      A.   I believe so, yeah.
10     I mean we would have these type of
11 speeches once a year, you know, where we'd have a
12 meeting, and they'd say, you know, guys, we need to
13 cut the errors.  It was just overall effort.
14     Q.   Another employee who you claim was
15 treated more favorably than you is Lizardo
16 Hernandez?
17     A.   Yes.
18     Q.   What shift did Mr. Hernandez work?
19     A.   He worked on the first shift with me.
20     Q.   And he was a warehouse clerk?
21     A.   Actually, he was the guy that brought
22 wrong orders.  He was a side loader operator that
23 brought me wrong metal, but he was never
24 disciplined.

Page 219

1      Q.   He was the one who brought you the wrong
2  metal?  I thought that was Mr. DeMien.
3      A.   Both of them.  They were both side loader
4  operators.  They were both the guys who pulled the
5  orders for me.  So they went and got the metal and
6  the orders for me, but both of them made mistakes.
7  They were human, they made mistakes, but they were
8  never disciplined for it.
9      Q.   With respect to Mr. Hernandez, did you
10 ever see his disciplinary record?
11     A.   No.  I don't know everything.
12     Q.   And Mr. Hernandez worked at the company
13 for how long?
14     A.   Roughly five years.  I don't know for
15 sure.
16     Q.   Was he still employed there when you
17 left?
18     A.   Yes.
19     Q.   Okay.  And he was still a side load
20 operator?
21     A.   Yes.
22     Q.   And as a result of being a side load
23 operator, he did not have to prepare daily
24 production log reports like you?

Page 220

1      A.   Correct.
2      Q.   And Mr. Hernandez -- the incident you
3  claim in which he brought you the wrong metal, for
4  which he was not disciplined, did anybody in
5  management know that Mr. Hernandez brought you the
6  wrong metal?
7      A.   You know, I tried not to tell on the
8  guys.  You know, we're all in this thing together.
9  I tried not to rat them out to the boss, you know,
10 this guy is screwing up, he's bringing me the wrong
11 metal.  I tried not to do that.
12     Q.   I'm not asking whether or not you were a
13 snitch.
14     My question was, do you know if anybody
15 in management knew that Mr. Hernandez brought you
16 the wrong metal, as you claimed today?
17     A.   Randy knew, because I asked Randy to have
18 these guys sign the work orders, so they could be
19 accountable.
20     Q.   All right.  When was this incident,
21 Mr. Wingo?
22     A.   Over the last two years, off and on, I
23 asked him to have them sign them.
24     Q.   I'm not asking about signing off and on.

Page 221

1      When was it that Mr. Hernandez allegedly
2  brought you the wrong metal?
3      A.   This was quite often.  I was catching
4  three to five orders a week, so Lizardo was maybe
5  one or two a week.
6      Q.   But as I understand your testimony,
7  Mr. Wingo, at least you seem to be suggesting, under
8  sworn oath here today, that Mr. Hernandez brought
9  you wrong metal, which resulted in you being
10  disciplined, correct?
11      A.   He may have brought some of it over the
12  course of time.  I caught a lot of the stuff he
13  brought.
14      Q.   I'm not ask for speculation.  My question
15  is specific, very precise.
16      Are you claiming that Mr. Hernandez
17  brought you wrong metal, which subsequently resulted
18  in your being disciplined?
19      A.   I don't know, I don't think he signed the
20  work orders that I specifically got disciplined for.
21      Q.   Okay.  And so you would agree that
22  Mr. Hernandez, by virtue of his side load operator
23  position, was not similarly situated to you, because
24  he had different duties and responsibilities than a

Page 222

1  warehouse clerk?
2      A.   Yes.
3      Q.   And that would be true for anybody whose
4  position was side load operator, correct?
5      A.   Yes.
6      Q.   Did he have a different supervisor than
7  you?
8      A.   Same.
9      Q.   Mr. DeMien?
10      A.   Correct.
11      Q.   And at other times it would have been
12  who?
13      A.   That was mainly it, first shift.  On
14  occasion, if Mark wasn't there, it would be Randy or
15  second shift foreman or one of the other foremans.
16  Ray Dormo was another foreman that occasionally
17  stepped in.
18      Q.   All right.  The last person you
19  identified as a possible comparable younger employee
20  treated more favorably than you would be Ray Cather?
21      A.   Ray Cather.
22      Q.   Was he a warehouse clerk?
23      A.   Yes.
24      Q.   And he was one of the persons who came

Page 223

1  over from Munster?
2      A.   Correct.
3      Q.   And how was he more favorably treated
4  than you?
5      A.   He was allowed to talk on his cell phone,
6  when the foreman would walk right by.  He slept in
7  his Jeep, and the foreman caught him two or three
8  times and didn't say anything, just kept walking.
9  He would ignore it.
10      Q.   Anything else?
11      A.   He was on the cell phone, he -- oh, he'd
12  sit in the job and just rock.  Rather than work, he
13  would just sit there and do nothing, maybe just rock
14  back and forth.  He had a nervous disorder where
15  he'd just rock and stuff.
16      Q.   So those are how he was more favorably
17  treated than you?
18      A.   Yeah, he was allowed to do these things.
19  If I was to do any of that, I would be disciplined.
20      Q.   But again, you were never disciplined for
21  talking on your cell phone?
22      A.   No.
23      Q.   And did you ever review Mr. Cather's
24  personnel file?

Page 224

1      A.   No.  Those were private.
2      Q.   So you don't know, for example, whether
3  or not he was disciplined for the things you just
4  described?
5      A.   I don't know for sure.  I know a lot of
6  times it was ignored.
7      Q.   Can you identify any younger warehouse
8  clerk who, on their daily production log reports,
9  misrepresented to the company that they had
10  completed all the work they had performed that day?
11      A.   Probably Al was the main one, because he
12  was the one I worked with.  Like I say, he would
13  take credit for three or four orders that we weren't
14  able to complete.  I mean, it would be usually at
15  least one or two a day.
16      Q.   Anybody else, besides Mr. Herrera?
17      A.   He was the main one that I worked with,
18  that I know.
19      Q.   Do you know if anybody in management in
20  Copper and Brass knew that?
21      A.   I don't know.  No, I don't know.
22      Q.   So other than what you've testified to
23  today, Mr. Wingo, what other proof do you have that
24  you were discriminated against on the basis of your

56 (Pages 221 to 224)