ROBERT G. WINGO, MAY 19, 2008

Page 225

1 age?
2    A.   Well, mainly, mainly the issues of
3 discipline and some of the stuff, like one time I
4 went and opened the back door, who the younger
5 employees used to leave open all the tame. Ray
6 Cather used to leave the door open all the time.
7 Well, one day I come back from break, after I had
8 left it open halfway, and the boss told me, don't
9 ever leave that door open again.
10        And I'm like, come on, Ray here left it
11 open all the time around the clock, and you never
12 cared. And he was a younger employee. And me, as
13 an older employee, now for some reason he would not
14 allow me to do it. He says, no, you can't ever do
15 that again.
16        And that was near my termination time.
17    Q.   When was that?
18    A.   That was in November sometime.
19    Q.   Of what year?
20    A.   2007.
21    Q.   And who told you that?
22    A.   Mark DeMien.
23    Q.   And how do you know that Mark DeMien said
24 that to you because it was your age, not because

Page 226

1 maybe the weather --
2    A.   Well, he didn't know -- well, it wasn't
3 that cold of a day at that time. I mean the one guy
4 used to leave it open around the clock, even in the
5 wintertime he would leave it open. And the younger
6 employees used to leave it open, and he would say
7 nothing.
8    Q.   Were you disciplined for that?
9    A.   Verbally. He says, just don't ever do it
10 again or I'll write you up or whatever.
11    Q.   Is there any -- did you ever receive any
12 discipline, as a result of that?
13    A.   Not in writing.
14    Q.   So I gather from your testimony so far
15 today, most of the discipline you received over your
16 career at Copper and Brass you consider to be
17 unwarranted?
18    A.   No, I agree with some of it. I mean I
19 made mistakes. I was there for 24 years. I did
20 99 --
21    Q.   Again, it's a yes or no. So I appreciate
22 you wanting to get on your soapbox there, but I'm
23 going to have to cut you off.
24        Would you agree, Mr. Wingo, that if

Page 227

1 somebody was providing false or misleading
2 information on their daily production log, that
3 discipline would be warranted?
4    A.   It --
5    MS. WEGNER: Object, calls for speculation.
6    Also form, foundation.
7
8 BY MR. LINDEN:
9    Q.   You can go ahead and answer my question
10 now.
11    A.   Could you say it again? I didn't hear.
12    Q.   Sure.
13    MR. LINDEN: Could you read back the question,
14 please.
15        (WHEREUPON, the record was read
16        by the reporter.)
17 BY THE WITNESS:
18    A.   It depends on each case.
19 BY MR. LINDEN:
20    Q.   Well, if you provided false information,
21 misrepresenting the status of work on a daily
22 production log, you would agree that the company
23 could probably discipline you for that?
24    A.   Yes, they should at least make you aware

Page 228

1 of it and say, you can't do it this way anymore.
2    Q.   And you would agree, by the time you were
3 terminated, that the company had disciplined you on
4 a number of occasions about your paperwork, correct?
5    A.   I don't think so. I mean, I wasn't
6 perfect, I made some mistakes; but overall my
7 paperwork was pretty much in order.
8    Q.   You are now going to disagree with the
9 record, all these exhibits that establish that
10 you received discipline on multiple occasions for
11 excess work order errors?
12    A.   Sure. I was there for 24 years, and --
13    Q.   I'm not asking you how many years you
14 were there for, Mr. Wingo.
15        Let's read back my question, please, and
16 I'd like to get an answer to my question.
17    A.   Sure.
18    Q.   I'm going to ask you, Mr. Wingo, to
19 kindly refrain from talking while I'm asking my
20 question.
21    A.   I thought you were done. I'm sorry.
22    Q.   It's a simple courtesy, and I'll do the
23 same to you, okay.
24        You would agree today you've been

57 (Pages 225 to 228)

ROBERT G. WINGO, MAY 19, 2008

## Page 229

1  cross-examined about quite a few number of times
2  that you were disciplined for excessive work order
3  errors?
4      A.  Yes.
5      Q.  And you would agree, with respect to all
6  that discipline, you never filed a single grievance,
7  under the labor contract, contesting the validity of
8  any of that discipline?
9      A.  I never did grievance it.
10     Q.  And you would agree that in the fall of
11  2007, prior to your being terminated, you were
12  disciplined on several occasions for excessive work
13  order errors?
14     A.  Yes.
15     Q.  And you would agree also, after being
16  suspended for three days, for excessive work order
17  errors, when you returned to work, Mr. Lunt sat down
18  with you and talked to you and counseled you about
19  the importance of being accurate in your, in your
20  documentation?
21     A.  Yes.
22     Q.  And you would agree that you were
23  counseled on two occasions after you returned from
24  your suspension, but prior to your being terminated

## Page 230

1  by Mr. Lunt, about your documentation?
2      A.  Could you repeat that, please.
3      MR. LINDEN:  Can you read that back, please.
4          (WHEREUPON, the record was read
5           by the reporter.)
6  BY THE WITNESS:
7      A.  No, I don't agree.  I don't quite
8  understand that.
9  BY MR. LINDEN:
10     Q.  You don't recall being shown two memos?
11     A.  Documentation, it's kind of vague.  What
12  do you mean?
13     Q.  You don't recall -- I'm not answering any
14  questions today, Mr. Wingo.
15     A.  I didn't understand.
16     Q.  My question to you is, you don't recall
17  receiving two memos from Mr. Lunt, after you
18  returned from your suspension, where he raised
19  concerns about your documentation?
20     A.  By "memo," do you mean he talked to me
21  personally, or what do you mean, actually?
22          'Cause he talked to me personally, yes,
23  he says --
24     MR. LINDEN:  Can you hand me the exhibits,

## Page 231

1  please.
2  BY THE WITNESS:
3      A.  Do you mean work order sheets, production
4  sheets?  I just don't understand what you mean by
5  memos.
6  BY MR. LINDEN:
7      Q.  Exhibits 31 and 30, the November 19th and
8  November 30, 2007 memos from Mr. Lunt, do you recall
9  testifying about them before?
10     A.  Yes.
11     Q.  And you would agree, you received those
12  prior to your being terminated on December 3rd by
13  Mr. Lunt, correct?
14     A.  Yes.
15     Q.  So you would agree, by the time he
16  terminated you in December of 2007, through the fall
17  of 2007, on multiple occasions, you had been
18  disciplined and counseled about your documentation?
19     A.  By "documentation," do you mean the
20  repetitive errors, or what do you actually mean?
21     Q.  We can fence all day long, if you went
22  to, Mr. Wingo.
23     A.  I didn't know what you mean.  You said by
24  documentation.  I'm just asking you to clarify it,

## Page 232

1  please.
2      Q.  Did your job require you to prepare and
3  maintain documentation?
4      A.  Yes, the work order sheet, production
5  sheets, yes.
6      Q.  Okay.  And so you understand that means
7  documentation, I'm assuming.
8      A.  Okay.
9      Q.  Is that a yes?
10     A.  Yes.
11     Q.  Okay.  And you would agree, throughout
12  the fall of 2007, on several occasions you were
13  disciplined progressively and then subsequently
14  counseled when you returned to work, by Mr. Lunt,
15  about your documentation?
16     A.  I documented on the work orders that,
17  what I did with my time, and that's --
18     Q.  That's not responsive to my question.
19     A.  I don't understand your question, then.
20     MR. LINDEN:  Why don't you read back my
21  question, please.
22     A.  Could you rephrase it, because I don't
23  understand the way you worded it.  Could you
24  simplify it?

58 (Pages 229 to 232)

Page 233

1   Q.   I think the question is very simple and
2  direct and to the point, Mr. Wingo.
3      Again, if you want to play games.
4      A.   I'm not playing games. I just want to
5  understand what you're asking.
6      Q.   I think the record will amply reflect
7  that all day long you've been playing games with the
8  questions.
9      A.   No one's playing games here. I want to
10  be honest with you guys. I'm telling you the truth.
11  I'm trying to tell you that I did the orders to the
12  best of my ability.
13      Q.   Let's read back my question, please. I'm
14  not listening to any speeches.
15      A.   Fine.
16      (WHEREUPON, the record was read
17      by the reporter.)
18  BY THE WITNESS:
19      A.   I just wrote on the work orders that they
20  were --
21  BY MR. LINDEN:
22      Q.   I'm asking what you wrote on work orders.
23  The question called for yes or no. I didn't ask you
24  to tell me what you were doing with work orders.

Page 234

1      A.   Randy, yes, Randy documented some stuff,
2  yes.
3      Q.   Well, that's still not quite responsive.
4      A.   I mean I documented on there also.
5      Q.   I'm not asking what you documented. I'm
6  asking you, Mr. Wingo, and again, I'm prepared --
7  I've already changed my flight. I'm going to be
8  leaving later tonight now, because you've
9  unfortunately needlessly protracted this deposition
10  with your chronic nonresponsive --
11      A.   I'm just trying to explain what happened
12  in the thing. I tried to write on the order --
13      Q.   Again, Mr. Wingo, I posed a question to
14  you. My question is very specific.
15      During the fall of 2007, prior to your
16  being terminated on December 3, 2007, isn't it true
17  the company disciplined you and counseled you on
18  multiple occasions about issues with your
19  documentation?
20      A.   I was terminated.
21      Q.   I didn't ask you if you were terminated.
22      A.   I was terminated.
23      MR. LINDEN:  Let's read back my question.
24      A.   That's a yes, I guess. Yes, I was

Page 235

1  terminated for my documentation, for falsifying the
2  record, but I didn't falsify the record, because --
3      Q.   Again, I'm going to interrupt, because
4  again you're being totally nonresponsive for, I
5  don't know how many times.
6      MR. LINDEN:  Can you read back my question,
7  please.
8      (WHEREUPON, the record was read
9      by the reporter.)
10      MS. WEGNER:  I'll object to the form of that
11  question, but you can answer.
12  BY THE WITNESS:
13      A.   I don't know how to answer that yes or
14  no, I'm sorry. To me -- I'm lost in the question.
15  I'm -- could we take a break?
16  BY MR. LINDEN:
17      Q.   If you need to take a break, Mr. Wingo,
18  to consult with your counsel, by all means, let's
19  take a break.
20      MS. WEGNER:  He didn't say that was the reason
21  he needed to take a break. And we have been going
22  at it for a couple of hours now. I would frankly
23  like to go to the bathroom.
24  BY THE WITNESS:

Page 236

1      A.   You're pounding me on the issue, and I'm
2  trying to help you with it, but you won't listen to
3  my answer, so it's very hard to tell you.
4  BY MR. LINDEN:
5      Q.   That's totally nonresponsive. I'll tell
6  you something right now, you and your counsel --
7  Mr. Wingo, extend me the courtesy that I've shown
8  you all day. Refrain from talking over me when I'm
9  talking. It's a simple courtesy. I think it's so
10  elementary that you should have no difficulty
11  comprehending it by now.
12      A.   That's fine.
13      Q.   So what I'm about to say is, when we're
14  done for the day, I'm going to reserve the right to
15  seek relief from court and come back after I review
16  the record, in light of this witness' chronic
17  inability to be responsive to simple questions.
18  BY THE WITNESS:
19      A.   I'm trying to answer your question.
20      MR. LINDEN:  We're taking a break now. Off the
21  record now.
22      (WHEREUPON, a recess was had.)
23      MR. LINDEN:  Let's mark this Exhibit 37.
24      (WHEREUPON, a certain document was

59 (Pages 233 to 236)

Page 237

1    marked Wingo Deposition Exhibit No. 37,
2    for identification, as of this date.)
3        (WHEREUPON, the document was
4        tendered to the witness.)
5  BY MR. LINDEN:
6    Q.    All right.  Mr. Wingo, you've been handed
7  what's been marked Exhibit 37, which, for purposes
8  of identification, is a November 29 daily production
9  log.
10        Was this prepared by you?
11    A.    Yes, sir.
12    Q.    Okay.  Is there anybody else's
13  handwriting on this document besides yours?
14    A.    Yes.
15    Q.    Where?
16    A.    The initials at the bottom by 20, MEA;
17  and also 21, it would be IG.
18    Q.    Okay.  Did you see whoever wrote those
19  write those initials?
20    A.    No, I did not, no.  I think a foreman
21  wrote them later.
22    Q.    But you don't know that for a fact, do
23  you?
24    A.    I can only guess.

Page 238

1    Q.    Okay.  And where on this do you indicate
2  any of these work orders are incomplete?
3    A.    Right on the right-hand column, in the
4  comments.
5    Q.    Which ones, sir?
6    A.    Okay, the first one, actually, the one,
7  the -- okay, the one with MEA by it, number 20, I
8  wrote that I boxed it.  And you can see by the time,
9  2:25, it was time to go.  So in other words, I just
10  prepared the order, I did a partial on it, I boxed
11  it up, I stamped the weight, I did everything but
12  complete the order, because it was time to go, it
13  was 2:25.  And that was common all the time, this
14  kind of stuff.
15    Q.    Other than the fact that you reference
16  the time 2:25, you would agree there's nothing in
17  your comments that says the order is incomplete?
18    A.    I did not write incomplete.  I did
19  everything but write incomplete.
20    Q.    Okay.
21    A.    And the one, the second one, number 21
22  was the wrong size was pulled, and I was just
23  documenting that the wrong size was pulled.  So I
24  told Arty, the second shift guy, I let him know that

Page 239

1  that was the wrong material, don't ship it.  That's
2  what I told him.
3        So that's basically all I was doing was
4  documenting that it was the wrong size, and I
5  couldn't do anything with it.
6    Q.    So other than what you've testified to by
7  now, what other evidence do you have that the
8  company discriminated against you because of your
9  age?
10    A.    Just basically the discipline for the
11  mistakes, excessive mistakes, when other people were
12  making more excessive mistakes than me, and they
13  were not disciplined.
14        The younger employees were allowed to
15  make unlimited mistakes, and they were never
16  disciplined.  They were pulling me the wrong orders,
17  I was constantly dealing with bad orders, wrong
18  sizes, wrong alloys, wrong department, it didn't
19  belong in my department.  They were bringing me all
20  these bad orders that I had no chance to succeed.
21        And I tried to bring it to the attention
22  of the bosses to make them be accountable for, and
23  there was nothing.  So they were discriminating
24  against me, being older, and letting the younger

Page 240

1  guys do whatever they wanted.
2    Q.    When did this alleged age discrimination
3  start, Mr. Wingo?
4    A.    The age discrimination, it was
5  probably -- I saw an increase in bad orders from
6  DeMien, from Tyler, around, right after the
7  harassment deal with his dad.
8    Q.    So the age discrimination started, what,
9  in the fall of 2007?
10    A.    It could have been sooner than that, but
11  that's when it really became evident.
12    Q.    When you say "sooner than that," you
13  realize this is your lawsuit.  You have to prove
14  your claims in this case.
15    A.    Okay.
16    Q.    So when is it that you're claiming the
17  age discrimination started?
18    A.    When they started writing me up for the
19  errors and not the younger employees that were
20  making the errors and causing the errors.
21    Q.    And when was this, sir?
22    A.    This was all along.
23    Q.    All along?  Starting in 1984, sir?
24    A.    No, it was started when I told you,

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087   800.708.8087   FAX: 312.704.4950

Page 241

1 earlier in like August.
2    Q.    August of what year, sir?
3    A.    2007, I mean that's when it really
4 escalated.  There was errors all along --
5    Q.    Again --
6    A.    Okay.  You ask me for something, and then
7 when I tell you, you don't want to hear it, so.
8    Q.    Kindly refrain from inaccurately
9 characterizing the record, which will amply speak
10 volumes of what's going on here.
11        So again, Mr. Wingo, since this is your
12 lawsuit, this is an opportunity for me to now find
13 out, on behalf of your former employer, what your
14 proof is in this case.  You should know your claim.
15 You're the one who's filed this lawsuit.
16    A.    Yes, sir.
17    Q.    So I'm now trying to find out from you,
18 among other things, when did the age discrimination
19 start?
20    A.    When I was being disciplined for the
21 errors, and they weren't; as simple as that.
22    Q.    Let's not be so vague, Mr. Wingo.
23    A.    Vague?
24    Q.    And let's kindly refrain from the

Page 242

1 snickering.
2        When was it, Mr. Wingo?
3    A.    They were making errors all along.
4    Q.    What year did the age discrimination
5 allegedly start?
6    A.    Basically, right around the August, after
7 the, after the oral harassment from the foreman.
8    Q.    August of 2007?
9    A.    Correct.
10    Q.    Okay.  And when you say the harassment by
11 the, by the supervisor, 'cause I don't want the
12 record to be unfairly --
13    A.    By Mark DeMien.  By Mark DeMien.  I'll be
14 more specific.
15    Q.    And when we talk about Mark DeMien, we're
16 talking about your testimony earlier in your
17 deposition, where you were upset with the fact that
18 he swore at you?
19    A.    Yes, sir.
20    Q.    Okay.  That's what you mean by
21 harassment?
22    A.    Well, it was ongoing screaming and
23 yelling and swearing, a combination of all that.
24 That wasn't a professional way to handle a dispute

Page 243

1 with an employee.
2    Q.    This was --
3    A.    I was just waiting for material.  I
4 wasn't doing anything wrong, anyway.
5    Q.    This is Mark DeMien you're complaining
6 about?
7    A.    Yes.  Mark is the one that swore at me
8 and harassed me verbally in front of other
9 employees.
10    Q.    Again, the term "harassment," I gather
11 you like to toss it around.
12        But when we talk in terms of harassment,
13 we're talking about the fact that you didn't like
14 the fact that he swore at you?
15    A.    Well, would that be harassment to you?
16    Q.    Again, I'm not here, sir, to answer
17 questions.
18    A.    Okay.  What I'm saying, if someone swears
19 at you, that, to me, is harassment.
20    Q.    You described earlier today what the
21 swearing was, correct?
22    A.    Yes.
23    Q.    And you complained about that in
24 August of 2007?

Page 244

1    A.    Yes, to Randy Lunt.
2    Q.    Okay.  And you also didn't like the fact
3 that you thought Mark DeMien was favoring his son?
4    A.    Well, he never was disciplined for the
5 wrong orders, so.
6    Q.    Again --
7    A.    Yes.
8    Q.    Thank you.
9        And so again, so I'm sure I could -- that
10 I want to be certain that I understand your claim in
11 this lawsuit, you're claiming what, both Mark DeMien
12 and Randy Lunt decided to terminate you because of
13 your age?
14    A.    They ignored others' errors, and yes,
15 they decided to terminate me for the errors that
16 other people were making, too, and they weren't
17 being disciplined.
18    Q.    So they terminated you as a sacrifice to
19 the younger people?
20    A.    Seems that way.
21    Q.    Okay.  And when you say it "seems that
22 way," you're speculating, right?
23    A.    Well, they're still there and I'm gone,
24 so.

61 (Pages 241 to 244)

ROBERT G. WINGO, MAY 19, 2008

Page 245

1    Q.    There are other people employed there who
2  are older than you, correct?
3    A.    Yes.
4    Q.    Lance Amack being one?
5    A.    Yes. He's ready to retire.
6    Q.    Do you know a Mr., I believe, Polito?
7    A.    Do you have a first name? I don't
8  recognize the last name.
9    Q.    Hold on.
10   A.    Maybe he was a newer guy. I don't know
11  the names.
12        Probably second shift.
13   Q.    Do you know a Fredrick Stalzik
14  (phonetic)?
15   A.    Freddie, yes. Yes, I do know Freddie.
16   Q.    Is he older or younger than you?
17   A.    I don't know his age. I never asked him
18  his age. I don't know.
19        He's an older gentleman.
20   Q.    Was he still employed --
21   A.    He's probably over 50.
22   Q.    Is he still employed there?
23   A.    I believe so. I don't know.
24   Q.    Do you know an employee by the name of

Page 246

1  Enrico Polito?
2    A.    It sounds familiar, but I don't remember.
3  I don't know his last name. That's why I don't
4  know.
5        I thought there was a Rico there, yes.
6    Q.    The Rico you knew, was he older or
7  younger than you?
8    A.    I don't know. I'm not placing the guy
9  with the name. It's been a while.
10   Q.    Do you know a Denny Prosser (phonetic)?
11   A.    Denny Prosser, yes.
12   Q.    He was employed at Copper and Brass when
13  you left?
14   A.    Yes.
15   Q.    Was he about the same age as you?
16   A.    I'm not sure his age. I think he was
17  younger.
18   Q.    Well, was he much younger than you?
19   MS. WEGNER: I'll object, calls for
20  speculation. Already asked and answered.
21  BY THE WITNESS:
22   A.    Was he what, younger than me?
23  BY MR. LINDEN:
24   Q.    Much younger than you.

Page 247

1    MS. WEGNER: Same objections.
2  BY THE WITNESS:
3    A.    I don't know.
4
5  BY MR. LINDEN:
6    Q.    Do you know a -- you mentioned, I think,
7  Zidro Garcia?
8    A.    Zidro. That was the IG on the forms,
9  yes. Zidro, yes.
10   Q.    And he worked on the second shift?
11   A.    Yes.
12   Q.    Do you know if he was roughly your age?
13   A.    I think he was younger.
14   Q.    Do you know how much younger?
15   A.    I don't know.
16   Q.    Do you know a Tony Falco?
17   A.    Yes.
18   Q.    Do you know how old he is?
19   A.    He's 40, 40 something. I'm not sure
20  exactly what.
21   Q.    You don't know exactly how old he is?
22   A.    He's probably 47 or something like that.
23  I'm not sure.
24   Q.    Do you know an Arturo Flores?

Page 248

1    A.    Arty's probably 50.
2    Q.    Was he a warehouse clerk?
3    A.    Yes.
4    Q.    And was he still employed at Copper and
5  Brass when you left?
6    A.    I think so.
7    Q.    Okay. So Mr. Wingo, you seem to be
8  suggesting in part, you don't dispute the fact that
9  you made errors?
10   A.    Yes.
11   Q.    And you don't dispute the fact that the
12  errors you made resulted in your discipline, but you
13  believe younger employees were making the same
14  mistakes, and they should have also been disciplined
15  like you were?
16   A.    Correct, they were making similar errors
17  on the work orders, maybe not exactly the same
18  problems; but they were bringing me the wrong
19  material, alloys, things I could not succeed with,
20  and they were not being disciplined.
21   Q.    All right. So beyond them bringing you
22  the wrong materials and -- who were those younger
23  people that were bringing you the wrong materials?
24   A.    The side loader operators.

62 (Pages 245 to 248)

Page 249

1  Q.  How else were the younger people, besides
2  also being allowed to be on their cell phones and
3  keep the door open, how else were they treated more
4  favorably than you?
5  A.  Just allowed to, to have free time and
6  not have to grab a broom and start sweeping.  They
7  were allowed free time.
8  Q.  Is there any reason to doubt that you're
9  going to successfully complete your probationary
10  period at BorgWarner?
11  A.  Is there any doubt?  I should be okay.
12  I'm doing fine.
13  Q.  You haven't received any disciplines
14  since you've been there?
15  A.  No.
16  Q.  And you like your job at BorgWarner?
17  A.  Yes, I do.
18  Q.  And when you complete your probationary
19  period, will you get any sort of pay increase?
20  A.  I think so, but I'm not positive.
21  Q.  Well, has anybody told you that you'll be
22  eligible for a pay increase?
23  A.  Yes, they said there would be merit
24  raises, but they didn't say specifically when.  It

Page 250

1  may be at the end of 90 days, I'm not sure.
2  Q.  Now, you're not claiming any sort of
3  psychological injury, as a result of being
4  terminated, are you?
5  A.  I don't know.  I mean I was shattered
6  when I was fired.  I mean I was totally embarrassed,
7  humiliated by my family; yeah, I was beat up, man,
8  totally.
9  Q.  Have you seen any sort of healthcare
10  provider for any of these problems?
11  A.  I haven't been doing anything.  I've just
12  been trying to maintain with peace and love of my
13  family to get through it.
14  Q.  And obviously you're able to function and
15  work at BorgWarner?
16  A.  Yeah, I'm okay.
17  Q.  And you were also able to function and
18  work at Murphy's Metals?
19  A.  Okay so far, yes.
20  I find myself missing my --
21  Q.  I don't have a question in front of you
22  right now, Mr. Wingo.
23  A.  Okay.
24  Q.  Do you think Mark DeMien was out to get

Page 251

1  you, after you complained about his swearing at you?
2  A.  I don't know.  He, he -- things went
3  downhill from there.
4  Q.  Did you ever talk to Pat Bishop about his
5  lawyer?
6  A.  He said he might get a lawyer.  I don't
7  know.
8  Q.  Did he say to you why he may be getting a
9  lawyer?
10  A.  Not really.
11  (WHEREUPON, a recess was had.)
12  BY MR. LINDEN:
13  Q.  Now, you're aware, Mr. Wingo, you were
14  required to produce a number of documents for your
15  deposition today?
16  A.  Yes.
17  Q.  And at the beginning your counsel
18  provided me with some documents, and I just want to
19  make sure I've been provided with all the documents
20  that you were requested to produce.
21  So item number 1, you were requested to
22  produce all documents, whether admissible or
23  inadmissible, which you believe support, tend to
24  support, refute, or tend to refute any allegations

Page 252

1  set forth in your complaint.
2  Have you provided all those documents
3  today?
4  A.  I believe we have.
5  Q.  Number 2, you were requested to produce
6  all documents relating to any employment maintained
7  or sought by you from December 2007 to the present.
8  A.  Yes, sir.
9  Q.  Well, you indicated earlier in your
10  deposition that you have a list at home of places
11  where --
12  A.  I thought we sent that in.  I thought we
13  sent that in to the people.
14  Q.  Sent them in to who?
15  A.  I thought we sent it in to my lawyer to
16  give to you.
17  Q.  But you have a handwritten list or a
18  typed list somewhere?
19  A.  Yes.  We prepared a list of all the
20  companies we went to.
21  Q.  But that has not been provided today,
22  correct?
23  A.  I thought it was.  I'm shocked that it's
24  not.  I thought you had that in your hands.

63 (Pages 249 to 252)

ROBERT G. WINGO, MAY 19, 2008

Page 253

1    Q.   Well, let's talk about your shocked state
2  of mind there, Mr. Wingo, okay?
3    A.   No, I thought we sent that in, that's
4  all.
5    Q.   I'm going to hand you what your counsel
6  provided at the beginning of the deposition, and I'm
7  going to ask you to identify for me where your
8  handwritten notes are concerning your job quest.
9    A.   Okay, my wife prepared, along with me,
10 prepared the list of companies that we went to. My
11 wife helped me with it. It was an extensive list,
12 it was over a hundred companies, and --
13    Q.   I appreciate your description of it. I'm
14 going to ask you --
15    A.   Find it?
16    Q.   -- is it in there?
17    A.   I don't know.
18         I'll know right away. It's pretty
19 lengthy.
20    MR. LINDEN: Let the record reflect that
21 Mr. Wingo is now going through the documents his
22 counsel provided me.
23 BY THE WITNESS:
24    A.   Do you know that they're not here?

Page 254

1         You could save us a lot of time. There's
2  over a hundred pages here.
3    Q.   Mr. Wingo, these were documents you and
4  your counsel provided me today. They're your
5  documents. You're going to have to help us
6  determine whether or not you have, in fact, produced
7  this document, which you were obligated to produce.
8    A.   I thought it was in here. It should be
9  in here. As far as I know, it should be in here,
10 because we did provide it.
11    MS. WEGNER: I do not see such a list in these
12 documents.
13    MR. LINDEN: Okay, thank you.
14 BY THE WITNESS:
15    A.   We can amply provide that, if you really
16 need that, we can provide it. I thought my wife
17 sent it to you, I thought somebody had that already.
18    MR. LINDEN: Well, I'm entitled to it. It was
19 required to be produced. Again, I'm going to
20 reserve the right to continue the deposition, should
21 it be warranted.
22 BY MR. LINDEN:
23    Q.   All right, so coming back to the
24 documents that you were required to produce today,

Page 255

1    Mr. Wingo. Number 3 was a copy of any version of
2  your résumé which you have submitted to any
3  potential employer since December 1, 2007 to the
4  present.
5    A.   Okay.
6    Q.   Did you provide a copy of that today?
7    A.   I'm still looking. I'll check and see if
8  it's in here.
9         I didn't get a chance to go through it.
10 There's over a hundred pages here. I honestly
11 thought that all that was included and that you got
12 it. I'm sorry, if it's not.
13    Q.   I appreciate your apology. But
14 regardless, it should have been provided today.
15    A.   I thought it was in here.
16    MS. WEGNER: I actually see a résumé, page 119.
17    MR. LINDEN: Well, he has my copy right in
18 front of him.
19 BY THE WITNESS:
20    A.   There you go. It's here. I just don't
21 know where everything is. I'm just getting to the
22 bottom here.
23         That's the quarantined material.
24         Okay. There is my résumé, that was

Page 256

1  there. There you go.
2  BY MR. LINDEN:
3    Q.   So the last item is you were requested to
4  produce copies of your federal, state and any
5  applicable city income tax return for the years 2003
6  to 2006. And I saw there were some tax returns
7  there, so --
8    A.   They're all here.
9    Q.   -- presumably those have been provided?
10    A.   Yeah, they're all here.
11    Q.   All right, so why don't you give me back
12 the documents.
13    A.   Can I look for that one thing?
14    Q.   What are you looking for?
15    A.   Didn't you say there was a list?
16    Q.   Yeah, you can go ahead and finish looking
17 for that list.
18    A.   I already looked through a hundred pages.
19    MS. WEGNER: You don't have that many pages to
20 go.
21 BY THE WITNESS:
22    A.   I believe we did provide it. I'm sorry,
23 if it's not here, but I swear that we sent it in.
24    MR. LINDEN: We'll go off the record.

64 (Pages 253 to 256)

Page 257

1  BY THE WITNESS:
2      A.   I don't know what happened here.
3          (WHEREUPON, a recess was had.)
4      MR. LINDEN:  Back on the record.
5  BY MR. LINDEN:
6      Q.   So you've had an opportunity to finish
7  going through the documents you produced.
8          Were you able to find the documentation
9  concerning your job search?
10     A.   No, sir.  If you need it, we will get it
11  for you.
12     Q.   I'm going to want that, sir.
13     A.   Okay.
14     Q.   All right.  Now, among the documents you
15  did produce today were some handwritten notes of
16  your -- of somebody's.
17     MR. LINDEN:  And why don't we mark this as an
18  exhibit.  Where are we?
19          (WHEREUPON, a certain document was
20          marked Wingo Deposition Exhibit No. 38,
21          for identification, as of this date.)
22          (WHEREUPON, the document was
23          tendered to the witness.)
24

Page 258

1  BY MR. LINDEN:
2      Q.   All right.  You've been handed what's
3  been marked as Exhibit 36 (sic), which, for purposes
4  of identification, these are from your documents
5  that were produced today.  They are Bates stamped
6  000136 through 000146.
7          Who prepared this document?
8      A.   I did.
9      Q.   And before we get to the last page of
10  this exhibit, were all the other pages prepared
11  right after you had your meeting with Mr. Fruehauf?
12     A.   Let me see.  I'm not sure.
13     MS. WEGNER:  Would you care to make a copy for
14  me?
15     MR. LINDEN:  You don't have a copy of the
16  documents you produced?
17     MS. WEGNER:  Yeah, but I mean as an exhibit.
18  You did not.  Okay, that's fine.
19     (Witness looks at document.)
20  BY THE WITNESS:
21     A.   Was a there a question?
22     Q.   Yeah.
23     A.   Could you -- I thought you were still
24  asking.

Page 259

1      Q.   No.
2          (WHEREUPON, the record was read
3          by the reporter.)
4  BY THE WITNESS:
5      A.   Yes, it was.  Yes.
6  BY MR. LINDEN:
7      Q.   Okay.  And when I reviewed your notes
8  here -- and by the way, is there anybody else's
9  handwriting in this exhibit, other than yours?
10     A.   I think my wife's handwriting is at the
11  top.
12     Q.   Top of what, the very first page?
13     A.   Yes, sir, where -- yes, my wife's, my
14  wife's handwriting is at the top of the page.
15     Q.   But other than that, the rest of the
16  handwriting is yours?
17     A.   I believe so.
18     Q.   Where does your wife's handwriting end?
19     A.   Right where the line is drawn.
20     Q.   On the very first page?
21     A.   Yes.
22     Q.   So beginning on December 4th, Tuesday,
23  approximately 11 o'clock forward, onward, that would
24  be your handwriting?

Page 260

1      A.   Yes, sir.
2      Q.   And this document indicates that you were
3  complaining to Mr. Fruehauf about how Mark DeMien
4  spoke to you when he swore at you?
5      A.   Yes.
6      Q.   Okay.
7      A.   How I was being harassed, yes.
8      Q.   And you would agree, there's nothing in
9  here to indicate that you were complaining to Bill
10  Fruehauf about age discrimination?
11     A.   Yes.
12     Q.   And the very last page of this exhibit,
13  this is your handwriting?
14     A.   Which page?
15     Q.   The very last page of the exhibit.
16     A.   Let me check.
17     Q.   000146 at the top.  It refers to Pat
18  Bishop, and there's a phone number.
19     A.   Yes.
20     Q.   This is all your handwriting?
21     A.   Yes, sir.
22     Q.   And what, you prepared this after having
23  a phone conversation with Pat Bishop?
24     A.   Yes.

65 (Pages 257 to 260)

ROBERT G. WINGO, MAY 19, 2008

Page 261

1    Q.    And that's Pat Bishop's phone number at
2    the top?
3    A.    Yes.
4    Q.    And Sergio Garcia, who is he?
5    A.    Sergio and Pat Bishop were -- witnessed
6    the harassment from Mark DeMien when he was
7    swearing, and they both recommended that I file a
8    grievance or get a lawyer at that point.
9    Q.    So they saw Mark DeMien swear at you in
10   August 2007?
11   A.    Yes, sir.
12   Q.    Sergio Garcia, what job did he hold at
13   Copper and Brass?
14   A.    He worked with Pat Bishop in bay 5, as
15   receiving clerks.
16   Q.    Did they indicate that they had ever been
17   sworn at by Mark DeMien?
18   A.    I don't know for sure.
19   Q.    Anybody ever complain to you about
20   Mark DeMien?
21   A.    I don't know.  I mean, you know, lot of
22   people don't like the foreman.  I don't really know.
23   You know.  Not really.
24   Q.    So other than what you've testified to

Page 262

1    today, what other evidence, if any, do you have to
2    support your claim of age discrimination?
3    A.    Mainly the issues with the allowing of
4    breaking company rules by the younger employees.
5    Q.    Let's save some time.  I don't want you
6    to repeat anything that you've already testified to.
7          Is there anything in addition to what
8    you've testified to today to support your claim of
9    age discrimination?
10   A.    I can't think of any right now.
11   Q.    Well, today's the date, time and place
12   for you to testify, so I can discover what it is
13   that you're claiming.
14   A.    Mainly the things we've already
15   discussed.
16   Q.    Okay.  And there's -- you have no other
17   evidence, correct?
18   A.    I'm not sure if something becomes evident
19   after this, I don't know.  But I think that's all.
20   Q.    You're currently not aware of any other
21   evidence, though, right?
22   A.    Right.
23   Q.    Okay.
24   MR. LINDEN:  I have nothing further.  Thank you

Page 263

1    for your time, Mr. Wingo.
2    THE WITNESS:  Okay, thank you.
3    MR. LINDEN:  You're welcome.

Page 264

1          EXAMINATION
2    BY MS. WEGNER:
3    Q.    Mr. Wingo, during your deposition today
4    you've been shown a number of documents regarding
5    discipline that you received, for which you did not
6    file any grievances.
7          Do you recall that?
8    A.    Yes.
9    Q.    What is the reason you did not file
10   grievances regarding much of the discipline that you
11   received during your employment with Copper and
12   Brass Sales?
13   A.    Well, it just wasn't my style.  I just
14   didn't, I just didn't challenge some of the stuff,
15   because I didn't feel we would get anywhere.  I just
16   tried to -- I mean everybody makes mistakes.  I just
17   tried to do better and not make mistakes.  I mean I
18   did 200,000 orders at Copper and Brass, yes, I'm
19   going to make some mistakes.  They took exceptions
20   to the ones I made.  It was discriminating against
21   me.
22   MR. LINDEN:  I'm going to --
23   MS. WEGNER:  Please.
24   BY MS. WEGNER:

66 (Pages 261 to 264)

Page 265

1    Q.   Please, Mr. Wingo, are there any other
2  reasons -- did you believe that you would suffer any
3  type of retaliation, if you filed grievances?
4    A.   That was kind of the deal.  I couldn't, I
5  wouldn't be able to -- allowed to work overtime, if
6  I challenged anything with grievances and stuff.
7    Q.   Okay.  All right.
8         And why did you believe that you wouldn't
9  be allowed to work overtime, if you challenged any
10  discipline by filing grievances?
11    A.   Because other employees said that that's
12  how the foremans get even with you, or retaliate, is
13  they don't allow you to work overtime.
14    Q.   Quite early on in your deposition you
15  were shown Exhibit Number 3, which was an employee
16  report form, dated July 16, 1999.
17    A.   Yes.
18    Q.   Do you recall that?
19    A.   No, because no one signed it.
20    Q.   You recall, though, being shown this
21  document earlier in your deposition.
22    A.   Oh, yes, yes, sure.  Exhibit 3, right.
23    Q.   Okay.  Was it the standard practice that
24  you sign an employee report form when you were

Page 266

1  being -- receiving counseling or discipline at
2  Copper and Brass?
3    A.   Yes.
4    Q.   And if you did not, as a matter of
5  standard practice at Copper and Brass, sign an
6  employee report form regarding counseling or
7  discipline, would it be standard practice to notice
8  that you refused?
9    A.   Yes, we would, we would write down I
10  refused to sign.  This one says "I disagree with
11  statement," but they just put an X through it.
12  Anyone could have done that.
13         I did not sign the document, no.
14    Q.   And on Exhibit Number 3, this employee
15  report form of July 16, 1999, it does not contain
16  any signature of any supervisor, correct?
17    A.   Correct, right.
18    Q.   Okay.
19    A.   There's no signature from the supervisor.
20    Q.   And earlier in your deposition you were
21  shown Exhibit Number 4 --
22    A.   Okay.
23    Q.   -- which appears to be a training, a
24  number of sheets of a training summary and

Page 267

1  certification log.
2         Are all of the initials in the right-hand
3  column your initials?
4    A.   Let me check it.
5         It looks like they're all my initials,
6  but the first page doesn't even have a date on it.
7  And that's the one that says the Internet one.
8         Actually, it does have a date here.
9    MR. LINDEN:  Well, I'm going to object, because
10  your witness is not being responsive.
11  BY MS. WEGNER:
12    Q.   That was not my question.
13    A.   Okay.
14         I see it.
15    Q.   Each page of Exhibit Number 4 in the
16  right-hand column where it indicates it should be
17  the employee's initials?
18    A.   Okay.
19    Q.   Are those your initials?
20    A.   Yes, yes.
21    Q.   All right.
22    A.   Yes.
23    Q.   Okay.  Now, do you take some -- have some
24  dispute with the first page of this training log,

Page 268

1  Exhibit Number 4, in connection with the notation
2  for the Internet?
3    A.   I thought it was, but now that I see the
4  date is over here, instead of at the top of the page
5  where it says "Date, assigned position," it's blank,
6  and then they dated it at the bottom.
7    Q.   So you don't have any issue with --
8    A.   No, I think that one's okay.
9    Q.   Okay.
10    A.   What I'm saying is I didn't know if that
11  one was an add-on, because that's -- everything
12  else --
13    MR. LINDEN:  Again, Mr. -- I'm going to object.
14  The witness is not being responsive to the question,
15  and I ask that it be stricken.
16  BY MS. WEGNER:
17    Q.   In your position that you held at the
18  time of your termination, handling the shipping
19  functions, other than repetitive documentation
20  errors, to your knowledge, what other types of
21  errors could you have made?
22    A.   In addition to the regular errors or key
23  punch errors?  What do you mean?
24    MR. LINDEN:  I'm going to object to the form of

67 (Pages 265 to 268)

Page 269

1  the question.
2  BY MS. WEGNER:
3      Q.   I'm sorry, documentation errors?
4      A.   Meaning -- speak English for me.
5           I'm sorry, I'm brain dead at this point.
6      Q.   Well, fine.   There are documents here
7  that indicate you made repetitive documentation
8  errors.
9      A.   Yes.   Okay, there was -- it was
10 repetitive errors, because there's only so many
11 things you can do wrong.   So I guess, yes, if you
12 make an error, it's kind of a repeat deal.   We do
13 the same -- I do 200,000 orders, it's a repetitive
14 process.   Some of them are going to be the same
15 mistakes, yes.
16     Q.   Did you feel you received adequate
17 representation from your union, during your
18 employment with Copper and Brass Sales?
19     A.   No.
20     Q.   Why did you believe you did not receive
21 adequate representation from your union, while you
22 were employed at Copper and Brass Sales?
23     A.   Well, just the way they represented me
24 all along, it didn't seem like they were behind me.

Page 270

1  It seemed like they were more with the company or
2  with Mark DeMien in trying to, you know, terminate
3  me, seemed like they were helping him terminate me.
4      Q.   You were earlier shown Exhibit Number 10,
5  which was an employee report form for June 15, 1999
6  regarding a verbal warning for repetitive errors,
7  that you responded to by indicating there was a
8  problem with the scale not working.
9      A.   Yes.
10     Q.   Did you notify anyone at Copper and Brass
11 Sales that the scale was not working?
12     A.   I believe I did, yes.
13     Q.   And did anyone at Copper and Brass Sales
14 make any attempt to get the scale --
15     A.   Repaired.
16     Q.   -- repaired?
17     A.   Eventually I think they did, but I think
18 there was like a short in the wire, and they kind of
19 let it go for two months.   The scale was working off
20 and on for two months.   It had a short in it.   If
21 you happened to step on it the wrong way, it would
22 go haywire and, you know.   It didn't happen all the
23 time so they didn't repair it right away; and then
24 it got worse and worse, and they finally repaired

Page 271

1  it.
2      Q.   You were earlier shown Exhibit Number 11.
3  It's just an employee report form for January 10,
4  2001, which had two pages attached to it of work --
5  a packing list and work orders.
6      A.   Yes.
7           One was not even my name.   I didn't do
8  that one.
9      Q.   Okay.   Are you referring to the second
10 page of Exhibit Number 11, this packing list?
11     A.   I'm referring to the work order 493068.
12 That one has the initials, "Filled by and packed by
13 LDA," which is another employee.   That's not my
14 initials.
15     Q.   Okay.
16     A.   So they did the order.   I didn't do that
17 order.
18     Q.   Do you know who the initials LDA refer
19 to?
20     A.   Lance, that would be Lance Amack.
21     Q.   All right.   Then, in looking at Exhibit
22 Number 11, is it your contention that you should not
23 have received discipline, in connection with the
24 orders contained on work order 493068 or 410341,

Page 272

1  because you weren't responsible for packaging?
2      A.   Correct, yes.
3      Q.   During your employment with Copper and
4  Brass Sales, were you ever provided with a
5  definition of the company's -- I'm sorry, let me
6  start that one again.
7           During your employment with Copper and
8  Brass Sales, did you ever receive the Copper and
9  Brass Sales definition of falsification of company
10 documents?
11     A.   I can't remember if that was in the
12 contract or the work rules.
13          It was never an issue.   I never did that
14 stuff, so I never, you know, paid total attention to
15 that.
16     Q.   Did you have any understanding, while you
17 were employed at Copper and Brass Sales, what the
18 meaning was of falsifying company documents?
19     MR. LINDEN:   Objection.   Asked and answered.
20 BY MS. WEGNER:
21     Q.   You can answer.
22     A.   Could you please rephrase it, please, or
23 say it again, please.
24     MS. WEGNER:   Could you please read it back for

68 (Pages 269 to 272)

Page 273

1  me.
2       (WHEREUPON, the record was read
3       by the reporter.)
4  BY THE WITNESS:
5    A.   Yes.
6    Q.   Okay.  What was your understanding of the
7  meaning of falsifying company documents?
8    A.   To write something that, that was false
9  or to, to say something that wasn't true about
10  something.
11    MS. WEGNER:  I'm looking for 27.
12    There it is, 27.
13  BY MS. WEGNER:
14    Q.   All right.  You earlier in the deposition
15  were shown Exhibit Number 27.
16    A.   Okay.
17    Q.   Which was an employee report form of
18  October 4, 2007 regarding the switching of labels on
19  orders, for which you received a written warning,
20  correct?
21    A.   Yes.
22    Q.   Okay.  And you earlier testified that
23  there was another employee working with you --
24    A.   That's what I understand.

Page 274

1    Q.   -- on these orders that are documented on
2  Exhibit 27, correct?
3    A.   Yes.
4    Q.   All right.  Who was the other employee?
5    A.   Lance Amack.
6    Q.   You've got to let us finish.
7       Who was the other employee working with
8  you on the work orders that are documented in
9  Exhibit 27?
10    A.   Lance Amack.
11    Q.   Okay.  Is it your contention Mr. Amack
12  was responsible for the, any of the errors that are
13  documented in Exhibit 27?
14    A.   I think we both share the blame.  I key
15  punched it, and he put it on the wrong bundles.
16       I was helping him out doing the key
17  punching.
18    Q.   You were earlier shown Exhibit Number 28,
19  which is an employee report form for October 10,
20  2007.
21    A.   Yes.
22    Q.   And in response to the employee report
23  form that's marked as Exhibit Number 28, did you
24  write this statement that the order should not have

Page 275

1  come to RBW-NP?
2    A.   Yes.  It should have been brought to the
3  saw area, and they brought it to my area, which is
4  non-processing.  And it should have been a processed
5  order, it should have been cut in half.
6    Q.   Okay.  Earlier in the deposition you were
7  shown Exhibit 37 --
8    A.   Yes.
9    Q.   -- which was a daily production log?
10    A.   Yes.
11       11/29?
12    Q.   Yes, Exhibit 27 is the daily production
13  log for November 29th.
14    A.   Yes.
15    Q.   Is that 2007?
16    A.   2007, yes.
17    Q.   In making time notations in the
18  right-hand column of the daily production log --
19    A.   Yes.
20    Q.   -- was it your standard practice to put
21  the time you started a project or the time you
22  stopped a project?
23    A.   Normally I think it was a starting time.
24  But if the bell rang and it was the last order of

Page 276

1  the day, you obviously had to put the ending time,
2  too.
3       So I think that's what I did on this one.
4  I may have started it, but at the time that I wrote
5  the finish, 'cause I think I wrote the complete -- I
6  didn't get a chance to put -- the time didn't come
7  out right.  The time came out at 2:25, 'cause the
8  bell rang.  So in other words, it was one of those
9  orders, it was a partial.  I wasn't able to complete
10  it, so I wrote down 2:25, because the bell rang.
11       And what it could have been --
12    Q.   No.
13    A.   Okay.  That's enough.
14    Q.   All right.  We earlier looked at Exhibit
15  Number 11.  I'd like you to refer back to that
16  again --
17    A.   Okay.
18    Q.   -- and take a look at this work order
19  493068.  On the right-hand side there are boxes for
20  the inclusion of information for filled by, packed
21  by and QA audit.
22       Do you see those --
23    A.   Yes.
24    Q.   -- around the middle of the page?

69 (Pages 273 to 276)

ROBERT G. WINGO, MAY 19, 2008

Page 277

1    A.    Sure.
2    Q.    Okay.
3    A.    Yes.
4    Q.    In looking at this work order, was --
5    were those the boxes that Mr. Lunt wanted you to
6    complete, you and -- all your initial in each,
7    filled by, packed by, and QA audit?
8    A.    Yes.
9    Q.    Okay.
10    A.    Yes.
11    Q.    All right.  On any given day, was it your
12    responsibility to fill a work order --
13    A.    Um.
14    Q.    -- with respect to getting together the
15    materials?
16    A.    Certain areas were different.  The RBW
17    area was different, it had a different system that
18    they had come up with.  Normally, the field guy is,
19    is the guy that goes to get it, okay, or the guy
20    that cuts it.  In this case, the one you're talking
21    about, this guy cut it, this guy packed it and this
22    guy was the audit on that one.
23    Q.    Are you referring to 410341, that work
24    order that's part of Exhibit 11?

Page 278

1    A.    Yes.
2    Q.    Okay?
3    A.    So Lance signed that one there as packed
4    by and filled by, but he technically did not -- this
5    was an item that was cut, it was metal that was cut.
6    And Lance did not cut the material, so he did not
7    fill the order.  Someone else should have signed it
8    for fill.
9    Q.    To your knowledge, was there someone at
10    Copper and Brass Sales, while you were employed
11    there in the last several years, that was
12    responsible for QA audit?
13    A.    I'm not sure who they did on this one.
14    Normally it would be, normally it would be the
15    packer, the packer did a lot of them.  But in this
16    case it could have been the operator or the lead
17    man.  Looks like the lead man signed off on that.
18    Q.    Well, in the last year or two of your
19    employment at Copper and Brass Sales, what was your
20    position?
21    A.    Packer.
22    Q.    Okay.  And then, as a packer in the last
23    two years that you worked at Copper and Brass Sales,
24    were you responsible for filling in the box for QA

Page 279

1    audit on the work orders?
2    A.    I did a lot of the time, yes.
3    See, Lance did not at this time, though,
4    so in 2000 they weren't doing it that way, 2001; but
5    later they did have us do it.
6    Q.    Earlier in your deposition you were shown
7    Exhibit Number 3 --
8    A.    Okay.
9    Q.    -- which was an employee report form for
10    July 16th, 1999 --
11    A.    Yes.
12    Q.    -- which reflected that you were
13    receiving a suspension for wasting time, which
14    included talking to Randy Lunt, correct?
15    A.    I never did receive a suspension.
16    Q.    Okay, fair enough.
17    A.    I never signed it, I never knew about it.
18    The supervisor never signed it.  I don't know where
19    it came from.  It's --
20    Q.    During the course of your employment at
21    Copper and Brass Sales, did you often have reason to
22    talk to Randy Lunt, in connection with performing
23    your duties?
24    A.    Yes.

Page 280

1    Q.    Okay.  It wouldn't be anything unusual
2    for you to talk to Mr. Lunt, in connection with a
3    question that you had or performing your duties --
4    A.    Correct.
5    Q.    -- right?
6    A.    Yes.
7    8:05 is break time, so I don't know why
8    he'd be yelling at me when it's break time.
9    Q.    All right.  Earlier in your deposition
10    you were shown Exhibit Number 13 --
11    A.    Okay.
12    Q.    -- which was a memo --
13    A.    Yes.
14    Q.    -- that you responded to in your own
15    handwritten words.
16    A.    Mm-hmm.
17    Q.    Correct?
18    A.    Yes.
19    Q.    Okay.
20    MR. LINDEN:  What's the date on that?
21    MS. WEGNER:  February 12, 2001.
22    MR. LINDEN:  Thank you.
23    MS. WEGNER:  Exhibit 13.
24    BY MS. WEGNER:

70 (Pages 277 to 280)

Page 281

1    Q.    Why did you state at the bottom of this
2  memo, Exhibit 13, that you thought the system was
3  causing some of the errors?
4    A.    Well, it says -- I think the system is
5  causing some of the errors, because this job packing
6  used to be a two-man operation, and now it's a
7  one-man operation, with the hurry-up mentality. In
8  other words, we were hurried through the orders, and
9  that caused errors. It used to be a two-man
10  operation, and they lowered it to a one-man
11  operation, and that kind of speeded things up and
12  caused errors.
13    Q.    At the very bottom of the page there is a
14  parentheses, and there are a couple of words.
15       Do you know what you were --
16    A.    I was trying to read that myself. I
17  could not tell exactly what that says.
18    Q.    Okay.
19    A.    Less rush, maybe. I think it got chopped
20  off. I think it's less rush. See, the S is chopped
21  off, and the H is chopped off?
22    Q.    And is that a name?
23    A.    No, no, it just means don't rush us. I'm
24  saying by rushing us, you cause us to make errors.

Page 282

1    Q.    Okay. Do you have any recollection of
2  the incidents that are described in Exhibit
3  Number 13, with the specific work orders?
4    A.    This goes back --
5    Q.    To 2001?
6    A.    -- to 2001. That's seven years ago. I
7  don't have total recall.
8    Q.    Do you know, as you sit here today,
9  whether or not, as it's stated in the second
10  paragraph, that the machine operator made the first
11  error, do you know who that machine operator was?
12    A.    I don't have the work order, so it's
13  really hard to tell.
14    Q.    Do you have any knowledge as to whether
15  or not the machine operator that was responsible for
16  the error in Exhibit Number 13 received any
17  discipline?
18    A.    I don't think so. I don't know. That I
19  don't really know. It doesn't say here.
20    Q.    Okay. And in the next paragraph, the
21  third paragraph of Exhibit 13, it talks about work
22  order number 414421 and that the operator used the
23  wrong part number to fill the order.
24       Do you have any knowledge as to who that

Page 283

1  operator was?
2    A.    No. It doesn't say here who it was.
3    Q.    And do you have any knowledge as to
4  whether the operator that was responsible for using
5  the wrong part number to fill the order received any
6  discipline?
7    A.    It doesn't say here. Just says me.
8    Q.    So you don't have any knowledge as to --
9    A.    No, I don't have any --
10    Q.    -- whether or not the operator received
11  any discipline?
12    A.    Don't have any knowledge. It doesn't
13  say.
14    Q.    You were earlier shown an employee report
15  form for December 1, 2005, marked as Exhibit 23.
16    A.    Okay.
17    Q.    And in response, where you disagreed with
18  this written warning, you stated you were doing
19  100 pound sheet order, sheets --
20    A.    Yes.
21    Q.    -- were heavy?
22    A.    They were very heavy.
23    Q.    Okay.
24    A.    It's normally a two-man job. When

Page 284

1  they're over a certain weight, they have a weight
2  restriction you can't lift.
3       I should have had another guy, and he
4  left me alone there. I had 100-pound sheets, they
5  were heavy stainless sheets. He left me alone to do
6  it myself, so I did the best I could. I did 13 of
7  them an hour, which was not that bad, because they
8  were super heavy sheets.
9    Q.    Would you typically have assistance --
10    A.    You should.
11    Q.    -- if you were doing hundred-pound
12  sheets?
13    A.    Yes. The foremen know this, and they
14  should send you a helper when you're doing something
15  that heavy, because we have a 70-pound weight
16  restriction.
17    Q.    Okay. I'm sorry, you may have provided
18  this testimony earlier. I simply don't recall what
19  time your shift started each day, typically.
20    A.    6 o'clock, typically. 6:00 to 2:30.
21    Q.    And did you get regular breaks --
22    A.    Yes.
23    Q.    -- during your shift?
24    A.    Yes, 8 o'clock and, and 2 o'clock --

71 (Pages 281 to 284)

Page 285

1  1 o'clock, excuse me.  8 o'clock to 1 o'clock.  We
2  had a lunch break, too, at 11:00.
3      Q.  How long was your lunch break?
4      A.  Half hour.
5      Q.  And how long were your morning and
6  afternoon --
7      A.  8 o'clock and 1 o'clock were 15-minute
8  breaks.
9      Q.  Okay.  Earlier in your deposition you
10  were shown Exhibit 24, which is an employee report
11  form for March 28, 2006.
12     A.  Yes.
13     Q.  And --
14     A.  It was throw-away masonite.
15     Q.  No.  My question to you is, it indicates
16  that there was a change made in the category of rule
17  violation, as noted by Mr. DeMien?
18     A.  Yes.
19     Q.  Initially, it was a category D violation?
20     MR. LINDEN:  I'm going to object.  It's an
21  inaccurate characterization of what the document
22  says, and I think the document speaks for itself.
23  BY MS. WEGNER:
24     Q.  Were you provided with any reason why you

Page 286

1  were charged with this category B violation, failure
2  to perform task, as reflected in Exhibit 24?
3      A.  It was throwaway material.  I was -- I
4  took it out of the garbage can.  It was getting
5  thrown out, and I was going to use it.  And I didn't
6  ask Mark, I didn't ask if I can use it; and he said
7  bring it back, so I did.
8          But normally he didn't care, but this
9  time he took issue.
10     Q.  Well, had you --
11     A.  Other employees were allowed to take
12  boxes and not ask, and they didn't say nothing; and
13  this one, he took issue with me.
14     Q.  You were earlier shown Exhibit Number 26,
15  which is an employee report form for June 22,
16  2007 --
17     A.  Yes.
18     Q.  -- which indicates that you failed to
19  notify the foreman to verify and sign off on the
20  piece count.  And you responded by saying "New
21  system, getting used to system."
22     A.  Yeah.
23     Q.  Now, let me ask you this.
24     A.  Mm-hmm.

Page 287

1      Q.  Prior June of 2007, had you not been
2  required to notify the foreman to verify and sign
3  off on piece counts?
4      A.  Normally we had to -- we had to start
5  doing it by the piece count, only they didn't want
6  it billed by the weight, they wanted it billed by
7  the piece count, so we had to adhere to that.
8      Q.  And so when do you recall the process
9  changing, where --
10     A.  Around --
11     Q.  -- Copper and Brass required that you
12  bill by piece rather than weight?
13     A.  Must have been around this time, because
14  I said in my statement that it was a new system, and
15  I was getting used to it.  So they probably just
16  implemented it to be that way all the time.
17     Q.  All right.  What was your job
18  classification at Copper and Brass Sales?
19     A.  Order clerk.
20     Q.  Was that your official job
21  classification, pursuant to the collect bargaining
22  agreement?
23     A.  Warehouseman, I guess is what they
24  basically called it.  But if you break that down

Page 288

1  further, it would be order clerk.
2      Q.  To your knowledge, did Tyler DeMien have
3  the same job classification of warehouseman?
4      A.  Yes.
5      Q.  And to your knowledge, did the other side
6  loaders at Copper and Brass Sales, while you were
7  apply -- while you were employed there, have the
8  same job classification as warehousemen?
9      A.  Yes.
10     Q.  During your employment with Copper and
11  Brass Sales, you stated that there were other people
12  who handled shipping and receiving duties, correct?
13     A.  Yes.
14     Q.  Did those other persons that handled
15  shipping and receiving duties, to your knowledge,
16  also have the classification of warehouseman?
17     A.  Yes.
18     Q.  During your employment at Copper and
19  Brass Sales, were there ever -- was there ever a
20  period of time where production errors were posted
21  for everyone to see?
22     A.  Yes.  Early on at different times they
23  had posted it, so we could be made aware of our
24  mistakes.  They didn't always specify names or, you

72 (Pages 285 to 288)

Page 289

1  know, stations, like RBW station or the sheet
2  station or like that. They would break it down like
3  that, as far as where the errors were coming from;
4  and there was quite a few from all over the shop, so
5  it was our goal to try to reduce the errors.
6      Q.    When you confronted Mr. Fruehauf in the
7  parking lot --
8      A.    Yes.
9      Q.    -- after your termination, did you only
10 complain to him about the harassment you'd received
11 from Mark DeMien?
12     A.    Yes, I basically talked to him about the
13 harassment issue, that I said over a course of time
14 I've made relatively few errors. And I says, you
15 know, I think other people made more, but I was the
16 only one that they took issue with.
17     Q.    When you spoke with Mr. Fruehauf on
18 December 4th, didn't you complain about being
19 terminated?
20     A.    Yes, sure, of course, yes. I was
21 devastated. It was Christmastime, and it was not a
22 good time.
23     Q.    And when you met with Mr. Fruehauf in
24 the --

Page 290

1      A.    His office.
2      Q.    On December 4th, you went to his office.
3           Did you suggest that he contact
4  Mr. Bishop or Mr. Garcia to confirm what you had
5  indicated was the treatment you received?
6      MR. LINDEN:  I'm going to object to the form of
7  the question. It's leading.
8
9  BY THE WITNESS:
10     A.    Yes, it was -- I did.
11          He seemed, Mr. Fruehauf seemed very
12 concerned that one of his employees would speak to
13 another employee like that, because if a
14 warehouseman spoke to anyone like that, the
15 warehouseman or boss, they would be terminated
16 immediately. And here his foreman was, was acting
17 very unprofessional. And he seemed very concerned
18 with it, and he seemed like he wanted to get to the
19 bottom of it.
20          So yes, he did say he was going to
21 interview Pat Bishop and Sergio Garcia to see what
22 actually happened.
23     Q.    Do you know whether or not Mr. Fruehauf
24 ever interviewed Mr. Bishop or Mr. Garcia about the

Page 291

1  incident that you claim was abusive and harassing
2  from Mr. DeMien?
3      A.    Yes. Mr. Fruehauf said he was going to
4  contact him, and he was going to call me in for an
5  inter -- you know, to talk to me after he talked to
6  them. But later that day he called me over the
7  phone, and we had a conference call on the phone
8  with the three people in the, in his office, that
9  Mr. Fruehauf, Randy Lunt and Mark DeMien. And I was
10 on -- at my house on the phone with them, on a
11 conference call.
12     Q.    This was the very same day, December 4th?
13     A.    Same day, yes.
14     MR. LINDEN:  I'm going to object and move that
15 his response be stricken, because you asked him a
16 simple question whether or not Mr. Fruehauf ever
17 spoke to Mr. Garcia or Mr. Bishop.
18 BY MS. WEGNER:
19     Q.    Did Mr. --
20     A.    I'm trying to explain what happened.
21     Q.    No, no, no, no.
22          Did Mr. Fruehauf ever get back to you to
23 tell you whether or not he had interviewed
24 Mr. Garcia or Mr. Bishop?

Page 292

1      A.    Yes, he did. He --
2      Q.    When did Mr. Fruehauf get back to you to
3  advise you whether or not he had interviewed
4  Mr. Garcia or Mr. Bishop?
5      A.    On a phone call later that day.
6      Q.    And this is later December 4th that
7  Mr. Fruehauf contacted you?
8      A.    Yes.
9      Q.    What did Mr. Fruehauf tell you on
10 December 4th, regarding interviewing Mr. Garcia or
11 Mr. Bishop about your complaints?
12     A.    He said that, that both of them, that
13 they said that they did not hear anything, when, in
14 fact, they witnessed the whole thing. Mr. Fruehauf
15 claimed that both of them said that they did not
16 hear anything.
17     Q.    When Mr. Fruehauf contacted you by phone
18 later in the day on December 4th, did he tell you
19 anything about any decision he had arrived at,
20 regarding your termination?
21     A.    Well, after he lied and said about the,
22 the interview with Pat Bishop and Sergio Garcia,
23 after he lied and said he talked to them, when he
24 didn't, then he hung up on the phone. And so I

73 (Pages 289 to 292)

Page 293

1  didn't get to hear the final, final words on the
2  whole issue. 'Cause I called back a few minutes
3  later, and he wouldn't pick up.
4      Q.   Okay. Now, did you ever come to learn,
5  from either Mr. Bishop or Mr. Garcia, that
6  Mr. Fruehauf had, in fact, not interviewed them
7  regarding Mr. DeMien's --
8      A.   Yes.
9      Q.   -- Mr. DeMien's verbal abuse of you in
10 late August of 2007?
11     A.   Could you restate that, please. I got
12 lost in the beginning, or from the beginning to the
13 end. Could you --
14     Q.   Did you ever come to learn that
15 Mr. Fruehauf had, in fact, not interviewed
16 Mr. Bishop or Mr. Garcia, regarding Mr. DeMien's
17 verbal abuse of you on August 30, 2007?
18     A.   Yes, I did.
19     Q.   And how did you come to learn
20 Mr. Fruehauf had, in fact, not interviewed
21 Mr. Bishop or Mr. Garcia, regarding Mr. DeMien's
22 verbal abuse of you on August 30, 2007?
23     A.   When I went in for my hearing with Gino,
24 my union representative, I went in for the final

Page 294

1  meeting with Randy Lunt, Gino, my union rep and Pete
2  LaRocco, my union steward, and I ran into Pat
3  Bishop. And I said, Pat, didn't you tell them that
4  you heard the whole conversation? Or what did you
5  say? Didn't you hear it or what?
6         He says, yeah, of course I heard it. I
7  was there, and I told you to hire a lawyer, that you
8  shouldn't let him talk to you that way. But he said
9  Fruehauf never asked us, he never asked if we
10 witnessed it. So in other words, he lied and said
11 that he did witness it, but he never did ask them if
12 they saw it.
13     Q.   During your employment with Copper and
14 Brass Sales, when did you begin completing the
15 production logs?
16     A.   That's hard to say. Probably at least
17 ten or 15 years ago.
18     Q.   Okay.
19     A.   Quite a while back.
20     Q.   And did you do anything different in the
21 way that you completed the production logs from the
22 time you began until your termination?
23     A.   Not so much. It basically stayed the
24 same.

Page 295

1         I think before we maybe didn't put times,
2  but I think the main thing was always add the work
3  order number, the pieces and the pounds and the date
4  and the shift and the station.
5      Q.   And ever the course of time, did it come
6  to be that you began putting down the time you
7  started the project?
8      A.   Yeah, I think after a while they started
9  requesting times, too.
10     Q.   Okay. And so the work, the production
11 logs that you completed for November 28th and
12 November 29th, that we earlier looked at as
13 exhibits, did you do anything else in the way you
14 documented your work on those than on any other
15 logs?
16     A.   Basically the same. I just documented
17 that there were wrong sizes, because I couldn't fill
18 the order with the wrong material. It would have
19 been an error. So I had to stop right there and
20 pull off the order and notify the side load operator
21 that it was the wrong material.
22     Q.   During your employment with Copper and
23 Brass Sales, were you ever instructed to only enter
24 completed projects on the production log?

Page 296

1      A.   I think that we were allowed to do both,
2  we were allowed to do partials and completed.
3  Mainly most of them that you put down there are
4  completed. Later in the day you may get some
5  projects that go incompleted or that get canceled.
6  Sometimes the orders get canceled before you can
7  finish them or right after you finish them.
8      Q.   To your knowledge, who replaced you in
9  your packer position at Copper and Brass Sales?
10     A.   I believe Tyler DeMien replaced me and
11 was working overtime and -- I don't know if he's
12 still doing it, but he was doing it for a while.
13     Q.   Prior to the production logs of
14 November 28th and November 29, 2007, had you ever
15 been accused of taking credit for the work of others
16 in your daily production log?
17     A.   No.
18     Q.   When you had the conference call with
19 Mr. Fruehauf, Mr. Lunt, and Mr. DeMien on
20 December 4, 2007, did anyone else participate in
21 that call?
22     A.   My wife. I talked to my wife for a
23 second briefly on the phone, when I was talking to
24 them. I asked Mr. Fruehauf to please hold for a

74 (Pages 293 to 296)

Page 297

1  second. And I asked my wife, I told my wife,
2  they're lying to me, what do I do? They're lying.
3  They claimed that they talked to them and -- when
4  they didn't even talk to them, it turned out.
5      Q.   Were you ever made aware that it was the
6  policy of Copper and Brass Sales, pursuant to
7  Randy Lunt, that no one was terminated for
8  documentation errors?
9      A.   Yes. Mr. Lunt told my wife that -- you
10  know, she was very concerned after, after the second
11  write-up or so. She was getting very concerned and
12  worried about the whole situation, as well as I was,
13  and so she talked to Mr. Lunt about certain issues
14  and stuff.
15       And Randy said that we had never
16  terminated anyone over errors, that they'd always
17  just counseled them and tried to make them do
18  better.
19      Q.   When, to your knowledge, did your wife
20  speak to --
21      A.   That was sometime --
22      Q.   -- Mr. Lunt?
23      A.   -- late in the fall. November, probably.
24      Q.   And to your knowledge, did your wife

Page 298

1  personally meet with Mr. Lunt to discuss the issues
2  of the write-ups that you received?
3      A.   No, no, just talked over the phone.
4      Q.   You earlier were asked about the
5  incidents involving data entry errors that you had
6  made.
7       Do you recall that?
8      A.   Yes.
9      Q.   Okay. Do you have any knowledge of other
10  employees making data entry errors?
11      A.   I'm sure there was some, because there
12  was a lot of errors made. But I can't specify,
13  without the company documentation. I mean they have
14  a record of every error.
15      Q.   How do you know the company has a record
16  of every error?
17      A.   They used to post them, and they keep
18  track of them.
19      Q.   When was the last time you saw errors
20  posted?
21      A.   I can't even remember the last time. I
22  think they quit doing it the last year or two.
23      Q.   And as you sit here today, do you recall
24  when you began completing production logs during

Page 299

1  your employment at Copper and Brass Sales?
2      A.   Roughly, the production logs come in
3  about 15 -- 10 or 15 years ago, I'm not exactly
4  sure. I would say probably 15, back in the day.
5  I'm not sure.
6      Q.   So did you ever receive any specific
7  instruction on how to complete the production logs?
8      A.   Just fill them out the way we did, you
9  know, the orders that you do; and, you know, for
10  partials, they were obviously most of the time at
11  the end of the orders. Sometimes the partials come
12  in the middle of the orders, because you would do an
13  order, and there wouldn't be enough stock to do the
14  order, so maybe some would come in the middle of the
15  orders occasionally.
16       But you try to document, if you can, but
17  you couldn't -- the employees rarely documented
18  everything that went through. You try to --
19      MR. LINDEN: I'm going to object and move to
20  strike as non-responsive.
21  BY MS. WEGNER:
22      Q.   Earlier you talked about production logs,
23  where there were initials of other employees that
24  you believe completed work on a work order you had

Page 300

1  worked on, that they had completed that on a
2  different shift.
3       Do you remember that?
4      A.   Yes.
5      MR. LINDEN: I'm going to object. It's a
6  mischaracterization of his testimony.
7  BY MS. WEGNER:
8      Q.   Do you know whether or not Zidro Garcia
9  created production logs, when he worked in packing
10  in Copper and Brass Sales on the second shift?
11      A.   Yes.
12      Q.   Okay. And do you know whether or not
13  Zidro Garcia's production logs would include the
14  same, some of the same work orders that were on your
15  production logs, because he completed work on
16  projects you had worked on?
17      A.   Yes, I started the project on that one in
18  particular with Zidro. I started the order, but the
19  metal was the wrong size. So I told the side loader
20  operator that pulled the wrong size, I said, look,
21  Lizardo, you pulled the wrong stuff. Do not ship
22  it.
23       I also told the second shift guy that had
24  come in early, which I noted on my production log

Page 301

1  that I told Arty that it was the wrong size pull.
2  That's right here, I told Arty that that was the
3  wrong size pull. So basically I was only able to
4  partial the order. I could not complete it, because
5  it was the wrong size, so I documented that all on
6  the order.
7      MS. WEGNER: I don't have anything else.
8      MR. LINDEN: I have some follow-up questions.
9              EXAMINATION
10 BY MR. LINDEN:
11     Q.  I'm trying to reconcile your testimony
12 earlier today to what you just testified to,
13 Mr. Wingo.
14         When I was asking you questions, I asked
15 you questions about whether or not you had any
16 complaints with the way your union represented you,
17 and you responded no.
18         Do you remember that?
19     A.  Yes.
20     Q.  Okay. And yet in response to your
21 counsel's questioning you testified that you felt
22 the union did not adequately represent you.
23     A.  Yes, it's a later stage --
24     Q.  It's a simple yes or no. I'm not asking

Page 302

1  for anything else, Mr. Wingo.
2          And then you testified that, something to
3  the effect that you didn't file any grievances,
4  because you would be retaliated against, because you
5  would lose your overtime opportunities.
6          Do you remember testifying to that?
7      A.  Yes.
8      Q.  Ever complain to Pete LaRocco about that?
9      A.  Yes.
10     Q.  When?
11     A.  On numerous occasions. That's why I
12 couldn't have Pete represent me, because he didn't
13 always give me a fair shake, especially near the
14 end, before I was terminated.
15     Q.  Okay. Let's deal with another seeming
16 inconsistency with your testimony.
17         Earlier, do you remember me asking you
18 questions about whether or not Pete LaRocco
19 represented you properly, and you indicated that he
20 did?
21     A.  Well, as overall view, yes, he was okay.
22     Q.  Oh, I see.
23     A.  But in certain specifics near the end he
24 was not very good.

Page 303

1      Q.  Near the end, let's talk about near the
2  end. Let's see if we can be a little more precise
3  today, okay, Mr. Wingo?
4      A.  Sure, sure.
5      Q.  When was it that you first started having
6  problems with Mr. LaRocco?
7      A.  During some of the representations where
8  he would maybe -- Pete LaRocco was accused of being
9  sold out by --
10     Q.  I'm going to have to interrupt you. The
11 question simply called for when. That means a day.
12     A.  I don't know.
13     Q.  Was it 2007, was it 2006, was it 1999?
14     A.  Off and on, maybe, over a three-year
15 period.
16     Q.  When did it start?
17     A.  I don't know, specifically.
18     Q.  Can't recall specifically?
19     A.  Off and on, over a three-year period.
20     Q.  Let me ask you this, Mr. Wingo. You
21 obviously know how to file a lawsuit, because you
22 filed a lawsuit here.
23     A.  Yes.
24     Q.  You just testified moments ago that you

Page 304

1  felt you were not adequately represented by your
2  union, correct?
3      A.  Yes.
4      Q.  How come you didn't sue the Teamsters?
5      A.  I thought about it.
6      Q.  How come you didn't sue them?
7          I didn't ask you whether or not you
8  thought about it. How come you didn't sue them?
9      A.  I couldn't afford it. I couldn't afford
10 it.
11     Q.  Are you paying your current counsel by
12 the hour?
13     MS. WEGNER: I object. Attorney-client
14 privilege.
15     MR. LINDEN: I hate to tell you that's not
16 attorney-client privilege. But if you want to
17 instruct him not to answer, let me forewarn you,
18 I'll seek the appropriate relief.
19         Are you asking him not to answer that question?
20 BY THE WITNESS:
21     A.  What is the question again?
22     MS. WEGNER: Yes, I am, anything related to his
23 communications or his arrangements with his
24 attorney.

76 (Pages 301 to 304)

Page 305

1    MR. LINDEN: That's clearly discoverable, so
2 I'm going to -- again, we're just building a list
3 here of things that we're just going be coming back
4 to continue your deposition, Mr. Wingo.
5    So just so I'm clear, counsel, and the record
6 is going to reflect this, so I can seek the
7 appropriate relief.
8
9 BY MR. LINDEN:
10    Q.   Mr. Wingo, are you paying your counsel on
11 an hourly basis?
12    MS. WEGNER: Same objection, and he will not
13 answer.
14    MR. LINDEN: So you're instructing your witness
15 not to answer that question?
16    MS. WEGNER: That is correct.
17 BY MR. LINDEN:
18    Q.   And with regard to not being able to
19 afford to sue the Teamsters, who did you -- who are
20 you going to retain in that regard?
21    A.   What are you talking about? If I'm not
22 suing them, why would I retain an attorney?
23    Q.   Well, you concluded it would be too
24 expensive to sue them, so you must be considering

Page 306

1 retaining someone, Mr. Wingo.
2    I appreciate your hand gesture and your
3 facial gesture.
4    A.   I don't understand what you're saying.
5 She told you --
6    MS. WEGNER: I object. That may conceivably
7 call for attorney-client privilege. It may call for
8 speculation.
9    MR. LINDEN: Your objection's noted, counsel.
10 You want to read back my question, please?
11 Never mind.
12 BY MR. LINDEN:
13    Q.   Here's the question, Mr. Wingo.
14 Hopefully you can answer directly.
15    On what basis did you conclude it would
16 be too expensive to sue the Teamsters?
17    A.   It's not cheap.
18    Q.   But on what basis did you come to that
19 conclusion?
20    Are you just speculating?
21    A.   Because attorneys are not cheap, it's
22 not --
23    Q.   Did you consult with any attorneys,
24 possibly, about suing the Teamsters?

Page 307

1    A.   Yes. I made phone calls.
2    Q.   And did you ever complain to Gino
3 Rodriguez that you thought Pete LaRocco was not
4 doing an effective job?
5    A.   Yes, I told him -- yes, sir.
6    Q.   When was the first time you complained
7 to Gino Rodriguez?
8    A.   Probably five years ago.
9    Q.   You've got to wait. I don't know how
10 many times I have to tell you that.
11    A.   Can I take a break? I need to use the
12 restroom.
13    MR. LINDEN: Let the record reflect that the
14 witness has gotten up on his own and is leaving the
15 room.
16    MS. WEGNER: He's requested a break.
17    MR. LINDEN: Let the -- in the middle of the
18 question, he's gotten up, claiming he's got to use
19 the restroom.
20    MS. WEGNER: I don't think that was in the
21 middle of the question.
22    (WHEREUPON, a recess was had.)
23 BY MR. LINDEN:
24    Q.   Let me ask you this, Mr. Wingo: Does the

Page 308

1 fact that you're ill, does it have something to do
2 with the fact that when I was cross-examining you,
3 you had no questions with your union representation;
4 but when your attorney asked you questions, you then
5 concluded that there were problems with its
6 representation of you?
7    A.   Well, I thought more the issue is where,
8 for some of the issues, I didn't think that my
9 union steward was the issue. I thought we were here
10 for the other issues.
11    Q.   Well, Mr. Wingo, you know, I asked you
12 today, if any time you had any difficulty
13 understanding any of my questions, to let me know.
14    A.   I tried to.
15    Q.   Wait a minute.
16    And as you may recall, when I asked you
17 questions about whether or not you had any quarrels
18 with your union representation, first of all, you
19 never indicated any difficulty understanding the
20 question; and secondly, you said there was no
21 problems with their representing you.
22    Do you recall that?
23    A.   Yes, I do; and overall there was no
24 problem.

77 (Pages 305 to 308)

Page 309

1    Q.    It's a simple yes or no, Mr. Wingo.
2         So how was it that after we broke for
3    lunch, had other breaks this afternoon, that you
4    somehow came to the realization, when your attorney
5    asked you virtually the same question that I did,
6    you had an opposite response?
7    A.    I didn't want to drag the whole union
8    issue into the thing. I thought we were here for
9    the Copper and Brass versus me, not for the union
10   issue.
11   Q.    Let's explore that.
12   A.    I don't want to battle the union and you
13   guys. My fight is with Copper and Brass. They're
14   the ones that terminated me.
15   Q.    That's not my question. My question was,
16   how can you reconcile, so your explanation is you
17   lied to me this morning --
18   A.    I never lied.
19   Q.    Hold on. I'm asking a question.
20   Mr. Wingo, for I don't know how many times, I'm
21   going to ask you, please, show me the courtesy of
22   letting me ask my questions, before you interrupt.
23        So as I understand your testimony now,
24   you decided to lie to me, in response to my question

Page 310

1    about your union representing you, because you
2    didn't want to get the union involved in this? Am I
3    correct in interpreting what you just said?
4    MS. WEGNER: I object. That's a
5    mischaracterization of the man's testimony.
6    BY MR. LINDEN:
7    Q.    I'm waiting for an answer, Mr. Wingo.
8    A.    Is that a yes or no?
9    MR. LINDEN: Why don't you read back the
10   question, so we can help the witness, so we'll see
11   if it's a yes or no answer.
12        (WHEREUPON, the record was read
13        by the reporter.)
14   A.    I guess that's a yes.
15   Q.    Anything else you lied about, in answer
16   to any of my questions today?
17   A.    No.
18   Q.    But if something else occurs to you that
19   you might have lied about, while we're still here,
20   you'll be kind enough to let me know?
21   A.    Certainly.
22   Q.    So you indicated also, in response to
23   questions by your counsel, contrary to what you
24   testified to this morning, that you believed you

Page 311

1    would be retaliated against in losing overtime
2    opportunities, if you filed any grievances, correct?
3    A.    Yes.
4    Q.    Okay. And you said the foreman would
5    get -- got even with other employees for doing that,
6    correct?
7    A.    Yes.
8    Q.    Who, who was the foreman that got even
9    with other employees for filing grievances?
10   A.    I can't say at this time. I don't know
11   all the names, dates and everything; but that was
12   standard procedure throughout the years.
13   Q.    And when you say, "throughout the years,"
14   how many years back are we talking about?
15   A.    I was there 24 years.
16   Q.    So it was throughout the 24 years?
17   A.    Yes.
18   Q.    So if you filed a grievance during those
19   24 years, you would lose your overtime
20   opportunities?
21   A.    Correct.
22   Q.    You filed a grievance, you said, on a few
23   occasions, as you recall?
24   A.    Only a few, yes.

Page 312

1    Q.    Only a few. And how do you define only a
2    few?
3    A.    What, did we find two, I think we saw.
4    Q.    So your definition of a few, so I'm sure
5    I understand you today, would be two?
6    A.    Yes.
7    Q.    And on the two occasions that you filed
8    grievances, were you retaliated against, and you
9    lost overtime opportunities?
10   A.    I'll never know. I mean they didn't ask
11   me to work overtime on certain occasions, so I --
12   yes, I wasn't asked all the time, so possibly, yes.
13   Q.    Well, hold on. Again, your response here
14   was pretty confusing. First, you said you'd never
15   know.
16   A.    So are the questions. I mean the
17   questions are --
18   Q.    I'm speaking right now. Again --
19   A.    Okay.
20   Q.    -- please show me that courtesy. I might
21   as well just have a tape here playing it, when I ask
22   my questions.
23        Your testimony seems to suggest you don't
24   know, and now you're guessing you know.

78 (Pages 309 to 312)

ROBERT G. WINGO, MAY 19, 2008

Page 313

1    Did you, in fact, ever lose any overtime
2  opportunities, as a result of filing a grievance?
3    A.   Yes.  I was not asked to work overtime.
4    Q.   And when was that, sir?
5    A.   On many occasions, but I can't specify,
6  because it was at times that I didn't work, or was
7  not asked.
8    Q.   So wait a minute.  You're claiming that
9  you lost overtime opportunities for filing
10 grievances before, but you did not work on those
11 days?
12   A.   Right.  I wasn't allowed to work on
13 certain days that I wasn't asked.
14   Q.   And do you know who made those decisions?
15   A.   The foremans, they were --
16   Q.   Who were the foremans?
17   A.   Mark DeMien and various ones.
18   Q.   Okay.  When was the last time you filed a
19 grievance before your termination?
20   A.   Like I said before, two years before.
21   Q.   2005, correct?
22   A.   Correct.
23   Q.   All right.  Are you claiming that in
24 2005, after you filed a grievance, that you lost

Page 314

1  overtime opportunities?
2    A.   Yes.  I lost overtime opportunities
3  throughout the years.
4    Q.   I'm not talking about throughout the
5  years.  Now let's focus, Mr. Wingo.  It's late, my
6  patience is kind of wearing thin, given your
7  habitual nonresponsiveness here today.
8        The question is, and it's very simple;
9  and again, if you have difficulty understanding it,
10 let me know.  And also please let me finish my
11 question before you barge in.  Okay?
12       You say you filed a grievance in 2005,
13 correct?
14   A.   Yes.
15   Q.   Now you seem to be suggesting for the
16 first time that in 2005, after you filed a
17 grievance, you were retaliated against by denying an
18 overtime opportunity, correct?
19   A.   Yes.
20   Q.   Okay.  Who denied you an overtime
21 opportunity, as a direct result of you filing a
22 grievance in 2005?
23   A.   The foremans.
24   Q.   What foremans?

Page 315

1    A.   Mark DeMien.
2    Q.   What proof do you have that Mark DeMien,
3  in 2005, denied you an overtime opportunity, because
4  you filed a grievance about -- I'm talking, sir.
5  I'm beginning to suspect you do that intentionally.
6    A.   I'm just trying to answer your question.
7    Q.   How could you be answering my question,
8  if I'm not even done with my question?
9    A.   I thought you were done.  I'm sorry, I
10 thought you were done.
11   MR. LINDEN:  Why don't you read back my
12 question, please.
13       (WHEREUPON, the record was read
14        by the reporter.)
15 BY THE WITNESS:
16   A.   I don't have any proof.
17   Q.   Thank you.
18       Let's talk about Exhibit 28, which is the
19 October 10, 2007 discipline.  I put Exhibit 28
20 before you, Mr. Wingo.
21       Your testimony now, in response to
22 questions from your counsel, you tried to blame what
23 happened there on the person who gave you the
24 product, correct?

Page 316

1    A.   Right, they pulled the wrong material.
2    Q.   You still processed, even though it was
3  brought to the wrong area, correct?
4    A.   I did not catch it.
5    Q.   Okay.  And that would have been your
6  responsibility, correct?
7    A.   Correct.
8    Q.   Okay.  Now, let's talk about Exhibit 37,
9  so I'm sure I understand your testimony.  This is
10 your daily production log for November 29, 2007.
11       As I understand your testimony, in
12 response to a question by your counsel, the times
13 you have in the column "Stop Time" are the actual
14 start times for when you start working on these
15 projects.
16   A.   I'm not sure on all of them that they
17 were start or stop times.  I just tried to document
18 some time there.
19   Q.   Well, how would the person relying on
20 this document know whether or not it was a start
21 time or a stop time -- I'm not done -- if you're
22 sitting here today, looking at your own document,
23 can't tell us whether or not the time is a stop
24 or start time?

79 (Pages 313 to 316)

Page 317

1    A.    They could get a random, pretty close
2  time to what it was.
3    Q.    A random close time to what?
4    A.    To what time it was done, or started.
5    Q.    Well, let's take an example here. Let's
6  look at item number 10. You have, in the column
7  "Stop time," "10:02."
8         For item number 10, was that a stop time
9  or a start time?
10    A.    It's hard to tell at this point now.
11    Q.    So somebody picking this sheet up cold,
12  whether it was somebody on the next shift or some --
13  or Mr. Lunt or Mr. DeMien, they could not be able to
14  determine, by looking at your document, whether or
15  not the time in the "Stop Time" column is a stop
16  time or a start time?
17    A.    These are not totally accurate times.
18  They're pretty close to the time. I mean they're --
19    Q.    Sir, I'm not asking you whether or not
20  they're accurate.
21         My question was, somebody picking this
22  document up could not be able to ascertain whether
23  or not the time in the "Stop Time" column is a start
24  time or a stop time, correct?

Page 318

1    A.    Possibly. Probably.
2    Q.    Well, what, what in this document, in
3  Exhibit 37, would clue somebody in, picking this
4  document up, like me or, for that matter,
5  Randy Lunt, that the times in this column are start
6  times, as you claim they were?
7    A.    I can't remember if they were start times
8  or stop times in all of them. I tried to give a
9  pretty close time to it all the time. Usually
10  you're not at the thing where you can write it down.
11    Q.    Do you recall, in answer to questions by
12  your counsel about the times in the column on that
13  document, you said those were start times?
14    A.    I believe we tried to be accurate for
15  start times.
16    Q.    Again, I'm not asking about accuracy.
17         Do you recall, in response to questions
18  by your counsel, you indicated that the times in the
19  "Stop Time" columns were start times?
20    A.    I'm getting confused.
21    MS. WEGNER: I object. Asked and answered.
22    MR. LINDEN: Well, eventually it will be
23  answered. So far he hasn't answered it.
24    Why don't you read back my question, please.

Page 319

1         (WHEREUPON, the record was read
2         by the reporter.)
3  BY THE WITNESS:
4    A.    I believe most of them were stop times.
5  BY MR. LINDEN:
6    Q.    So hold on a second. So you -- now it's
7  a different story. Most of the times in the stop
8  time columns on the November 29th Exhibit 37,
9  they're actually stop times?
10    A.    Well, at the top of the page, you'll see
11  that it stays "Start Time" and "Stop Time" --
12    Q.    Mr. Wingo --
13    A.    -- so I tried to be as accurate as I
14  could.
15    Q.    Are those stop times or start times?
16    A.    I can't remember. I honestly can't
17  remember. I thought they were mostly start times,
18  but I think the last one was definitely a stop time,
19  because the clock ran out.
20    Q.    You would agree, Mr. Wingo, there's
21  nothing in your document, based on your struggle to
22  figure out what those times are indicative of, to
23  indicate whether they were a start time or a stop
24  time?

Page 320

1    MS. WEGNER: Object on the basis of form and
2  foundation.
3  BY THE WITNESS:
4    A.    I'm not -- could you rephrase it? Could
5  you simplify and rephrase it?
6    Q.    I'll be happy to rephrase.
7    A.    Could I please talk?
8    Q.    You're not going to talk, and you're not
9  going to argue with me.
10    A.    I just want to make a point. I can't
11  understand your questions. You need to simplify
12  them, they're too wordy and they're -- I just --
13  please simplify them, and I can give you more direct
14  answers.
15    Q.    They're pretty simple, Mr. Wingo. Kindly
16  refrain interrupting me like you've been doing
17  throughout the course of this deposition.
18         We're now well into this deposition, and
19  for the first time you're now claiming the questions
20  are a little too complicated?
21    A.    They've been that way all along. I've
22  been trying to answer you all the way through, and
23  they're all very wordy.
24    Q.    Sort of like your testimony?

80 (Pages 317 to 320)

ROBERT G. WINGO, MAY 19, 2008

Page 321

1    A.   They're all 30 words per question.
2  There's no -- you know.
3    Q.   Mr. Wingo, that's sort of like your
4  testimony. You're shifting testimony about.
5    A.   You wanted yes or no answers.
6    MS. WEGNER: There is no reason to have this.
7    THE WITNESS: Okay, I'm just trying to be
8  helpful. I'm trying to get through this.
9    He's asking me long questions, and there's no
10 yes or no to his questions. It's very wordy and
11 confusing.
12   MS. WEGNER: All right.
13 BY MR. LINDEN:
14   Q.   Well, unfortunately, the thing that's
15 confusing today, Mr. Wingo, is your continuously
16 shifting testimony. So again, let's try to focus on
17 Exhibit 37 and let's see if maybe we can get a
18 consistent answer from you regarding the document.
19      I'm gathering, from your story moving
20 back and forth, you cannot tell us today whether or
21 not the times you noted in Exhibit 37 are start
22 times or stop times.
23   A.   Okay, what I'm saying is this: Most of
24 them are all stop times -- start times.

Page 322

1    Q.   Again, I'm going to interrupt you,
2  Mr. Wingo. You're not answering my question.
3    A.   Okay, what is the question?
4    MR. LINDEN: Ask the question, please.
5      (WHEREUPON, the record was read
6      by the reporter.)
7  BY THE WITNESS:
8    A.   Most of them are stop -- start times.
9  That's what I'm trying to explain. Most of them are
10 all start times.
11   Q.   You tell me which ones, going by items,
12 are start times.
13   A.   All these. All the ones, except for the
14 last one. The last one is a stop time, because the
15 bell rang.
16   Q.   So again, let's make sure the record
17 reflects what you just testified to.
18      So your testimony today, under sworn
19 oath, is that in Exhibit 37, items 1 through 22 --
20 actually, 20, 1 through 20, the times you've entered
21 into the "Stop Time" column are start times?
22   A.   That's both a start and a stop time it
23 says right at the top of the page, start and stop
24 times, does it not, right here.

Page 323

1    Q.   Let's again, again, the record's going to
2  reflect you can't tell a consistent story here,
3  Mr. Wingo.
4    A.   It's what it says right there.
5    Q.   You just testified a moment ago, and I'll
6  let the record stay as it is, that all the times
7  except the last times entered were start times.
8    A.   I believe most of them are all start
9  times, yes.
10   Q.   Well, again, your story changes.
11   A.   But it also -- well, because at the top
12 of the page it says "Start Time" and "Stop Time" so
13 it's both. I mean this is when I started this
14 one --
15   Q.   Mr. Wingo, again, which -- just listen to
16 my question.
17      Which one of the times in items 1 through
18 20 are start times?
19   A.   I believe most of them are start times.
20   Q.   Well, most of them. Which ones are not
21 start times?
22   A.   The bottom one.
23   Q.   Which item number is that?
24   A.   Number 21.

Page 324

1    Q.   So all except item --
2    A.   Excuse me, 20, 20.
3    Q.   All except item 20 are start times?
4    A.   Yes.
5    Q.   Okay.
6    A.   No, wait, wait, you twisted that.
7  Number 20 is a stop time because the bell rang. I
8  wasn't able to complete the order.
9    Q.   I think you already just testified to
10 that, Mr. Wingo.
11   A.   I just told you, that's the way it was.
12   Q.   So all the other times that you've noted
13 on your document, with the exception of 20, they're
14 start times?
15   A.   Pretty much so.
16   Q.   And how would somebody picking up that
17 document know that all the other times are start
18 times?
19   A.   It's not an exact science. It's just to
20 give the boss -- like the boss always said, it's
21 just at random times, to give us an idea of what's
22 going on.
23   Q.   Again, you didn't answer my question,
24 Mr. Wingo.

81 (Pages 321 to 324)

Page 325

1    How would somebody picking up that
2 document know the times are start times?
3    A.   The boss would know.
4    Q.   Who is the boss?
5    A.   Randy Lunt would know, because he said,
6 just try to get a general time.
7    Q.   Randy Lunt, picking that document up,
8 would know that your entries are start times?
9    A.   Yes.  That's what it says, your start
10 time.
11    Q.   Well, it also says "Stop Time," like you
12 indicated.
13    A.   We'll, that's what I mean, it's kind of
14 confusing.  But yes, those are when the orders were
15 started.
16    I mean it's kind of a confusing document.
17    Q.   You're confused by the document?
18    A.   Well, like you say, it has both start and
19 stop times.
20    Q.   My question is, you're confused by the
21 document?
22    A.   Occasionally.
23    Q.   And you were confused by it at the time
24 you were employed at Copper and Brass?

Page 326

1    A.   Occasionally.
2    Q.   You know, I gathered from your testimony
3 here today, Mr. Wingo, you disagree with about all
4 the discipline you received that you've been asked
5 questions about today; am I right?
6    A.   No.
7    Q.   Well, what discipline don't you --
8    A.   There was some issues that -- I don't
9 recall exactly which ones, but there was some I
10 didn't, I didn't agree with, and there were some
11 that were my fault.  I'm not perfect, I made some
12 mistakes.
13    Q.   And you testified, in response to
14 questions by your counsel, that some of the stuff
15 you couldn't recall, because you were asked
16 questions about some things that had happened
17 seven years ago?
18    A.   Yes.
19    Q.   And I'm assuming things that occurred
20 even longer ago than seven years ago, your
21 recollection would be even less reliable?
22    A.   Sometimes --
23    MS. WEGNER:  Objection, calls for speculation.
24    You can answer.

Page 327

1 BY THE WITNESS:
2    A.   Sometimes you remember stuff more vividly
3 and sometimes you don't.  I just can't have total
4 recall on everything that ever happened in my life,
5 or even seven years ago.
6 BY MR. LINDEN:
7    Q.   Let's talk about Exhibit 24.  This is the
8 discipline you received back in March of 2006.
9    Now, you indicated, in response to
10 questions from your counsel, there were other
11 employees who were allowed to take home product.
12    A.   Just materials, sometimes thrown away
13 wood, they were able to take wood out.  I mean they
14 didn't care if they took firewood home.
15    Q.   And who were these other employees?
16    A.   Ray Cather used to take wood home.
17    Q.   When you say "wood," what, this would be
18 like wood from scaffolding or?
19    A.   Scrap wood.  Anything that would end up
20 in the dumpster that they would throw away, they
21 would let us take home.
22    As a matter of fact, I used to get wood
23 for Randy Lunt, the boss.  He would tell me to get
24 him a couple boxes of firewood, and I would do that.

Page 328

1    Q.   Now, with regard to the incident that you
2 got disciplined in March 2006, it didn't involve
3 scrap wood, did it?
4    A.   Yes, it was scrap masonite.
5    Q.   Is masonite wood?
6    A.   Basically.
7    Q.   Basically?
8    A.   Isn't it particle wood, masonite?  It's
9 like pressed wood, whatever you want to call it?
10    Q.   Well, what's the masonite used for at
11 Copper and Brass?
12    A.   Some of it's used -- full sheets are used
13 for protection of the metal.
14    Q.   And is it used to ship stuff to
15 customers?
16    A.   Yes.
17    Q.   Okay.  So besides Ray Cather, did any
18 other employees ever take home wood, masonite or
19 anything like that?
20    A.   Some employees took boxes and stuff,
21 some -- you know, that was basically it, mainly
22 firewood.
23    Q.   Who are employees who took away boxes?
24    A.   Pete LaRocco used to take moving boxes.

82 (Pages 325 to 328)

Page 329

1    Q.    Lance Amack ever take anything?
2    A.    I don't know.
3    Q.    Now, you indicated that the side loader
4  operators and the shipping and receiving are
5  actually warehouse clerks?
6    A.    Warehousemen.
7    Q.    Well, there's a job classification
8  warehouse clerk, isn't there?
9    A.    Probably.
10   Q.    What do you mean, "Probably"?
11   A.    Well, our classification was overall
12  warehousemen, and then you break it down to order
13  clerks or side loader operator; but we made the same
14  money.
15   Q.    And you had different duties and
16  responsibilities than the side load operator,
17  correct?
18   A.    Yes.
19   Q.    And you had different duties and
20  responsibilities than the shipping and receiving
21  clerks?
22   A.    Yes.
23   Q.    Now, when you complained to Bill Fruehauf
24  about Mark DeMien swearing at you in August of 2007,

Page 330

1  you had already been terminated, correct?
2    A.    Yes.
3    Q.    Now, this conference call you
4  described -- when was the last time you spoke to
5  Sergio Garcia?
6    A.    I haven't talked to Sergio since I was
7  terminated.
8    Q.    When was the last time you spoke to Pat
9  Bishop?
10   A.    I ran into Pat on the last day of my
11  grievance procedure, on the very last one.
12   Q.    Was Pat Bishop ever disciplined by
13  Mark DeMien?
14   MS. WEGNER:  Object, calls for speculation.
15  BY THE WITNESS:
16   A.    I don't know.
17  BY MR. LINDEN:
18   Q.    Well, let's see if I can help you out.
19   A.    Probably, yes.  Yes, he was wrote up that
20  same day, right, of the verbal harassment; yes, he
21  was.
22   Q.    So the very same day that you got
23  verbally --
24   A.    Wait, that was stricken from the case.

Page 331

1  He had it taken out.  So that's why I didn't know if
2  I should say it.  Pat had that -- he fought the
3  whole thing.
4    Q.    He filed a grievance?
5    A.    He filed a grievance, and Randy took it
6  out of his file.
7    Q.    So let me make sure I understand.
8         So the same day you were verbally abused
9  by Mark DeMien, there was an incident with
10  Mark DeMien and Pat Bishop that resulted in Pat
11  Bishop getting disciplined?
12   A.    Yes.
13   Q.    And Pat Bishop filed a grievance against
14  Mark DeMien, correct?
15   A.    Yes.
16   Q.    And the discipline was removed from Pat
17  Bishop's record?
18   A.    Yes.
19   Q.    Did Pat Bishop tell you he got an
20  attorney to possibly sue Copper and Brass?
21   A.    He had mentioned he got an attorney, and
22  I didn't know what he was -- how far he went with
23  it.  He said he was probably getting an attorney.
24   Q.    When did he tell you that?

Page 332

1    A.    Somewhere in the fall, I believe it was.
2    Q.    Before or after you were terminated?
3    A.    I think it was before.
4    Q.    All right.  Then you indicated that you
5  believe Tyler DeMien replaced you, correct?
6    A.    He did.  He was working in my position,
7  yes.
8    Q.    Well, let's talk about that.
9         The last time you worked at Copper and
10  Brass was on December 3, 2007?
11   A.    Yes.
12   Q.    And currently, do you know if Tyler
13  DeMien's employed by Copper and Brass?
14   A.    Yes.
15   Q.    Do you know what shift he's working on?
16   A.    I don't know for sure.
17   Q.    So you were working on the first shift,
18  correct?
19   A.    Correct.
20   Q.    You would agree with me, if he was
21  working on some shift other than that, the second or
22  third shift, he didn't replace you?
23   A.    Right.  I don't know.  I don't know if he
24  did or not.

83 (Pages 329 to 332)

Page 333

1    Q.    And so as far as you know, Copper and
2  Brass never hired anybody to replace you?
3    A.    I think they did replace me, yes, but I'm
4  not sure by who and when.
5    Q.    Okay.  So you're speculating that you
6  think they might have replaced you.
7    A.    Well, they had to.  It was an everyday
8  job.  They had to eventually replace me.
9    Q.    Do you know for a fact whether or not you
10  were replaced?
11    A.    Mark DeMien -- the younger guy replaced
12  me immediately, the next day or two.  I know that.
13  Other than that, I don't know really, you know, the
14  total, the total --
15    Q.    And how do you know that?  How do you
16  know the next day or so Tyler DeMien replaced you?
17    A.    I talked to one of the employees, and he
18  said that Tyler was doing the job.
19    Q.    And who was the employee who told you
20  that?
21    A.    That was Lance.
22    Q.    Mr. Amack?
23    A.    Yes.
24    Q.    And so when did he tell you that?

Page 334

1    A.    I can't remember exactly when.  It was
2  around, right after the termination, somewhere in
3  December.
4    Q.    But you don't know whether or not
5  Mr. DeMien was simply temporarily filling you until
6  such time as they permanently replaced you, if they
7  were going to --
8    A.    Yes.
9    Q.    And would there possibly have been a job
10  posting?
11    A.    There should have been, yes.
12    Q.    And so you don't know, sitting here
13  today, who, if anyone, would have permanently
14  replaced you?
15    A.    Correct.
16    Q.    All right.  Now, let's talk about this
17  conference call that took place on December 4th,
18  involving Mr. Fruehauf.
19        Your wife was also involved in that call?
20    A.    Yes, she was in the background, and she
21  understood, you know, a little of what was going on.
22    Q.    Did you let Mr. Fruehauf know that your
23  wife was on the telephone?
24    A.    No.  She was not on the phone, she was in

Page 335

1  the background listening -- not listening, but I was
2  talking.  I was talking on the phone, she was
3  hearing me talk.
4    Q.    She wasn't on the other phone?
5    A.    No.
6    Q.    So she only heard what you were saying
7  and not --
8    A.    Right.
9    Q.    And so you also said that your wife
10  supposedly had a conversation with Randy Lunt,
11  something to the effect where he told you no one
12  would be terminated for documentation errors?
13    A.    Yes, that no one had ever been terminated
14  for errors.
15    Q.    And when did that conversation take
16  place?
17    A.    That was in November, sometime I believe
18  in early November.
19    Q.    And this is what, after you had been
20  disciplined?
21    A.    Correct.
22    Q.    In what your wife was --
23    A.    I think it was after the three-day
24  suspension, my wife became concerned.  And I was

Page 336

1  talking to Randy on the phone, and then she asked if
2  she could ask him a few questions.
3    Q.    You obviously didn't participate in that
4  conversation?
5    A.    No.
6    Q.    And the only participants in this
7  conversation would have been your wife and
8  Randy Lunt?
9    A.    Yes.
10    Q.    And how long did they talk for?
11    A.    I don't recall exactly how much time,
12  maybe five minutes.
13    Q.    And what, your wife called Randy Lunt?
14    A.    No, I was talking to Randy.  I had called
15  him and I was talking to him, and then she asked if
16  she could ask him a few questions.
17    Q.    So you originally called Randy Lunt?
18    A.    Correct.
19    Q.    And why did you call Randy?
20    A.    'Cause I was concerned about my job I
21  didn't want to lose my job.  I had been there
22  24 years, I was trying to protect my job.  So I
23  says, Randy, you know, what's going on?  How are we
24  looking here?

84 (Pages 333 to 336)

Page 337

1    And he says, just do the orders, make
2 sure you do them right, slow down and make sure you
3 get them right. He said, slow down and make sure
4 you get them right.
5    But after he told me to slow down, then
6 the next week or so he's telling me to speed up with
7 the production. And I couldn't do that, because
8 there wasn't a lot of orders all the time, so it was
9 a very tricky time.
10   Q.   Well, speed up with production doesn't
11 mean you speed up with your paperwork, does it?
12   A.   What does speeding up mean to you? It
13 means hurry up everywhere, to me.
14   Q.   Speeding up with production means
15 processing orders. He felt that you were doing
16 50 percent less of the number of orders --
17   A.   There was only on two occasions. That
18 was taken out of context. There was two bad days in
19 there where there weren't many orders, and there was
20 no orders to produce. The guy at nights did eight,
21 I did 12; I mean, you know.
22   Q.   This is what Mr. Lunt was telling you,
23 when he meant speed up production, correct?
24      Notwithstanding the fact you might have

Page 338

1 disagreed with him, he was telling you that you had
2 to be doing as many orders as the other people?
3   A.   Which I was, most of the time.
4   Q.   But that was his opinion, he thought you
5 weren't.
6   A.   The average sheet looks like this. When
7 an employee does his sheet back there, it mostly
8 looks like this. This is an average day for most of
9 the employees back then. This was an average day
10 for me, this is how many I normally did, okay.
11      Some days, if we were busy, I did more;
12 and if we were less, you saw that it would be less
13 orders. There was no way to control it, all this
14 was out of my control. I just did the orders that
15 were in front of me. If they weren't in the racks,
16 I couldn't do them. I didn't have a control.
17   Q.   As I understand this phone conversation
18 with Randy Lunt, you called him, and then during the
19 conversation your wife got on the phone and talked
20 to Randy Lunt?
21   A.   Yes.
22   Q.   And this is after Randy Lunt told you, he
23 was counseling you, he said, just pay attention on
24 your paperwork and do the paperwork properly, and

Page 339

1 you won't have problems?
2   A.   He said slow down on everything, measure
3 it. He says, do all the procedures right and make
4 sure you get it right.
5      And I said, okay, I'll slow down, like
6 you said, and do it right. And so I tried to be
7 cautious and do everything right.
8   Q.   All right, your testimony's a little bit
9 different than what it was a couple of minutes ago.
10 A couple of minutes ago it was about Randy Lunt
11 telling you about making sure you did your paperwork
12 right, Mr. Wingo.
13      Now it seems to be -- I'm talking,
14 Mr. Wingo.
15      So now your testimony is Mr. Lunt was
16 telling you to do something else, in addition to the
17 paperwork, also pick up your pace on your
18 production.
19      Is that what you're claiming Randy Lunt
20 said in this phone conversation?
21   A.   I'm saying that all along Randy said,
22 slow down and make sure you get the orders right.
23 That's what I'm saying.
24   Q.   Slow down and get your paperwork right?
24   A.   Slow down and get your paperwork right,

Page 340

1 your packing right the whole job do the order right
2 basically is what he was saying. Not just
3 paperwork. Paperwork's only part of the order. You
4 know, you got to do the physical part of the order,
5 too.
6   Q.   And you agree, it's very important, it
7 was an essential function of your job to do your
8 paperwork right?
9   A.   Sure, yes.
10  Q.   And you would agree, if you didn't do
11 your paperwork right, that the company could
12 discharge you for it?
13  A.   Sure.
14      MR. LINDEN:  I have nothing further.
15      Thank you for your time, Mr. Wingo.
16      THE WITNESS:  Sure.
17          EXAMINATION
18 BY MS. WEGNER:
19  Q.   To your knowledge, Mr. Wingo, was
20 Mr. LaRocco --
21  A.   LaRocco.
22  Q.   Was Mr. LaRocco very friendly with
23 members of management at Copper and Brass?
24  A.   Yes, he was.

85 (Pages 337 to 340)

Page 341

1    Q.   And with whom, to your knowledge, was
2  Mr. LaRocco friendly with, at Copper and Brass?
3    A.   Mark DeMien.  They went to football games
4  together.
5    Q.   During your deposition testimony today,
6  have you been truthful, in response to all the
7  questions that have been asked of you?
8    A.   Yes, to the best of my ability.
9  Sometimes the questions were very wordy, and I did
10 try to get through them.  I didn't always understand
11 them, because they were 20 to 30 words long and very
12 wordy and contradictory.  So I tried to answer in
13 the best fashion that I could.
14   MS. WEGNER:  I have nothing else.
15   Signature will be reserved.
16   MR. LINDEN:  Let me put on the record, I'm
17 reserving the right to continue the deposition upon,
18 number one, being provided the documents that should
19 have been produced today, including the journal of
20 employers; also upon my reviewing the record to
21 determine the extent of the nonresponsiveness of
22 this witness.
23   So again, I reserve the right to seek the
24 appropriate relief in court.

Page 342

1    MS. WEGNER:  We're not going to agree on that.
2  We're willing to give you any documents that we have
3  not produced, pursuant to your request, that are not
4  under objection.
5    MR. LINDEN:  Well, they were supposed to be
6  here today, and this deposition has been noticed up
7  and renoticed on three different occasions, dating
8  back a couple of months.  So all those documents
9  should have been here today.  So I'm kind of
10 perplexed and puzzled why they were not all produced
11 today.
12   THE WITNESS:  Well, we turned them all in
13 and --
14   MS. WEGNER:  Mr. Wingo, you don't need to say
15 anything else.
16   MR. LINDEN:  Off the record.
17        FURTHER DEPONENT SAITH NOT.
18
19
20
21
22
23
24

Page 343

1      IN THE UNITED STATES DISTRICT COURT
2    FOR THE NORTHERN DISTRICT OF ILLINOIS
3         EASTERN DIVISION
4
5  ROBERT G. WINGO,            )
6       Plaintiff,      )
7       vs.        ) 1:08:CV-00368
8  THYSSENKRUPP MATERIALS NA, INC., )
9  d/b/a COPPER AND BRASS SALES,   )
10 INC.,            )
11      Defendant.     )
12      I hereby certify that I have read the
13 foregoing transcript of my deposition given at the
14 time and place aforesaid, consisting of Pages 1 to
15 342 inclusive, and I do again subscribe and make
16 oath that the same is a true, correct and complete
17 transcript of my deposition so given as aforesaid,
18 and includes changes, if any, so made by me.
19         ROBERT G. WINGO
20 SUBSCRIBED AND SWORN TO
21 before me this     day
22 of      , A.D. 200 .
23   Notary Public
24

Page 344

1  STATE OF ILLINOIS )
2         ) SS:
3  COUNTY OF C O O K )
4
5    I, ELIA E. CARRIÓN, a Notary Public
6  within and for the County of Cook, State of
7  Illinois, and a Certified Shorthand Reporter of said
8  state, do hereby certify:
9      That previous to the commencement of the
10 examination of the witness, the witness was duly
11 sworn to testify the whole truth concerning the
12 matters herein;
13     That the foregoing deposition transcript
14 was reported stenographically by me, was thereafter
15 reduced to typewriting under my personal direction
16 and constitutes a true record of the testimony given
17 and the proceedings had;
18     That the said deposition was taken before
19 me at the time and place specified;
20     That I am not a relative or employee or
21 attorney or counsel, nor a relative or employee of
22 such attorney or counsel for any of the parties
23 hereto, nor interested directly or indirectly in the
24 outcome of this action.

86 (Pages 341 to 344)