# EXHIBIT B

1

1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF ILLINOIS

3                   EASTERN DIVISION

4

5   ROBERT G. WINGO,                )

6               PLAINTIFF,          )

7         VS.                       )  No. CV 0 0368

8   THYSSENKRUPP MATERIALS NA, INC. )

9   D/B/A COOPER AND BRASS          )

10   SALES, INC.                     )

11               DEFENDANTS,         )

12

13

14          This is the discovery deposition of MARIO

15   ALVAREZ, taken in the above-entitled cause before

16   GWENDOLYN BEDFORD, a Notary Public and Certified

17   Shorthand Reporter within and for the County of Cook,

18   State of Illinois, taken at the offices of VICTORIA

19   COURT REPORTING SERVICES, INC., 29 South LaSalle

20   Street, Suite 200, Chicago, Illinois, held on the 12th

21   day of June, 2008 at the hour of 10 o'clock a.m.

22   pursuant to notice.

23

24

DEPOSITION OF MARIO ALVAREZ -- 06/12/08

**Page 2**

1  APPEARANCES:
2
3      LISA KANE & ASSOCIATES
4      BY: JANICE WEGNER
5          120 South LaSalle Street
6          Suite 1420
7          Chicago, Illinois 60603
8          312-606-0383
9          On behalf of the Plaintiff;
10
11     HONIG, MILLER, SCHWARTZ & COHN, LLP
12     BY: MR. MATTHEW DISBROW
13         2290 First National Building
14         660 Woodward Avenue
15         Detroit, Michigan 48226
16         313-465-7000
17         Fax: 313-465-8000
18         On behalf of the Defendants.
19
20
21
22
23
24

**Page 3**

1              I N D E X
2  WITNESS                      PAGE
3  MARIO ALVAREZ
4  Examination by Ms. Wegner         4,91
5  Examination by Mr. Disbrow        45,96
6
7           E X H I B I T S
8  DOCUMENTS              MARKED FOR ID.
9  Exhibit 1              32
10 Exhibit 2              35
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 4**

1              (WITNESS SWORN)
2              MARIO ALVAREZ,
3  called as a witness herein, after having been first
4  duly sworn, was examined and testified as follows:
5              EXAMINATION
6  BY MS. WEGNER:
7      Q   All right, sir.  Would you please state your
8  complete name for the record and spell your last name?
9      A   **My name is Mario Alvarez, A-L-V-A-R-E-Z.**
10     Q   Let the record reflect that this is the
11 deposition of Mario Alvarez in the case entitled Robert
12 Wingo vs. Thyssenkrupp Materials, N.A., doing business
13 as Copper and Brass Sales, Inc.  Case Number 08 C 368,
14 pending in the United States District Court for the
15 Northern District of Illinois, Eastern Division.
16             This deposition is being taken pursuant
17 to subpoena and in accordance with the Federal Rules of
18 Civil Procedure and applicable local rules.
19             Mr. Alvarez, did you receive a subpoena
20 and a witness fee check to appear for your deposition
21 today?
22     A   **Yes, I did.**
23     Q   All right, Mr. Alvarez.  My name is Jane
24 Wegner.  I am one of the attorneys representing Robert

**Page 5**

1  Wingo in the lawsuit he has filed against Materials NA
2  Inc. doing business as Copper and Brass Sales, Inc.  I
3  would like to ask you some questions regarding your
4  employment with Copper and Brass Sales --
5      A   **Yes, ma'am.**
6      Q   -- Mr. Wingo's employment with Copper and
7  Brass Sales, some questions about the business of
8  Copper and Brass Sales and allegations that have been
9  made by Mr. Wingo in his lawsuit.
10             Have you ever given a deposition before?
11     A   **No, ma'am.  This is my first time.**
12     Q   Have you ever provided sworn testimony at a
13 trial or some other type of hearing?
14     A   **No.**
15     Q   Have you ever been a Plaintiff or a Defendant
16 in a lawsuit?
17     A   **No, ma'am.**
18     Q   Nobody has ever sued you and you have never
19 sued anybody else?
20     A   **No.**
21     Q   Okay.  Would you try and remember to respond
22 verbally to all the questions that are asked of you so
23 the Court Reporter can make an accurate record?
24     A   **Sure.**

2 (Pages 2 to 5)

DEPOSITION OF MARIO ALVAREZ -- 06/12/08

6

1    Q   I'm going to be asking you questions. The
2  attorney for Copper and Brass Sales will have the
3  ability to make objections. When I finish questions,
4  he may have some questions for you.
5    A   **Sure.**
6    Q   All right. If I ask a question that you
7  think you don't understand, will you please let me
8  know?
9    A   **Most definitely.**
10    Q   If you tell me that you don't understand a
11  question, I will rephrase it to make it perfectly clear
12  for your response, all right?
13    A   **Yes.**
14    Q   And if you do answer a question, we are going
15  to assume you understood that question. Is that fair?
16    A   **Yes.**
17    Q   It is also helpful for the Court Reporter,
18  even though you may think you know where I'm going with
19  a question, she can't record more than one person
20  speaking at the same time.
21    A   **Okay.**
22    Q   So you need to try and wait for me to
23  complete a question before you begin speaking and I'll
24  try to do the same with your response so she can do her

7

1  job well.
2    A   **That's fine.**
3    Q   Do you have any questions about this process?
4    A   **No.**
5    Q   Do you need any more to drink?
6    A   **No, fine.**
7    Q   If you need a break, let us know and as long
8  as you answer any question that has been asked first,
9  we'll take a break?
10    A   **That's fine.**
11    Q   Any question about this process?
12    A   **No, ma'am.**
13    Q   Where do you reside, Mr. Alvarez?
14    A   **I live at 120 Red Cedar Drive, Streamwood,**
15  **Illinois, 60107.**
16    Q   And the town where you live?
17    A   **Streamwood.**
18    Q   How long have you lived on Red Cedar Drive in
19  Streamwood?
20    A   **Nine years.**
21    Q   With whom do you reside on Red Cedar Drive in
22  Streamwood?
23    A   **My wife and my daughter, Kayla and my**
24  **daughter Ashley.**

8

1    Q   And is your residence on Red Cedar Drive a
2  home?
3    A   **Yes, it is.**
4    Q   Do you have any present intention on
5  relocating from your current home address in the next
6  year?
7    A   **We are talking about it, maybe next year,**
8  **maybe, it is not for sure.**
9    Q   Do you know where you will be locating to
10  next year?
11    A   **We're looking at Lake in the Hills, but it is**
12  **nothing for sure. We are just talking. It is not for**
13  **sure that we're moving.**
14    Q   Mr. Alvarez, what is your date of birth?
15    A   **10/27/60.**
16    Q   And what is your current age?
17    A   **Forty-seven. I'm going to be 48 in October.**
18    Q   Do you have a current home telephone number?
19    A   **Yes, I do.**
20    Q   What is that?
21    A   **630-830-9102.**
22    Q   What is your Social Security number, sir?
23    A   **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.**
24    Q   Are you employed right now?

9

1    A   **Yes, I do.**
2    Q   And where do you work right now?
3    A   **I just started like a week ago, two weeks,**
4  **Borg Warner.**
5    Q   And where are you employed by Borg Warner?
6    A   **I believe it is Lake Street, Addison.**
7    Q   In Addison?
8    A   **Yes.**
9    Q   What is your position with Borg Warner that
10  you recently started?
11    A   **He call it EOM. I start at four o'clock in**
12  **the morning. EOM, I think they call it. I'm not sure.**
13    Q   And what is the work that you perform for
14  Borg Warner in Addison?
15    A   **We are the ones getting ready to distribute**
16  **clutches and auto parts to the dealers.**
17    Q   So in your employment with Borg Warner, do
18  you participate in making these auto parts?
19    A   **No, we just distribute them.**
20    Q   What precisely do you do for your work?
21    A   **Labeling, picking, loading the trucks,**
22  **unloading the trucks. We are doing a project right now**
23  **for Beijing. So we pick the parts, make the labels and**
24  **put them in special boxes for, what you call it,**

3 (Pages 6 to 9)

DEPOSITION OF MARIO ALVAREZ -- 06/12/08

10

1  overseas.  That is pretty much what I'm doing now.
2     Q    Are you working full-time for Borg Warner?
3     A    Yes, ma'am.
4     Q    Where were you employed before Borg Warner?
5     A    Copper and Brass.
6     Q    Are you a member of the Union in your current
7  job with Borg Warner?
8     A    No, there is no union there, which I don't
9  want.  No.
10    Q    When were you employed with Copper and Brass
11  Sales?
12    A    I started January 28, 2001.
13    Q    And what was your position with Copper and
14  Brass Sales?
15    A    Six or seven years I worked there they moved
16  me everywhere.  The last one was RBW, non-process.
17  That was my last position that I left -- when I left.
18    Q    While you were employed with Copper and Brass
19  Sales, were you a member of a union?
20    A    Yes, I was.
21    Q    And what union did you belong to while you
22  were employed by Copper and Brass Sales?
23    A    Teamsters 714.
24    Q    Do you know when you were employed with

11

1  Copper and Brass Sales, whether your classification was
2  "warehouseman"?
3     A    Yes.  That is what it was, warehouseman.
4     Q    When you last worked at Copper and Brass
5  Sales as a warehouseman in RBW non-processed, who did
6  you report to?
7     A    Very last time that I worked there, Mark
8  DeMien.
9     Q    When you last worked at Copper and Brass
10  Sales in RBW processed sales, what shift were you on?
11    A    That was the first shift.
12    Q    And how long were you on the first shift in
13  the RBW non-processed position?
14    A    Three weeks, maybe two.  I don't know,
15  between two and three weeks, because I just came back
16  from the second shift.  So I wasn't second shift, two
17  weeks, two or three weeks.  I don't know.  Around in
18  that area.
19    Q    For how long did you work on the second shift
20  at Copper and Brass?
21    A    Three and a half years.
22    Q    And when you worked on the second shift at
23  Copper and Brass Sales, what was the last position that
24  you had?

12

1     A    RBW non-process, the same.
2     Q    When you were on the second shift at Copper
3  and Brass Sales handling RBW non-process, who was the
4  last supervisor you reported to?
5     A    Chris Ignacio.
6     Q    And when you worked on the second shift in
7  RBW non-processed, what hours did you usually work?
8     A    Started at 2:30.  My regular hours from 2:30
9  to 1 o'clock at night.  And usually they call you for
10  overtime.  So I used to come in early.
11    Q    What are the tasks that you performed when
12  you were doing the RBW non-processed work at Copper and
13  Brass Sales last?
14    A    We had the work orders.  They were staging it
15  in the racks with bundles and boxes and we used to get
16  the forklift and put them in a station because there
17  was two stations, Number 6 and Number 7.  What you do
18  is lay them down on the floor like five, six, seven
19  orders at the same time on the floor and put one on the
20  horse, which is -- they call it a "horse", and you read
21  the work order and see how many the customers want, how
22  many pounds or how many pieces.  And you go from there.
23  You just continue and pack it up and print the label
24  and send it back to -- we call it Bay 1. the area.  So

13

1  we stage it up there.  Very much that was every single
2  day the same thing.
3     Q    Was there someone else that worked with you
4  in RBW non-processed when you last worked that position
5  on the second shift at Copper and Brass Sales?
6     A    There was Arturo and I think the last name is
7  Pacheco, I think.  Isidro Garcia, myself and there was
8  Demos was the side loader which is the one that brings
9  all the work.  Just about three people working in that
10  station when I worked the second shift, Arturo, Isidro
11  and myself.
12    Q    When you were working in the RBW
13  non-processed area on the second shift, what was it
14  that the side loader brought?
15    A    The bundles and the material that we need to
16  ship to the customers.
17    Q    When did your employment end with Copper and
18  Brass Sales?
19    A    January 28th of 2008, this year.
20    Q    And you said that you changed from the second
21  shift to the first shift and only worked there two or
22  three; is that right?
23    A    That is correct, ma'am.
24    Q    And you only worked two or three weeks on the

4  (Pages 10 to 13)

DEPOSITION OF MARIO ALVAREZ -- 06/12/08

14

1  first shift before you were terminated in January?
2    **A   Yes.**
3    Q    What is the reason that your shift changed in
4  two to three weeks before your termination in January
5  of 2008?
6    **A   What was the reason I went to first shift?**
7    Q    Exactly.
8    **A   The reason was that we didn't have no**
9  **babysitter and the opportunity came up, they posted a**
10 **bid which this is how they do it.  They post a bid for**
11 **first shift and I was the senior guy and I was supposed**
12 **to -- so they give it to me.**
13   Q    When was the bid posted for the RBW
14 non-processed first shift position?
15   **A   It was supposed to be in December 1st,**
16 **something like that.  I can't remember the exact date,**
17 **but it was in December.**
18   Q    And where was the bid posted for the RBW
19 first shift position in December of 2007?
20   **A   It is a bulletin board in the Receiving**
21 **Office.**
22   Q    You said that you had been doing second shift
23 work at Copper and Brass for about three years before
24 you last changed to first shift.  Did you always do RBW

15

1  non-processed for that time?
2    **A   No.  First I was in the Sheet Station.  And**
3  **then the foreman didn't like it that I was there.  So**
4  **he moved me to UPS and I complained about him to Randy**
5  **and he got upset and he put me in RBW.  So that is what**
6  **they do.**
7    Q    Who was the foreman that you complained about
8  to Randy?
9    **A   Chris Ignacio, which I also took it to the**
10 **EEOC about this.**
11   Q    And what was your complaint about Chris
12 Ignacio that you made to Randy?
13   **A   He is pointing his finger in my chest,**
14 **telling me that I'm not a man.  And I got witnesses and**
15 **letters of the people who listened to it and he**
16 **continued aggressively intimidating me and everbody**
17 **listened to it.  And the next day I went to Randy's**
18 **office with Pete LaRocco and Marcus Spahenna (sic)**
19 **which both of them are the union stewards and nothing**
20 **was done like always.**
21   Q    What did Randy say when you complained to him
22 about Chris Ignacio's treatment of you.
23      MR. DISBROW:  Object as to relevance.  You
24 can answer the question.

16

1       THE WITNESS:  He didn't say nothing.  He said
2  that he would talk to him.  That was it.
3  BY MS. WEGNER:
4    Q    When you mentioned Randy, are you referring
5  to Randy Lunt?
6    **A   Yes, ma'am, the Plant Manager.**
7    Q    You also said that you complained to Randy
8  and then they put you in RBW because that is what they
9  do.  What do you mean by that?
10      MR. DISBROW:  I would object as to relevance.
11      THE WITNESS:  Still answer it?
12      MS. WEGNER:  Yes.
13      THE WITNESS:  Because that job is very, very,
14 very hard work and you need to be young, put it that
15 way, to be able to perform it.  There was another guy,
16 62-year-old, Lance, he tried.  He couldn't do it.  So
17 they moved him.  They moved him to UPS, which is a
18 lighter job.  That is what Bob used to do before when I
19 worked in first shift long time ago.
20 BY MS. WEGNER:
21   Q    Did you work with Mr. Wingo at Copper and
22 Brass Sales?
23   **A   Yes, ma'am, in 2001 when I started working, I**
24 **worked first shift.  I worked with him for two and a**

17

1  **half years on first shift.**
2    Q    Why did you change from first shift to
3  another shift after two and a half years?
4    **A   Because Mark DeMien -- I was working.  I came**
5  **early.  My shift starts at 6 o'clock and I came in at**
6  **5 o'clock in the morning.  I took a forklift, which the**
7  **rules of Copper and Brass is nobody owns any forklifts,**
8  **whoever comes first.  If you have work to do, you are**
9  **using it.  So that day Danny White, this older man, he**
10 **had a bypass or something in the heart.  I don't know**
11 **what it was.  He was an older man and he uses that**
12 **forklift.  He told me to get off of the forklift and I**
13 **said no.  And he told me about three times to get out**
14 **of the forklift and I said no.  And so he went to**
15 **complain to Mark DeMien and Mark DeMien out of the**
16 **office, slamming the door, pointing his finger get off**
17 **the forklift.  I filed a grievance with the union and**
18 **told them that I was going to sue them, and after that**
19 **they moved me out.**
20   Q    What was the reason you filed a grievance
21 over the forklift?
22   **A   Because of the aggression of Mark DeMien.**
23 **And my grievance was if they are going to punish me**
24 **because of disciplinary action that I didn't get off**

DEPOSITION OF MARIO ALVAREZ -- 06/12/08

18

1 the forklift, I complained also, and the agreement was
2 for him to go to anger management because the policy is
3 to get together with the employers and help each other.
4     MR. DISBROW:  I am just going to object to
5 foundation of that statement.
6 BY MS. WEGNER:
7     Q   As a result of the issue involving the
8 forklift and Danny White, did you receive any
9 discipline?
10     A   Yes.  They gave me a three-day suspension.
11 They write me up.  I don't know what else they did to
12 me.  And then the following date, two days, I was going
13 to second shift.
14     Q   When you worked in RBW non-processed station
15 at Copper and Brass Sales, did you perform a task
16 called PK-10?
17     A   Yes, ma'am.
18     Q   Could you explain what PK-10 is.
19     A   PK-10, when you receive the work order,
20 whatever the customer is asking you, how many pounds or
21 linear feet for the bar.  If they ask you for -- how
22 can I say it?  It is the billing.  I can't remember
23 exactly how it goes.  You put it in the computer and
24 you put exactly what they are asking you for.

19

1 Measurements and what kind of materials it is and
2 everything goes there.  When you -- the tag number,
3 when you put your tag number, it comes, the
4 measurements and what kind of material it is
5 automatically in PK-10.  So all it is you just enter it
6 in and the label comes out to send it to the customer.
7 And you put the tag number on the back of the PK-10 and
8 it stays up into the bin and the foreman comes and
9 picks it up.  It is very much the process that we --
10 the side loader is responsible to bring all the
11 material with the PK-10 with the order.  Sometimes they
12 make the mistakes and because we don't check it, they
13 blame it on us.  But whoever has it first is the side
14 loader.  The side loader is the one who is responsible
15 to bring us the right material to our station.  So we
16 just process it in the computer.
17     Q   So I understand the process, the side loader
18 gets the work orders before you do?
19     A   Yes.
20     Q   And after the side loader pulls material for
21 the work order, he would bring it to you in RBW?
22     A   Yes.  Two racks.  He is just a station in the
23 rack and we pick them up with a forklift.
24     Q   While you worked at Copper and Brass Sales,

20

1 did you have to wait for the side loader to bring you
2 the materials?
3     A   Hours.  Especially when Tyler used to work.
4 Tyler used to work side loader.  He used to smoke
5 outside and do whatever he want to do and we just
6 waiting.
7     Q   Did anyone ever tell you when you were
8 working at Copper and Brass Sales that there was a
9 specific number of work orders they expected you to be
10 able to complete each day?
11     A   No.  It is impossible for us to give a number
12 because some days in my case or anybody's case for that
13 matter, sometimes you do eleven orders.  Sometimes you
14 do 25 orders.  Twenty-five is way too much for one
15 person.  It is way too much.  The only time you do 25
16 orders is when Miller -- the second shift bundles, all
17 you do is carry the bundles.  You just -- you have to
18 break them up.  You pick the tickets on them and ship
19 them off.  That is the only time I could do two pages
20 which is 30 something orders.  When you have all this
21 Miller Company.  But besides that, it is impossible to
22 do more than 20 orders.  Some orders take half
23 an hour.  Some orders take 45 minutes.  So it depends.
24 It varies.  Sometimes it is a lot of work to get

21

1 involved and sometimes you got to break the boxes and
2 build the box and do all the things that you had to do
3 to be able to do one order.  So it takes time.  It
4 takes a very long time.  Most of us -- usually, I know
5 you are not asking me this.  We used to write down
6 everything on the side of the orders exactly what we
7 did for them to be able to know the time, because
8 sometimes they were complaining you not taking -- you
9 are taking too much time.  If you come over here and
10 see what we do, it is a different story.
11     Q   Do you recall if the RBW non-process position
12 on the first shift that you received in January was
13 posted shortly after Mr. Wingo's termination?
14     A   No, I think it was before that.
15     Q   Before?
16     A   I think.  I really don't know when Mr. Wingo
17 was terminated.  I can't remember exactly the date
18 which I think, you know what, I think I did, because
19 they needed somebody on first shift.  They needed
20 somebody on first shift that is when I came down, from
21 December when they post it all the way down to January
22 and they needed somebody.  That is why I went down.
23     Q   Was there anyone working at the RBW
24 non-processed station between the time Mr. Wingo was

6 (Pages 18 to 21)

DEPOSITION OF MARIO ALVAREZ -- 06/12/08

22

1  terminated and the time you changed and went down
2  there?
3      A  Yes.
4      MR. DISBROW:  Objection as to form and
5  foundation.
6      THE WITNESS:  You want me to answer.
7  BY MS. WEGNER:
8      Q  Yes.
9      A  They asked people from the second shift -- I
10 mean the third shift to stay working eight hours, extra
11 eight hours. They were working 16 hours to be able to
12 do his job to that specific station. Yeah, they were
13 like people from third shift. And they used to tell us
14 if we want to come early to come early to do the
15 overtime, work RBW in the morning time because they
16 didn't have nobody.
17     Q  Do you know who the people were from the
18 third shift who stayed and workd overtime to handle the
19 RBW non-processed work after Mr. Wingo was terminated?
20     MR. DISBROW:  Objection. Foundation.
21     THE WITNESS:  Juan Martinez used to be one.
22 Al Herrera used to stay sometimes. His ending shift
23 started at seven. They would leave at 11, 1 o'clock.
24 And then Isidro used to come early. Arturo Pacheco

23

1  used to come early to do that work.
2      Q  When did you work with Tyler?
3      A  We worked in -- when we ended our shift, he
4  works third shift. In the morning when I switch with
5  him, he used to stay overtime in the mornings. So he
6  stayed side loading sometimes. My shift ended at
7  11 o'clock at night. Sometimes I would leave at 2:30
8  in the morning, overtime. So I worked with him for
9  three hours or two hours. It depends. Whatever
10 overtime I can handle.
11     Q  How often would you stay and work overtime
12 when you were on the second shift?
13     A  Most every night. I used to do two hours
14 from 11 to 1, 11 to 1:30, 2:30 sometimes, depends.
15 Mostly every night.
16     Q  And that staying overnight most every night
17 was in the last three and a half years when you were on
18 second shift handling RBW non-processed?
19     A  Yes.
20     Q  And when you were on the second shift
21 handling the RBW non-processed staying overtime, would
22 Tyler do the side loading portion for you?
23     A  Yes.
24     Q  And was it on those occasions when you were

24

1  doing the RBW non-processed work on overtime that you
2  referred to having to wait for Tyler to bring you the
3  materials?
4      MR. DISBROW:  Objection as to relevance.
5      THE WITNESS:  Yes.
6  BY MS. WEGNER:
7      Q  Did Tyler as the side loader ever bring you
8  the wrong materials for an order?
9      MR. DISBROW:  Objection as to relevance.
10     THE WITNESS:  All the time.
11 BY MS. WEGNER:
12     Q  Did you ever make a mistake of shipping out
13 the wrong materials that were brought to you by Tyler?
14     A  Not exactly by him, but I had mistakes.
15     Q  By other people?
16     A  Always side loaders. And I try to argue it
17 wasn't my fault, but it didn't work. It's my fault.
18     Q  Did any side loaders ever get any discipline
19 for bringing you the wrong materials?
20     MR. DISBROW:  Objection as to foundation. I
21 don't know how he can answer that question.
22     THE WITNESS:  As a matter of fact, that is
23 the truth, because they cannot get involved because the
24 last person who touched the material is us. They just

25

1  tell them that you got to be more careful next time.
2  But the persons who get the written statements or
3  verbal is us, who touches the last order. So no, they
4  never get written down or anything.
5  BY MS. WEGNER:
6      Q  Were you ever made aware that Mr. Wingo
7  complained about Mark DeMien last year in August or
8  September?
9      A  Yes. Not just about DeMien, about Pete
10 LaRocco which is the Union Steward.
11     Q  How were you aware that Mr. Wingo complained
12 about Mark DeMien?
13     A  The way that he was treating him, doing the
14 things that he tried to explain to him the things that
15 was going on. He just laughed and he didn't care about
16 it.
17     Q  Who is it that you understand Mr. Wingo
18 complained to about Mark DeMien?
19     MR. DISBROW:  Objection as to foundation.
20     THE WITNESS:  My understanding first he went
21 to Pete LaRocco and I think it is went to Randy Lunt.
22 That is what my understanding was.
23 BY MS. WEGNER:
24     Q  And how did you learn of Mr. Wingo's

7 (Pages 22 to 25)

DEPOSITION OF MARIO ALVAREZ -- 06/12/08

26

1   complaint to Pete LaRocco and Randy Lunt about Mark
2   DeMien's treatment of him?
3       A   When we coming in, they were going out.  Many
4   times Pete LaRocco also mentioned to him, "You a dead
5   man.  You a dead man."  Like insinuating that he is
6   going to be terminated every single time.  We always
7   hear these things.
8       Q   When did you last hear Pete LaRocco say,
9   "You're a dead man"?
10      A   That was the last week that I was working
11  there.  Practically every single day telling him that,
12  you know.  Pete LaRocco gets his way no matter what it
13  is. whatever he says, that is where he goes in the
14  company.
15      Q   You personally heard Pete LaRocco saying to
16  Mr. Wingo, "You're a dead man."?
17      Q   Did Pete LaRocco explain when you were
18  present why he was saying to Mr. Wingo, "You're a
19  deadman"?
20      A   No, but I heard from the coworkers that he
21  was trying to terminate Wingo.  The reason, I don't
22  know.  But he saying there is going to be another
23  one in my checkbook.  That is what he does.
24      Q   Mr. Alvarez, I'm going to show you a document

27

1   we used earlier in a deposition.  It is marked as
2   Exhibit Number 2.  It is produced by Copper and Brass,
3   0015.
4           Do you recognize that document?
5       A   Yes, I do.  It is the daily work shift that
6   we fill it out before we do any work in the company.
7   We got to write the work order and the quantities and
8   where it goes.
9       Q   While you were working at Copper and Brass
10  Sales, you completed these production logs everyday?
11      A   Yes, ma'am.
12      Q   Did you ever receive any training at Copper
13  and Brass Sales as to how you were to complete the
14  production log?
15      A   No.  In the beginning when I started working
16  there, the other guy showed me a week.  And after that
17  I did it myself.  Confirming what other people were
18  doing, I was doing it too.  They, you know what, they
19  showed us everything about all the safety and all that
20  stuff, but they never came out with how we supposed to
21  do this, that I remember.  Maybe they did it when I was
22  off, when they would teach us.
23      Q   What was the information that you would put
24  down on the production log that you worked on everyday?

28

1       A   First what we do is get the work order.  We
2   work the work order and then the amount of pieces or
3   pounds that we, metal pieces, the amount of pounds and
4   where it is going and the end of the time.  And the
5   time or the beginning of time, whatever you -- some
6   foremans wanted you to start at the beginning and some
7   wanted the end.
8       Q   What foreman did you work for Copper and
9   Brass Sales that wanted you to report the time of the
10  beginning?
11      A   That was in the Sheet Station.  They want
12  to -- nobody does it though.
13      Q   So in the Sheet Station when you worked there
14  at Copper and Brass Sales, you were required to list
15  the time that you began work on a work order?
16      A   I worked with another guy named Brad burden
17  seen and he used to do hi lift, the same production
18  lift and I would do any same numbers I used to do mine.
19  This numbers in his list and I used to do sot SOEUPL
20  STPR* same numbers New Mexico my list.  So I didn't
21  fill the end, he D the ending time and beginning time.
22      Q   You have in front of you a work order that is
23  dated November 28, 2007?
24      A   Yes.

29

1       Q   Do you recognize that work order as one that
2   Mr. Wingo filled out?
3       A   Yes, that is my initials right there, Mario
4   Alvarez.  And practically when you don't have no time
5   to do it, at the beginning of the order you write down
6   the work order, whether you finish or not.  That is
7   what I do.  Most people do the same thing.  You write
8   it down and start working at it.  When he comes, it is
9   2:30 already, almost 2:20.  I come at 2:30.  So I do
10  the same order.  I put in my list.
11      Q   If you look at that document in front of you,
12  the work order for November 28th, did you actually put
13  your initials next to the last two work orders?
14      A   No, ma'am.  I didn't do that.  No, I didn't.
15  Somebody else did that.
16      Q   But in looking at Exhibit Number 2, the
17  production log for November 28th, Mr. Wingo put down
18  what he completed on a work order before his shift
19  ended for you, correct?
20      A   Yeah.  This is what he was supposed to do.
21      Q   Is that always the way you had worked with
22  Mr. Wingo in the RBW non-processed was that he -- you
23  followed him on the second shift.  He would write down
24  any -- what he had completed on any work order for you

8 (Pages 26 to 29)

DEPOSITION OF MARIO ALVAREZ -- 06/12/08

30

1  to know what to finish?
2     A   That is right. And then I write it down also
3  on my shift.
4     Q   What was the information that you would then
5  write on your production log?
6     A   Same work order, the pieces and the pounds
7  and where they are going and the time I finish.
8     Q   And the people, when I get up at 11 o'clock,
9  they start at 11 and do the same thing.
10    Q   Do you need some more to drink?
11    A   Fine. Thank you.
12       (BRIEF RECESS)
13 BY MS. WEGNER:
14    Q   While you worked at Copper and Brass Sales,
15 did you ever witness anyone making disparaging remarks
16 about older employees?
17    A   They used to call me "old fart".
18    Q   Who used to call you an "old fart" at Copper
19 and Brass Sales?
20    A   The guys I used to work with. Whether they
21 were joking or whatever, they always.
22    Q   When you worked on the second shift handling
23 the RBW non-processed work, was there a person who then
24 relieved you in that position after your shift ended?

31

1     A   Yes, there were two people, Juan Martinez and
2  Al Herrera.
3     Q   And did Mr. Martinez and Mr. Herrera work in
4  the RBW non-processed area on the third shift?
5     A   Yes, they did.
6     Q   And if you weren't able to complete
7  everything on a work order before your shift ended, did
8  you mark down how much you did so that Juan or Al would
9  know to finish?
10    A   Yeah.
11    Q   Did you mark down how much you had completed
12 on a work order, but were not able to complete fully by
13 the end of your shift, did you write that on your
14 production log --
15    A   Yes.
16       MR. DISBROW: Objection. Let her finish the
17 question.
18       MS. WEGNER: -- similar to this document that
19 we earlier marked as Exhibit 2.
20       THE WITNESS: Yes.
21       MR. DISBROW: Objection. Calls for
22 speculation. Form and foundation.
23       I'm not trying to interrupt you. I get
24 an opportunity to object to the question. I really

32

1  need to do that before you answer so I can get it on
2  the record. So I'm not trying to interrupt you, so you
3  understand. I'm trying to do my job.
4        THE WITNESS: Right.
5  BY MS. WEGNER:
6     Q   Did anyone, any supervisor or manager at
7  Copper and Brass Sales ever tell you not to write down
8  anything related to a work order on your production log
9  if you did not complete your work on that work order?
10    A   Uh-huh, no. I have been doing it for six
11 years. Nobody said anything.
12    Q   So you wrote down on production logs for six
13 years work orders, even if you didn't complete that
14 work order?
15    A   Yeah.
16       MS. WEGNER: Can you mark that Number 1.
17          (WHEREUPON Exhibit 1 was marked
18           for identification)
19 BY MS. WEGNER:
20    Q   Mr. Alvarez, you are being shown a document
21 that we has been marked as Exhibit Number 1 for your
22 deposition today. Do you recognize this document?
23    A   Yes, ma'am. This is my writing and this is
24 my production sheet.

33

1     Q   And is this production sheet one that you
2  prepared in your employment at Copper and Brass Sales
3  on November 28, 2007?
4     A   Yes, it is.
5     Q   On Line 12 of this work order that we have
6  marked as Exhibit Number 1, in the Comment Section
7  there is a note that seems to say "Cancel". What does
8  that mean?
9     A   It means I worked on it and took my time in
10 doing it and then for some reason they come back and
11 the office says they canceled it. So what I did, I had
12 to take it apart, whatever I did with the order,
13 whether I put it in a box or bin, I had to take it out
14 and cut the bins and restore it back where it belongs.
15 Practically either the foreman or somebody in the
16 office comes and says the order is canceled. We got to
17 go and look for it and take it away, cut the banding.
18    Q   This document that we have marked as Exhibit
19 Number 1, your production log for November 28, 2007, is
20 that a document that you had in your possession from
21 your employment with Copper and Brass Sales?
22    A   Yes, ma'am. And the reason that I started
23 doing this myself --
24    Q   Certainly you can tell me?

9 (Pages 30 to 33)

DEPOSITION OF MARIO ALVAREZ -- 06/12/08

34

1   **A   The reason is they are trying to do the same**
2   **thing to me, that I wasn't doing no work.**
3       MR. DISBROW:  Was this produced prior to
4   today?
5   BY MS. WEGNER:
6       Q   Mr. Alvarez, when did you first provide this
7   document to me?
8       **A   Just today.  Because I got, the 8th, 2007 to**
9   **December 20 something, I got all this.  They are all**
10  **mine.  The reason I had this, because they tried to do**
11  **the same thing to me, that I don't do no work.**
12      Q   If you look on what we have marked as Exhibit
13  Number 1, your Daily Production Log for November 28,
14  2007, can you tell me if Work Order 466844 appears on
15  your production log?
16      **A   446?**
17      Q   466844.
18      **A   Yes, Line 6, right?**
19      Q   Thank you.  And looking at your production
20  log for November 28, 2007, do you see whether Work
21  Order Number 466883 appears?
22      **A   Yes, ma'am.  It is number one.**
23      Q   I'm now going to show you a document that we
24  marked at an earlier deposition as Exhibit Number 3,

35

1   and this is a document produced by Copper and Brass
2   Sales Bates stamped 00016.
3           Do you recognize the production log for
4   November 29, 2007 in that Exhibit Number 3 in front of
5   you?
6       **A   Yeah.**
7       Q   Do you recognize Exhibit Number 3 from an
8   earlir deposition as a production log that was
9   completed by Mr. Wingo?
10      MR. DISBROW:  Objection as to foundation.
11      THE WITNESS:  Yeah, I do.
12  BY MS. WEGNER:
13      Q   Do you recognize Mr. Wingo's handwriting?
14      **A   Yeah, right here.  (Indicating).**
15      MS. WEGNER:  Would you make that Number 2.
16  Exhibit 2 was marked.
17          (WHEREUPON Exhibit 2 was marked
18              for identification)
19      MR. DISBROW:  I'm going to state for the
20  record that as with Alvarez Exhibit 1, Alvarez
21  Exhibit -- what has been marked as Alvarez Exhibit
22  Number 2 was not produced prior to today and we have
23  not seen this document ever before.
24

36

1   BY MS. WEGNER:
2       Q   All right, Mr. Alvarez, you have in front of
3   you what we have marked as Alvarez Deposition Exhibit
4   Number two?
5       **A   Yes, I do.**
6       Q   Do you recognize Exhibit Number 2?
7       **A   Yes, this is the same production sheet.**
8       Q   Is this a production sheet, Exhibit Number 2,
9   that prepared while you were employed at Copper and
10  Brass Sales?
11      **A   Yes.**
12      Q   And is Alvarez Exhibit Number 2 a Daily
13  Production Log that you prepared on November 29, 2007?
14      **A   Yes.**
15      Q   And does Alvarez Exhibit Number 2 contain
16  your printing or writing?
17      **A   Yeah, this is my writing.**
18      Q   And Alvarez Exhibit Number 2 seems to have
19  two pages, correct?
20      **A   Yes, it is.**
21      Q   So does Alvarez Exhibit Number 2 indicate
22  that on November 29th you were able to work on 25 work
23  orders?
24      **A   Yes.**

37

1       Q   When did you first provide the production log
2   for November 29, 2007 that we have marked as Alvarez
3   Exhibit Number 2 to my office?
4       **A   This afternoon when I came to you, first**
5   **time.**
6       Q   If you look at Alvarez Deposition Exhibit
7   Number 2, your production log for November 29, 2007,
8   can you tell me if you see on there the Work Order
9   Number 467112?
10      **A   Yes, I do, ma'am.  It is Line Number 1.**
11      Q   And on your Daily Production Log for
12  November 29, 2007, do you see Work Order Number 467012?
13      **A   This was the 29th.**
14      Q   On November 29th on your two page work order,
15  do you see Work Order 467012?
16      **A   Yes, I do.  It is Line Number 4.  No, this --**
17  **I am sorry.  7212, right?**
18      Q   No, 467012.
19      **A   I better get my glasses.**
20      Q   We're looking for Work Order 467012 your
21  Daily Production Log on November 29, 2007?
22      **A   Yes, I do.**
23      Q   Where do you see Work Order Number 467012 on
24  your November 29, 2007 Daily Production Log?

10 (Pages 34 to 37)

DEPOSITION OF MARIO ALVAREZ -- 06/12/08

38

1     A  I lost it. Where is that at?
2         MR. DISBROW:  Do you want to help him,
3  Counsel, because I sure don't see it.
4         MS. WEGNER:  I don't see it.
5         THE WITNESS:  I don't either.
6  BY MS. WEGNER:
7     Q   On November 29, 2007, was there someone else
8  working with you handling the RBW non-processed work?
9     A  No.
10    Q   On the second shift?
11    A  No, I always worked by myself.
12    Q   Always?
13    A  Always.
14    Q   Are you familiar with Isidro Garcia?
15    A  Yeah.
16    Q   Did Mr. Isidro Garcia ever handle RBW
17  non-processed work?
18    A  Yes, he did, but he work in a different side
19  with Arturo Pacheco all the time. I always worked by
20  myself, always. Work with nobody.
21    Q   While you were employed at Copper and Brass
22  Sales, did mistakes occur on work orders on a regular
23  basis?
24    A  Yeah. Not measurement, wrong materials,

39

1  different things that they came out with.
2     Q   Are you aware of anyone that worked at Copper
3  and Brass Sales while you worked there who did not make
4  a mistake on a work order?
5         MR. DISBROW:  Object as to foundation.
6         THE WITNESS:  Everybody make mistakes.
7  BY MS. WEGNER:
8     Q   Are you familiar with Tyler DeMien?
9     A  Yes, ma'am.
10    Q   And Tyler DeMien is someone that you worked
11  with at Copper and Brass Sales?
12    A  Yes.
13    Q   And is Tyler DeMien the person that you
14  indicated was the side loader?
15    A  Yes, that is correct.
16    Q   And Tyler's -- to your knowledge, how long
17  did Tyler work at Copper and Brass Sales?
18    A  I don't know. His dad brought him in. So,
19  three -- let's see. I worked two and a half years
20  second shift. He was there. About three and a half
21  years.
22    Q   Do you know how old Tyler DeMien is?
23    A  When he started, he was only 19 or so. Yeah.
24    Q   While you worked at Copper and Brass Sales

40

1  with Tyler DeMien, did you ever witness him receiving
2  more favorable treatment than other employees?
3         MR. DISBROW:  Objection as to foundation.
4         THE WITNESS:  Well, that is every single day.
5  He used to get drunk. He used to get drunk in the
6  parking lot and his dad would come in at 3 o'clock in
7  the morning and wake him up so he can go work. They
8  punch him in. They punch him out early. So all this
9  treatment that he has, he always made mistakes. He
10  always did all these things that his dad, who is Mark
11  DeMien, never wrote anything to him, you know. So it
12  is the other foremen's because he is the son of a
13  foreman.
14    Q   Who did you witness punching Tyler DeMien in
15  or out?
16        MR. DISBROW:  Objection as to foundation.
17  Assumes facts not in evidence?
18    A  Mark.
19    Q   When did you witness John Behenna punching
20  Tyler DeMien in and out.
21    A  It was going on for three months. I mean
22  every single time. They would go early. So is his
23  nephew by the way, John's nephew, which the policy of
24  Copper and Brass you are not supposed to have any

41

1  family working with you for the simple reason, that is
2  the reason, the treatment. They get special treatment.
3     Q   All right. Who is John Bahenna's nephew?
4     A  We call him Junior. His name is -- what is
5  his name? I can't remember his last name right now,
6  his first name. We always called him Junior.
7     Q   During what period of time did you witness
8  Mr. Behenna punching out Tyler DeMien and his nephew,
9  Junior?
10    A  About one o'clock in the morning. They used
11  to leave at 12 and John used to punch him out by
12  one o'clock.
13    Q   Do you know the reason that Tyler and Junior
14  would leave at midnight?
15        MR. DISBROW:  Objection as to foundation.
16        THE WITNESS:  Smoke weed.
17  BY MS. WEGNER:
18    Q   When you noticed Mr. Bahenna punching out
19  Tyler and Junior, to your knowledge had Tyler and
20  Junior finished their shift?
21    A  No. There was another guy named Mike. Mike
22  works in cross stock, starts from 4:30 to one o'clock
23  in the morning. They used to leave between 12 and one
24  o'clock. John used to punch them out all the time.

11 (Pages 38 to 41)

DEPOSITION OF MARIO ALVAREZ -- 06/12/08

42

1    Q   To your knowledge, is it a violation of
2  Copper and Brass Sales' policy to punch out any other
3  employee?
4    A   Most definitely.  Everybody else would get
5  fired right there on the spot.
6    Q   While you worked at Copper and Brass Sales,
7  were you allowed to use your cell phone during working
8  hours?
9    MR. DISBROW: Objection as to relevance.
10    THE WITNESS:  No, but they allowed several
11  people to do it.
12  BY MS. WEGNER:
13    Q   Who are you aware of being allowed to use
14  their cell phones during working hours?
15    A   Junior, Mike, Tyler, Peter LaRocco in front
16  of Randy's office.  Sitting in his forklift doing
17  nothing, talking on the phone.  Who else?
18    Q   Who would be sitting on a forklift doing
19  nothing, talking on the phone?
20    A   Pete LaRocco.
21    Q   Do you believe that Mr. Wingo was treated
22  unfairly by his termination?
23    MR. DISBROW: Objection as to relevance.
24    THE WITNESS:  Personally, we all talked about

43

1  that when they let him go.  The man had been working
2  there for 24 years, and because he performed -- he is
3  getting old.  They didn't do the same thing to him.
4  They did it to all of us, when they got rid of us, they
5  started getting excuses and putting it together.  We
6  talked about what they did to him was very unfair
7  because of his age, you know.  ----
8  BY MS. WEGNER:
9    Q   Do you believe Mr. Wingo was treated unfairly
10  by Copper and Brass Sales because of his age?
11    MR. DISBROW: Objection. Foundation.
12    THE WITNESS:  I think so.  I think so.  And I
13  don't think this is a false document, this right here,
14  for them to be able to accuse him of something.  They
15  accuse him also -- orders that were not even out of the
16  warehouse, accused him that he made mistakes and he
17  came back and fixed them and they still mess him up.
18  All this stuff, I think they -- he was very unfairly
19  treated, very.
20    Q   What knowledge do you have of orders where
21  mistakes were fixed where Mr. Wingo was accused of the
22  mistakes, even though they were --
23    MR. DISBROW: Objection as to foundation.
24

44

1  BY MS. WEGNER:
2    Q   -- even though those mistakes were corrected?
3    A   I can't remember the order right now, but it
4  was like eight or nine boxes stationed in the Bay 1
5  area, which is ready to go, which never left the
6  compound, never left the warehouse.  They write him up
7  because I think he wasn't bending enough or he didn't
8  put the sticker right, which is -- it just came back
9  and be fixed in five minutes.  And still, you know, my
10  opinion, my thing is that we talkd about that too.  If
11  Kevin promises and haven't been with the customer,
12  there is no reason why you should be punished.  The
13  problem can be fixed inside the place.
14    Q   When you worked at Copper and Brass Sales,
15  did you ever switch labels on work orders?
16    MR. DISBROW: Objection. Relevance.
17    THE WITNESS:  Yeah, I did.  Not just I switch
18  them purposely.  But when you put them together,
19  because you put like -- this is your station here.  You
20  put one, two, three, four and then you left them out of
21  the horse and put them back in the floor, and they
22  could be touching each other and they could be
23  switching, you know, when they stick to each other.  It
24  happened to me once.

45

1  BY MS. WEGNER:
2    Q   When you worked at Copper and Brass Sales in
3  the RBW non-processed area, was it your practice to be
4  working on several work orders at the same time?
5    MR. DISBROW: Objection. Relevance.
6    THE WITNESS:  You put a whole bunch -- you
7  have like six on the floor.Is?
8    MS. WEGNER: I don't have any other questions
9  for Mr. Alvarez.
10    EXAMINATION
11  BY MR. DISBROW:
12    Q   Mr. Alvarez, my name is Matt Disbrow.  I am
13  an attorney for Copper and Brass Sales.  I have a few
14  questions for you.
15       You were subpoenaed to appear here
16  today; is that correct?
17    A   Yes, sir.
18    Q   And what time were you subpoenaed to appear?
19    A   2 o'clock.
20    Q   And do you have a copy of your subpoena?
21    A   Oh, yes, I do.
22    Q   It is your recollection that you were
23  subpoenaed to appear at the law offices of Lisa Kane;
24  is that correct?

VICTORIA COURT REPORTING SERVICE, INC   (312)   443-1025

DEPOSITION OF MARIO ALVAREZ -- 06/12/08

46

1   A   Yes.
2   Q   Is that where you went today?
3   A   Yes.
4   Q   What time did you get to their office?
5   A   About 1:57, 1:56.  My train came over here
6   from 1:42.
7   Q   What train did you take?
8   A   The Elgin train.
9   Q   Do you have a number of that train?
10  A   No.  I think it is Elgin to Chicago.  I don't
11  know the name of it.
12  Q   What time did it leave Elgin?
13  A   I took it in Roselle, which I work in Lake,
14  so I took Roselle which is nine miles, about five miles
15  away from there.  So I left at 2:30.  I took the train
16  from Roselle to 12:50.
17  Q   Did you provide the documents that have been
18  listed as Alvarez Exhibit 1 and 2 to anyone at Miss
19  Kane's office prior to today?
20  A   No, sir.
21  Q   Did you provide them with any other documents
22  that have not been introduced into evidence?
23  A   No, just these two.
24  Q   And you testified that you have more of these

47

1   documents?
2   A   My personal ones.
3   Q   How many do you have, sir?
4   A   From -- I can let you know right now.
5       MS. WEGNER:  I object on the basis of
6   relevance.
7       THE WITNESS:  I won't give them to you.
8       MR. DISBROW:  We'll be sending you a
9   subpoena, so keep them safe.
10      THE WITNESS:  Not a problem.
11  BY MR. DISBROW:
12  Q   What was the process at the end of your
13  shift.  What did you do with the production logs?
14  A   We turn them into the Foreman's Office.
15  Q   You turn them into the Foreman Office?
16  A   Yes.
17  Q   The originals?
18  A   Yes.  Everybody makes copies, sir.
19  Q   Where do you make copies at?
20  A   In the office.
21  Q   Did anyone see you make copies?
22  A   Yes, I asked.
23  Q   Who did you ask?
24  A   John.

48

1   Q   John who?
2   A   Bahenna.
3   Q   And if he testifies that he never saw you
4   make copies, would you disagree with that comment?
5   A   I most definitely will.
6   Q   Did you ever keep copies of a blank
7   production log?
8   A   No.  They give us a whole stack.
9   Q   You would take stacks home, maybe?
10  A   No, they stay in the locker.
11  Q   Do you have any originals of Daily Production
12  Logs?
13  A   No, sir.
14  Q   Do you know the reason why Mr. Wingo was
15  terminated?
16  A   The reason that we all talk about it was
17  because he used false documents and something else.  I
18  can't remember.
19  Q   When you say "we all talked about it", who do
20  you mean?
21  A   The warehouse people.
22  Q   So that was secondary information that you
23  got through other people in the plant after Mr. Wingo
24  left?

49

1   A   Both of the foremans were saying that he --
2   the foreman talked to Pete LaRocco and Pete LaRocco was
3   telling around that he falsifies documents and that is
4   the reason they get rid of him.  Pete LaRocco is the
5   Union Steward.
6   Q   I understand.  You said you felt that he was
7   treated unfairly.  Is that your testimony?
8   A   Yeah, I think so.
9   Q   So at any time did you take in these
10  documents that you showed me today and tell anyone that
11  you felt that he was being treated unfairly?
12  A   What do you mean?
13  Q   Did you tell any management personnel at
14  Copper and Brass that you felt that Mr. Wingos'
15  termination was unfair?
16  A   No.
17  Q   Did you show anybody these documents and tell
18  them, "I filled them out the same way as Mr. Wingo"?
19  A   No, I didn't.  This was for my own purpose.
20  Q   Do you know of any management employee who
21  knew that we were putting down, allegedly putting
22  down -- strike the question.  Let's go off the record
23  for a minute.
24      (BRIEF PAUSE)

13 (Pages 46 to 49)

50

1      MR. DISBROW:  Strike the last question and
2  start over.
3  BY MR. DISBROW:
4      Q   Do you to know of any management employees
5  that knew that you were putting down orders on your
6  Daily Production Logs that you did not complete?
7      **A   My supervisor.**
8      Q   Who is your supervisor?
9      **A   Chris Ignacio.**
10     Q   How were you aware that he knew that you were
11 putting down orders that you did not complete?
12     **A   It is not my thing to know that he is doing
13 it.  He always checks every order.**
14     Q   Let's go through -- let's go through one of
15 your production logs here.  Let me make sure I get
16 yours.  Let's go with Alvarez Exhibit 2.  Make sure I
17 understand how this is filled out.  Now on 29 -- strike
18 that.
19          This document is dated November 29,
20 2007.  Do you recall specifically that this is the
21 document that you prepared on that date?
22     **A   Yes, that is my writing.  That is what I do.**
23     Q   And if you go through the columns with me,
24 you have the first column is item numbers that you

51

1  completed, correct?
2      **A   That's correct.**
3      Q   And I think you testified earlier that you
4  completed about 25 that day.  Does that look correct to
5  you?
6      **A   Yes.**
7      Q   And your earlier statement that it was
8  impossible to complete more than 20 orders in a day,
9  that was false; wasn't it?
10     **A   No, it wasn't.**
11          MS. WEGNER:  I object.  It mischaracterizes
12 his testimony.
13          THE WITNESS:  Excuse me.  This is the order
14 that you can see here.
15 BY MR. DISBROW:
16     Q   Sir, I just want a yes or no answer.  Is it a
17 true statement or an untrue statement.  I want you to
18 answer my questions and just my questions.
19     **A   It wasn't false.**
20     Q   Explain to me how that is true, sir.  You
21 testified earlier that it was impossible, and I believe
22 the record will reflect that you said it was impossible
23 to complete more than 20 orders in a day, and yet here
24 we have you on this particular day completing 25

52

1  orders.  So your earlier statement was incorrect;
2  wasn't it?
3          MS. WEGNER:  Mischaracterizes his testimony.
4          THE WITNESS:  It wasn't.  If you recall also
5  that I told you that Miller orders, that was second
6  shift, this is the ones right here. (Indicating)
7  BY MR. DISBROW:
8      Q   I believe you said that was third shift, sir?
9      **A   No, I didn't say that.  And if you come back
10 whatever I said, I said it is impossible to do more
11 than 25 orders, unless you do the tag and ships, which
12 is five.  This one here, six, which is this one.  You
13 don't have to do nothing.**
14     Q   We'll go through this in more detail.  At
15 least it was possible to complete more than 20 orders
16 in a day?
17     **A   No, it is not possible.**
18     Q   Never possible?
19     **A   Well, it is.  It depends on the
20 circumstances.  That is what I say.**
21     Q   So it is possible?
22     **A   Could be.**
23     Q   Do you know Mr. Pat Bishop?
24     **A   Yes, I know Mr. Pat Bishop.**

53

1      Q   He was a warehouseman as well, correct?
2      **A   Yeah, I worked with him.**
3      Q   If Mr. Bishop testifies that he completed
4  between 30 and 40 orders in a day, would you dispute
5  his testimony?
6      **A   Yes, I will.**
7          MS. WEGNER:  On the basis of form and
8  foundation.  Calls for speculation and assumes facts
9  not in evidence.
10          THE WITNESS:  I'll dispute it, because the
11 ones that they did is the tag and ship.
12 BY MR. DISBROW:
13     Q   What shift did Mr. Bishop work?
14     **A   Mr. Bishop worked with me on second shift.**
15     Q   Did he work first shift as well?
16     **A   He moved from the second shift to first
17 shift.**
18     Q   If he testified that he completed more than
19 20 orders in a day, routinely on first shift, would you
20 have any way to prove that that was untrue?
21     **A   Yes, I would, because he does the tag and
22 ship.  He goes to the office.**
23     Q   No, sir, follow my question.  I'm talking
24 first shift?

14  (Pages 50 to 53)

---

54

1    A    Yes. To answer you, first shift.
2    Q    Isn't it true that you do not have any
3 personal knowledge about the amount of orders other
4 warehousemen were completing on an average basis on
5 first shift?
6        MS. WEGNER: Objection. Form. Foundation.
7        THE WITNESS: I got knowledge of it. I know
8 what they do.
9 BY MR. DISBROW:
10    Q    Let's pick this same day. Let's stick with
11 the 29th of November. Do you know how many orders
12 Mr. Bishop did that day?
13    A    He don't do nothing, because he works in Bay
14 5.
15    Q    Are you sure about this?
16    A    I'm positive.
17    Q    What about -- let's pick somebody else. Who
18 works in RBW non-process besides Mr. Wingo on the 29th
19 of November 2007? Do you know?
20    A    That is Wingo.
21    Q    Just Wingo?
22    A    Yes.
23    Q    Who else worked in RBW non-processed?
24    A    My shift? Art and Garcia.

---

55

1    Q    Do you have personal knowledge of the amount
2 of orders they completed on a daily basis? Do you know
3 what I mean by "personal knowledge"?
4    A    Yes.
5    Q    Sitting here today, you know exactly the
6 number --
7    A    Not exactly.
8    Q    You don't know how many orders?
9    A    But I'll tell you how many --
10    Q    I don't want you to guess.
11    A    I'm not guessing. That is how they do.
12    Q    Sir, testimony is based on personal
13 knowledge. You can only testify about what you know,
14 sir.
15    A    Okay.
16    Q    And it is true, you don't know on a daily
17 basis what other people were doing, correct?
18    A    We were right across from each other.
19    Q    I just need a "yes" or "no". You either know
20 or don't know.
21    A    I know most every day what they did, two
22 people and I was by myself.
23    Q    You answered my question. Stick with my
24 question.

---

56

1    A    I will.
2    Q    Did you make it a habit of reviewing other
3 people's production log?
4    A    It is not a habit. It is just across the
5 street. I mean -- this is the work shift right here.
6 I'm working here. They are working here. We can see
7 each other. (Indicating).
8    Q    Did you make copies of anyone else's
9 production logs?
10    A    Of course not.
11    Q    So you don't know what their production log
12 is like sitting her today?
13    A    No, but I have seen it.
14    Q    Do you recall specifically the numbers on a
15 particular day that the person working across from you
16 completed the number of orders, sir?
17    A    No.
18    Q    Let's go back to Alvarez Exhibit Number 2.
19 The time that you have on the very right hand column,
20 is that the time that you completed the order?
21    A    Yeah.
22    Q    So you wrote down, if I'm following you
23 correctly, that Work Order 467112 you completed at
24 3:05?

---

57

1    A    That's correct.
2    Q    Do you stand by this document?
3    A    Yeah.
4    Q    You completed the order?
5    A    Yes, by 3:05.
6    Q    When other people wrote down times in the
7 stop time column, that was the time that they
8 completed -- that they were representing that they
9 completed a particular work order, correct?
10        THE WITNESS: Yeah.
11        MS. WEGNER: I object. Calls for
12 speculation.
13        THE WITNESS: See --
14        MR. DISBROW: No, no, you answered the
15 question. Stick with me.
16 BY MR. DISBROW:
17    Q    Can you explain why for Item Numbers 2, 3, 4,
18 5 and 6, you don't have a completion time, a stop time?
19    A    Because that is the ones that second shift,
20 if you go from 3:05 to 3:47, that is elapse of time
21 that it took me to do these orders, which is 1, 2, 3,
22 4, 5, 6 orders. All you do is get them and put them in
23 the forklift to PK-10.
24    Q    So you didn't complete those orders?

---

DEPOSITION OF MARIO ALVAREZ -- 06/12/08

58

1    A   Yes, I did.  The reason I didn't write it
2  down is because it won't take that long.
3    Q   What wouldn't take that long?
4    A   To do this order.  This is the tag and ship
5  orders that I was telling you when I did my statement
6  before.  The only reason that you have more than 25
7  orders is because when you have tag and ship orders,
8  that is six of them.
9    Q   How do you know that these are the particular
10  orders that don't take any time?
11    A   Because those are non-breakable.  They are
12  all copper rods, which goes to Miller.  What I'm trying
13  to tell you is this order is from 3:05 to 3.47.  It is
14  not even -- how long is that?
15    Q   I can do the math.
16    A   So it won't take me long to do those orders.
17    Q   Sticking with Item Number 2 on Alvarez
18  Exhibit Number 2.  I am sorry, Item Number 1 on Alvarez
19  Exhibit Number 2, Work Order 467112.
20        Did you complete that order?
21    A   Yes, sir.
22    Q   So Mr. Wingo couldn't have completed that
23  order?
24    A   He started it.

59

1    Q   That wasn't my question.  Either you
2  completed it or he completed it.  Who completed it,
3  sir?
4    A   I did.
5    Q   You completed the order?
6    A   But he started it.
7    Q   I'm not disputing that with you.  Follow my
8  question.  You completed the order, correct?
9        MS. WEGNER:  Asked and answered.
10        THE WITNESS:  Yes.
11  BY MR. DISBROW:
12    Q   If you would go back to what was DeMien
13  Exhibit Number 2, I believe --
14        MS. WEGNER:  Three.
15  BY MR. DISBROW:
16    Q   Have you ever seen one of Mr. Wingo's
17  production logs before today?
18    A   I worked with him side by side.
19    Q   Did he put down completion time and stop
20  times?
21    A   He does the same thing I do, the finish time.
22    Q   Sure, finish time.  So that last column is
23  the finish time of the work order, correct?  Stay with
24  me.

60

1    A   Oh, this one.  You want me to stay here?
2    Q   Right.  We are talking about this column
3  here.  (Indicating)
4    A   Okay.
5    Q   That's the time Mr. Wingo completed his
6  orders, correct?
7        MS. WEGNER:  Object.
8        THE WITNESS:  It could be yes and no.
9  BY MR. DISBROW:
10    Q   Do you know or do you not?  I don't want you
11  to guess.  You either know that those were stop times
12  or you don't know those were stop times.
13    A   According to my -- yeah, the stop times.
14    Q   If that was true, and you look at Item Number
15  20 on Mr. Wingo's Production Log from November 29,
16  2007, he wrote down a stop time.  Do you see that?
17    A   Yeah, it only says two.
18    Q   I understand it is cut off.  There is a time
19  there, but we don't know what the minutes are, but we
20  can see a two?
21    A   Yes.
22    Q   So if you completed that order, that is an
23  incorrect stop time, correct?
24        MS. WEGNER:  Objection.  Calls for

61

1  speculation.  Assumes facts not in evidence.
2        THE WITNESS:  No, it is not.  I will tell you
3  why it is not.
4  BY MR. DISBROW:
5    Q   Did he complete Order 467112 at two something
6  on the afternoon of November 29, 2007.  It is a "yes"
7  or "no" question.
8    A   No.
9    Q   He did not.
10        Did you have any management
11  responsibilities while you worked at Copper and Brass?
12    A   No, sir.
13    Q   You didn't supervise anybody?
14    A   No, sir.
15    Q   Did you have access to Mr. Wingo's personnel
16  file?
17    A   No, sir.
18    Q   Do you know how many times Mr. Wingo was
19  written up or disciplined?
20    A   No.
21    Q   Do you have any way to compare that to any
22  other individual that worked at Copper & Brass?
23    A   No.
24    Q   Had you met Jan prior to today?

16 (Pages 58 to 61)

DEPOSITION OF MARIO ALVAREZ -- 06/12/08

62

1    A   No, sir.
2    Q   Did you talk to her on the phone prior to
3  today?
4    A   Yeah.
5    Q   How many times had you spoken to her?
6    A   One time. And the next time she spoke with
7  my wife.
8    Q   How long was the conversation?
9    A   Not even five minutes. Not even --
10    Q   And what was the substance of your
11  conversation?
12    A   Oh, he just saying that we received this
13  letter for subpoena, to come in here if I'm willing to
14  come, and I said yeah.
15    Q   Did you discuss the issues in the case at
16  all?
17    A   No.
18    Q   How about Lisa Kane, have you ever spoken
19  with Lisa Kane?
20    A   With her?
21    Q   No. Her partner, Lisa Kane?
22    A   No, I never spoke with him.
23    Q   Anyone else that you know of from the law
24  office of Lisa Kane?

63

1    A   No, sir, never.
2    Q   Since Mr. Wingo's termination, have you ever
3  spoken to Mr. Wingo?
4    A   No, sir.
5    Q   Not spoken to him once?
6    A   We work together.
7    Q   After he left?
8    A   No, sir.
9    Q   Did you ever take credit for someone else's
10  work while you were at Copper and Brass?
11    A   No, sir.
12    Q   Would you be upset if anybody took credit for
13  your work?
14    A   If we do it together, I don't see why --
15    Q   Is it your understanding that management uses
16  production logs that warehousemen were completing on a
17  day?
18       MS. WEGNER: Objection. Calls for
19  speculation. Form. Assumes facts not in evidence.
20       THE WITNESS: To be honest with you, I don't
21  know what they do with it. I know they see it when
22  they are going to get you in trouble. They have piles
23  and piles of those in the office.
24

64

1  BY MR. DISBROW:
2    Q   They use them for something, but you don't
3  know?
4    A   I don't know. I don't know what they use
5  them for.
6    Q   Were you ever informed what management's
7  position was with regard to falsifying documents?
8    A   No.
9    Q   Are you familiar with the work rules at
10  Copper and Brass?
11    A   Yes, I got -- I got one of those things.
12    Q   Do you know what a D violation was under the
13  work rules?
14    A   Uh-huh.
15    Q   You have to answer "yes" or "no"?
16    A   No.
17    Q   Were you aware that there were some offenses
18  that could result in immediate termination?
19    A   Yeah. Yes.
20    Q   Did you know that falsifying company records
21  was a category D violation under the work rules?
22    A   No, I never knew that.
23    Q   Did you ever ask a supervisor what management
24  understanding of falsifying company records included?

65

1    A   Never asked.
2    Q   Never asked. So you don't know whether
3  management considered putting down stop times on a
4  production log when you didn't actually complete the
5  order constituted falsification of records, do you?
6       MS. WEGNER: Calls for speculation. Form.
7  Foundation. Assumes facts not in evidence.
8       MR. DISBROW: I think that is exactly right.
9  He doesn't know.
10       THE WITNESS: You don't want me to explain to
11  you. No. What I want you to do is answer my question.
12  Can you read my question back, please?
13       (WHEREUPON the record was read
14        as follows:
15       "Q  Never asked. So you don't know
16        whether management considered putting
17        down stop times on a production log when
18        you didn't actually complete the order
19        constituted falsification of records, do
20        you?")
21       THE WITNESS: No.
22  BY MR. DISBROW:
23    Q   I want to make sure I'm clear on that. You
24  don't know, sitting here today, whether management

17 (Pages 62 to 65)

DEPOSITION OF MARIO ALVAREZ -- 06/12/08

66

1  considered putting down a completion time on a
2  production log when the employee did not actually
3  complete the order -- strike that. I'm not following
4  my own question.
5       You don't know sitting here today
6  whether it was management's understanding of their work
7  rules that an employee putting down a completion time
8  on a production log when they didn't complete that work
9  order constituted a falsification document?
10      MS. WEGNER: Same objections.
11      THE WITNESS: If you do work, you supposed to
12  write down your work order. See you --
13  BY MR. DISBROW:
14      Q  I want you to answer my question. All I want
15  you to answer is whether you know what management's
16  position was with regard to that particular -- let me
17  finish. All I want you to answer is whether you know
18  sitting here today how management interpreted the work
19  rule concerning falsification of work records?
20      A  I don't know.
21      Q  You don't know?
22      A  No.
23      Q  It wasn't your decision to make, was it, as
24  to whether Mr. Wingo putting down a completion time

67

1  when he didn't complete the order constituted a
2  falsification of a work record?
3      A  It is not a falsification.
4      Q  No, that is not my question. That wasn't
5  your decision to make; was it?
6      A  No, everybody does it.
7      Q  No, that wasn't my question either. My
8  question was, as an hourly employee, you don't make
9  that determination; do you?
10      MS. WEGNER: Object to the form of the
11  question.
12      THE WITNESS: Strike the question.
13  BY MR. DISBROW:
14      Q  As an hourly employee, you don't make a
15  decision as to what management considers a work rule
16  violation and what management does not consider a work
17  rule violation?
18      A  No.
19      Q  What is the process that an employee goes
20  through when they believe management is making the
21  wrong decision with regard to enforcing their work
22  rules?
23      A  I don't know.
24      Q  You don't know what you do if you feel that

68

1  you received discipline unfairly?
2      A  I don't know. They always change their
3  minds, so I don't know, to be honest with you.
4      Q  You were a union member; weren't you?
5      A  Not really.
6      Q  You weren't a member of the Teamsters Union?
7      A  No.
8      Q  You weren't aware that there was a grievance
9  process?
10      A  Yes, there is a grievance process.
11      Q  If you felt -- strike the question.
12          Did you ever file a grievance?
13      A  Yes, I did.
14      Q  So you are familiar with the process to a
15  certain degree, correct?
16      A  Yeah. Yeah, I'm very familiar. I am
17  familiar with it. Whether they do it or not --
18      Q  Wait a minute. Have you ever met with the
19  union Business Agent when you worked for Copper and
20  Brass?
21      A  Gino.
22      Q  You met with Gino before?
23      A  Yeah.
24      Q  He didn't work for Copper and Brass; did he?

69

1      A  Practically, yeah, he did.
2      Q  No, no. He was not a Copper and Brass
3  employee; was he?
4      MS. WEGNER: Objection. Calls for
5  speculation.
6      THE WITNESS: No, he wasn't.
7  BY MR. DISBROW:
8      Q  You never saw him there working next to you;
9  did you?
10      A  No, I never did.
11      Q  Was it your understanding that he was an
12  employee of the Teamsters Union?
13      A  Yeah.
14      Q  And he was there to represent bargaining unit
15  members when they felt management had taken a wrong
16  position with regard to their own employment; correct?
17      A  Yeah. They never did write that down.
18      Q  But there were times when the union would
19  decide not to pursue a particular grievance, correct?
20      A  I guess.
21      Q  Was there ever a time where the union decided
22  not to pursue a grievance that you filed?
23      A  All the time.
24      Q  Did you testify earlier that you filed an

18 (Pages 66 to 69)

DEPOSITION OF MARIO ALVAREZ -- 06/12/08

---

70

1  EEOC charge against Copper and Brass?
2      A   Yes, I did.
3      Q   Do you know what the current position of that
4  EEOC charge is?
5      A   The reason they couldn't continue was because
6  the EEOC don't take harassment charges.
7      Q   Did they stop the process?  Is that your
8  understanding?
9      A   Yes, they stop it, because they don't do
10  harassment.  They told me to get a lawyer and sue them.
11      Q   They sent you a letter?
12      A   Yeah, they sent me a letter.
13      Q   They are not pursuing it?
14      A   Yeah.
15      Q   Have you retained a lawyer?
16      A   I will in a second.
17      Q   Simple question, either you have or you
18  haven't, sir?
19      A   No, I haven't.
20      Q   You made a reference when you were talking
21  about your EEOC charge I think along the lines of it's
22  coming?
23      A   It is coming.
24      Q   What is coming, sir?

---

71

1      A   It could come at any time.
2      Q   I don't know what it is.  That is what I am
3  trying to get at.
4      A   Maybe I can sue you guys.  You don't know
5  that.  I don't know.
6      Q   Is it fair to say that you are fairly angry
7  with Copper and Brass?
8      A   No, I'm not angry, sir.
9      Q   You seem angry to me?
10      A   Not angry.  It is very unfairly how these
11  people treat you even though the Human Resources they
12  don't do nothing about it and the union don't do
13  nothing about it.  And this is not only the case.  If
14  you work before there you would remember a rough day.
15      Q   We're got going over all God's creation.
16      A   You know how it is.
17      Q   Is it fair to say that you are unhappy with
18  the way your employment ended at Copper and Brass?
19          MS. WEGNER:  Form.  Foundation.  Relevance.
20          THE WITNESS:  I'm happy that I left that
21  place.
22  BY MR. DISBROW:
23      Q   It has been good for you?
24      A   I feel more peaceful.  I am not as stressed.

---

72

1  I'm very thankful to be honest with you.
2      Q   Do you know how old Pete LaRocco is?
3      A   How old is he?
4      Q   Do you know how old he is?
5      A   Forty-two, I guess.  I don't know.
6      Q   He is over 40, is that your understanding?
7      A   I think so, yes.
8      Q   He has the most senority in the plant?
9      A   Yeah, by 30 years.
10      Q   Do you think that Pete LaRocco gets special
11  treatment?
12      A   All the time.  All the time.  People get
13  fired for six-points and he has more than 20-points and
14  he is still working there.  He can treat people "F"
15  you.  I'm going to kill you.  You asked me, sir, if he
16  had special special treatment.
17      Q   You want to go off and tell your story.  You
18  will have plenty of time to do that.
19      A   Okay.
20      Q   I want you to answer my questions?
21      A   Sure, sure.  No problem.
22      Q   You said there was a time that you got moved
23  to second shift after a run in that you had with Mr.
24  DeMien; is that correct?

---

73

1      A   That's correct, sir.
2      Q   Isn't it true that the move to second shift
3  was management's attempt to work with you, to resolve
4  the issue you were having, you had with the supervisor
5  on first shift?
6      A   No, that wasn't it.  There was no issue
7  there.
8      Q   I think you testified there was an issue.  We
9  can move on.  The record speaks for itself.
10      A   The issue was --
11      Q   If you filed a grievance, there was an issue?
12      A   Yes, there was an issue.
13      Q   There was some testimony about side loaders
14  bringing the wrong material.  Isn't it a fact that as
15  the packaging, the employee packaging material at RBW
16  non-process, it was your responsibility make sure that
17  what was packaged was consistent with the material that
18  was requested on the work order, correct?
19      A   Yes, sir, it is.
20      Q   So I know you testified that everybody makes
21  mistakes, correct?
22      A   Yes.
23      Q   But that's a mistake.  If you don't catch it,
24  that is a mistake.  Let me ask a better question.  I

---

DEPOSITION OF MARIO ALVAREZ -- 06/12/08

74

1  don't think that is clear enough.  Strike that.
2          So it is a mistake, even though you are
3  brought wrong material by the side loaders, that you
4  don't verify before you package the material that you
5  have the correct material.  That's a mistake?
6      A   Yeah, we need to verify it.
7      Q   Did you ever sit on one of Wingo's meetings
8  with management concerning the discipline that you
9  received?
10     A   No, sir.
11     Q   You don't have any firsthand knowledge about
12 the discipline that Mr. Wingo received; do you?
13     A   No.
14     Q   That is all secondhand information, correct?
15     A   Yeah.  But we --
16     Q   You answered the question.
17         Mr. LaRocco is not a management
18 employee; is he?
19     A   He is not.
20     Q   He is an hourly union guy; isn't he?
21     A   Yeah, he is.
22     Q   Sitting here today, do you know the training
23 that Mr. Wingo received concerning completing work
24 orders?  Strike the question.

75

1          Sitting here today, do you know the
2  training that Mr. Wingo received concerning completing
3  production logs?
4      A   No.
5      Q   So you don't know if he was told specifically
6  how to fill the production log out or not?
7      A   No, not personally, no
8      Q   He may have received training, you just don't
9  know?
10         MS. WEGNER:  Calls for speculation.
11 BY MR. DISBROW:
12     Q   He may have received training, you just don't
13 know?
14     A   May.
15         MS. WEGNER:  Same objection.
16 BY MR. DISBROW:
17     Q   You don't know?
18     A   If nobody else receive it.
19     Q   You either know or you don't know.
20     A   No, I don't know, sir.
21     Q   Sheet Station, that is a machine operator's
22 job; is that right?
23     A   Yes.
24     Q   It is not the same as warehouseman; is that

76

1  correct?
2      A   Same process.
3      Q   You got warehouseman and you have got machine
4  operator?
5      A   No, sheet is warehouse.
6      Q   I know you work in the warehouse, but you
7  have different titles, correct?
8      A   The machine operator is the saw area and the
9  shear station.
10     Q   The people that you were talking about used
11 to joke around and call you an "old fart", they were
12 hourly employees that worked with you?
13     A   Yes.
14     Q   You didn't consider that harassment; did you?
15     A   No, it didn't do any good to complain anyway.
16     Q   Did you work side by side with Tyler DeMien
17 on a daily basis?
18     A   Side by side, no.
19     Q   You worked a different shift than him most of
20 the time; didn't you?
21     A   Yes, sir.
22     Q   So you don't have any firsthand knowledge
23 about what Mr. Tyler DeMien was doing on a regular
24 basis at work; do you?

77

1      A   For two an a half hours, yes, I did.
2      Q   And he was on the side loader, right?
3      A   Yes.
4      Q   Did you have visual contact with him at all
5  times for the two and a half hour overlap?
6      A   Yeah.
7      Q   You watched him constantly while you were
8  packaging your materials?
9      A   Yes.  He was standing out there.  He was
10 supposed to be working, but he was standing around
11 doing nothing.
12     Q   Is your testimony that Mr. Tyler DeMien was
13 constantly doing nothing?
14     A   Very much.
15     Q   Is it your testimony that Mr. LaRocco got
16 that same type of treatment?
17     A   All the time.
18     Q   Do you know who made the decision to
19 terminate Mr. Wingo?
20     A   I think it was Pete.
21     Q   No, do you have any personal knowledge?
22     A   No, I don't.
23     Q   Do you have any personal knowledge about who
24 made the decision to terminate Mr. Wingo?

DEPOSITION OF MARIO ALVAREZ -- 06/12/08

78

1    **A    No, I don't, sir.**
2        Q    Do you know how many times Mr. Wingo was
3    given second chances when he made mistakes?
4        MS. WEGNER: Object.  Assumes facts not in
5    evidence.  Foundation.  Calls for speculation.
6        MR. DISBROW: Can you read back the question?
7        THE WITNESS: No, I don't.  I understood.  I
8    was waiting for her.
9    BY MR. DISBROW:
10        Q    IG, do you know an employee that had the
11    initials IG?
12    **A    Isidro Garcia.**
13        Q    I'm going to show you an exhibit that was
14    marked as an exhibit during the DeMien deposition.
15        Do you have that handy, Jan?
16        MS. WEGNER: Right there. (Indicating).
17    BY MR. DISBROW:
18        Q    I want you to go ahead and take a look at.
19    If you look at the bottom of this exhibit, it contains
20    a number of different documents.  But if you look at
21    the document that is identified on the bottom with the
22    Numbers 000116, can you flip about 16 pages further in?
23    **A    16?**
24        Q    Yes.  Got it?

79

1    **A    Yes.**
2        Q    Are you familiar with this particular type of
3    document?
4    **A    Yes, this is the PK-10.**
5        Q    This is the packing list that spits out when
6    you do your PK-10?
7    **A    It comes in the office, yes.**
8        Q    It looks like Work Order 4677012, do you see
9    that work order?
10    **A    Yes.**
11        Q    And if you look down at the filled by box, do
12    you know where that is at?
13    **A    Yes.**
14        Q    It has an IG?
15    **A    Yes.**
16        Q    Is it your understanding that stands for
17    Isidro Garcia?
18    **A    Garcia.**
19        Q    Does that designation mean that the document
20    is indicating that Isidro Garcia filled this particular
21    work order?
22    **A    Yeah.**
23        MS. WEGNER: Calls for speculation.
24        THE WITNESS: And also -- I don't know why

80

1    they did.
2    BY MR. DISBROW:
3        Q    Do you have any knowledge, sitting here
4    today, whether or not Isidro Garcia filled this
5    particular work order?
6    **A    You know what, no.**
7        Q    Let's look at another document.
8    **A    This is nothing to me.**
9        Q    Let's look at Document 114, 00114.  Got it?
10    **A    00114.  I'm sorry.  So it is 14?**
11        Q    Yeah.  Have you ever seen this document
12    before?
13    **A    Yes, this is my initials.**
14        Q    In the "fill by" column, your initials?
15    **A    Yes.**
16        Q    You also packed this order?
17    **A    Yes.**
18        Q    And are those your initials in the audit
19    column as well?
20    **A    Yeah.**
21        Q    This is Work Order 466883; is that correct?
22    **A    Yes, that is correct.**
23        Q    Do you recall if you, in fact, filled this
24    order?

81

1    **A    Yes, I filled it.**
2        Q    No one else would have filled that order?
3    **A    No, because I finished it.  Whoever started**
4    **it, just leave it there and not finish it.  I finished**
5    **the paperwork.**
6        Q    Go one page up.
7    **A    Fifteen.**
8        Q    Thirteen.  You see this is the packing list
9    for the same order.  Do you see that?
10    **A    Yes.**
11        Q    And it has your initials in the "filled by"
12    box, correct?
13    **A    That's correct.**
14        Q    Now, did you put those initials into the
15    computer, is that how that works?
16    **A    Uh-huh.**
17        Q    And is that how you -- is that when you fill
18    in your complete time is when you finalize this
19    particular document?
20    **A    No.  When -- practically, yeah.**
21        Q    What is the last step in the process?  Maybe
22    that's the best way to answer the question.
23    **A    The last step.**
24        Q    Let me ask a better question.  In a

21 (Pages 78 to 81)

DEPOSITION OF MARIO ALVAREZ -- 06/12/08

82

1 particular work order, what is the last step in
2 completing that order when it is considered complete?
3    A   Put the sticker number, whatever it comes,
4 and put them in the bin or wherever it goes.
5    Q   So you complete this packing list by putting
6 your information --
7    A   You know what, sometimes I do the finish time
8 before I write in the computer. See what I'm saying?
9    Q   You weren't consistent in how you did it?
10    A   It varies, because otherwise I would forget
11 or do things different. So I write it down. Sometimes
12 I write it down before I pack the order.
13    Q   You put your complete time before you --
14    A   No, write the order down.
15    Q   You write the work order down before you pack
16 it?
17    A   Before I pack it.
18    Q   You complete one order. I'm just trying to
19 follow you here. You complete one order, right, you
20 are following me?
21    A   Uh-huh.
22    Q   And then you write down another order on your
23 production log, right? You haven't finished filling
24 it, but you are writing it down because you know you

83

1 got to fill it, correct?
2    A   No. What I'm trying to tell you is when I
3 get an order, before I finish it, I write it down.
4    Q   You write down the work order number?
5    A   And the pieces and the pounds and all this.
6    Q   You can't put in a completion date until you
7 have filled it?
8    A   Not until whatever.
9    Q   Otherwise, it is not correct? You can't --
10 are you following me?
11    A   I mean you cannot go and watch all the time.
12 Okay. This is the time. So what you do is just, I
13 wrote it down. I got two more things to do. Put the
14 time in there.
15    Q   Are you saying that your completion times are
16 not accurate?
17    A   It is not accurate or -- I mean I cannot tell
18 you that is exactly the time. It goes in there.
19    Q   So your documents aren't necessarily
20 accurate, is that what you are telling me?
21    A   They are accurate. The timing that you do
22 and how you do it, is how you feel comfortable how you
23 do your orders. Everybody has a different system.
24    Q   The time that you wrote down isn't

84

1 necessarily the time that you actually completed the
2 order?
3    A   It could be two minutes or five minutes
4 earlier that I wrote down the time.
5    Q   How did you generally do it?
6    A   I get the bundle. Before I start doing
7 anything, I write my stuff out.
8    Q   You write down the work order, how much
9 material you need to pack, how you go along
10 your way and you need to write a comment, you do that?
11    A   Yes.
12    Q   And the last thing you write down on a
13 particular work order is your completion, right?
14    A   No, but see. The thing is, if 11 o'clock
15 comes in my case, I had all these down, and I put the
16 time that I finish for the other people to finish it,
17 but see this is my time. Whatever they finish, they
18 write it down also. Do you see what I'm saying?
19    Q   No. Are you telling me -- let's go back to
20 Alvarez Exhibit Number 2. Look at -- go to Page 2?
21    A   Okay.
22    Q   Number 5?
23    A   Okay.
24    Q   Do you know whether or not you completed that

85

1 order?
2    A   Well, according to that, yes, to that time,
3 yes.
4    Q   You completed -- okay. Because that is what
5 that last column says. That is when you completed that
6 order.
7    A   This order could be not finish.
8    Q   It either is complete or not complete. I
9 don't want to argue semantics.
10    A   I'm not arguing with you. This is completed
11 here. Regardless did I finish it, it is also 12:40, so
12 I get off at 1 o'clock. See what I'm saying?
13    Q   I don't know what you're saying.
14    A   You write it down. If I haven't finished it,
15 the other person comes and fill the same order --
16    Q   Who would have taken over for you on this
17 particular day?
18    A   He comes out, Juan Martinez, or Al --
19 whatever his name is.
20    MS. WEGNER: Herrera.
21    THE WITNESS: Herrera. So what I am saying
22 to you, we had to sweep the flooring and clean
23 everything else. I started, I can't start the order.
24 It doesn't mean that I -- well, how we work in our --

22 (Pages 82 to 85)

DEPOSITION OF MARIO ALVAREZ -- 06/12/08

86

1  BY MR. DISBROW:
2      Q   I just need to know.
3      A   **According to this --**
4      Q   Let me go back to my original question.
5          Did you complete 467087 at 12:40 or did
6  you not complete that order?
7      A   **According to this, yes, I completed it.  But**
8  **I'm trying to explain to you --**
9      Q   That is all I needed to know.
10     A   **It has been a long time.**
11     Q   It has been a long time; hasn't it?  Do you
12 recall what happened on November 29, 2007?
13     A   **No.**
14     Q   You don't have any memory sitting here today
15 specifically about a particular work order that you may
16 have filled or not; do you?
17     A   **So many.**
18     Q   All we really have to go by is the documents
19 and what they say; isn't that a fair statement?
20     A   **Yeah, I guess.**
21     Q   I think I started asking you a line of
22 questions.  I don't think that I got through.  You were
23 a union employee along with Mr. Wingo, correct?
24     A   **Yes, sir.**

87

1      Q   And you said that you felt that he was
2  terminated unfairly, correct?
3      A   **Yes.**
4      Q   Why didn't you go and talk to your union
5  about that?
6      A   **It would have been no difference, sir.**
7      Q   It could have, though; correct?
8      A   **Yeah.  He knew --**
9      Q   You could have gone, for example, to Gino
10 Rodriguez with your documents, but you didn't do that;
11 did you?
12     A   **What documents?  This just came out to me**
13 **today.  I just got it.**
14     Q   You just remember you had them?
15     A   **Yeah.  I just figured because they said**
16 **"false document".  I remember when they said that at**
17 **Copper and Brass.  That is what I kind of figured it**
18 **was because of this.  I mean --**
19     Q   I'm going to represent to you that we're
20 going to request the originals of your documents?
21     A   **Okay.**
22     Q   And we're going to test to see how old that
23 paper is?
24     A   **Okay.**

88

1      Q   Are you concerned that it is going to come
2  back as not as old as you say they are?
3      A   **No, sir.  This is the real -- the right month**
4  **and date is the same.**
5      Q   Have you made any more copies of these
6  documents, or you just have your original copy?
7      A   **This is a copy here.**
8      Q   Who made those copies that we see here today?
9      A   **I did.**
10     Q   Did you bring -- I understand.  You made
11 copies of the originals at work, correct?
12     A   **Yes.**
13     Q   You still have those copies?
14     A   **Yes, some are at home and some here.**
15     Q   If you made those copies on the day that you
16 prepared the work order, they would be a few months
17 old, correct?
18     A   **Yeah.**
19     Q   Have you made any other copies of those
20 documents since leaving?
21     A   **No.**
22     Q   Did you supply the originals of those -- not
23 the originals that you turned into Copper and Brass.
24 Did you supply your originals copies to Miss Wegner?

89

1      A   **Only this afternoon.**
2      Q   And she made copies of them?
3      A   **Yes.**
4      Q   In her office?
5      A   **Yes.**
6      Q   Did you ever tell Mark DeMien that you
7  thought writing down a completion time when it wasn't
8  actually a completion time was okay?
9      A   **No, I don't think nobody does that.**
10     Q   Did you ever tell Randy Lunt that you thought
11 writing down a completion time on your work order when
12 you actually didn't complete the order to be no big
13 deal?
14     A   **Excuse me.  The reason you write it down is**
15 **because --**
16     Q   Back to the question.  Stick with my
17 question.  Did you ever tell Randy Lunt --
18     A   **No, I did not.**
19     Q   Did you ever ask them what their feeling was
20 with regard to putting a completion time down in the
21 stop time column -- did you ever ask Randy Lunt what
22 his feeling was about it?
23         MS. WEGNER:  Object on the basis of
24 foundation.  Calls for speculation.

23 (Pages 86 to 89)

90

1    MR. DISBROW: Counsel, he either told them or
2  not. That is not speculative.
3        You can answer the question.
4     MS. WEGNER: No, that wasn't the question.
5  Would you please read back his question.
6     MR. DISBROW: Yeah, that would be a good
7  idea. Read back that question, because I don't think
8  she was paying attention.
9        (WHEREUPON the record was read as
10           follows:
11           "Q  Did you ever ask them what their
12           feeling was with regard to putting a
13           completion time down in the stop time
14           column -- did you ever ask Randy Lunt
15           what his feeling was about it?")
16    THE WITNESS: You want me to answer?
17    MR. DISBROW: Absolutely.
18    THE WITNESS: No, I did not.
19  BY MR. DISBROW:
20    Q    So they could, from a management perspective,
21  have believed that was falsification of the document.
22  You don't know, correct?
23    MS. WEGNER: Object. Form. Foundation.
24  Speculation.

91

1     THE WITNESS: No.
2  BY MR. DISBROW:
3    Q    You don't know; do you?
4    A    No.
5     MR. DISBROW: I don't have any further
6  questions.
7         EXAMINATION
8  BY MS. WEGNER:
9    Q    When you worked second shift under Chris
10  Ignacio, was your supervisor, Mr. Ignacio, aware of the
11  way that you completed your production logs?
12    MR. DISBROW: Asked and answered. Objection.
13    THE WITNESS: He was one of the foremen. He
14  always checked every single one of them.
15  BY MS. WEGNER:
16    Q    When you recorded to Mr. Ignacio and you were
17  doing the RBW non-process work, was he ever aware that
18  you stopped work on a work order without completing it
19  so that you could sweep and clean up before the end of
20  your shift?
21    MR. DISBROW: Objection. Foundation as to
22  what Mr. Ignacio knew or didn't know.
23    THE WITNESS: Yeah, he knew that. If you see
24  the time, finish time it is 3:05. I started at 2:30.

92

1  I had to switch and check the forklifts and check
2  everything else. So they, assuming that they know.
3  But they -- I started at 2:30 and this finish time is
4  3:05. So it is a half hour, 25 minutes period of time
5  in there. They are aware of this, even though in the
6  end, same thing. So I don't know if that is the
7  answer. But --
8    Q    Let me ask you a question. Are you referring
9  to Alvarez Deposition Exhibit Number 1?
10   A    Yes, ma'am.
11   Q    And Alvarez Deposition Exhibit Number 1, is
12  your production log for November 28, 2007?
13   A    Yes.
14   Q    And your Daily Production Log for
15  November 28, 2007 reflects that you began your shift at
16  2:30 in the afternoon, correct?
17   A    Right.
18   Q    When you began your shift at 2:30 in the
19  afternoon on November 28, 2007, did you immediately
20  begin working on Work Order 466883?
21   A    No.
22   Q    What did you do on November 28, 2007 after
23  you began your shift at 2:30 and before you started
24  working on Work Order 466883?

93

1     MR. DISBROW: Objection as to foundation.
2  Wait, objection as to foundation. Mr. Alvarez already
3  testified that he didn't have any specific recollection
4  about what he was doing as to the particular work
5  orders.
6     THE WITNESS: I can tell you what I used to
7  do in the beginning of my shift everyday.
8  BY MS. WEGNER:
9    Q    Let me ask you a better question then.
10        Did you have a standard practice or
11  procedure or steps you would take or things you would
12  do after starting your shift at 2:30 in the afternoon
13  on the second shift at Copper and Brass sales when you
14  worked there in late 2007?
15    MR. DISBROW: Can you read back that
16  paragraph of a sentence?
17        (WHEREUPON the record was read as
18           follows:
19           "Q  Did you have a standard practice or
20           procedure or steps you would take or
21           things you would do after starting your
22           shift at 2:30 in the afternoon on the
23           second shift at Copper and Brass sales
24           when you worked there in late 2007?")

24  (Pages 90 to 93)

DEPOSITION OF MARIO ALVAREZ -- 06/12/08

94

1    MR. DISBROW:  Objection as to form and
2  foundation.  Compound.
3    THE WITNESS:  Answer it?  Yeah, the first
4  thing I had to do is that we all, not just me, we had
5  to check our equipment, which is the forklift, check
6  the water.  If it needs water, we need to fill it up
7  with water and sweep the area that we are working in.
8  Cleaning is the whole thing.  So all this takes half an
9  hour, 45 minutes or whatever.  But that is the
10 procedure that we always take in the beginning and in
11 the end of the shift.
12 BY MS. WEGNER:
13   Q   When Mr. Disbrow was questioning you
14 regarding your understanding of filing grievances, you
15 indicated that you didn't believe that you received
16 representation from the union during your employment at
17 Copper and Brass Sales; is that correct?
18   MR. DISBROW:  Objection as to relevance.
19   THE WITNESS:  That is correct.  What it is
20 that Pete LaRocco and Gino and Randy Lunt would get
21 together before everything going on and they decide
22 what they are going to do to you, whether they
23 represent you or not.  That is how this is.  It has
24 always been like that.  They have a meeting before you

95

1  get there.  They already decide what they are going to
2  do to you.
3  BY MS. WEGNER:
4    Q   Do you believe Pete LaRocco received special
5  treatment because he was a union steward?
6    A   **Not only that he has been working there since**
7  **he was 18 years old.  They were trying to fire him.**
8  **And John Bahenna (sic) fired him, because he had six**
9  **points.  He didn't show up on Saturday and they fired**
10 **him.  He stayed out of work for five weeks, I think it**
11 **was.  And Gino came back and talked to Mr. -- which is**
12 **the president of the company with Randy Lunt.  They**
13 **decide because his dad is sick, is ill, he is going to**
14 **come back to work and they pay him back all the five**
15 **weeks like nothing happened, you know.  And previously**
16 **I can't remember names right now, but people have been**
17 **fired because of six points regardless of what it is.**
18 **That to me, that is special treatment.  Special**
19 **treatment is when this man telling another co-worker "F**
20 **you.  I'm going to kill you" and all this stuff.  I was**
21 **a witness in front of Randy Lunt.  They don't do**
22 **nothing about that either.  That is a trick to somebody**
23 **else.  And I can continue doing -- I can go on and on**
24 **about Pete LaRocco.**

96

1    Q   What was the reason that you were terminated
2  by Copper and Brass Sales?
3    MR. DISBROW:  Go ahead.
4    THE WITNESS:  The reason I was terminated,
5  because Mike Peroni called me "F you, Mario" in front
6  of Mark DeMien and I turned around going to my station
7  and talked to Mark about it, the harassment that Mike
8  was doing to me.  And then Mike said that is enough to
9  Randy's office, because I signed a piece of paper in
10 September and that is the reason I was terminated.  And
11 I filed a grievance.  Gino came up to talk to Randy
12 Lunt, that he was going to go to arbitration and all
13 this and nothing was done.  They just covering each
14 other.  That is what it was.
15   MS. WEGNER:  I don't have anything else.
16   EXAMINATION
17 BY MR. DISBROW:
18   Q   Did you ever tell Chris Ignacio, that's his
19 name, that you were putting down completion times in
20 your work production logs that weren't really
21 completion times?
22   A   **At the end of the shift.**
23   Q   No.  Did you ever tell Chris Ignacio that you
24 were putting down completion times on your production

97

1  logs when you didn't actually complete the work order?
2    A   **I never told that.  Whatever I put down is**
3  **what it is.**
4    Q   You assumed he knew.  You never told him?
5    A   **Well, he checks it.**
6    Q   I think you testified that you assumed he
7  knew, but you never told him, correct?
8    A   **No.  He always checks it.**
9    Q   You don't know sitting here today, do you,
10 whether Chris Ignacio checked your production logs and
11 believed that when you put down a completion time, you
12 actually completed that order; do you?
13   A   **I don't.  That is the reason I started doing**
14 **this, because he checks it every single night and puts**
15 **them in the computer.**
16   Q   That is not my question.  My question is, you
17 don't know whether Chris Ignacio reviewed your
18 production logs and based upon the information you put
19 in the production logs believe that the completion time
20 you identified for a particular work order was an
21 actually completed work order; do you?
22   A   **He checked it.**
23   Q   No, that is not my question.  You keep saying
24 "he checked it."

25 (Pages 94 to 97)

DEPOSITION OF MARIO ALVAREZ -- 06/12/08

98

1    A    He knows exactly what --
2    Q    He was watching you every day?
3    A    Every single day.
4    Q    And your testimony is that he knew when you
5    completed an order and when you didn't complete an
6    order every time?
7    A    Every time. I have got written down one of
8    these --
9    Q    You wrote down your completion times?
10    A    I got written down by --
11    Q    No, no, no. Mr. Alvarez, I want you to
12    answer my questions.
13         You wrote down completion times,
14    correct?
15    A    Yes.
16    Q    And he would review that and he would assume
17    those are completion times?
18         MS. WEGNER: Objection. Calls for
19    speculation.
20         THE WITNESS: Yes, it is being done.
21    BY MR. DISBROW:
22    Q    Because that is completion time, correct?
23    A    Yeah.
24    Q    He would have no reason to assume that they

99

1    weren't actual completion times; would he?
2         MS. WEGNER: Objection. Calls for
3    speculation.
4         THE WITNESS: He had no knowledge of it.
5    BY MR. DISBROW:
6    Q    Because you don't know what he knew or what
7    he didn't know?
8    A    No.
9    Q    Seems like you have had troubles over the
10    years with other union members?
11    A    Trouble with forklifts, yes.
12    Q    And you weren't happy with the way the union
13    represented you; weren't you?
14    A    Not just me, but everybody were not happy.
15    Q    You know why no one sued the union?
16    A    That is very surprising. It won't be the
17    first time.
18    Q    Do you know why Mr. Wingo decided not to sue
19    his union?
20         MS. WEGNER: Calls for speculation. Assumes
21    facts not in evidence.
22    BY MR. DISBROW:
23    Q    I'll represent to you, Mr. Alvarez, that
24    Mr. Wingo did not sue his union.

100

1    A    I don't know what he did.
2    Q    You don't know why he didn't sue his union?
3    A    I don't know what he did. I don't know. I
4    don't know if he did or not. I don't know if he is
5    doing it to be honest with you.
6    Q    You paid union dues?
7    A    Yeah.
8    Q    And you paid those dues so the union would
9    represent the employees' interest, right?
10    A    Not at Copper and Brass.
11    Q    Mr. Alvarez, the Teamsters Union is a very
12    large union.
13    A    Yes, it is.
14    Q    If you were unhappy with your Local, there
15    was a process for you to report it to the
16    international; wasn't it?
17    A    Yes.
18    Q    And why didn't you do it?
19    A    Because they not allow us to do that.
20    Q    Who didn't allow you?
21    A    Pete.
22    Q    Did Pete have any control --
23    A    We tried --
24    Q    No, Mr. Alvarez. Did Pete LaRocco have any

101

1    control over you getting the International Teamsters
2    number and calling that number from your home?
3    A    No, sir.
4    Q    You could have done that; couldn't you?
5    A    Yeah.
6    Q    Do you know of any reason why Mr. Wingo
7    couldn't have done that?
8    A    I don't know if he is doing it. I don't know
9    if he is not. I don't know if he is doing it. I don't
10    know what he is doing.
11    Q    Nonetheless, the process is, the Union gets a
12    chance to review what management does inside Copper and
13    Brass, correct?
14    A    Not all the time.
15    Q    That is the process, correct?
16    A    That is the process.
17    Q    That is supposed to be a check for you as an
18    union member on management, correct?
19    A    Yes.
20    Q    And if you are unhappy with the way the union
21    represents you, you have the right to challenge your
22    union representation; don't you?
23    A    Yeah.
24    Q    It is not all about what management does or

26 (Pages 98 to 101)

DEPOSITION OF MARIO ALVAREZ -- 06/12/08

102

1 doesn't do; does it?
2    A    That is good.  Thank you for letting me know
3 about the union.  I might call myself.
4    Q    You said that you signed a document before
5 you got terminated, right?
6    A    Yes.
7    Q    That document was a Last Chance Agreement;
8 wasn't it?
9    A    Yes, it was.
10    Q    And that document said if you were written up
11 again, you would be terminated; didn't it?
12    A    That's right.
13    Q    And you agreed to that?
14    A    Yes, that is what it says.  It doesn't admit
15 that I did it.
16    Q    And you received progressive discipline;
17 didn't you?
18        MS. WEGNER:  Objection.  Calls for
19 speculation.
20        THE WITNESS:  What does this have to do with
21 this?
22 BY MR. DISBROW:
23    Q    You testified about all the things that you
24 believe the union did against you.  You didn't get

103

1 terminated because of a first offense; did you?
2    A    No.
3    Q    Now, let me ask you another question.  Did
4 you ever get written up for a Category D violation that
5 you recall?
6    A    D?  This same thing.
7    Q    Any Category D violation that you recall?
8    A    I can't remember.
9    Q    Let's look at it.
10    A    Yes, please.
11        MR. DISBROW:  Do you have the one, Exhibit
12 Number 5, handy?
13 BY MR. DISBROW:
14    Q    I want you to take a look at what was
15 previously marked as Lunt Exhibit Number 5 and let me
16 know if you have seen this document before.
17    A    Work rules, yes.
18    Q    You'll see that there are numbers in the
19 lower right hand corner, C and B - Wingo and there are
20 some other numbers.  See that in the lower right hand
21 corner of the pages.
22    A    Right here. (Indicating).
23    Q    Yes.  Wait a minute.  Let me back up.  Turn
24 to the second page, 675.  See where it lists categories

104

1 of different types of violations?
2    A    Yes, I see it.
3    Q    See where Category D says, "First violation
4 can lead immediately to termination."  Do you see that?
5    A    Uh-huh.
6    Q    Now go with me for a minute to page number--
7    A    When was this printed?  1996.
8    Q    Go with me at 681.
9    A    81, Work Rules.
10    Q    Work Rules, Category D.  Do you see that?
11    A    Yes, I see it.
12    Q    Do you see one of them is falsifying company
13 records.  Did you ever get written up for falsifying
14 company records?
15    A    No.
16    Q    To your knowledge, did you ever get written
17 up for any Category D violations?
18    A    I don't think so.
19    Q    So when I asked you if you received --
20    A    Hold on a minute.  I don't know if it is
21 Category D.  I forgot.  I think it is D.  I don't know.
22 But anyway --
23    Q    Nonetheless, you weren't terminated for a
24 first offense; were you?

105

1        MS. WEGNER:  I object.  Assumes facts not in
2 evidence.
3        MR. DISBROW:  I'll strike the question.  I'll
4 make it easy for you, Jan.
5 BY MR. DISBROW:
6    Q    Prior to your termination, had you received
7 discipline before?
8    A    Yeah.
9    Q    Do you remember an occurrence in January 21,
10 2003 -- strike that.
11    A    What was it?
12    Q    Strike that.
13        Do you remember being written up in
14 October 2004 by refusing to give up a fork truck?
15    A    I think that was with the Mark DeMien case.
16 I think that was the case.
17    Q    You received a written warning for that;
18 didn't you?
19    A    Yes.  That is what I'm talking about.  That
20 is -- my previous thing was that was punishment, that
21 the company states that no one owns a forklift.
22    Q    Do you remember in March 2005 getting written
23 up for violating a minor work rule, Category B, failing
24 to do something that you were told by your foreman,

27 (Pages 102 to 105)

DEPOSITION OF MARIO ALVAREZ -- 06/12/08

106

1    receiving a three-day suspension?
2        A    That was the work order.
3        Q    You received a three-day suspension?
4        A    Yeah.
5        Q    You weren't terminated?
6        A    No.
7        Q    Do you remember being involved in an
8    altercation with another employee in July of 2004
9    receiving a written warning?
10        MS. WEGNER:  Object on the basis of
11    relevance.
12        THE WITNESS:  I don't remember who.
13    BY MR. DISBROW:
14        Q    If there is an Employee Report Form in your
15    file indicating that you did receive a written warning
16    on July 22nd of '04 --
17        A    With who.
18        Q    Let me finish my question.
19        If there was an Employee Report Form
20    indicating that you received a written warning on
21    July 22, 2004 for a verbal altercation on a warehouse
22    floor, would you dispute that fact?
23        A    I don't know what you are talking about.  You
24    have got to tell me who the person is so I can

107

1    remember.
2        Q    You don't remember if you received a write up
3    or not?
4        A    I received write ups.
5        Q    Do you remember in September of 2003 two
6    incidents took place between you and Mr. LaRocco where
7    you were written up and received a written warning for
8    creating a disturbance on the warehouse floor?  You
9    recall that incident?
10        MS. WEGNER:  Again, I object on the basis of
11    relevance.
12        THE WITNESS:  What happened to Pete LaRocco?
13    BY MR. DISBROW:
14        Q    No, that is not my question.
15        A    Metal bar.  He almost break my legs and
16    nothing was done to him.
17        Q    Mr. Alvarez, let me explain how this process
18    works.
19        A    I remember that.
20        Q    I ask the questions I want to ask and you
21    answer them.  That is how this process works.
22        A    I got you.  I just want you to be aware.
23        Q    What I'm aware of and I think what you are
24    aware of is that you did receive a written warning for

108

1    creating a disturbance in 2003?
2        MS. WEGNER:  Objection on the basis of
3    relevance and assumes facts not in evidence.  Form and
4    foundation.
5    BY MR. DISBROW:
6        Q    Isn't that correct, Mr. Alvarez?
7        A    Correct about what?
8        Q    That you received a written warning?
9        A    Yes, I did.
10        Q    For an altercation in September 2003?
11        MS. WEGNER:  Objection.
12    BY MR. DISBROW:
13        Q    How about September 30th of that same year,
14    did you get into multiple altercations with Pete
15    LaRocco?
16        MS. WEGNER:  I would object.
17        THE WITNESS:  Because he verbal abusive.
18        MS. WEGNER:  I have a continuing objection.
19        MR. DISBROW:  That's fine.  So stipulated.
20    You get a continuing objection.
21        MS. WEGNER:  Assume facts not in evidence.
22    Relevance.
23    BY MR. DISBROW:
24        Q    Isn't it true that you got into multiple

109

1    altercations with Pete LaRocco?
2        A    That's got to be false.
3        Q    You didn't get --
4        A    Only one time, that time.
5        Q    Do you remember in 2002, September of 2002,
6    getting into an argument with a co-worker and receiving
7    a verbal warning?
8        A    Who is that?
9        MS. WEGNER:  Objection.
10        THE WITNESS:  You already read that one.
11    BY MR. DISBROW:
12        Q    No, not 2002, sir.  Do you recall that?
13        A    I don't know.
14        Q    Do you have reason to dispute it happened?
15        A    I don't know what you are talking about.  If
16    you tell me what it is, I would let you know.
17        Q    I'm just asking you a question, sir.  Do you
18    recall receiving a verbal --
19        A    This is 2002, sir.
20        Q    Either you remember or you don't.  I
21    understand that, but you either remember or you don't.
22        A    No, I don't remember.
23        Q    Do you dispute that it happened if there is a
24    write up in your personnel file?

28 (Pages 106 to 109)

110

1    A    Knowing how they are, yes, I dispute it. I
2 definitely dispute it.
3    Q    Do you remember getting suspended in March of
4 '05?
5    A    One second. I don't know.
6    Q    Do you remember cursing out a supervisor in
7 January of 2006?
8    A    That is not true. That wasn't true. I can
9 take a lie detector.
10    Q    You never cursed out a supervisor?
11    A    Never.
12    Q    You never raised your voice at anybody at the
13 plant?
14    A    Now you talk about supervisor. You said
15 supervisor, you didn't say nobody in the plant.
16    Q    Did you get written up for cursing out a
17 supervisor?
18    A    Well, I guess I did, but I never did it. I
19 never cursed him. My oath, I can go take a lie
20 detector.
21    Q    It is always somebody else's fault; isn't it?
22    MS. WEGNER: Oh, come on.
23    THE WITNESS: I could take a lie detector.
24

111

1 BY MR. DISBROW:
2    Q    I'm not asking you to take a lie detector
3 test.
4    A    Well, I will.
5    Q    Is it your testimony -- let me ask the
6 question.
7    Is it your testimony, Mr. Alvarez, that
8 your discipline was always somebody's else fault?
9    A    No. That was Pete LaRocco.
10    Q    That is not my question.
11    A    That was a --
12    Q    That is not my question.
13    A    I never said that.
14    Q    Is it your testimony that it is always
15 somebody else's fault? Do you admit that you did get
16 into altercations at work?
17    A    Everybody does.
18    Q    Including Mr. Wingo?
19    A    I don't know what Mr. Wingo do.
20    Q    Is he an "everybody"?
21    A    I can tell you about Pat Bishop and all these
22 people.
23    Q    I don't want to know about Mr. Bishop.
24 Mr. Bishop didn't sue the company.

112

1    Did Mr. Wingo get into altercations at
2 work that you are aware of?
3    A    You know what, Bob --
4    Q    Answer my question, Mr. Alvarez.
5    Are you aware that Mr. Wingo got into
6 altercations with employees?
7    A    No.
8    Q    Never happened that you are aware of. He
9 never raised his voice once that you are aware of?
10    A    No, I don't think he did.
11    MS. WEGNER: I think that you should stop
12 arguing and badgering the witness.
13    THE WITNESS: I'm getting aggravated right
14 now. This is not my case.
15    MR. DISBROW: This was a put up job and I
16 will ask my questions that I need to ask. I'll
17 represent to you that I do not believe Mr. Alvarez when
18 he testifies he only met with you for five minutes
19 beforehand, Jan. So I will ask my questions the way I
20 want them asked. I have no further questions at this
21 time.
22    THE WITNESS: You got this thing right, this
23 harassment thing.
24    MR. DISBROW: Are we on the record still,

113

1 because I didn't ask you a question, and unless
2 somebody asks you a question --
3    THE WITNESS: To me that is harassment the
4 way you are yelling and screaming.
5    MR. DISBROW: Did you have anymore questions?
6    MS. WEGNER: I'm just going to check.
7    MS. WEGNER: No. I don't think that I have
8 any other questions for this gentleman. However, I
9 would like to state for the record that I really resent
10 your implication that was anything improper that
11 occurred or that this witness was lying in his
12 testimony and that we had anything to do with it.
13    THE WITNESS: I agree with that.
14    MR. DISBROW: The record is closed.
15    MS. WEGNER: Mr. Alvarez, you have a right to
16 review the transcript and make corrections. That is
17 done, if it should be ordered, and the Court Reporter
18 prepares it in booklet form. And that is called
19 "reserving your signature". But you also have the
20 right not to wish to review that transcript and have
21 the right to correct it. We call that "waiving your
22 signature". So you would not necessarily be notified
23 if it were prepared and you wouldn't have the
24 opportunity to review it and verify it. And it is your

DEPOSITION OF MARIO ALVAREZ -- 06/12/08

114
1  decision.  What would you like to do.
2         THE WITNESS:  I don't know.  As a lawyer, do
3  you think that I need it?
4         MS. WEGNER:  I don't represent you, so I
5  can't give you advise.
6         THE WITNESS:  I could use it, though.
7         MS. WEGNER:  You want to reserve your
8  signature?
9         THE WITNESS:  Yeah.
10        MS. WEGNER:  So you want to have the
11 opportunity to review it.
12        THE WITNESS:  Yes.  Especially the last
13 statements, okay.
14        MS. WEGNER:  We will reserve signature for
15 you.  Thank you very much for coming in, sir.
16        THE WITNESS:  Thank you very much.  I feel
17 very intimidated right now.  Thank you very much.
18            (WHEREUPON the deposition was
19             adjourned at 5:30 p.m.)
20
21
22
23
24

116
1  STATE OF ILLINOIS  )
2                     )SS:
3  COUNTY OF C O O K  )
4
5
6            C E R T I F I C A T E
7
8      The within and foregoing deposition of the
9  witness was taken before GWENDOLYN BEDFORD, Certified
10 Shorthand Reporter and Notary Public, in the City of
11 Chicago, County of Cook and State of Illinois, and
12 there were present at the taking of said deposition
13 Counsel as previously set forth.
14        The said witness was first duly sworn to tell
15 the truth and nothing but the truth, and was then
16 examined upon oral interrogatories.
17        The questions and answers were taken down in
18 shorthand by the undersigned and computer-transcribed
19 under my personal direction.
20        The signature of the witness was not waived
21 by agreement of the parties.
22        The undersigned is not interested in the
23 within case, nor of kin or counsel to any of the
24 parties.

115
1     IN THE UNITED STATES DISTRICT COURT
2     FOR THE NORTHERN DISTRICT OF ILLINOIS
3             EASTERN DIVISION
4
5  ROBERT G. WINGO,           )
6         PLAINTIFF,   )
7     VS.          ) No. CV 0 0368
8  THYSSENKRUPP MATERIALS NA, INC. )
9  D/B/A COOPER AND BRASS      )
10 SALES, INC.            )
11        DEFENDANTS,   )
12     C E R T I F I C A T E
13
14     I, MARIO ALVAREZ, do hereby certify that I
15 have read the foregoing transcript in the
16 above-entitled cause and do assert that this is my
17 testimony.
18            _____
19            MARIO ALVAREZ
20 SUBSCRIBED AND SWORN
21 ON THE _____DAY OF
22 _____, 2008.
23
24 _____
   NOTARY PUBLIC

117
1      I further certify that this certificate
2  applies to the original signed and certified
3  transcripts only.  I assume no responsibility for the
4  accuracy of any reproduced copies not made under my
5  control or direction.
6      IN TESTIMONY WHEREOF, I have hereunto set my
7  hand this _____ day of _____, 2008.
8
9
10
11        _____
12        GWENDOLYN BEDFORD
13        084-003700
14
15
16
17
18
19
20
21
22
23
24

30 (Pages 114 to 117)

VICTORIA COURT REPORTING SERVICE, INC  (312)  443-1025

DEPOSITION OF MARIO ALVAREZ -- 06/12/08

116

1    STATE OF ILLINOIS    )

2                          )SS:

3    COUNTY OF  C O O K  )

4

5

6                    C E R T I F I C A T E

7

8            The within and foregoing deposition of the

9    witness was taken before GWENDOLYN BEDFORD; Certified

10   Shorthand Reporter and Notary Public, in the City of

11   Chicago, County of Cook and State of Illinois, and

12   there were present at the taking of said deposition

13   Counsel as previously set forth.

14           The said witness was first duly sworn to tell

15   the truth and nothing but the truth, and was then

16   examined upon oral interrogatories.

17           The questions and answers were taken down in

18   shorthand by the undersigned and computer-transcribed

19   under my personal direction.

20           The signature of the witness was not waived

21   by agreement of the parties.

22           The undersigned is not interested in the

23   within case, nor of kin or counsel to any of the

24   parties.

VICTORIA COURT REPORTING SERVICE, INC  (312)  443-1025

DEPOSITION OF MARIO ALVAREZ -- 06/12/08

117

1          I further certify that this certificate

2     applies to the original signed and certified

3     transcripts only.  I assume no responsibility for the

4     accuracy of any reproduced copies not made under my

5     control or direction.

6          IN TESTIMONY WHEREOF, I have hereunto set my

7     hand this  2nd  day of  July  , 2008.

8

9

10

11

12     GWENDOLYN BEDFORD, C.S.R.

13     No. 084-03700

14

15

16

17

18

19

20

21

22

23

24