# EXHIBIT C

1

1          UNITED STATES DISTRICT COURT FOR THE

2              NORTHERN DISTRICT OF ILLINOIS

3                     EASTERN DIVISION

4

5     ROBERT G. WINGO,                )

6              Plaintiff,             )

7          vs.                        ) No. 08 C 368

8     THYSSENKRUPP MATERIALS NA,      )

9     INC., d/b/a COPPER AND BRASS,   )

10             Defendant.             )

11

12             Deposition of RANDY E. LUNT, called

13    for examination, taken pursuant to notice,

14    agreement and by the provisions of the Rules of

15    Civil Procedure for the United States District

16    Courts pertaining to the taking of depositions,

17    taken before PATRICIA A. ARMSTRONG, a Notary

18    Public within and for the County of DuPage, State

19    of Illinois, and a Certified Shorthand Reporter,

20    No. 084-1766, of said state, taken at 29 South

21    LaSalle Street, Chicago, Illinois, on the 29th day

22    of May, 2008 at 7:30 a.m.

23

24

DEPOSITION OF RANDY E. LUNT  -  5/29/08

---

**Page 2**

```
1   PRESENT:
2
3       LISA KANE & ASSOCIATES, by
4       MS. JANET WEGNER,
5       120 South LaSalle Street, Suite 1420,
6       Chicago, Illinois 60603,
7       (312) 606-0383,
8           appeared on behalf of Plaintiff;
9
10                  and
11
12      HONIGAN, MILLER, SCHWARTZ and COHN, LLP, by
13      MR. MATTHEW SCOTT DISBROW,
14      2290 First National Bank Building,
15      660 Woodward Avenue
16      Detroit, Michigan 48226-3506,
17      313-465-7372,
18      MR. MATTHEW SCOTT DISBROW,
19          appeared on behalf of Defendant.
20
21
22
23  REPORTED BY: PATRICIA ARMSTRONG, CSR, RPR.
24          Certificate No. 84-1766.
```

---

**Page 4**

|  | E X H I B I T S (Continued.) | |
|---|---|---|
| | NUMBER | MARKED FOR ID |
| | No. 19 | 111 |
| | No. 20 | 116 |
| | No. 21 | 122 |
| | No. 22 | 123 |
| | | |
| | --- | |

---

**Page 3**

### I N D E X

| WITNESS | EXAMINATION |
|---|---|
| RANDY E. LUNT, | |
| By Ms. Wegner | 5 - 131 |

### E X H I B I T S

| NUMBER | MARKED FOR ID |
|---|---|
| No. 1 | 18 |
| No. 2 | 20 |
| No. 3 | 21 |
| No. 4 | 29 |
| No. 5 | 33 |
| No. 6 | 39 |
| No. 7 | 63 |
| No. 8 | 71 |
| No. 9 | 74 |
| No. 10 | 80 |
| No. 11 | 82 |
| No. 12 | 88 |
| No. 13 | 95 |
| No. 14 | 96 |
| No. 15 | 96 |
| No. 16 | 98 |
| No. 17 | 103 |
| No. 18 | 104 |

---

**Page 5**

```
1           (WHEREUPON, the witness was
2           duly sworn.)
3               RANDY E. LUNT,
4   was called as a witness herein, after having been
5   first duly sworn, was examined and testified as
6   follows:
7               EXAMINATION
8   BY MS. WEGNER:
9       Q.   Sir, would you please state your
10  complete name for the record and spell your last
11  name.
12      A.   Randy E. Lunt, L-u-n-t.
13          MS. WEGNER:  Let the record reflect that
14  this is the deposition of Randy E. Lunt, witness
15  for the Defendant, in the case entitled Robert G.
16  Wingo versus Thyssenkrupp Materials NA, Inc.,
17  doing business as Copper and Brass Sales, Case
18  No. 08 C 368, pending in the United States
19  District Court for the Northern District of
20  Illinois, Eastern Division.
21          This deposition is being taken
22  pursuant to notice and in accordance with the
23  Federal Rules of Civil Procedure and applicable
24  local rules.
```

---

VICTORIA COURT REPORTING SERVICE, INC.   (312) 443-1025

DEPOSITION OF RANDY E. LUNT   -   5/29/08

**6**

1  BY MS. WEGNER:
2      Q.   Mr. Lunt, my name is Jan Wegner.  I
3  am one of the attorneys representing Mr. Wingo in
4  the lawsuit he has filed against Thyssenkrupp
5  Materials NA, Inc., doing business as Copper and
6  Brass Sales.
7          Have you ever given a deposition
8  before?
9      A.   I don't recall.  I may have one time
10  in the past.
11     Q.   Have you ever provided sworn
12  testimony at a trial or other type of hearing?
13     A.   Yes, I have.
14     Q.   And prior to today, how many
15  instances have there been where you have given
16  sworn testimony?
17     A.   Two or three.
18     Q.   In what types of matters have you
19  provided sworn testimony before today?
20     A.   I was subpoenaed in a problem
21  regarding a house that an individual had built by
22  a builder, and that's the only time I can clearly
23  remember.  I think there was one other time maybe
24  during a divorce proceeding.

**7**

1      Q.   Have you been a party to litigation,
2  either a Plaintiff or Defendant?
3      A.   Maybe in a traffic violation, that's
4  the only time I can actually think of one.
5      Q.   And when you provided sworn testimony
6  in the divorce proceeding, that was not your
7  divorce?
8      A.   Yes, it was.
9      Q.   Then you were a party to litigation?
10     A.   Okay.
11     MR. DISBROW:  I was going to help him out,
12  but I thought you would get there.
13  BY MS. WEGNER:
14     Q.   All right, sir.
15         It's important that you remember to
16  respond verbally to all of my questions because
17  our court reporter has the task of making an
18  official record, and to do that, her machine
19  doesn't accept a non-verbal response.  Okay?
20     A.   No problem.
21     Q.   If you forget, we will remind you.
22         It is also helpful for Patricia if we
23  both don't try and speak at the same time because
24  it's difficult for her to record that.

**8**

1          So please try and wait for me to
2  complete a question even though you may think you
3  know where I am going with it.  And I, in turn,
4  will attempt to allow you to complete your
5  response and it will make her job easier.  Okay?
6      A.   Okay.
7      Q.   Will you let me know if I ask a
8  question that you feel you don't understand?
9      A.   Yes.
10     Q.   If you tell me you don't understand a
11  question, I will rephrase it to make it perfectly
12  clear for your response.  Okay?
13     A.   Thank you.
14     Q.   If you do answer a question, it will
15  be assumed that you understood that question.
16         You agree that's fair?
17     A.   Fair.
18     Q.   And if you need a break, we will be
19  happy to accommodate a request that you have for a
20  break or anyone else in the room.  We don't want
21  anybody to be uncomfortable.  Just we would only
22  ask that you answer any question that has been
23  asked first.  Okay?
24     A.   Yes.

**9**

1      Q.   Any question about this process?
2      A.   No.
3      Q.   Did you meet with anyone to prepare
4  for your deposition?
5      A.   When you say meet, I talked to an
6  attorney on the phone.
7      MR. DISBROW:  Okay.  And I would just
8  object to the degree that it's attorney-client
9  privilege.
10  BY MS. WEGNER:
11     Q.   With whom did you speak to prepare
12  for your deposition?
13     A.   Russell Linden.
14     Q.   And how long was your phone
15  conversation with Mr. Linden to prepare for your
16  deposition?
17     A.   Approximately two hours.
18     Q.   To your knowledge, did anyone else
19  participate in your phone conversation with
20  Mr. Linden to prepare for your deposition?
21     MR. DISBROW:  Objection to the degree that
22  it calls for attorney-client privilege.
23         If it was anybody outside of the
24  company, that's a fair question.  If it's anybody

DEPOSITION OF RANDY E. LUNT  -  5/29/08

10

1  inside the company, it's not a fair question.
2  BY THE WITNESS:
3      **A.  I am not sure there was nobody else.**
4  **BY MS. WEGNER:**
5      Q.   Thank you.
6          Did you review any documents to
7  prepare for the deposition?
8      **A.  Yes, I did.**
9      Q.   What documents did you review to
10  prepare for the deposition?
11      **A.  I looked at our work and safety**
12  **rules, and I looked at a response to a grievance**
13  **that one of our foremen had written.**
14      Q.   And who filed the grievance that the
15  response was related to that was written by one of
16  the foremen that you reviewed to prepare for the
17  deposition?
18      **A.  Robert Wingo.**
19      Q.   What did Mr. Wingo's grievance
20  pertain to that you reviewed?
21      **A.  I actually could not find a copy of**
22  **his grievance.**
23      Q.   What was the date of the response to
24  the grievance that you reviewed that was written

11

1  by the foreman?
2      **A.  I don't recall the exact date.  It**
3  **was in 2005.**
4      Q.   Any other documents that you reviewed
5  to prepare for the deposition?
6      **A.  I am sorry.**
7      Q.   Are there any other documents that
8  you reviewed to prepare for the deposition, other
9  than what you already told me?
10      **A.  I don't recall.  I may have looked at**
11  **a couple of my letters written to Mr. Wingo.**
12      Q.   And what is your date of birth, sir?
13      **A.  January 5, 1954.**
14      Q.   What is your current age?
15      **A.  Fifty-four.**
16      Q.   Where do you reside?
17      **A.  Glen Ellyn.**
18      Q.   What is your current home address?
19      **A.  One North 661 River Drive,**
20  **Glen Ellyn, Illinois.**
21      Q.   And how long have you resided on
22  River Drive in Glen Ellyn, Illinois?
23      **A.  Approximately three years.**
24      Q.   Is your current residence a home or

12

1  an apartment?
2      **A.  A home.**
3      Q.   Do you have any present intention on
4  relocating from your current home address within
5  the next year?
6      **A.  No.**
7      Q.   Have you ever been convicted of a
8  felony?
9      **A.  No.**
10      Q.   Have you been convicted of a crime
11  involving dishonesty?
12      **A.  No.**
13      Q.   What is your highest level of
14  education?
15      **A.  Master's Degree.**
16      Q.   And what Master's Degree do you hold?
17      **A.  Business management.**
18      Q.   When did you receive your Master's
19  Degree?
20      **A.  I don't recall the exact year.  I am**
21  **going to guesstimate five years ago.**
22      Q.   From what institution did you receive
23  your Master's Degree?
24      **A.  Keller.**

13

1      Q.   What undergraduate degree do you
2  hold?
3      **A.  Bachelor's in business.**
4      Q.   Is your Bachelor's Degree a Bachelor
5  of Arts or Bachelor of Science?
6      **A.  Bachelor of Science.**
7      Q.   When did you receive your Bachelor's
8  Degree?
9      **A.  Excuse me?**
10      Q.   When did you receive your Bachelor's
11  Degree?
12      **A.  1997.**
13      Q.   From what institution did you receive
14  your Bachelor's Degree?
15      **A.  University of Illinois, Chicago.**
16      Q.   Do you hold any professional licenses
17  or certifications?
18      **A.  No.**
19      Q.   Are you currently employed by Copper
20  and Brass Sales?
21      **A.  Yes.**
22      Q.   When did you begin your employment
23  with Copper and Brass Sales?
24      **A.  July 1994.**

4 (Pages 10 to 13)

DEPOSITION OF RANDY E. LUNT  -  5/29/08

14

1    Q.    In what position did you begin in
2 your employment with Copper and Brass Sales?
3    A.    Second shift supervisor.
4    Q.    And how long did you hold the second
5 shift supervisor position with Copper and Brass
6 Sales?
7    A.    Approximately one year.
8    Q.    And what is the next position that
9 you held with Copper and Brass Sales after about
10 one year as the second shift supervisor?
11    A.    First shift supervisor.
12    Q.    How long did you hold the first shift
13 supervisor position at Copper and Brass Sales?
14    A.    I am not positive.  I am going to
15 guess two years.
16    Q.    What was your next position at Copper
17 and Brass?
18    A.    General foreman.
19    Q.    How long were you general foreman at
20 Copper and Brass Sales?
21    A.    I don't remember exactly.  I am going
22 to estimate two years.
23    Q.    And after general foreman, what was
24 the next position that you held?

15

1    A.    Plant manager.
2    Q.    Do you recall what year you became
3 the plant manager at Copper and Brass Sales?
4    A.    I am sorry, I do not.
5    Q.    Are there any other positions that
6 you have held at Copper and Brass Sales?
7    A.    No.
8    Q.    Do you hold an ownership interest in
9 Copper and Brass Sales?
10    A.    No.
11    Q.    What do you currently earn as the
12 plant manager at Copper and Brass Sales?
13    MR. DISBROW:  I am going to object as to
14 relevant.
15    But you can answer the question.
16 BY THE WITNESS:
17    A.    Approximately $85,000.
18 BY MS. WEGNER:
19    Q.    And what are your duties and
20 responsibilities as the plant manager of Copper
21 and Brass Sales?
22    A.    I am responsible for shipping,
23 receiving, production, safety, disciplinary
24 action, training, quality, hiring and firing.

16

1    Q.    Now, do you currently supervise
2 anyone as the plant manager of Copper and Brass
3 Sales?
4    A.    I have four warehouse supervisors,
5 two full-time office personnel in and one-part
6 time office personnel.  There are also 37 hourly
7 employees.
8    Q.    Do the hourly employees at Copper and
9 Brass Sales report directly to you?
10    A.    Not directly to me, indirectly.
11    Q.    What is the business of Copper and
12 Brass Sales?
13    A.    They are a metal distributor.
14    Q.    What are the number of items of
15 product that are sold or distributed from the
16 Copper and Brass Sales location in Schaumburg?
17    A.    Can you please clarify that question?
18    Q.    Yes.  Do you have a catalog of items
19 that are sold or distributed from the Schaumburg
20 location?
21    A.    I do not.  I can only tell you that
22 we have approximately 2000 part numbers.
23    Q.    What were the gross sales of Copper
24 and Brass Sales from the Schaumburg location in

17

1 2007?
2    MR. DISBROW:  I am going to object as to
3 relevance.
4    Before you answer, I am also going to
5 object on the grounds that that could be
6 considered confidential and proprietary
7 information.
8    MS. WEGNER:  It could be, but you haven't a
9 protective order in place.  However, if you would
10 like to --
11    MR. DISBROW:  I am just stating for the
12 record -- well, you can answer the question if you
13 know.
14 BY THE WITNESS:
15    A.    I don't know that answer.
16 BY MS. WEGNER:
17    Q.    Are the hourly employees at the
18 Schaumburg location of Copper and Brass Sales
19 Union members?
20    A.    At the Schaumburg location?
21    Q.    Correct.
22    A.    Yes, they are.
23    Q.    And you're the plant manager at the
24 Schaumburg location; correct?

DEPOSITION OF RANDY E. LUNT  -  5/29/08

18

1    **A.   Yes.**
2    Q.    What Union do the hourly employees at
3    the Schaumburg location of Copper and Brass Sales
4    belong to?
5    **A.   Teamster Union 714.**
6    MS. WEGNER: Pat, would you mark this as
7    Exhibit No. 1, please.
8        (WHEREUPON, a certain document
9            was marked Lunt Deposition
10           Exhibit No. 1, for identification,
11           as of May 29, 2008.)
12   BY MS. WEGNER:
13   Q.    Mr. Lunt, you are being shown a
14   document we have marked as Exhibit No. 1, which is
15   produced by the Defendant in this case, Bates
16   stamped 00661.
17       Do you recognize this document?
18   **A.   Yes, I do.**
19   Q.    Is Exhibit No. 1 a document you can
20   identify for the record?
21   **A.   Yes, it's part of our organizational**
22   **chart.**
23   Q.    And does the organizational chart
24   that we have marked as Exhibit No. 1 represent the

19

1    organization of persons employed at the Schaumburg
2    Copper and Brass Sales location?
3    **A.   It appears that it is accurate.**
4    **Without going through it step by step -- and**
5    **there's portions of it that I am not totally**
6    **familiar with because it deals with sales and**
7    **inside sales, which is not part of my**
8    **responsibility.  I can only attest to the**
9    **warehouse portion of it.**
10   Q.    So, with respect to the
11   organizational chart that we have marked as
12   Exhibit No. 1, is the warehouse portion to which
13   you can attest that portion on the right-hand side
14   underneath plant manager and your name?
15   **A.   It's accurate.  The only question**
16   **mark I would have is that Mark Pucalik, he does**
17   **not answer directly to me, although he is part of**
18   **the warehouse and material control.  He answers**
19   **directly to the vice president.**
20   Q.    To your knowledge, who is the vice
21   president to whom Mark Pucalik reports to?
22   **A.   William Fruehaf.**
23   Q.    And to whom do you report as the
24   plant manager of the Schaumburg location of Copper

20

1    and Brass Sales?
2    **A.   William Fruehaf.**
3    Q.    How long have you reported to
4    Mr. Fruehaf in your position as the plant manager
5    of Copper and Brass Sales?
6    **A.   Mr. Fruehaf has been with the**
7    **Schaumburg location, I am going to guess, five**
8    **years, maybe six years.  I don't know when he came**
9    **into the facility.**
10   MS. WEGNER: Can you mark this as No. 2,
11   Pat.
12       (WHEREUPON, a certain document
13           was marked Lunt Deposition
14           Exhibit No. 2, for identification,
15           as of May 29, 2008.)
16   BY MS. WEGNER:
17   Q.    Do you recognize Exhibit No. 2,
18   Mr. Lunt, Bates stamped 00659, as produced by the
19   Defendant in this case?
20   **A.   I have never actually seen this**
21   **document before, but it appears to be a list of**
22   **employees, former and current.**
23   Q.    Do you have any knowledge as to who
24   prepared Exhibit No. 2?

21

1    **A.   No, I don't.**
2    Q.    Do you have any knowledge as to when
3    Exhibit No. 2 was prepared?
4    **A.   No, I don't.**
5    MS. WEGNER: Mark this as No. 3, please,
6    Patricia.
7        (WHEREUPON, a certain document
8            was marked Lunt Deposition
9            Exhibit No. 3, for identification,
10           as of May 29, 2008.)
11   BY MS. WEGNER:
12   Q.    Exhibit No. 3, Mr. Lunt, is a
13   document produced by the Defendant, Bates stamped
14   00660.
15       Do you recognize this document?
16   **A.   It is the first time I have seen it.**
17   Q.    Do you have any knowledge as to who
18   prepared Exhibit No. 3?
19   **A.   No, I don't**
20   Q.    Do you have any knowledge as to when
21   Exhibit No. 3 was prepared?
22   **A.   No, I don't.**
23   Q.    In reviewing Exhibit No. 3, does it
24   represent persons currently employed in the

DEPOSITION OF RANDY E. LUNT  -  5/29/08

22

1  warehouse at the Schaumburg location of Copper and
2  Brass Sales?
3      MR. DISBROW:  Objection as to foundation.
4  He doesn't know about this document.
5      To the degree you know, you can
6  answer the question.
7  BY THE WITNESS:
8      **A.   No, it doesn't**
9  BY MS. WEGNER:
10     Q.   Exhibit No. 3 contains the name of
11 Niven Beluso, which is not contained on the
12 Exhibit No. 3.
13     Are you familiar with Niven Beluso?
14     **A.   Yes, I am.**
15     Q.   Was Niven Beluso employed at the
16 Schaumburg location of Copper and Brass Sales?
17     **A.   Yes, he was.**
18     Q.   Did Niven Beluso's employment at
19 Copper and Brass Sales end?
20     **A.   Yes, it did.**
21     Q.   When did Niven Beluso's employment
22 with Copper and Brass Sales end?
23     **A.   Either December of 2007 or January of**
24 **2008.**

23

1      Q.   Now, what is the reason Niven
2  Beluso's employment ended with Copper and Brass
3  Sales?
4      **A.   I believe he walked off the job.**
5      Q.   Are there persons named on Exhibit
6  No. 3 who are no longer employed at the Schaumburg
7  location of Copper and Brass Sales?
8      **A.   Yes.**
9      Q.   And who are those persons on Exhibit
10 No. 3 who are no longer employed at Copper and
11 Brass Sales?
12     **A.   The only one I see immediately is**
13 **Mario Alvarez.**
14     Q.   Exhibit No. 3 contains a name not
15 listed on Exhibit No. 2 of Derek Lipinski.
16     Is Derek Lipinski employed at the
17 Schaumburg location of Copper and Brass Sales?
18     **A.   Yes, he is.**
19     Q.   And when was Mr. Lipinski hired at
20 the Schaumburg location of Copper and Brass Sales?
21     **A.   I don't recall.  I am going to guess**
22 **1995 or 1996.**
23     Q.   And Mr. Lipinski is still employed at
24 the location?

24

1      **A.   Yes, he is.**
2      Q.   Are there current employees of Copper
3  and Brass Sales at the Schaumburg location that
4  you are aware of whose names are not contained on
5  Exhibit 3?
6      MR. DISBROW:  I am sorry, I didn't catch
7  that.
8      Would you state the question again,
9  please.
10     MS. WEGNER:  Could you read it back, Pat.
11     (WHEREUPON, the record was
12     read by the reporter.)
13     MR. DISBROW:  If you know, Randy.  Don't
14 guess.
15 BY THE WITNESS:
16     **A.   I only know of one person that is not**
17 **on this list.  And it's difficult to go through a**
18 **list of 36 people and pick who is there and who is**
19 **not there.**
20     **But a new hire Gil Briones,**
21 **B-r-i-o-n-e-s, I believe.**
22 BY MS. WEGNER:
23     Q.   And when was Gil Briones hired?
24     **A.   I would say approximately a month**

25

1  ago.
2      Q.   And was Mr. Briones hired for a
3  warehouseman position?
4      **A.   Helper.**
5      Q.   During your employment at Copper and
6  Brass Sales, did you ever directly supervise
7  Mr. Wingo?
8      **A.   Yes, I did.**
9      Q.   During what period of time did you
10 directly supervise Mr. Wingo?
11     **A.   Mid '90s, 1995, 1996, that range.**
12     Q.   And for how long a period of time in
13 the mid '90s did you supervise Mr. Wingo?
14     **A.   I guess between two to four years.**
15     Q.   And what was your position while you
16 supervised Mr. Wingo directly?
17     **A.   First shift supervisor and general**
18 **foreman.**
19     Q.   Have you ever prepared a formal
20 evaluation of Mr. Wingos' performance?
21     **A.   Explain what you mean by "formal**
22 **evaluation."**
23     Q.   A written document detailing
24 Mr. Wingo's performance over a specific period of

7  (Pages 22 to 25)

VICTORIA COURT REPORTING SERVICE, INC.     (312) 443-1025

DEPOSITION OF RANDY E. LUNT  -  5/29/08

**26**

1  time, such as a one-year period?
2      **A.  Not over a one year period of time.**
3  **I have given him letters of write-up, summarizing**
4  **his lack of performance or other items that needed**
5  **to be improved upon.**
6      Q.   Over the course of your employment at
7  Copper and Brass Sales, have you given write-ups
8  summarizing performance and areas that need
9  improvement for a variety of the warehouse
10  employees at the Copper and Brass Sales Schaumburg
11  location?
12      MR. DISBROW: Objection; foundation to the
13  question.  I think it's confusing.
14  BY MS. WEGNER:
15      Q.   Do you understand my question?
16      **A.  No.  Please repeat it.**
17      Q.   Mr. Wingo wasn't the only warehouse
18  employee at the Schaumburg location of Copper and
19  Brass Sales for whom you have prepared
20  documentation that detailed performance
21  deficiencies or summarized areas that needed
22  improvement; isn't that correct?
23      **A.  Correct.**
24      Q.   To your knowledge, when was Mr. Wingo

**27**

1  first hired by Copper and Brass Sales?
2      **A.  He was hired prior to my coming to**
3  **Copper and Brass.  I don't recall the year that he**
4  **was hired in.**
5      Q.   If I were to indicate to you that
6  Mr. Wingo claims he began working at Copper and
7  Brass Sales in January of 1984, would you have any
8  reason to doubt that?
9          Does that sound about right?
10      **A.  I would not disagree with you.**
11      MS. WEGNER: Matt, it appears that we have
12  never received a verification for the discovery
13  responses, the Answers to Interrogatories that the
14  Defendant provided in this case.
15      MR. DISBROW: I will check on that.  That
16  would be odd, but I will check on that for you.
17          Are you talking about for
18  Interrogatory -- did you say Interrogatories?
19      MS. WEGNER: Well, actually, the document
20  that you provided, which I can show you, is
21  combined as the Answers to Interrogatories and the
22  response.
23      MR. DISBROW: Did you submit a combination
24  discovery response -- request?

**28**

1      MS. WEGNER: No, ours are separate.
2      MR. DISBROW: Okay.
3      MS. WEGNER: But it's signed by Mr. Linden
4  and Mr. Peale at the end, and there is no
5  verification for the Answers to the
6  Interrogatories.
7      MR. DISBROW: Jan, I will check on that for
8  you.
9      MS. WEGNER: Thank you.
10      MS. WEGNER: Do you have any knowledge,
11  Matt, as to who might be verifying the discovery
12  responses?
13      MR. DISBROW: I was not involved in the
14  preparation of those responses.
15      MS. WEGNER: Okay.
16  BY MS. WEGNER:
17      Q.   Are the Union employees at Copper and
18  Brass Sales subject to performance evaluations,
19  Mr. Lunt?
20      **A.  I believe at one time, they were.**
21  **Currently, no.**
22      Q.   And when, to your knowledge, is the
23  last time any of the Union employees at Copper and
24  Brass Sales were subject to any performance

**29**

1  evaluations?
2      **A.  Currently, we do it only when we have**
3  **a performance issue with an employee.**
4      MS. WEGNER: Pat, would you mark that as
5  the next exhibit.
6          (WHEREUPON, a certain document
7          was marked Lunt Deposition
8          Exhibit No. 4, for identification,
9          as of May 29, 2008.)
10  BY MS. WEGNER:
11      Q.   Mr. Lunt, Exhibit No. 4 is a document
12  produced by the Defendant, Bates stamped 00742
13  through 772.
14          Do you recognize Exhibit No. 4?
15      MR. DISBROW: Take your time to go through
16  it.
17      MS. WEGNER: Absolutely.  And you certainly
18  may have as much time as you need to review any
19  document that you are shown.
20  BY THE WITNESS:
21      **A.  It appears to be the contract with**
22  **the Union and the Company.**
23  **BY MS. WEGNER:**
24      Q.   And you are familiar with the terms

8 (Pages 26 to 29)

VICTORIA COURT REPORTING SERVICE, INC.   (312) 443-1025

DEPOSITION OF RANDY E. LUNT   -   5/29/08

30

1  of the contract between the Union and the Company
2  that we have marked as Exhibit No. 4; is that
3  correct?
4      **A.   Yes.**
5      Q.    Were you a participant in negotiating
6  this agreement marked as Exhibit 4?
7      **A.   Yes.**
8      Q.    And your signature is contained on a
9  number of the pages at the back of Exhibit No. 4;
10 correct?
11     **A.   Correct.**
12     Q.    In looking at Exhibit No. 4, this
13 Union contract, it became effective April 16, 2006
14 and runs through April 15th of 2009; is that
15 correct?
16     **A.   Correct.**
17     Q.    So Exhibit No. 4 is the Union
18 contract that governed Mr. Wingo's employment with
19 Copper and Brass Sales through the end of his
20 employment; right?
21     **A.   Correct.**
22     Q.    On one of the last pages of the
23 Collective Bargaining Agreement, it indicates,
24 it's Page 771, there is a letter of understanding

31

1  regarding the attendance policy.
2          Are you familiar with this document
3  which you signed?
4      **A.   Yes.**
5      Q.    Was there any change to the
6  attendance policy as a result of the letter of
7  understanding that is attached to the Collective
8  Bargaining Agreement?
9      **A.   Yes.**
10     Q.    What was the change that was made to
11 the attendance policy?
12     **A.   Without having the two documents in**
13 **front of me, I couldn't tell you the exact**
14 **changes.**
15     Q.    What is the other document you would
16 need to look at?
17     **A.   The old attendance policy and the new**
18 **attendance policy.**
19     Q.    Where would the attendance policy be
20 in written form?
21     MR. DISBROW: Objection. It's a little
22 ambiguous.
23         What attendance policy are you
24 talking about, the old or the new?

32

1      MS. WEGNER:  The new.
2  BY THE WITNESS:
3      **A.   Each individual in the warehouse is**
4  **given a copy of it at the time the contracts are**
5  **passed out.  They sign for it.  So each employee**
6  **would have a copy of it.**
7  BY MS. WEGNER:
8      Q.    To your knowledge, is the attendance
9  policy -- any attendance policy contained in the
10 employee handbook of Copper and Brass Sales, or is
11 it a separate document?
12     **A.   A separate document.  It's not part**
13 **of the negotiated agreement in the contract.**
14     Q.    You are familiar with the terms of
15 the present attendance policy at Copper and Brass
16 Sales?
17     **A.   I am familiar, but not in great**
18 **detail.  I would have to have a copy in front of**
19 **me.**
20     Q.    Now, do you recall when the
21 attendance policy was changed at Copper and Brass
22 Sales pursuant to the letter of understanding that
23 is contained in the Collective Bargaining
24 Agreement?

33

1      **A.   No, I don't.**
2      MS. WEGNER:  Pat, would you mark that as
3  Exhibit No. 5.
4          (WHEREUPON, a certain document
5          was marked Lunt Deposition
6          Exhibit No. 5, for identification,
7          as of May 29, 2008.)
8  BY MS. WEGNER:
9      Q.    Exhibit No. 5, Mr. Lunt, is a
10 document produced by the Defendant, Bates stamped
11 00674 through 683.
12         Do you recognize this document?
13     **A.   It's actually several documents**
14 **stapled together.**
15     Q.    Exhibit No. 5 indicates it's the work
16 and safety rules.
17     **A.   The last page is not part of the work**
18 **and safety rules.**
19     Q.    Exhibit 5, then, should not contain
20 page Bates stamped 00683; is that right, the last
21 page?
22     MR. DISBROW: I am not following you, Jan.
23 It's your exhibit, do you want to include Page
24 No. 5 -- I mean Page No. 683?

9  (Pages 30 to 33)

DEPOSITION OF RANDY E. LUNT  -  5/29/08

34

1        MS. WEGNER:  Not if Mr. Lunt indicates it
2   is not part of the work and safety rules.
3        MR. DISBROW:  And I don't want to testify
4   for Mr. Lunt.
5        MS. WEGNER:  I understand.  He says it's a
6   separate document.
7        MR. DISBROW:  But I just want to make sure
8   that we understand each other, the work rules
9   versus Exhibit 5 could be different.
10  BY MS. WEGNER:
11       Q.    Is Exhibit No. 5, with the exception
12  of the last page, 683, the work and safety rules
13  of Copper and Brass Sales?
14       A.    **All I can say is that this last page**
15  **is not part of our work and safety rules.**
16       Q.    Let's pull it off.  We will make it a
17  separate document.
18       So then we are kind of readjusting
19  here, and Exhibit No. 5 will be those documents
20  Bates stamp 00674 through 00682.
21       Do you recognize that as one
22  document?
23       A.    **It appears to be the work and safety**
24  **rules of the Schaumburg facility.**

35

1        Q.    Are the work and safety rules for the
2   Schaumburg facility that we have marked as Exhibit
3   No. 5, those that were in effect when
4   Mr. Wingo was last employed there in December of
5   2007?
6        A.    Yes.
7        Q.    The work and safety rules that are
8   contained in Exhibit No. 5 are those that govern
9   the conduct of the employees that were subject to
10  the Collective Bargaining Agreement at the
11  Schaumberg location of Copper and Brass Sales?
12       A.    **Could you repeat that?  I am not sure**
13  **I understood it.**
14       MS. WEGNER:  Sure.  Would you read it back,
15  Pat.
16       (WHEREUPON, the record was
17       read by the reporter.)
18       MR. DISBROW:  I am sorry, that sounded more
19  like a statement than a question.
20       Jan, maybe it's better if you just
21  ask it again.
22  BY MS. WEGNER:
23       Q.    Are the work and safety rules that
24  are listed in Exhibit No. 5 those that govern the

36

1   employees subject to the Collective Bargaining
2   Agreement at the Copper and Brass Sales Schaumburg
3   location?
4        A.    Yes.
5        Q.    Does the Copper and Brass Sales
6   attendance policy fall under any of these
7   categories of work and safety rules contained in
8   Exhibit 5?
9        A.    **It's actually a separate document.  I**
10  **would love to see if it actually overlaps.**
11       MR. DISBROW:  And I will just object to the
12  degree the document speaks for itself.
13  BY MS. WEGNER:
14       Q.    Were you involved in the decision to
15  terminate Mr. Wingo's employment?
16       A.    Yes, I was.
17       Q.    Who else was involved in the decision
18  to terminate Mr. Wingo's employment?
19       A.    **His immediate supervisor also played**
20  **a part.  I don't recall if I contacted our HR**
21  **group prior to the decision.  I believe the**
22  **decision was more based on my --**
23       MS. WEGNER:  Pat, can you read back that
24  response.

37

1        (WHEREUPON, the record was
2        read by the reporter.)
3   BY THE WITNESS:
4        A.    **My review of the case, and it was my**
5   **decision.**
6   BY MS. WEGNER:
7        Q.    And who is the immediate supervisor
8   of Mr. Wingo that you said played a part in the
9   decision to terminate him?
10       A.    Mark DeMien.
11       Q.    What was Mr. DeMien's part that he
12  played in the decision to terminate Mr. Wingo?
13       A.    **He had been responsible for most of**
14  **the documentation in the last several years of**
15  **Mr. Wingo's failure to perform his tasks properly**
16  **as an employee.**
17       **He also came across Mr. Wingo's**
18  **production sheets showing that he had falsified**
19  **company documents.**
20       Q.    Now, despite any performance
21  deficiencies on the part of Mr. Wingo, he was
22  employed by Copper and Brass Sales for about 24
23  years; isn't that right?
24       A.    **That would be correct.**

DEPOSITION OF RANDY E. LUNT  -  5/29/08

38

1       Q.   When was the decision made to
2   terminate Mr. Wingo?
3       **A.   I am not sure what day he was**
4   **terminated, but it was the day of his termination.**
5       Q.   To your knowledge, what policy or
6   policies were violated by Mr. Wingo that resulted
7   in his termination?
8       **A.   He was terminated for falsifying**
9   **company records, which is a Category D fork rule**
10  **violation.**
11      Q.   Does Copper and Brass Sales have a
12  progressive discipline policy?
13      **A.   Yes, they do.**
14      Q.   Mr. Wingo did not receive progressive
15  discipline in connection with his violation that
16  resulted in his termination; correct?
17      MR. DISBROW:  Objection; foundation,
18  mischaracterizes earlier testimony.
19      MS. WEGNER:  Could I have an answer?
20      MR. DISBROW:  You can answer it if you
21  know.
22  BY THE WITNESS:
23      **A.   Mr. Wingo had been given numerous**
24  **verbal written warnings, he had been given a**

39

1   **one-day suspension, a three-day suspension and**
2   **finally terminated for his -- because of errors,**
3   **plus the Category D, as shown on the work and**
4   **safety rules, is first offense termination.**
5       MS. WEGNER:  Pat, would you mark that as
6   the next exhibit.
7           (WHEREUPON, a certain document
8           was marked Lunt Deposition
9           Exhibit No. 6, for identification,
10          as of May 29, 2008.)
11  BY MS. WEGNER:
12      Q.   Mr. Lunt, Exhibit No. 6 are documents
13  produced by the Defendant Copper and Brass Sales,
14  Bates stamped 00684 and 685.
15          Do you recognize this?
16      **A.   It appears to be the job description**
17  **of the warehouse position -- warehouseman**
18  **position, I should say.**
19      Q.   And the job description for warehouse
20  position that is marked as Exhibit 6 is dated
21  effective April 16, 2007; correct?
22      **A.   Correct.**
23      Q.   Since the version of the general
24  warehouse corporate job description that we have

40

1   marked as Exhibit No. 6 issued April 16, 2007,
2   have there been any changes to that job
3   description?
4       **A.   Not that I know of.**
5       Q.   And this job description marked as
6   Exhibit No. 6 applies to those persons who are
7   Union employees working in the warehouse at the
8   Schaumburg location of Copper and Brass Sales;
9   correct?
10      MR. DISBROW:  Objection to foundation.
11  BY THE WITNESS:
12      **A.   I would appreciate your rewording**
13  **that because I am not sure what you are asking.**
14  BY MS. WEGNER:
15      Q.   Does Exhibit No. 6 represent the job
16  description for the Union warehouse employees at
17  the Copper and Brass Sales location in Schaumburg?
18      **A.   It's a fairly exactly description,**
19  **yes.**
20      Q.   Now, how does a warehouse employee
21  learn the duties of a particular warehouse
22  position at the Copper and Brass Sales location in
23  Schaumburg?
24      **A.   He is trained.**

41

1       Q.   Are all the warehousemen at the
2   Schaumburg Copper and Brass Sales location
3   expected to be able to function in any position in
4   the warehouse?
5       MR. DISBROW:  Objection. It's an
6   incomplete hypothetical.
7           You can answer, if you know.
8   BY THE WITNESS:
9       **A.   The goal was to eventually train**
10  **everyone at every location for every position.**
11  BY MS. WEGNER:
12      Q.   And for the warehousemen at the
13  Schaumburg location of Copper and Brass Sales, how
14  many different positions are there?
15  BY THE WITNESS:
16      **A.   They vary.  We have several work**
17  **stations that are dedicated to warehousemen.**
18  **There is overlap between operators and**
19  **warehousemen and overlap between helpers and the**
20  **warehousemen. I believe there are four or five**
21  **different set positions there.**
22  BY MS. WEGNER:
23      Q.   What are the titles of the four or
24  five different set positions at the warehouse?

11  (Pages 38 to 41)

VICTORIA COURT REPORTING SERVICE, INC.    (312) 443-1025

DEPOSITION OF RANDY E. LUNT   -   5/29/08

42

1    A.   They are all considered warehousemen.
2  There are different work stations.
3    Q.   What is the work that is performed at
4  the different work stations by the warehousemen at
5  the Schaumburg location?
6    A.   We have RBW nonprocessing, they fill
7  RBW nonprocessed orders.  We have the sheet
8  station, they fill nonprocessed sheet station
9  orders.
10        There is shipping and receiving, but
11  both of those can be done by helpers.  Packaging,
12  and also PVC, where a coating of PVC is applied to
13  raw material.
14    Q.   What does the initial RBW stand for?
15    A.   Rod, bar and wire.
16    Q.   And into what category do those
17  persons fall who are filling orders?
18    A.   It would be a warehouse position.
19    Q.   Well, does someone who is doing order
20  filling fall into the category of shipping and
21  receiving?
22    A.   Our shipping and receiving people can
23  fill orders and do on a regular basis.  That's not
24  their primary function.

43

1    Q.   What was Mr. Wingo's position at
2  Copper and Brass Sales just prior to his
3  termination?
4    A.   RBW nonprocessing.
5    Q.   In Mr. Wingo's position at the
6  Schaumburg location of Copper and Brass Sales in
7  RBW nonprocessing, what were his job duties?
8    A.   It was to pull material, inspect it,
9  verify the accuracy of the work order, read,
10  understand and follow all work order instructions,
11  package the material according to the
12  instructions, weigh it, stamp the weight.  And
13  then once done that, enter that information into
14  the system, generating a shipping label and attach
15  that shipping label to the material.
16    Q.   Prior to Mr. Wingo's termination from
17  Copper and Brass Sales, how long had he been in
18  the assignment in RBW nonprocessing?
19    A.   I really can't answer that.  He had
20  been there numerous times in the past and moved
21  throughout the warehouse, and probably there for
22  at least several months prior to his termination,
23  if not longer.
24    Q.   In Mr. Wingo's performance of his

44

1  duties in RBW nonprocessing, did his performance
2  depend on other employees on his shift to
3  accurately and efficiently perform their duties?
4    MR. DISBROW:  Objection; incomplete
5  hypothetical.
6        You can answer it.
7    THE WITNESS:  I am not sure what she is
8  asking on that.
9        Can you please repeat that?
10  BY MS. WEGNER:
11    Q.   In Mr. Wingo's last position in RBW
12  nonprocessing, did his successful performance of
13  his duties depend on other employees accurately
14  and efficiently completing their job duties?
15    MR. DISBROW:  Same objection.
16  BY THE WITNESS:
17    A.   Not really.  I mean, the side loader
18  driver would stage material, but it still was
19  Bob's responsibility to do his job properly.
20  BY MS. WEGNER:
21    Q.   What would the material be that a
22  side loader would stage for Mr. Wingo?
23    A.   It would be RBW or parts, parts dock.
24  It would be bundles of materials that Bob would

45

1  pull work orders from, whether they are full
2  bundles or partial bundles.
3    Q.   To your knowledge, would it be
4  necessary for Mr. Wingo to wait on occasion for
5  someone, such as the side loader, to pull material
6  for Mr. Wingo to have access to it?
7    A.   It's possible.  It would be rare,
8  though.
9        During those rare occasions, Bob was
10  capable of using his fork truck to pull his own
11  material down for himself.
12    Q.   In the RBW nonprocessing position,
13  was Mr. Wingo responsible for the PVC coat
14  process?
15    A.   No.
16    Q.   On the Schaumburg location of Copper
17  and Brass Sales, was the PVC coating contained on
18  rolls?
19    A.   Yes.
20    Q.   And this PVC coating is a material
21  that is applied to the metal so it's not
22  scratched; right?
23    A.   It has several purposes, but one of
24  them is to prevent scratches.

VICTORIA COURT REPORTING SERVICE, INC.   (312) 443-1025

DEPOSITION OF RANDY E. LUNT  -  5/29/08

46

1    Q.   What are the other purposes of the
2  PVC coating?
3    A.   There is protection from ultraviolet
4  rays.  There is also cutting, we have special
5  laser PVC, so when you cut through, it doesn't
6  bubble up.
7    Q.   How large are these PVC coating
8  rolls?
9    A.   We have three basic widths, 36, 48
10  and 60-inch wide rolls.
11    Q.   And how much do the PVC rolls weigh?
12    A.   I, quite honestly, can't tell you.
13    Q.   You have never tried to lift a PVC
14  roll?
15    A.   Yes.
16    Q.   And these PVC rolls, are they located
17  in a rack?
18    MR. DISBROW:  You can answer the question,
19  but I am just going to object on the whole line of
20  questioning as to relevance.  I don't know where
21  we are going.  But you can certainly answer the
22  question.
23  BY THE WITNESS:
24    A.   Most are staged in a rack area.

47

1  BY MS. WEGNER:
2    Q.   Was it necessary for someone handling
3  the PVC coating process to lift those PVC rolls
4  when they needed to be replaced?
5    MR. DISBROW:  Objection; incomplete
6  hypothetical.
7    You can answer the question.
8  BY THE WITNESS:
9    A.   Yes, it was expected of the
10  employees.
11  BY MS. WEGNER:
12    Q.   And the PVC coating rolls that are
13  required to be lifted, is it a job that one person
14  can do?
15    A.   I believe most times one person does,
16  if not all times.
17    Q.   Are you aware of exceptions where the
18  PVC rolls require more than one person to lift
19  them?
20    A.   Years ago, we bought oversized rolls
21  that had twice the amount on a roll, and they were
22  exceptionally heavy.  Other than that, no.
23    Q.   Are you aware of an incident that
24  occurred on or about August 30, 2007, when Mark

48

1  DeMien swore at Mr. Wingo when Pat Bishop was
2  assisting Mr. Wingo to lift a PVC roll?
3    MR. DISBROW:  Objection as to foundation;
4  assumes facts not in evidence.
5    You can answer the question.
6  BY THE WITNESS:
7    A.   I am not aware of Mark DeMien
8  swearing at Bob Wingo.
9    I am aware of Bob Wingo and Pat
10  Bishop both receiving letters of counsel for
11  wasting time and talking at the PVC station.
12  BY MS. WEGNER:
13    Q.   Did Mr. Wingo have any discussion
14  with you regarding the incident that occurred for
15  which he got a letter of counsel for talking and
16  wasting time at the PVC station?
17    A.   Yes, he did.
18    Q.   Was anyone else present when
19  Mr. Wingo spoke to you regarding the incident that
20  occurred at the PVC roll station?
21    A.   I do not recall.
22    Q.   What did Mr. Wingo say to you about
23  this incident at the PVC station involving
24  Mr. DeMien?

49

1    A.   He denied that he was wasting time
2  and that he felt that he was unfairly written up.
3    Q.   And Mr. Bishop, did he talk to you
4  about it?
5    A.   Yes.  Mr. Bishop did talk to me about
6  it.
7    Q.   What did Mr. Bishop discuss with you
8  regarding the incident that occurred at the PVC
9  roll station?
10    A.   He felt that Bob had stopped him to
11  help him move a roll, but he felt that it was
12  unfair that if they are both treated the same, but
13  he felt that it was unnecessary for him to receive
14  the write-up.
15    I did investigate the claim and
16  talked to other individuals and found nobody in
17  the warehouse was willing to testify that they
18  heard any swearing or that Mark was out of line in
19  his write-up.
20    Q.   To your knowledge, did Mr. Bishop
21  obtain the permission of his immediate supervisor
22  to assist Mr. Wingo in handling this PVC roll for
23  which he received counseling?
24    MR. DISBROW:  Objection.  I think that

13  (Pages 46 to 49)

DEPOSITION OF RANDY E. LUNT - 5/29/08

50

1  mischaracterizes earlier testimony.
2         You can answer, if you know.
3  BY THE WITNESS:
4     A.  He did receive permission to assist
5  Bob in moving a PVC roll, but not to talk. That's
6  what the write-up was, wasting time to talk.
7  BY MS. WEGNER:
8     Q.  Who was the immediate supervisor that
9  gave Mr. Bishop permission to assist Mr. Wingo in
10  handling the PVC roll?
11    A.  Ray Dormill.
12    Q.  And who did you interview to
13  investigate Mr. Warton's claim that Mr. DeMien had
14  sworn at him?
15    A.  Ray Dormill and Sergio Garcia, along
16  with Mark DeMien.
17    Q.  When did you interview Sergio Garcia
18  regarding what occurred at the PVC roll?
19    A.  I don't remember the exact date.
20    Q.  Did you ever make any notes about
21  your interview of Mr. Garcia?
22    A.  More than likely, yes.
23    Q.  If you made notes regarding your
24  interview with Mr. Garcia, what did you do with

51

1  those notes?
2     A.  I don't recall. They may be in
3  either Bob's or Pat Bishop's record, but I don't
4  recall what I did with them.
5     Q.  Did you ever ask Mr. Bishop whether
6  Mr. DeMien swore?
7     A.  Yes, I did.
8     Q.  What did Mr. Bishop say?
9     A.  I believe he did say yes, but I don't
10  recall that for a fact.
11    Q.  And why did you interview Sergio
12  Garcia to try and ascertain what occurred at the
13  PVC roll area between Mr. DeMien, Mr. Bishop and
14  Mr. Wingo?
15    A.  I believe Pat Bishop gave me that
16  name as a witness to what occurred, so I followed
17  up and talked to him.
18    Q.  Why did you interview Ray Dormill
19  regarding what occurred with respect to the PVC
20  roll incident?
21    A.  As a potential witness and also as
22  the person that they claimed gave Pat permission
23  to assist.
24    Q.  And did Mr. Dormill witness what

52

1  occurred with Mr. DeMien and Mr. Winger and
2  Mr. Bishop?
3     A.  He was in an office adjacent. I did
4  not hear any swearing. All he could testify is
5  the fact he gave Pat permission to assist Bob in
6  moving the roll of PVC.
7     Q.  Did you in this investigation of what
8  happened regarding the PVC roll interview Mr. Mark
9  DeMien?
10    A.  Yes.
11    Q.  And what did Mr. DeMien tell you when
12  you interviewed him regarding the PVC roll
13  incident?
14    A.  Basically that he had talked to both
15  Pat and Bob earlier in the day and warned them
16  about wasting time, because they were talking.
17  And it was only on the second time that he caught
18  them wasting time and talking that he talked to
19  both individuals and provided them with the letter
20  of counsel.
21    Q.  Did Mr. DeMien admit that he swore at
22  Mr. Wingo?
23    A.  He did not admit to anything. He
24  denied swearing, let's put it that way.

53

1     Q.  Now, what were the words Mr. Wingo
2  told you Mark DeMien used when he swore at
3  Mr. DeMien?
4     A.  I honestly don't remember.
5     Q.  So did you reach a conclusion in your
6  investigation of Mr. Wingo's complaints about the
7  conduct of Mark DeMien?
8     A.  I talked to both Pat and Bob and told
9  them that I found no evidence to support their
10  claims.
11    Q.  Did Mr. DeMien receive any discipline
12  as a result of Mr. Wingo's complaints regarding
13  Mr. DeMien's conduct?
14    A.  No, I did not.
15    Q.  Did you ever prepare a written report
16  of this investigation regarding the PVC roll
17  incident?
18    A.  I don't recall putting together a
19  written report. I don't believe there was ever a
20  written grievance filed in the incident. I
21  believe everything was done verbally.
22    Q.  Now, is it a violation of any Copper
23  and Brass Sales policy for supervisory or
24  managerial employees to swear at subordinate

14 (Pages 50 to 53)

VICTORIA COURT REPORTING SERVICE, INC.    (312) 443-1025

DEPOSITION OF RANDY E. LUNT  -  5/29/08

54

1  employees?
2       A.   It is not condoned.  There is a
3  certain amount of shop talk that's both hourly and
4  salaried, but we have documented cases, taken
5  action against other employees for swearing.
6       MS. WEGNER:  Do you want to take a couple
7  minutes at this point?
8       MR. DISBROW:  Sure.
9          (WHEREUPON, a recess was had.)
10      MS. WEGNER:  Back on the record.
11  BY MS. WEGNER:
12      Q.   Mr. Lunt, are Union employees working
13  at the Copper and Brass Sales location in
14  Schaumburg paid the same rate of pay regardless of
15  their warehouse job position dependent on
16  seniority pursuant to the Union contract?
17      MR. DISBROW:  I am just going to object to
18  the degree the contract speaks for itself.
19  BY THE WITNESS:
20      A.   It depends on which classification
21  they are in.  Helpers get paid differently than
22  warehousemen.  Warehousemen get paid differently
23  than machine operators.
24          And within each classification based

55

1  on years of service, there is progressive
2  increases from a warehouseman with zero years of
3  experience versus two years of experience.
4          It has escalated a little bit for
5  machine operators and for helpers, the time lines
6  are a little bit shorter.
7  BY MS. WEGNER:
8       Q.   How is it that management at Copper
9  and Brass Sales at the location at which you are
10  the plant manager determine which Union employees
11  work in a specific job position or job
12  classification?
13      A.   When you say "job classification,"
14  you are talking warehouseman versus machine
15  operator?
16      Q.   Yes.
17      A.   It's done through a bidding process
18  per the contract.
19      Q.   And how is it that management at the
20  Copper and Brass Sales plant that you manage
21  determines which Union employees work in a
22  specific job classification within the warehouse
23  classification?
24      A.   If all warehousemen, which ones we

56

1  pick to work, say, RBW versus -- it's done
2  strictly who has the capability to do the job
3  best.  We are looking at maximizing our
4  efficiencies and our productivity.
5          It's also based on the fact that we
6  consider warehousemen as a pool of labor from
7  which we pick on, so we will pick the most
8  efficient RBW employee versus PVC versus packer
9  versus whatever on that and arrange accordingly.
10      Q.   Is there a specified training period
11  for warehouse persons within those specific job
12  positions?
13      A.   From one classification to another,
14  30 days is a standard training.  But that's just
15  to move from, say, a helper to a warehouse
16  position.
17          There is so much knowledge that
18  overlaps from whether you are packing at the sheet
19  station, packing at the packaging station or
20  packing at RBW, 90 percent of that is the same,
21  it's repetitive.
22          So it requires very little training
23  to move from one area to another.
24      Q.   To your knowledge, how many of the

57

1  job positions within the warehouse classification
2  had Mr. Wingo held during his 24 years of service
3  with Copper and Brass Sales?
4       A.   To my knowledge, he has held every
5  one of them.
6       Q.   To your knowledge, did Mr. Winger
7  ever function as a machine operator at the
8  Schaumburg location?
9       A.   Not to my knowledge.
10      Q.   What are the types of machines the
11  machine operators operate at the Schaumburg
12  location?
13      A.   Currently, we have RBW saws, shears.
14      Q.   Now, are all warehouse employees
15  required to complete production logs on a daily
16  basis?
17      A.   Not all.
18      Q.   Which warehouse employees are
19  required to complete production logs on a daily
20  basis?
21      A.   We don't require our dock people or
22  side loader operators to do that.  Our people that
23  are filling or packaging orders should fill out
24  production sheets.  It is the same thing with our

DEPOSITION OF RANDY E. LUNT   -   5/29/08

58

1    machine operators that are filling orders.
2        Q.    Well, are there exceptions?  You say
3    should.
4            Machine operators and warehouse
5    persons, other than persons on the dock and the
6    side loaders, should fill out production logs
7    every day?
8        A.    The guys on the dock because they are
9    not filling orders, they are loading trucks or
10    unloading trucks, aren't going to be filling
11    orders, so they won't be.
12            Machine operators, as long as they
13    are cutting material or shearing material, yes,
14    should be required to fill out production sheets.
15        Q.    And are people that are filling,
16    packing on operating machines completing
17    production logs on a daily basis at the Schaumburg
18    location?
19        A.    Yes.
20        Q.    Is there a requirement that the
21    warehouse employees complete a certain number of
22    work orders per day?
23        A.    Every day and every position is
24    different, so we couldn't put a requirement.

59

1        Q.    What are the circumstances that make
2    each day and each position different so that you
3    can't put a requirement for a certain number of
4    orders per day to be completed?
5        A.    Say at the sheet station, I would
6    expect two-and-a-half orders -- or two-and-a-half
7    skids packed per hour.
8            But if an order required that special
9    packaging, extra banding, different style skids,
10    that would require additional handling or time,
11    there is an opportunity to say he is not going to
12    get two-and-a-half, he is only going to get
13    one-and-a-half or there is only going to be two
14    orders an hour on that.  We would have to look at
15    those things.
16        Q.    How were you able to come to the
17    determination that someone working at the sheet
18    station should be able to do two-and-a-half skids
19    per hour?
20        A.    The view of previous production
21    sheets over a period of time on an average.
22        Q.    In Mr. Wingo's position at Copper and
23    Brass Sales at the Schaumburg location, what was
24    the number of orders he was expected to complete

60

1    per day?
2        A.    The average for that was somewhere
3    between 30 and 40 orders a day.  We had
4    individuals pack as many as 50 orders a day, but
5    most were within the 30 to 40 range.
6        Q.    When Mr. Wingo was last employed at
7    the RBW area, was he the only person handling that
8    position on the shift that he worked?
9        A.    That would vary from day-to-day based
10    on the workloads.
11        Q.    In late 2007, how many shifts were
12    there at the Schaumburg plant?
13        A.    Three shifts.
14        Q.    Were all warehouse positions at the
15    Schaumburg facility functioning on each of the
16    three shifts?
17        A.    No.
18        Q.    What job positions weren't being
19    conducted on any particular shift at the
20    Schaumburg plant in late 2007?
21        A.    Receiving only receives seven --
22    their hours are 7:00 a.m. to 3:00 p.m.  We don't
23    receive around the clock.
24            We don't operate our packaging

61

1    station normally over the midnight shift.  But we
2    have on occasion.  Based on workload, everything
3    changes.
4        Q.    What is the packaging station?
5        A.    Where processed material, whether
6    it's material that's handled at the shear or
7    material that's cut at our RBW saws, and then it's
8    directed over to the packaging station and,
9    therefore, packed according to the customer's
10    requirements.
11        Q.    So let me make sure that I understand
12    since I am really not familiar with the work
13    that's conducted at your plant.
14            If material needs to be sheared or
15    sawed, it becomes a processed material; is that
16    the distinction?
17        A.    Correct.
18        Q.    So the fact that material needs to
19    have the PVC coating applied doesn't include
20    processing?
21        A.    It doesn't change the size or shape
22    of material so, therefore, it's not considered
23    process.
24        Q.    What is the information that is

16 (Pages 58 to 61)

DEPOSITION OF RANDY E. LUNT  -  5/29/08

62

1  required to be placed on the production logs by
2  warehouse employees?
3      **A.  Employee name, I am going from memory**
4  **here, employee name, shift, date, work station,**
5  **work order number, number of pieces, number of**
6  **pounds and completion time.**
7      Q.  Is there a procedure in place at the
8  Schaumburg facility of Copper and Brass Sales to
9  determine what procedure is to be followed if an
10  employee is unable to complete an order that's
11  being worked on when that employee's shift comes
12  to an end?
13      MR. DISBROW:  Can you read that back.  I
14  don't think I caught all that.
15      (WHEREUPON, the record was
16      read by the reporter.)
17      MR. DISBROW:  Thank you.
18  BY THE WITNESS:
19      **A.  In a processed order, the operator**
20  **would only take credit for the material that he**
21  **has finished.**
22      **In a nonprocessed order, the**
23  **warehouse would only take credit for the orders**
24  **that he has completed.**

63

1      MS. WEGNER:  Would you mark that as No. 7.
2      (WHEREUPON, a certain document
3      was marked Lunt Deposition
4      Exhibit No. 7, for identification,
5      as of May 29, 2008.)
6  BY MS. WEGNER:
7      Q.  Do you recognize Exhibit No. 7?
8      **A.  Yes.**
9      Q.  And what is Exhibit No. 7?
10      **A.  A description of our daily production**
11  **log.**
12      Q.  When did this description of the
13  daily production log go into effect at the
14  Schaumburg facility of Copper and Brass Sales?
15      **A.  It has always been in effect.**
16      Q.  So from the time you began, was this
17  the daily production log procedure?
18      **A.  Yes.**
19      Q.  What are the hours of the first shift
20  at the Schaumburg facility?
21      **A.  6:00 a.m. to 2:30.**
22      Q.  At the Schaumburg facility on the
23  first shift, are the employees allowed a
24  five-minute wash-up time?

64

1      **A.  Prior to lunch and prior to going**
2  **home.**
3      Q.  So at the Schaumburg facility, the
4  first shift work actually ends at 2:25 to allow
5  the employees five minutes to wash up?
6      **A.  Correct.**
7      Q.  Is there a procedure at the
8  Schaumburg location of Copper and Brass Sales
9  governing what procedure is to be followed if an
10  employee doesn't begin to work on an order because
11  he knows he won't be able to complete it before
12  the end of his shift?
13      MR. DISBROW:  Object to the form of the
14  question, what you mean by governing.
15      You can answer it, if you know.
16      THE WITNESS:  I am not sure what she is
17  asking.
18  BY MS. WEGNER:
19      Q.  Let me give you an example.
20      If an employee receives an order at
21  2:15, but he knows it's going to take him 20
22  minutes, and he only has 10 minutes left to
23  actually work before wash-up time, what is he
24  supposed to do?

65

1      MR. DISBROW:  Just objection, incomplete
2  hypothetical.
3      You can answer, if you know.
4  BY THE WITNESS:
5      **A.  He can start that order.  He can put**
6  **it on the scale.**
7      **He can start to take the measurement,**
8  **verify that the part numbers are correct, that the**
9  **mills are correct, do the beginning paperwork.  He**
10  **can set up the next shift to complete the order.**
11  BY MS. WEGNER:
12      Q.  In this example, how would an
13  employee set up the next shift to complete the
14  order?
15      MR. DISBROW:  Same objection.
16  BY THE WITNESS:
17      **A.  By doing the things that I just**
18  **explained.**
19  BY MS. WEGNER:
20      Q.  So, it's just my misunderstanding of
21  your terminology.
22      How, then, does the employee who has
23  partially worked on an order communicate what has
24  been accomplished to the next shift?

17  (Pages 62 to 65)

DEPOSITION OF RANDY E. LUNT  -  5/29/08

66

1      A.   It should be all written on the work
2  order.
3      Q.   Was it Mr. Wingo's job to ascertain
4  whether the person who operated the side loader
5  correctly provided him with the material to
6  complete an order?
7      MR. DISBROW:  Object to the form of the
8  question.  I don't even know what you are asking
9  myself.
10 BY THE WITNESS:
11     A.   I am not sure what you are asking
12 either.
13 BY MS. WEGNER:
14     Q.   Well, you do have different material;
15 right?
16          And side loader operators, you said,
17 pull down the bundles of the material?
18     A.   Yes.
19     Q.   So how does the side loader operator
20 determine what bundles of material to pull?
21          Is it on the work order?
22     A.   There are part numbers, and every
23 piece of material we have has a part number.
24 Every work order has a part number specifying the

67

1  material that needs to be pulled.
2          Every side loader driver takes that
3  part number and pulls that material down.  The
4  person filling the order matches that part number
5  up to the material part number, and they should be
6  the same.
7      Q.   And are the warehouse employees at
8  the Schaumburg facility required to write any
9  information on work orders?
10     MR. DISBROW:  Objection.  It has been asked
11 and answered.
12     MS. WEGNER:  No, I asked about production
13 logs.
14     MR. DISBROW:  You can answer the question.
15 BY THE WITNESS:
16     A.   Yes, they are.
17 BY MS. WEGNER:
18     Q.   What is the information that is
19 required to be written by warehouse employees on
20 work orders?
21     A.   They have to do an inspection record.
22 They can either stamp the weight in or hand write
23 the weight in on a mill bundle.
24          The number of pieces on the

68

1  inspection sheet is not only the diameter of the
2  material but also the length.
3          They can either hand write or they
4  can put a tag on the work order that specifies the
5  tag number, the number of pounds used to fill the
6  order, the mill that the material came from, the
7  heater lot number that the material came from and
8  the purchase order number that the material came
9  from, the type of package that was used, the
10 package material, gross and net weight, number of
11 bundles, skids, boxes used, who filled out the
12 work order, that packaged it, and the date that it
13 was done.
14          I believe that's most, if not all the
15 information that needs to be written on the work
16 order by the warehouseman filling that work order.
17     Q.   Isn't it true that there are errors
18 that are encountered on a daily basis on orders at
19 the Copper and Brass Sales Schaumburg location?
20     MR. DISBROW:  Objection; form of the
21 question, hypothetical, assumes facts not in
22 evidence.
23 BY THE WITNESS:
24     A.   Without looking at a work order, I

69

1  couldn't answer that.
2          Are there errors?  Yes, there are.
3          Do we try to minimize these errors?
4  Yes, we do.
5  BY MS. WEGNER:
6      Q.   What are the different types of
7  errors that occur at the Schaumburg facility
8  warehouse?
9      A.   I am not sure where you want to go
10 with this question.
11     MR. DISBROW:  I will just object because
12 it's pretty broad and ambiguous.
13          But you can answer it, if you know
14 all of the different errors that are possible.
15 BY THE WITNESS:
16     A.   It could be hundreds of errors.
17          I mean, an employee filling the work
18 order can grab the wrong material, he can grab the
19 wrong bundle, he can grab the wrong mill on it.
20          That is why it is up to our employees
21 to verify, as I state numerous times, read,
22 understand and follow all the order instructions.
23 BY MS. WEGNER:
24     Q.   Have you encountered errors with the

18 (Pages 66 to 69)

DEPOSITION OF RANDY E. LUNT  -  5/29/08

70

1  persons that are operating the saws or the shears,
2  where they cut something to the wrong
3  specification?
4       MR. DISBROW: Objection to form of the
5  question.
6       Do you want to know generally
7  throughout his entire employment there or a
8  specific time period, what are we after?
9       MS. WEGNER: No, in general.
10      MR. DISBROW: On average?
11      MS. WEGNER: In general.
12      MR. DISBROW: You can answer it, if you
13  know.
14  BY THE WITNESS:
15      A.  It has happened in the past, we have
16  had.
17  BY MS. WEGNER:
18      Q.  And have you encountered at the
19  Schaumburg facility errors by the people that
20  write all the various information that's required
21  on the work orders?
22      MR. DISBROW: The same objections to form
23  of the question, incomplete hypothetical, vague
24  and ambiguous and compound.  You can answer it, if

71

1  you know.
2  BY THE WITNESS:
3      A.  On occasion, yes.
4  BY MS. WEGNER:
5      Q.  On the work orders, you indicated
6  that the employees are required to fill in
7  information on who filled the order and who
8  packaged the order.
9       Is that different?
10      A.  At nonprocess stations, it's the same
11  person.
12      At processing stations, it is
13  different.  A shear operator would fill in who
14  filled the order, but the packer would fill who
15  packed it.  At nonprocessing, it's the same person
16  filling and packaging the order.
17      MS. WEGNER: Pat, would you mark that as
18  the next exhibit.
19      (WHEREUPON, a certain document
20      was marked Lunt Deposition
21      Exhibit No. 8, for identification,
22      as of May 29, 2008.)
23  BY MS. WEGNER:
24      Q.  Do you recognize Exhibit No. 8, a

72

1  document produced by the Defendant, Bates stamped
2  00006?
3      A.  Daily production log from Robert
4  Wingo, I would believe.
5      Q.  And the daily production log that we
6  are looking at as Exhibit No. 6 has a space for
7  noting special comments and assignments; is that
8  correct?
9      A.  Yes, it does.
10      Q.  What, to your knowledge, is the
11  purpose of the section on the production log for
12  the comments or special assignments entry?
13      A.  If a person was going to clean up, he
14  actually should enter a separate line so there is
15  no work orders next to it, and just put down that
16  from, say, 8:00 a.m. to 10: 00 a.m., he cleaned up
17  his work station.
18      Or if instead of writing the same
19  work order down twice, as if he filled two
20  separate work orders, he should write down it
21  once, put a note down that it took two books or
22  two bundles or whatever it took on that.
23      Q.  On this daily reduction log we have
24  marked as Exhibit No. 8, Mr. Wingo recorded time

73

1  where he had no orders to process; is that
2  correct?
3      MR. DISBROW: Objection to the degree the
4  document speaks for itself.
5  BY THE WITNESS:
6      A.  I can only read what Bob wrote down
7  on this.
8  BY MS. WEGNER:
9      Q.  Well, is there something incorrect
10  about Mr. Wingo noting on the daily production log
11  that he did other things in addition to the work
12  that he performed on the actual work orders that
13  are listed?
14      A.  No.
15      Q.  You would expect that; is that
16  correct?
17      A.  I would expect him to put it on a
18  separate line so it doesn't get mixed in with the
19  work order numbers.
20      But no, I expect him to write down if
21  he is taken away from his job function for a
22  period of time, to note that.
23      MS. WEGNER: Okay.  Let's make this Exhibit
24  No. 9.

19  (Pages 70 to 73)

DEPOSITION OF RANDY E. LUNT  -  5/29/08

74

1          (WHEREUPON, a certain document
2          was marked Lunt Deposition
3          Exhibit No. 9, for identification,
4          as of May 29, 2008.)
5       MS. WEGNER: Let's take a break right here.
6          (WHEREUPON, a recess was had.)
7       MS. WEGNER: Back on the record.
8    BY MS. WEGNER:
9       Q.   Exhibit No. 9, you were handed before
10   we took that short break.
11         Mr. Lunt, do you recognize this
12   document?
13      A.   Yes, I do.
14      Q.   And Exhibit 9 is Bates stamped 0009.
15         Do you recognize Exhibit No. 9 as a
16   daily production log of the Copper and Brass Sales
17   Schaumburg facility?
18      A.   Yes.
19      Q.   And do you recognize Exhibit No. 9 to
20   be a daily production log by Mr. Wingo?
21      A.   Yes.
22      Q.   Do you know the date of the daily
23   production log that we have marked as Exhibit
24   No. 9?

75

1       MR. DISBROW: Objection to the document
2    speaks for itself.
3          But you can answer it.
4    BY THE WITNESS:
5       A.   It says 11/15.
6    BY MS. WEGNER:
7       Q.   Do you know what year is represented
8    in the production log we have marked as Exhibit
9    No. 9?
10      A.   2007.
11      Q.   How can you determine that the
12   production log we have marked as Exhibit No. 9 is
13   from 2007?
14      A.   I would look up the work order
15   numbers and see what year those work orders were
16   from.
17      Q.   Are you familiar with in general the
18   work order numbers that are listed on Exhibit
19   No. 9 as those in the 2007 calendar year?
20      A.   They would be pretty consistent. I
21   feel fairly certain of that, yes.
22      Q.   Is there anything incorrect about the
23   way Mr. Wingo has completed the daily production
24   log that we have marked as Exhibit No. 9?

76

1       MR. DISBROW: Objection; form of the
2    question, it's vague, ambiguous.
3          You can answer it
4    BY THE WITNESS:
5       A.   Some minor things. I mean, he has
6    taken credit for one work order three times rather
7    than put individual -- one single entry and put a
8    note down that it's three bundles or three boxes,
9    whatever type of package he used. Not all of them
10   have time slotted.
11         And then there is a gap at the very
12   bottom. And once again, there is a work order
13   number on the bottom that he didn't actually
14   package.
15   BY MS. WEGNER:
16      Q.   And how can you determine from
17   looking at Exhibit No. 9 that there is a work
18   order at the bottom that Mr. Wingo did not
19   package?
20      A.   Enter it into the computer system and
21   found that Sergio Garcia had actually packaged
22   that work order instead of Bob.
23      Q.   On the last line of Exhibit No. 9,
24   Line 20, there are initials IG next to the work

77

1    order number.
2          Do you know who placed those initials
3    there?
4       A.   I placed those initials there.
5       Q.   What is the reason that you placed
6    the initials IG on Line 20 of the work order we
7    have marked as Exhibit No. 9?
8       A.   That was the person who actually
9    packaged that work order.
10      Q.   And I am sorry, how did you determine
11   that IG, the initials that you placed on Line 20,
12   was the person that packaged the work order?
13      A.   I believe the initial assessment was
14   done looking at the computer, also look up the
15   yellow copy or the original copy of the work order
16   and see whose work was done on there and whose
17   initials.
18      Q.   Can you explain what the initials PT
19   mean in the comment or special assignment section
20   of the production log?
21      A.   Pool truck.
22      Q.   What does that mean?
23      A.   We have trucks that come from one
24   branch to another. We have a central hub in

VICTORIA COURT REPORTING SERVICE, INC.   (312) 443-1025

78
1    Toledo, now called Northwood but where -- it's
2    going to be a long-winded answer.
3         MR. DISBROW:  Go ahead, just answer the
4    question.
5         MS. WEGNER:  That's fine.  Sometimes I need
6    an explanation.
7    BY THE WITNESS:
8         A.   Copper and Brass Sales has
9    approximately 46 branches nationwide.  Not every
10   branch duplicates the other branch's inventory.
11        So if a customer needs something that
12   is not in their regional branch, they will find
13   out what other branches do have that material,
14   place the order on that branch, and we ship it
15   among ourselves using what we call pool trucks.
16        You have a central hub in what we
17   used to call Toledo, all the trucks converge there
18   at one time during the evening hours, exchange the
19   material going to each year and then return to
20   their branches.
21        And we can cover one-third to half
22   the nation the next-day delivery using that
23   system.  And so that's what we call a PT or a pool
24   truck.

79
1    BY MS. WEGNER:
2         Q.   Thank you.
3         And do you know what the initials OT
4    means in the comment or special assignment section
5    of the work order we have marked as Exhibit 9?
6         A.   And that is our truck.  It means
7    that's delivered by one of our local trucks, it's
8    our truck, o-u-r, our truck.
9         Q.   On Line 19 of the daily production
10   log, it appears that there are the initials MSP
11   next to the pool truck terminology.
12        Do you know what that means?
13        A.   That is our Minnespolis branch.
14        Q.   What caused you to do an
15   investigation into the production log that we have
16   marked as Exhibit No. 9 to determine that Isidro
17   Garcia did the packaging for the last work order
18   on that document?
19        A.   After it was brought to my attention
20   that Bob had added work orders to other production
21   logs that he had not finished packaging, I took a
22   look at a random sample of November production
23   logs to see if there was a trend, and found two
24   other examples where Bob did the same thing.

80
1         Q.   I'm sorry.  Can you explain what you
2    mean when you say that he added work orders to
3    other production logs?
4         A.   He added, other than the 28th and the
5    29th, which were the two that initially caught my
6    supervisor's attention.
7         Once we did that, I looked at other
8    production sheets that Bob had turned in during
9    the month of November and found other instances
10   that he had written down and taken credit for
11   packaging orders that he did not complete himself,
12   that somebody else had packed.
13        MS. WEGNER:  This is going to be No. 10.
14        (WHEREUPON, a certain document
15        was marked Lunt Deposition
16        Exhibit No. 10, for identification,
17        as of May 29, 2008.)
18   BY MS. WEGNER:
19        Q.   Do you recognize Exhibit No. 10,
20   Mr. Lunt?
21        A.   Yes.
22        Q.   Can you identify Exhibit No. 10?
23        A.   Daily production log with the
24   initials RGW dated 11/20.

81
1         Q.   To your knowledge, this is a
2    production log that is marked as Exhibit No. 10
3    for November 20, 2007?
4         A.   Correct.
5         Q.   And this daily production log we have
6    marked as Exhibit No. 10 is Defendant's document
7    00011.
8         Do you have the ability to determine
9    what information Mr. Wingo placed on the third
10   line of the production log we have marked as
11   Exhibit No. 10 in the comment and special
12   assignment section?
13        MR. DISBROW:  I am just going to object on
14   the grounds that Mr. Lunt didn't prepare this
15   document.
16        To the degree he knows what is there,
17   he can answer your question.
18   BY THE WITNESS:
19        A.   I can't really read -- the most I can
20   read is mill plus PO, but I can't read the line
21   above it.
22   BY MS. WEGNER:
23        Q.   Do you know who actually pulled the
24   material for the work order listed on Line 3 in

DEPOSITION OF RANDY E. LUNT  -  5/29/08

82

1  Exhibit No. 10?
2     **A.  I could not tell you that.**
3     MS. WEGNER:  This is going to be No. 11.
4        (WHEREUPON, a certain document
5        was marked Lunt Deposition
6        Exhibit No. 11, for identification,
7        as of May 29, 2008.)
8  BY MS. WEGNER:
9     Q.   Do you recognize Exhibit No. 11?
10    **A.  Yes.**
11    Q.   Exhibit No. 11 is a document produced
12  by the Defendant, 00013.
13       Do you believe Exhibit No. 11 is a
14  production log completed by Mr. Wingo for
15  November 28, 2007?
16    **A.  Yes.**
17    Q.   Do you know whose initials appear in
18  the last two lines of the production log we have
19  marked as Exhibit 11?
20    **A.  I am not sure what you mean by the**
21  **last two lines.**
22    Q.   16 and 17, where there is initials
23  placed next to the work order?
24    **A.  Are you referring to the initials**

83

1  **MEA?**
2     Q.   Yes.
3     **A.  Mark DeMien had placed those initials**
4  **and they are Mario Alvarez' initials because he is**
5  **the one that actually packaged, filled and**
6  **packaged these two orders.**
7     Q.   Do you contend there is anything
8  improper about the way Mr. Wingo completed this
9  daily production log dated November 28, 2007?
10    **A.  Yes. He took credit for packaging**
11  **two orders, put weights, times, pieces down and he**
12  **did not fill the orders.**
13    Q.   What are the orders you are referring
14  to that you think Mr. Winger improperly took
15  credit for on Exhibit No. 11?
16    **A.  466844, 466883.**
17    Q.   What leads you to believe that
18  Mr. Wingo took credit for work order 446883 on
19  Exhibit 11?
20    **A.  The fact that he wrote down pieces,**
21  **pounds and a completion time.**
22    Q.   Isn't it true that also on Exhibit
23  No. 11 on Line 17 next to work order 466883,
24  Mr. Wingo wrote "set up, stamped, boxed"?

84

1     MR. DISBROW:  Objection to the degree the
2  document speaks for itself, and on the grounds
3  that Mr. Lunt did not prepare this document and
4  may not know what Mr. Wingo was referring to.
5        But you can answer the question, if
6  you know.
7     THE WITNESS:  Could you repeat the
8  question.
9  BY MS. WEGNER:
10    Q.   Isn't it true that next to work order
11  No. 466883 in Exhibit No. 11 in the comments and
12  special assignment section, Mr. Wingo "wrote set
13  up, stamped, boxed"?
14    MR. DISBROW:  Same objections.
15  BY THE WITNESS:
16    **A.  It appears he wrote that. I am**
17  **making the assumption he wrote it and nobody else**
18  **did.**
19  BY MS. WEGNER:
20    Q.   Did you ever conduct an investigation
21  to determine who wrote up set up, stamped, boxed
22  on Exhibit No. 11 on Line 17.
23    **A.  During our discussion with Bob, he**
24  **admitted that he filled out this production sheet,**

85

1  **yes.**
2     Q.   And it's your contention that
3  Mr. Alvarez actually completed the work order
4  process for work order 466883; right?
5     MR. DISBROW:  You answer it, but I just
6  want to put the objection asked and answered.
7  BY THE WITNESS:
8     **A.  Yes.**
9  BY MS. WEGNER:
10    Q.   What part of this process was it that
11  Mr. Alvarez conducted with work order 466883?
12    **A.  He completed it and PK10'd it, put**
13  **the information in the computer and signed off on**
14  **the work order itself.**
15    Q.   So there were, to your knowledge, two
16  steps in the process to completing work order
17  466883 that Mr. Alvarez completed?
18    MR. DISBROW:  Objection; mischaracterizes
19  his testimony.
20       You can answer, if you know.
21  BY THE WITNESS:
22    **A.  Without looking at the yellow copy, I**
23  **couldn't tell you what else that Mr. Alvarez had**
24  **done to this work order.**

VICTORIA COURT REPORTING SERVICE, INC.   (312) 443-1025

DEPOSITION OF RANDY E. LUNT  -  5/29/08

86

BY MS. WEGNER:
1
2      Q.   And why is it that you contend
3 Mr. Wingo took credit for completing work order
4 466883?
5      **A.   He wrote it down on his production**
6 **log. He also put completion time.**
7      Q.   So, it's your understanding that the
8 completion time Mr. Wingo put down was the time
9 that he completed with respect to work order
10 466883?
11      MR. DISBROW:  Just objection to the form of
12 the question.  I don't think I understand the
13 question, frankly.  Maybe that's me more than
14 anybody else.
15      But I think it's not clear, Jan, what
16 you mean.
17      MS. WEGNER:  I think Mr. Lunt is the one
18 that said he wrote down he completed it, and I am
19 asking what is the ʰit" he is referring to,
20 Mr. Lunt.
21 BY THE WITNESS:
22      **A.   The fact that Bob would write down**
23 **the work order number, the number of pieces, the**
24 **number of pounds and the completion time tells me**

87

1 he finished that order when he did that.
2 BY MS. WEGNER:
3      Q.   What is it about looking at Exhibit
4 No. 11 and Line 17 that tells you that Mr. Winger
5 put a completion time which states that he
6 completed the order?
7      MR. DISBROW:  I am just going to object
8 because it has been asked and answered a number of
9 times.
10 BY THE WITNESS:
11      **A.   I believe I have answered this.**
12      MS. WEGNER:  Okay.
13 BY MS. WEGNER:
14      Q.   What training has been provided to
15 the warehouse employees at the Schaumburg facility
16 of Copper and Brass Sales regarding the
17 information to be placed on production logs?
18      **A.   I would guess that probably once**
19 **every year to two years, we go over this. There**
20 **are several postings that have been posted in the**
21 **building and we have had meetings over periods of**
22 **time to train people and refresh their memories in**
23 **how to properly fill out a production sheet.**
24      Q.   And the time that is expected to be

88

1 placed in the right-hand column on the production
2 log, is that supposed to be the time that the work
3 is completed?
4      **A.   Correct.**
5      MS. WEGNER:  Pat, would you mark that as
6 the next exhibit.
7      (WHEREUPON, a certain document
8      was marked Lunt Deposition
9      Exhibit No. 12, for identification,
10      as of May 29, 2008.)
11      MS. WEGNER:  What is the Bates stamp number
12 on 12, is that 14?
13      MR. DISBROW:  Yes, you got that right, Jan.
14 BY MS. WEGNER:
15      Q.   And Mr. Lunt, can you identify
16 Exhibit No. 12?
17      **A.   Daily production log filled out by**
18 **RGW on November 29th.**
19      Q.   Exhibit No. 12 is a document produced
20 by the Defendant, Bates stamped 00014.
21      And do you recognize Exhibit No. 12
22 as a production log completed by Mr. Wingo on
23 November 29, 2007?
24      **A.   Yes.**

89

1      Q.   At Line 20 and below Line 20, there
2 are initials placed next to the back order numbers
3 on Exhibit 12.
4      Do you know who placed those initials
5 there?
6      **A.   Mark DeMien.**
7      Q.   Do you know the reason Mr. DeMien
8 placed the initials next to the work orders in
9 Line 20 and the line blow that on Exhibit 12?
10      **A.   Two work order numbers that somebody**
11 **else had actually done the work and completed that**
12 **should not have been on this production sheet.**
13      Q.   Why is it that you contend that the
14 last two work orders listed on Exhibit No. 12
15 should not have been on Mr. Wingo's production
16 sheet or production log?
17      **A.   Excuse me for a second.**
18      MR. DISBROW:  Do you want to go off the
19 record?
20      MS. WEGNER:  Sure.
21      (WHEREUPON, a recess was had.)
22      MS. WEGNER:  Back on the record.
23      THE REPORTER:  There is a question pending.
24      MS. WEGNER:  Would you read it back,

23  (Pages 86 to 89)

DEPOSITION OF RANDY E. LUNT  -  5/29/08

90

1    please, Pat.
2            (WHEREUPON, the record was
3            read by the reporter.)
4    BY THE WITNESS:
5        A.   Because he did not complete them.
6    BY MS. WEGNER:
7        Q.   Is it your contention that Mr. Wingo
8    should not be writing work orders on production
9    logs where he does perform work on them?
10       A.   If he does not complete them, he
11   shouldn't take credit for them.
12       Q.   But were you not also requiring that
13   Mr. Wingo on his production log keep track of
14   everything he did during the day, including
15   clean-up and assisting other employees?
16           MR. DISBROW: Just objection to the degree
17   it mischaracterizes earlier testimony.
18           You can answer the question.
19   BY THE WITNESS:
20       A.   He could put notes in the special
21   assignment, but at the same time, you can't take
22   credit for putting down a work order number, the
23   pounds packed, the pieces packed and the time
24   completed on it if he did not complete the order.

91

1    BY MS. WEGNER:
2        Q.   Well, Mr. Wingo on Exhibit No. 12 did
3    not put down a time completed for the last entry,
4    work order 467012; isn't that correct?
5        A.   Well, in that work station, he would
6    only work on one work order at a time.  You have
7    to finish before you start the next one.  You
8    can only fill one order at a time.
9            So it would be inconceivable for him
10   to be working on two work orders at the same time
11   and, therefore, he couldn't put down both work
12   order 467112 and 467012 and not finish either one
13   of those.
14       Q.   I'm sorry, you contend that Mr. Wingo
15   could only work on one work order at a time.
16           Haven't you cited him on prior
17   occasions for switching packing lists between
18   different orders that he had worked on?
19           MR. DISBROW: Objection as to foundation;
20   assumes facts not in evidence.
21           Answer the question, if you can.
22   BY THE WITNESS:
23       A.   Two different situations.  He PK'd --
24   he could pack both orders, PK10 both orders, then

92

1    print up the packing list after he had completed
2    them and then switch them.
3            So, he filled one work order, then
4    filled the next order, but then PK10 them both at
5    the same time.  He didn't finish either one of
6    these.
7    BY MS. WEGNER:
8        Q.   Yes, although on Exhibit No. 12,
9    Mr. Wingo did put down the stop time, which you
10   know to be the end of his shift at 2:25; is that
11   correct?
12           MR. DISBROW: Objection.  The document
13   speaks for itself.  And also assumes facts not in
14   evidence.
15           Again, Randy, you can answer it if
16   you know.
17   BY THE WITNESS:
18       A.   He wrote down 2:25 as a completion
19   time for the work order.
20   BY MS. WEGNER:
21       Q.   Isn't 2:25 the time which Mr. Wingo's
22   first shift would end?
23       A.   Then my contention is did he work
24   overtime on 467012.

93

1        Q.   Did Mr. Winger charge you for any
2    overtime working on work order 467012?
3        A.   I don't have his time card.  But why
4    would he write it down if he had already finished
5    for the day.
6        Q.   Well, actually, did you ask Mr. Wingo
7    why he wrote down something related to work order
8    467012 on Exhibit No. 12?
9        A.   I asked him why he wrote down either
10   one of those since he had not completed either
11   one.  He couldn't cleanly answer that question for
12   me.
13       Q.   Can you explain to me what PK10 is?
14       A.   It's a data entry once an order is
15   completed, putting that information into the
16   computer system so that it generates the packing
17   list, shipping label, updates the inventory,
18   creates certain case documentation.
19       Q.   Is there a particular amount of time
20   that you have determined it would generally take
21   for a warehouse employee to PK10 an order in the
22   computer?
23       A.   It's probably only a few seconds,
24   less than a minute, I would say, that the average

24  (Pages 90 to 93)

94

1   warehouseman can finish that.
2       Q.   And you are familiar with the PK10
3   process?
4       A.   Fairly familiar.
5       Q.   So, then, what is the information
6   that a warehouse person has to enter into the
7   computer to employ the PK10 process?
8       A.   Types in the work order number,
9   brings up a screen, and the cursor just goes and
10  fills in the blanks, basically whether it's
11  complete or partial, amount of weight packed,
12  number of pieces packed.  And each one may be
13  because they may be pounds versus linear inches
14  versus square feet, depending on the billing
15  quantity on it, scrap his initials, type of
16  package, number of packages and initials of the
17  person who packed it, and then an inventory tag
18  that was used on that.
19          That inventory tag will then populate
20  automatically the mill, the PO and the heat and
21  lot number for traceability.  And then once he
22  hits the inner button, it prints the label for
23  him.
24      MS. WEGNER:  Pat, mark that as Exhibit

95

1   No. 13.
2           (WHEREUPON, a certain document
3           was marked Lunt Deposition
4           Exhibit No. 13, for identification,
5           as of May 29, 2008.)
6   BY MS. WEGNER:
7       Q.   Do you recognize Exhibit No. 13,
8   Mr. Lunt?
9       A.   This is not the same as Exhibit 11.
10      Q.   I don't think it's exactly the same.
11  That's why I gave it to you.
12          I think there is some additional
13  writing on it.
14          If you want to compare the two, there
15  is a circle and like an arrow.
16      A.   That was just a note added to by Mark
17  DeMien.
18      Q.   So where at the circle, then the
19  arrow, and it says "Two more filled by second
20  shift" and initials with 12/1/07, you believe that
21  is information that was added by Mark DeMien?
22      A.   Correct.
23      MS. WEGNER:  This is going to be Exhibit
24  No. 14.

96

1           (WHEREUPON, a certain document
2           was marked Lunt Deposition
3           Exhibit No. 14, for identification,
4           as of May 29, 2008.)
5   BY MS. WEGNER:
6       Q.   Exhibit No. 14, Mr. Lunt, appears
7   similar to Exhibit No. 12, but it has again an
8   added circle and an arrow and the writing, "These
9   two WOs were filled by second shift," with some
10  initials dated 12/1/07.
11          Do you know whose handwriting is
12  contained in the additional information?
13      A.   The initials are Mark DeMien's.
14      Q.   And what about the printing or the
15  handwriting?
16      A.   That would appear to be Mark DeMien's
17  also.
18      MS. WEGNER:  This is going to be 15.
19          (WHEREUPON, a certain document
20          was marked Lunt Deposition
21          Exhibit No. 15, for identification,
22          as of May 29, 2008.)
23  BY MS. WEGNER:
24      Q.   And Exhibit No. 15 is a document

97

1   produced by the Defendants, 00160.
2       Q.   Do you recognize Exhibit No. 15?
3       A.   No, I don't.  If the date is correct,
4   it's prior to me working at Copper and Brass
5   Sales.
6       Q.   The document that we have marked as
7   Exhibit No. 15 was produced by Copper and Brass
8   Sales in this discovery process in this case.
9           Do you have any reason to doubt its
10  authenticity?
11      A.   No.
12      MR. DISBROW:  I was just going to object,
13  mischaracterizing testimony that he has given
14  about this document.  He says he has never seen
15  this document before.
16      MS. WEGNER:  And I understand that.
17  BY MS. WEGNER:
18      Q.   But my question is, if it's not
19  disputed that this document was produced by Copper
20  and Brass Sales, is there any reason to doubt its
21  authenticity as a business record of Copper and
22  Brass Sales?
23      MR. DISBROW:  Same objections, compound.  I
24  just think it's a question for a different

DEPOSITION OF RANDY E. LUNT  -  5/29/08

98

1   witness. He wasn't even employed at Copper and
2   Brass Sales at the time. I don't know how he can
3   testify about this document.
4        MS. WEGNER: Let's make this No. 16.
5        (WHEREUPON, a certain document
6             was marked Lunt Deposition
7             Exhibit No. 16, for identification,
8             as of May 29, 2008.)
9   BY MS. WEGNER:
10       Q.   Do you recognize Exhibit No. 16?
11       A.   Yes.
12       Q.   Now, exhibit No. 16 was produced by
13  Copper and Brass Sales in this litigation marked
14  00095.
15            Have you seen Exhibit No. 16 before?
16       A.   Yes.
17       Q.   And Exhibit 16, can you identify it?
18       A.   It's an employee report form.
19       Q.   Is Exhibit No. 16 a document that
20  reflects discipline issued to Mr. Wingo?
21       A.   Yes, it does.
22       Q.   And what was the discipline Mr. Wingo
23  received on October 10, 2007 as contained in
24  Exhibit No. 16?

99

1        A.   A one-day suspension.
2        Q.   And what was the reason Mr. Winger
3   received a one-day suspension on October 10, 2007,
4   as evidenced by Exhibit 16?
5        MR. DISBROW: I am going to object to the
6   degree the document speaks for itself, but you can
7   answer.
8   BY THE WITNESS:
9        A.   Repetitive work order errors.
10  BY MS. WEGNER:
11       Q.   Repetitive work order errors. Okay.
12            To your knowledge, was the order
13  contained in the work order identified in Exhibit
14  No. 16 one that was processed material?
15       A.   I'm sorry, I am not sure what you are
16  asking here.
17       Q.   Well, it says it was a processed work
18  order, it was cut material, so it should not have
19  gone to RBW MP?
20       A.   But Bob packed anyway, even though it
21  was not processed. He failed to read and follow
22  work order instructions.
23       Q.   Isn't it true that someone else
24  didn't read and follow work order instructions in

100

1   connection with the work order that is identified
2   in Exhibit No. 16?
3        A.   Yes.
4        Q.   Who else didn't read and follow work
5   order instructions on Exhibit 16?
6        A.   I can't tell you. I'm sorry, I don't
7   know.
8        Q.   Well, let's see, someone pulled
9   the wrong material on Exhibit No. 16; is that
10  right?
11       A.   Yes.
12       Q.   And that would be the side loader
13  operator was the person who pulled the wrong
14  material on Exhibit 16; is that correct?
15       MR. DISBROW: Objection; assumes facts not
16  in evidence. He didn't prepare this document.
17            You can answer, if you know.
18  BY THE WITNESS:
19       A.   I couldn't tell. Bob could have
20  pulled his own material on this one. I don't know
21  that for a fact.
22  BY MS. WEGNER:
23       Q.   What is the notation on here, if you
24  can explain it, Utokumpu versus --

101

1        A.   Utokumpu, that is the name of the
2   mill. U-t-o-k-u-m-p-u, Utokumpu, it's a foreign
3   mill.
4        Q.   All right. And Mr. Wingo on the date
5   in question with respect to this work order wasn't
6   operating the RBW saw, was he?
7        A.   No, he wasn't.
8        Q.   And in the typical flow process at
9   the Schaumburg facility, how would the cut
10  material from the RBW saw then get to Mr. Wingo,
11  who was handling RBW nonprocessed material?
12       A.   That I couldn't tell you for sure, I
13  would have to speculate.
14       Q.   Are there a number of different ways
15  where this cut material process would then go to
16  Mr. Wingo for the order filling, packaging
17  process?
18       MR. DISBROW: Objection; incomplete
19  hypothetical.
20            You can answer it, if you know.
21  BY THE WITNESS:
22       A.   I am not sure. You know, either a
23  side loader dropped it off. Maybe Bob pulled his
24  own material. Maybe the work order got

26 (Pages 98 to 101)

DEPOSITION OF RANDY E. LUNT  -  5/29/08

102

1  misslotted.  I am not sure, so I couldn't give you
2  a definitive answer.
3  BY MS. WEGNER:
4      Q.   Did anyone else receive discipline as
5  a result of the mistakes made on this work order
6  identified in Exhibit No. 16, other than
7  Mr. Wingo?
8      MR. DISBROW:  Objection as to foundation
9  and incomplete hypothetical.  He indicated he
10  didn't know the other person that may have been
11  involved.
12      But you can answer, if you know.
13  BY THE WITNESS:
14      A.   And that, I don't know.
15  BY MS. WEGNER:
16      Q.   Well, did you do anything to
17  investigate who else was involved in the mistakes
18  made on this work order identified in Exhibit 16?
19      A.   I did not write Robert up on this
20  one, so I didn't do the investigation.
21      Q.   Do you know whether or not there was
22  any investigation done by Mark DeMien or anyone
23  else regarding the mistakes made on work orders
24  identified in Exhibit 16?

103

1      A.   I don't know.
2      MS. WEGNER:  This is going to be the next
3  number, is that 17.
4      (WHEREUPON, a certain document
5      was marked Lunt Deposition
6      Exhibit No. 17, for identification,
7      as of May 29, 2008.)
8  BY MS. WEGNER:
9      Q.   Do you recognize Exhibit 17, sir?
10      A.   It appears to be the employee
11  handbook, but there is also an attachment to the
12  back of it that is not part of the employee
13  handbook.
14      Q.   That might be the page I am looking
15  for another exhibit.  And you are right.
16      I apologize.  Let's pull out the last
17  page.
18      So Exhibit 17, then, would consist of
19  Pages 00701 through 00741 as the employee handbook
20  of Thyssenkrupp Materials NA, Inc., doing business
21  as Copper and Brass Sales?
22      A.   It appears to be so.
23      Q.   And does the employee handbook that
24  we have marked as Exhibit 17 set forth the

104

1  discipline policy of Copper and Brass Sales?
2      A.   It applies to -- it's my
3  understanding this correctly applies to non-Union
4  employees, that Union employees should consult
5  their Union contract for information.
6      MS. WEGNER:  18 is going to be 662 and then
7  663.
8      MR. DISBROW:  Together?
9      MS. WEGNER:  Yes, together.
10      MR. DISBROW:  All right.
11      MS. WEGNER:  This is Exhibit 18,
12  Pages 00662 and 00663.
13      (WHEREUPON, a certain document
14      was marked Lunt Deposition
15      Exhibit No. 18, for identification,
16      as of May 29, 2008.)
17  BY MS. WEGNER:
18      Q.   Do you recognize these documents
19  contained in Exhibit 18, Mr. Lunt?
20      A.   Yes, I do.
21      Q.   Can you identify the documents
22  contained in Exhibit 18?
23      A.   Two different documents.  One is an
24  employee report form and another is a suspension

105

1  and probation, they are a letter of probation.
2      Q.   You are familiar with Tyler DeMien?
3      A.   Yes, I am.
4      Q.   To your knowledge, in late 2007, was
5  Tyler DeMien doing the side loader operator
6  functions at the Schaumburg facility?
7      A.   Yes.
8      Q.   And in late 2007, prior to
9  Mr. Wingo's termination was Tyler DeMien working
10  the third shift operating the side loader?
11      A.   Correct.
12      Q.   Tyler is related to Mark?
13      A.   Yes.
14      Q.   Mark is Tyler's father?
15      A.   Yes.
16      Q.   And Mark DeMien is the supervisor on
17  the first shift?
18      A.   The first shift, correct.
19      Q.   There are occasions when Mark DeMien
20  would supervise his son Tyler?
21      A.   There is some overlap, yes.
22      Q.   Isn't it true that there is a policy
23  at Copper and Brass Sales that relatives should
24  not supervise each other?

DEPOSITION OF RANDY E. LUNT  -  5/29/08

106

1    A.  I believe that policy was implemented
2  after Tyler was hired.  But it was brought to my
3  attention from my vice president that it will
4  never happen again.
5    Q.  I'm sorry.  So are you indicating
6  there was an exception made with respect to Mark
7  DeMien supervising his son Tyler at Copper and
8  Brass Sales?
9    MR. DISBROW:  Objection; mischaracterizes
10  testimony.
11  BY THE WITNESS:
12    A.  I did not say that.
13  BY MS. WEGNER:
14    Q.  Exhibit No. 18 contains a suspension/
15  probation notice dated December 21, 2006, the
16  first page.
17    MR. DISBROW:  That's what I was just
18  getting at, you are dealing specifically with the
19  first page only; correct?
20    MS. WEGNER:  Yes.
21  BY MS. WEGNER:
22    Q.  Does the suspension/probation notice
23  that is the first page Exhibit 18 state that Tyler
24  DeMien had received numerous verbal and written

107

1  warnings for attendance since August of 2005?
2    MR. DISBROW:  I would just object to the
3  degree the document speaks for itself.
4    You can answer the question.
5  BY THE WITNESS:
6    A.  As part of our attendance policy, yes
7  he did.  Every time you hit a certain point level,
8  you get a warning.  It does not carry any
9  disciplinary action.
10  BY MS. WEGNER:
11    Q.  You actually prepared Exhibit No. 18,
12  this first page, suspension and probation notice;
13  correct?
14    A.  Yes.
15    Q.  And you signed the
16  suspension/probation notice that's the first page
17  of Exhibit 18; right?
18    A.  Yes.
19    Q.  Have you ever seen the documented
20  verbal and written warnings given to Tyler DeMien
21  between August of 2005 the date of the
22  suspension/probation notice on December 21st, 2006
23  that you prepared?
24    A.  I am not sure what you are asking

108

1  here.
2    MR. DISBROW:  Let me just put my objection
3  on the record.
4    Objection to the degree the document
5  speaks for itself, assumes facts not in evidence.
6    I had something else in my head and
7  now it's gone.  Bear with me a minute.  Oh, and I
8  am just going to object on the relevance grounds.
9    You can answer the question, if you
10  know.
11  BY THE WITNESS:
12    A.  Yes, I did see them.
13  BY MS. WEGNER:
14    Q.  Prior to December of 2006, isn't it
15  true that Tyler DeMien had received a three-day
16  suspension in May of 2005?
17    A.  Yes.
18    Q.  And that employee report form
19  documenting a three-day suspension of May 10, 2005
20  to Tyler DeMien is the second page of Exhibit 18;
21  correct?
22    A.  Correct.
23    Q.  And isn't it true that the employee
24  report form dated May 10, 2005 states any future

109

1  violations will lead to termination?
2    MR. DISBROW:  Objection to the degree the
3  document speaks for itself and also just a general
4  objection as to relevance, this whole line of
5  questioning on an attendance policy.
6    You can answer the question.
7  BY THE WITNESS:
8    A.  Well, there is two different issues
9  here.  One is leaving the job, the other is an
10  attendance policy.  They are separate issues.
11  BY MS. WEGNER:
12    Q.  Isn't it true that discipline can be
13  issued for repeated violations or combinations of
14  violations?
15    MR. DISBROW:  Objection; ambiguity.
16    There is different types of
17  violations based on earlier testimony, absences
18  versus work rule violations.  So I am not really
19  sure what you are asking.
20  BY MS. WEGNER:
21    Q.  Isn't punching out and leaving work
22  without notifying a supervisor a work rule
23  violation beyond attendance?
24    A.  Yes.  These should be separated.

28 (Pages 106 to 109)

DEPOSITION OF RANDY E. LUNT  -  5/29/08

110

1  These are two separate issues, and Tyler was
2  handled no differently than several other
3  employees, Mario Alvarez, a few other individuals
4  that I would have to look up on this case.
5       The same thing with the suspension,
6  there is probably a half dozen other employees
7  that were given suspensions and probationary
8  periods for the same exact reason. So these were
9  handled consistently throughout the warehouse
10  force.
11      Q.   So Tyler DeMien has not been
12  terminated from Copper and Brass Sales; is that
13  correct?
14      A.   Correct.
15      Q.   And on December 21st, 2006, Tyler
16  DeMien was given a last chance agreement; isn't
17  that correct?
18      MR. DISBROW: Objection; assumes facts not
19  in evidence.
20           If you are referring to the first
21  page of document No. 18, it speaks for itself.
22  BY THE WITNESS:
23      A.   He was given a six-month probationary
24  period in which to reduce his points. If he

111

1  failed to do that, he would be terminated.
2  BY MS. WEGNER:
3      Q.   And was Tyler successful in surviving
4  the six-month probationary period that's outlined
5  in the first page of Exhibit 18?
6      A.   Yes, he was.
7      Q.   So it's your testimony that after
8  December 21st, 2006 -- I'm sorry, after December
9  29th, 2006, for a six-month period, Tyler DeMien
10  did not accumulate more points than provided for
11  in the agreement contained in Exhibit 18 on the
12  first page?
13      A.   Correct.
14      MR. DISBROW: I just didn't understand the
15  question; but if you did, respond.
16  BY THE WITNESS:
17      A.   I make the assumption that you are
18  saying within the next six months, did he abide by
19  these probationary rules, and yes, he did.
20      MS. WEGNER: This is going to be 19.
21           (WHEREUPON, a certain document
22           was marked Lunt Deposition
23           Exhibit No. 19, for identification,
24           as of May 29, 2008.)

112

1  BY MS. WEGNER:
2      Q.   Exhibit No. 19 are documents produced
3  by Copper and Brass Sales in this litigation,
4  Bates stamped 00664 through 00673.
5       Do you recognize these documents in
6  Exhibit No. 19?
7      MR. DISBROW: Go ahead and look at each one
8  of them over very carefully.
9           And I will just represent for the
10  record that there are a number of different types
11  of documents here, it's not one document, it's a
12  collection of documents.
13           So I object to the form of the
14  question, in its current form, it's compound and
15  ambiguous.
16  BY THE WITNESS:
17      A.   I recognize them as an assortment of
18  training notes, write-ups, letters of counsel, all
19  copies of work orders dating back five-plus years
20  for the person referred to as Al Herrera, Elutario
21  Herrera.
22  BY MS. WEGNER:
23      Q.   Did you have any involvement in
24  issuing the discipline contained on the second

113

1  page of Exhibit No. 19 to Mr. Herrera?
2      A.   No.
3           I'm sorry, I remember this one. My
4  involvement was after the fact.
5      Q.   What involvement did you have after
6  the fact regarding Mr. Herrera?
7      A.   I was made aware of it, that Al, Ray
8  Cather and Bob Wingo were in the RBW nonprocess
9  area and labels were switched and two work orders
10  were misidentified. All three employees were
11  given the same write-up.
12      Q.   And Mr. Herrera's name or initials
13  are listed on a number of these sheets contained
14  in Exhibit No. 19 as someone who performed work on
15  particular work orders?
16      MR. DISBROW: Objection to the form of the
17  question.
18           Do you want to ask about a specific
19  document in this collection?
20  BY MS. WEGNER:
21      Q.   Well, do you recognize Mr. Herrera's
22  signature on some of these pages, 666, 671, 673?
23      MR. DISBROW: Can you repeat those numbers
24  back, please, so we can look at them.

DEPOSITION OF RANDY E. LUNT  -  5/29/08

114

1        MS. WEGNER:  666, 671, 669.
2    BY THE WITNESS:
3        **A.   I don't recognize Al's writing, but**
4    **it does appear to be his signature.**
5    BY MS. WEGNER:
6        Q.   Are you familiar with Mr. Herrera
7    completing work orders by using the initials AH
8    rather than the E for his formal name?
9        **A.   I believe we use ANH, and that's the**
10   **three initials he goes by, because we refer to him**
11   **as Al versus Eluterio.**
12       Q.   Do you have any knowledge as to the
13   reason that Mr. Herrera signed Page 669 in Exhibit
14   No. 19?
15       **A.   His supervisor at that time made him**
16   **aware of an error and put this in his training**
17   **file as the fact, just as documentation that he**
18   **sat down and talked to Al and went over the work**
19   **order error.**
20       Q.   Was it the practice to go over work
21   order errors by -- and then having the employee
22   initial -- or sign these documents that we have
23   here in Exhibit No. 19 that are signed by
24   Mr. Herrera?

115

1        MR. DISBROW:  I am just going to object to
2    the form of the question.  This document goes back
3    to 2003.
4            You haven't indicated a time frame,
5    it's vague and ambiguous in its current form.
6            You can answer if you can.
7    BY THE WITNESS:
8        **A.   Again, it varies, the work order**
9    **error, the frequency of the work order error.**
10   **Everyone would handle it a little bit differently**
11   **as far as whether to do a verbal, a sitdown,**
12   **letter of counsel, sometimes just a blurb in his**
13   **training file to go over and make sure that the**
14   **employee understood what he did wrong and how to**
15   **correct that situation.**
16   BY MS. WEGNER:
17       Q.   Has Mr. Herrera ever received any
18   suspension for repetitive work order errors?
19       **A.   No, not that I am aware of.**
20       Q.   Is Mr. Herrera still employed at
21   Copper and Brass Sales?
22       **A.   Yes, he is.**
23       MS. WEGNER:  Pat, would you mark that
24   Exhibit No. 20.

116

1            (WHEREUPON, a certain document
2            was marked Lunt Deposition
3            Exhibit No. 20, for identification,
4            as of May 29, 2008.)
5        MR. DISBROW:  While you are looking that
6    over, Randy, I am just going to indicate for the
7    record again this is a collection of separate
8    documents, it's not actually one document.
9            So the same objections with regard to
10   Exhibit 19 would apply to Exhibit No. 20.
11   BY MS. WEGNER:
12       Q.   So you have had a chance to look at
13   Exhibit 20, these documents that are Bates stamped
14   00686 through 00700; is that right, Mr. Lunt?
15       **A.   Yes.**
16       Q.   Are you familiar with these documents
17   in Exhibit No. 20?
18       MR. DISBROW:  Objection to the form of the
19   question, it's compound in its current form.
20            There are a number of documents here
21   again.
22            If you want to go through and ask him
23   if he is familiar with each one, that's the more
24   appropriate way to handle the situation.

117

1        MS. WEGNER:  All right.
2    BY MS. WEGNER:
3        Q.   Have you seen any of the documents in
4    Exhibit No. 20 before today?
5        **A.   Yes.**
6        MR. DISBROW:  Wait.  Same objections.
7            You can answer -- again, the
8    appropriate way to answer this is to be more
9    specific with your question.
10   BY MS. WEGNER:
11       Q.   And the answer?
12       **A.   Yes.**
13       Q.   Of those documents contained in
14   Exhibit No. 20, which of those have you seen
15   before?
16       MR. DISBROW:  To the degree you recall it.
17   BY MS. WEGNER:
18       Q.   And there are little numbers in the
19   bottom right-hand corners that you can identify
20   the documents that you have seen before.
21       **A.   I can only testify that I recognize**
22   **the disciplinary actions written up that are**
23   **included in here for the past five years.**
24            **As far as the individual printouts of**

DEPOSITION OF RANDY E. LUNT  -  5/29/08

118

1  screen prints and work order copies, I couldn't
2  testify whether I have seen these or not before.
3      Q.   Do you also see the page Bates
4  stamped 695, a document that you prepared?
5      MR. DISBROW: Objection. It's not signed;
6  assumes facts not in evidence.
7  BY MS. WEGNER:
8      Q.   Well, did you prepare this page Bates
9  stamped 695?
10     A.   I am reading it, please.
11     Q.   Okay.
12     A.   Yes, I prepared it.
13     Q.   Did you prepare the page in Exhibit
14 No. 20 Bates stamped 687?
15     MR. DISBROW: And I will just object to
16 this whole line of questioning on the grounds of
17 relevance.
18 BY THE WITNESS:
19     A.   No, I did not.
20 BY MS. WEGNER:
21     Q.   And this page Bates stamped 693 in
22 Exhibit 20, did you prepare that?
23     A.   I assisted in the preparation along
24 with our HR department.

119

1      Q.   Page Bates stamped 696 seems to be a
2  different kind of employee report form in that
3  it's typed rather than on a printed form.
4          Did you prepare that document?
5      A.   No, I did not.
6      Q.   Are your initials contained on the
7  right-hand margin of Exhibit No. 20 Bates stamp
8  Page 696?
9      A.   My initials are, yes.
10     Q.   Your initials and your last name?
11     A.   Yes.
12     Q.   You have very nice handwriting?
13     A.   Thank you.
14     MR. DISBROW: It's better than mine.
15 BY MS. WEGNER:
16     Q.   Mr. Alvarez, is he still employed at
17 Copper and Brass Sales?
18     A.   No, he isn't.
19     Q.   When did Mr. Alvarez' employment
20 cease with Copper and Brass Sales?
21     A.   I believe in January of 2008.
22     Q.   And what is the reason that
23 Mr. Alvarez' employment with Copper and Brass
24 Sales ended in January of 2008?

120

1      A.   Violation of an agreement with the
2  Company as far as last chance and basically an
3  altercation with -- a verbal altercation with
4  another employee.
5      Q.   And when was the last chance
6  agreement that Mr. Alvarez was provided with which
7  he violated and was terminated?
8          Is it contained in one of these?
9      A.   It's contained in your Exhibit 20.
10     Q.   Okay.
11     MR. DISBROW: Did we just look at it?
12     THE WITNESS: Yes. It's dated
13 September 14, 2007 but signed on September 24,
14 2007.
15 BY MS. WEGNER:
16     Q.   Oh, it's this Page 693?
17     A.   Correct.
18     Q.   So the fact that Exhibit No. 20,
19 Page Bates stamped 693, states that this letter
20 serves as your final warning, you believe
21 constitutes a last chance agreement?
22     MR. DISBROW: Objection to relevance. The
23 document speaks for itself.
24          You can answer the question.

121

1      THE WITNESS: Can you repeat that question
2  so I understand it?
3      MS. WEGNER:  Read it back, Patricia,
4  please.
5          (WHEREUPON, the record was
6           read by the reporter.)
7      MR. DISBROW: Same objections.
8  BY THE WITNESS:
9      A.   Basically gave him his final warning,
10 any further violations of the work and safety
11 rules would result in his termination.
12 BY MS. WEGNER:
13     Q.   Was Mr. Wingo provided with a last
14 chance agreement in connection with surviving any
15 termination of his employment by Copper and Brass
16 Sales?
17     MR. DISBROW: I am just going to object as
18 to form and relevance, dealing with different
19 violations.
20          You can answer the question, if you
21 know.
22 BY THE WITNESS:
23     A.   With all his write-ups, verbal,
24 written, suspensions, one-day and three-day

31 (Pages 118 to 121)

DEPOSITION OF RANDY E. LUNT  -  5/29/08

122

1  suspensions, I don't recall the terminology used,
2  whether or not -- but I believe many of them
3  stated that future disciplinary action would lead
4  up to and include termination.
5      (WHEREUPON, a certain document
6      was marked Lunt Deposition
7      Exhibit No. 21, for identification,
8      as of May 29, 2008.)
9  BY MS. WEGNER:
10     Q.   Do you recognize Exhibit No. 21,
11  Bates stamped 00005?
12     A.   Yes, I do.
13     Q.   And what is Exhibit No. 21?
14     A.   Employee report form.
15     Q.   Did you complete Exhibit No. 21?
16     A.   Yes, I did.
17     Q.   Did you meet with Mr. Wingo to tell
18  him he was being terminated?
19     A.   Yes, I did.
20     Q.   What did you say to Mr. Wingo when
21  you met with them regarding his termination?
22     A.   I don't remember the exact words, but
23  I brought in both Union stewards Pete LaRocco and
24  Avis Vahania, sat them down, went over the details

123

1  of his falsifying company documents and terminated
2  him at that time.
3      Q.   Did Mr. Wingo say anything when you
4  told him he was being terminated?
5      A.   I don't recall.  I know that he was
6  given his right to agree, disagree, rebuttal,
7  right of grievance, and he was told at the time
8  from his Union stewards they would file a
9  grievance on his behalf.
10     Q.   I'm sorry, at the meeting that you
11  participated in where Mr. Wingo was informed he
12  was being terminated, the Union representatives --
13     A.   Made him aware, and I did, too.
14     Q.   Made Mr. Wingo aware of his right to
15  grieve this decision; right?
16     A.   Correct.
17     MS. WEGNER:  22.
18     (WHEREUPON, a certain document
19     was marked Lunt Deposition
20     Exhibit No. 22, for identification,
21     as of May 29, 2008.)
22  BY MS. WEGNER:
23     Q.   Do you recognize Exhibit No. 22,
24  Mr. Lunt?

124

1      A.   Yes, I do.
2      Q.   Can you identify Exhibit No. 22?
3      A.   It's a grievance form submitted by
4  Bob Wingo.
5      Q.   And did you complete any part of
6  Exhibit 22?
7      A.   Disposition.
8      Q.   Below Mr. LaRocco's signature about
9  halfway down on the page, where it talks about
10  disposition of foreman, is that your printing?
11     A.   Correct.
12     Q.   And you also signed and dated this
13  form on December 7, 2007; is that right?
14     A.   Yes.
15     Q.   To your knowledge, did the Union take
16  any further action as a result of the denial of
17  this grievance?
18     A.   Yes, they did.
19     Q.   And what further action are you aware
20  of?
21     A.   This is the second step grievance
22  procedure.
23     And then the next step if we don't
24  reach an agreement, then they can go to

125

1  arbitration.  But in place of arbitration, prior
2  to the arbitration, Jim Rodriguez, Bob Wingo and
3  Pete LaRocco met in my office to try to resolve
4  this issue.
5      We were unable to come to an
6  agreement and Bob's termination became final.
7      Q.   Do you recall when the meeting took
8  place with Mr. Rodriguez, Mr. Winger and
9  Mr. LaRocco regarding the third step?
10     A.   Do I remember what date that was, no,
11  I don't.
12     Q.   Who assumed any of Mr. Wingo's duties
13  after his termination?
14     A.   Immediately after his termination,
15  that vacancy was covered with overtime.
16     Q.   Who on overtime performed any of
17  Mr. Wingo's duties immediately following his
18  termination?
19     MR. DISBROW:  Objection.
20     To the degree that you know.  There
21  is a number of employees.
22     MS. WEGNER:  Please don't be helping him.
23     MR. DISBROW:  I stated my objection.  I
24  think it's an unfair question.  You can answer it,

32 (Pages 122 to 125)

DEPOSITION OF RANDY E. LUNT  -  5/29/08

126

1  if you can.
2  BY THE WITNESS:
3      A.  Overtime was covered through
4  contract. The contract states that arc work gets
5  asked first. In this case, that would be Al
6  Herrera on third shift and Art Pachaco Flores on
7  second shift. And I am sure other individuals, if
8  they turned it down, would be asked.
9  BY MS. WEGNER:
10     Q.  Did Tyler DeMien perform any of
11  Mr. Wingo's duties immediately after he was
12  terminated?
13     A.  I don't recall. I don't believe so.
14  He is a side loader driver and would not be the
15  first person asked.
16     Q.  And has there been a permanent
17  replacement for Mr. Wingo?
18     A.  We, through the bidding process, had
19  people switch shifts to replace the people on
20  first shift that are initially Al -- Mario Alvarez
21  was one of the people brought from second shift to
22  first shift.
23     Q.  And after Mr. Alvarez, who then took
24  the position that Mr. Winger had held?

127

1      MR. DISBROW: I am just going to object to
2  the form of the question. I think it
3  mischaracterizes his testimony.
4          But you can answer it.
5  BY MS. WEGNER:
6      A.  There are no direct replacements
7  because the warehousemen are a pool of labor that
8  we pick from.
9          What we did was increased the numbers
10  of first shift people through the bidding process,
11  and switching people around from work station to
12  work station.
13          That position is currently being
14  filled my Mike Perrone.
15     Q.  I'm sorry, by who?
16     A.  Mike Perrone.
17     Q.  And how long has Mr. Perrone been
18  filling the position that Mr. Wingo had held?
19     MR. DISBROW: Same objection.
20          You can answer the question, but same
21  objection, and I think it mischaracterizes the
22  testimony you just gave.
23  BY THE WITNESS:
24     A.  A month to two months maybe.

128

1  BY MS. WEGNER:
2      Q.  Do you believe Mr. Wingo was treated
3  fairly in his termination?
4      A.  I'm sorry, I didn't hear your
5  question.
6      Q.  Do you believe Mr. Wingo was treated
7  fairly in his termination?
8      A.  Extremely fairly.
9      MS. WEGNER: I don't have any other
10  questions for Mr. Lunt.
11     MR. DISBROW: I have no questions.
12     MS. WEGNER: Signature?
13     MR. DISBROW: Whatever the normal process
14  here is.
15     MS. WEGNER: I don't know that there is a
16  normal process. It's really up to the witness or
17  his counsel to decide whether they wish to reserve
18  or waive.
19     MR. DISBROW: We will reserve the right to
20  signature.
21         FURTHER DEPONENT SAITH NOT.
22
23
24

129

1      UNITED STATES DISTRICT COURT FOR THE
2          NORTHERN DISTRICT OF ILLINOIS
3               EASTERN DIVISION
4  ROBERT G. WINGO,          )
5          Plaintiff,        )
6      vs.                   ) No. 08 C 368
7  THYSSENKRUPP MATERIALS NA,  )
8  INC., d/b/a COPPER AND BRASS, )
9          Defendant.        )
10         I hereby certify that I have read the
11  foregoing transcript of my deposition given at the
12  time and place aforesaid, consisting of Pages 1 to
13  132, inclusive, and I do again subscribe and make
14  oath that the same is a true, correct and complete
15  transcript of my deposition so given as aforesaid,
16  and includes changes, if any, so made by me.
17
18         _____
19              RANDY E. LUNT
20
21  SUBSCRIBED AND SWORN TO
    before me this _____ day of
22  _____, A.D. 2008
23
    _____
24  Notary Public

VICTORIA COURT REPORTING SERVICE, INC.    (312) 443-1025

DEPOSITION OF RANDY E. LUNT  -  5/29/08

130

1  STATE OF ILLINOIS  )
2                     )
3  COUNTY OF DU PAGE  )
4            I, Patricia Ann Armstrong, a Notary
5  Public within and for the County of DuPage, State
6  of Illinois, and a Certified Shorthand Reporter of
7  said state, do hereby certify:
8            That previous to the commencement of
9  the examination of the witnesses, the witness was
10  duly sworn to testify the whole truth concerning
11  the matters herein;
12            That the foregoing deposition
13  transcript was reported stenographically by me,
14  was thereafter reduced to typewriting under my
15  personal direction and constitutes a true record
16  of the testimony given and the proceedings had;
17            That the said deposition was taken
18  before me at the time and place specified upon
19  written interrogatories;
20            That I am not a relative or employee
21  or attorney or counsel, nor a relative or employee
22  of such attorney or counsel for any of the parties
23  herein, nor interested directly or indirectly in
24  the outcome of this action.

131

1            IN WITNESS WHEREOF, I do hereunto set
2  my hand and affix my seal of office at Chicago,
3  Illinois, this 17th day of June, 2008.
4
5
6
7            Notary Public, DuPage County,
8            Illinois.
9            My commission expires 03/23/09.
10
11  C.S.R. Certificate No. 84-1766.
12
13
14
15
16
17
18
19
20
21
22
23
24

34 (Pages 130 to 131)

VICTORIA COURT REPORTING SERVICE, INC.   (312) 443-1025

DEPOSITION OF RANDY E. LUNT  -  5/29/08

1    STATE OF ILLINOIS    )

2                         )

3    COUNTY OF DU PAGE    )

4            I, Patricia Ann Armstrong, a Notary

5    Public within and for the County of DuPage, State

6    of Illinois, and a Certified Shorthand Reporter of

7    said state, do hereby certify:

8            That previous to the commencement of

9    the examination of the witnesses, the witness was

10   duly sworn to testify the whole truth concerning

11   the matters herein;

12           That the foregoing deposition

13   transcript was reported stenographically by me,

14   was thereafter reduced to typewriting under my

15   personal direction and constitutes a true record

16   of the testimony given and the proceedings had;

17           That the said deposition was taken

18   before me at the time and place specified upon

19   written interrogatories;

20           That I am not a relative or employee

21   or attorney or counsel, nor a relative or employee

22   of such attorney or counsel for any of the parties

23   herein, nor interested directly or indirectly in

24   the outcome of this action.

VICTORIA COURT REPORTING SERVICE, INC.    (312) 443-1025

DEPOSITION OF RANDY E. LUNT  -  5/29/08

1    the outcome thereof.

2           I further certify that this certificate

3    applies to the original signed IN BLUE and

4    certified transcripts only.  I assume no

5    responsibility for the accuracy of any reproduced

6    copies not made under my control or direction.

7           IN TESTIMONY WHEREOF I have hereunto set

8    my hand and affixed my notarial seal this _16TH_ day

9    of _June_____, A.D., 2008.

10

11

12

13

14

15

16

17           Patricia A. Armstrong, CSR, RPR.,

18

19   My Commission Expires

20

21   March 23, 2009.

22

23

24