# EXHIBIT D

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE NORTHERN DISTRICT OF ILLINOIS

 3                    EASTERN DIVISION

 4

 5    ROBERT G. WINGO,              )

 6              PLAINTIFF,          )

 7         VS.                      ) No. CV 0 0368

 8    THYSSENKRUPP MATERIALS NA, INC. )

 9    D/B/A COOPER AND BRASS        )

10    SALES, INC.                   )

11              DEFENDANTS,         )

12

13

14         This is the discovery deposition of Mark

15    DEMIEN, taken in the above-entitled cause before

16    GWENDOLYN BEDFORD, a Notary Public and Certified

17    Shorthand Reporter within and for the County of Cook,

18    State of Illinois, taken at the offices of VICTORIA

19    COURT REPORTING SERVICES, INC., 29 South LaSalle

20    Street, Suite 200, Chicago, Illinois, held on the 12th

21    day of June, 2008 at the hour of 10 o'clock a.m.

22    pursuant to notice.

23

24
```

COPY

DEPOSITION OF MARK DEMEIN -- 06/12/08

```
                                               2
1   APPEARANCES:
2
3        LISA KANE & ASSOCIATES
4        BY: MS. JANICE WEGNER
5        120 South LaSalle Street
6        Suite 1420
7        Chicago, Illinois 60603
8        Phone:  312-606-0383
9        On behalf of the Plaintiff;
10
11       HONIG, MILLER, SCHWARTZ & COHN, LLP
12       BY: MR. MATTHEW DISBROW
13       2290 First National Building
14       660 Woodward Avenue
15       Detroit, Michigan 48226
16       Phone:  313-465-7000
17       Fax:  313-465-8000
18       On behalf of the Defendants.
19
20
21
22
23
24
```

```
                                               3
1              I N D E X
2    WITNESS                    PAGE
3    MARK DEMIEN
4    Examination by Ms. Wegner        4
5
6
7              E X H I B I T S
8    DOCUMENTS              MARKED FOR ID.
9    Exhibit 1          30
10   Exhibit 2          36
11   Exhibit 3          51
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
                                               4
1                    (WITNESS SWORN)
2                    MARK DEMIEN,
3    called as a witness herein, after having been first
4    duly sworn, was examined and testified as follows:
5                    EXAMINATION
6    BY MS. WEGNER:
7        Q   Sir, would you state your complete name for
8    the record and spell your last name?
9        A   Mark Allen DeMien, D-e-M-i-e-n.
10       Q   Let the record reflect this is the deposition
11   of Mark DeMien, witness for the Defendant, in the case
12   entitled Robert J. Wingo vs. Thyssenkrupp Matrials, NA,
13   Inc., doing business as Copper and Brass Sales, Inc,
14   Case Number 08 C 368 pending in the United States
15   District Court for the Northern District of Illinois,
16   Eastern Division.  And the deposition is being taken
17   pursuant to notice and in accordance with the Federal
18   Rules of Civil Procedure and applicable local rules.
19           Mr. DeMien, my name is Jan Wegner.  I am
20   one of the attorneys representing Robert Wingo in his
21   lawsuit against Copper and Brass Sales.
22           Have you ever given a deposition before?
23       A   No.
24       Q   Have you ever provided sworn testimony at a
```

```
                                               5
1    trial or any other type of hearing?
2        A   No.
3        Q   Have you ever been a Plaintiff or a Defendant
4    in any lawsuit?
5        A   No.
6        Q   It is important that you remember to respond
7    verbally to all the questions that are asked of you so
8    the Court Reporter can make an official record, okay?
9        A   Okay.
10       Q   And it is also helpful for the Court Reporter
11   to provide us with an accurate record, if we don't try
12   to speak at the same time.  Try to wait for a question
13   to be completed before you answer because she can't
14   record more than one person speaking at the same time.
15   All right?
16       A   Okay.
17       Q   Would you let me know if I ask a question
18   that you feel that you don't understand?
19       A   Yes.
20       Q   Okay.  If you tell me you don't understand a
21   question, I'll rephrase it to make it perfectly clear
22   for you to respond to.  All right?
23       A   Yes.
24       Q   If you do answer a question, it will be
```

VICTORIA COURT REPORTING SERVICE, INC  (312)  443-1025

DEPOSITION OF MARK DEMEIN -- 06/12/08

6

1  assumed that you understood that question.  Do you
2  agree that is fair?
3      A   Yes.
4      Q   Okay.   And if you need a break, as long as
5  you answer any questions that has been asked first, we
6  would be happy to take a break, okay?
7      A   Okay.
8      Q   Any question about this process?
9      A   No.
10     Q   What is your home address?
11     A   1104 Hilcrest Avenue, Fox River Grove,
12  Illinois.
13     Q   What is the zip code of your present home
14  address?
15     A   60021.
16     Q   Is your current residence a home or
17  apartment?
18     A   Single family home.
19     Q   With whom do you reside at your home?
20     A   Linda Salcedo and her two sons.
21     Q   Do you have a current home telephone number?
22     A   No.
23     Q   Do you have a current cell phone number?
24     A   Yes.

7

1      Q   And what is your present cell phone number?
2      A   (847)736-7727.
3      Q   What is your date of birth?
4      A   December 22, 1961.
5      Q   And what is your present age?
6      A   Forty-six.
7      Q   What is your Social Security number?
8          MR. DISBROW:  You can go ahead and give it to
9  her.  I'll object as relevance, but you can go ahead
10  and give it to her.
11         THE WITNESS:  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.
12         MR. DISBROW:  We'll ask pursuant to the
13  statute that that number be kept private and
14  confidential.
15         MR. DISBROW:  Mark, didn't understand exactly
16  what you meant by "party to a lawsuit".  He wanted to
17  clarify that there was a divorce proceeding.  You can
18  clarify that for her.
19         THE WITNESS:  With my ex-wife.
20         MS. WEGNER:  So you have been divorced.
21  Other than divorce proceedings, have you sued anyone or
22  any entity or has anyone or any entity sued you?
23         THE WITNESS:  No.
24

8

1  BY MS. WEGNER:
2      Q   Have you ever been convicted of a felony?
3      A   No.
4      Q   Have you ever been convicted of a crime
5  involving dishonesty?
6      A   No.
7      Q   What is your highest level of education?
8      A   Bachelor Degree.
9      Q   And what Bachelor Degree do you hold?
10     A   From Judson College.
11     Q   And where is Judson College located?
12     A   Elgin, Illinois.
13     Q   Do you have a four-year degree from Judson
14  College?
15     A   Yes.
16     Q   And is your Bachelor Degree a Bachelor of Art
17  or Bachelor of Science?
18     A   Bachelor of Art.
19     Q   And what is the area of concentration for
20  your Bachelor Degree?
21     A   Business.
22     Q   And what year did you receive your Bachelor
23  of Art Degree?
24     A   1984.

9

1      Q   Are you presentedly employed with Copper and
2  Brass Sales?
3      A   Yes.
4      Q   And when did you begin your employment with
5  Cooper and Brass Sales?
6      A   October 1, 1996.
7      Q   And who hired you to work at Copper and Brass
8  Sales?
9      A   Scott Orsic.
10     Q   In what position did you begin when you
11  started with Copper and Brass Sales in October of 1996?
12     A   Receiving Supervisor.
13     Q   Where were you employed prior to Cooper and
14  Brass Sales?
15     A   For one week at Hinckley & Schmitt.
16     Q   What was the position that you held at
17  Hinckley & Schmitt?
18     A   Route Driver Trainee.
19     Q   And why did your employment end with Hinckley
20  & Schmitt within a week?
21     A   I decided to quit.
22     Q   Where were you employed before Hinckley &
23  Schmitt?
24     A   Industrial Towel & Uniform.

3 (Pages 6 to 9)

DEPOSITION OF MARK DEMEIN -- 06/12/08

10

1    Q    How long are you employed by industrial towel
2  and uniform?
3        A    One month.
4    Q    What was your position with Industrial Towel
5  & Uniform?
6        A    Route Driver Trainee.
7    Q    Why did your employment end with Industrial
8  Towel & Uniform?
9        A    I quit.
10   Q    What was the reason you quit Industrial Towel
11 & Uniform?
12       A    The pay was too low.
13   Q    And where were you employed before Industrial
14 Towel & Uniform?
15       A    The Daily Herald.
16   Q    How long were you employed by the Daily
17 Herald?
18       A    Approximately three years.
19   Q    And what was your position with the Daily
20 Herald?
21       A    Branch Manager.
22   Q    What branch did you manage for the Daily
23 Herald?
24       A    Different branches, but mostly the Palatine

11

1  branch.
2    Q    Why did your employment end with the Daily
3  Herald?
4        A    I decided to seek employment elsewhere.
5    Q    Have you ever been terminated from a position
6  of employment?
7        A    No.
8    Q    When you began working with Cooper and Brass
9  Sales in October of 1996 as a Receiving Supervisor,
10 what was your rate of pay?
11       A    I believe the salary was $27,000 per year.
12   Q    And how long were you Receiving Supervisor
13 with Copper and Brass Sales?
14       A    Up until 20, up until 2003.
15   Q    How many people did you supervise typically
16 as the Receiving Supervisor for Copper and Brass Sales?
17       A    Three, two to three.
18   Q    What is the next position that you assumed
19 after Receiving Supervisor of Copper and Brass Sales?
20       A    Current position, Plant Supervisor.
21   Q    Was the change from Receiving Supervisor to
22 Plant Supervisor a promotion?
23       A    Yes.
24   Q    And who promoted you to Plant Supervisor?

12

1        A    Randy Lunt.
2    Q    When you were Receiving Supervisor at Copper
3  and Brass Sales, who did you report to?
4        A    Scott Orsic.
5    Q    And when you reported to Mr. Orsic, what was
6  his position or his title?
7        A    Plant Manager, our Regional Plant Manager.
8    Q    And when Mr. Lunt promoted you to Plant
9  Supervisor, what was Mr. Lunt's title, to your
10 knowledge?
11       A    Plant Manager.
12   Q    And Mr. Lunt replaced Mr. Orsic at some point
13 in time?
14       MR. DISBROW: I would object to one,
15 foundation.  If you know the answer whether he replaced
16 him or not.
17       THE WITNESS: Yes.
18 BY MS. WEGNER:
19   Q    Did you begin reporting to Mr. Lunt when you
20 received the Plant Supervisor position?
21       A    I worked with Randy, yeah.  That was -- you
22 are talking 1996, the initial first day?  Are you
23 talking Plant Supervisor or the Receiving Supervisor?
24       A    When your title changed to Plant Supervisor

13

1  in 2003, had you already been reporting to Mr. Lunt?
2        A    Yes.
3    Q    What were your duties as the Receiving
4  Supervisor at Copper and Brass Sales?
5        A    Supervise all activity, receiving supplies
6  and incoming products and the safety of the employees
7  within the receiving bay.
8    Q    And what were your duties when you became the
9  Plant Supervisor at Cooper and Brass Sales?
10       A    Supervise all related to the plant production
11 and order filing for customer work orders and safety of
12 the employees as well as supervising every production
13 area.
14   Q    As a Plant Supervisor with Copper and Brass
15 Sales, do you supervise anyone?
16       A    Yes.
17   Q    And how many people do you supervise as a
18 Plant Supervisor of Cooper and Brass Sales?
19       A    Fifteen people on day shift and however many
20 people are currently on the third shift, six or seven.
21   Q    Is there a second shift presently at Cooper
22 and Brass Sales?
23       A    Yes.
24   Q    And does anyone on the second shift report to

4 (Pages 10 to 13)

DEPOSITION OF MARK DEMEIN -- 06/12/08

14

1  you?
2      A   Only if I'm covering in some capacity for
3  that shift.
4      Q   Are there persons in a supervisory capacity
5  who report to you in your position as a Plant
6  Supervisor?
7      A   No.
8      Q   What are the titles of the people on the
9  first shift or the day shift who report to you?
10     A   Warehousemen, Machine Operators and helpers,
11  bargaining unit employees.
12     Q   And what are the titles of the people on the
13  third shift that report to you?
14     A   Machine Operators and Warehousemen.
15     Q   During what shift presently are receiving
16  activities usually conducted at the Copper and Brass
17  Sales location that you are the supervisor of?
18     A   First shift.
19     Q   What supervisory training have you received
20  during your employment with Cooper and Brass Sales?
21     MR. DISBROW: Object to form and foundation.
22     THE WITNESS: All kinds of training.
23  BY MS. WEGNER:
24     Q   What kind of training have you received as a

15

1  supervisor?
2      A   Quality training, production training, first
3  aid training, lean training.
4      Q   Any other training that you have received as
5  a supervisor at Copper and Brass Sales?
6      A   I have gone through supervisor seminar.
7      Q   Any other training that you have received as
8  a supervisor at Copper and Brass Sales other than what
9  you have already testified to?
10     A   Not anymore that I can recall.
11     Q   And when did you go through a supervisory or
12  supervisor seminar while you were employed at Cooper
13  and Brass sales?
14     A   Early in my employment with Cooper and Brass.
15  I can't recall the exact date.
16     Q   Then would your supervisor seminar have been
17  when you became a Receiving Supervisor?
18     A   Yes.
19     Q   And who conducted the supervisor seminar that
20  you attended early in your employment with Cooper and
21  Brass Sales?
22     A   An outside firm that I can't recall at this
23  time.
24     Q   How long was the supervisor seminar you

16

1  attended early in your employment at Copper & Brass
2  Sales?
3      A   The training was most of the day that I
4  remember.
5      Q   What was the content of the supervisor
6  seminar that you attended early in your employment at
7  Cooper and Brass Sales?
8      MR. DISBROW: Object to the extent that you
9  recall.
10     THE WITNESS: Dealing with subordinate
11  employees.
12  BY MS. WEGNER:
13     Q   Do the second shift employees at Cooper and
14  Brass Sales report to a particular person?
15     A   Yes.
16     Q   Who do the second shift employees report to?
17     A   Chris Ignacio.
18     Q   And what, to your knowledge, is Chris
19  Ignacio's title?
20     A   Second Shift Plant Supervisor.
21     Q   How long has Mr. Ignacio been the Second
22  Shift Plant Supervisor at Cooper and Brass Sales?
23     A   Roughly two years.
24     Q   Your son, Tyler, worked at Cooper and Brass

17

1  Sales, correct?
2      A   Yes.
3      Q   And when did Taylor begin working at Cooper
4  and Brass Sales?
5      A   Approximately three and a half year ago, I
6  believe.
7      Q   And in what position did your son, Tyler,
8  begin working at Copper and Brass Sales?
9      A   Union Helper.
10     Q   When Tyler began working at Cooper and Brass
11  Sales three and a half years ago, what shift did he
12  work on as Union Helper?
13     A   I believe he was on first shift.
14     Q   Did Tyler at some point in time stop being
15  Union Helper at Cooper and Brass Sales?
16     A   Yes.
17     Q   When was Tyler no longer a Union Helper at
18  Cooper and Brass Sales?
19     A   When he became a Warehouseman and I'm not
20  sure exactly when that was.
21     Q   Do you know how long Tyler was a Union
22  Helper?
23     A   Probably a year.  I can't recall the exact
24  time frame.

5  (Pages 14 to 17)

DEPOSITION OF MARK DEMEIN -- 06/12/08

18

1    Q    When Tyler became a Warehouseman, what shift
2 did he work on?
3    A    Second shift.
4    Q    And how long did Tyler work on the second
5 shift as a Warehouseman once he assumed the
6 Warehouseman position?
7        MR. DISBROW:  Objection.  Foundation.
8 Assumes facts not in evidence.
9        You can answer, if you can.
10       THE WITNESS:  I'm not exactly sure, maybe six
11 months.
12 BY MS. WEGNER:
13    Q    What shift is Tyler currently working at
14 Cooper and Brass Sales?
15    A    Third shift.
16    Q    And for how long has Tyler worked on the
17 third shift at Copper and Brass Sales?
18    A    At least a year.  I'm not exactly sure of the
19 exact time frame.
20    Q    What are the third shift hours at Cooper and
21 Brass Sales?
22    A    11 p.m. to 7:30 a.m.
23    Q    And what are the first shift hours at Cooper
24 and Brass Sales?

19

1    A    Typically 6:30 a.m. to 2:30 p.m.
2    Q    How long have the first and third shift hours
3 been in effect as you have described them to me at
4 Cooper and Brass Sales?
5    A    As long as I can remember.
6    Q    Then there is an overlap from the employees
7 from the third shift and the employees from the first
8 shift, right?
9    A    Yes.
10    Q    What duties does your son, Tyler, currently
11 perform at Copper and Brass Sales as the Warehouseman?
12       MR. DISBROW:  Object as to form and
13 foundation.   Answer to the degree that you know.
14       THE WITNESS:  He drives a side loader.
15 BY MS. WEGNER:
16    Q    How long has Tyler been in the position as a
17 Warehouseman primarily driving a side loader on the
18 third shift?
19    A    Every since he started working third shift.
20 It was primarily a side loader driver.
21    Q    What is it that a side loader driver does at
22 Cooper and Brass Sales?
23    A    He pulls material for customer work orders
24 and puts material away, stock for different

20

1 workstations.
2    Q    What do you currently earn as the Plant
3 supervisor at Cooper and Brass Sales?
4        MR. DISBROW:  I am going to object as to
5 relevance.   You can answer the question.
6        THE WITNESS:  $53,000 a year is my salary.
7 BY MS. WEGNER:
8    Q    Have you been the person supervising your
9 son, Tyler, since you have been working at Cooper and
10 Brass Sales?
11       MR. DISBROW:  Object to form and foundation,
12 also object because in it currents form it
13 mischaracterizes his earlier testimony.
14       You can answer if you can.
15       MS. WEGNER:  I'll withdraw that question.
16 BY MS. WEGNER:
17    Q    When Tyler began working at Cooper and Brass
18 Sales about three and a half years ago and you started
19 on the first shift, did you supervise him?
20    A    Yes.
21    Q    Did you supervise your son, Tyler, while he
22 worked on the second shift at Cooper and Brass Sales?
23    A    No.
24    Q    And have you supervised your son, Tyler,

21

1 while he worked on the third shift at Cooper and Brass
2 Sales?
3    A    Yes.  For part of the shift, not all of the
4 shift.
5    Q    For what part of the third shift do you
6 supervise your son, Tyler?
7        MR. DISBROW:  Object to the whole line of
8 questioning as to relevance.   You can answer.
9        THE WITNESS:  From the time I start until the
10 time third shift ends or the time Tyler stops working
11 overtime, if he is asked to work overtime and agrees to
12 stay.
13 BY MS. WEGNER:
14    Q    And at what time did you start working at
15 Cooper and Brass Sales?
16    A    3:30 a.m. on most days.
17    Q    And has 3:30 a.m. been your start time since
18 you became the Plant Supervisor at Cooper and Brass
19 Sales?
20    A    For part of the time.
21    Q    When you first became Plant Supervisor, what
22 were your hours?
23    A    Generally 5 until 2:30 p.m. or 3 o'clock.
24    Q    And when did your start time as Supervisor at

DEPOSITION OF MARK DEMEIN -- 06/12/08

22

1  Copper and Brass Sales change to 2:30 a.m.?
2      **A   Probably three to four years ago.**
3      Q    While you have been the Plant Supervisor, has
4  there ever been a third shift supervisor?
5      **A   Not that I can recall.**
6      Q    Who, if anyone, has supervised the third
7  shift employees from the time they began at 11 p.m.
8  until you have arrived at work?
9      **A   Those duties are shared by the second shift**
10 **supervisor and the NCD Cross Dock Supervisor.**
11     Q    What are the hours of the second shift?
12     **A   2:30 p.m. to 11 p.m.**
13     Q    And what are the hours of the NCD Cross Dock
14 Supervisor?
15     **A   From what I can remember, probably he starts**
16 **generally around 4 p.m, to whenever.**
17     Q    Is there a period of time when there is no
18 supervisor present while the third shift is working at
19 Copper and Brass Sales?
20     **A   Not that I'm aware of.**
21     Q    Has there been a rule in effect at Copper and
22 Brass Sales since you worked there that no employee
23 should supervise a family member?
24     MR. DISBROW:  Objection as to relevance.

23

1  You can answer the question, if you know.
2      THE WITNESS:  Not that I'm aware of.
3  BY MS. WEGNER:
4      Q    In your capacity as a Plant Supervisor,
5  aren't you aware of the various work rules?
6      MR. DISBROW:  Objection as to form and
7  foundation.
8      THE WITNESS:  Yes.
9  BY MS. WEGNER:
10     Q    Are you familiar with the Copper and Brass
11 Sales Handbook?
12     **A   Yes.**
13     Q    I show you a document previously marked as an
14 exhibit in Mr. Lunt's deposition as Exhibit 17.  Do you
15 recognize that document?
16     **A   Yes.**
17     Q    What is Exhibit 17?
18     **A   Employee Handbook.**
19     Q    Is Exhibit 17 the Employee Handbook of your
20 employer?
21     **A   Yes.**
22     Q    If you turn to Page 15 of the Employee
23 Handbook, it tells us it has a Bates stamp number of
24 00718.

24

1      Do you see on Page 15 a section dealing
2  with "Hiring of Relatives"?
3      MR. DISBROW:  Objection.  The document speaks
4  for itself.  You can answer the question.
5      THE WITNESS:  Yes.
6  BY MS. WEGNER:
7      Q    How long has that Employee Handbook, that is
8  marked as Exhibit 17, been in effect at your place of
9  employment?
10     MR. DISBROW:  Objection.  Form and
11 foundation.  Also objection as to the document speaks
12 for itself.  It clearly contains a revision date.
13     You can answer to the degree that you
14 know.
15     THE WITNESS:  As far as what these dates
16 state that is how I know of it.
17 BY MS. WEGNER:
18     Q    Prior to this version of the Employee
19 Handbook that has been handed to you as Exhibit 17, was
20 there an Employee Handbook at your place of employment
21 at Copper and Brass Sales?
22     **A   Yes.**
23     Q    To your knowledge, are there other employees
24 at Cooper and Brass Sales who supervise a relative?

25

1      MR. DISBROW:  Object as to relevance.  I
2  didn't know this was a nepotism case, Counsel, but you
3  can answer if you know.
4      THE WITNESS:  I'm not aware, no.
5  BY MS. WEGNER:
6      Q    As the Plant Supervisor at Cooper and Brass
7  Sales, do you have the sole authority to hire
8  employees?
9      **A   No.**
10     Q    As a Plant Supervisor at Copper and Brass
11 Sales, do you have the sole authority to terminate
12 employees?
13     **A   Yes.**
14     Q    And as a Plant Supervisor at Copper and Brass
15 Sales, do you have the sole authority to discipline
16 employees?
17     **A   Yes.**
18     Q    And Copper and Brass sales has a Discipline
19 Policy, correct?
20     **A   Yes.**
21     Q    Is the Discipline Policy at Copper and Brass
22 sales, a Progresstive Discipline Policy?
23     MR. DISBROW:  Form and foundation.  You can
24 answer to the degree that you know what she means by

7 (Pages 22 to 25)

VICTORIA COURT REPORTING SERVICE, INC  (312)  443-1025

DEPOSITION OF MARK DEMEIN -- 06/12/08

26

1  "progressive discipline"?
2      THE WITNESS:  Work and safety rules have
3  progressive discipline, yes.
4  BY MS. WEGNER:
5      Q    Other than work and safety rules, are there
6  other rules at Copper and Brass Sales, to your
7  knowledge, that have some other form of discipline?
8      MR. DISBROW:  Same objection.  Also vague and
9  ambiguous.
10     THE WITNESS:  Attendance rules.
11 BY MS. WEGNER:
12     Q    And what, to your knowledge, are the
13 discipline rules related to attendance at Copper and
14 Brass Sales?
15     MR. DISBROW:  Objection.  Form and
16 foundation.
17     THE WITNESS:  It is a point system with rules
18 built in.
19 BY MS. WEGNER:
20     Q    I show you what was marked at an earlier
21 deposition, Mr. Lunt's deposition, as Exhibit Number 5.
22     Do you recognize Exhibit Number 5?
23     MR. DISBROW:  Just wait.  Let me get to it.
24 I have it.  Go over the entire document before you

27

1  answer.
2      THE WITNESS:  Yes.
3  BY MS. WEGNER:
4      Q    What is Exhibit Number 5 from Mr. Lunt's
5  deposition?
6      A    **Chicago Branch Work and Safety Rules.**
7      Q    Are you familiar with Mr. Wingo?
8      A    **Yes.**
9      Q    And when did you first become acquainted with
10 Mr. Wingo?
11     A    **I met him on my first day of employment.**
12     Q    And Mr. Wingo was already employed at Copper
13 and Brass Sales when you began, correct?
14     A    **Yes.**
15     Q    Did you have any involvement in the decision
16 to terminate Mr. Wingo's employment with Copper and
17 Brass Sales?
18     MR. DISBROW:  I'm going to object to the form
19 and foundation.  Vague as to what "involvement" means,
20 but you can certainly answer to the degree that you
21 know.
22     THE WITNESS:  Yes.
23 BY MS. WEGNER:
24     Q    And what was your involvement in the

28

1  termination of Mr. Wingo at Copper and Brass Sales?
2      A    **Listening to Mr. Lunt determine that**
3  **Mr. Wingo would be terminated.**
4      Q    Do you know the basis of Mr. Lunt's
5  determination that Mr. Wingo would be terminated?
6      A    **Yes.**
7      Q    What is your understanding of the basis on
8  which Mr. Lunt determined that Mr. Wingo would be
9  terminated?
10     A    **Falsification of company documents.**
11     Q    Based on your employment at Cooper and Brass
12 Sales, do you have an understanding of the
13 falsification of company documents at Copper and Brass
14 Sales?
15     A    **Yes.**
16     Q    And what is your definition of the
17 falsification of company documents at Copper and Brass
18 Sales?
19     A    **Writing untrue figures on a company document.**
20     Q    And what company documents do you understand
21 Mr. Wingo allegedly falsified that resulted in his
22 termination?
23     A    **Production reports.**
24     Q    During your employment at Copper and Brass

29

1  sales, have you ever completed production reports?
2      A    **No.**
3      Q    Do you know what training has been provided
4  to Copper and Brass Sales' employees regarding
5  completion of production reports?
6      A    **Yes.**
7      Q    And how are you aware of the training
8  provided to Copper and Brass Sales' employees regarding
9  the completion of production reports?
10     A    **It has been notated in their training file.**
11     Q    What specifically, to your knowledge, is the
12 training Copper and Brass Sales employees have received
13 regarding the completion of production reports?
14     A    **The training is ongoing, held with meetings,**
15 **personal consultation as well as in work order**
16 **training.**
17     Q    During your employment at Copper and Brass
18 Sales, have you ever received training for completion
19 of production reports?
20     A    **Yes.**
21     Q    And when did you receive training regarding
22 the completion of production reports at Copper and
23 Brass Sales?
24     A    **I can't recall an exact date.**

8 (Pages 26 to 29)

DEPOSITION OF MARK DEMEIN -- 06/12/08

30

1  Q   Do you recall what year you received training
2  on completion of production reports?
3     A   No.
4     Q   Who provided this training to you regarding
5  the completion of production reports?
6     A   Randy Lunt.
7     Q   And this training that you received from
8  Randy Lunt on completion of production reports, was
9  that something that was oral?
10    A   Yes.
11    Q   And what was it that Randy Lunt told you
12 regarding the completion of production reports when you
13 received the training from him?
14       MR. DISBROW:  Objection as to form and
15 foundation.
16          You can answer to the degree that you
17 know and recall.
18       THE WITNESS:  Employees were to put down
19 exactly the work, put the work order and that they
20 completed it on each line, per line item.
21       MS. WEGNER:  Can you make this Number 1?
22          (WHEREUPON Exhibit 1 was marked
23             for identification)
24

31

1  BY MS. WEGNER:
2     Q   Have you had a chance to look at the
3  documents in Exhibit Number 1, sir?
4     A   Yes.
5     Q   Are you familiar with the documents contained
6  in Exhibit Number 1?
7     A   Yes.
8       MR. DISBROW:  I'll state for the record that
9  these are many different documents.
10      MS. WEGNER:  These documents marked as
11 Exhibit Number 1 are Bates stamped 000099 through
12 000118.
13 BY MS. WEGNER:
14    Q   Mr. DeMien, you take a look at the page in
15 Exhibit Number 1 that has the Bates stamp 000105.
16          Do you recognize this as a reproduction
17 log?
18    A   Yes.
19    Q   Is your handwriting contained anywhere on
20 000105 of Exhibit Number 1?
21    A   Yes.
22    Q   And where is your handwriting contained on
23 000105 of Exhibit Number 1?
24    A   Where it is circled on Lines 16 and 17.  It

32

1  says "MEA" and then at the bottom of the page where it
2  says, "two more filled by second shift", my initials
3  and the date, 12/1/07.
4     Q   And if you look at the next page of Exhibit
5  Number 1, 000106, do you recognize that as a Daily
6  Production Log at Copper and Brass Sales?
7     A   Yes.
8     Q   And is your handwriting contained on this
9  page Bates stamped 06 at Exhibit Number 1?
10    A   Yes.
11    Q   And where on Page 06 of Exhibit Number 1 is
12 your writing or printing contained?
13    A   Right next to Number 20 where it is circled
14 "MEA" and just under that, MEA where it says "IG".  The
15 arrow pointing to these two work orders, WO'S were
16 filled by second shift.  My initials "MD" and the date,
17 12/1/07 at the bottom, right.
18       MR. DISBROW:  Let me state for the record
19 this is a poor copy.  It appears that part of the page
20 has been cut off on this particular document on the
21 right hand side.  I don't know if that is a complete
22 copy of this document.  In fact, I'm fairly confident
23 it is not.
24       MS. WEGNER:  The documents that are following

33

1  Pages 105 and 106 are packing slips.
2       MR. DISBROW:  Is that a question, Counsel, or
3  a statement?
4  BY MS. WEGNER:
5     Q   Did you accumulate these documents following
6  Page 105 and 106 for any reason?
7       MR. DISBROW:  Object to form and foundation.
8  I don't know where those documents came from.  They
9  appear to have Plaintiff's Counsel's numbers on them.
10 I don't know where these particular copies came from.
11          You can answer to the degree that you
12 know.
13       THE WITNESS:  I don't know what "accumulate"
14 means.
15 BY MS. WEGNER:
16    Q   When did it first become important to you to
17 write these notes on these Daily Production Logs at
18 Pages 105 and 106 of Exhibit --
19       MR. DISBROW:  Objection as to form.  I don't
20 know what that means.
21          You can answer if you know.
22       THE WITNESS:  They were random checks.
23 BY MS. WEGNER:
24    Q   And how often do you conduct random checks of

9  (Pages 30 to 33)

DEPOSITION OF MARK DEMEIN -- 06/12/08

34

1  Daily Production Logs as the Plant Supervisor at Copper
2  and Brass Sales?
3  **A   I can't give you a concrete figure.**
4  **Sometimes weekly, sometimes daily,  while I'm entering**
5  **them onto a computer spreadsheet.**
6  Q   What is the purpose for which you enter the
7  Daily Production Logs onto a computer spreadsheet?
8  **A   It is required by my job.**
9  Q   In looking at Exhibit Number 1, Pages 105 and
10  106, are those the documents that you referred to
11  earlier as production reports?
12  MR. DISBROW: Objection as to form.  Are you
13  asking if they are examples of production logs?
14  MS. WEGNER: I'm asking whether this document
15  that is entitled "Production Log" is the production
16  report that he was referring to earlier when he said
17  that the employees were required to fill them out?
18  MR. DISBROW: I understand that, Counsel. I
19  think language is important.  You said are these the
20  production logs, not examples of.  I think that the
21  form is vague.
22  You can answer if you know.
23  THE WITNESS:  These appear to be copies of
24  the production logs that order fillers fill out when

35

1  they complete work orders.
2  BY MS. WEGNER:
3  Q   And when we were talking earlier, you were
4  talking about production reports and training that you
5  are aware employees received on how to complete
6  production reports.  And my question is, was that what
7  you were referring to?
8  **A   Yes, this right here. (Indicating)**
9  Q   The production log?
10  **A   The production log, they do fill those out.**
11  Q   Do you, as the Plant Supervisor at Copper and
12  Brass Sales enter production logs prepared by all
13  employees at the plant at which you were the
14  supervisor?
15  **A   To where?**
16  Q   You say you enter them into a computer spread
17  sheet?
18  **A   Yes.**
19  MR. DISBROW: It is 11:33, whenever it is
20  convenient for you, I'm ready for a break.
21  MS. WEGNER: Fine, I can do that.
22  (BRIEF RECESS)
23  (WHEREUPON Exhibit 2 was marked
24  for identification)

36

1  BY MS. WEGNER:
2  Q   So Mr. DeMien, I'm showing you what we have
3  marked as Exhibit Number 2, for your deposition,
4  produced by Copper and Brass Sales with the Bates stamp
5  00015.
6  Do you recognize this document?
7  **A   Yes.**
8  Q   And do you recognize Exhibit Number 2 to be a
9  Daily Production Log for November 28, 2007?
10  MR. DISBROW: Objection. The document speaks
11  for itself.  You can answer.
12  THE WITNESS: Yes.
13  BY MS. WEGNER:
14  Q   And does Exhibit Number 2 contain markings by
15  you where you circled on Lines 16 and 17 initials and
16  then drew an arrow and wrote two more "filled by second
17  shift" with your initials and a date, 12-1-07?
18  **A   Yes.**
19  Q   On November 28, 2007, did you have a
20  conversation with Mr. Wingo about the quality of the
21  material that was being pulled to complete the orders
22  near the bottom of Exhibit Number 2?
23  MR. DISBROW: Objection. Form and
24  foundation. Vague.  Are you dealing with line items?

37

1  Maybe it would help if you specified.
2  BY MS. WEGNER:
3  Q   Well, there is a note written on Exhibit
4  Number 2 that, near lines 15, 16 and 17 along the right
5  hand side where it says "Quarantine Metal" on
6  November 28, 2007, did you, Quarantine Metal, do its
7  quality.
8  **A   Vaguely remember, but probably, yes.**
9  Q   How did it come to your attention on
10  November 28, 2007 that there was poor quality metal
11  being used to fill a customer order.
12  MR. DISBROW: Objection. Just to the degree
13  that you recall.
14  THE WITNESS: I recall having conversations
15  about something about that. Yeah, with Bob Wingo.
16  BY MS. WEGNER:
17  Q   Do you know whether or not on November 28,
18  2007 at any point in time during the day the order that
19  originally had been sought to be filled with bad metal
20  was actually filled?
21  MR. DISBROW: Objection. Form of the
22  question. Vague.  Foundation.
23  THE WITNESS: I believe it was filled later
24  on in the day by another individual.

10 (Pages 34 to 37)

DEPOSITION OF MARK DEMEIN -- 06/12/08

38

BY MS. WEGNER:

Q    On November 28, 2007, did you specifically tell Mr. Wingo not to fill the order with the bad metal?

MR. DISBROW: Objection. Form and foundation.   What order are we talking about?

MS. WEGNER:  Orders listed on Exhibit Number 2.

MR. DISBROW: You have 17 orders listed on Exhibit Number 2.

BY MS. WEGNER:

Q    Near the bottom of Page 86444, there is a notation regarding the quality of the metal, rejected, and then your initials?

A    **I may have. Yes, probably, yeah.  Probably told him not to at that point.**

Q    While you have been employed as a First Receiving Supervisor and then Plant Supervisor at at Copper and Brass Sales, is it true that there are errors made very often on work orders.

MR. DISBROW: Objection as to form.

THE WITNESS: There are errors made on work orders.

39

BY MS. WEGNER:

Q    What types of errors have you experienced during your employment at Copper and Brass Sales on work orders?

A    **Wrong material getting shipped on a work order. Wrong amount of material getting shipped on a work order. Bad quality metal getting shipped on a work order. Foreign material getting shipped on a work order that was actually supposed to be domestic.**

Q    Is that it?

A    **Wrong mill if a work order requests a specific mill, another mill is used to fill on that work order.  That is an error as much as I can recall.**

Q    While you have been the Plant Supervisor at the Copper and Brass Sales location that you currently are the supervisor of, is there anyone who has had duties of checking work orders for their accuracy?

A    **Yes.**

Q    Who has checked work orders for accuracy while you have been Plant Supervisor.

A    **Plant Supervisors, Quality Reps, Material Control Supervisors.**

Q    While you have been employed at your current location as a Plant Supervisor with Copper and Brass

40

Sales, who has been the Material Control Supervisor?

A    **It has been numerous, current Material Control Supervisor is Mark Pucalik.**

Q    And who are the Quality Reps that you have indicated have checked work orders for accuracy while you have been the Plant Supervisor?

A    **Bill Orbit.**

Q    How often are work orders checked for accuracy at the Copper and Brass Sales location that you supervise as a Plant Supervisor?

A    **Most work orders that I pick up on my shift I check for accuracy.   Mark Pucalik checks almost daily for accuracy.  I'm not sure how often Bill Orbit checks, but he does.  A second shift supervisor also does on his shift.**

Q    And is there anywhere that Copper and Brass Sales at the location that you supervisor where there is a list of the errors made on work orders?

A    **Yes.**

Q    What is the list of work orders called?

A    **Returns and allowances.**

Q    And does this list of work order errors indicate who may have been responsible for making an error on a work order?

41

A    **I believe so, but I can't recall for sure.**

Q    While you worked at the Copper and Brass Sales location, at which you are currently employed, are you aware of anyone who hasn't made a mistake on a work order?

MR. DISBROW: Objection as to form and foundation.   Very broad.

You can answer if you know.

THE WITNESS: No.

BY MS. WEGNER:

Q    On the Daily Production Log that we have marked as Exhibit Number 2 for November 28, 2007, this is a Daily Production Log that you believe was prepared by Mr. Wingo; is that right?

A    **Yes.**

Q    On the November 28, 2007 Daily Production Log that we have marked as Exhibit Number 2, there are a number of notations in the Comments Section next to the different work orders.

Do you know the reason those comments were placed there?

MR. DISBROW: Objection as to foundation. He didn't prepare the document.

To the degree that you know.

VICTORIA COURT REPORTING SERVICE, INC  (312)  443-1025

DEPOSITION OF MARK DEMEIN -- 06/12/08

42

1    THE WITNESS: I believe that Bob was trying
2 to comment, you know, why, things he was running into
3 while filling the order.
4 BY MS. WEGNER:
5    Q   Do you know whether employees of Copper and
6 Brass Sales typically made comments next to the work
7 order numbers on the Daily Production Logs when they
8 encountered any type of problem?
9    A   Yes.
10   Q   And there were other employees at Copper and
11 Brass Sales who also made notes in the Comments Section
12 on the Daily Production Logs noting any problems they
13 encountered or unusual things with particular work
14 orders?
15   A   Yes.
16   Q   And it also appears from Exhibit Number 2
17 that Mr. Wingo noted on the November 28, 2007
18 Production Log that he had no work orders in the first
19 half hour on Line Number 2.  Do you see that?
20      MR. DISBROW: Objection to the degree that
21 the document speaks for itself and foundation because
22 he didn't prepare this document.
23      THE WITNESS: I see he wrote that, yes.
24

43

1 BY MS. WEGNER:
2    Q   Had you seen other Daily Production Logs over
3 the course of time where Mr. Wingo had made notations
4 when he didn't have any work orders to work on during
5 the day?
6      MR. DISBROW: Objection.  Irrelevant.
7      You can answer, Mark.
8      THE WITNESS: Not that I can recall.
9 BY MS. WEGNER:
10   Q   When you saw this work order we marked as
11 Exhibit Number 2 with the initials on Lines 16 and 17
12 on the left-hand side, what did you think?
13      MR. DISBROW: Objection as to form and
14 foundation.  Can you read it back?
15      (WHEREUPON the record was read
16      as follows:
17      "Q  When you saw this work order we
18      marked as Exhibit Number 2 with the
19      initials on Lines 16 and 17 on the
20      left-hand side, what did you think?")
21      MS. WEGNER: Oh, that is a bad question.
22 BY MS. WEGNER:
23   Q   When you saw the production log for
24 November 28th that we marked as Exhibit Number 2 with

44

1 the initials on the left-hand side next to Number 16
2 and 17, what did you think?
3      MR. DISBROW: Same objections.  I don't
4 know -- I don't even understand the question.  I think
5 it mischaracterizes his earlier testimony.
6      THE WITNESS: I don't understand the
7 question.
8      MR. DISBROW: I'm not trying to make a
9 talking objection, but hear me out for a minute.  Jan,
10 Mark -- I believe his testimony is that he made those
11 notations, if you are talking about the initials?  Are
12 you talking about the initials?
13      MS. WEGNER: If that is true, then I
14 apologize.  I'm mistaken.  I thought he put the circle
15 there.
16      THE WITNESS: I made the notations.
17 BY MS. WEGNER:
18   Q   You made the initial --
19   A   MEA, MEA.
20   Q   Why did you write "MEA" on Line 16 and 17 of
21 Exhibit Number 2?
22   A   As I was doing my random check of this
23 production log, by checking the computer as to who
24 actually filled the work order, what time the work

45

1 order was keypunched and completed, I discovered it was
2 filled by MEA, who is Mario Alvarez.
3    Q   And why did the fact that when you were
4 checking on the computer you found that these orders
5 were filled by Mario Alvarez call anything into
6 question?
7    A   Because Bob is writing them down as he is
8 claiming that he completed those orders.
9    Q   With respect to these two work orders for the
10 Daily Production Log on November 28, 2007 on Lines 16
11 and 17, were they entered into the computer on more
12 than one occasion?
13      MR. DISBROW: Objection as to foundation.
14 You can answer, if you know.
15      THE WITNESS: They can only get entered at
16 one time and a computer will document at what time the
17 work order is actually keypunched.
18 BY MS. WEGNER:
19   Q   So when you checked the work orders with
20 respect to the Daily Production Log on November 28,
21 2007, the last two items, who had actually keypunched
22 those work orders into the computer?
23   A   That would be Mario Alvarez.
24   Q   And do you know whether or not on

12 (Pages 42 to 45)

VICTORIA COURT REPORTING SERVICE, INC  (312)  443-1025

DEPOSITION OF MARK DEMEIN -- 06/12/08

46

1  November 28, 2007, Mr. Alvarez prepared a Daily
2  Production Log?
3      A  I assume he may have, but I don't know for
4  sure.
5      Q  Well, Mr. Alvarez on November 28, 2007
6  worked second shift, right?
7      A  Correct.
8      Q  And Mr. Alvarez on November 28, 2007 worked
9  second shift, followed Mr. Wingo in this production
10  area called PK, right?
11      MR. DISBROW:  Objection as to form and
12  foundation.  You can answer to the degree you know who
13  followed it.
14      THE WITNESS:  I'm assuming that Mario
15  followed at RBW non-processed and keypunched these
16  orders that I indicated.
17  BY MS. WEGNER:
18      Q  Do you know whether or not on November 28,
19  2007, Daily Production Log, if any filled out by
20  Mr. Alvarez, these two work orders on Line 16 and 17 of
21  Exhibit Number 2 were also written?
22      MR. DISBROW:  Can you read back that
23  question, please?
24      (WHEREUPON the record was read as

47

1      follows:
2      "Q  Do you know whether or not on
3      November 28, 2007, Daily Production
4      Log, if any filled out by Mr. Alvarez,
5      these two work orders on Line 16 and 17
6      of Exhibit Number 2 were also
7      written?")
8      MR. DISBROW:  Objection as to Form.  I think
9  it is vague.  I don't really understand it.
10      THE WITNESS:  I don't understand it.
11      (WHEREUPON Exhibit 2 was marked
12      for identification)
13  BY MS. WEGNER:
14      Q  Isn't the Daily Production Log a document
15  where each employee is supposed to note each work order
16  that they worked on so that you know what they have
17  done during the day?
18      A  Completed work order.
19      Q  Do you use any of the information contained
20  on these Daily Production Logs relating to the starting
21  and stopping times for work orders to gauge
22  productivity?
23      MR. DISBROW:  Object as to form.  The one
24  that we have been looking at appears to only have stop

48

1  times.
2      THE WITNESS:  It has stop times.  I don't
3  understand the question.
4  BY MS. WEGNER:
5      Q  Okay.  Do you know whether or not the
6  employees who completed the Daily Production Log at
7  Copper and Brass Sales have ever been given instruction
8  on what they are to do if they are working on a work
9  order which they haven't completed at the time their
10  shift ends?
11      MR. DISBROW:  Can you read back the question,
12  please?
13      (WHEREUPON the record was read as
14      follows:
15      "Q  Okay.  Do you know whether or not
16      the employees who completed the Daily
17      Production Log at Copper and Brass Sales
18      have ever been given instruction on what
19      they are to do if they are working on a
20      work order which they haven't completed
21      at the time their shift ends?")
22      THE WITNESS:  Yes.
23  BY MS. WEGNER:
24      Q  And how do you know what instructions

49

1  employee at Copper and Brass Sales have been given
2  regarding what they should do if they are working on a
3  work order that they haven't completed when their shift
4  ends?
5      MR. DISBROW:  I need the question again.
6      (WHEREUPON the record was read as
7      follows:
8      "Q  And how do you know what
9      instructions employees at Copper and
10      Brass Sales have been given regarding
11      what they should do if they are
12      working on a work order that they
13      haven't completed when their shift
14      ends?")
15      THE WITNESS:  It is covered in their
16  training.
17  BY MS. WEGNER:
18      Q  And who has covered it in the Copper and
19  Brass Sales employees as to what instructions they are
20  given about what to do if they haven't completed work
21  on a work order when their shift ends?
22      THE WITNESS:  I need to hear the question
23  again.
24      MR. DISBROW:  Repeat the question.  Form is

13  (Pages 46 to 49)

DEPOSITION OF MARK DEMEIN -- 06/12/08

50

1  not clear.
2  BY MS. WEGNER:
3      Q    Who has covered in the training at Copper and
4  Brass Sales what employees are supposed to do when they
5  are supposed to work on a work order that is not
6  completed at the end of their shift?
7      A    **Various supervisors.**
8      Q    Where are the supervisors that you believe
9  have conducted training at Copper and Brass Sales what
10  employees are supposed to do if they are working on a
11  work order that they do not complete by the end of
12  their shift?
13      A    **To my knowledge all supervisors.**
14      Q    Have you been present at every training
15  session conducted by supervisors at Copper and Brass
16  Sales regarding what employees should do when they are
17  working on a work order that they are unable to
18  complete at the end of their shift?
19      MR. DISBROW:  Objection as to form and
20  foundation.
21      THE WITNESS:  I can't recall, no.
22  BY MS. WEGNER:
23      Q    And what are the instructions that the
24  employees are given at Copper and Brass Sales in their

51

1  training regarding what they should do if they are
2  working on a work order that they are unable to
3  complete at the end of their shift?
4      A    **Employees are to write down completed work**
5  **orders on the production log that they complete.**
6      Q    Did you ever check any of Mr. Alvarez's
7  production logs to see whether or not he also made
8  notes on the production logs about problems that he
9  encountered with work orders?
10      A    **I can't recall specific times.**
11      MS. WEGNER:  Let's make this Number 3.
12      (WHEREUPON Exhibit 3 was marked
13          for identification)
14  BY MS. WEGNER:
15      Q    Exhibit Number 3, Mr. DeMien is a Daily
16  Production Log for November 29, 2007 on which you also
17  made notes as you told us earlier, correct?
18      MR. DISBROW:  Objection. Assumes facts not
19  in evidence. Form of the question.
20      You can answer the question.
21      THE WITNESS:  I wrote down the circle and
22  wrote down "MEA", and wrote down "IG" and the arrow
23  pointing to these two works orders were "filled by
24  second shift" and my initials and the date. That is

52

1  what I wrote on this original copy.
2  BY MS. WEGNER:
3      Q    And who do the initials "IG" refer to.
4      A    **I believe Isidro Garcia.**
5      Q    Did you check any of Isidro Garcia's Daily
6  Production Logs to see if he made notes in the Comments
7  Section when he encountered a problem with the work
8  order?
9      A    **Not that I can recall.**
10      Q    Do you recall having an argument with
11  Mr. Wingo at the end of August or the very beginning of
12  September 2007, with Pat Bishop present, where you
13  swore and yelled at Mr. Wingo?
14      A    **No.**
15      Q    Were you ever made aware that Mr. Wingo
16  complained about the way you treated him at Copper and
17  Brass Sales?
18      A    **Yes.**
19      Q    And when were you made aware that Mr. Wingo
20  complained about your treatment of him at Copper and
21  Brass Sales?
22      A    **On -- I can't remember specifics, but on many**
23  **different occasions over the years.**
24      Q    What complaints were you made aware of that

53

1  Mr. Wingo made regarding your treatment of him at
2  Copper and Brass Sales?
3      A    **Nothing specific that I can recall.**
4      Q    In late August or early September of 2007,
5  did Mr. Lunt tell you that Mr. Wingo had come to him to
6  complain to him about you?
7      A    **Yes.**
8      Q    And in late August or early September of
9  2007, what did Mr. Lunt tell you Mr. Wingo's complaint
10  was regarding your treatment of him?
11      A    **He claims I swore at him.  Bob Wingo claims**
12  **that I swore at him to Randy.  That is what his**
13  **complaint was.**
14      Q    And other than telling you that Mr. Wingo
15  claimed you swore at him when he complain to Mr. Lunt
16  in late August or early September 2007, did Mr. Lunt
17  say anything else regarding Mr. Wingo?
18      A    **Only that there was a Letter of Counsel that**
19  **I had issued to both Bob and Pat and that he disagreed**
20  **verbally with the Letter of Counsel after I believe**
21  **signing that Letter of Counsel and that Randy was**
22  **investigating if I swore at Bob.**
23      Q    Do you have any knowledge as to what Mr. Lunt
24  did to investigate whether you swore at Mr. Wingo?

14 (Pages 50 to 53)

54

1    A   No.
2    Q   Were you ever made aware of the results of
3  any investigation that Mr. Lunt conducted as to whether
4  or not you swore at Mr. Wingo?
5    A   Yes.
6    Q   And who was made aware of the results of
7  Mr. Lunt's investigation into whether you swore at
8  Mr. Wingo?
9    A   Randy.
10   Q   And what was the information Mr. Lunt
11 provided regarding the results of his investigation
12 into whether you had swung at Mr. Wingo?
13   **A   He told me that I didn't swear at Mr. Wingo**
14 **after he conducted his investigation.**
15   Q   Do you have any knowledge as to who, if
16 anyone, was interviewed in any investigation as to
17 whether or not you had sworn at Mr. Wingo?
18      MR. DISBROW:  Objection.  Asked and answered.
19         You can answer again.
20      THE WITNESS:  No.
21 BY MS. WEGNER:
22   Q   I'll show you what we marked at an earlier
23 deposition, at Mr. Lunt's deposition, as Exhibit 17.
24 I'm sorry, 16, Copper and Brass Bates stamped 00095.

55

1         Do you recognize that document, Mr.
2  DeMien?
3       MR. DISBROW:  Go ahead.
4       THE WITNESS:  Yes.
5  BY MS. WEGNER:
6    Q   And what is that document that you have in
7  front of you, Lunt Exhibit 16?
8    **A   It is an Employee Report Form.**
9    Q   Did prepare Lunt Exhibit 16?
10   **A   Yes.**
11   Q   Did you sign Lunt Exhibit 16 at the bottom?
12   **A   Yes, under Supervisor's Signature or right**
13 **above it.**
14   Q   Prior to issuing the Employee Report Form
15 that we are showing you as Lunt Exhibit 16, did you
16 have any discussion with Mr. Wingo regarding the work
17 order that has been identified with an error on that
18 document?
19      MR. DISBROW:  Could you repeat that question?
20      (WHEREUPON the record was read as
21        follows:
22      "Q  Prior to issuing the Employee Report
23      Form that we are showing you as Lunt
24      Exhibit 16, did you have any discussion

56

1         with Mr. Wingo regarding the work order
2         that has been identified with an error
3         on that document?")
4       MR. DISBROW:  Objection as to form.
5       THE WITNESS:  Not that I can recall, no.
6  BY MS. WEGNER:
7    Q   Did you meet in person with Mr. Wingo to
8  give him the Employee Report Form?
9    **A   Yes.**
10   Q   And when you met with him to give him the
11 Employee Report Form that we marked as Exhibit 16, was
12 there any reason given about the mistake on the work
13 order?
14   **A   Yes.**
15   Q   What did Mr. Wingo tell you about the mistake
16 on the work order that is the subject of Lunt
17 Exhibit 16?
18   **A   Pretty much what he wrote in his employee**
19 **statement.**
20   Q   And Mr. Wingo wrote in the Employee Statement
21 portion of the Employee Report Form marked as Lunt
22 Exhibit 16 that he was provided with the wrong material
23 by the side loader operator?
24      MR. DISBROW:  The document speaks for itself.

57

1  Specifically it says, "Side loader operator pulled
2  wrong MICC material not tallied."  But the document
3  speaks for itself.
4       THE WITNESS:  What was the question again?
5       MS. WEGNER:  Could you read back the
6  question?
7       (WHEREUPON the record was read
8        as follows:
9       "Q  And Mr. Wingo wrote in the Employee
10      Statement portion of the Employee Report
11      Form marked as Lunt Exhibit 16 that he
12      was provided with the wrong material by
13      the side loader operator?")
14      MR. DISBROW:  Same objection.
15      THE WITNESS:  Yes.
16 BY MS. WEGNER:
17   Q   Was the side loader operator who pulled the
18 wrong material for the order, the work order that is
19 the subject of Lunt Exhibit 16, disciplined in any way
20 for his mistake?
21      MR. DISBROW:  Objection as to form and
22 foundation.   We haven't determined who the side
23 operator is.
24      THE WITNESS:  I'm not aware, no.

15  (Pages 54 to 57)

58

1  BY MS. WEGNER:
2     Q   Who was the side loader operator who pulled
3  the wrong material for the work order that is the
4  subject of Lunt Exhibit 16?
5        MR. DISBROW: To the degree that you know you
6  can answer answer that question.
7        THE WITNESS: I can't recall.
8  BY MS. WEGNER:
9     Q   Isn't it true that Mr. Wingo told you that
10  the side loader operator that pulled the wrong material
11  was Tyler, your son?
12    A   I can't recall that, no.
13    Q   Did anyone receive any discipline as a result
14  of being the side loader operator that pulled the wrong
15  material for the work order that is the subject of Lunt
16  Exhibit 16?
17        MR. DISBROW: Could you repeat that question?
18        (WHERUPON the record was read as
19        follows:
20        "Q  Did anyone receive any discipline as
21        a result of being the side loader
22        operator that pulled the wrong material
23        for the work order that is the subject
24        of Lunt Exhibit 16?")

59

1        MR. DISBROW: Objection as to form and
2  foundation.
3        THE WITNESS: Without going through the files
4  and checking everything, I can't recall.
5  BY MS. WEGNER:
6     Q   Well, in the employee response in the
7  Employee Report Form marked as Lunt Exhibit 16, doesn't
8  Mr. Wingo comment that the side loader operator should
9  also be held accountable?
10        MR. DISBROW: Objection. Document speaks for
11  itself.
12        THE WITNESS: What is the question again,
13  please?
14        (WHEREPON the record was read
15        as follows:
16        "Q  Well, in the employee response in
17        the Employee Report Form marked as Lunt
18        Exhibit 16, doesn't Mr. Wingo comment
19        that the side loader operator should
20        also be held accountable?")
21        MR. DISBROW: Same objection.
22        THE WITNESS: He comments that -- in this the
23  words written here.
24

60

1  BY MS. WEGNER:
2     Q   Did you do anything to hold the side loader
3  operator accountable for the mistake of pulling the
4  wrong material for the work order that is the subject
5  of Lunt Exhibit 16?
6        MR. DISBROW: Objection. Form and
7  foundation.  There is no evidence that the side loader
8  operator pulled the wrong material.
9     A   Not that I can recall.
10  BY MS. WEGNER:
11    Q   Do you know what the material is that was the
12  subject of the work order that was discussed in Lunt
13  Exhibit 16?
14    A   I detailed a part number and the mill, I
15  can't tell you at this juncture what exactly that
16  material is.
17    Q   Can you tell me at this juncture
18  approximately what the material is for this part number
19  and that mill?
20        MR. DISBROW: Objection. Asked and answered.
21        If you know, you can answer the
22  question.
23        THE WITNESS: It is bar stock.
24

61

1  BY MS. WEGNER:
2     Q   And the particular bar stock that is the
3  subject of that work order in Lunt Exhibit 16, would
4  that be something that typically would be required to
5  be pulled by a side loader operator?
6     A   Yes.
7     Q   November of 2007, the production logs that we
8  looked at earlier had a station letter "PK", which I
9  think you described as non-process something?
10    A   That is his writing. I'm not exactly sure,
11  but he believes it is non-process RBW.
12    Q   And RBW stands for rod, bar and wire. So in
13  November of 2007 at the RBW non-processed station, was
14  there a minimum number of completed orders that were
15  required per day from a warehouse at Copper and Brass
16  Sales?
17        THE WITNESS: No.
18  BY MS. WEGNER:
19    Q   And in November of 2007 at the RBW
20  non-processed station at which Mr. Wingo was working,
21  was there an average number of orders completed by
22  warehousemen per day.
23    A   The whole month, a specific day, I'm not
24  exactly sure.

16 (Pages 58 to 61)

DEPOSITION OF MARK DEMEIN -- 06/12/08

62

1     Q   I asked you about average, an average number
2   of work orders that is expected to be completed by a
3   warehouseman at the station such as the rod, bar and
4   wire non-process.
5         MR. DISBROW:  I think he is trying to tell
6   you that he doesn't understand your question.  He don't
7   know if you want an average for the production log or
8   generally.
9   BY MS. WEGNER:
10    Q   Per day.
11        MR. DISBROW:  Generally.
12  BY MS. WEGNER:
13    Q   Generally per day.
14    **A   Generally per day, 20 to 25 work orders in an**
15  **eight-hour period.**
16    Q   And did that average of generally 20 to 25
17  work hours per eight-hour period apply to the rod, bar
18  and wire warehouse non-process warehouse person working
19  on the first shift as well as the second shift?
20    **A   Yes.**
21    Q   And what types of instances would cause the
22  average number of work orders of between 20 to 25 per
23  day at the rod, bar and wire non-process station to
24  vary?

63

1         MR. DISBROW:  Calls for speculation and
2   objection.
3         You can answer if you know.
4         THE WITNESS:  Numerous variations.
5   BY MS. WEGNER:
6     Q   Could you give me an example of some of these
7   things that would cause variations in the number of
8   work orders?
9     **A   Sure.  Operators going to the bathroom too**
10  **often.  Operators who is filling those orders, going to**
11  **get coffee and other drinks too often.  Machinery**
12  **breakdown.  An operator themselves that are filling**
13  **those work orders talking at another station.  Power**
14  **failures.  Side loaders difficulty in handling stock**
15  **problems with particular items being filled on work**
16  **orders.  Horseplay by operators that are filling those**
17  **work orders.  Excessive talking.**
18    Q   Would the size of a particular work order
19  cause a variation between 20 to 25 work orders per day,
20  if you have a number of smaller ones versus one large
21  one?
22    **A   Yes.**
23    Q   If there were no work orders during a period
24  in a day that were available to be filled, that would

64

1   also affect the number of work orders that would be
2   expected to be completed in a day in an average  hour
3   workday, true?
4     **A   Yes.**
5     Q   You know, the number of parts, items, stock
6   at the Copper and Brass Sales location where you were
7   the Plant Supervisor?
8     **A   There are many, but not the exact number, no.**
9     Q   Did you ever have an occasion to have to wake
10  your son up when he was sleeping in his car to report
11  to work?
12        MR. DISBROW:  Objection.  Irrelevant,
13  Counselor.
14        THE WITNESS:  Not that I can recall.
15  BY MS. WEGNER:
16    Q   Who replaced Mr. Wingo on the RBW non-process
17  station after his termination?
18        MR. DISBROW:  Objection as to form.  It is
19  ambiguous as to what you mean by "replace".  I think it
20  also calls for a legal conclusion.  You can answer if
21  you know.
22        THE WITNESS:  Numerous warehousemen.
23  BY MS. WEGNER:
24    Q   Well, the day after Mr. Wingo's termination,

65

1   was there a warehouseman that went to work at the RBW
2   process station that Mr. Wingo had been working at?
3         MR. DISBROW:  Objection as to form.  Are we
4   talking new warehousemen, currently employed
5   warehousemen?
6         MS. WEGNER:  Talking about any warehouseman?
7         THE WITNESS:  There was currently employed
8   warehousemen, yes.
9   BY MS. WEGNER:
10    Q   Okay.  Who moved in the RBW non-process
11  station that Mr. Wingo had been working on the day
12  after Mr. Wingo's termination?
13        MR. DISBROW:  To the degree that you know.
14        THE WITNESS:  I don't know the specific
15  warehouseman who did, no, but there was someone.
16  BY MS. WEGNER:
17    Q   Well, you are the Plant Supervisor, right?
18    **A   Yes.**
19    Q   And you are responsible for the production at
20  the facility and supervise everybody on the first shift
21  and you can't tell me who moved in the RBW non-process
22  station after Mr. Wingo was terminated?
23        MR. DISBROW:  Objection.  Asked and answered
24  and it is argumentative.

17  (Pages 62 to 65)

DEPOSITION OF MARK DEMEIN -- 06/12/08

66

1    You can answer it again, Mark.
2    THE WITNESS: I can't recall the specific
3 person.
4 BY MS. WEGNER:
5    Q    Are there any records at your plant that
6 would reflect who began working at the RBW non-process
7 station that Mr. Wingo had worked at after his
8 termination?
9    A    I'm sure there is.
10    Q    What would those records be that we could
11 look at to determine who began working at the RBW
12 non-processed station immediately after Mr. Wingo was
13 terminated?
14    A    **Production logs dated that day. Work order**
15 **activity, who filled the work orders dated that day.**
16 **Attendance records that will show all the warehousemen**
17 **that were present on that day.**
18    Q    Did your son, Tyler, move into the RBW
19 non-processed station that Mr. Wingo has worked at
20 after he was terminated?
21    MR. DISBROW: Objection as to form. Vague.
22    THE WITNESS: No.
23 BY MS. WEGNER:
24    Q    Did you attend a meeting where Mr. Wingo was

67

1 told that he was being terminated?
2    A    **Yes.  But I was not there for the whole**
3 **meeting.**
4    Q    Okay. What is the reason you were not there
5 for the whole reason when Mr. Wingo was informed that
6 he was being terminated?
7    A    **Because Mr. Wingo was speaking with Randy**
8 **Lunt as to why he shouldn't be terminated and it was**
9 **dragging on so long and I had to leave at that point.**
10 **So I was excused by Randy, the Plant Manager.**
11    MS. WEGNER: Can I take a look at the exhibit
12 over there in front of you since I don't have all of
13 them.
14    MR. DISBROW: Can we take a short break?
15    MS. WEGNER: Yes.
16    (BRIEF RECESS)
17 BY MS. WEGNER:
18    Q    Mr. DeMien, do you recall Mr. Wingo being
19 suspended in November of 2007?
20    A    **Yes.**
21    Q    Do you recall the reason for Mr. Wingo's
22 suspension in November of 2007?
23    A    **I would have to see the report form that you**
24 **are referring to.**

68

1    Q    Would that be one of those Employee Report
2 Forms, such as Exhibit 16?  Is that the document that
3 you are referring to when you say "Report Form"?
4    A    **This is October.**
5    Q    Okay.  In connection with Mr. Wingo's
6 termination in December of 2007, was he afforded
7 progressive discipline pursuant to the discipline
8 policy by Copper and Brass Sales?
9    MR. DISBROW: Objection. Assumes facts not
10 in evidence. Form and foundation.
11    THE WITNESS: To my knowledge, yes.
12 BY MS. WEGNER:
13    Q    Are you familiar with Mario Alvarez?
14    A    **Yes.**
15    Q    And Mr. Alvarez was the second shift employee
16 who was following Mr. Wingo at the RBW non-process
17 station in November and December of 2007 before
18 Mr. Wingo's termination, correct?
19    MR. DISBROW: Form and foundation.
20    THE WITNESS: Yes, as far as I can recall,
21 yeah.
22 BY MS. WEGNER:
23    Q    Is Mr. Alvarez still employed at Copper and
24 Brass Sales?

69

1    A    **No.**
2    Q    What, to your knowledge, is the reason that
3 Mr. Alvarez is no longer employed at Copper and Brass
4 Sales?
5    A    **I believe he was terminated.**
6    Q    You know the reason for Mr. Alvarez's
7 termination?
8    A    **I believe it was because he was given**
9 **progressive discipline on a behavior issue.**
10    MS. WEGNER: I don't have any other
11 questions.
12    MR. DISBROW: No questions.
13    MR. DISBROW: Reserve signature.
14    (WHEREUPON the deposition was adjourned
15    at 11 o'clock a.m.)
16
17
18
19
20
21
22
23
24

18 (Pages 66 to 69)

DEPOSITION OF MARK DEMEIN -- 06/12/08

70

```
1          IN THE UNITED STATES DISTRICT COURT
2          FOR THE NORTHERN DISTRICT OF ILLINOIS
3                    EASTERN DIVISION
4
5    ROBERT G. WINGO,              )
6              PLAINTIFF,   )
7         VS.              ) No. CV 0 0368
8    THYSSENKRUPP MATERIALS NA, INC. )
9    D/B/A COOPER AND BRASS         )
10   SALES, INC.                    )
11          DEFENDANTS,        )
12              C E R T I F I C A T E
13
14        I, MARK DEMIEN, do hereby certify that I have
15   read the foregoing transcript in the above-entitled
16   cause and do assert that this is my testimony.
17        _____
18              MARK DEMIEN
19   SUBSCRIBED AND SWORN
20   ON THE _____DAY OF
21   _____, 2008.
22
23   _____
24        NOTARY PUBLIC
```

71

```
1    STATE OF ILLINOIS   )
2                     )SS:
3    COUNTY OF C O O K )
4
5
6          C E R T I F I C A T E
7
8         The within and foregoing deposition of the
9    witness was taken before GWENDOLYN BEDFORD, Certified
10   Shorthand Reporter and Notary Public, in the City of
11   Chicago, County of Cook and State of Illinois, and
12   there were present at the taking of said deposition
13   Counsel as previously set forth.
14        The said witness was first duly sworn to tell
15   the truth and nothing but the truth, and was then
16   examined upon oral interrogatories.
17        The questions and answers were taken down in
18   shorthand by the undersigned and computer-transcribed
19   under my personal direction.
20        The signature of the witness was not waived
21   by agreement of the parties.
22        The undersigned is not interested in the
23   within case, nor of kin or counsel to any of the
24   parties.
```

72

```
1         I further certify that this certificate
2    applies to the original signed and certified
3    transcripts only.  I assume no responsibility for the
4    accuracy of any reproduced copies not made under my
5    control or direction.
6         IN TESTIMONY WHEREOF, I have hereunto set my
7    hand this _____ day of _____, 2008.
8
9
10
11        _____
12        GWENDOLYN BEDFORD
13        084-003700
14
15
16
17
18
19
20
21
22
23
24
```

19 (Pages 70 to 72)

VICTORIA COURT REPORTING SERVICE, INC  (312)  443-1025

DEPOSITION OF MARK DEMEIN -- 06/12/08

71

1    STATE OF ILLINOIS    )

2                         )SS:

3    COUNTY OF  C O O K  )

4

5

6                      C E R T I F I C A T E

7

8            The within and foregoing deposition of the

9    witness was taken before GWENDOLYN BEDFORD, Certified

10   Shorthand Reporter and Notary Public, in the City of

11   Chicago, County of Cook and State of Illinois, and

12   there were present at the taking of said deposition

13   Counsel as previously set forth.

14           The said witness was first duly sworn to tell

15   the truth and nothing but the truth, and was then

16   examined upon oral interrogatories.

17           The questions and answers were taken down in

18   shorthand by the undersigned and computer-transcribed

19   under my personal direction.

20           The signature of the witness was not waived

21   by agreement of the parties.

22           The undersigned is not interested in the

23   within case, nor of kin or counsel to any of the

24   parties.


VICTORIA COURT REPORTING SERVICE, INC  (312)  443-1025

DEPOSITION OF MARK DEMEIN -- 06/12/08

72

1        I further certify that this certificate

2  applies to the original signed and certified

3  transcripts only.  I assume no responsibility for the

4  accuracy of any reproduced copies not made under my

5  control or direction.

6        IN TESTIMONY WHEREOF, I have hereunto set my

7  hand this _2nd_ day of _July_, 2008.

8

9

10

11

12       _Gwendolen Bedford_

         CERTIFIED SHORTHAND REPORTER

13

         C.S.R. 084-003700

14

15

16

17

18

19

20

21

22

23

24

VICTORIA COURT REPORTING SERVICE, INC  (312)  443-1025