# EXHIBIT E

1

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3

4

5    ROBERT WINGO,                    )

6              Plaintiff,             )

7        vs.                          ) No.  08 c 368

8    THYSSENKRUPP MATERIALS NA,       )

9    INC., d/b/a COPPER AND BRASS     )

10   SALES,                           )

11             Defendants.            )

12

13

14

15       The deposition of PATRICK BISHOP, called by the

16   Plaintiff for examination, pursuant to subpoena, and

17   pursuant to the provisions of the Code of Civil Procedure

18   of the State of Illinois and the Rules of Supreme Court

19   thereof pertaining to the taking of depositions for the

20   purpose of discovery, taken before ROSE MARIE WEBER, a

21   Certified Shorthand Reporter for the State of Illinois,

22   at 29 South LaSalle Street, Suite 610, Chicago, Illinois,

23   commencing on the 30th day of May, A.D. 2008, at the hour

24   of 7:15 a.m.

DEPOSITION OF PATRICK BISHOP -- 05/30/08

```
 2
 1  APPEARANCES:
 2
 3      LISA KANE & ASSOCIATES, P.C.,
 4      BY:  MS. JANICE A. WEGNER
 5          120 South LaSalle Street,
 6          Suite 1420,
 7          Chicago, Illinois  60603
 8              On behalf of the Plaintiff,
 9              Robert Wingo;
10
11      HONIGMAN, MILLER, SCHWARTZ AND COHN, L.L.P.,
12      BY:  MR. MATTHEW S. DISBROW
13          2290 First National Building,
14          660 Woodward Avenue,
15          Detroit, Michigan  48226
16              On behalf of the Defendants,
17              Thyssenkrupp Materials NA.
18
19
20
21
22
23
24
```

```
 4
          OBJECTION INDEX
 1
 2  OBJECTION MADE BY              PAGE
 3
 4  MR. DISBROW                    22
 5  MR. DISBROW                    32
 6  MR. DISBROW                    33
 7  MR. DISBROW                    36
 8  MR. DISBROW                    41
 9  MR. DISBROW                    42
10  MR. DISBROW                    43
11  MR. DISBROW                    44
12  MR. DISBROW                    45
13  MR. DISBROW                    46
14  MR. DISBROW                    47
15  MR. DISBROW                    48
16  MR. DISBROW                    49
17  MR. DISBROW                    50
18  MR. DISBROW                    51
19  MR. DISBROW                    52
20  MR. DISBROW                    53
21  MR. DISBROW                    54
22  MR. DISBROW                    55
23  MR. DISBROW                    56
24  MS. WEGNER                     63
```

```
 3
          EXAMINATION INDEX
 1
 2  WITNESS                EXAMINATION
 3
 4  PATRICK BISHOP
 5      EX-BY MS. WEGNER           7
 6      EX-BY MR. DISBROW          59
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 5
          EXHIBIT INDEX
 1
 2  NUMBER              MARKED FOR ID
 3
 4      NO EXHIBITS MARKED
 5      NO EXHIBITS ATTACHED
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

2 (Pages 2 to 5)

VICTORIA COURT REPORTING SERVICE, INC   (312)   443-1025

6

```
1          DEPOSITION OF PATRICK BISHOP
2                 MAY 30, 2008
3          PATRICK BISHOP, having been first
4  duly sworn, was examined and testified as follows:
5  EXAMINATION
6  BY MS. WEGNER:
7     Q.   Sir, would you please state your full
8  name for the record?
9     A.   Patrick Daryl Bishop. D-a-r-y-l.
10    Q.   Let the record reflect this is the
11 deposition of Patrick Bishop in the case entitled
12 Robert Wingo versus Thyssenkrupp Materials NA,
13 Inc., doing business as Copper and Brass Sales,
14 case number 08 C 368, in the United States District
15 Court for the Northern District of Illinois,
16 Eastern Division.
17         This deposition is being taken
18 pursuant to subpoena and in accordance with the
19 Federal Rules procedure and applicable local rules.
20         All right, Mr. Bishop.  I
21 introduced myself to you earlier.  I'm Jan Wegner,
22 one of the attorneys representing Robert Wingo in
23 the lawsuit that he currently has pending against
24 Copper and Brass Sales.
```

7

```
1          I will be asking you some
2  questions today regarding your employment with
3  Copper and Brass Sales, Mr. Wingo's employment with
4  that same entity, some questions regarding the
5  business of Copper and Brass Sales and allegations
6  made in Mr. Wingo's pending lawsuit.
7          Have you ever given a deposition
8  before today?
9     A.   No.
10    Q.   Have you ever provided sworn testimony
11 before today at a trial or other type of hearing?
12    A.   No.
13    Q.   Prior to today, have you ever been
14 involved in any litigation as a witness or a party?
15    A.   No.
16    Q.   All right.  Mr. Bishop, it's important
17 that you respond verbally to all the questions that
18 are asked of you so that the court reporter can
19 make an accurate record because she's using
20 machines that are incapable of a non-verbal
21 response.  Okay?
22    A.   Okay.
23    Q.   Will you let me know if I ask a
24 question that you feel you don't understand?
```

8

```
1     A.   Absolutely.
2     Q.   Okay.  If you tell me you don't
3  understand a question, I will rephrase it to make
4  it perfectly clear for you to be able to respond to
5  that question.  All right?
6     A.   All right.
7     Q.   And if you do answer a question, it
8  will be assumed that you understood that question.
9  Okay?
10    A.   Okay.
11    Q.   It would be helpful if you wait for a
12 question to be completed before you begin speaking
13 because it's difficult for the court reporter to
14 record more than one person speaking at the same
15 time.  Okay?
16    A.   All right.
17    Q.   If you need a break, let us know.  As
18 long as you answer any question that's been asked
19 first, we'll be happy to take a break.  Okay?
20    A.   Great.
21    Q.   Any question about the process?
22    A.   None.
23    Q.   All right.  From time to time during
24 my questioning, the attorney representing Copper
```

9

```
1  and Brass, who you've met is Mr. Disbrow, may have
2  objections that he will pose, and he will also have
3  the opportunity to question you when I am finished,
4  just so you understand how that process works.
5  Okay.
6     A.   That's fine.
7     Q.   Did you receive a subpoena and a
8  witness fee check to appear for your deposition
9  today?
10    A.   Yes.
11    Q.   Mr. Bishop, are you represented by an
12 attorney here today for your deposition?
13    A.   I have no idea.
14         MR. DISBROW: I think the record
15 will reflect that the company's attorney does not
16 represent you personally in this matter.
17         THE WITNESS: Then no.
18 BY MS. WEGNER:
19    Q.   Where do you reside, sir?
20    A.   Indiana.
21    Q.   Okay.  Where is your current residence
22 in Indiana?
23    A.   Dyer.
24    Q.   What is your home address?
```

DEPOSITION OF PATRICK BISHOP -- 05/30/08

10

1    A.   9471 Henry Street.
2    Q.   How long have you lived at 9471 Henry
3  Street in Dyer, Indiana?
4    A.   September 2006.
5    Q.   And is your current residence a home
6  or an apartment?
7    A.   It's a home.
8    Q.   With whom do you reside at your home
9  in Dyer, Indiana?
10   A.   My wife and three kids.
11   Q.   Do you have any current intention on
12  relocating from your present home address within
13  the next year?
14   A.   No, it's a brand new house.
15       MR. DISBROW:  Moving is no fun
16  with three kids.  I can attest to that.
17       THE WITNESS:  I said from when we
18  moved from the old house, I'll never do that again.
19  BY MS. WEGNER:
20   Q.   What is your date of birth, Mr.
21  Bishop?
22   A.   12-16-76.
23   Q.   And what is your current age?
24   A.   Thirty-one.

11

1    Q.   Do you have a current phone number?
2    A.   Yes.  219-558-8700.
3    Q.   And is this your home phone number?
4    A.   Yeah.  My son is starting
5  kindergarten.  So, when we got the new house, we had
6  to make sure to get an easy number for him to
7  remember.
8    Q.   Have you ever been convicted of a
9  felony?
10   A.   No.
11   Q.   Have you ever been convicted of a
12  crime involving dishonesty?
13   A.   No.
14   Q.   And what is the highest level of
15  education you've achieved, Mr. Bishop?
16   A.   High school.
17   Q.   Are you a high school graduate?
18   A.   No.
19   Q.   Where did you attend high school?
20   A.   Highland High School, Griffith High
21  School.
22   Q.   Were the high schools that you
23  attended in Indiana?
24   A.   Yes.

12

1    Q.   And how much high school did you
2  complete?
3    A.   Three years.
4    Q.   Three years?
5    A.   Yes.
6    Q.   Do you have any training in a trade?
7    A.   No.
8    Q.   Do you hold any professional licenses
9  or certifications?
10   A.   No.
11   Q.   Are you currently employed with Copper
12  and Brass Sales?
13   A.   Yes.
14   Q.   And when did you begin your employment
15  with Copper and Brass Sales?
16   A.   2001, September 17th.  That's the year
17  911 happened, right?
18       MR. DISBROW:  Yes.
19  BY MS. WEGNER:
20   Q.   And in what position did you begin
21  with Copper and Brass Sales in 2001?
22   A.   Warehouseman.
23   Q.   At what location did you begin working
24  with Copper and Brass Sales?

13

1    A.   Munster, Indiana.
2    Q.   And at what location do you currently
3  work with Copper and Brass Sales?
4    A.   Schaumburg, Illinois.
5    Q.   Did you transfer from the Copper and
6  Brass Sales, Munster, Indiana location to
7  Schaumburg?
8    A.   Yes, I guess you can call it that.
9  They come down and asked us if we wanted jobs
10  there, that we'd still keep our seniority.  We'd
11  keep basically everything we had.  Just a transfer,
12  I guess, is the best way to put it.
13   Q.   Was the Copper and Brass Sales
14  location at which you were employed in Munster,
15  Indiana closed at some time?
16   A.   They closed in January of 2002.
17   Q.   Are you a member of a union?
18   A.   Yes.
19   Q.   What union do you belong to?
20   A.   Local 714.
21   Q.   Has your union affiliation with the
22  teamsters?
23   A.   Correct.
24   Q.   What are your duties as a warehouseman

DEPOSITION OF PATRICK BISHOP -- 05/30/08

14

1   with Copper and Brass Sales?
2      **A.   Current?**
3      Q.   Yes.
4      **A.   I work in receiving, unloading trucks,**
5   **checking material in, tagging the material, putting**
6   **away the material.**
7      Q.   How long have you held your current
8   position with Copper and Brass Sales in receiving?
9      **A.   A year maybe, give or take a couple**
10  **months or so.**
11     Q.   Have you performed other warehouseman
12  positions while you've been employed at Copper and
13  Brass Sales?
14     **A.   Yes.**
15     Q.   What other job positions have you
16  worked in?
17     **A.   The rod, bar and wire area, driving a**
18  **side loader, pulling orders, PVC station, sheet**
19  **station, packing station.  That's it.**
20     Q.   What duties did you perform in the
21  rod, bar and wire area at Copper and Brass?
22     **A.   Just packaging metal.**
23     Q.   And what process was used for you to
24  move within various stations at Copper and Brass

15

1   Sales?
2      **A.   As in?**
3      Q.   Did you request to be moved to the
4   different stations?
5      **A.   You're a warehouseman.  You know they**
6   **can put you anywhere they want.**
7      Q.   Among the different work stations that
8   you have worked at with Copper and Brass Sales, are
9   there any that are -- that have job duties that are
10  more difficult than others?
11     **A.   I don't think so in my opinion, no.**
12     Q.   What were your duties when you worked
13  in the PVC station in Copper and Brass Sales?
14     **A.   Just grab a machine that rolls the**
15  **plastics on the bottom.  You grab a sheet and just**
16  **step on a pedal and is runs it right through the**
17  **machine and onto another skid.  It just puts a**
18  **layer of clear plastic of PVC on top of it or white**
19  **laser color.**
20     Q.   Were you employed before you started
21  working at Copper and Brass Sales?
22     **A.   No.**
23     Q.   Did you have full-time employment, at
24  any time, before you started working at Copper and

16

1   Brass Sales?
2      **A.   Yes.**
3      Q.   What was the last employment that you
4   had before you began working with Copper and Brass
5   Sales in September of 2001?
6      **A.   Webb Ford.**
7      Q.   Where were you employed by Webb Ford?
8      **A.   Highland, Indiana.**
9      Q.   And what was your position with Webb
10  Ford?
11     **A.   I worked the parts counter.**
12     Q.   Was your position with Webb Ford a
13  full-time position?
14     **A.   Yes.**
15     Q.   And how long were you employed by Webb
16  Ford?
17     **A.   Let's see.  July 7, '97 to February of**
18  **'01.**
19     Q.   Why did your employment end with Webb
20  Ford?
21     **A.   Termination.**
22     Q.   In between Webb Ford and Copper and
23  Brass Sales, did you have any employment?
24     **A.   No.  Unemployment.**

17

1      Q.   Okay.  Fair enough.
2           What's the reason that you were
3   terminated by Webb Ford?
4      **A.   A customer came in and wanted touch-up**
5   **paint for their car.  The stickers were missing off**
6   **the door.  It was a brand-new car.  I asked him**
7   **where the stickers were for the paint code on the**
8   **door.  So, I told him to go out there and get the**
9   **number off and come back in, and there was no**
10  **sticker there.**
11         **So, I go back.  Okay.  You maybe**
12  **see the car has been wrecked.  Well, it comes down**
13  **to it and he finds out the car has been wrecked.**
14  **The parents comes down.  Well, the snow plow that**
15  **plows our lot, slammed into the car.  So, he's**
16  **going to have it repaired without telling them and**
17  **they find out that I have done something.  I just**
18  **did my job and I ended up getting fired for it.**
19  **That's it.  I got the raw end of the deal, I say.**
20  **Don't ever buy a car from them.**
21     Q.   Did you file any type of charges or
22  complaints against Webb Ford regarding your
23  termination?
24     **A.   No, not when their lawyer was an old**

DEPOSITION OF PATRICK BISHOP -- 05/30/08

18
1  Lake County judge. I don't think it's going to
2  work.
3      Q.   Have you ever filed any charges or
4  complaints against your current employer, Copper
5  and Brass Sales?
6      A.   As in grievances?
7      Q.   Okay. Grievances.
8           Have you done that?
9      A.   Yeah.
10     Q.   Have you had a lawyer represent you in
11 any claims ]against Copper and Brass Sales?
12     A.   No.
13     Q.   Have you ever filed any discrimination
14 charges against Copper and Brass Sales?
15     A.   Yes.
16     Q.   Where did you file discrimination
17 charges against Copper and Brass Sales?
18     A.   Through corporate.
19     Q.   Did you contact someone in human
20 resources to file discrimination charges against
21 Copper and Brass Sales?
22     A.   Yes.
23     Q.   When did you contact human resources
24 to file claims of discrimination against Copper and

19
1  Brass Sales?
2      A.   I don't know what dates they are. I
3  have all that stuff on file at home.
4      Q.   Do you recall what year you contacted
5  the human resources regarding your complaint
6  against Copper and Brass Sales?
7      A.   It was either '06 or '07. I'm not
8  sure. I honestly don't know.
9      Q.   What was the complaint that you made
10 with human resources?
11     A.   I don't have that in front of me. I'm
12 sorry.
13     Q.   Well, did your complaints to human
14 resources at Copper and Brass Sales stem from any
15 particular incident?
16     A.   There was an incident.
17     Q.   Okay. And what was the incident that
18 occurred that caused you to contact human resources
19 corporate?
20     A.   I honestly don't know. I've had a few
21 of them. So, I don't know which one it was. I
22 honestly can't tell you.
23     Q.   So, as you sit here today, you don't
24 know what your claims were that you presented to

20
1  corporate human resources?
2      A.   Oh, one that was sent to them. God,
3  I'm trying to think. It went back and forth
4  sending certified letters. Oh, god. I honestly
5  don't know which one it is. It's the one that had
6  all the certified letters with it.
7      Q.   Was the complaint that you lodged
8  against Copper and Brass Sales with corporate human
9  resources resolved?
10     A.   To them it was.
11     Q.   Did you make your complaint to
12 corporate human resources related to any particular
13 individual at Copper and Brass Sales?
14     A.   Yes.
15     Q.   And who was it that you complained
16 about?
17     A.   Mark Demean and Randy Lunt.
18     Q.   Are you aware of whether or not there
19 was any investigation that was conducted by
20 corporate human resources as a result of your
21 complaint?
22     A.   They went off of Randy's
23 investigation.
24     Q.   And what is it that you believe Randy

21
1  investigated that corporate human resources relied
2  upon?
3          MR. DISBROW: I'm just going to
4  object on the grounds of foundation. I don't know
5  that he knows or has personal knowledge regarding
6  the investigation Randy undertook, but you can
7  answer the question if you know.
8          THE WITNESS: Well, do you want
9  to know how he did his investigation?
10         BY MS. WEGNER:
11     Q.   No. You said to me that human
12 resources went off Randy's investigation.
13     A.   Right. Randy said he did an
14 investigation, according to their letters that were
15 sent back to me, and they saw none of this had
16 happened. So, that was the end of it.
17     Q.   Do you have any personal knowledge
18 that Randy actually conducted an investigation upon
19 which human resources relied?
20     A.   It's none of my business. It's just
21 his job to do.
22     Q.   Well, what did you complain about to
23 human resources regarding Mark Demean and Randy
24 Lunt?

6 (Pages 18 to 21)

DEPOSITION OF PATRICK BISHOP -- 05/30/08

22

1      A.   It was over a suspension.  I was
2  suspended for three days.  Let's see.  February of
3  '06.  Yes, that's exactly when it was.  February of
4  '06, and it wasn't Mark Demean.  It was Steve
5  Catama.
6              MR. DISBROW:  I think that's
7  spelled C-a-t-a-m-a.
8              THE WITNESS:  That's right.
9  Because he was fired that week, and they suspended
10  me and then fired him.
11             BY MS. WEGNER:
12     Q.   Did you file a grievance regarding the
13  three-day suspension in February of '06?
14     A.   Yes.
15     Q.   And what was the result that was
16  reached for the grievance that you filed relating
17  to the suspension in February of 2006?
18     A.   That one was when all the certified
19  letters were being sent back and forth, and I got
20  nothing.  The grievance was denied.
21     Q.   What was the reason you were told you
22  were being suspended for three days in February of
23  2006?
24     A.   It had to do with -- I don't know if

23

1  it was insubordinate.  I want to say
2  insubordination.
3      Q.   Prior to February of 2006, had you
4  been suspended?
5      A.   Yes.
6      Q.   And how many times prior to February
7  of 2006 had you been suspended?
8      A.   Just once.
9      Q.   Prior to February of 2006, what was
10  the length of the suspension you received?
11     A.   Three days.
12     Q.   When were you suspended prior to
13  February of 2006?
14     A.   Oh, I don't know when this one was but
15  I know what it was for.
16     Q.   Okay.
17     A.   I didn't file a grievance on it but it
18  was just based on hearsay, basically is what it
19  was, and I got my three day's pay back.
20     Q.   What was it that you understand was
21  hearsay that caused your first suspension at Copper
22  and Brass Sales?
23     A.   Somebody came on the floor and said I
24  was doing donuts on a forklift, doing burnouts on

24

1  an electrical forklift which is impossible.  I filed
2  a grievance on it and our BA came down and said
3  "It's hearsay.  You got no proof."
4              So, they had to pay me my time
5  off.
6      Q.   Who is it that you are referring to as
7  the BA that came down to assist you?
8      A.   Gino Rodriguez, my business agent.
9      Q.   Mr. Rodriguez is affiliated with your
10  local union?
11     A.   Yes, he's our business agent.
12     Q.   Are you familiar with Mr. Wingo?
13     A.   Yes.
14     Q.   And when did you first become
15  acquainted with Mr. Wingo?
16     A.   I finally knew Bob -- I started there
17  midnights and didn't know him then.  Then I want to
18  say 2003 or 2004, somewhere around there.
19     Q.   Well, when you first started working
20  at the Copper and Brass Sales Schaumburg location,
21  working midnights, what was your job position?
22     A.   Warehouseman.
23     Q.   What specific area?
24     A.   Rod, bar and wire.

25

1      Q.   What tasks did you perform in the rod,
2  bar and wire area on midnights?
3      A.   Packing material.
4      Q.   When, in your employment at the
5  Schaumburg location, did you change from the
6  midnight shift?
7      A.   About eight or nine months after I
8  started.  I went to second shift.
9      Q.   And how were you able to transfer to
10  the second shift after eight or nine months?
11     A.   I asked the guy to switch.
12     Q.   Who did you ask to switch?
13     A.   His name is Mike Peroni.
14     Q.   And Mr. Peroni agreed to switch shifts
15  with you?
16     A.   Right.  Well, we had to go through
17  Randy and Randy posted it, if anybody wanted it,
18  then it had to go here and there, and if nobody
19  wanted it, then he let the switch happen.
20     Q.   What was the position that you assumed
21  when you switched to the second shift?
22     A.   Rod, bar and wire.
23     Q.   Were your duties any different in rod,
24  bar and wire than on the second shift?

VICTORIA COURT REPORTING SERVICE, INC  (312)  443-1025

DEPOSITION OF PATRICK BISHOP -- 05/30/08

26

1    A.   No.
2    Q.   How long did you handle the rod, bar
3  and wire position on second shift then?
4    A.   Well, like I said, I float around.  If
5  I finish my work there, you know, Steve Thomas is
6  the foreman.  He'll say "Can you help them over
7  here?"  "Can you help them over here?"  I don't
8  have a problem with that.  I'm getting paid to
9  work.  It makes my day go by faster.  So, one minute
10  you're helping to pack and unpack.  I don't have a
11  problem with that.
12       So, I floated and bounced around
13  from time to time.  One week they put me on packing
14  station.  My main area was the rod, bar and wire.
15    Q.   When did you last work mainly in rod,
16  bar and wire?
17    A.   I would say the end of second shift,
18  right when I went onto days.  I started out in the
19  sheet station or PVC.  I went to days and that was
20  -- Yeah, it was days.  June of '06 I went to days.
21    Q.   What process did you follow to change
22  your shift to the day shift in 2006?
23    A.   Well, there was a bid to go to days
24  and I was the highest senior guy who bid for it and

27

1  I got it.
2    Q.   Well, when you were working in rod,
3  bar and wire on the second shift, do you know what
4  Mr. Wingo's position was?
5    A.   I believe he was in the packing
6  station.
7    Q.   Do you know -- When you worked in rod,
8  bar and wire on the second shift, were you required
9  to prepare production logs?
10    A.   Yes.  Yes, we were.  Yes.
11    Q.   What was the information you were
12  required to put on production logs?
13    A.   You had your name at the bottom, you
14  put the date on the top, what you wore on, the
15  time you started and then each production sheet
16  goes 1 to 20 from the orders that you fill.
17       You put the work order number,
18  the pieces, the weight and the destination; the
19  time stopped.  The time when you finished the
20  order.  There is a start time and a stop time.  Back
21  then there was only a stop time on the orders.  Now,
22  we have a start and stop time.
23    Q.   Did you receive training on filling
24  out the production logs at Copper and Brass Sales?

28

1    A.   No, it's basically self-explanatory.
2    Q.   When you completed production logs
3  working in RBW, what was the stop time that you
4  entered?
5    A.   When you completed the order, when
6  you're officially done with the order.
7    Q.   Did you work in rod, bar and wire on
8  the first shift at all?
9    A.   Oh, a few times, only when somebody
10  was off and they would -- When I first started
11  first shift, I floated around.  They put me to it.
12  You catch for the shear, sheet station, packing
13  station, PVC station, RBW, you know.  They move you
14  around wherever you're needed.  I was basically the
15  floater.  I was the new guy on the shift.
16    Q.   What were the duties that you
17  performed in the packing station?
18    A.   Stuff that comes from the saws, the
19  shear bay and packing cush packs, 8 by 8 by 8
20  boxes, whatever.  Basically like a UPS style but
21  UPS doesn't go until the afternoon.
22    Q.   When was it that the production logs
23  were changed to reflect both a start and stop
24  sometime?

29

1    A.   The start of LEAN.
2    Q.   When did LEAN start at the Copper and
3  Brass Sales location?
4    A.   A circled variety.  It was branch
5  wide.  I don't know.  Do you know?
6       MR. DISBROW:  No.
7  BY MS. WEGNER:
8    Q.   You don't recall?
9    A.   No.  Maybe last year, start of '07.  I
10  don't know.
11    Q.   In the position that you are currently
12  doing in receiving, that you have been doing for
13  about a year, did you complete production logs?
14    A.   Absolutely.  If we have orders to
15  fill, because now in the receiving area - and I'll
16  explain this to you - we get TR's, which is
17  transfers, there is three of us that work down
18  there.  One person might fill the orders.  I might
19  not fill an order for three months, and I won't
20  fill out a sheet because I'm not doing production.
21  I'm running the crane, checking the material in.
22  So, there is no need to fill a production sheet
23  out.  Whoever fills an order -- if I fill one order
24  I have to put it on the sheet.

8 (Pages 26 to 29)

DEPOSITION OF PATRICK BISHOP -- 05/30/08

30

1    Q.   When the change occurred with the
2  production logs that now contain a start and a stop
3  time, did you receive training regarding those
4  changes?
5    A.   Yeah, we had a meeting on it.  Yes.
6    Q.   Do you recall when the meeting was
7  whether you received training on the change in the
8  work orders?
9    A.   I don't recall.  It would be my
10  foreman in the office when we started the success.
11  I'm sure Mark had one with his guys on it too.  I
12  can't answer that for you, but it was -- I know
13  everybody had to have it because it was the start
14  of, like I said the LEAN, the success.
15    Q.   Mr. Bishop, did you ever receive
16  instructions on what notations, if any, you should
17  make when you had begun working on an order but
18  were unable to complete an order at the end of your
19  shift?
20    A.   Have I ever had any notations?
21    Q.   Did you receive instructions on what
22  you were to do with respect to a work order that
23  you --
24    A.   If I was in the middle of one?

31

1    Q.   Yes.
2    A.   I always finished my job, even after
3  the bell.  I'm not that type of person to leave
4  somebody hanging out to figure out what the hell
5  I'm doing.
6    Q.   Have you had occasions where you've
7  started your shift and there has been work left
8  over from a prior shift for you to do?
9    A.   There is always work left over from a
10  prior shift.  They run 24 hours.  There's always
11  something to do.
12        Are you asking did somebody leave
13  something in the middle of something?
14    Q.   Yes.
15    A.   Yeah, I've had a few.
16    Q.   All right.  Aside from the receiving
17  area where you said you don't fill out production
18  logs on a regular basis unless you have a transfer,
19  when you worked in rod, bar and wire, did the
20  first-shift person in that -- at that station leave
21  unfinished work orders for you?
22        MR. DISBROW:  I'm going to object
23  to the form of the question.  I think it
24  mischaracterizes earlier testimony.  If you

32

1  understand the question, you can answer it.
2        THE WITNESS:  I'm sorry.  What
3  are you asking again?
4        BY MS. WEGNER:
5    Q.   When you were in rod, bar and wire on
6  the second shift?
7    A.   Okay.
8    Q.   Did the person handling the work in
9  rod, bar and wire on the first shift leave
10  unfinished work order for you to complete?
11    A.   No, Ray would never do that to me.
12    Q.   And who are you referring to by "Ray"?
13    A.   Me and Ray Cather.  We used to ride
14  together on second shift when we worked on second
15  shift together.  Even went to days and he covered
16  the days part of it, and then I cover the afternoon
17  part when I was on second shift. So, we helped each
18  other.  It's just how it was with me and him.
19    Q.   Did anyone at Copper and Brass Sales
20  ever indicate to you the average number of hours --
21  I'm sorry -- work orders you should be able to
22  process in a day?
23        MR. DISBROW:  I'm going to object
24  to the form of the question because I think it's

33

1  ambiguous in the current form.
2        THE WITNESS:  I don't think so.
3        BY MS. WEGNER:
4    Q.   When you were in rod, bar and wire,
5  did you ever learn that the company had an
6  expectation of a certain number of work orders that
7  you should complete in a day?
8    A.   No, not that I know of.  I average 40
9  orders a day when I worked eight-hour shifts.
10    Q.   While you've worked at Copper and
11  Brass Sales, have you learned how many work orders
12  other people average per day working in the rod,
13  bar and wire area?
14    A.   It's none of my business what they do.
15  I'm not worried about what other people do.
16    Q.   Do you know what Mr. Wingo's last
17  position was?
18    A.   The RB&W line.
19    Q.   And for how long did Mr. Wingo, to
20  your knowledge, work on the RBW line in his last
21  position at Copper and Brass Sales?
22    A.   I can't tell you.  I don't know.  I
23  worked on the opposite side of the building from
24  him.  He works Bay 1 and I work Bay 5.  It's on the

DEPOSITION OF PATRICK BISHOP -- 05/30/08

34

1    totally other end of the building.  When he went
2    down there, I have no idea.
3        Q.    Who's your supervisor in receiving?
4        A.    Ray Doromal.
5            MR. DISBROW:  I'm not sure on
6    this one either but I think it's D-o-r-o-m-a-l.
7            MS. WEGNER:  D-o-r-o-m-a-l.
8            MR. DISBROW:  I think so but I'll
9    double check.
10    BY MS. WEGNER:
11        Q.    When you started working in receiving
12    on the first shift, do you recall when Mr. Wingo
13    was in the RBW area?
14        A.    I have no idea.  I don't know.
15        Q.    Do you recall an incident that
16    occurred with Mark Demean in late August of 2007
17    when you were working with Mr. Wingo, and Mark
18    Demean saw you or Mr. Wingo?
19        A.    I would say it wasn't lae August.  It
20    was in late September, October.
21        Q.    Okay.
22        A.    Obviously, I do.
23        Q.    And you said you're typically on the
24    other side of the building from Mr. Wingo.

35

1            So, at the time of this incident
2    in September of 2007 involving Mr. Demean, why were
3    you near Mr. Wingo?
4        A.    Because Mr. Wingo was working the PVC
5    station which is located right next to where I
6    worked.
7        Q.    And when Mr. Demean, in September of
8    2007, allegedly swore, were you standing talking to
9    Mr. Wingo.
10            MR. DISBROW:  I'll object to the
11    form of the question.  It assumes facts not in
12    evidence.  You can answer the question if you know.
13            THE WITNESS:  I wasn't standing
14    next to him when he did.  No, I wasn't standing
15    there.
16    BY MS. WEGNER:
17        Q.    Did you hear what Mr. Demean said to
18    Mr. Wingo on this occasion in September of 2007?
19        A.    He was yelling at him, cussing at him.
20        Q.    How far away from Mr. Wingo and Mr.
21    Demean were you when you heard the yelling and
22    cussing?
23        A.    Let's see.  They were at the back side
24    of the table here and I was in the receiving bay

36

1    over here.  I don't know.  I'd say from maybe 30
2    feet, 40 feet.
3        Q.    And were you able to see Mr. Demean
4    and Mr. Wingo at the time you heard Mr. Demean
5    yelling and cussing?
6        A.    Yes.
7        Q.    And what did you hear Mr. Demean say
8    to Mr. Wingo on this occasion?
9        A.    He just asked if he was fucking doing
10    anything today.  Is that what you want me to say?
11    You know, there's a difference with -- you know,
12    you got shop talk and you got regular talk, you
13    know.
14        Q.    Did you hear Mr. Demean say anything
15    to Mr. Wingo on this occasion in September of 2007?
16        A.    No, I didn't hear.  I know he went to
17    him again but I didn't hear anything.  I wasn't
18    around then.
19        Q.    On this day that Mr. Demean yelled and
20    cussed at Mr. Wingo, did you help Mr. Wingo lift
21    PVC roll?
22        A.    Yes, I did.
23        Q.    How heavy can you estimate the PVC
24    roll that you helped Mr. Wingo lift was?

37

1        A.    I'm sure 75 pounds, a hundred pounds.
2        Q.    And how high does the PVC roll that
3    you helped have to be lifted?
4        A.    Probably about right to here on me.
5    (Indicating.)  So, what's that, about five and a
6    half foot?
7        Q.    In your experience at Copper and Brass
8    Sales, is the lifting of this 75 to a hundred pound
9    PVC roll to a height of five and a half feet
10    something that one person usually does?
11        A.    One person can do it but you can ask
12    for help.
13        Q.    Have you assisted other people in
14    lifting the PVC rolls?
15        A.    Yes, all time.  I mean if you're
16    walking by and a guy will ask, "Hey, can you give
17    my a hand lifting this" and you say "Okay."
18        Q.    And on this occasion in September of
19    2007, when you helped Mr. Wingo lift the PVC roll,
20    did you request permission from your supervisor to
21    help Mr. Wingo?
22        A.    Yes, I did.
23        Q.    Why did you request permission from
24    your supervisor to help Mr. Wingo lift the PVC

10 (Pages 34 to 37)

DEPOSITION OF PATRICK BISHOP -- 05/30/08

---

38

1  roll?
2      A.  Because Mark Demean had already said
3  something to me earlier in the day because I walked
4  by and asked Bob for some Tums, and when he went to
5  his locker to get me some, he told me to stay in my
6  bay and I said "Okay."
7      Q.  All right. And when you asked your
8  supervisor if you could help Mr. Wingo lift the PVC
9  roll, was it Ray Doromal that you asked?
10     A.  Yes.
11     Q.  Did Mr. Doromal give you permission to
12 help Mr. Wingo?
13     A.  Yes, he did.
14     Q.  Did you receive any discipline as a
15 result of helping Mr. Wingo lift the PVC roll?
16     A.  Yes.
17     Q.  What was the discipline you received
18 for helping Mr. Wingo lift the PVC roll?
19     A.  A letter of counsel.
20     Q.  And who issued the letter of counsel
21 to you?
22     A.  Mark Demean.
23     Q.  Did Mr. Demean explain the basis for
24 the discipline that you received for helping Mr.

---

39

1  Wingo lift the PVC roll?
2      A.  No, he didn't. Just whatever the
3  letter stated.
4      Q.  Did you complain to anyone in
5  management about the discipline that you received
6  --
7      A.  I had -- Go ahead.
8      Q.  -- from Mr. Demean?
9      A.  I filed a grievance against them.
10     Q.  All right. Was the grievance that you
11 filed, as a result of the discipline you received
12 from Mr. Demean for helping Mr. Wingo lift the PVC
13 roll, resolved?
14     A.  Yes.
15     Q.  How was that grievance resolved?
16     A.  Basically, when I wrote my grievance I
17 didn't feel I deserved it. Just basically know
18 what my union contract says. I need a letter of
19 counsel and I don't feel I deserved it.
20         So, the union and company greed
21 to a 90-day probation period. I didn't get into
22 any trouble. I just wanted out. A letter of
23 counsel was nothing to hurt you, against you. It's
24 just a counseling letter but I don't want it in my

---

40

1  file.
2         That's the only reason why I
3  filed a grievance on it. I stayed out of trouble
4  for 90 days and it was removed.
5      Q.  Did Mr. Wingo, to your recollection,
6  receive any discipline as a result of the incident
7  where Mark Demean swore at him?
8         MR. DISBROW:  Objection to form
9  of the question. Do you understand?
10        THE WITNESS:  I don't know. It's
11 his business. I have no ideas.
12 BY MS. WEGNER:
13     Q.  When you heard Mark Demean swear at
14 Mr. Wingo, did you hear any response that Mr. Wingo
15 made?
16     A.  No, I didn't.
17     Q.  Did anyone with Copper and Brass Sales
18 in a supervisory, managerial or human resource
19 position, ever ask you what you witnessed Mr.
20 Demean say to Mr. Wingo --
21        MR. DISBROW:  Object to form of
22 the question.
23 BY MS. WEGNER:
24     Q.  -- on that occasion?

---

41

1         MR. DISBROW:  Object to the form
2  of the question as compound.
3         THE WITNESS:  I was too busy
4  actually dealing with my own at the time. Randy
5  asked me what happened and I said, "You know what?
6  I don't want to get involved with this. I'm
7  dealing with my own right now because this stuff
8  happened that same day." So, I said, "You know
9  what? Take it how you want."
10 BY MS. WEGNER:
11     Q.  So, when Randy asked you what happened
12 that day between Mark Demean and Mr. Wingo, you
13 didn't tell him what you heard Mr. Demean say?
14     A.  I was too busy with Mr. Lunt myself
15 about fighting this write-up that I got. I was
16 worried about myself, not Mr. Wingo.
17     Q.  Did you ever prepare any type of
18 written statement regarding what you witnessed Mr.
19 Demean say to Mr. Wingo on that occasion in
20 September of 2007?
21     A.  Did I write anything up?
22     Q.  Yes.
23     A.  No, I didn't.
24     Q.  And are you familiar with Mr.

---

11 (Pages 38 to 41)

DEPOSITION OF PATRICK BISHOP -- 05/30/08

**Page 42**

1 Freuhauf?
2     A.   Yes.
3     Q.    Who's Mr. Freuhauf?
4     A.    He's the vice president of our region,
5 the north central region.
6     Q.    Did Mr. Freuhauf ever contact you to
7 ask what you witnessed Mr. Demean say to Mr. Wingo
8 when you heard Mr. Demean swear at Mr. Wingo in
9 September of 2007?
10     A.   No.
11     Q.    Were you ever told that Mr. Freuhauf
12 claimed he did contact you to find out what you
13 witnessed Mr. Demean say when he swore at Mr. Wingo
14 in September of 2007?
15             MR. DISBROW:  Object to the form
16 of the question.  Assumes facts not in evidence.
17             THE WITNESS:  You're asking if he
18 asked me?
19 BY MS. WEGNER:
20     Q.    I thought I already asked you that and
21 you said no.
22             Did anyone ever tell you that Mr.
23 Freuhauf claimed he did contact you?
24     A.    No, no.  Nobody ever did.

**Page 43**

1             MR. DISBROW:  Same objection.
2 BY MS. WEGNER:
3     Q.    Do you know the reason that Mr. Wingo
4 was terminated?
5     A.    I have no idea.
6     Q.    Have you had contact with Mr. Wingo
7 since he was terminated?
8     A.    He tried contacting me about three or
9 four times.
10     Q.    How do you know Mr. Wingo tried to
11 contact you three or four times?
12     A.    He called my cell phone.
13     Q.    Did you call to Mr. Wingo?
14     A.    I've talked to him a couple times.  He
15 said he was bummed about being fired, you know.  I
16 said I'm sorry.  He said, "Well, let me know what's
17 going on:  And I said, "I don't know what's going
18 on here.  File your grievance and do what you got
19 to do."
20     Q.    Do ou recall what the last time was
21 that you spoke to Mr. Wingo was?
22     A.    Maybe two weeks after he was fired.
23     Q.    Did Mr. Wingo of tell you that he
24 spoke to Mr. Freuhauf about his termination?

**Page 44**

1     A.    No.
2     Q.    All right.  Earlier when we talked
3 about Mr. Demean swearing at Mr. Wingo, you
4 mentioned something about there is shop talk and
5 there is other talk?
6     A.    Right.
7     Q.    What do you mean by that?
8     A.    Well, shop talk is -- I mean you're
9 talking to somebody, you know, and it's like, "You
10 know, that's bullshit."  "That's bullshit."  That's
11 shop talk.  If you tell somebody to go fuck
12 themselves, it's not.  I don't know how you want --
13 how else you want me to put it.
14     Q.    Okay.  Those statements that you just
15 made, telling somebody to go fuck themselves, is
16 that what you heard Mr. Demean say to Mr. Wingo?
17             MR. DISBROW:  Objection.
18 Mischaracterizes his previous testimony.  It's been
19 asked and answered.
20             THE WITNESS:  I've already told
21 you he said, "Are you going to fucking do anything
22 today?"
23 BY MR. WEGNER:
24     Q.    And you felt Mr. Demean's statement to

**Page 45**

1 Mr. Wingo that you witnessed was inappropriate?
2             MR. DISBROW:  Objection to form
3 of the question.  Mischaracterizes his earlier
4 testimony.
5             THE WITNESS:  I don't know.  You
6 can take it either way.  It's just how the guy is,
7 you know.
8 BY MS. WEGNER:
9     Q.    I'm sorry.  Who are you referring to?
10     A.    Mark Demean.  That's just how he is.
11 Some people see him one way and some people see him
12 another way.
13     Q.    Are you familiar with Tyler Demean?
14     A.    Yeah.
15     Q.    Did you work with Tyler Demean at the
16 Copper and Brass Sales' Schaumburg location?
17     A.    Yes, he was a helper on first shift
18 for a little while and then he transferred to
19 midnights.
20     Q.    Did you work on the midnight shift
21 with Tyler Demean?
22     A.    No, he hasn't been there that long.
23 Maybe two years I want to say.
24     Q.    Okay.  So that I understand it, by the

DEPOSITION OF PATRICK BISHOP -- 05/30/08

46

1  time Tyler Demean transferred to midnights, you
2  were already working a different shift?
3      A.   He was on days the same time I was, I
4  want to say, for a little bit because he was a
5  helper, and then there was an opening for midnights
6  and I know he took the opening to go to midnights.
7  How long, I don't know.
8      Q.   To your knowledge, are there instances
9  where Tyler Demean would be supervised by his
10  father, Mark?
11          MR. DISBROW:  Objection to
12  foundation. You can answer if you know.
13          THE WITNESS:  Well, his dad was a
14  foreman on first shift, and Tyler was on first
15  shift and his dad was the foreman and you got other
16  father and sons that work out there. Denny and
17  Jason Prosser. Me and my brother worked there.
18  BY MS. WEGNER:
19      Q.   Are you currently working with your
20  brother?
21      A.   Yeah.  My brother works as a customer
22  service supervisor.
23      Q.   What's your brother's name.
24      A.   Kevin.

47

1      Q.   Does your brother ever supervise your
2  work?
3      A.   Never.
4          MR. DISBROW:  I'm going to object
5  to this line of questioning as to relevance.  You
6  can answer the question.  I don't think they're
7  relevant.
8          THE WITNESS:  No, he has nothing
9  to do with hourly or union employees.
10  BY MS. WEGNER:
11      Q.   And you also mentioned Denny and Jason
12  Prosser.
13      A.   Both warehousemen.
14      Q.   And neither Denny or Jason Prosser is
15  a supervisor?
16      A.   No, they're both warehousemen.
17      Q.   Are you allowed to use a cell phone
18  while you're at work on the floor?
19      A.   Emergency only.
20      Q.   Have you ever witnessed Tyler Demean
21  use his cell phone during the workday on the floor?
22      A.   I don't see Tyler during the day.
23      Q.   Well, when you worked first shift, you
24  started at 6:00 o'clock?

48

1      A.   Yes, 5:00, 4:00.  It depends if he
2  wants to come in early or not.
3      Q.   And you have seen Tyler when he comes
4  in early?
5      A.   Yes.
6      Q.   Do you know what hours Tyler works on
7  the midnight shift?
8      A.   11:00 to 7:30.
9      Q.   All right.  So, when you normally
10  start at 6:00 in the morning, is Tyler still at
11  work?
12      A.   Yes.
13      Q.   So, you see him in the morning when
14  you don't come in earlier than your normal start
15  time?
16      A.   Yes, in passing.  Just to say "Hi," if
17  I start at 5:00 and that's when I'm going on break
18  and I'm going in.
19      Q.   And has anyone told you that they
20  witnessed Tyler on his cell phone during his shift
21  on the floor?
22          MR. DISBROW:  Objection to form
23  of the question.  Foundation.  You can answer it.
24          THE WITNESS:  It's none of my

49

1  business, no.
2  BY MS. WEGNER:
3      Q.   Have you been made aware of what Mr.
4  Wingo's claiming in his lawsuit?
5      A.   No, I haven't.
6      Q.   In his lawsuit, Mr. Wingo is claiming
7  that he was treated less favorably than other
8  employees at Copper and Brass Sales because of his
9  age.
10          Did you ever witness any instance
11  where you thought Mr. Wingo being treated less
12  favorably than other employees because of his age?
13      A.   No.
14      Q.   Did Mr. Wingo ever complain to you
15  while you worked with him at Copper and Brass
16  Sales' Schaumburg location that he felt he was
17  being treated unfairly?
18          MR. DISBROW:  Objection to the
19  form of the question as ambiguous in its current
20  form.
21          THE WITNESS:  No, no.
22  BY MS. WEGNER:
23      Q.   Mr. Wingo never said to you he thought
24  that something had happened to him at work was not

13 (Pages 46 to 49)

DEPOSITION OF PATRICK BISHOP -- 05/30/08

50

1 fair?
2          MR. DISBROW: Same objection.
3          THE WITNESS: Not that I can
4 recall, no.
5      BY MS. WEGNER;
6      Q.    Did Mr. Wingo ever tell you he didn't
7 think it was fair that he'd been terminated?
8          MR. DISBROW: Same objection.
9 It's been asked and answered.
10         THE WITNESS: When he called me
11 on the phone, yes, he did.
12     BY MS. WEGNER:
13     Q.    What was it that Mr. Wingo said about
14 it not being fair that he was terminated?
15     A.    Just you got to understand.
16 Obviously, you know Bob, right? You know how he
17 talks? Have you met Bob?
18     Q.    I've met Mr. Wingo.
19     A.    Okay. Just how he talks, and this is
20 funny how he talks. "Hey, Bubba, you know, this is
21 bullshit what they did to me leading me on like
22 this." Just stuff like that, you know. Hey, like,
23 you know, sorry you lost your job, you know. File
24 your grievances. File the proper procedure. You

51

1 know, that's the only thing you can do. That's the
2 answer to your question, I hope.
3      Q.    While you were employed at Copper and
4 Brass Sales with Mr. Wingo, did anyone indicate to
5 you that there was a problem with Mr. Wingo's
6 performance in any position?
7      A.    No. Like I said, I worked on the
8 opposite side of the building. I don't know what
9 happened on this side over here.
10     Q.    Do you know who took over the position
11 Mr. Wingo had been working in when he was
12 terminated?
13         MR. DISBROW: Objection to the
14 form of the question. Assumes facts not in
15 evidence. Just before you answer, I'm also going to
16 object on foundation. He's not a management
17 employee.
18         THE WITNESS: I mean they bring
19 people in early to cover. Is it Mario came off
20 second shift? I don't know. Like I said, I wasn't
21 there at the beginning of this year, you know.
22         I missed the first four and a
23 half weeks of work. My daughter come down with
24 RSV. So, she was in Christ Children's Hospital in

52

1 intensive care. So, you know, what happened at the
2 beginning of the year from whatever when Bob got
3 let go in what, December? I don't know. I
4 honestly don't know who filled in for him.
5      BY MS. WEGNER:
6      Q.    Well, you said that you were aware
7 that they brought in people early to cover?
8      A.    Right. They'd called guys from second
9 shift out to come in early to start, like 10:30,
10 because they're shorthanded.
11     Q.    Immediately after Mr. Wingo's
12 termination in 2007, who did you see in the RBW
13 work on the first shift?
14         MR. DISBROW: Objection to
15 foundation.
16         THE WITNESS: I'm trying to think
17 who it is. I honestly don't know who they brought
18 in over there. I know they bring guys in early to
19 cover but...
20     BY MS. WEGNER:
21     Q.    Do you know who they brought in early?
22     A.    I know Al would stay over on midnights
23 to help cover, Artie would come in early. Will
24 they put Carlito down there maybe? I don't know.

53

1 I don't make those decisions. I just, you know
2 like I said, I'm on the other side of the building.
3      BY MS. WEGNER:
4      Q.    All right. Did you ever see Tyler
5 Demean handling the RBW duties after Mr. Wingo was
6 terminated.
7          MR. DISBROW: I'm going to object
8 to the form of the question. I think it's been
9 asked and answered. I think he told you numerous
10 times he doesn't know who's performing those
11 duties.
12         THE WITNESS: Basically, they put
13 whoever they want down there, you know. Guys
14 coming in early, guys stay over late. Other guys
15 on days they put down there. That's one of the
16 busiest departments is RBW line.
17     BY MS. WEGNER:
18     Q.    And who presently is handling the RBW
19 processing?
20         MR. DISBROW: Object to the form
21 of the question. I think he's already told you he
22 doesn't know.
23         THE WITNESS: Right now down
24 there is --

14 (Pages 50 to 53)

DEPOSITION OF PATRICK BISHOP -- 05/30/08

54

BY MS. WEGNER:
    Q.  Yeah, in the last week. Have you
noticed somebody handling RBW work?
    **A.  Yeah, Mike Peroni is down there now**
**and another guy will stay over and come in early.**
    Q.  Have you, during your employment with
Copper and Brass Sales, made work order errors?
    **A.  Yeah, I'm sure I have.**
    Q.  Did you ever receive any discipline
for work order errors?
          MR. DISBROW: Objection as to
relevance. You can answer if you know.
          THE WITNESS: I've never received
discipline for errors, work order errors. I've
been written-up if that's what you want to call
discipline. If you're calling a write-up
discipline then, yes.
BY MS. WEGNER:
    Q.  Have you ever been cited with
repetitive work order errors?
    **A.  As in?**
    Q.  Repetitive work order errors?
    **A.  I don't --**
    Q.  Did you receive discipline for

55

anything like that?
    **A.  Well, I've been written up for doing**
**an order wrong. You know, they make a copy of it**
**and show me it. Here's a verbal warning. You**
**know, try not to let it happen again. Okay. Great.**
    Q.  Do you know whether work order errors
are something that commonly happens at Copper and
Brass Sales?
    **A.  Nobody's perfect.**
    Q.  Did Mr. Wingo ever tell you he was not
going to file a grievance against Mark Demean for
swearing at him because he was concerned that he
would suffer retaliation?
    **A.  Not in that way. Said he didn't want**
**to file a grievance because he would -- he said**
**Mark would take away his overtime, but whatever. I**
**would say how can you take away the overtime when**
**he was Number 2 on the seniority list?**
    Q.  Do you know for sure he was Number 2
on the list?
    **A.  He was.**
    Q.  Have you ever been made aware of a
rule at Copper and Brass Sales that no employee
should supervise a relative?

56

          MR. DISBROW: Objection to
relevance. You can answer it if you know.
          THE WITNESS: I don't know
anything about that.
BY MS. WEGNER:
    Q.  To your knowledge, does Mark Demean
have a reputation for being someone who retaliates
when people voice complaints about him?
          MR. DISBROW: Objection to
foundation, form of the question.
          THE WITNESS: Only thing I can
say about Mark Demean is he goes by the book.
BY MS. WEGNER:
    Q.  What do you mean by that remark?
    **A.  He goes by the union contract. He's**
**just a stickler for the rules, I guess, if that's**
**what you want to hear.**
    Q.  Did you ever learn the reason Mr.
Wingo was terminated?
          MR. DISBROW: Objection. Asked
and answered.
          THE WITNESS: Ever learn the
reason why?
          MS. WEGNER: Yes.

57

          THE WITNESS: I believe you just
told me that he was for age discrimination. I
think you said.
BY MS. WEGNER:
    Q.  So, no one ever told you that Mr.
Wingo was terminated for any specific type of rule
violation; is that right?
    **A.  No. That's none of my business.**
    Q.  Are you familiar with the work rules
at Copper and Brass Sales?
    **A.  Most of them, yes.**
    Q.  Have you ever received any training on
the Copper and Brass Sales work and safety rules?
    **A.  Yes.**
    Q.  Are you aware of a major work rule
enforced at Copper and Brass Sales relating to
falsifying company records?
    **A.  It's in our union contract. I believe**
**it's a Class D violation, which is an automatic**
**violation.**
    Q.  And have you ever been made aware of
the company's definition of "falsifying company
records"?
    **A.  No, I never have.**

15 (Pages 54 to 57)

DEPOSITION OF PATRICK BISHOP -- 05/30/08

58

1    MS. WEGNER: I don't have any
2  other questions for Mr. Bishop.
3    MR. DISBROW: I just have a few.
4  I just want to make it clear. I think you were
5  clear but I just want to make sure the record is
6  clear.
7    EXAMINATION
8    BY MR. DISBROW:
9    Q.    Sitting here today you have no
10  personal knowledge concerning the reasons for Mr.
11  Wingo's termination; is that correct?
12    A.    Yes, I have no idea. That's not my
13  business. It's the company's business.
14    Q.    So, the first time you heard any
15  allegation of age discrimination was from Ms.
16  Wegner here today?
17    A.    Yes. I've never heard nothing of
18  that.
19    Q.    And you don't have any evidence of age
20  discrimination; is that your earlier testimony?
21    A.    Of being?
22    Q.    You don't have any evidence --
23    A.    No, I have nothing.
24    Q.    -- that relates to age discrimination

59

1  against Mr. Wingo?
2    A.    No, no, I don't.
3    Q.    I take it from your earlier testimony
4  that overtime s based on seniority?
5    A.    Well, it's seniority and incumbency.
6  Incumbency is -- how they put it is they say if you
7  work a station for six hours because they added
8  into the contract -- a hired senior guy cannot get
9  the overtime.
10    Say I'm the lowest man on the
11  totem pole and the number one guy wants to work
12  that area but I worked there six hours, I get it
13  offered to me first because of the incumbency.
14    Q.    But it's all governed by the
15  collective bargaining agreement?
16    A.    Yes, it's all in our contract. Now,
17  like Saturday work, they called me this morning to
18  see if I want to work Saturday. Saturday goes
19  strictly by seniority because there is no
20  incumbency for Saturday.
21    Q.    Okay. So, if any supervisor wanted to
22  -- Strike that.
23    So, to your knowledge, is it
24  possible for a supervisor to deny an individual's

60

1  overtime if he is -- or has the right to that
2  overtime under the collective bargaining contract?
3    A.    He can't deny him.
4    Q.    And if he did that would be --
5    A.    A grievance. Yeah, you file a
6  grievance against that supervisor for the time that
7  you've lost. This is how it works. If where I'm
8  at, I get offered first because I get seniority
9  over the guy I work with because we work in the
10  same spot. You know, he wanted to come in early
11  yesterday. I didn't have a problem with that. Go
12  ahead. I'll sign on but I get the incumbency first
13  and then that's where my seniority comes in because
14  I have the seniority there.
15    So, if you got four guys that
16  work in one station, the highest senior guy is
17  going to get the overtime over the over three guys.
18    Q.    And are you aware of any -- Are you
19  aware of Mark Demeanor, or any other supervisor,
20  trying to go outside of the collective bargaining
21  agreement and deny an individual overtime?
22    A.    No. With how slow we are right now,
23  we're even lucky to get any.
24    Q.    Mr. Peroni, Mike Peroni, there was

61

1  some testimony about him earlier?
2    A.    Yes.
3    Q.    Do you know when he started with the
4  company?
5    A.    He started right after me. I know he
6  started -- I want to say January of 2002.
7    Q.    Okay. So, he was a current employee
8  of the company well before Mr. Wingo was terminated
9  in January of 2007?
10    A.    Oh, yes. He's been there for -- It's
11  what, his seventh year?
12    Q.    So, he wasn't a replacement employee?
13    A.    No.
14    Q.    Not a new hire?
15    A.    No. That's who I switched with on
16  midnights. He came off of midnights to come to
17  first shift because there was nobody there, when I
18  went to second shift, because he was on second
19  shift and I switched with him.
20    Q.    I think there was some testimony
21  earlier too that Bob Wingo uses colorful language,
22  if I can put it that way?
23    A.    Everybody uses colorful language.
24    Q.    It's common in the shop?

16 (Pages 58 to 61)

VICTORIA COURT REPORTING SERVICE, INC  (312)  443-1025

DEPOSITION OF PATRICK BISHOP -- 05/30/08

62

1      A.   It's shop talk exactly.  Earlier I
2  explained it.
3      Q.   You spent some time in the shop.  I
4  spent some time in the shop.  That's not something
5  that somebody uses a curse word the not something
6  that you would find outside of the ordinary?
7      A.   No.
8      Q.   So, would you find -- Based upon your
9  experience with Mr. Wingo, do you think that he
10  would be seriously offended if somebody swore in
11  front of him?
12      A.   No.
13      Q.   Or swore at him?
14      A.   No.
15      Q.   That wouldn't shock his conscience?
16      A.   No.
17      Q.   It wouldn't affect his ability to
18  carry out his duties?
19      A.   No.
20          MS. WEGNER:  I think it calls for
21  speculation and I would object.
22  BY MR. DISBROW:
23      Q.   Now, this incident that occurred
24  somewhere around late August or September of 2007,

63

1  you indicated that you heard Mr. Demean say
2  something along the lines of "Are you going to
3  fucking do any work today?"
4      A.   Right.
5      Q.   Did you take, from that statement,
6  that it was directed at Mr. Wingo because of his
7  age?
8      A.   No.
9      Q.   And I think from your earlier
10  testimony, that's the way Mr. Demean talks to a
11  certain degree?
12      A.   Right.  Correct.
13      Q.   To everybody?
14      A.   Yeah.
15      Q.   Regardless of how old that person may
16  be?
17      A.   Yes.
18      Q.   Or how young that person may be?
19      A.   Yes.
20      Q.   He may swear at someone that's 20?
21      A.   Correct.
22          MR. DISBROW:  I don't have any
23  further questions.
24          MS. WEGNER:  All right, Mr.

64

1  Bishop.  You have the right, if a transcript is
2  prepared, to review it and verify for its accuracy.
3  That's called reserving your significant.  You
4  also, if you wish, have the right to choose to have
5  no further involvement with this deposition
6  proceeding, and if you don't wish the right to
7  review the transcript, then you can waive your
8  signature.  It's your choice.  Which would you like
9  to do?
10          MR. DISBROW:  Before you make
11  that decision, you also should be advised that if
12  you waive it now, you can't object to what's on the
13  transcript later.
14          So, there is a legal
15  significance, and without you having counsel today.
16  As we did yesterday, I think we should advise you
17  that it would be preferable, from a union
18  standpoint because you're a union employee, to
19  reserve that right and you can talk to a union
20  attorney later and determine whether or not you
21  wish to review this transcript.  It's your choice
22  today.
23          THE WITNESS:  Right.  Well,
24  whatever.

65

1          MR. DISBROW:  So, you have to
2  tell us whether you want to reserve or waive.
3          THE WITNESS:  Yeah, the best
4  thing for me to do is to reserve.
5          FURTHER DEPONENT SAITH NOT.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

17  (Pages 62 to 65)

DEPOSITION OF PATRICK BISHOP -- 05/30/08

66

1          ROBERT WINGO VS.
2    THYSSENKRUPP MATERIALS NA, INC., et al.
3
4        The Deposition of PATRICK BISHOP, taken in
5    the matter, on the date, and at the time and place
6    set out on the title page hereof.
7        It was requested that the deposition be
8    taken by the reporter and that same be reduced to
9    typewritten form.
10       It was agreed by and between counsel and
11   the parties that the Deponent will read and sign
12   the transcript of said deposition.
13
14
15
16
17
18
19
20
21
22
23
24

67

1              CERTIFICATE
2    STATE OF              :
3    COUNTY OF             :
4        Before me, this day, personally appeared,
5    PATRICK BISHOP, who, being duly sworn, states that
6    the foregoing transcript of his/her Deposition,
7    taken in the matter, on the date, and at the time
8    and place set out on the title page hereof,
9    constitutes a true and accurate transcript of said
10   deposition.
11   _____
12           PATRICK BISHOP
13
14       SUBSCRIBED and SWORN to before me this ____ day
15   of _____, _____ in the jurisdiction
16   aforesaid.
17   _____ _____ My
18   Commission Expires  Notary Public
19
20
21
22
23
24   .

68

1        DEPOSITION ERRATA SHEET
2
3
4    Case Caption: ROBERT WINGO VS.
5       THYSSENKRUPP MATERIALS NA, INC., et al.
6    DEPONENT:      PATRICK BISHOP
7    DEPOSITION DATE: MAY 30, 2008
8    .
9    To the Reporter:
10   I have read the entire transcript of my Deposition
11   taken in the captioned matter or the same has been
12   read to me.  I request that the following changes
13   be entered upon the record for the reasons
14   indicated.  I have signed my name to the Errata
15   Sheet and the appropriate Certificate and authorize
16   you to attach both to the original transcript.
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____

69

1    _____
2    _____
3    _____
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   SIGNATURE:_____DATE:_____
24

18 (Pages 66 to 69)

DEPOSITION OF PATRICK BISHOP -- 05/30/08

70

```
 1        I, Rose Weber, Certified shorthand Reporter
 2  for the State of Illinois, do hereby certify that the
 3  foregoing was reported by stenographic and mechanical
 4  means, which matter was held on the date, and at the
 5  time and place set out on the title page hereof
 6  and that the foregoing constitutes a true and accurate
 7  transcript of same.
 8        I further certify that I am not related to
 9  any of the parties, nor am I an employee of or related
10  to any of the attorneys representing the parties, and
11  I have no financial interest in the outcome of this
12  matter.
13        I have hereby subscribed my hand on the ____
14  day of _____, _____ .
15
16
17
18
19                Rose Weber, CSR
20
21
22
23
24
```

VICTORIA COURT REPORTING SERVICE, INC  (312)  443-1025

DEPOSITION OF PATRICK BISHOP -- 05/30/08

70

1          I, Rose Weber, Certified shorthand Reporter

2     for the State of Illinois, do hereby certify that the

3     foregoing was reported by stenographic and mechanical

4     means, which matter was held on the date, and at the

5     time and place set out on the title page hereof

6     and that the foregoing constitutes a true and accurate

7     transcript of same.

8          I further certify that I am not related to

9     any of the parties, nor am I an employee of or related

10    to any of the attorneys representing the parties, and

11    I have no financial interest in the outcome of this

12    matter.

13         I have hereby subscribed my hand on the 17th

14    day of ____June____, __2008__ .

15

16

17

18                                _Rose Marie Weber_

19                                Rose Weber, CSR

20

21

22

23

24


VICTORIA COURT REPORTING SERVICE, INC  (312)  443-1025