# EXHIBIT F

1

```
 1              UNITED STATES DISTRICT COURT FOR THE

 2                 NORTHERN DISTRICT OF ILLINOIS

 3                      EASTERN DIVISION

 4

 5    ROBERT G. WINGO,              )

 6              Plaintiff,          )

 7         vs.                      )  No. 08 C 368

 8    THYSSENKRUPP MATERIALS NA,    )

 9    INC., d/b/a COPPER AND BRASS, )

10              Defendant.          )

11

12              Deposition of PETE LAROCCO, called

13    for examination, taken pursuant to notice,

14    agreement and by the provisions of the Rules of

15    Civil Procedure for the United States District

16    Courts pertaining to the taking of depositions,

17    taken before PATRICIA A. ARMSTRONG, a Notary

18    Public within and for the County of DuPage, State

19    of Illinois, and a Certified Shorthand Reporter,

20    No. 084-1766, of said state, taken at 29 South

21    LaSalle Street, Chicago, Illinois, on the 29th day

22    of May, 2008 at 2:00 p.m.

23

24
```

COPY

DEPOSITION OF PETE LAROCCO  -  5/29/08

2

1  PRESENT:
2
3  LISA KANE & ASSOCIATES, by
4  MS. JANET WEGNER,
5  120 South LaSalle Street, Suite 1420,
6  Chicago, Illinois 60603,
7  (312) 606-0383,
8      appeared on behalf of Plaintiff;
9
10     and
11
12  HONIGAN, MILLER, SCHWARTZ and COHN, LLP, by
13  MR. MATTHEW SCOTT DISBROW,
14  2290 First National Bank Building,
15  660 Woodward Avenue,
16  Detroit, Michigan 48226-3506,
17  313-465-7372,
18  MR. MATTHEW SCOTT DISBROW,
19      appeared on behalf of Defendant.
20
21
22
23  REPORTED BY: PATRICIA ARMSTRONG, CSR, RPR.
24      Certificate No. 84-1766.

3

1            I N D E X
2  WITNESS              EXAMINATION
3  PETE LAROCCO,
4    By Ms. Wegner            5 - 72
5                            80 - 85
6    By Mr. Disbrow           72 - 80
7
8          E X H I B I T S
9  NUMBER               PAGE REFERENCE
10  No. 2                  15
11  No. 3                  15
12  No. 4                  12
13  No. 5                  15, 41
14  No. 7                  45
15  No. 11                 59
16  No. 14                 61
17  No. 16                 67
18  No. 17                 16
19  No. 18                 46
20  No. 21                 57
21  No. 22                 76
22  No. 30                 32
23    (Exhibit No. 30 retained by counsel.)
24            ---

4

1      (WHEREUPON, the witness was
2      duly sworn.)
3      PETE LAROCCO,
4  called as a witness herein, having been first
5  duly sworn, was examined and testified as
6  follows:
7          EXAMINATION
8  BY MS. WEGNER:
9    Q.  Sir, would you please state your
10  complete name for the record and spell your last
11  name.
12    A.  Pete LaRocco, L-a capital R-o-c-c-o.
13    MS. WEGNER:  Let the record reflect that
14  this is the deposition of Pete LaRocco, witness
15  for the Defendant in the case entitled Robert
16  Wingo versus Thyssenkrupp Materials NA, Inc.,
17  doing business as Copper and Brass Sales, Case
18  No. 08 C 368, pending in the United States
19  District Court for the Northern District of
20  Illinois Eastern Division.
21      This deposition is being taken
22  pursuant to notice and in accordance with the
23  Federal Rules of Civil Procedure and applicable
24  local rules.

5

1    MR. DISBROW:  Let me just state for the
2  record that I don't know if it's accurate to
3  reflect that he is a witness for the Defendant.
4  Mr. LaRocco is an hourly employee.
5    THE WITNESS:  Right.
6    MR. DISBROW:  And a Union representative.
7    THE WITNESS:  Union steward.
8    MR. DISBROW:  We did not have the ability
9  to produce Mr. LaRocco.  He was subpoenaed.
10  BY MS. WEGNER:
11    Q.  Mr. LaRocco, my name is Jan Wegner.
12  I am one of the attorneys representing Robert
13  Wingo in a lawsuit he has filed against Copper and
14  Brass Sales.
15      I am going to be asking you questions
16  today regarding Mr. Wingo's employment with Copper
17  and Brass Sales, your employment with Copper and
18  Brass Sales and questions about the business of
19  your employer, Copper and Brass Sales, and
20  allegations made by Mr. Wingo in his lawsuit.
21      Have you ever given a deposition
22  before?
23    A.  Yes, I have.
24    Q.  Prior to today, how many occasions

2 (Pages 2 to 5)

DEPOSITION OF PETE LAROCCO   -   5/29/08

6

1   have you given a deposition?
2        **A.   One.**
3        Q.    And in what type of matter did you
4   give deposition testimony before today?
5        **A.   With our Labor 714 Teamsters.**
6        Q.    Other than the prior deposition
7   testimony that you provided, have you provided any
8   other sworn testimony at a trial or other type of
9   hearing?
10       **A.   No.**
11       Q.    And have you ever been a party to a
12  litigation, Plaintiff or Defendant?
13       **A.   No.**
14       Q.    It's important that you remember to
15  respond verbally to all the questions that are
16  asked of you so the court reporter can make an
17  accurate record because her machines don't accept
18  a nonverbal response.  All right?
19       **A.   Okay.**
20       Q.    It's also very helpful for her if we
21  both don't try and speak at the same time because
22  she can't record more than one person speaking at
23  the same time.  So please try and wait for me to
24  complete a question and I will try and wait for

7

1   your complete response, and we will make her job
2   easier.  Okay?
3        Will you let me know if I ask a
4   question that you feel you don't understand?
5        **A.   Yes.**
6        Q.    If you tell me you don't understand a
7   question, I will rephrase it to make it perfectly
8   clear for your response.  All right?
9        **A.   Yes.**
10       Q.    If you do answer a question, it will
11  be assumed that you understood that question.
12       Do you agree that's fair?
13       **A.   Yes.**
14       Q.    Should you need a break, please let
15  us know; and as long as you answer any question
16  that has been asked first, we will be happy to
17  take a break.  Okay?
18       **A.   Okay.**
19       Q.    Do you have any questions about this
20  process?
21       **A.   No, I don't.**
22       Q.    Did you receive a subpoena and a
23  witness fee check to appear here?
24       **A.   Yes, I did.**

8

1        Q.    So your deposition today is pursuant
2   to subpoena; correct?
3        **A.   Right.**
4        Q.    What is your current home address?
5        **A.   218 Wakefield Lane, Schaumburg,**
6   **Illinois.  60193 is the Zip Code.**
7        Q.    And how long have you lived on
8   Wakefield Lane in Schaumburg?
9        **A.   About 15 years now.**
10       Q.    Is your current residence on
11  Wakefield Lane a home?
12       **A.   Yes.**
13       Q.    Do you have any present intention of
14  relocating?
15       **A.   No.**
16       Q.    What is your date of birth?
17       **A.   9/11/59.**
18       Q.    What is your current age?
19       **A.   I am going to be 49.**
20       Q.    You will be 49 in?
21       **A.   Right, September.**
22       Q.    So currently you are 48?
23       **A.   Yeah, 48.  I'm sorry.**
24       Q.    What is the highest level of

9

1   education you have achieved?
2        **A.   High school.**
3        Q.    Where did you attend high school?
4        **A.   Proviso East.**
5        Q.    Did you graduate from Proviso East?
6        **A.   No, I had my GED there.**
7        Q.    When did you receive your GED?
8        **A.   A while back, I don't know the exact**
9   **year.**
10       Q.    Do you hold any professional licenses
11  or certifications?
12       **A.   No.**
13       Q.    Do you have any trade or specialty
14  professional training?
15       **A.   From work, yes.**
16       Q.    And from which employer do you have
17  trade training?
18       **A.   Thyssenkrupp Copper and Brass Sales.**
19  **On machinery, if that's what I understand the**
20  **question to be.**
21       Q.    Have you ever been convicted of a
22  felony?
23       **A.   No.**
24       Q.    Have you ever been convicted of a

VICTORIA COURT REPORTING SERVICE, INC.    (312) 443-1025

DEPOSITION OF PETE LAROCCO   -   5/29/08

10

1  crime involving dishonesty?
2      **A.   No.**
3      Q.    Are you currently employed with
4  Copper and Brass Sales?
5      **A.   Yes, I am.**
6      Q.    When did you begin your employment
7  with --
8      **A.   Twenty-nine years ago, 4/24/79, I**
9  **think it was.**
10     Q.    And what is your position with Copper
11 and Brass Sales?
12     **A.   I am a machine operator lead man and**
13 **the steward for our Local.**
14     Q.    You are a machine operator?
15     **A.   Yes.**
16     Q.    And you are a lead man for what?
17     **A.   For the bay, for the machine bay.**
18 **And I am the steward for the members.**
19     Q.    Your position as a steward in
20 connection with your membership in Teamsters Local
21 714; is that correct?
22     **A.   Yes.**
23     Q.    How long have you been a member of
24 Teamsters?

11

1      **A.   About 21 years now.**
2      Q.    Mr. LaRocco, could you please try and
3  let me wait to complete my question?
4      **A.   Yes, I will.**
5      Q.    Thank you.
6          I'm sorry, you have been a member of
7  Teamsters Local 714 for about 21 years?
8      **A.   No, 29 years.**
9      Q.    And how long have you been a Union
10 steward?
11     **A.   Twenty-one years.**
12     Q.    How long have you been a machine
13 operator at Copper and Brass Sales?
14     **A.   I would say about 21 years.**
15     Q.    What are the machines that you
16 operate at Copper and Brass Sales?
17     **A.   I operated shears, I have operated**
18 **cutting machines, steel cutting machines,**
19 **slitters.**
20     Q.    What are your duties as a machine
21 operator with Copper and Brass Sales?
22     **A.   As a lead man, I hand out the work to**
23 **my fellow operators in the bay.  And I cut**
24 **according to the order, what it calls for.  We**

12

1  **mainly cut stainless steel.**
2      Q.    And what are your duties as Union
3  steward?
4      **A.   I try to represent the members.**
5          **If they have a grievance, I give them**
6  **a grievance form and let them fill it out and we**
7  **go through the process of the grievance work.**
8          **I have negotiated contracts, too,**
9  **there, six of them, six three-year contracts.**
10     Q.    Did you participate in negotiating
11 the most recent Union contract?
12     **A.   Yes, I have.  My signature should be**
13 **in the back.**
14     Q.    Mr. LaRocco, I am going to show you a
15 document that we have previously marked as Exhibit
16 No. 4 in an earlier deposition.
17         Do you recognize that?
18     **A.   Yes, I do.**
19     Q.    And what is Exhibit No. 4?
20     **A.   It's our previous contract.**
21     Q.    Previous to when?
22     **A.   Three-year contract.  It's going to**
23 **be ending soon.**
24     Q.    Is this Exhibit No. 4 the Union

13

1  Collective Bargaining Agreement that was in effect
2  from April 16, 2006 through April 15, 2009 at the
3  Copper and Brass Sales location in Schaumburg?
4      **A.   Yes.**
5      Q.    And did you sign a number of the
6  pages of the --
7      **A.   Yes, on Page 23.**
8      Q.    And you also signed Page 24, 25 --
9      **A.   Right.**
10     Q.    (Continuing.) -- 26, 27 and 28 of the
11 agreement?
12     **A.   Yes.**
13     Q.    If you look at the page of the
14 Collective Bargaining Agreement, it has a little
15 number in the bottom right-hand corner, 00771,
16 it's the next to the last page, I believe.
17         On Page 00771 of the Collective
18 Bargaining Agreement there is a letter of
19 understanding regarding the attendance policy?
20     **A.   Yes.**
21     Q.    Were there any changes that were made
22 to the attendance policy after this letter of
23 understanding?
24     **A.   Yes.  I think there were a few of**

4 (Pages 10 to 13)

DEPOSITION OF PETE LAROCCO  -  5/29/08

14

1   them we changed -- a few things that were changed.
2       Q.   Now, when did those changes take
3   place?
4       A.   I don't know the exact dates.  But we
5   were able to do that if we have a meeting with the
6   company and my business agent and Gino and I.
7       Q.   Can you tell me what the current
8   attendance policy is?
9       A.   I am not sure exactly.  This happened
10  a while back.  I couldn't tell you off the top of
11  my head right now.
12      Q.   Are you aware of any document in
13  existence that would articulate the attendance
14  policy at the Schaumburg location of Copper and
15  Brass Sales that was reached and that became
16  effective after the latest contract?
17      A.   Excuse me, I don't understand what
18  you said.  I missed that.
19      Q.   Is there a document that you are
20  aware of that's in existence that would set forth
21  the attendance policy?
22      A.   Those are work rules, they are not a
23  part of the contract.  Those are the Company's
24  work rules.

15

1           They have full discretion.  We can
2   talk about it, but they decide if they want to
3   change things.
4       Q.   Right.  But you said there was a
5   change in the attendance policy?
6       A.   Yes, that was, I would say, maybe a
7   year back.
8       Q.   I am going to show you what was
9   marked at another deposition in this matter as
10  Exhibit No. 5.
11          Do you recognize Exhibit No. 5?
12      A.   Yes.  These are part of the work
13  rules.
14      Q.   And do you know where in these work
15  rules the attendance policy is set forth?
16      A.   I don't see them in here.  No, I
17  don't see them in here.
18      Q.   I am going to show you a document
19  marked at an earlier deposition as Exhibit No. 2.
20          Have you ever seen that document
21  before?
22      A.   No, I haven't.
23      Q.   I am going to show you a document
24  previously marked as Exhibit No. 3.  Have you seen

16

1   that document before?
2       A.   No, I haven't.
3       Q.   Do you recognize names on Exhibits 2
4   and 3 as names of employees of Copper and Brass
5   Sales?
6       A.   Yes.
7       Q.   I am going to --
8       A.   Excuse me, other than I am not -- am
9   I in here.  No, I am not in here.
10      Q.   You are not in there?
11      A.   Yeah, why is that?
12      Q.   Beats me, I don't know.
13      A.   I have never seen these.
14      Q.   I have not yet been able to determine
15  who prepared that or when they were prepared.  So
16  you are not on here.
17          Let me show you Exhibit No. 17, the
18  document is entitled "Employee Handbook."
19          Have you ever seen that before?
20      A.   No.  I think this is for management.
21      Q.   Okay.
22      A.   No, I have never seen this.
23      Q.   Is there a seniority list for the
24  employees who are members of the Union local 714

17

1   at Copper and Brass?
2       A.   Yes, there is.
3       Q.   Who is No. 1 on the seniority list?
4       A.   I am.
5       Q.   I thought so.
6       A.   In fact, they call me Grandpa there.
7       Q.   Who is No. 2 on the seniority list
8   presently?
9       A.   At this time, I think it's Benny
10  Crosser.  Kurt Sorenson retired.  We have had a
11  couple individuals that retired who were older
12  than -- they were like 58 or 59, right around
13  that.  We have had a couple retirements.
14          Just recently, Danny White and Kurt
15  Sorenson were the last two employees that retired.
16      Q.   Are you familiar with Mr. Wingo?
17      A.   Yes, I am.
18      Q.   When Mr. Wingo was employed at Copper
19  and Brass Sales last, was he next on the seniority
20  list below you?
21      A.   Yes.
22      Q.   Do you know how long Mr. Wingo was
23  employed by Copper and Brass Sales?
24      A.   He was there 29 -- Bob, maybe 21

DEPOSITION OF PETE LAROCCO  -  5/29/08

18

1   or -- 18 or 21, around there, I think it is.
2      Q.    Did Mr. Wingo ever complain to you
3   about harassment that he received from supervisors
4   or managers at Copper and Brass Sales?
5          MR. DISBROW:  I just want to object to the
6   form of the question, it's vague and ambiguous in
7   its current form.
8          And I guess I should explain to you,
9   Mr. LaRocco, lawyers are going to make objections
10  during depositions.
11         That doesn't affect your ability to
12  answer the question.
13  BY THE WITNESS:
14     A.    Yes.  As I stated, though, there is a
15  grievance form that if they thought there was a
16  problem, that I never deny anybody a grievance
17  form.
18         And if I did, he could call the Union
19  hall and they would issue a grievance form for him
20  to fill out and state his piece.
21  BY MS. WEGNER:
22     Q.    When did Mr. Wingo tell you that he
23  felt he was being harassed by the supervisors or
24  managers at Copper and Brass Sales?

19

1          MR. DISBROW:  Same objections.
2          MS. WEGNER:  You can answer.
3   BY THE WITNESS:
4      A.    I don't know the exact date.
5   BY MS. WEGNER:
6      Q.    Do you recall the month or year that
7   he complained to you?
8      A.    I would say probably maybe four or
9   five months ago.  I don't know the exact date, but
10  I do know that he has stated that, yes.
11     Q.    Did Mr. Wingo complain to you that he
12  believed he was being harassed by any supervisor
13  or manager prior to his termination?
14     A.    For not doing his work, yes.
15     Q.    Who did Mr. Wingo complain he
16  believed was harassing him when he complained to
17  you?
18     A.    I believe it was Mark DeMien.
19     Q.    Did Mr. Wingo describe to you the
20  harassment he believed he was receiving from
21  Mr. DeMien when he complained to you?
22     A.    That he was doing too much in the one
23  area that he was in the back, he wasn't doing the
24  proper work order.  We have work orders that you

20

1   need to properly fill out correctly.  And Bob kept
2   making the same mistake, and he felt he was being
3   harassed by the foreman.
4      Q.    What, if anything, did you do --
5      A.    I had suggested to Bob if he felt
6   that he was being harassed, to fill out a
7   grievance form.  And I don't think he ever did.
8      Q.    Did Mr. Wingo ever indicate to you
9   that he had concern about filing a grievance
10  because it could affect his ability to receive
11  overtime?
12     A.    I don't remember that.
13     Q.    Did Mr. Wingo ever tell you that he
14  was concerned about filing any grievance because
15  he feared retaliation?
16     A.    I don't remember that.
17     Q.    Do you have personal knowledge that
18  Mr. Wingo kept making the same mistake on the --
19     A.    I was shown copies, I was shown
20  copies of the work orders that the same mistakes
21  were being made on.
22     Q.    Who showed you the copies of the work
23  orders?
24     A.    The supervisor.

21

1      Q.    You are referring to --
2      A.    Randy Lunt.
3      Q.    When did Mr. Lunt show you these
4   copies of work orders with the same mistakes by
5   Mr. Wingo?
6      A.    Bob was brought into the office
7   numerous times to explain that he was making these
8   mistakes, and I would go in there with him as a --
9   you know, representing him, and Mr. Lunt would
10  show us and try to tell Bob that I needed to fill
11  out the orders correctly and quit making the
12  errors that he was making.
13     Q.    Did you participate in meetings of
14  any other employees and management regarding
15  errors on work orders?
16     A.    Yes.
17     Q.    In your experience at Copper and
18  Brass Sales, were work order errors pretty common?
19     A.    Yes.  We went through a few changes
20  on work orders, and we had numerous of meetings.
21  And we were trained on certain work orders, how to
22  fill them out and what they expected of us
23  according to what bay you are in, how to fill
24  these orders out.

VICTORIA COURT REPORTING SERVICE, INC.    (312) 443-1025

DEPOSITION OF PETE LAROCCO  -  5/29/08

22

1    They have had numerous training
2  sessions with us; and if you needed more sessions,
3  you could request to be retrained on that -- on
4  whatever mistakes you were making, you could be
5  retrained on.
6    Q.   When was the last time you were made
7  aware of any work order errors that were made by
8  employees at the Schaumburg location of Copper and
9  Brass Sales?
10    A.   I would say maybe about three weeks
11  ago myself. I was brought in, told that I was
12  making a mistake on the order.
13        And I was counseled and then
14  retrained on what I was doing, because we are
15  switching over to a new system.
16    Q.   What is the new system?
17    A.   We are supposed to be getting a new
18  computer system, where you enter SL10 tags that
19  need to be made after you cut the order.
20        You need to make sure that you put
21  the right information in the computer in order to
22  fill out the tag that has to be retagged to the
23  metal that is going back into the stock.
24    Q.   In the work that you have performed

23

1  for Copper and Brass Sales as a machine operator
2  with shearing, cutting or slitting material, have
3  you ever made mistakes on the cuts that you have
4  made?
5    A.   Yes, I have.
6    Q.   When is the last time that you made a
7  mistake in cutting material at Copper and Brass
8  Sales?
9    A.   Maybe about three months ago.
10    Q.   What is the mistake that you made
11  about three months ago in cutting material?
12    A.   I had cut the wrong alloy. I
13  mistaked the -- alloys are marked with -- we have
14  identification numbers on the alloys. And I am
15  not -- I am going blind here, so I missed what
16  alloy it was, and I wrote down the wrong alloy.
17  And the customer got the wrong alloy.
18    Q.   So on this occasion about three
19  months ago when you cut the wrong alloy --
20    A.   I was issued a written warning.
21    Q.   But in that instance where you cut
22  the wrong alloy about three months ago, went all
23  the way through the filling, packaging and
24  shipping process to the customer?

24

1    A.   It went all the way through the
2  process to the customer, yes.
3    Q.   The instance where you made the
4  mistake cutting the wrong alloy about three months
5  ago, did anyone else involved with processing that
6  order at Copper and Brass Sales receive any
7  discipline?
8    A.   The material goes to me first. I am
9  the one that cuts the material first.
10  The next stage, it would go to the packer.
11        And I think the packer was warned
12  about letting the process go through to that
13  point. And his name was Lance. And he was just
14  warned.
15        I am the one that I took the written
16  because it should have gone through me first.
17    Q.   Were you the person that actually
18  pulled the material to cut it?
19    A.   Yes, I did. See, we random racks.
20  This material that I was cutting didn't need to be
21  pulled from the regular racks because they were
22  little pieces that we retagged. And I just
23  mistakenly missed the alloy on it.
24    Q.   In other instances --

25

1    A.   Somebody else would bring the
2  material to the table.
3    Q.   On other types of orders where the
4  material is kept elsewhere, there are people who
5  bring that material to you?
6    A.   Right. But the main person that is
7  responsible is the person that is cutting the
8  material and releasing that material to be packed.
9        And I took responsibility for that
10  because it was my mistake.
11    Q.   How is it that you state that the
12  main person that's responsible is the person who
13  cuts and releases the material to be packed?
14    A.   Say that again, I'm sorry.
15    MS. WEGNER:  Can you read my question back,
16  Pat, and we will see if it makes sense.
17        (WHEREUPON, the record was
18        read by the reporter.)
19  BY THE WITNESS:
20    A.   Because I am the one that's pulling
21  the material. I am the one that's cutting the
22  material.
23        And I am the one that's writing the
24  information on the order.

VICTORIA COURT REPORTING SERVICE, INC.    (312) 443-1025

DEPOSITION OF PETE LAROCCO   -   5/29/08

26

BY MS. WEGNER:

Q.   And in your position at Copper and Brass Sales as a machine operator, what is the information that you write on the order?

A.   The size that I am cutting, the tolerance that I am cutting, the weight of the order, the weight of the material, and my initials are done that I filled that order, and that they are getting the correct material.

Q.   Is there a progressive discipline policy at Copper and Brass Sales for the Union employees?

A.   Yes, there is. And I think it is very lenient. I mean, you really have to make the same mistakes over and over. Unless, you know, like a one-month span, if you make six mistakes, you are going to get disciplined.

And, as I said, then, if you don't understand what you are doing, you could always ask for training.

And I must say that Copper and Brass Sales is very good on retraining you. If you need any retraining, they will take the time to give you retraining during your working hours.

27

Q.   What is the basis for your statement that if someone makes six mistakes, they will get disciplines?

A.   Well, I am saying they are -- I mean, you need to really make a lot of mistakes in one month's span. I threw a figure out there, I'm sorry if that -- I am just saying that you really need to make that same mistake over.

Q.   Is repetitive work order mistakes something for which Mr. Wingo received discipline, to your knowledge?

A.   Yes.

Q.   Who else at Copper and Brass Sales have received discipline --

A.   Numerous people.

Q.   (Continuing.) -- discipline for repetitive work order mistakes?

A.   Numerous people.

Q.   Who?

A.   Mario Alvarez, Bob Wingo. Their names are on the second shift, there are Isidro, I can't pronounce his last name. There has been a few of them. A lot of them are mostly new men, too.

28

Q.   Are you referring to Isidro Garcia?

A.   Yes, Isidro Garcia, and there has been a few others.

Q.   In your work with Copper and Brass Sales as a machine operator, do you fill out daily production logs?

A.   Yes.

Q.   And what is the information that you are required to complete on the daily production logs?

A.   Your work order that you are filling, how many pieces that you have filled, the weight, your time start and your time finish.

Q.   Have you ever been informed of the expectation of Copper and Brass Sales as to the number of work orders you would be expected to average to complete for the day?

A.   Yes.

Q.   What is the number of work orders you are typically expected to complete for the day?

A.   Well, in the machine operator -- as a machine operator in our bay, probably about 10 to 15 according to how much weight you are cutting and how many pieces.

29

There could be an order that you are 5,000 pieces that could take all day. And there is orders that is one piece, two pieces that you should be able to do a few of those.

It depends on -- in our area, the piece count is more what is going to take the longest time.

In RBW, which is just there is no cutting involved, they are usually recommended 15 to 20 orders a day, because they are just taking the full metal, no processing.

Q.   And how have you been made aware that in RBW -- which stands for rod, bar and wire?

A.   Right.

Q.   Nonprocessed material?

A.   Right.

Q.   Warehouse employees are expected typically to handle 15 to 20 work orders per day?

A.   Right.

Q.   Now, how have you been made aware of that?

A.   By Mr. Lunt. They have done a time study.

Q.   When is the last time Mr. Lunt

8 (Pages 26 to 29)

DEPOSITION OF PETE LAROCCO  -  5/29/08

30

1  articulated that in rod, bar and wire nonprocessed
2  areas, employees would be typically expected to
3  handle 15 to 20 work orders per day?
4      MR. DISBROW:  I am just going to object to
5  the form of the question.
6          Do you mean when is the last time he
7  articulated that specifically to Mr. LaRocco?
8      MS. WEGNER:  Yes.
9      THE WITNESS:  To me?
10     MS. WEGNER:  Yes.
11 BY THE WITNESS:
12     A.   In our area, as I say, I really don't
13 remember that he had recently said anything to me
14 about it, because most of my guys are senior guys
15 in that bay anyway, that we get the work out.
16 BY MS. WEGNER:
17     Q.   Well, but you represent all of the
18 employees who are Union members?
19     A.   Then I must be misunderstanding what
20 you are saying.
21          Are you saying in my bay?
22     Q.   No.
23     A.   Okay.  Please explain to me.
24     Q.   You said Mr. Lunt had indicated that

31

1  people who handle the nonprocessed rod, bar and
2  wire work orders would typically be expected to
3  handle 15 to 20 work orders per day?
4      A.   Okay.
5      Q.   And my question is:  When is the last
6  time you heard him articulate that?
7      A.   During Bob Wingo's time.
8      Q.   Any particular point of Mr. Wingo's
9  20 something years that you are indicating
10 Mr. Lunt may have made the comment?
11     A.   Well, the last time I heard Mr. Lunt
12 say those statements was during Bob's session when
13 he was working the RBW.
14     Q.   When is it that you last recall
15 Mr. Wingo working the RBW?
16     A.   Just before he was terminated, right
17 around that area?
18     Q.   I am going to show you a document
19 that was actually marked at Mr. Wingo's deposition
20 as Exhibit No. 30, and ask you to take a look at
21 that and see if you recall this?
22     A.   Yes.
23     Q.   Did you receive a copy of this, as
24 indicated on the top?

32

1      A.   Yes, it's in my Union bag.  Key
2  puncher, yes, I remember.  Yes.
3      Q.   Did you participate in any meeting
4  where there was a discussion regarding items
5  listed in this document?
6      A.   I was brought back -- yes.  I was
7  brought back to the RBW.  And I'd just like to say
8  that when I was brought back there, Bob did not
9  like what he was hearing and he asked me to leave.
10 And I did so, into the back of the warehouse.
11         And then he was brought into the
12 office as he was getting this, and stated to him
13 that he did not need to sign this if he didn't
14 feel that he thought it was just and that he could
15 file a grievance.
16     Q.   If you look at the last paragraph of
17 the document that you have in front of you that
18 was marked at Mr. Wingo's deposition as Exhibit
19 No. 30, Mr. Lunt is indicating that Mr. Wingo
20 consistently filling 15 to 20 RBW MP orders in an
21 eight-hour day is less than other employees
22 working at the same work station by a considerable
23 amount, and that Mr. Wingo's production has fallen
24 to approximately 50 percent of the other workers.

33

1      A.   I have seen other work order
2  production sheets, and some of the senior men,
3  they get 20 to 30 orders.  And that's what I think
4  he is going on.
5          But from what I have been told, 15 to
6  20 orders is decent.  But that's not what he was
7  written up for.
8      Q.   I understand that.
9          But the statement that Mr. Lunt is
10 making in this document we have marked as Exhibit
11 No. 30 is inconsistent with the information he
12 provided to you, that 15 to 20 work orders per day
13 would be what would be typically expected?
14     A.   Well, he is going according to what
15 other individuals back there are doing, and they
16 are doing 20 to 30 orders a day.
17     MR. DISBROW:  And I am just going to object
18 because I think that mischaracterizes
19 Mr. LaRocco's earlier testimony.
20 BY THE WITNESS:
21     A.   Yes.  That's what I think he is going
22 on is according to what the other employees back
23 there are doing.  They are doing 20 to 30 orders.
24 In my mind they work.

9  (Pages 30 to 33)

DEPOSITION OF PETE LAROCCO  -  5/29/08

34

1  BY MS. WEGNER:
2      Q.    But that wasn't my question to you.
3      A.    Okay.
4      Q.    You told me that Mr. Lunt indicated
5  that handling rod, bar and wire nonprocessed work
6  orders, an employee would be expected on average
7  to be able to complete 15 to 20 work orders per
8  day; that's what you told me; correct?
9      A.    Yes.
10     Q.    And so when Mr. Lunt in Wingo
11  Deposition Exhibit 30, the document you have in
12  front of you, this memo regarding repetitive
13  warehouse errors, dated 11/19/2007, when Mr. Lunt
14  states that Mr. Wingo was consistently filling 15
15  to 20 RBW MP orders in an eight-hour day, that is
16  consistent with what you had been told what is the
17  normal expectation; correct?
18     A.    Yes.
19     Q.    Now, in looking at this memo of
20  November 19, 2007, previously marked at
21  Mr. Wingo's deposition as Exhibit 30, you said you
22  were in a meeting when this document was given to
23  Mr. Wingo?
24     A.    Right.

35

1      Q.    If you look at the second paragraph
2  of Wingo Deposition Exhibit 30 near the bottom of
3  that paragraph, it indicates that Mr. Wingo had
4  disagreed about placing initials in required
5  boxes, saying it wasn't done that way in the past.
6          Do you have any information on what
7  that refers to?
8      A.    We were told that because of the new
9  way that orders were going to come out in the new
10  system, that you must mark your initials that you
11  have filled that order.
12         And Bob was told a few times that he
13  had not been putting his initials there, and I
14  felt that that's not the way we used to do it.
15  But it was being changed that we had to do it,
16  with the audit, there was an audit box, that you
17  are auditing that that order is correct.
18     Q.    When did this process change about
19  putting initials in there?
20     A.    Maybe about, I would say about a
21  month or two before he was written up for this.
22         We were brought into the office and
23  we were retrained on from now on, you must initial
24  and audit your orders to make sure that you are

36

1  giving the customer what they are asking and the
2  sizes are right and that the pieces -- and the
3  piece count is correct.
4      Q.    On work orders, correct me if I am
5  wrong, there are three boxes to be completed, one
6  marked filled by, one marked --
7      A.    Filled by, packed by and audit.  The
8  audit is the person that is filling the order, he
9  is the auditor.
10     Q.    Now, what, to your knowledge,
11  constitutes filling an order at Copper and Brass
12  Sales?
13     A.    Can you state that again?  I don't
14  understand what you are saying again.
15     Q.    What is or what are the determining
16  factors as to who was considered to have filled an
17  order at Copper and Brass Sales?
18     A.    The person that is in RBW, the side
19  loader driver delivers the material.  The filler,
20  who fills the order and packs it, is the auditor,
21  he makes the determining factor.
22         I hope I answered that correctly to
23  you.  And weighs, he weighs, fills and gives the
24  correct piece count.  So he is filler and the

37

1  auditor and the packer all in one.
2      Q.    Are you aware of any instances where
3  in RBW the same person does not fill, weigh, pack
4  and audit an individual work order?
5      A.    I am not aware of it.
6      Q.    Now, did Ms. Wingo ever complain to
7  you that Mr. DeMien had harassed him and sworn at
8  him?
9      A.    I don't recall that.
10     Q.    Did you ever participate in any
11  meeting between Mr. Wingo and Mr. Lunt where
12  Mr. Wingo complained about Mark DeMien harassing
13  and swearing at him?
14     A.    Yes, I have.
15     Q.    When was the meeting where Mr. Wingo
16  complained to Mr. Lunt about Mark DeMien swearing
17  at him?
18     A.    Where?
19     Q.    When?
20     A.    I don't know the exact date or exact
21  time, but it was just before -- I would say about
22  two, three months before Bob was terminated?
23     Q.    What did Mr. Lunt say when the
24  complaint was brought to him regarding?

10 (Pages 34 to 37)

**38**

1    A.   That Bob felt that he was being
2 harassed to file a grievance form or fill out any
3 kind of forms that he wanted to to take action. I
4 suggested to Bob that if he felt that he was being
5 harassed, to fill out forms and they would
6 investigate.
7    Q.   Who would investigate if forms were
8 filled out?
9    A.   First he would fill out a grievance
10 form, and then our business agent would come in,
11 and Randy Lunt and our business agent would
12 investigate the allegations. And then it would go
13 to corporate and go to human resource.
14    Q.   Did you ever learn that there was
15 anyone who had witnessed Mark DeMien swearing at
16 Mr. Wingo?
17    A.   I don't recall that.
18    Q.   On the occasion that Mr. Wingo
19 complained that Mark DeMien had sworn at him, do
20 you recall Pat Bishop being involved in anything
21 related to that incident?
22    A.   I need to tell you, a lot of times
23 that there were meetings, I don't know what it
24 was, Bob felt that he did not want me in those

**39**

1 meetings, and I was taken out of the meeting at
2 his request.
3    So I don't recall a lot that was said
4 over who was involved in the Mark DeMien issue.
5    Q.   Did Mr. Wingo ever tell you why he
6 had you taken out of meetings?
7    A.   He felt that I was sleeping with the
8 enemy.
9    Q.   Mr. Wingo actually told you he felt
10 you were sleeping --
11    A.   Well, he felt that I was with the
12 company. I wasn't representing him right.
13    And I told him that if he felt that,
14 then he could always request to have me taken out
15 and have a senior person brought in. And I think
16 that he did a couple of times have somebody else
17 brought in.
18    Q.   Did Mr. Wingo express to you why he
19 felt you were sleeping with the enemy?
20    A.   No, he didn't. I just did what he
21 asked me to do. He has always been able to write
22 grievances.
23    Q.   Are you, in fact, friendly with Mark
24 DeMien?

**40**

1    A.   Mark DeMien is my foreman. I do not
2 go out with Mark DeMien, I don't associate with
3 Mark DeMien out of work. He is my foreman.
4    Q.   Do you associate or socialize with
5 any managers or supervisors from Copper and Brass
6 Sales out of work?
7    A.   No, I don't, not really, no, other
8 than if they have a barbecue or something like
9 that, you know, for our quarterly meetings or
10 whatever, they have a barbecue or something like
11 the, Christmas, you know, Thanksgiving, where they
12 have a thing out -- a barbecue out in the pit, out
13 in our document area, that's about it.
14    Q.   Are you familiar with Tyler DeMien?
15    A.   Tyler DeMien is Mark DeMien's son.
16    MS. WEGNER: Why don't we take a couple
17 minutes here.
18    (WHEREUPON, a recess was had.)
19    MS. WEGNER: Back on the record.
20 BY MS. WEGNER:
21    Q.   Is it a violation of any Copper and
22 Brass Sales policy, to your knowledge, for
23 supervisory or managerial employees to swear at
24 subordinate employees?

**41**

1    A.   I think there are work rules on that.
2    Q.   Work rules, are you referring to one
3 of the exhibits that we placed in front of you
4 that, I believe, govern managerial --
5    A.   I believe there is something in here.
6    Q.   Okay.
7    A.   Insubordination or language, action
8 direction from management that is abusive in
9 nature, Category C.
10    Q.   I'm sorry, what document are you
11 looking at?
12    A.   The work rules.
13    Q.   What exhibit number is that, the
14 sticker on the front?
15    A.   Exhibit 5.
16    Q.   To your knowledge, do the work rules
17 in Exhibit No. 5 apply to supervisors and managers
18 at Copper and Brass Sales?
19    A.   I don't see that. It applies to us.
20    Q.   When you say it applies to us, are
21 you --
22    A.   Our Union members.
23    Q.   Have you been made aware of any
24 repetitive work order errors, where the filled by,

DEPOSITION OF PETE LAROCCO   -   5/29/08

42

1  packed by and QA boxes have not been completed by
2  the same -- initialed by the same person in the
3  last several months?
4      A.   Other people, yes.  If you are saying
5  there were other people involved that had -- yes.
6      Q.   Because you told me that the policy
7  was -- the system was changing?
8      A.   Right.
9      Q.   So in the last several months, have
10 you still come upon instances where people have
11 not put their initials in all of the required
12 boxes on the work order?
13     A.   Yes, there was one -- probably about
14 two months ago, Lance, Lance Amack, he was
15 verbally warned about it the first time that he
16 did it.
17     Q.   To your knowledge, it's the first
18 time that Lance had made that work order mistake
19 of not initially all three boxes?
20     A.   Right, to my knowledge.  Most of the
21 time that when they are verbally warned, they come
22 and get me to make sure that you are being warned
23 verbally in front of the steward and management.
24     Q.   Have you ever been made aware of

43

1  complaints or concerns by other Union employees
2  that Tyler DeMien is receiving preferential
3  treatment?
4      A.   I have not been made aware of that.
5      Q.   Have you ever been made aware of
6  instances where Tyler DeMien has been allowed to
7  talk on his cell phone during work hours?
8      MR. DISBROW:  Objection; assumes facts not
9  in evidence.
10 BY THE WITNESS:
11     A.   I am not aware of that.
12 BY MS. WEGNER:
13     Q.   Now, is talking on a cell phone
14 during work hours on the floor a violation of work
15 rules?
16     A.   We are not allowed to talk on the
17 floor, unless you go to the foreman and it's an
18 emergency, and you notify the foreman that, hey,
19 look it, I need to talk to this person, it's about
20 somebody in the hospital or something like that,
21 then they will let you do it.
22         Just so you know, Tyler DeMien is not
23 on my shift, so I barely even see him.  He is on a
24 late shift, the third shift.

44

1      Q.   Do you know what hours Tyler DeMien
2  works on his third shift?
3      A.   I think it's 6:00 to 2:30, 2:30 to
4  11:00, 11:00 to 7:00.  11:00 to 7:00.  Three
5  shifts.
6      Q.   Okay.  And on your shift, you are
7  allowed to stop five minutes early for washing up?
8      A.   We are allowed to stop for five
9  minutes, yes, before wash-up.  The bell goes off,
10 but you still have to remain in the building and
11 you do have to wait those five minutes to leave,
12 that's it.
13     Q.   Is there a policy or procedure that
14 you follow when working on work orders that you
15 can't complete before the bell goes off and your
16 workday stops?
17     A.   You are supposed to communicate with
18 the next shift on -- that you are not able to
19 complete the order so that he is able to complete
20 the order.
21     Q.   And how do you communicate where you
22 left off on an order?
23     A.   You either write notes or you stay
24 and you tell the next shift.

45

1      Q.   And what procedure is typically used
2  to write the notes for the next shift to let them
3  know where you leave off on a work order?
4      A.   There is not really a procedure, it's
5  just you either write, you know, that, here, you
6  need to do this or that, or give it to the foreman
7  and let the foreman tell the individual.
8      Q.   I am going to show you a document we
9  have marked at an earlier deposition as Exhibit
10 No. 7.
11         Have you ever seen Exhibit 7 before?
12     A.   Yes.
13     Q.   Can you identify Exhibit No. 7?
14     A.   Yes.
15     Q.   What is Exhibit No. 7?
16     A.   About daily production log.
17     Q.   What is your understanding of the
18 instruction in the daily production log relating
19 to the completion of the daily production log, if
20 any, at or near the end of your workday?
21     MR. DISBROW:  I am just going to put an
22 objection on the record to the degree the document
23 speaks for itself.
24         You can answer.

12 (Pages 42 to 45)

DEPOSITION OF PETE LAROCCO    -    5/29/08

46

1  BY THE WITNESS:
2      A.   **If you do not finish the order, you**
3  **are to state that you did not finish the order,**
4  **and according to start and finish time.  So, if**
5  **you don't finish, you are supposed to write in**
6  **comments that you did not complete the order.**
7  BY MS. WEGNER:
8      Q.   I am going to show you what was
9  marked as Exhibit No. 18 at an earlier deposition,
10  which is a two-page document regarding discipline
11  for Tyler DeMienn.
12      Do you recognize this document?
13      A.   Yes.
14      MR. DISBROW:  I am just going to state for
15  the record, as indicated in an earlier deposition,
16  this is actually two separate documents about two
17  separate incidents.
18  BY MS. WEGNER:
19      Q.   Did you participate in any Union
20  proceedings regarding the suspension that Tyler
21  DeMien received on May 10, 2005 for leaving work
22  without permission, punching out without notifying
23  his supervisor?
24      A.   **You know, I don't --**

47

1      MR. DISBROW:  You know what, you are
2  looking at the wrong page.  You want to go to the
3  next page.
4  BY THE WITNESS:
5      A.   **No, I wasn't involved in this.  This**
6  **is the second sift steward.**
7  BY MS. WEGNER:
8      Q.   Okay.  Whose signature do you
9  recognize as the second shift steward?
10      A.   **Marcos Berena -- not Berena -- his**
11  **last name, I can't pronounce, it's with a B,**
12  **Marcos Bahama -- here, it should be on this one**
13  **here. I'm sorry, I am bad on names.**
14      Q.   You are indicating that the name of
15  the second shift steward would be on either
16  Exhibit 2 or 3?
17      You are certainly welcome to look at
18  those again and see if you can identify that name.
19      MR. DISBROW:  Remembering, Pete, that your
20  name is not on the list either.
21  BY THE WITNESS:
22      A.   **No, I don't see his name here.**
23  BY MS. WEGNER:
24      Q.   To your knowledge, what work rules

48

1  did Mr. DeMien violate when he left work without
2  permission?
3      A.   **I am not familiar with this.**
4      Q.   Well, you are familiar with the work
5  rules, aren't you?
6      A.   **Yeah, I am, but I am not familiar**
7  **with this issue here.  I wasn't involved in this.**
8      Q.   Okay.  Fair enough.
9      If Mr. DeMien left work without
10  permission and punched out without notifying his
11  supervisor, what work rules would he have
12  violated?
13      You have those work rules in front of
14  you, don't you?
15      MR. DISBROW:  Object to the form; calls for
16  speculation.
17      He has already testified he doesn't
18  know anything about this particular document.
19      With regard to references to the work
20  rules, those documents speak for themselves.
21      MS. WEGNER:  You can answer.
22  BY THE WITNESS:
23      A.   **I am not familiar with it.  It's in**
24  **the work rules, I know that.  Do I need to look**

49

1  **this up?**
2  BY MS. WEGNER:
3      Q.   That's my question to you, can you
4  tell me what work rules Tyler DeMien violated
5  leaving work without permission and punching out
6  without notifying his supervisor as this employee
7  report form that is part of Exhibit 18 states?
8      MR. DISBROW:  Same objection.
9      He doesn't have any personal
10  knowledge -- he has already told you he doesn't
11  have any personal knowledge about this employee
12  report form.
13      Counsel is just well-suited to
14  reviewing the work rules and finding the verbiage
15  in the work rules.
16      I don't know where we are trying to
17  go with requiring Mr. LaRocco to spend the time to
18  read through the multiple pages of work rules to
19  find that particular language.
20      MS. WEGNER:  Well, it is my deposition;
21  correct?
22      MR. DISBROW:  I mean, like I said, I am
23  here all day.
24      If you want to ask him to do that,

13  (Pages 46 to 49)

DEPOSITION OF PETE LAROCCO   -   5/29/08

50

1  it's your deposition. I am just stating an
2  objection for the record.
3  BY MS. WEGNER:
4      Q.   Is it a violation of the Copper and
5  Brass Sales work rules to leave company property
6  without management's permission?
7      A.   I am sure.
8      Q.   And is it a company work rule that
9  employees must punch in and out?
10     A.   Yes.
11     Q.   Is it a Copper and Brass Sales
12 company rule that employees are not allowed to
13 leave their work stations before break or wash-up
14 time?
15     A.   I think so, yes.
16     Q.   And is it a violation of the Copper
17 and Brass Sales work rules to fail to return to a
18 work station from lunch or break promptly?
19     A.   I think so.
20     Q.   So on Exhibit No. 18 on the first
21 page, did you have any involvement in the
22 suspension/ probation issue to Tyler DeMien on --
23     A.   Yes.
24     Q.   (Continuing.)  -- December 21st,

51

1  2006?
2      A.   Yes, I was involved.
3      Q.   And did you get a copy of this memo,
4  the first page of 18?
5      A.   Yes.
6      Q.   The second sentence in Exhibit No. 18
7  indicates that in accordance to the plant
8  attendance policy put into effect in January of
9  1996, Mr. DeMien's tardiness reaching six points
10 was grounds for termination; correct?
11     MR. DISBROW: I am just going to object to
12 the form of the question. There is a number of
13 different sentences. You indicated that it was
14 the second sentence.
15     MS. WEGNER: Okay. Fair enough.
16     MR. DISBROW: And if you want to read it
17 verbatim, you certainly can, but that wasn't
18 exactly what stated.
19 BY MS. WEGNER:
20     Q.   Well, my question actually is, if you
21 know why the second sentence of the first page of
22 Exhibit 18 talks about the attendance policy that
23 was put into effect in January of 1996, because we
24 earlier talked about there having been changes to

52

1  the attendance policy with the last Union contract
2  after there was a letter of understanding?
3      A.   Right.
4      Q.   And so I am wondering whether or not
5  the aspect of the attendance policy governing
6  tardiness was changed with the letter agreement
7  that became affixed to the April 2006 or April of
8  2009 agreement?
9      A.   I am not sure.
10     MR. DISBROW: I am just going to object to
11 form and foundation.
12     I don't believe Mr. LaRocco prepared
13 the first page of Exhibit No. 18, so he is not the
14 individual indicating which attendance policy was
15 in effect at the time that was written.
16 BY MS. WEGNER:
17     Q.   You represented Tyler at this
18 suspension/probation hearing outlined in Exhibit
19 No. 18; right?
20     A.   Yes.
21     Q.   Did you ever question anybody as to
22 the plant attendance policy that was being
23 referenced by Mr. Lunt for January of 1996?
24     A.   My job is to try to get the

53

1  individual -- you know, try to get him back to
2  work. And this is what we came up with.
3      And this is what we have come up with
4  other individuals, too. So, I am not familiar
5  with these other questions you are asking me.
6      All I know is that when I am in there
7  and an individual is going to be terminated, that
8  this is what Randy Lunt agreed to.
9      Q.   Well, did you have any question that
10 Mr. Lunt's memo of 12/21/2006 was correct in that
11 it states that there were numerous verbal and written
12 warnings?
13     A.   I don't remember and I don't know --
14 I don't understand what you are asking me, other
15 than the individual was put on probation and he
16 served probation for -- you know, he's got a
17 six-month probation that he had. And that was my
18 job is to try to get him back, I am a steward.
19     Q.   And did you question whether or not
20 Mr. Lunt's statement in this memo of 12/21/2006
21 was accurate in stating that Tyler DeMien had
22 received a minimum of four final warnings since
23 August of 2005?
24     A.   I didn't question it, no.

14 (Pages 50 to 53)

54

1    Q.   What was it that you did to plead for
2  leniency for Tyler DeMien?
3    A.   In the past, when you did reach six
4  points, they would put you under a probation --
5  the same as what he got here, you would get this
6  last ditch chance here.
7         He would serve a three-day unpaid
8  suspension, brought back on a six month's
9  probation with only one point.
10        There has been other -- we have come
11  up with that with other individuals if it hits six
12  points.
13    Q.   I am going to show you --
14    THE WITNESS:  Can I ask a question?
15    MR. DISBROW:  Well, it's her deposition.
16    THE WITNESS:  I don't understand what that
17  has to do with his age discrimination that they
18  are saying.
19         I don't understand, what does this
20  have to do with that?
21  BY MS. WEGNER:
22    Q.   What is Tyler DeMien's approximate
23  age, to your knowledge?
24    A.   He is a young man, I know that, yeah.

55

1  But what --
2    MR. DISBROW:  I mean, I don't represent
3  you, Pete, but what we are here to do is Jan is
4  going to ask you questions and you are supposed to
5  answer.
6    THE WITNESS:  Okay. I'm sorry. I am just
7  trying to be --
8    MR. DISBROW:  You'll get out of here
9  quicker if you just answer her question.
10    THE WITNESS:  Okay. I'm sorry. I
11  apologize. I don't understand. Forget about it.
12  I apologize. Go ahead.
13  BY MS. WEGNER:
14    Q.   Are you familiar with production logs
15  that were completed by Mr. Wingo in the latter
16  part of 2007 during his employment?
17    MR. DISBROW:  Objection; vague and
18  ambiguous.
19  BY THE WITNESS:
20    A.   I really don't deal with his bay that
21  much, he is in another bay than --
22  BY MS. WEGNER:
23    Q.   Well, you represented Mr. --
24    A.   At times. He would throw me out of

56

1  the office because he didn't -- I don't
2  understand, you know, that was another part I
3  never understood.
4    Q.   Well, let me ask you this:  At the
5  time that the company made the decision to
6  terminate Mr. Wingo, did you represent him?
7    A.   I called the business agent and let
8  him be aware of what was going on, and our
9  business agent was really his representative at
10  that time, Gino Rodriguez.
11    Q.   So you didn't participate in --
12    A.   All I do is -- at that time they were
13  going to do it, I said, "Bob, you don't have to
14  agree on this, you don't have to sign it.  If you
15  file a grievance, I will call Gino Rodriguez and
16  he will represent you on this."
17    Q.   Well, were you present at the meeting
18  where Mr. --
19    A.   They did bring me in to tell me that
20  he was being terminated.
21         And I told Bob, "Bob, you have the
22  right to file a grievance and you have a right to
23  disagree with this, you do not have to sign this,
24  and I will contact Gino Rodriguez, and I did.

57

1    Q.   Is that the extent of your
2  participation in the meeting where Mr. Wingo was
3  being told he was terminated?
4    A.   Yes. And that point, then Gino took
5  over because this individual was being terminated.
6    Q.   Okay.
7    A.   I tried up to a point to defend him,
8  but the company is going to do it, then I feel
9  that it is best to have the business agent come in
10  at that point to try to do his best to help that
11  individual.
12    Q.   I am going to show you what was
13  marked as Exhibit 21 at an earlier deposition.
14         Have you seen that before?
15    A.   Yes.
16    Q.   Did you sign that Exhibit 21?
17    A.   Yes, I did. I signed that Bob
18  refused to sign it because he felt that it was not
19  right. And at that point, I contacted Gino, and
20  Bob had a right to go to the second step of this
21  grievance.
22    Q.   Do you have any knowledge as to the
23  reason Mr. Wingo was allegedly terminated?
24    A.   Yes, I do.

DEPOSITION OF PETE LAROCCO  -  5/29/08

58

1    Q.   What is your knowledge as to the
2  reason Mr. Wingo was terminated?
3    A.   He had put down that he had completed
4  orders that he did not complete. And it was
5  written on his production sheet that he had
6  completed the orders, when it's the second shift
7  individual that works in the same area had
8  completed the orders, and he falsified an order
9  that was on there that was already completed.
10   Q.   Well, who falsified an order that was
11  on there that was already completed?
12   A.   He wrote down on his work sheet that
13  he had completed and started an order when he
14  never did, that the other second shift member had
15  done the work.
16   Q.   Did you see the documentation?
17   A.   Yes, I did.
18   Q.   Regarding this alleged falsification?
19   A.   Yes, I did.
20   Q.   And what was the documentation that
21  you were shown?
22   A.   I was shown Bob's sheet, that the
23  orders that he had written down, and that he had
24  finished. And I was shown the sheet from the

59

1  second shift warehouseman that had filled the
2  order, and that he started and finished the order.
3    And Bob was questioned, and he said
4  that he started the order or something like that.
5    Q.   I am going to show you what we marked
6  as Exhibit No. 11 in an earlier deposition.
7    Can you tell me if you recognize
8  that?
9    A.   Yes, I do.
10   Q.   What is Exhibit No. 11?
11   A.   This is the worksheet that he had
12  falsified.
13   Q.   And what is it that is contended
14  Mr. Wingo falsified on Exhibit No. 11?
15   A.   I think it was the last two items. I
16  am not sure, but I think it was. At that time, I
17  was told that.
18   MS. WEGNER:  Do you want to go back -- I
19  don't know if he has finished, so again, will you
20  reread the question.
21  BY THE WITNESS:
22   A.   You know what, honestly, I vaguely
23  remember what work -- I mean, what work orders
24  were in question.

60

1    But I remember that when I was in the
2  meeting, that I was shown that he had finished
3  these orders, and I was shown that the other
4  individual had finished the orders.
5    And then when questioned, Bob said,
6  well, that maybe I just started it and this
7  individual had finished and completed the orders.
8    I am not going to sit here and try to
9  pinpoint what I don't remember now. I don't
10  remember which orders they were.
11  BY MS. WEGNER:
12   Q.   Did Mr. Wingo indicate to you that he
13  had noted information on the exhibit you have in
14  front of you, Exhibit No. 11, any differently than
15  he had on any other occasion?
16   A.   I don't recall that. Honestly, I do
17  not recall that.
18   Q.   And on Exhibit No. 11, do you know
19  whether or not the times that are noted in the
20  right-hand column are the start times or the stop
21  times?
22   MR. DISBROW:  Objection to the degree the
23  document speaks for itself.
24   You can answer.

61

1  BY THE WITNESS:
2    A.   The way I see it is 12:55, the next
3  order was completed at 1:22, the next order was
4  completed at 2:00, the next order was completed at
5  2:20. That's how he did his start times, start
6  and finish times. That's what I am looking at.
7  BY MS. WEGNER:
8    Q.   Are you certain that's how
9  Mr. Wingo --
10   A.   I am not certain, but that's the way
11  that I see that he is writing it down as.
12    See, my sheets are different, my
13  sheets are finish and start, finish and start.
14  His sheets are just his stop times here.
15    You know, he started an order at
16  6:45, the next one was done at 7:15. That's the
17  way I am looking at this.
18   Q.   I am going to show you an Exhibit
19  No. 14 from a previous deposition.
20    Do you recognize that?
21   A.   Yes, I do.
22   Q.   What is Exhibit No. 14?
23   A.   It's a production sheet.
24   Q.   Is Exhibit No. 14 one of the

16 (Pages 58 to 61)

DEPOSITION OF PETE LAROCCO   -   5/29/08

62

1  production sheets that was alleged that
2  Mr. Wingo falsified?
3      A.   You know, I can't recall.
4      Q.   Do you know what training Mr. Wingo
5  had received regarding the completion of the
6  production sheets?
7      A.   Bob received the same amount of
8  training as I have, because he has been there just
9  almost as long as I have.
10     Q.   Well, you received the same training
11  as him but different production sheets?
12     A.   On production sheets, we are trained
13  as to what to do on the production sheets.
14     Q.   Were you personally present when
15  Mr. Wingo was trained on how to complete
16  production sheets?
17     A.   His area was brought in different
18  than my area, yes.
19     Q.   Did you act as Union representative
20  for Mario Alvarez?
21     A.   Yes, I did.
22     Q.   You work first shift; correct?
23     A.   Yes.  Mario has been to three
24  different shifts.  He just recently -- right, his

63

1  shift -- he didn't want the second shift steward.
2      I had a couple points.  Again, you
3  don't have to have us in there.  You can ask for a
4  senior man or whatever, yes.
5      You are not recommended to have -- I
6  mean, if they don't want the steward in there,
7  they can request a senior man on that shift.
8      Q.   Are you aware of Mr. Alvarez being
9  terminated?
10     A.   Yes.
11     Q.   Did you represent Mr. Alvarez in
12  connection with his termination?
13     A.   Gino Ridriguez represented Mario in
14  being terminated.  He was at his final -- he took
15  over from when we couldn't come for an agreement
16  with Randy, I needed to get Gino involved in it
17  and Gino took place -- took the rest of it.
18     Q.   So do you know the reason that
19  Mr. Alvarez was terminated?
20     A.   For something to do with cell phones.
21  I think it had to do with an argument with the
22  foreman and the cell phone and something like
23  that.
24     Q.   When, to your knowledge, was

64

1  Mr. Alvarez terminated?
2      A.   I don't know the exact date.
3      Q.   Do you recall the month or year?
4      A.   It was probably maybe three, four
5  months ago maybe.
6      Q.   So you believe Mr. Alvarez was
7  terminated in early 2007 -- I'm sorry, 2008, this
8  year?
9      A.   Yeah, I think so.
10     Q.   Who replaced Mr. Wingo when he was
11  terminated?
12     A.   I don't think they have replaced
13  anybody because we have slowed down.  I think they
14  hired a helper.
15     But as a warehouse, see, we have
16  positions of warehouseman, machine operator and
17  dock workers.  And they are able to hire a certain
18  amount of helpers that come in -- that they are
19  really not part of us, that they are able to just
20  like sweep and, you know, they are in a
21  different -- they do not really have a seniority,
22  they don't have seniority until they are able to
23  bid on a job as a warehouseman or a machine
24  operator.

65

1      Q.   Well, Mr. Wingo was terminated,
2  according to these documents, in early December
3  2003.
4      Who started performing the RBW
5  nonprocessing work upon Mr. Wingo's termination?
6      A.   There has been a few people back
7  there.
8      Can I look at this here to get the
9  names?
10     Q.   If it's at all helpful since we have
11  already determined some things are --
12     A.   Well, I am just saying that you are
13  asking me who replaced him?
14     MR. DISBROW:  I am just going to object to
15  the form of the question.
16  BY THE WITNESS:
17     A.   Warehouseman are a pool of people.
18  You know what I am saying?  There has probably
19  been three or four different people back there,
20  and I don't really pay attention to who is back
21  there, I am in my bay.
22  BY MS. WEGNER:
23     Q.   So you don't know who took over
24  handling RBW nonprocessing following Mr. Wingo's

VICTORIA COURT REPORTING SERVICE, INC.   (312) 443-1025

DEPOSITION OF PETE LAROCCO  -  5/29/08

66

1  termination?
2       MR. DISBROW:  I'm sorry, is your question
3  does he know who took over?
4  BY THE WITNESS:
5       A.  You know what, honestly, I don't.
6  BY MS. WEGNER:
7       Q.   But you said you knew there were
8  several people back there.
9       A.   Well, yeah, there is people that go
10  back there as the foreman appoints you back there
11  because you are a warehouseman.
12       You are supposed to be able to do
13  RBW, you are supposed to be able to do UPS, you
14  are supposed to be able to do packing, you are
15  supposed to be able to -- there are like a pool of
16  guys in there, you are not assigned.  You know
17  what I mean?
18       Q.   Well, based on your knowledge of the
19  work at Copper and Brass Sales and the work that's
20  necessary to be performed by someone handling the
21  RBW nonprocessed job function, isn't there some
22  training necessary?
23       A.   Yes.
24       MR. DISBROW:  Wait.  You can answer, but I

67

1  am just going to object to the foundation, because
2  I think he has indicated that he doesn't spend
3  much time in the area, so I don't know what his
4  foundation would be.
5       You can answer the question.
6  BY THE WITNESS:
7       A.   I am sure they are trained.  We go
8  through some good training there.
9       When you are hired there, they have a
10  list of training videos, training processes that
11  you have to go through in order to do your work.
12       And they keep track of whose got the
13  training in what areas.
14  BY MS. WEGNER:
15       Q.   I am going to show you what we have
16  marked at an earlier deposition as Exhibit 16.
17       Do you recognize Exhibit 16?
18       A.   I think so, yes.
19       Q.   Did you sign Exhibit 16?
20       A.   Yes.
21       Q.   Did you represent Mr. Wingo at any
22  hearing for the suspension he received?
23       A.   This is one of them that I had made
24  him fill out a grievance form.  They answered it,

68

1  and I suggested to Bob that he should go to the
2  second step, which would bring in Gino Rodriguez.
3  And I don't think he did at this point.
4       You know, you are able to put your
5  comments down.  And then if you still disagree,
6  you are able to go to the next step, which would
7  be to bring in our business agent.  And I am
8  assuming that he did not do this.
9       Q.   Are you aware of who Mr. Wingo is
10  referring to as the side loader operator who
11  pulled the wrong mill material in the response on
12  Exhibit 16?
13       A.   I am not sure, but I am going to
14  assume that it is Lazardo.  Lazardo, I think his
15  name is because I am still -- like I tell you, and
16  I am not that familiar with that area.
17       Q.   Do you know whether or not the side
18  loader operator who pulled the wrong mill material
19  received any discipline as a result of this work
20  order error?
21       A.   I don't recall.  I don't recall.
22       Q.   Is there a rule at Copper and Brass
23  Sales that a supervisor should not -- or an
24  employee should not supervise another employee

69

1  that he or she is related to?
2       A.   I am not aware of that.  I mean,
3  there has been people that have been hired in the
4  office that are related, too.  And I have never
5  been aware of that you are not supposed to -- we
6  got two guys there now that are working there.
7       What does that have to do with Bob's
8  age?
9       Q.   Are you referring to Mark and Tyler?
10       A.   No, the Prossers, Denny Prosser, and
11  there is other individuals there that are working
12  that -- I am not aware of that you are not be able
13  to hire -- is there a rule there that --
14       Q.   All right.  Listen, Mr. LaRocco, my
15  question to you was whether there was a rule that
16  employees should not supervise another employee --
17       A.   I thought you were telling me that.
18       Q.   (Continuing.) -- who that person is
19  related to?
20       A.   Okay.  I am not aware of that.  I'm
21  sorry.
22       Q.   Thank you.  That's fine.
23       Are you aware of Mark DeMien
24  supervising Tyler DeMien?

18 (Pages 66 to 69)

DEPOSITION OF PETE LAROCCO   -   5/29/08

70

1    A.   One point, Tyler DeMien was on his
2  shift, and he is no longer on his shift.  He has
3  been to -- he has put bids in for other shifts.
4  He has put bids in to go to the third shift.
5    Q.   Now, if Tyler works overtime, would
6  Mark DeMien, to your knowledge, be his supervisor?
7    MR. DISBROW:  Objection; calls for
8  speculation.
9  BY THE WITNESS:
10    A.   Yes.
11  BY MS. WEGNER:
12    Q.   So after Mr. Wingo was told he was
13  being terminated, you no longer had any
14  involvement and I should talk to Mr. Rodriguez?
15    A.   Right.  Mr. Rodriguez had handled the
16  rest of that.  That's how the procedure goes.  I
17  am only up to a point.
18        At that time, I would say, "Okay,
19  Bob, listen, you don't have to agree on this, you
20  don't have to sign anything, any documents, and
21  that I will call Gino and get Gino involved in
22  this now," because Gino is our final --
23    Q.   Do you believe that Mr. Wingo was
24  treated fairly in his termination?

71

1    A.   I believe that Bob Wingo had made
2  numerous mistakes that he was told over and over
3  and over and over again, that it just kept
4  happening, that yes, I think he was treated fairly
5  for a senior person.
6    Q.   Well, you have made mistakes, haven't
7  you?
8    A.   Yes, but I corrected my mistakes.
9    Q.   And have you been told to receive
10  trainings about those mistakes?
11    A.   I have corrected my mistakes.
12        And can I add one other thing?
13    Q.   How did you correct your mistakes?
14    A.   By not doing them.  After being told
15  what I was doing wrong, I corrected it.
16    Q.   Well, you recently made a mistake in
17  cutting material because you pulled the wrong
18  alloy; correct?
19    A.   Right.  And I have not made that
20  mistake, it hasn't happened anymore since then.
21    Q.   Okay.
22    A.   I don't understand why -- no, I won't
23  do that.
24    Q.   Prior to this most recent time when

72

1  you made the mistake cutting the wrong alloy, had
2  you made that mistake before?
3    MR. DISBROW:  I am just going to object as
4  to relevance.
5  BY THE WITNESS:
6    A.   No, I don't think I have.
7  BY MS. WEGNER:
8    Q.   Never in 29 years?
9    A.   I don't remember it.
10    MR. DISBROW:  I am just going to object
11  because it's getting argumentative at this
12  point.  He did answer the question.
13    MS. WEGNER:  I am not arguing at all with
14  this gentleman, and I take offense at you
15  suggesting that I am.
16        All right.  Mr. LaRocco, I don't have
17  any other questions for you.
18        I am not sure whether or not
19  Mr. Disbrow, the attorney for Copper and Brass
20  Sales, may have some.
21    MR. DISBROW:  I just have a few.
22        EXAMINATION
23  BY MR. DISBROW:
24    Q.   The first one that I want you to take

73

1  a look again, Mr. LaRocco, is what was previously
2  shown to you as -- and I have to find it myself --
3  Deposition Exhibit 30 to the Wingo deposition.
4        Can we put our hands on that?
5        You are looking at it now, I can just
6  look over your shoulder.
7        And the question I have is, to your
8  knowledge, did Mr. Wingo ever file a grievance
9  with regard to that particular issue?
10    A.   No, he did not.
11    Q.   Could he have?
12    A.   Yes, he could have.
13    Q.   And there has been some questions
14  that you were asked about alleged harassment,
15  quote/unquote, and it had to do with some
16  purported allegations that Mr. Wingo made about
17  supposed harassment directed at him from Mark
18  DeMien.
19        To your knowledge, did Mr. Wingo use
20  the word "harassment"?
21    A.   You know what, honestly, I don't
22  recall.
23    Q.   Was the issue, and I believe it was
24  sometime in late August 2007, more that he felt

VICTORIA COURT REPORTING SERVICE, INC.     (312) 443-1025

DEPOSITION OF PETE LAROCCO  -  5/29/08

74

1  that his discipline -- he didn't agree with his
2  discipline?
3      MS. WEGNER:  I will object; calls for
4  speculation, assumes facts not in evidence,
5  mischaracterizes the witness' prior testimony,
6  calls for speculation, form and foundation.
7      MR. DISBROW:  You can answer the question.
8  BY THE WITNESS:
9      A.  No.
10  BY MR. DISBROW:
11     Q.  To your knowledge, did Mr. Wingo ever
12  allege that Mr. DeMien or anyone else was
13  harassing him because of his age?
14     A.  Never.
15     Q.  Would you agree with me that there is
16  a fair amount of shop talk that goes on?
17     A.  Yes.
18     Q.  It's not uncommon for people to use
19  colorful language in the shop; is that fair --
20     A.  Yes --
21     Q.  Let me finish the question.
22      Is that a fair statement?
23     A.  Yes.
24     Q.  I want you to go ahead and take a

75

1  look at Exhibit No. 18, if you would.  I want you
2  to look at the first page again.
3      You were asked a number of questions
4  about this particular page, and I want to make
5  sure I understand what your testimony was.
6      As I understand it, and you correct
7  me if I am wrong, with regard to this attendance
8  issue that Mr. Tyler DeMien was having; is that
9  correct?
10     A.  Yes.
11     Q.  And was the company ready to
12  terminate Mr. Tyler DeMien at the time; is that
13  your recollection?
14     A.  Yes.
15     Q.  And I think the point you were trying
16  to make, although I don't think it came across
17  that well, so I just want to clarify, is that as
18  the Union representative, you went to bat for
19  Mr. DeMien and got that reduced to a probation?
20     A.  Yes.
21     Q.  And that was consistent with what you
22  were able to achieve in similar instances?
23     A.  Exactly.

76

1      Q.  I thought that's what you were trying
2  to say.
3      A.  Yes.
4      Q.  I want you to take a look at a
5  document that was previously marked as Exhibit 22
6  in the Lunt deposition.
7      I don't know that you were shown that
8  exhibit earlier, Exhibit 22.
9      Can you look at that document for me?
10     A.  Okay.
11     Q.  Let me know when you are ready.
12     A.  Right.
13     Q.  Have you ever seen this document that
14  has been labeled as Exhibit No. 22?
15     A.  Yes.
16     Q.  Can you tell me what it is?
17     A.  This is when he was being terminated.
18     Q.  And by he, you mean?
19     A.  Bob Wingo.
20     Q.  This is the grievance form that was
21  filled out?
22     A.  Yes, it is.
23     Q.  And I am just reading the form here,
24  it says: "I am filing this grievance because I

77

1  feel I was unfairly terminated."
2      Do you know whose writing that is?
3      A.  That's Bob's.
4      Q.  And were you with him when he filled
5  this grievance form out?
6      A.  No, I wasn't.  He filled it out and
7  then brought it in, and then I signed it, so it
8  would go to Gino for the next step.
9      Q.  When Mr. Wingo filled this grievance
10  form out and returned it to you, did he ever
11  indicate to you that he believed he was being
12  terminated because of his age?
13     A.  Absolutely not.
14     Q.  That allegation was never made to
15  you?
16     A.  Never, never.
17     Q.  You were also involved, at least to
18  some degree, in the second step and other meetings
19  that Copper and Brass Sales had with regard to
20  Mr. Wingo's termination; is that correct?
21     A.  Yes.
22     Q.  Now, do you have any personal
23  knowledge of Mr. Wingo ever indicating in those
24  meetings that he felt he had been terminated

VICTORIA COURT REPORTING SERVICE, INC.    (312) 443-1025

DEPOSITION OF PETE LAROCCO  -  5/29/08

78

1  because of his age?
2      A.  Absolutely not.
3      Q.  Did he ever indicate that anyone had
4  made any comments with regard to his age?
5      A.  No.
6      Q.  Now, I think you indicated that you
7  had been a Union steward for about 21 years; is
8  that correct, at Copper and Brass?
9      A.  Yes.
10     Q.  And in that time, you have been
11  involved in a number of grievance proceedings, I
12  would assume?
13     A.  Yes.
14     Q.  And you have been involved in
15  representing Union employees when they have had
16  disciplinary action taken against them?
17     A.  Yes.
18     Q.  So you have some familiarity with the
19  amount of disciplinary action that goes on within
20  the plant?
21     A.  Yes.
22     Q.  How would you characterize the amount
23  of disciplinary action taken against Mr. -- strike
24  that.

79

1          How would you characterize the amount
2  of issues that Mr. Wingo had through the course of
3  his employment at Copper and Brass Sales as
4  compared to other employees?
5      MS. WEGNER:  I object; calls for
6  speculation, form and foundation, relevance.
7      MR. DISBROW:  You can answer the question.
8  BY THE WITNESS:
9      A.  I think he has had more chances than
10  others.
11  BY MR. DISBROW:
12     Q.  So it is fair to say that management
13  gave him numerous chances to correct his
14  performance issues?
15     A.  Absolutely, yes.
16     MS. WEGNER:  Same objection.
17  BY MR. DISBROW:
18     Q.  And is it fair to say he had a number
19  of performance issues over his time at the
20  company?
21     A.  Yes.
22     MS. WEGNER:  Same objection.
23  BY MR. DISBROW:
24     Q.  And I'm sorry, your answer to my

80

1  question was?
2      A.  Yes.
3      MR. DISBROW:  I have no other questions at
4  this time.
5          FURTHER EXAMINATION
6  BY MS. WEGNER:
7      Q.  During the course of your
8  representation of employees at Copper and Brass
9  Sales, have you been the Union representative for
10  every single employee?
11     A.  No.
12     Q.  And not having been the Union
13  representative or every single employee at Copper
14  and Brass Sales over the course of your
15  employment, you don't have personal knowledge
16  regarding the performance problems of every
17  employee; correct?
18     A.  Yes, I do.  I am told after what
19  disciplinary action was done to that employee,
20  whether I was in there or not, as the head Union
21  steward.
22     Q.  But you have only obtained the
23  information that you may have learned about other
24  employees' performance through hearsay, having

81

1  heard it from someone else, so that's not personal
2  knowledge; correct?
3      MR. DISBROW:  I am just going to object to
4  this calls for a legal conclusion as to what
5  hearsay is.  I object to form and foundation of
6  the question.
7          I think it also has been asked and
8  answered and mischaracterizes earlier testimony.
9          You can answer the question, if you
10  can.
11  BY THE WITNESS:
12     A.  The supervisor tells me what kind of
13  disciplinary action was taken, Randy Lunt.
14  BY MS. WEGNER:
15     Q.  Well, Mr. Lunt is not the supervisor,
16  is he?
17     A.  It's the supervisor, our plant
18  supervisor.  We have foremen and supervisors.
19     Q.  And, as you sit here today, can you
20  categorically state that you are aware personally
21  that Mr. Wingo had more chances than others at
22  Copper and Brass Sales?
23     A.  If you look at his file, that should
24  tell you right there that he has.

21 (Pages 78 to 81)

DEPOSITION OF PETE LAROCCO   -   5/29/08

82

1    Q.   Well, I didn't ask you to instruct me
2  to look at Mr. Wingo's file.  I asked you a
3  question.
4    A.   I said he has had ample, yes.
5         I apologize.
6    Q.   Do you know the reason why Mr. Wingo
7  managed to stay employed at Copper and Brass Sales
8  for over 20 years if his performance was such an
9  issue?
10     MR. DISBROW:  I am just going to object to
11 the degree that it calls for speculation and as to
12 foundation, as I do not believe that Mr. LaRocco
13 was a decision-maker with regard to employment
14 actions that may or may not have been taken
15 against Mr. Wingo.
16 BY THE WITNESS:
17    A.   I don't want to answer that.  I don't
18 think that is a question for me to answer.  I am
19 not the company.
20 BY MS. WEGNER:
21    Q.   So, well, then is your answer that
22 you don't know?
23    A.   I don't know what you are asking me.
24 You are asking me a question that you should be

83

1  asking the company.
2         Really, I am being serious, why would
3  you ask me that question?
4    Q.   Because I am wondering why if
5  Mr. Wingo's discipline was so bad, he wasn't
6  terminated much earlier?
7    A.   He was terminated a few times -- not
8  terminated, suspended a few times before.
9    Q.   How many times are you aware of
10 Mr. Wingo being suspended?
11    A.   Oh, I would say he has been suspended
12 four or five times, if you look in the records.
13    Q.   Do you believe that Copper and Brass
14 Sales followed its discipline policy, its
15 progressive discipline policy when it terminated
16 Mr. Wingo?
17    A.   Yes, I do.
18     MS. WEGNER:  I don't have anything else.
19     MR. DISBROW:  Nothing.
20     MS. WEGNER:  Mr. LaRocco, you have the
21 right to review the transcript of this deposition
22 should you wish to do so.
23         That would allow you to receive
24 notice that it has been transcribed.  It's

84

1  prepared in a booklet form, which contains all the
2  questions and answers and you have the right to
3  review it.  That's what is known as reserving your
4  signature.
5     THE WITNESS:  Okay.  Can I ask you a
6  question?
7     MR. DISBROW:  Well, let me state for the
8  record because I think that in most instances when
9  we are dealing with a Union steward, they have
10 Union representation.
11    THE WITNESS:  Exactly.
12    MR. DISBROW:  And you may want to contact
13 the Union attorney to determine whether they wish
14 to reserve.
15    THE WITNESS:  I generally won't get
16 involved in that.
17    MR. DISBROW:  Because he is not a lawyer,
18 he doesn't know.
19    THE WITNESS:  I don't know anything about
20 it.
21        I would just say that I would think
22 that I would need that to get to Gino.  I would
23 need this to give to our attorney.
24    MR. DISBROW:  And Jan, I think what he is

85

1  trying to tell you is he needs to reserve the
2  right.  I think that's the way to handle it.
3     THE WITNESS:  Yes.
4     MS. WEGNER:  Well, I was going to say that
5  perhaps we can agree to do that, because if he
6  waives it now, you are done.
7     MR. DISBROW:  Right.  And that's what I was
8  trying to say.
9     MS. WEGNER:  He may later choose to waive
10 it.  It's reserved on your behalf at this point.
11    THE WITNESS:  I would like it.
12    MS. WEGNER:  To reserve?
13    THE WITNESS:  Right.
14    MS. WEGNER:  We will do that for you.
15    MR. DISBROW:  I think you are done.
16        FURTHER DEPONENT SAITH NOT.
17
18
19
20
21
22
23
24

22 (Pages 82 to 85)

VICTORIA COURT REPORTING SERVICE, INC.   (312) 443-1025

DEPOSITION OF PETE LAROCCO  -  5/29/08

```
                                        86
1        UNITED STATES DISTRICT COURT FOR THE
2            NORTHERN DISTRICT OF ILLINOIS
3                  EASTERN DIVISION
4    ROBERT G. WINGO,            )
5        Plaintiff,      )
6        vs.             ) No. 08 C 368
7    THYSSENKRUPP MATERIALS NA,   )
8    INC., d/b/a COPPER AND BRASS, )
9        Defendant.      )
10       I hereby certify that I have read the
11   foregoing transcript of my deposition given at the
12   time and place aforesaid, consisting of Pages 1 to
13   89, inclusive, and I do again subscribe and make
14   oath that the same is a true, correct and complete
15   transcript of my deposition so given as aforesaid,
16   and includes changes, if any, so made by me.
17
18
19   _____
                 PETE LAROCCO
20   SUBSCRIBED AND SWORN TO
21   before me this _____ day of
22   _____, A.D. 2008.
23   _____
24   Notary Public
```

```
                                        88
1        IN WITNESS WHEREOF, I do hereunto set
2    my hand and affix my seal of office at Chicago,
3    Illinois, this 16th day of June, 2008.
4
5
6
7                 Notary Public, DuPage County,
8                 Illinois.
9                 My commission expires 03/23/09.
10
11   C.S.R. Certificate No. 84-1766.
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
                                        87
1    STATE OF ILLINOIS   )
2                        )
3    COUNTY OF DU PAGE   )
4        I, Patricia Ann Armstrong, a Notary
5    Public within and for the County of DuPage, State
6    of Illinois, and a Certified Shorthand Reporter of
7    said state, do hereby certify:
8        That previous to the commencement of
9    the examination of the witnesses, the witness was
10   duly sworn to testify the whole truth concerning
11   the matters herein;
12       That the foregoing deposition
13   transcript was reported stenographically by me,
14   was thereafter reduced to typewriting under my
15   personal direction and constitutes a true record
16   of the testimony given and the proceedings had;
17       That the said deposition was taken
18   before me at the time and place specified upon
19   written interrogatories;
20       That I am not a relative or employee
21   or attorney or counsel, nor a relative or employee
22   of such attorney or counsel for any of the parties
23   herein, nor interested directly or indirectly in
24   the outcome of this action.
```

23  (Pages 86 to 88)

VICTORIA COURT REPORTING SERVICE, INC.    (312) 443-1025

87

DEPOSITION OF PETE LAROCCO   -   5/29/08

1    STATE OF ILLINOIS    )

2                         )

3    COUNTY OF DU PAGE    )

4             I, Patricia Ann Armstrong, a Notary

5    Public within and for the County of DuPage, State

6    of Illinois, and a Certified Shorthand Reporter of

7    said state, do hereby certify:

8             That previous to the commencement of

9    the examination of the witnesses, the witness was

10   duly sworn to testify the whole truth concerning

11   the matters herein;

12            That the foregoing deposition

13   transcript was reported stenographically by me,

14   was thereafter reduced to typewriting under my

15   personal direction and constitutes a true record

16   of the testimony given and the proceedings had;

17            That the said deposition was taken

18   before me at the time and place specified upon

19   written interrogatories;

20            That I am not a relative or employee

21   or attorney or counsel, nor a relative or employee

22   of such attorney or counsel for any of the parties

23   herein, nor interested directly or indirectly in

24   the outcome of this action.


VICTORIA COURT REPORTING SERVICE, INC.    (312) 443-1025

DEPOSITION OF PETE LAROCCO  -  5/29/08

1    the outcome thereof.

2           I further certify that this certificate

3    applies to the original signed IN BLUE and

4    certified transcripts only.  I assume no

5    responsibility for the accuracy of any reproduced

6    copies not made under my control or direction.

7           IN TESTIMONY WHEREOF I have hereunto set

8    my hand and affixed my notarial seal this _16Th_ day

9    of _June_, A.D., 2008.

10

11

12

13

14

15

16

17           Patricia A. Armstrong, CSR, RPR.,

18

19    My Commission Expires

20

21    March 23, 2009.

22

"OFFICIAL SEAL"
Patricia Ann Armstrong
Notary Public, State of Illinois
My Commission Expires Mar. 23, 2009

23

24

VICTORIA COURT REPORTING SERVICE, INC. - (312) 443-1025