# EXHIBIT G

                                                                    1

1           IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3

4

5   ROBERT G. WINGO,                )

6              Plaintiff,            )

7       vs.                          )   No.  08 CV 368

8   THYSSENKRUPP MATERIALS NA,       )

9   INC., d/b/a COPPER AND BRASS     )

10  SALES,                           )

11             Defendants.           )

12

13

14

15          The deposition of MARK PUCALIK, called by the

16  Plaintiff for examination, pursuant to notice, and

17  pursuant to the provisions of the Code of Civil Procedure

18  of the State of Illinois and the Rules of Supreme Court

19  thereof pertaining to the taking of depositions for the

20  purpose of discovery, taken before ROSE MARIE WEBER, a

21  Certified Shorthand Reporter for the State of Illinois,

22  at 29 South LaSalle Street, Suite 610, Chicago, Illinois,

23  commencing on the 30th day of May, A.D. 2008, at the hour

24  of 11:00 o'clock a.m.

DEPOSITION OF MARK PUCALIK -- 05/30/08

Page 2

```
 1  APPEARANCES:
 2
 3      LISA KANE & ASSOCIATES, P.C.,
 4      BY:  MS. JANICE A. WEGNER
 5          120 South LaSalle Street
 6          Suite 1420
 7          Chicago, Illinois  60603
 8              On behalf of the Plaintiff,
 9              Robert Wingo;
10
11      HONIGMAN, MILLER, SCHWARTZ AND COHN, L.L.P.,
12      BY:  MR. MATTHEW S. DISBROW,
13          2290 First National Building,
14          660 Woodward Avenue,
15          Detroit, Michigan  48226
16              On behalf of the Defendants,
17              Thyssenkrupp Materials, et al.
18
19
20
21
22
23
24
```

Page 3

```
             EXAMINATION INDEX
 2  WITNESS                       EXAMINATION
 3
 4  MARK PUCALIK
 5      EX-BY MS. WEGNER              6
 6      EX-BY MR. DISBROW            35
```

Page 4

```
                OBJECTION INDEX
 2  OBJECTION MADE BY                   PAGE
 3
 4  MR. DISBROW                          10
 5  MR. DISBROW                          17
 6  MR. DISBROW                          19
 7  MR. DISBROW                          20
 8  MR. DISBROW                          21
 9  MR. DISBROW                          24
10  MR. DISBROW                          26
11  MR. DISBROW                          27
12  MR. DISBROW                          28
13  MR. DISBROW                          29
14  MR. DISBROW                          30
15  MR. DISBROW                          32
16  MR. DISBROW                          33
17  MR. DISBROW                          34
18  MR. DISBROW                          35
19  MS. WEGNER                           36
20  MS. WEGNER                           37
```

Page 5

```
                EXHIBIT INDEX
 2  NUMBER                         MARKED FOR ID
 3
 4  NO EXHIBITS MARKED
 5  NO EXHIBITS ATTACHED
```

Page 6:

```
 1              DEPOSITION OF MARK PUCALIK
 2                    MAY 30, 2008
 3              MARK PUCALIK, having been first
 4    duly sworn, was examined and testified as follows:
 5    EXAMINATION
 6    BY MS. WEGNER:
 7        Q.   Sir, would you please state your full
 8    name for the record and spell your last name?
 9        A.   Mark David Pucalik. P-u-c-a-l-i-k.
10        Q.   Let the record reflect this is the
11    deposition of Mark Pucalik, witness for the
12    defendant in the case of Robert Wingo versus
13    Thyssenkrupp Materials NA, Inc., doing business as
14    Copper and Brass Sales, case number 08 C 368,
15    pending in the United States District Court for the
16    Northern District of Illinois Eastern Division.
17              This deposition is being taken
18    pursuant to notice and in accordance with the
19    Federal Rules of Civil Procedure and applicable
20    local rules.
21              Mr. Pucalik, my name is Jan
22    Wegner. I'm one of the attorneys representing
23    Robert Wingo in the lawsuit he has filed against
24    Copper and Brass Sales.
```

Page 7:

```
 1              Have you ever given a deposition
 2    before?
 3        A.   Yes, once before.
 4        Q.   Okay. How long ago did you provide
 5    deposition testimony?
 6        A.   Oh, maybe 30 years ago.
 7        Q.   And in what type of matter did you
 8    provide deposition testimony?
 9        A.   Insurance.
10        Q.   Did you provide deposition testimony
11    in a case in which you were a party?
12        A.   Yes.
13        Q.   Did the deposition that you gave in
14    the past relate to a motor vehicle accident?
15        A.   Yeah.
16        Q.   Have you been a party to any other
17    litigation?
18        A.   Never.
19        Q.   And have you provided any other sworn
20    testimony at a trial or any other type of hearing?
21        A.   No.
22        Q.   All right. Mr. Pucalik, it's
23    important that you remember to respond verbally to
24    questions that are asked of you so that the court
```

Page 8:

```
 1    reporter can make an accurate record as her machine
 2    doesn't accept a non-verbal response. Okay?
 3        A.   Okay.
 4        Q.   Will you also let me know that if I
 5    ask a question that you don't understand?
 6        A.   Yes.
 7        Q.   If you tell me you don't understand a
 8    question, I'll rephrase it to make it perfectly
 9    clear for your response. Okay?
10        A.   Okay.
11        Q.   If you do answer a question, it will
12    be assumed that you do understand that question. Do
13    you agree that's fair?
14        A.   Okay.
15        Q.   Will you also try to wait for me to
16    finish my question before you answer it because
17    it's difficult for the court reporter to record
18    more than one person speaking at the same time?
19        A.   Okay.
20        Q.   If you need a break, please let us
21    know and we'll be happy to accommodate any request
22    that you have for a break. All right?
23        A.   Okay.
24        Q.   Okay. Any questions about the
```

Page 9:

```
 1    process?
 2        A.   No.
 3        Q.   All right. Are you currently
 4    employed?
 5        A.   Yes.
 6        Q.   And with whom are you now employed?
 7        A.   Thyssenkrupp, Copper and Brass.
 8        Q.   When did you begin your employment
 9    with Thyssenkrupp Copper and Brass?
10        A.   Twelve years ago in September.
11        Q.   1996?
12        A.   Yes, I think that's right.
13        Q.   Sound about right?
14        A.   Yeah.
15        Q.   Where do you reside?
16        A.   Munster, Indiana.
17        Q.   What is your home address?
18        A.   8107 Forest Avenue, Munster, Indiana.
19        Q.   How long have you lived on Forest
20    Avenue in Munster, Indiana?
21        A.   About 13 years.
22        Q.   Is your address on Forest Avenue in
23    Munster, Indiana home?
24        A.   Yes.
```

Page 10

1    Q.   Do you have any present intention on
2  relocating from your current present home address
3  within the next year?
4    A.   No.
5    Q.   Did you meet with anyone to prepare
6  for your deposition?
7    A.   I met him when I walked in.
8         MR. DISBROW: Just object to the
9  degree any further questions get into the purview
10 of attorney-client privilege.
11        MS. WEGNER: I'm not seeking to
12 invade attorney-client privilege.
13 BY MS. WEGNER:
14   Q.   Did you have any discussions with
15 anyone about your deposition prior to coming here
16 today?
17        MR. DISBROW: Same objection.
18 You can answer that to the degree those discussions
19 did not involve an attorney for the company.
20        THE WITNESS: So, you asked --
21 Again, I'm sorry. Did I --
22        MS. WEGNER: Would you read back
23 my question, Rose?
24        (Record read as requested.)

Page 11

1         THE WITNESS: No.
2         MR. DISBROW: I just want to make
3  it clear for you, Mark, any discussions you had
4  with the attorney for the company are off limits.
5  You're not to testify about that.
6         THE WITNESS: Okay.
7         MR. DISBROW: And I will instruct
8  you not to answer, and she's not going there and
9  I'm not trying to imply that you are, but I don't
10 know that Mark's clear on this. We did not have...
11        MS. WEGNER: Well, to the extent
12 that you've objected, I think I'd actually like
13 clarification because I think I can find out who he
14 spoke to, just not the content of the
15 communication, and that's why I'm asking him with
16 whom he may have had any discussions.
17        MR. DISBROW: You can answer who
18 you spoke to. You can give the name but if it's an
19 attorney, you can't get into what was discussed.
20        MS. WEGNER: That I will not ask.
21 I don't want to know about that.
22        THE WITNESS: Can I ask a
23 question? Did I talk to anybody about this
24 situation today?

Page 12

1         MS. WEGNER: Your deposition?
2         THE WITNESS: Like I said, when I
3  came in I met and I guess I talked to this
4  gentleman.
5  BY MS. WEGNER:
6    Q.   You spoke with Mr. Disbrow?
7    A.   Yes.
8    Q.   Okay. Fine. Prior to coming to the
9  deposition today?
10   A.   Prior, no.
11   Q.   Okay.
12   A.   I'm sorry.
13   Q.   Did you review any documents to
14 prepare for the deposition?
15   A.   No.
16   Q.   What is your date of birth?
17   A.   12-20-55.
18   Q.   And what is your current age?
19   A.   Fifty-two.
20   Q.   Have you ever been convicted of a
21 felony?
22   A.   No.
23   Q.   Have you ever been convicted of a
24 crime involving dishonesty?

Page 13

1    A.   No.
2    Q.   What's the highest level of education
3  you've achieved?
4    A.   Some college.
5    Q.   How much college did you complete?
6    A.   One year.
7    Q.   And where did you attend college?
8    A.   Columbia College.
9    Q.   In Chicago?
10   A.   Yes.
11   Q.   Communications?
12   A.   Photography.
13   Q.   When you began in your employment with
14 Copper and Brass, what was the position you began
15 in?
16   A.   Warehouseman.
17   Q.   And when you began in your employment
18 with Copper and Brass as a warehouseman, were you
19 at the Munster location?
20   A.   Yes.
21   Q.   And how long were you a warehouseman
22 at the Munster location of Copper and Brass?
23   A.   In that position, I think about a
24 year.

Page 14

1    Q.   And after about a year as warehouseman
2  at Copper and Brass in Munster, what's the next
3  position that you held?
4    A.   Material control.
5    Q.   Were you a member of a union as a
6  warehouseman?
7    A.   No.
8    Q.   Were you a member of a union in your
9  position with Copper and Brass in material control?
10   A.   No.
11   Q.   Have you ever been a member of a union
12 while you've been employed with Copper and Brass?
13   A.   No.
14   Q.   What were your duties in material
15 control for Copper and Brass?
16   A.   Inventory.
17   Q.   And in handling the material control
18 for Copper and Brass, were you still in Munster?
19   A.   Yes.
20   Q.   How long did you handle material
21 control with Copper and Brass?
22   A.   Including Munster, and I'm presently
23 working at Schaumburg.
24   Q.   Yes.

Page 15

1    A.   I've been there 12 years. About 11
2  years total now.
3    Q.   Other than the position of
4  warehouseman in material control, have you held any
5  other positions with Copper and Brass?
6    A.   My current position is regional
7  material control.
8    Q.   And when did you assume
9  responsibilities for regional material control for
10 Copper and Brass?
11   A.   Almost five years ago.
12   Q.   Do you supervise anyone in your
13 current position with Copper and Brass?
14   A.   I don't have any direct reports.
15   Q.   And who do you report to in your
16 present position at Copper and Brass Sales?
17   A.   Executive vice-president, Bill
18 Freuhauf.
19   Q.   And when did you transfer to the
20 Schaumburg location to the Copper and Brass Sales?
21   A.   About six years ago.
22   Q.   Have you ever held a supervisory
23 position with Copper and Brass Sales?
24   A.   I'm not really sure what you mean. As

Page 16

1  a management supervisory position?
2    Q.   Have you ever been a manager?
3    A.   Yeah, I manage inventory. I manage
4  materials.
5    Q.   But do you manage people?
6    A.   Do I manage people? No, I don't have
7  any direct reports.
8    Q.   In your employment with Copper and
9  Brass Sales, have you ever had responsibility for
10 hiring employees?
11   A.   No.
12   Q.   And in your employment with Copper and
13 Brass, have you had any responsibility for
14 terminating employees?
15   A.   No.
16   Q.   In your employment with Copper and
17 Brass, have you had any responsibility or authority
18 to discipline employees?
19   A.   No.
20   Q.   And during your employment with Copper
21 and Brass, you've never held a position as inside
22 sales representative; is that correct?
23   A.   No.
24   Q.   All right. Mr. Pucalik, you have been

Page 17

1  identified by the defendant, Copper and Brass
2  Sales, as a person with knowledge of facts
3  regarding Mr. Wingo's job performance at Copper and
4  Brass Sales.
5         What personal knowledge do you
6  have of Mr. Wingo's performance during his
7  employment at Copper and Brass Sales?
8         MR. DISBROW: Object to the form
9  of the question as vague and ambiguous. You can
10 answer it if you can.
11        THE WITNESS: Just what I see him
12 do at work.
13   BY MS. WEGNER:
14   Q.   Okay. What is it that you're
15 referring to that you've seen Mr. Wingo do at work?
16   A.   Be employed as a warehouseman.
17   Q.   Do you know how long Mr. Wingo was
18 employed at Copper and Brass Sales?
19   A.   No, I don't.
20   Q.   And in what positions have you
21 witnessed Mr. Wingo working at Copper and Brass
22 Sales?
23        MR. DISBROW: I'm sorry. Mr.
24 Wingo's positions?

Page 18

1  MS. WEGNER: Yes.
2  THE WITNESS: General warehouse
3  duties.
4  MR. DISBROW: If you know. Don't
5  guess if you don't know.
6  THE WITNESS: Okay.
7  BY MS. WEGNER:
8  Q. Well, specifically, what duties have
9  you seen Mr. Wingo performing at work at Copper and
10 Brass Sales?
11 A. You mean like drive a fork truck or --
12 Q. Yes, specific duties.
13 A. -- package material?
14 Q. Correct.
15 A. That's about all we do.
16 Q. So, you've seen Mr. Wingo drive a
17 forklift at work at Copper and Brass Sales and
18 you've seen him package materials?
19 A. Yeah.
20 Q. And have you ever evaluated Mr.
21 Wingo's performance as a warehouseman for Copper
22 and Brass Sales?
23 A. No.
24 Q. Have you, at any time, had the ability

Page 19

1  to form an opinion of Mr. Wingo's performance of
2  his duties as a warehouseman for Copper and Brass
3  Sales?
4  MR. DISBROW: I'm just going to
5  object on the grounds of relevance but you can
6  answer it.
7  THE WITNESS: I would say yes.
8  BY MS. WEGNER:
9  Q. Okay. And what opinion did you form
10 regarding Mr. Wingo's performance of his duties as
11 a warehouseman for Copper and Brass Sales?
12 MR. DISBROW: Same objection.
13 You can answer it.
14 THE WITNESS: Okay.
15 BY MS. WEGNER:
16 Q. Are you aware of any specific
17 performance deficiencies --
18 MR. DISBROW: Same objection. Go
19 ahead. I'm sorry.
20 MS. WEGNER: -- that Mr. Wingo
21 has exhibited as a warehouseman for Copper and
22 Brass Sales?
23 MR. DISBROW: Same objection.
24 He's testified he didn't -- Mr. Wingo didn't report

Page 20

1  to him. No one reported to him.
2  So, foundation. Objection to
3  form of the question. You can answer if you know.
4  THE WITNESS: No comment.
5  MR. DISBROW: You can't do that.
6  THE WITNESS: I can't do that?
7  Okay. Can you say that again, please?
8  MS. WEGNER: Rose, can you read
9  back my question?
10 (Record read as requested.)
11 MR. DISBROW: Same objection.
12 THE WITNESS: I don't know how to
13 answer that. I'm sorry.
14 BY MS. WEGNER:
15 Q. Well, in your employment with Copper
16 and Brass Sales of the last 12 years, have you
17 observed other warehousemen doing their job in a
18 similar manner that you observed Mr. Wingo?
19 MR. DISBROW: Objection. Form of
20 the question. It's vague and ambiguous. Also,
21 relevance.
22 THE WITNESS: I'm sorry. I don't
23 understand how to answer that.
24 BY MS. WEGNER:

Page 21

1  Q. Okay. Mr. Wingo isn't the only
2  warehouseman that you observed working at the
3  Schaumburg location, is he?
4  A. Correct.
5  Q. I mean, over the course of time,
6  haven't you observed just about every warehouseman
7  working?
8  A. Yes.
9  Q. All right. And in comparing your
10 observance of the various warehousemen at the
11 Schaumburg facility of Copper and Brass Sales, did
12 Mr. Wingo perform his job duties in a similar
13 manner as other warehouseman?
14 MR. DISBROW: Objection as to
15 foundation. You can answer the question if you
16 know.
17 THE WITNESS: Yes.
18 BY MS. WEGNER:
19 Q. Anyone in management at Copper and
20 Brass Sales ever have any discussion with you
21 regarding Mr. Wingo's performance?
22 A. Yes.
23 Q. And who, in management, at Copper and
24 Brass have discussed with you Mr. Wingo's

Page 22

1  performance?
2     A.  I'd have to say Randy Lunt.
3     Q.  And over the course of your
4  employment, has Mr. Lunt discussed with you the
5  performance of other warehousemen?
6     A.  Yes.
7     Q.  All right.  What is it that Mr. Lunt
8  has said to you regarding Mr. Wingo's performance?
9     A.  I don't think I can give you exact
10 quotes if that's you're asking or just an idea.  I
11 don't recall exact things that he might have said.
12    Q.  All right.  That's fair enough.
13        If you don't recall exact words,
14 I can't ask you to recall something you don't
15 remember.
16    A.  Okay.  Just the level of mistakes that
17 he makes.
18    Q.  And over the course of time, has Mr.
19 Lunt discussed with you the level of mistakes made
20 by other warehousemen?
21    A.  Oh, yeah.  Yes.
22    Q.  And in your employment at Copper and
23 Brass Sales, of mistakes pretty common among the
24 warehousemen?

Page 23

1     A.  I deal with numbers, and one of my
2  responsibility is to oversee a half-million
3  transactions that we perform.  So, that's a large
4  number but our goal is to be like 99.8 percent
5  correct on everything.
6     Q.  With five-hundred thousand
7  transactions, what types of transactions are those?
8     A.  I oversee documents that represent
9  material going out of the company and I also
10 oversee documents on material coming into the
11 company, and my goal is to see that those
12 transactions, in a narrow sense, from my desk are
13 done correctly.
14    Q.  Okay.  And in handling the documents
15 for materials in and materials out of the company,
16 do you see work orders?
17    A.  Yes.
18    Q.  How often do you see work orders that
19 contain mistakes?
20    A.  I'm not sure how to answer that.  Not
21 daily.  I mean there are days when everything is
22 perfect but maybe every other day.
23    Q.  And what are the types of mistakes
24 that you see on work orders?

Page 24

1     A.  The mistakes that I'm keying on and
2  looking for, generally pertain to the weight of our
3  inventory.
4     Q.  And over the course of your employment
5  with Copper and Brass Sales, have you seen mistakes
6  on work orders that have been made by every
7  warehouseman?
8         MR. DISBROW:  Objection as to
9  foundation.  If you can recall that, you can answer
10 it is.
11        THE WITNESS:  I don't think I
12 could answer that because there are so many people.
13 I don't segregate them by who did what.
14 BY MS. WEGNER:
15    Q.  Do you have any recollection of seeing
16 work orders where there was a mistake by Mr. Wingo?
17    A.  Yes.
18    Q.  Okay.  But in addition to seeing work
19 orders where there were mistakes by Mr. Wingo,
20 you've seen work orders where mistakes were made by
21 other warehousemen as well, correct?
22    A.  Yes.
23    Q.  Did you ever perform any type of an
24 audit as to the number of work orders that

Page 25

1  contained mistakes?
2     A.  No, that's not any responsibility.
3     Q.  So, you don't know how many work
4  orders Mr. Wingo may have made a mistake on,
5  correct?
6     A.  No, I couldn't answer that.
7     Q.  And similarly, you don't know how many
8  work orders any other warehouseman would have made
9  a mistake on, correct?
10    A.  I don't document that, no.
11    Q.  In handling inventory, do you handle
12 scrap?
13    A.  Yes.
14    Q.  So, how is it that scrap occurs at the
15 Schaumburg location of Copper and Brass Sales?
16    A.  We have scrap that is generated from
17 processing work orders, you have scrap that is
18 generated by mishandling, and you have scrap that
19 is generated by obsolete inventory.
20    Q.  Okay.  Generally, how would scrap
21 metal be generated by processing?
22    A.  If you're cutting a bar, that slice
23 you take out of there generates what we refer to as
24 "perf."  If you're working with flat goods, sheet

26

goods and you're trimming something to size per customer order, the remnant and obsolete inventory would be scrap that is just no longer needed in a marketplace. You would scrap it out.

Q. And then you also identified scrap through mishandling?

A. Oh, yes. You can mishandle something. You can drop it and it can bend and it's no longer useable.

Q. In your experience at Copper and Brass Sales, have you also encountered scrap through someone making a mistake?

A. Yes.

Q. So, for instance, someone might cut something to the wrong length and it's no longer useable?

A. Correct.

Q. So, have you ever made some type of a calculation as to the percentage of scrap at the Schaumburg warehouse?

MR. DISBROW: I'm just going to object to the grounds of relevance to this whole line of questioning. You can answer.

THE WITNESS: I know how much

27

scrap we sell every month because that's my responsibility is to move that.

BY MS. WEGNER:

Q. How much scrap do you sell per month?

MR. DISBROW: Objection as to relevance. You can answer it if you know.

THE WITNESS: In the Schaumburg plant, we average about 40,000 pounds a month.

BY MS. WEGNER:

Q. And what does that 40,000 pounds per month of scrap average or equate to relative to the total inventory at the facility --

MR. DISBROW: Same objection.

BY MS. WEGNER;

Q. -- in material?

A. You want to know how much inventory is in that warehouse; is that what you're asking? I can't do the calculations in my head.

Q. Okay. That's fine.

Does the scrap represent some type of percentage of total weight in inventory?

MR. DISBROW: If you know?

THE WITNESS: Yeah, it does.

BY MS. WEGNER:

28

Q. Do you know what that percentage is?

A. No, I don't.

Q. Okay. While you've worked at the Schaumburg facility -- for how long, six years?

A. About six years, yeah.

Q. You've handled material control, correct?

A. Right.

Q. So, over the last six years, has the amount of pounds of scrap per month averaged about the same?

MR. DISBROW: Same objection. Relevance. You can answer.

THE WITNESS: It fluctuates with business.

BY MS. WEGNER:

Q. Does the amount of scrap per month fluctuate a great deal?

MR. DISBROW: Same objection.

THE WITNESS: Don't know what a "great deal" would be.

BY MS. WEGNER:

Q. More than 10,000 pounds?

A. Oh, it can, yes.

29

Q. Okay. Well, over the last six years, have you seen a significant increase in the average pounds of scrap per month?

MR. DISBROW: Let me just put a standing objection on the record so I don't have to keep interrupting you as to the question of relevance.

MS. WEGNER: That's fine.

THE WITNESS: Scrap is part of us doing business. As sales increase, so will that.

MS. WEGNER: Truly, that I don't know why you're objecting to any questions because Mr. Pucalik was actually identified by the defendant.

MR. DISBROW: Jan, I'm just going to state for the record my objections. I have the right to do so and you can object to my objections. We'll just be here a little longer.

BY MS. WEGNER:

Q. Did you become familiar with Mr. Wingo when you moved to the Schaumburg location?

A. As I did everybody that I worked there with, yes.

Q. Did you ever have any discussions with

Page 30

1  Mr. Wingo regarding his warehouseman position at
2  Copper and Brass Sales?
3           MR. DISBROW:  Objection to form.
4  Ambiguous.
5           THE WITNESS:  I don't think so.
6  I don't recall.
7      BY MS. WEGNER:
8      Q.   Did Mr. Wingo ever complain to you
9  about his job at Copper and Brass Sales?
10     A.   I don't recall.  I can't recall any
11 specific complaints, no.
12     Q.   Did anyone at Copper and Brass Sales
13 ever complain to you about Mr. Wingo?
14     A.   Yes.
15     Q.   Who complained to you about Mr. Wingo?
16     A.   Once again, I would say Randy Lunt.
17     Q.   What was Mr. Lunt's specific
18 complaint?
19     A.   I can't quote him but just the number
20 of errors is the general.
21     Q.   And Mr. Lunt complained to you about
22 the level of errors of other warehousemen?
23     A.   Yes.
24     Q.   And do you recall who the other

Page 31

1  warehousemen were that Mr. Lunt complained to you
2  about?
3      A.   Actually, I don't recall right now
4  anyone there.
5      Q.   How is it that you specifically recall
6  their complaints about Mr. Wingo but no one else?
7      A.   Maybe because we're sitting here.
8      Q.   Oh, so the fact that you were told
9  your deposition was being requested in Mr. Wingo's
10 case refresh your recollection regarding --
11     A.   No.  I mean Bob did create a lot of
12 mistakes, and I think the level of mistakes that he
13 created was greater than anybody else, and that's
14 my recollection.  Everyone makes mistakes
15 certainly.
16     Q.   What makes you think Mr. Wingo's level
17 of mistakes was greater than anyone else's?
18     A.   Oh, I guess it would have to, and I've
19 never seen it but I've been told, and I saw it on
20 the desk his, you know, stack of mistakes in paper
21 form.
22     Q.   When did you see a stack of mistakes
23 by Mr. Wingo on the desk?
24     A.   In Randy's office maybe.  I don't

Page 32

1  know.  A year or two ago or so.
2      Q.   Did Mr. Lunt specifically point out to
3  you this stack of Mr. Wingo's mistakes that was on
4  his desk?
5      A.   I think a comment was made, yes.
6      Q.   What was the comment that was made by
7  the stack of papers on the desk in Randy's office?
8      A.   I don't remember the exact comment.
9      Q.   Did you review the stack of documents
10 that was on Randy's desk?
11     A.   No, I did not.
12     Q.   So, as you sit here today, you don't
13 know whether that stack that was pointed to on the
14 desk in Randy's office related only to Mr. Wingo,
15 do you?
16     A.   I was just told that this is a stack
17 of mistakes from Bob.  It wasn't alluded to that
18 this is everybody.  It was just --
19     Q.   And you don't know whether there was
20 paperwork regarding mistakes that had been made by
21 others in this stack that Randy pointed out to?
22     A.   No.
23           MR. DISBROW:  Let me object
24 because it's been asked and answered, and I guess

Page 33

1  that's it.
2      BY MS. WEGNER:
3      Q.   And did Mr. Lunt tell you why he had
4  the stack of papers on his desk regarding Mr.
5  Wingo's mistakes?
6      A.   No.
7      Q.   Are you aware of Mr. Lunt's collecting
8  papers regarding the mistakes of any other
9  warehouse person?
10          MR. DISBROW:  Objection as to
11 foundation.
12          THE WITNESS:  Do I answer?
13          MR. DISBROW:  You can answer if
14 you now.  I don't know how you'd know that but you
15 can answer.
16          THE WITNESS:  Ask your question
17 again, please.
18     BY MS. WEGNER:
19     Q.   Are you aware of Mr. Lunt collecting
20 paperwork regarding mistakes for any other
21 warehouse person?
22     A.   Yes, it's part of his responsibility.
23     Q.   So, have you been aware that Mr. Lunt
24 had stacks on his desk of mistakes for other

34

1 warehousemen beyond the stack that he had for Mr.
2 Wingo?
3        MR. DISBROW: Objection as to
4 form and foundation.
5        THE WITNESS: No.
6 BY MS. WEGNER:
7   Q.   Do you know whether or not there was
8 ever any study conducted comparing the number of
9 mistakes or the kinds of mistakes among the
10 warehouseman?
11  A.   No, I don't know that.
12  Q.   And you don't have any personal
13 knowledge that Mr. Wingo had a greater number of
14 mistakes than anyone else, do you?
15  A.   No.
16  Q.   Do you know the reason why Mr. Wingo
17 was terminated?
18  A.   No.
19  Q.   Do you have any knowledge of the
20 procedure followed by the warehousemen, at the
21 Schaumburg facility, in the last year to complete
22 production logs?
23  A.   **I know there is a production log.**
24 **It's not anything that I work with.**

35

1   Q.   Do you know who assumed the position
2 Mr. Wingo held after he was terminated?
3        MR. DISBROW: Objection. Assumes
4 facts not in evidence.
5        THE WITNESS: No.
6 BY MS. WEGNER:
7   Q.   Do you know what the last position was
8 that Mr. Wingo would have held before he was
9 terminated?
10  A.   **Yeah, packing at the UPS station.**
11       MS. WEGNER: All right. I don't
12 have any other questions for Mr. Pucalik.
13       MR. DISBROW: I just have a few.
14 I just want to make sure I'm clear on a few things.
15      EXAMINATION
16 BY MR. DISBROW:
17  Q.   I think your testimony is that you did
18 not directly supervise anyone and that would
19 include Mr. Wingo, correct?
20  A.   **That's correct.**
21  Q.   On a daily basis, how much time would
22 you say that you could -- Strike that.
23       You indicate that you did see Mr.
24 Wingo performing some of his duties, correct?

36

1   A.   **Yes.**
2   Q.   How much time would you say in a week
3 or a day, whatever makes sense to you, did you see
4 Mr. Wingo working?
5   A.   **A few minutes.**
6   Q.   A few minutes a day?
7   A.   **Yeah, because I'm not there. I'm**
8 **somewhere else.**
9   Q.   So, you don't have any personal
10 knowledge about how he conducted his job on a daily
11 basis or weekly basis then?
12  A.   **No, I wasn't his supervisor.**
13  Q.   When mistakes are made on work orders
14 or otherwise, do employees receive discipline for
15 making those types of mistakes?
16       MS. WEGNER: Objection. Calls
17 for speculation, also form and foundation.
18       MR. DISBROW: You can answer.
19       THE WITNESS: Yes.
20 BY MR. DISBROW:
21  Q.   That's not out of the ordinary for an
22 employee who makes a work order or other type of
23 mistake, to receive some sort of discipline?
24       MS. WEGNER: Same objection.

37

1        THE WITNESS: No.
2 BY MR. DISBROW:
3   Q.   I'm assuming that because you
4 indicated that the goal is to be as close to 100
5 percent as you can on maintaining inventory
6 appropriately?
7   A.   **Yes.**
8        MS. WEGNER: I object.
9 Mischaracterizing his former testimony.
10 BY MR. DISBROW:
11  Q.   Okay. Is it true that what you're
12 trying to do is get as close to 100 percent as you
13 can with regard to inventory levels?
14  A.   **Yes.**
15  Q.   Part of the way to control that is
16 through eliminating mistakes, correct?
17  A.   **Yes.**
18  Q.   So, do you believe that one of the
19 intentions behind discipline for mistakes is to
20 more efficiently handle inventory and reduce waste?
21       MS. WEGNER: I'm sorry. I object
22 to form and foundation. Calls for speculation.
23       MR. DISBROW: You can answer.
24       THE WITNESS: Yes.

38

BY MR. DISBROW:
Q. As inventory control -- As a material control employee, is it your understanding that one of the ways that you can control inventory is to eliminate errors which may cause scrap?
A. Yes.
    MR. DISBROW: I don't have any other questions.
    MS. WEGNER: All right. What about signature?
    MR. DISBROW: We reserve the right.
    THE COURT REPORTER: Will you be ordering the transcript?
    MS. WEGNER: No, not today.
    FURTHER DEPONENT SAITH NOT.

39

ROBERT WINGO VS.
THYSSENKRUPP MATERIALS NA, INC., et al.

    The Deposition of MARK PUCALIK, taken in the matter, on the date, and at the time and place set out on the title page hereof.
    It was requested that the deposition be taken by the reporter and that same be reduced to typewritten form.
    It was agreed by and between counsel and the parties that the Deponent will read and sign the transcript of said deposition.

40

CERTIFICATE
STATE OF         :
COUNTY OF        :
    Before me, this day, personally appeared, MARK PUCALIK, who, being duly sworn, states that the foregoing transcript of his/her Deposition, taken in the matter, on the date, and at the time and place set out on the title page hereof, constitutes a true and accurate transcript of said deposition.

_____
MARK PUCALIK

    SUBSCRIBED and SWORN to before me this ____ day of _____, _____ in the jurisdiction aforesaid.
_____  _____ My
Commission Expires   Notary Public

41

DEPOSITION ERRATA SHEET

Case Caption: ROBERT WINGO VS.
    THYSSENKRUPP MATERIALS NA, INC., et al.
DEPONENT:       MARK PUCALIK
DEPOSITION DATE: MAY 30, 2008

To the Reporter:
I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me. I request that the following changes be entered upon the record for the reasons indicated. I have signed my name to the Errata Sheet and the appropriate Certificate and authorize you to attach both to the original transcript.
_____
_____
_____
_____
_____
_____
_____
_____

```
                                                         42
 1  _____
 2  _____
 3  _____
 4  _____
 5  _____
 6  _____
 7  _____
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22
23  SIGNATURE:_____DATE:_____
24         MARK PUCALIK
```

DEPOSITION OF MARK PUCALIK -- 05/30/08

43

1    I, Rose Weber, Certified shorthand Reporter
2    for the State of Illinois, do hereby certify that the
3    foregoing was reported by stenographic and mechanical
4    means, which matter was held on the date, and at the
5    time and place set out on the title page hereof
6    and that the foregoing constitutes a true and accurate
7    transcript of same.
8        I further certify that I am not related to
9    any of the parties, nor am I an employee of or related
10   to any of the attorneys representing the parties, and
11   I have no financial interest in the outcome of this
12   matter.
13       I have hereby subscribed my hand on the 17th
14   day of  June , 2008 .
15
16
17
18
19                            *Rose Marie Weber*
20                            Rose Weber, CSR
21
22
23
24

VICTORIA COURT REPORTING SERVICE, INC   (312)   443-1025