IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT G. WINGO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:08:CV-00368 |
| | ) | |
| THYSSENKRUPP MATERIALS NA, INC., | ) | Honorable Samuel Der-Yeghiayan |
| d/b/a COPPER and BRASS SALES, INC. | ) | Magistrate Judge Schenkier |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S
LOCAL RULE 56.1(b) STATEMENT OF ADDITIONAL FACTS[1]**

Pursuant to N.D. Illinois L.R. 56.1(a), Defendant ThyssenKrupp Materials NA, Inc., d/b/a Copper and Brass Sales, Inc. ("Copper and Brass" or "the Company") submits the following response to Plaintiff Robert Wingo's ("Plaintiff's") 56.1(b) Statement of Additional Facts (Dkt. No. 29, "Pl.'s Rule 56.1 Statement" or "Plaintiff's Rule 56.1 Statement"):

**GENERAL OBJECTIONS**

Plaintiff's Rule 56.1 Statement fails to comply with L.R. 56.1(b)(3)(C) because he has submitted far more than the 40 facts allowed by including multiple facts in nearly all of his numbered paragraphs. Further, L.R. 56.1(b)(3)(C) requires that Plaintiff's facts consist "of *short* numbered paragraphs," (emphasis added) yet Plaintiff's extensive recitation of multiple facts in a

---

[1] There is no merit to Plaintiff's claim that Defendant's Local Rule 56.1(a) Statement of Undisputed Material Facts failed to comply with L.R. 56.1(a) because it did not provide deposition line citations. Plaintiff's authority of *Kause v. The Alberto-Culver Co.*, No. 97 C 3085, 1999 U.S. Dist. LEXIS 16846 at *1 (N.D. Ill. Oct. 14, 1999), only applies "in all civil cases before the undersigned judge," Judge Gottschall.

single paragraph does not meet the definition of "short." On both grounds, this Court should strike Plaintiff's 56.1(b) Statement of Additional Facts in its entirety.

## DEFENDANT'S RESPONSES TO
## PLAINTIFF'S 56.1(b) STATEMENT OF ADDITIONAL FACTS

80. Plaintiff, Robert G. Wingo, born on May 24, 1953 and currently fifty-five (55) years old, was a twenty-four (24) year employee of Defendant. Further, Plaintiff was the number two (2) ranking senior employee at Defendant's Copper & Brass Plant in Schaumburg, Illinois, when Defendant terminated Plaintiff's employment. Plaintiffs' twenty-four (24) years of employment withstood Defendant's end to the employment of nearly 300 employees. (Ex. A -Wingo Dep. at 6:7- 8, 15:24-16:1, 16:17-19, 100:17-102:1; Ex. E -Bishop Dep. at 55:10-21).

**Response:** Copper and Brass does not dispute the factual assertions in Paragraph 80, but objects that there is no foundation to Plaintiff's opinion that nearly 300 employees ended their employment with Copper and Brass during his time with the Company.

81. At the time of being fired by Defendant, Plaintiff earned $14.50 per hour as a Warehouseman, which is the same position he started as an employee of Defendant after graduating from college. (Ex. A -Wingo Dep. at 6:7-8, 40:16-42:16, 44:23-45:7, 287:20-288:9)

**Response:** Copper and Brass does not dispute the factual assertions in Paragraph 81, except for Plaintiff's misleading and unsupported assertion that he held the same job throughout his employment with the Company. Instead, as Plaintiff's testimony establishes, the warehouse classification consisted of multiple job assignments which included the rod, bar and wire ("RBW") work station, side load operator, shipping and receiving, performing truck loading and unloading, and machine operation. As Plaintiff acknowledged in his deposition, each of those job assignments had its own unique set of duties and responsibilities. For instance, warehouse clerks measure, weigh and pack orders, as well as fill out daily production logs, while machine operators cut and/or shear material, dock workers load and unload trucks, and side load operators bring material to warehouse clerks for packing. (Wingo Dep. at 43-44, 49-50; Lunt Dep. at 57-58.) Side load operators do not fill out daily production logs. (Lunt Dep. at 57-58.) Copper and

Brass further states that Plaintiff testified he did not have another full-time job in the seven years between graduating from college and starting employment with the Company. (Wingo Dep. at 40-41.)

82. As a Warehouseman at Defendant's Schaumburg Plant, Plaintiff performed all the duties and responsibilities of a Warehousemen, [sic] which included performing the duties of a warehouse clerk, machine operator, side loader operator, and shipping/receiving during his final year of employment. The duties of Warehousemen overlap and are interdependent [sic] each other, including the duties and responsibilities performed by side loader operators and warehouse clerks. Warehousemen further shift their responsibilities around the Schaumburg Plant as needed; however, both all [sic] Warehousemen are subject to the same job description and classification, same set of supervisors, and same standards of employment. (Ex. A -Wingo Dep. at 44:23-45:7, 287:20-288:9; Lunt Dep. at 15:19-24, 39:12-41:21; Ex. -D DeMien Dep. at 63:6-17; Ex. E -Bishop Dep. at 12:20-22; 13:24-15:6, 28:7-15; Ex. L)

**Response:** Copper and Brass does not dispute that the general job description of "warehouseman" covers several specific jobs in its Schaumburg, Illinois warehouse, including those listed in Paragraph 82, and that warehousemen may be moved from one job assignment to another to maximize productivity and efficiency. (Wingo Dep. at 287-88; Lunt Dep. at 55-56.) Copper and Brass disputes the remaining factual assertions in Paragraph 82. The warehouseman classification consists of multiple job assignments with distinct duties and responsibilities. Plaintiff testified that he was assigned to Copper and Brass's RBW work station for the last two years of his employment and performed similar duties at another packing station for five to seven years before that, so he did not perform all of the alleged jobs listed in the first sentence of Paragraph 82 during his final year of employment. (Wingo Dep. at 50-52.) While assigned to the RBW work station, Plaintiff was responsible for weighing, measuring and packing orders, entering data onto Company computers, and verifying the accuracy of this information. (Wingo Dep. at 50-57.) Earlier in Plaintiff's employment in the warehouseman classification, he served as a machine operator and a side load operator in the 1980s, and in the shipping and receiving department from approximately 1990 to 1995. (Wingo Dep. at 46-47.) The specific duties of a particular job within the general classification of warehouseman necessarily vary, including that

certain jobs such as side load operators, machine operators and dock workers do not have the clerical function of completing daily production logs as was required by the RBW work station. (Wingo Dep. at 329; Lunt Dep. at 56-58.)

83. During his tenure as a Warehouseman, Plaintiff processed 200,000 orders for the Schaumburg Plant. Processing orders at the Schaumburg Plant is a repetitive process with repetitive errors of which a hundred types are committed nearly daily by Warehousemen. Mark Pucalick, [sic] Defendant's Material Control Supervisor, who is responsible for checking Warehousemen's work orders almost daily for accuracy, concluded that he has "observed just about every warehouseman working and Mr. Wingo performed his job duties in a similar manner as other warehouseman." [sic] (Ex. A -Wingo Dep. at 264:13-21, 269:9-15, 297:9-18; Ex. B - Alvarez Dep. at 38:21-39:1; Ex. D - DeMien Dep. at 39:14-40:3; Ex. G -Pucalik Dep. at 21:5-17.)

    **Response:**  Copper and Brass objects to the lack of foundation to Plaintiff's opinion that

he processed 200,000 orders.[2]  Copper and Brass does not dispute that Mark Pucalik answered

"yes" at his deposition to a question posed by Plaintiff's counsel as quoted in Paragraph 83, but it

does dispute the assertion that there are a hundred different types of repetitive work order errors

that warehousemen commit on a near daily basis, because Plaintiff's citations to the record do

not support that fact.  Copper and Brass further disputes Paragraph 83 to the extent that it implies

Pucalik was Plaintiff's supervisor, as Pucalik did not supervise Plaintiff.  (Pucalik Dep. at 36.)

84. At all relevant times, Defendant had a progressive disciplinary policy in place governing the terms on which all Warehousemen are subject to discipline. Defendant's progressive disciplinary policy provides, *inter alia*, that repetitive errors, such as filling work orders, administrative, or otherwise, and wasting time are "Category A" violations and are never subject to termination; rather, within a 90-day framework, "Category A" violations are subject to an oral warning as a first disciplinary step, a written warning as a the second disciplinary step, and a three (3) day suspension as a third and final disciplinary step. The disciplinary policy also provides that sleeping on the job while not on break or at lunch is a Category C violation and is subject to a first disciplinary step of a three (3) day suspension and a second disciplinary step of termination. Further, the disciplinary policy states that "altering or defacing your own or another employee's time card, punching in or out another employees' time card or improperly handling of another employee's time card," like "falsifying company documents," is a Category D violation and

---

    [2] Plaintiff would have had to complete 33 orders per day, 250 days a year, for 24 years to reach 200,000.  Yet, Plaintiff testified that he was not always a warehouse clerk during his employment with Copper and Brass, and he often completed less orders than this.  (Wingo Dep. at 46-47, 63.)

subject to a first step disciplinary action of termination. (Ex. A -Wingo Dep. at 297:9-18; Ex. C - Lunt Dep. at 33:2-36:4; Ex. L.)

**Response:**   Copper and Brass objects to the factual assertions in Paragraph 84 because Plaintiff has mischaracterized "Category A" work rules violation.   Copper and Brass disputes that Category A violations of its work rules may never subject an employee to termination. Instead, the work rules provide for a "4 step progressive disciplinary action process" and that "[t]hree 3 day suspensions in a two year period will result in termination."  (Def.'s Rule 56.1 Statement, Ex. L at 2.)   Copper and Brass further disputes Plaintiff's factual assertion that violations more than 90 days old are irrelevant, because the work rules provide that such violations "may influence the action to be taken."  (Def.'s Rule 56.1 Statement, Ex. L at 2.) Copper and Brass does not dispute the remaining factual assertions in Paragraph 84.

85. Discipline for work order errors varied at Defendant's Schaumburg Plant as supervisors would handle it differently as far as whether to do a verbal, a sit-down, letter of counsel, or sometimes just a blurb in the Warehouseman's training file to go over and make sure that the employee understood what he did wrong and how to correct that situation. (Ex. C -Lunt Dep. at 115:8-15, Ex. A -Wingo Dep. at 297:9-18.)

**Response:**   Copper and Brass does not dispute the factual assertion in Paragraph 85.

86. The conditions of Plaintiff's employment went "downhill" soon after Plaintiff submitted to Randy Lunt, the Schaumburg Plant Supervisor, and Pete LaRocco, his union steward, a grievance of harassment against Mark DeMien, the Schaumburg Plant's first and third shift foreman, on August 30, 2007. (Ex. A-Wingo Dep. at 25:12-26:6, 239:10-240:7; Ex. B-Alvarez Dep. at 26:3-7)

**Response:**   Copper and Brass objects to Plaintiff's characterization that his employment went "downhill" at that point.   Rather the record establishes that Plaintiff was disciplined on numerous dates, including on multiple occasions for repetitive work order errors before ever complaining to Lunt about M. DeMien allegedly swearing.   Copper and Brass also disputes that Plaintiff submitted a grievance of harassment as Plaintiff never filed a grievance under the collective bargaining agreement concerning M. DeMien swearing at him or being disciplined, but instead complained to Lunt about the swearing.  (Wingo Dep. at 25-26.)  His oral complaint

was not a grievance under the collective bargaining agreement. (Exhibit A ¶ 3 (M. DeMien Decl.); Exhibit B ¶ 4 (LaRocco Decl.)) Copper and Brass does not dispute that Lunt was the Schaumburg plant manager. (Lunt Dep. at 14-15.)

87. Plaintiff's August 30, 2007 grievance against M. DeMien stemmed from M. DeMien's shouting at Plaintiff, stating "What the fuck are you doing," while Plaintiff was waiting to receive material from Jason Prosser, a 29-year-old Warehouseman. After Plaintiff explained what he was doing, M. DeMien further stated, "fuck you, get to work." After stating, "fuck you, I'll do anything I want," M. DeMien walked away from Plaintiff. Later that shift, M. DeMien resumed swearing and cussing at Plaintiff for talking to Pat Bishop, while Plaintiff was moving two (2) eighty (80) pound PVC rolls as Plaintiff was still waiting for Prosser to bring him Plaintiff's materials, which was common conduct at the Schaumburg Plant. (Ex. C -Lunt at 20:17-22; Ex. E -Bishop Dep. at 34:15-36:13; Ex. A-Wingo Dep. at 257:19-258:8; Ex. H; Ex. K.)

      **Response:** Copper and Brass disputes the factual assertions in Paragraph 87 because Plaintiff never filed any grievance concerning the incident. (Wingo Dep. at 25-26; Ex. B ¶ 5.) Copper and Brass further disputes that it was "common conduct" for warehouse clerks like Plaintiff to have to wait for side load operators to bring material, as warehouse clerks had access to forklifts to get their own materials. (Lunt Dep. at 45.) Copper and Brass further disputes that M. DeMien used the alleged obscenities as Lunt's investigation never corroborated Plaintiff's complaint. (Lunt Dep. at 53.) Copper and Brass disputes the remaining allegations in Paragraph 87. Copper and Brass states that the Company has a harassment policy that includes a complaint procedure, but Plaintiff never made a complaint of harassment under the policy about M. DeMien's alleged use of obscenity on or around August 30, 2007. (Ex. A ¶ 19.)

88. Beyond verbally abusing Plaintiff, M. DeMien issued Plaintiff a letter of counsel for "wasting time" on August 30, 2007. M. DeMien regularly permitted substantially younger employees under his supervision, such as Tyler DeMien, twenty-three (23) years old, and Lizardo Hernandez, thirty-five (35) years old, to waste time by using their cellular phones on company time. M. DeMien further allowed T. DeMien to leave the building and use his cellular phone during work hours without discipline. M. DeMien was also frequently witnessed waking up T. DeMien before his shifts, when he was sleeping, drunk, in the Schaumburg Plant's parking lot. M. DeMien is both the father and supervisor of T. DeMien, which violates Defendant's policy against relatives supervising each other. (Ex. A -Wingo Dep. at 48:7-11, 133:13-

22;150:18-151:1,218:14-220:19, 223:5-15; Ex. B -Alvarez Dep. at 39:24-42:17; Ex. C -Lunt at 20:17-22, 105:16-106:4; Ex. F - LaRocca Dep. at 43:13-24, 105:8-106:4; Ex. K.)

**Response:**    Copper and Brass disputes that Plaintiff was verbally abused.    Copper and Brass does not dispute that Plaintiff was issued a letter of counsel for wasting time for talking to another younger employee, Pat Bishop, who also received the same discipline on August 30, 2007.    Copper and Brass disputes that M. DeMien's occasional supervision of his son Tyler DeMien ("T. DeMien") violated any policy against relatives supervising each other.    Lunt testified that the policy arose after T. DeMien was hired and no exception was made for T. DeMien.    (Lunt Dep. at 105-06.)    Copper and Brass states that M. DeMien only supervised T. DeMien when their shifts overlapped.    (M. DeMien Dep. at 20-21.)    Copper and Brass further states that Plaintiff testified he was never disciplined for talking on his cell phone during work hours (Wingo Dep. at 152) and that M. DeMien did not see T. DeMien or Lizardo Hernandez ("Hernandez") using cell phones during work hours.    (Ex. A ¶ 8.)    Finally, there is no record support that any of those alleged acts occurred after August 30, 2007.

89. M. DeMien allowed Ray Cather, a twenty-seven (27) year-old Warehouseman, who worked on Plaintiff's shift, to use his cell phone for personal business without discipline. Plaintiff witnessed M. DeMien catch Cather sleeping three (3) times during work hours; however, M. DeMien simply ignored and walked by Cather sleeping, despite sleeping on the job being a Category C violation of Defendant's disciplinary policy and immediately subject to a three (3) day suspension as a first step disciplinary action and termination as a second step disciplinary action. M. DeMien further permitted Cather to sit on the job and simply do nothing without any disciplinary action. (Ex. A -Wingo Dep. at 222:18-225:22; Ex. C -Lunt at 20:17-22; Ex. K.)

**Response:**    Copper and Brass disputes that M. DeMien (1) observed Ray Cather ("Cather") sleeping during work hours when he was not on break or lunch, (2) saw Cather sitting at his work station doing nothing, or (3) failed to take disciplinary action against Cather for any conduct that M. DeMien did observe.    (Ex. A ¶ 10.)    Plaintiff has provided no foundation for his facts including when any of the events allegedly occurred.    Copper and Brass does not dispute that sleeping on the job is a Category C violation of its work rules that may be addressed with a

three-day suspension for a first offense and termination for a second offense. Copper and Brass states that Plaintiff's allegations in Paragraph 89 are irrelevant to this case.

90. Warehousemen, like Plaintiff, are customarily forced to wait hours for other Warehousemen to provide them with materials that they need to complete processing work orders. As was customary, Plaintiff occupied himself with other work responsibilities, such as putting away two (2) skids, containing 8-10 rolls of PVC, cleaning his station, and reloading PVC rolls, while waiting for Prosser to retrieve his materials to allow Plaintiff to process his next work order. Defendant's regulations further required Plaintiff to get additional help from another Warehouseman to reload the eighty (80) pound PVC rolls, due to the Schaumburg Plant's (70) pound weight restriction. (Ex. A-Wingo Dep. at 257:19-258:8; 284:13-16; Ex. E -Bishop Dep. at 36:9-37:17; Ex. H.)

      **Response:** Copper and Brass disputes the factual assertions in Paragraph 90 because warehouse clerks like Plaintiff did not have to wait hours for side load operators to bring material, as warehouse clerks had access to forklifts to get their own materials. (Lunt Dep. at 45.)

91. Lunt did not discipline M. DeMien as a consequence of Plaintiff's grievance, despite Plaintiff identifying two witnesses, Sergio Garcia and Patrick Bishop, to M. DeMien's abusive behavior. M. DeMien further remained as Plaintiff's foreman, and issued a letter of counsel for "wasting time," for his work while waiting for Jason Prosser to bring him his materials to process the work order. (Ex. C -Lunt Dep. at 47:23-49:19; Ex. A -Wingo Dep. 25:12-26:19)

      **Response:** Copper and Brass disputes the factual assertions in Paragraph 91 because Plaintiff never filed any grievance. Instead, Plaintiff made a verbal complaint to Lunt about M. DeMien using obscenities which Lunt subsequently investigated. (Wingo Dep. at 25-26; Ex. A ¶ 3; Ex. B ¶ 4.) Plaintiff's complaint was not substantiated and he never grieved the discipline issued by M. DeMien under the collective bargaining agreement. (Lunt Dep. at 53; Ex. B ¶ 5.)

92. Following Plaintiff's August 30, 2007 grievance for harassment against M. DeMien, Plaintiff began to see an increasing number of bad orders coming from T. DeMien and Hernandez, which prevented Plaintiff from having any chance of success. Plaintiff attempted to have a member of Defendant's management, such as Lunt, hold T. DeMien and Hernandez accountable for their errors, but Defendant did nothing to hold them accountable. M. DeMien was further witnessed laughing at Plaintiff in response to Plaintiff explaining to M. DeMien, the problems he was having with T. DeMien and Hernandez bringing him bad work orders. (Ex. A -Wingo Dep. at 239:10-240:7; Ex. B -Alvarez Dep. at 20:1-6; 24:12-17, 25:14-16.)

**Response:**  Copper and Brass disputes the factual assertions in Paragraph 92 because Plaintiff never filed any grievance, but instead made an oral complaint to Lunt about M. DeMien's use of profanity.  (Ex. A ¶ 3; Ex. B ¶ 4.)  Thus, there never was any harassment grievance filed under the collective bargaining agreement or a complaint made under the Company's harassment policy.  Copper and Brass further disputes this paragraph because Plaintiff did not speak to M. DeMien regarding T. DeMien or Lizardo Hernandez bringing him incorrect work orders and/or material, but even if Plaintiff did complain, M. DeMien would not have laughed at him.  (Ex. A ¶¶ 11-12.)  Copper and Brass further disputes this paragraph because there is no record support for Plaintiff's opinion concerning the increase in the number of bad orders, the motives or reasons for those orders, or his attempt to blame management for not holding other employees accountable.  Copper and Brass disputes that other employees' mistakes influenced Plaintiff's ability to perform his job as a warehouse clerk because it was his responsibility to ensure that orders contained the proper material and otherwise perform his job in a satisfactory manner.  (Wingo Dep. at 315-16.)

93. Coinciding with the increase in bad orders sent to Plaintiff, Lunt inexplicably approached Plaintiff to offer him a general warehouse helper position, which Plaintiff rejected as the change in position would result in a significant loss of pay to Plaintiff, who had the responsibility of paying for the college tuition of his children and the mortgage on his house. (Ex. A -Wingo Dep. at 71:17-73:12, 257:19-258:8; Ex. H)

**Response:**  Copper and Brass disputes the factual assertions in Paragraph 93 because there is no record support for the assertion of an "increase in bad orders sent to Plaintiff." Further, Lunt's offer of transferring Plaintiff to a warehouse helper position, which occurred in November or December of 2007 after Plaintiff returned from a three-day suspension in November of 2007, was unconnected to any incorrect material that side load operators brought Plaintiff, because it was still Plaintiff's responsibility to ensure that packed orders contained the

proper material. That offer was made to preserve Plaintiff's employment. (Def.'s Rule 56.1 Statement, Ex. J ¶ 10; Wingo Dep. at 72-73, 315-16.)

94. After Plaintiff made his grievance about M. DeMien's conduct, Plaintiff's union steward, Pete LaRocco, would tell Plaintiff practically daily, "you're a dead man." (Ex. B -Alvarez Dep. at 26:3-14, 42:24-43:19)

    **Response:** Copper and Brass disputes the factual assertions in Paragraph 94 because Plaintiff never submitted any grievance about M. DeMien's conduct nor did Pete LaRocco ("LaRocco") tell Plaintiff he is "a dead man." (Ex. B at ¶¶ 5-6.)

95. From October 2007 through November 2007, Lunt and M. DeMien began disciplining Plaintiff for acts in which others were responsible, which were untrue, or which Defendant punished Plaintiff more severely, but Plaintiff shared responsibility with other Warehousemen. (Ex. A -Wingo Dep. at 132:2-7,133:13-22,158:9-159:6,146:9-14,149:12-150:11,150:18-151:1,178:14-14-179:22, 239:10-240:1, 240:18-20, 248:11-20)

    **Response:** Copper and Brass disputes the factual assertions in Paragraph 95 because Plaintiff admits that he made, or should have caught, the mistakes which resulted in his discipline pursuant to Company work rules on October 4, 2007 (written warning for repetitive work order errors), October 10, 2007 (one-day suspension for repetitive work order errors), November 8, 2007 (three-day suspension for repetitive key punch errors), and November 30, 2007 (counseling memorandum for failure to follow instructions). Additionally, Plaintiff admitted that the October 4, November 8 and November 30, 2007 disciplines were not a result of his age. (Wingo Dep. at 145-50, 154-59, 161, 173-74, 176-78.) Copper and Brass further disputes that Lunt and/or M. DeMien disciplined Plaintiff differently than other employees who committed the same offenses as he did, as the Company treated Plaintiff more fairly than other employees. (LaRocco Dep. at 78-79.) Copper and Brass further disputes that Plaintiff was not responsible for the acts which led to his discipline as it was his responsibility to ensure that work orders were completed correctly. (Wingo Dep. at 315-16; Lunt Dep. at 44.) Copper and Brass

further disputes that Plaintiff shared responsibility for his duties with other warehousemen.

(Wingo Dep. at 315-16; Lunt Dep. at 44.)

96. Despite Elutario [sic-Eluterio] Herrera, a 43-year-old Warehouseman, and Plaintiff engaging in the identical conduct on October 4, 2007, M. DeMien, both Herrera's and Plaintiff's supervisor, issued Herrera a first step disciplinary action of an oral warning, but issued Plaintiff a more severe second step disciplinary action of a written warning to Plaintiff. [sic] (Ex. A -Wingo Dep. at 143:13-145:6; Ex. D -DeMien Dep. 12:21-13:20; 18:20-22, 19:6-9, 20:17-21:4; Ex. C - Lunt Dep. at 20:17-22, 111:21-113:11; Def. Mem. Ex. Q; Ex. J; Ex. K.)

      **Response:**  Defendant disputes that Eluterio Herrera ("Herrera") and Plaintiff deserved the same discipline for their actions on October 4, 2007.  Instead, Plaintiff's actions constituted a second offense of repetitive work order errors, whereas Herrera's action was his first such offense.  (Pl.'s Rule 56.1 Statement, Ex. O, Ex. P, Ex. X at 1-2.)

97. M. DeMien cited a June 22, 2007 "Category A" disciplinary action as his basis for elevating Plaintiff's October 4, 2007 discipline from an oral warning to a written warning; however, Herrera's previous "Category A" discipline occurred more recently, on July 10, 2007. (Ex. A - Wingo Dep. at 143:13-145:6; Ex. C -Lunt Dep. at 111:21-113:11; Def. Mem. Ex. Q; Ex. J.)

      **Response:**  Copper and Brass disputes the factual assertions in Paragraph 97 because it is not supported by the record.  Instead, Herrera's July 10, 2007 oral warning was for failing to use safety glasses and not repetitive work order errors like Plaintiff's June 22, 2007 discipline was.

(Def.'s Rule 56.1 Statement, Ex. O, Ex. X at 2.)

98. On October 5, 2007, M. DeMien suspended Plaintiff for one (1) day for an error in work order 45685, despite it being the result of the twenty-three (23) year-old Warehouseman, T. DeMien, bringing Plaintiff the wrong material for Plaintiff to process the work order. Despite Plaintiff bringing T. DeMien's fault in the work order error to the attention of M. DeMien, M. DeMien, both Plaintiff's and T. DeMien's supervisor, nevertheless disciplined Plaintiff, but not T. DeMien, for the error in processing work order 45685. (Ex. A -Wingo Dep. at 104:12-106:6, 149:10-151:1, 178:14-14-179:22; Ex. D -DeMien Dep. 12:21-13:20; 18:20-22, 19:6-9, 20:17-21:4; Ex. C -Lunt Dep. at 20:17-22, 101:4-7, 104:6-110:1; Ex. I; Ex. Q at ¶ 13; Ex. K.)

**Response:** Copper and Brass disputes that Plaintiff's work order error on October 5, 2007[3] was T. DeMien's fault, as Plaintiff is responsible for ensuring that orders are packed correctly regardless of any mistakes side load operators may make, and should have caught this mistake. (Wingo Dep. at 149-50, 315-16; Lunt Dep. at 44.) Copper and Brass further disputes that it was T. DeMien who brought Plaintiff the wrong material. Instead, Plaintiff's testimony on who brought him the material was conflicting and equivocal. Initially he testified the material was delivered by T. DeMien and then later in his deposition testified that it was Lizardo Hernandez. (Wingo Dep. at 179-80, 218-19.) Copper and Brass does not dispute that Plaintiff was given a one-day suspension for repetitive work order errors he committed on October 5, 2007.

99. In giving Plaintiff a one (1) day suspension, Defendant failed to follow its uniform progressive disciplinary procedure as Plaintiff is entitled to an oral warning as a first step disciplinary action and a written warning as a second step disciplinary action for work order errors falling within the 90-day framework. Defendant's progressive disciplinary policy states that Plaintiff should have received an oral warning for the October 4, 2007 alleged incident and a written warning for the October 5, 2007 alleged incident, as Plaintiff did not receive any other discipline within the 90 days preceding October 5, 2007. (Ex. A -Wingo Dep. at 178:14-179:23; Ex. C -Lunt Dep. at:39:12-40:4; Ex. L)

**Response:** Copper and Brass disputes the factual allegations in Paragraph 99 because the Company's work rules do not support this fact. Instead those work rules provide that "the severity of the violation, as well as, the employee's past work rule violations *may* influence management's actions. Violations prior to the 90 consecutive calendar day framework *may* influence the action to be taken." Those work rules do not specify that that discipline is removed from an employee's record after 90 days. (Def.'s Rule 56.1 Statement, Ex. L at 2 (emphasis added).) Thus, Copper and Brass acted in conformity with its work rules.

---

[3] The work order error occurred on October 5, 2007, but Plaintiff was disciplined on October 10, 2007, which is the date used throughout Copper and Brass's pleadings in this matter. (Def.'s Rule 56.1 Statement, Ex. Q.)

100. Lunt placed Plaintiff on a three (3) day suspension without pay on November 8, 2008 for alleged key punch errors; however, Plaintiff keypunched everything correctly when he entered the order into the computer with no harm done to the company. Despite Plaintiff correctly keypunching the order, M. DeMien issued Plaintiff a three (3) day suspension without ever showing Plaintiff what he did incorrectly. (Ex. A -Wingo Dep. at 104:6-106:6,158:15-159:6, 257:17-258:9; Ex. H; Ex. Q at ¶ 15-17; Ex. H.)

   **Response:**  Copper and Brass disputes the factual allegations in Paragraph 100 because

Plaintiff's deposition testimony establishes that he made the mistake that led to his November 8,

2008 three-day suspension.  (Wingo Dep. at 155-59.)  Copper and Brass further disputes that

Plaintiff's error did not harm the Company as he testified that accuracy was always a concern,

and particularly so with the need to carefully service customers during the economic downturn

which had begun at that time.  (Wingo Dep. at 64.)

101. In November 2007, M. DeMien further issued Plaintiff another oral warning for leaving the warehouse door open, despite M. DeMien permitting other Warehousemen, like Cather, 27-years-old, to leave the warehouse door open all the time, around the clock. (Ex. A -Wingo Dep. at 225:2-226:13; Ex. C -Lunt Dep. at 20:17-22; Ex. K.)

   **Response:**  Copper and Brass disputes this fact because Plaintiff never was disciplined

under the work rules for leaving the warehouse door open.  Instead, Plaintiff testified that

DeMien said "don't ever leave that door open again."  (Wingo Dep. at 225.)  Copper and Brass

disputes the factual assertions in Paragraph 101 because M. DeMien (1) did not allow

warehousemen to leave the warehouse doors open, (2) would tell anyone caught doing this to

close the door, and (3) gave anyone that did not obey his order to close the door a written

warning for insubordination.  (Ex. A ¶ 13.)

102. Lunt, with input from M. DeMien, terminated Plaintiff's employment solely on the basis for allegedly "falsifying company documents.". [sic] Lunt accused Plaintiff of a category D violation. Ten (10) years previously, Plaintiff trained Lunt, as an employee of Defendant. (Ex. A - Wingo Dep at 133:4-8; 202:6-209:17; Ex. N.)

   **Response:**   Copper and Brass does not dispute that Lunt terminated Plaintiff's

employment, with input from M. DeMien, for falsifying Company records/documents when he

took credit on his November 28 and 29, 2007 daily production logs for work orders that were

completed by other employees, which is a Category D offense under its work rules. (Def.'s Rule 56.1 Statement, Ex. L at 2, Ex. W.) Copper and Brass disputes Plaintiff's self-serving and non-responsive testimony that he trained Lunt. (Pl.'s Rule 56.1 Statement ¶ 81; Lunt Dep. at 13-14.)

103. Defendant has not articulated a cohesive definition of "falsifying company records," nor did Defendant instruct Warehousemen to what constituted "falsifying company records"; however, M. DeMien, who participated in the termination of Plaintiff's employment, believed that "falsifying company documents" was writing untrue figures on a company document. Lunt informed Plaintiff, when terminating his employment, that "falsifying company documents" was "taking credit for work order completed by other Warehousemen." (Ex. A -Wingo Dep at 202:6-209:17, 272:16-273:10; Ex. B -Alvarez Dep. at 67:4-6; Ex. E -Bishop Dep. at 57:21-24; Ex. D -DeMien Dep. at 28:16-19; Ex. N.)

     **Response:** Copper and Brass disputes the assertion in Paragraph 103 that it has not articulated "a cohesive definition" of falsifying company records. Lunt's and M. DeMien's statements on this issue are consistent. (M. DeMien Dep. at 28.) Copper and Brass further disputes that M. DeMien participated in Plaintiff's termination beyond the fact that Lunt received input from M. DeMien during the process. (Lunt Dep. at 36-37.) Furthermore, Copper and Brass states that Plaintiff defined falsifying company documents as "to write something that, that was false or to, to say something that wasn't true about something." (Wingo Dep. at 273.) Copper and Brass also disputes that it did not instruct warehousemen that recording incomplete work orders without indicating as such on daily production logs constituted falsifying company records because it posted materials and had training every one to two years on these logs. (Lunt Dep. at 87.)

104. Defendant purportedly based its decision to fire Plaintiff on two (2) daily production logs that Plaintiff maintained on November 28, 2007 and November 29, 2007 in which Defendant alleged that Plaintiff included work orders that he did not complete, but were completed work orders [sic] by other employees. (Ex. A -Wingo Dep at 202:6-209:17; Ex. N.)

     **Response:** Copper and Brass does not dispute that it terminated Plaintiff for including work orders on his daily production logs that he did not complete (which were then completed by other warehouse clerks) on his November 28 and 29, 2007 logs. (Def.'s Rule 56.1 Statement,

Ex. W; Wingo Dep. at 201.)  The decision to terminate followed a complete investigation that also included reviewing other logs prepared by Plaintiff in November, 2007.  That investigation established that Plaintiff engaged in similar falsification of Company documents with his November 15, 19 and 20, 2007 logs as well.  (Lunt Dep. at 80; Def.'s Rule 56.1 Statement, Ex. U.)

105. Defendant requires warehouse clerks to maintain daily production logs in order for the Warehousemen to document all of the work that they performed on a shift, including work performed on orders that cannot be completed either because the order was defective or because he could not complete them within his shift times. (Ex. A -Wingo Dep. at 64:15-:67:7, 104:6-106:6, 187:22-188:6, 191:20-192:9, 195:15-19, 238:6-19, 275:23-10, 294:16-24, 295:16-296:17, 298:23-299:5, 299:6-18, 300:8-301:6, 325:1-10; Ex. B -Alvarez Dep. at 27:4-22, 29:3-30:7, 31:3-15, 32:6-33:17, 33:22-34:2, 56:4-7, 67:4-6, 83:21-23, 84:1-18; Ex. Q at ¶ 21-25.)

      **Response:**  Copper and Brass disputes that warehouse clerks were instructed to record work orders on their daily production logs that were not, in fact, completed.  (Lunt Dep. at 62, 87-88, 90; M. DeMien Dep. at 47, 50-51.)

106. M. DeMien asserts that he found the alleged errors in Plaintiff's November 28, 2007 and November 29, 2007 production logs through a random check, which he does sometimes daily and other times weekly. However, M. DeMien checks daily production logs every night. Prior to Plaintiff's termination, M. DeMien had been Plaintiff's foreman for the previous five (5) years, as M. DeMien was the foreman for the first and third shifts at the Schaumburg Plant. (Ex. D -DeMien Dep. at 12:19-13:20; 33:5-22; Ex. B -Alvarez Dep. at 96:23-97:22; Ex. C -Lunt Dep. at 111:20-112:21; Ex. J)

      **Response:**  Copper and Brass disputes the factual assertion in Paragraph 106 that M. DeMien checks daily production logs every night, as he testified that he did so on a daily or weekly basis.  (M. DeMien Dep. at 32-33.)  Copper and Brass further disputes that M. DeMien is the foreman for the entire first and third shifts, as his work hours during the Fall of 2007 were 3:00 or 3:30 a.m. until 2:30 p.m.  (Ex. A ¶ 4.)

107. Plaintiff had been completing daily production logs for the previous fifteen (15) years in the same manner, during which the process for completing the production logs basically stayed the same. During his past fifteen (15) years of completing daily production logs, Plaintiff had never been accused of taking credit for the work of others, despite never doing anything different from how he completed his daily production logs on November 28, 2007 and November 29, 2007.

(Ex. A - Wingo Dep. at 64:15-:67:7, 104:6-106:6;, 180:16-184:17, 186:6-188:6, 191:20-198:23, 213:14-214:22, 237:6-239:2, 275:23-10, 294:16-24, 295:16-296:17, 298:23-299:5, 299:6-18, 300:8-301:6, 325:1-10; Ex. B -Alvarez Dep. at 27:4-22, 29:3-30:7, 31:3-34:2, 56:4-7, 67:4-6, 83:21-85:12; Ex. Q at ¶ 21-25.)

**Response:**  Copper and Brass does not dispute that it never disciplined Plaintiff for taking credit for work orders that he did not complete on his daily production logs which otherwise suggested he had completed them because it was unaware that he engaged in that practice prior to November 2007.  (Ex. A ¶ 14.)

108. M. DeMien believed that Plaintiff was documenting all of the work he performed on his November 28-29, 2007 shifts in his daily production logs. (Ex. D -DeMien Dep. at 41:16-42:15, Ex. C -Lunt Dep. at 72:10-73:22.)

**Response:**  Copper and Brass disputes the assertion in Paragraph 108 because M. DeMien's testimony suggests that Plaintiff may have been trying to comment about issues he encountered with work orders.  It does not indicate any belief on M. DeMien's part about whether Plaintiff was documenting all work he performed.  (M. DeMien Dep. at 41-42.)

109. In the Schaumburg Plant, Warehousemen include in their daily production logs, (a) the work order number, (b) the pieces and weight, and (c) a general time to when the Warehouseman began processing the work order. Depending on their comfort level, every Warehousemen [sic] uses a different system for recording the times that they spent processing work orders on their daily production logs. Warehousemen customarily include incomplete work orders in their daily production logs for such reasons as being provided a defective metal, or if the Warehousemen's [sic] shift ended in the middle of processing the order. If an incomplete work order is included in their daily production log, Warehousemen would write notes to that effect to show that the work order was not finished, so the next shift could complete processing the work order.(Ex. A - Wingo Dep. at 64:15-:67:7, 104:6-106:6;, 180:16-184:17, 186:6-188:6, 191:20-198:23, 213:14-214:22, 237:6-239:2, 275:23-10, 294:16-24, 295:16-296:17, 298:23-299:5, 299:6-18, 300:8-301:6, 325:1-10; Ex. B - Alvarez Dep. at 27:4-22, 29:3-30:7, 31:3-34:2, 56:4-7, 67:4-6, 83:21-85:12; Ex. Q at ¶ 21-25.)

**Response:**  Copper and Brass disputes the factual assertion in Paragraph 109 because warehouse clerks are to place the following information on their daily production logs (which is more than that stated in Paragraph 109): (1) the employee's name, (2) shift, (3) date, (4) work station; and for each work order filled: (1) work order number, (2) number of pieces, (3) weight, (4) any applicable comments, (5) and the time of completion.  (Def.'s Rule 56.1 Statement, Ex.

U at 1.)  Copper and Brass further disputes the remainder of Paragraph 109 because warehouse clerks were not permitted to include work orders on their daily production logs that they did not complete, or otherwise list incomplete work orders without indicating that the processing of the work order had not been completed.  (Lunt Dep. at 62, 87-88, 90; M. DeMien Dep. at 47, 50-51.)

110. Lunt provided Plaintiff's training for how to complete daily production logs, including Plaintiff's instruction [sic] to put a general time of when he began processing the work order, and Lunt further instructed Plaintiff to include all the work he performed on a shift, which would include partially completed work orders. All Warehousemen included incomplete work orders in their daily production logs. (Ex. A -Wingo Dep. at 64:15-:67:7, 104:6-106:6, 180:16-184:17, 187:22-188:6, 191:20-192:9, 195:15-19, 196:18-197:18; 213:14-214:22, 238:6-19, 275:23-10, 294:16-24, 295:16-296:17, 298:23-299:5, 299:6-18, 300:8-301:6, 325:1-10; Ex. B -Alvarez Dep. at 27:4-22, 29:3-30:7, 31:3-15, 32:6-33:17, 33:22-34:2, 56:4-7, 67:4-6, 83:21-23, 84:1-18; Ex. O.; Ex. S; Ex. Q at ¶ 21-25.)

     **Response:**  Copper and Brass disputes the factual assertions in Paragraph 110 because warehouse clerks were only to include work orders on their daily production logs that they, in fact, completed.  (Lunt Dep. at 62, 87-88, 90; M. DeMien Dep. at 47, 50-51.)  Copper and Brass further disputes Paragraph 110 because Mario Alvarez ("Alvarez") testified that he would always note any incomplete work orders on his daily production logs by writing down what needed to be completed.  (Alvarez Dep. at 31.)

111. Beyond making comments in their daily production log that would suggest to the next shift's Warehouseman that their work order was incomplete, the customary procedure was that the Warehousemen would also tell the Warehouseman on the next shift by a note or verbally, if you could, that the order is incomplete, so the next shift's Warehouseman can finish the work order, but each Warehousemen [sic] had his own preference for doing so. (Ex. A -Wingo Dep. at 64:15-:67:7, 104:6-106:6, 180:16-184:17, 187:22-188:6, 191:20-192:9, 195:15-19, 196:18-197:18; 213:14-214:22, 238:6-19, 275:23-10, 294:16-24, 295:16-296:17, 298:23-299:5, 299:6-18, 300:8-301:6, 325:1-10; Ex. B -Alvarez Dep. at 27:4-22, 29:3-30:7, 31:3-15, 32:6-33:17, 33:22-34:2, 56:4-7, 67:4-6, 83:21-23, 84:1-18; Ex. O.; Ex. S; Ex. Q at ¶ 21-25.)

     **Response:**  Copper and Brass disputes the factual assertions in Paragraph 111 because it was not "customary procedure" for warehouse clerks to list incomplete work orders on their daily production logs.  (Lunt Dep. at 62, 87-88, 90; M. DeMien Dep. at 47, 50-51.)  Any work orders that were not completed, but included on a daily production log, had to be indicated as

such on the log, so there is no basis for Plaintiff's assertion that merely leaving a note or speaking with the next warehouse clerk was "the customary procedure." (Lunt Dep. at 90; Alvarez Dep. at 31.) Warehouse clerks were also required to inform the clerk on the next shift of any incomplete or troublesome work orders. (LaRocco Dep. at 44-46.)

112. Plaintiff's November 28, 2007 daily production log was completed by Plaintiff exactly the way it is supposed to be done, and always done at the Schaumburg Plant. Plaintiff's November 28, 2007 daily production log shows that all but two (2) work orders, were completed by Plaintiff. As customarily done in the Schaumburg Plant, Plaintiff's November 28, 2007 daily production log indicates to the next shift's Warehouseman that work orders 466844 and 466883, which Lunt identified as the basis for Defendant's decision to fire Plaintiff, were incomplete to allow the next shift to complete the work orders. (Ex. A -Wingo Dep. at 64:15-:67:7, 104:6-106:6, 180:16-184:17, 187:22-188:6, 191:20-192:9, 195:15-19, 196:18-197:18; 213:14-214:22, 238:6-19, 275:23-10, 294:16-24, 295:16-296:17, 298:23-299:5, 299:6-18, 300:8-301:6, 325:1-10; Ex. B -Alvarez Dep. at 27:4-22, 29:3-30:7, 31:3-15, 32:6-33:17, 33:22-34:2, 56:4-7, 67:4-6, 83:21-23, 84:1-18; Ex. O.; Ex. S; Ex. Q at ¶ 21-25.)

**Response:** Copper and Brass disputes the factual assertions in Paragraph 112 because Plaintiff did not fill out his November 28 and 29, 2007 daily production logs properly. His inclusion of work orders that were not complete violates the instructions he was given by management that only completed work orders may appear on these logs, and was not how daily production logs were "customarily done" or "supposed to be done" at the Schaumburg warehouse. (Lunt Dep. at 62, 87-88, 90; M. DeMien Dep. at 47, 50-51; Alvarez Dep. at 31.) Copper and Brass further disputes that Plaintiff's daily production logs for November 28 and 29, 2007 indicated that the final two work orders were incomplete. (Wingo Dep. at 316-19; Lunt Dep. at 83, 86, 89-90.) Copper and Brass also disputes that Plaintiff completed his daily production logs the way they were "always" filled out, as M. DeMien has never seen any daily production logs from other employees prepared in the way that Plaintiff prepared his November 28 and 29, 2007 logs. (Ex. A ¶ 15.)

113. Lunt alleged that Plaintiff took credit for completing work orders 466844 and 466883 on his November 28, 2007 daily production log. However, as Plaintiff expressed to Lunt and M. DeMien during the meeting when his employment was terminated, Plaintiff's entry for work order 466844 notes that he was given a bad metal. As Plaintiff was not able to complete the work

order due to being provided a defective metal, which happens a lot, Plaintiff marked in the comments section, "quality of metal bad – Quarantine" to indicate that work order 466844 was incomplete. With respect to work order 466883, Plaintiff's entry in the November 28, 2007 daily production log shows that work order 466883 was incomplete, as the comments section states that it was "set up, it was stamped, it was boxed" to allow the second shift Warehouseman, Mario Alvarez, to complete the work order, which was a common practice at the Schaumburg Warehouse. (Ex. A -Wingo Dep. at 64:15-:67:7, 104:6-106:6, 180:16-184:17, 187:22-188:6, 191:20-192:9, 195:15-19, 196:18-197:18; 213:14-214:22, 238:6-19, 275:23-10, 294:16-24, 295:16-296:17, 298:23-299:5, 299:6-18, 300:8-301:6, 325:1-10; Ex. B -Alvarez Dep. at 27:4-22, 29:3-30:7, 31:3-15, 32:6-33:17, 33:22-34:2, 56:4-7, 67:4-6, 83:21-23, 84:1-18; Ex. O.; Ex. S; Ex. Q at ¶ 21-25.)

**Response:**  Copper and Brass disputes that Plaintiff's comments on his November 28, 2007 daily production log indicate which jobs were completed or not, as he was unable to distinguish whether the times listed were start or stop times.  (Wingo Dep. at 315-19.)  Copper and Brass further disputes that writing comments as Plaintiff alleges in Paragraph 113 was "a common practice" at the Schaumburg warehouse, as he has not introduced any record evidence to support this statement.  Copper and Brass does not dispute that Plaintiff took credit for work orders on his November 28, 2007 daily production log that he did not, in fact, complete because he indicated completion times, the number of pieces processed, the weight, and other information for those work orders.  (Lunt Dep. at 83.)

114. Plaintiff's November 28, 2007 daily production log also shows that Plaintiff had to finish the previous Warehouseman's work order 466674. Despite DeMien's review of Plaintiff's November 28, 2007 production log showing that Plaintiff completed the work order started by the previous shift's Warehouseman, Defendant has not fired any other employees for "falsifying company documents" at the Schaumburg Plant in, at least, the past 5 ½ years. (Ex. A -Wingo Dep. at 64:15-:67:7, 104:6-106:6, 180:16-184:17, 187:22-188:6, 191:20-192:9, 195:15-19, 196:18-197:18; 213:14-214:22, 238:6-19, 275:23-10, 294:16-24, 295:16-296:17, 298:23-299:5, 299:6-18, 300:8-301:6, 325:1-10; Ex. B -Alvarez Dep. at 27:4-22, 29:3-30:7, 31:3-15, 32:6-33:17, 33:22-34:2, 56:4-7, 67:4-6, 83:21-23, 84:1-18; Ex. O.; Ex. S; Ex. Q at ¶ 21-25.)

**Response:**  Copper and Brass disputes the assertion in Paragraph 114 that Plaintiff's November 28, 2007 daily production log shows that he had to finish a work order that another warehouse clerk did not complete.  (Ex. A ¶ 17.)  Copper and Brass further denies that Plaintiff's November 28, 2007 daily production log would justify terminating another warehouse clerk for

falsifying Company documents.  (Ex. A ¶ 18.)  Copper and Brass states that no other employee

was terminated for violating the work rule for falsifying company documents the same way

Plaintiff did because M. DeMien has no knowledge of any other warehouse employee preparing

daily production logs in a similar manner to the way Plaintiff prepared his November 28 and 29,

2007 logs.  (Ex. A ¶ 16.)  Copper and Brass further states that no other employee had made

misrepresentations on his daily production logs like Plaintiff.  (Def.'s Rule 56.1 Statement, Ex. J

¶ 16.)

115. Plaintiff documented his work that he performed on November 29, 2007 in his daily
production log in a manner that was commonly done in the Schaumburg Plant. Plaintiff's
November 29, 2007 daily production log states that the two work orders, 467112 and 467012,
were not completed by him. With respect to work order 467112, Plaintiff's entry shows that the
work order was not completed, as the 2:25 time and the corresponding comment, "box,"
attributed to work order 467112, shows that he did not complete the work order, but only started
it for the next shift's Warehouseman to finish. Plaintiff's entry for work order 467012 shows it
was not completed as he wrote in the comment section that the "wrong size" was pulled, which
was a mistake by another Warehouseman, so the work order could not be completed. (Ex. A -
Wingo Dep. at 64:15-:67:7, 104:6-106:6, 180:16-184:17, 187:22-188:6, 191:20-192:9, 195:15-
19, 213:14-214:22; 237:6-239:2, 275:23-10, 294:16-24, 295:16-296:17, 298:23-299:5, 299:6-18,
300:8-301:6, 325:1-10; Ex. B - Alvarez Dep. at 27:4-22, 29:3-30:7, 31:3-15, 32:6-33:17, 33:22-
34:2, 56:4-7, 67:4-6, 83:21-23, 84:1-18; Ex. P; Ex. Q at ¶ 21-25.)

**Response:**  Copper and Brass disputes the factual assertions in Paragraph 115 because

warehouse clerks were not supposed to list a completion time and other information for orders

that they did not, in fact, complete.  (Lunt Dep. at 62, 87-88, 90; M. DeMien Dep. at 47, 50-51.)

Copper and Brass further disputes that Plaintiff completed his November 29, 2007 daily

production log "in a manner that was commonly done in the Schaumburg Plant," because he

wrote down the completion time for work orders that were incomplete at the end of his shift and

did not record sufficient information for the next shift's warehouse clerk to know that the order

was not complete.  Notations such as "box" and "wrong size" do not indicate that such orders

were incomplete.  (Lunt Dep. at 62, 83-84, 87-88, 90; M. DeMien Dep. at 47, 50-51; Alvarez

Dep. at 31.)  Finally, Plaintiff's witness, Mario Alvarez, testified that if he did not complete a

work order by the end of his shift, he would "mark down" on his daily production log how much work he had completed on that order.  (Alvarez Dep. at 31.)  Plaintiff's November 28 and 29, 2007 logs indicated he had completed all of his work orders.  (Def.'s Rule 56.1 Statement ¶ 46, Ex. U at 4-5.)

116. M. DeMien and Lunt allowed other substantially younger Warehousemen, like Herrera, 43 years old, working alongside Plaintiff in Plaintiff's exact same department under the exact same supervisors, to include incomplete orders on his daily production logs without discipline. Herrera, supervised by M. DeMien and Lunt, would take credit for at least one or two work orders a day that he was not able to complete, including some Plaintiff completed for him. (Ex. A -Wingo Dep. at 64:15-:67:7, 104:6-106:6, 180:16-184:17, 187:22-188:6, 191:20-192:9, 195:15-19, 213:14-214:22; 237:6-239:2, 275:23-10, 294:16-24, 295:16-296:17, 298:23-299:5, 299:6-18, 300:8-301:6, 325:1-10; Ex. B -Alvarez Dep. at 27:4-22, 29:3-30:7, 31:3-15, 32:6-33:17, 33:22-34:2, 56:4-7, 67:4-6, 83:21-23, 84:1-18; Ex. Q at ¶ 21-25; Ex. C -Lunt Dep. at 20:17-22; Ex. K.)

**Response:**  Copper and Brass disputes the factual assertions in Paragraph 116 because Lunt states that no other warehouse employee had made misrepresentations on his daily production logs like Plaintiff did on November 28 and 29, 2007.  (Def.'s Rule 56.1 Statement, Ex. J ¶ 16.)  Further, M. DeMien never saw any other employees' daily production logs prepared in the same manner as Plaintiff's November 28 and 29, 2007 logs.  (Def.'s Rule 56.1 Resp., Ex. A ¶ 15-16.)  Copper and Brass also disputes this paragraph because Plaintiff improperly "took credit for packaging two orders, put weights, times, pieces down and he did not fill the orders," and this led Lunt to conclude that Plaintiff took credit for these orders by indicating they were finished when actually they were completed by other employees.  (Lunt Dep. at 83, 86-87.) Plaintiff also admitted that his November 29, 2007 daily production log included all of the detailed information that Lunt stated which showed the employee had completed an order, but did not list the incomplete status of item 20 on that daily production log.  (Wingo Dep. at 238.) Finally, Alvarez's testimony was that Herrera would specifically note on his daily production log the incomplete status of a work order. (Alvarez Dep. at 31.)  Plaintiff's testimony concerning Herrera was equivocal at best.  (Wingo dep. at 214.)

117. Defendant further permitted other significantly younger Warehousemen to commit "falsification of company documents" and Category D violations without discipline or termination of employment as T. DeMien, 23 years old, and Michael Peronne, [sic-Perrone] 34-years-old, and who later replaced Plaintiff, would leave their shifts at 12 a.m., despite being scheduled to work to 1 a.m., and John Barena, another supervisor at the Schaumburg Plant, would punch them out at 1 a.m., which should have resulted in them being "fired on the spot." M. DeMien, who participated in the termination of Plaintiff's employment, was often witnessed punching T. DeMien in and out of the Schaumburg Plant to credit T. DeMien for times when he was not working. (Ex. B -Alvarez Dep. at 39:24-42:5; Ex. C - Lunt Dep. at 20:17-22; Ex. K.)

**Response:**  Copper and Brass disputes the factual assertions in Paragraph 117 because Lunt testified that no other employees made misrepresentations on his daily production logs like Plaintiff did on November 28 and 29, 2007.  (Def.'s Rule 56.1 Statement, Ex. J ¶ 16.)  M. DeMien also never saw any other employees' daily production logs prepared in the same manner as Plaintiff's November 28 and 29, 2007 daily production log.  (Ex. A ¶ 15.) Copper and Brass further disputes this paragraph because Alvarez only alleged that T. DeMien was involved in leaving work early, and did not mention Mike Perrone ("Perrone").  (Alvarez Dep. at 39-42.) Moreover, Alvarez's testimony does not establish that Copper and Brass management knew of this situation.  (Alvarez Dep. at 39-42.)  Copper and Brass further disputes this paragraph because falsifying company documents and time card violations are separate and distinct types of Category D offenses.  (Def.'s Rule 56.1 Statement, Ex. L at 8.)

118. T. DeMien, twenty-three (23) years old, was given numerous verbal and written warnings, in addition to a minimum of four (4) final warnings from August 2005 through December 21, 2006, which does not include T. DeMien's three (3) day suspension on May 5, 2005 for absenteeism. Lunt, who terminated Plaintiff's employment, informed T. DeMien that his December 21, 2006 tardiness was grounds for termination of his employment, but instead only imposed upon him a three (3) day suspension. (Ex. C -Lunt Dep. at 20:17-22, 104:6-106:4; Ex. K; Ex. I.)

**Response:**  Copper and Brass disputes the factual assertions in Paragraph 118 because T. DeMien only received a last-chance agreement along with the three-day suspension after his union "pleaded for leniency" following verbal, written and final warnings for violation of the Company's attendance policy and the filing of a grievance under the collective bargaining

agreement challenging his discipline. (Pl.'s Rule 56.1 Statement, Ex. I.) All of the discipline referenced in Paragraph 118 concerned violations of the Company's attendance policy, which was separate from the work rules.

119. Following Defendant's termination of Plaintiff's employment, Defendant replaced Plaintiff, fifty-five (55) years old, with Mike Perrone, a thirty-four (34) year old employee, who was over twenty (20) years younger than Plaintiff. (Lunt Dep. at 20:17-22,127:6-24; Ex. K.)

**Response:** Copper and Brass disputes the factual assertions in Paragraph 119 because it filled the vacant position following Plaintiff's termination pursuant to procedures established under the collective bargaining agreement with Plaintiff's Union. This resulted in employees on other shifts working overtime at first (one of whom was Arturo Flores, age 51), and a seniority-based bidding process among other warehousemen eventually resulted in another hourly employee, Perrone, moving to the RBW work station several months after Plaintiff's termination. (Lunt Dep. at 125-27; Def.'s Rule 56.1 Statement, Ex. J ¶ 29.)

Respectfully submitted,

DATED: August 8, 2008   THYSSENKRUPP MATERIALS NA, INC.,
            d/b/a Copper and Brass Sales, Inc.


         By:  /s Russell S. Linden
            One of its Attorneys


Russell S. Linden
Admitted *pro hac vice*
2290 First National Building
660 Woodward Avenue, Suite 2290
Detroit, Michigan 48226
(313) 465-7466

Jeffrey S. Piell, Esq.
Quarles & Brady LLP
500 West Madison Street, Suite 3700
Chicago, IL 60661
(312) 715-5000

### *CERTIFICATE OF SERVICE*

RUSSELL S. LINDEN states that on August 8, 2008, he caused a copy of this **Response to Plaintiff's Local Rule 56.1(b) Statement of Additional Facts,** along with this **Certificate of Service**, to be served via the electronic notification system of the United States District Court for the Northern District of Illinois Eastern Division to the e-mail address listed below:

Lisa Kane, Esq.
Lisa Kane & Associates, P.C.
lisakane@sbcglobal.net


                    s/Russell S. Linden
                    RUSSELL S. LINDEN

DETROIT.3243876.2