# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT G. WINGO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08 C 368 |
| | ) | |
| | ) | |
| THYSSENKRUPP MATERIALS NA, | ) | |
| Inc. d/b/a COPPER AND BRASS SALES | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Defendant Thyssenkrupp Materials NA, Inc., d/b/a Copper and Brass Sales, Inc.'s ("CB") motion for summary judgment. For the reasons stated below, we grant CB's motion for summary judgment.

## BACKGROUND

Plaintiff Robert G. Wingo ("Wingo") alleges that he worked for CB as a

warehouse clerk for twenty-four years.  Wingo contends that throughout his career

he received awards and bonuses from CB for his performance.  Wingo alleges that in

2007, CB began disciplining him  for violations that Wingo claims were minimal.

Wingo claims that he was disciplined for minor manufacturing errors, while other

younger employees at CB were not disciplined for such errors.  Specifically, Wingo

alleges that he was suspended for one day in October 2007, for failing to discover a

mistake made by one of his fellow employees.  Wingo claims that, in contrast, CB

did not substantially discipline the employee that actually committed the error.

Wingo also alleges that in November 2007, he was suspended for three days for a

minor infraction involving an inadvertent "key punch error."  (Compl. Par. 17).

Wingo claims that, following his three-day suspension, he began to document on his

own production log work performed by other employees and the errors committed by

other employees on his own production logs.  However, Wingo claims that his

supervisors at CB accused him of taking credit for other employees' work on his

production logs.  Wingo's supervisors also allegedly accused him of documenting

work on his production logs that he had only worked on, but had not completed.

Wingo alleges that the manner in which he completed his production logs was

consistent with the manner in which he had kept the production logs throughout his

career at CB and was consistent with the way that other employees, who were not

disciplined, kept their production logs.  Wingo also claims that he provided CB with

evidence that he had eventually completed the work documented in his production

logs on later shifts.  However, Wingo claims that, on December 3, 2007, CB

terminated his employment for "falsifying company records/documents." (Comp. Par 20). Wingo claims he was replaced by a substantially younger employee who was twenty-two years old. Wingo brought the instant action alleging unlawful discrimination on the basis of his age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.* CB has moved for summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In seeking a grant of summary judgment, the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)(quoting Fed. R. Civ. P. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." *Id.* at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but, "by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P.

56(e).  A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000).  The court must consider the record as a whole, in a light most favorable to the non-moving party, and draw all reasonable inferences that favor the non-moving party.  *Anderson*, 477 U.S. at 255; *Bay v. Cassens Transp. Co.*, 212 F.3d 969, 972 (7th Cir. 2000).

## DISCUSSION

CB has moved for summary judgment on Wingo's ADEA claim arguing that Wingo was terminated for violating clear company policy and that Wingo has no evidence of age related animus on CB's part.  To succeed on an ADEA claim, a plaintiff must show that his age "'actually motivated the employer's decision'" and "'had a determinative influence on the outcome'" of the employment action taken against the plaintiff.  *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007)(quoting *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 573 (7th Cir. 2007)(internal quotation marks omitted)).  A plaintiff bringing an ADEA claim can seek to defeat a defendant's motion for summary judgment under either the direct

method of proof or the indirect method of proof.  *Id.*


I. Direct Method of Proof

Under the direct method of proof, a plaintiff must establish a discriminatory motivation through direct or circumstantial evidence.  *Rudin v. Lincoln Land Cmy. Coll.*, 420 F.3d 712, 719-20 (7th Cir. 2005).  Direct evidence of discrimination would constitute "an admission by" the defendant that the adverse employment action was taken "on the basis of" the plaintiff's membership in a protected class. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006).  A plaintiff can also present circumstantial evidence under the direct method of proof, but such evidence must be sufficient to create "'a triable issue of whether the adverse employment action of which [the plaintiff] complains had a discriminatory motivation.'"  *Rudin*, 420 F.3d at 721 (quoting *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1397 (7th Cir. 1997)).  The Seventh Circuit has also indicated that one way that circumstantial evidence can create a triable issue is if there is a "'convincing mosaic of discrimination against the plaintiff.'"  *Paz v. Wauconda Healthcare and Rehabilitation Centre*, *LLC*, 464 F.3d 659, 666 (7th Cir. 2006)(quoting *Walker v. Bd. of Regents of Univ. of Wis.*, 410 F.3d 387, 394 (7th Cir. 2005)).  When considering the evidence in its entirety in a light most favorable to Wingo, there is not a "convincing mosaic" of evidence that would permit a reasonable trier of fact to infer that CB terminated Wingo's employment on the basis of his age.  *Paz*, 464 F.3d at

666.  Therefore, Wingo must proceed under the indirect method to defeat CB's motion for summary judgment.

## II. Indirect Method of Proof

Wingo contends that he can proceed under the indirect method of proof. Under the indirect method, a plaintiff must first establish a *prima facie* case of discrimination.  *Hemsworth*, 476 F.3d at 492.  If a plaintiff establishes a *prima facie* case, the burden shifts to the employer to present a legitimate non-discriminatory reason for the action.  *Id.*  If the employer presents such a reason, the burden shifts to the plaintiff to show that the given reason is pretext for unlawful discrimination.  *Id.*

### A. *Prima Facie* Case

In order to establish a *prima facie* case of age discrimination under the indirect method, a plaintiff must prove that: "(1) []he is a member of a protected class; (2) []he was performing at a level that met h[is] employer's legitimate expectations; (3) []he was subject to an adverse employment action; and (4) []he was treated differently than a similarly situated person outside h[is] protected class[]." *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006).  The parties agree that Wingo meets the first and third  *prima facie* requirements since he is a member of a protected class under the ADEA and his employment was terminated by CB.  The parties dispute the second and fourth prongs of the *prima facie* standard relating to

whether Wingo was meeting CB's legitimate expectations and whether any other similarly situated person outside of Montgomery's protected class was treated differently.

### 1. Legitimate Employment Expectations

Wingo claims that he has presented sufficient evidence to raise a genuine issue of material fact as to whether he was meeting CB's legitimate employment expectations.  However, at this stage in the litigation Wingo must support this contention with evidence and "set forth specific facts showing that there is a genuine issue for trial" as to whether there was employer liability.  Fed. R. Civ. P. 56(e); *see also Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003)(describing summary judgment as the "put up or shut up" moment in the lawsuit).  To support the contention that he was meeting CB's legitimate expectations Wingo points to the longevity of his employment at CB and the fact that his "twenty-four [] years of employment withstood Defendant's end to the employment of nearly 300 employees."  (SAF Par. 80).  However, the Seventh Circuit has concluded that the relevant inquiry is the plaintiff's performance at the time of the adverse action.  *See, e.g., Hong v. Children's Memorial Hospital*, 993 F.2d 1257, 1262 (7th Cir. 1993)(stating that an employee cannot satisfy its burden by only showing that legitimate expectations were met for some period of time before termination); *see also Johal v. Little Lady Foods, Inc.*, 434 F.3d 943, 946 (7th Cir. 2006)(stating that "'[w]hat matters in a discriminatory discharge case is not the

employee's past performance, but whether []he was meeting the company's expectations at the time of [his] discharge'")(quoting *Johal v. Little Lady Foods, Inc.*, 2004 WL 1745749, at *14 (N.D. Ill. 2004)); s*ee also Cengr v. Fusibond Piping Sys., Inc.*, 135 F.3d 445, 453 (7th Cir. 1998)(finding that past raises and bonuses do not prove that an employee was meeting his employer's "legitimate expectations at the time of his discharge"). Thus, evidence of Wingo's prior performance at CB cannot establish that Wingo met CB's legitimate expectations unless Wingo can also show that he was meeting CB's expectations at the time of the adverse action.

In this case, CB has pointed to evidence that Wingo was not meeting its legitimate employment expectations at the time that his employment was terminated by CB. Specifically, CB has put forth evidence that Wingo was disciplined several times in the final six months of his employment at CB. The evidence put forth by CB indicates: (1) that on August 30, 2007, Wingo was issued "letters of counsel" for wasting time and talking on the job ("August 30 Incident"), (SF Par. 36), (2) that on October 4, 2007, Wingo was given a written warning for improperly labeling shipments ("October 4 Incident"), (SF Par. 37), (3) that on October 10, 2007, Wingo was issued a one-day suspension for a mistake involving a work order ("October 10 Incident"), (SF Par. 38), (4) that on November 8, 2007, Wingo was suspended for three days for "key punch errors," ("Key Punch Incident")(SF Par. 39), (5) that on November 30, 2007, Wingo was counseled for failing to follow instructions on a work order (SF Par. 41), and (6) that on December 3, 2007, Wingo was terminated for falsifying records, (SF Par. 49).

Wingo does not contest the fact that he received the above-stated discipline and, in many instances, he acknowledges some level of culpability for his errors. (RSF Par. 36-39, 41, 49). For example, Wingo does not dispute the contention that he was talking with another employee when he was disciplined for the August 30 Incident, and instead argues that the manner in which his supervisor chastised him for wasting time was inappropriate and that the younger employee with whom he was talking on the job received a lesser punishment. (RSF Par. 38). Wingo also does not dispute the fact that he mislabeled shipments during the October 4 Incident, and again argues only that another employee who made similar mistakes did not receive the same discipline. (RSF Par. 37). Wingo has also not disputed the fact that he failed to conduct a proper review of work orders before packing a shipment in the October 10 Incident. (RSF Par. 38). In the case of the October 10 Incident, Wingo merely argues that another employee was also to blame for the error in the work order and that the other employee was not disciplined as harshly. (RSF Par. 38.) Also, with respect to the Key Punch Incident, Wingo acknowledges in his complaint that he made the error. (Compl. Par. 15). Once again, without denying his own culpability Wingo takes issue with CB's discipline of him in response to the Key Punch Incident. (RSF Par. 39).

Finally, with respect to his work production logs, Wingo does not dispute the fact that he included work orders in the production logs that he did not complete on the specified shifts. (RSF Par. 46). The evidence submitted by CB indicates that Wingo's supervisors engaged in a review of his production logs and discovered (1)

9

that he had listed work orders that he did not complete and (2) that he had failed to indicate that such orders were incomplete. (SF Par. 45). CB has included, as an exhibit, copies of the production logs that CB alleges were improper. (SF Ex. U, V). Specifically, CB points out that Wingo's production logs included weights, piece counts, and completion times for work orders in a manner indicative of the fact that he was the employee that completed the orders. (SF Par. 46). Wingo has disputed CB's evidence as "misleading" and points to the fact that in his opinion, as well as the opinion of one of his co-workers, the notations that he made on the production logs were sufficient to indicate that he had not personally completed the orders. (RSF Par. 46). CB has offered evidence that Wingo's superiors reached the conclusion that Wingo had improperly documented his work orders in his production logs. (SF Par. 76). Wingo's superiors testified that no other employee had ever misrepresented their work in the same manner that Wingo did in November 2007. (SF Par. 76). Wingo has not offered evidence to refute CB's contention that Wingo's supervisors came to the conclusion that the manner in which he completed his production logs was improper. (RSF Par. 10).

In order to survive CB's motion for summary judgment, Wingo must show that he was satisfactorily performing his job, including adherence to CB's rules and regulations. *Jones v. Union Pac. R. Co.*, 302 F.3d 735, 741 (7th Cir. 2002). As indicated above, Wingo has not disputed the fact that he did not adhere to certain rules and regulations of CB in the last few months of his employment. Wingo instead takes issue with the extent of the discipline against him and alleges a

disparity between the discipline he received and the discipline received by younger employees. However, the court's role is not to second-guess the disciplinary decisions made by CB. *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997)(stating that courts do "not sit as a kind of 'super-personnel department' weighing the prudence of employment decisions made by firms charged with employment discrimination, [instead] we are concerned solely with whether the reason for which the defendant discharged the plaintiff was discriminatory"). In cases where "a plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited reason-a plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). As discussed further below, Wingo has not pointed to evidence that would permit a reasonable trier of fact to conclude that CB applied its employment expectations in a disparate fashion to similarly situated employees outside of Wingo's protected class. Thus, Wingo has failed to show that he was meeting CB's legitimate employment expectations at the time of his termination since it is undisputed that Wingo engaged in several rules violations in the months preceding his termination.

2. Similarly Situated Employees

CB also argues that Wingo has failed to satisfy the fourth element of the *prima facie* standard since he has not pointed to sufficient evidence to show that similarly situated employees outside of Wingo's protected class were treated more favorably.

In order to satisfy the similarly-situated element of the *prima facie* standard, a plaintiff "must demonstrate that there is someone directly comparable in all material respects." *Barricks v. Eli Lilly and Co.*, 481 F.3d 556, 559-60 (7th Cir. 2007)(stating that "[t]he 'similarly situated' test is a flexible, commonsense inquiry whose requirements vary from case to case" and that "[i]ts purpose is to determine whether there are enough common factors between a plaintiff and a comparator-and few enough confounding ones-to allow for a meaningful comparison in order to divine whether discrimination was at play"). In ADEA cases, a plaintiff "also can show that he was replaced by someone 'substantially younger'" *Denisi v. Dominick's Finer Foods, Inc.*, 99 F.3d 860, 864 (7th Cir. 1996). Wingo argues that there was both disparate treatment of similarly situated younger employees and that he was replaced by someone substantially younger.

### a. Alleged Disparate Treatment of Other Employees

Wingo argues that similarly situated substantially younger employees were not disciplined in the same way for engaging in similar conduct. In his brief opposing summary judgment Wingo relies on two specific employees whom he claims were given favorable treatment by CB. Wingo first points to Elutido Herrera ("Herrera"), a forty-three year old employee of CB whom Wingo alleges completed his production logs in the same manner as Wingo but who was never terminated by CB. (SAF Par. 116). Herrera is also the employee whom Wingo claims was equally responsible for the October 4 Incident. (SAF Par. 96). Wingo points to the fact that

Herrera was only given a "first-step" disciplinary action of an oral reprimand for the October 4 Incident and Wingo was given a more severe "second-step" disciplinary action of a written warning. (SAF Par. 96). However, Wingo's attempted comparison to Herrera is unavailing.

With respect to the October 4 Incident, CB has put forth undisputed evidence that there was a significant disparity in the preexisting disciplinary records of Wingo and Herrera at the time of the October 4 Incident. A factor the court must consider in comparing employees is whether such employees "had comparable experience, education, and other qualifications." *Salas w. Wisconsin Dept. of Corrections*, 493 F.3d 913, 923 (7th Cir. 2007). Prior disciplinary records are important indicators of whether employees have directly comparable qualifications. *See Greer v. Amesqua*, 212 F.3d 358, 370 (7th Cir. 2000)(considering the relative disciplinary records of the plaintiff and the comparable employee). CB has submitted evidence in the form of disciplinary records indicating that Wingo had previously received an oral warning for a similar offense on June 22, 2007. (SF Ex. O, P). In contrast, CB has submitted evidence that Herrera had no such prior verbal warning. (SF Ex. X). Wingo has not disputed the accuracy of these records. Wingo does point out that Herrera had received a prior verbal warning on July 10, 2007, but has not pointed to evidence that would indicate that Herrera's July 10, 2007 disciplinary action was related to work orders, and CB points out that Herrera's prior discipline was for the unrelated offense of failing to use his safety glasses. (SAF Par. 97); (R SAF Par. 97). Thus, Wingo has not pointed to sufficient evidence to indicate that Wingo and Herrera were

similarly situated with respect to the October 4 Incident since they had differing preexisting disciplinary records at the time.

Wingo also points to his own testimony indicating that he witnessed Herrera include incomplete orders on his production logs and that Herrera was never terminated for doing so. (SAF Par. 116). However, in advancing such an argument, Wingo ignores an important distinction between the act of including such incomplete orders and including such incomplete orders in a manner indicating that they were personally completed. Even if the court accepted as true Wingo's testimony that Herrera included incomplete work orders on his production logs as fact, Wingo has not pointed to evidence that Herrera also failed to note the work orders that were incomplete in his production logs. In fact, Wingo testified that he did not know for sure whether Herrera documented on the production logs that the orders were incomplete. (Wingo Dep. 214). Thus, Wingo has not shown that Herrera engaged in the same conduct as Wingo but was treated differently.

The second employee that Wingo points to as a similarly situated employee who was treated more favorably is Tyler DeMien ("DeMien"), a twenty-three year old employee who worked as a side load operator. (Ans. 10). Wingo first argues that DeMien was the primary employee responsible for the error in the October 5 Incident, and while Wingo was suspended for one day as a result of the October 5 Incident, DeMien received no discipline. (SAF Par. 96-97). Wingo further alleges that DeMien and another younger side load operator named Mike Perrone ("Perrone") engaged in what Wingo argues was more egregious conduct, including

leaving shifts early and stealing company time.  (SF Par. 117).  However, CB points

out that DeMien cannot be considered a similarly situated employee since DeMien

held a different position at CB than Wingo.  Specifically, Wingo does not dispute

that DeMien was a side load operator whose job was to deliver the materials to

employees in Wingo's position who assembled the orders.  (RSF Par. 9).  Wingo

testified that it was his responsibility to catch any mistakes made by side load

operators.  (Wingo Dep. 316).  As such, Wingo cannot rely on DeMien and/or

Perrone as similarly situated employees.  *Barricks*, 481 F.3d at 559-60 (stating that a

plaintiff "must demonstrate that there is someone directly comparable in all material

respects").  Furthermore, much of the improper conduct that Wingo alleges was

committed by DeMien and Perrone is conduct that CB never accused Wingo of

committing.  Thus, Wingo cannot rely on such conduct to show that DeMien and/or

Perrone were comparable employees who was treated differently.

In his brief opposing summary judgment, Wingo has also referenced the

actions of other employees at CB, without specifically arguing that these other

employees were similarly situated employees who were treated more favorably.

(Ans. 4-5).  Wingo has not offered evidence to show that these employees or any

other employees at CB were similarly situated employees who were treated more

favorably.

b. Replacement Employee

Wingo argues, in his opposition to summary judgment, that he was replaced

by a younger employee, which he claims would satisfy the fourth prong of the *prima facie* standard for ADEA cases. *Denisi*, 99 F.3d at 864. Wingo asserts that CB replaced him with Perrone who was thirty-four years old. In support of Wingo's position that Perrone replaced him, Wingo cites to the deposition of Randy Lunt ("Lunt"), the general foreman at CB. (SAF Par. 119). Lunt did not, however, testify that Perrone replaced Wingo, but rather that Wingo was not directly replaced and his position was covered by other warehousemen. (Lunt Dep. 127). Lunt testified that Wingo's position was initially covered by an employee named Mario Alvarez ("Alvarez"), who was forty-seven years old according to evidence submitted by Wingo. (Lunt Dep. 126); (SAF Ex. K). Lunt testified that employees were then switched around from work station to work station based on a bidding process which eventually resulted in Perrone, who was an existing employee, taking Wingo's position. (Lunt Dep. 127).

The evidence submitted by Wingo suggests that this case is akin to "mini-reduction-in-forces cases," where "the dismissed employee's duties are absorbed by another employee or employees rather than eliminated." *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 725 (7th Cir. 2008); *see also Collier v. Budd Co.*, 66 F.3d 886, 890 (7th Cir. 1995)(stating that in reduction in force cases jobs are consolidated or work is shifted onto existing employees, creating a situation in which "the discharged employee has not truly been replaced by anyone"). In mini-reduction-in-force cases, "the court applies a modified version of the fourth prong of the prima facie case" and "requires proof that the plaintiff's duties were absorbed by

employees not in the protected class." *Petts*, 534 F.3d at 725. The evidence relied upon by Wingo for the proposition that his job was absorbed by Perrone, who was a substantially younger employee, consists entirely of Lunt's testimony. (Lunt Dep. 126). However, as indicated above, Lunt testified that a number of employees absorbed Wingo's position, including Alvarez who was not substantially younger than Wingo. (Lunt Dep. 127); *see Roper v. Peabody Coal Co.*, 47 F.3d 925, 927 (7th Cir. 1995)(stating that "the disparity in age within the protected class must be sufficient to create a reasonable inference of age discrimination"); *see also Richter v. Hook-SupeRx, Inc.*, 142 F.3d 1024, 1029 (7th Cir. 1998)(finding that a seven year age disparity between ages fifty-two and forty-five was a "presumptively insubstantial gap"). Thus, Wingo has not set forth sufficient facts to show that he was replaced by a substantially younger employee.

Since Wingo has not pointed to sufficient evidence to show that a similarly situated substantially younger employee was treated more favorably, and he has not shown that he was replaced by a substantially younger employee, Wingo fails to satisfy the fourth prong of the *prima facie* standard. Therefore, Wingo has not shown that he was meeting CB's legitimate employment expectations or that similarly situated employees outside of Wingo's protected class were treated more favorably, Wingo has not established a *prima facie* case.

B. Legitimate Non-discriminatory Reason and Pretext

CB argues that even if Wingo had been able to establish a *prima facie* case,

CB has offered a legitimate non-discriminatory reason for Wingo's termination and Wingo has not presented evidence that CB's explanation was a pretext for unlawful discrimination. As discussed above, CB has put forth evidence, that has not been disputed by Wingo, that Wingo committed a series of work-related violations in the months preceding his termination. Since CB has put forth a legitimate and non-discriminatory reason for Wingo's termination, the burden shifts to Wingo to demonstrate that this proffered explanation is merely a pretext used to engage in unlawful age discrimination. *Hemsworth*, 467 F.3d at 492.

The Seventh Circuit has defined pretext as a "'dishonest explanation, a lie rather than an oddity or an error.'" *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 823 (7th Cir. 2006)(quoting *Kulumani v. Blue Cross Blue Shield Assn.*, 224 F.3d 681, 685 (7th Cir. 2000)); *see also Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004)(finding that "[p]retext is more than a mistake on the part of the employer; it is a phony excuse"). As discussed above, Wingo has admitted to making many of the mistakes for which he was disciplined in the last few months prior to the termination of his employment. (RSF Par. 36-41, 49). More importantly, Wingo has offered no evidence of animus towards Wingo based on his age.

To show pretext a plaintiff must prove, by direct or indirect evidence, that "'[(1)] the employer's non-discriminatory reason was dishonest; and [(2)] the employer's true reason was based on a discriminatory intent.'" *Brown v. Ill. Dep't of Natural Res.*, 499 F.3d 675, 683 (7th Cir. 2007)(quoting *Perez v. Illinois*, 488 F.3d 773, 777 (7th Cir. 2007)). Wingo has pointed to no evidence, direct or circumstantial

that would indicate that Lunt, who coincidently is roughly the same age as Wingo, held a bias against him on the basis of his age, when making the final decision to termination his employment. Wingo's only evidence of animus against him is his testimony that his supervisor cursed at him and accused him of "wasting time" following the August 30 Incident. (Ans. 4). However, CB correctly notes that the incident referred to by Wingo does not contain any indicia of age discrimination and, at most, suggests that there may have been a personality conflict between Wingo and his supervisor. *See Andre v. Bendix Corp.*, 774 F.2d 786,798 (7th Cir. 1985)(stating in a sex discrimination case "'conflict of personalities'" does not establish a claim)(quoting *Bellisssimo v. Westinghouse Electric Corp.*, 764 F.3d 175, 182 (3d Cir. 1985)).

Wingo also makes an argument that there is suspicious timing for the termination of his employment. (Ans. 13). The Seventh Circuit has indicated that suspicious timing alone cannot establish pretext. *Pugh v. City of Attica, Indiana*, 259 F.3d 619, 629 (7th Cir. 2007). Wingo fails to even present a theory about how his termination corresponds to some milestone with respect to his age that would indicate there is suspicious timing. Wingo also argues that CB's explanation for his termination is not worthy of credence. A plaintiff can also show pretext by showing that the employer's "proffered reason was not worthy of belief." *Sanchez v. Henderson*, 188 F.3d 740, 746 (7th Cir. 1999). Wingo also argues that the allegations against him are factually baseless. However, as discussed above, Wingo has not pointed to sufficient evidence that shows that the allegations against him are

factually baseless or that CB's reason for the employment action is not worthy of belief.

The final argument relied upon by Wingo to establish a pretext is his contention that CB has shifted its explanation for why it terminated Wingo. (Ans. 14). Wingo points to what he claims are inconsistencies in Lunt's testimony regarding the precise dates of the production logs which included false information. While Wingo is correct that shifting explanations for an employee's termination can be evidence of pretest, "'the explanations must actually be shifting and inconsistent to permit an inference of mendacity.'" *Schuster v. Lucent Techs., Inc.*, 337 F.3d 569, 577-78 (7th Cir. 2003). Beyond arguing, without citation, that Lunt has provided different dates of the improper production logs, Wingo has not provided evidence that CB's given explanation for the employment action against Wingo has changed. Wingo acknowledges that, at the outset, the stated reason for his termination was "falsifying company records/documents." (Compl. Par. 20). Wingo does not point to evidence that CB has put forth any other explanation for Wingo's termination.

Ultimately, Wingo relies only on his own speculation which is insufficient to support his contention that the disciplinary actions taken against him by CB were on the basis of his age. *See Hudson v. Wal-Mart Stores, Inc.*, 412 F.3d 781, 786 (2005)(stating that "a plaintiff's speculation is insufficient to establish pretext"). Therefore, even if Wingo were able to establish a *prima facie* case of discrimination, CB has pointed to a legitimate and non-discrimination explanation for his termination and Wingo has not put forth sufficient evidence that CB's reason is a

pretext for unlawful discrimination.  Therefore, we grant the motion for summary judgment.

## CONCLUSION

Based on the foregoing analysis, we grant CB's motion for summary judgment.


Samuel Der-Yeghiayan
United States District Court Judge


Dated:   October 23, 2008